## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

THOMAS STEVENS, 260 Hembree Road,
Roswell, GA 30075, Individually and On Behalf of
All Others Similarly Situated,

                           Plaintiff,

      vs.

INPHONIC, INC., DAVID A. STEINBERG, and
LAWRENCE S. WINKLER, 1010 Wisconsin Ave.,
N.W., Suite 600, Washington, D.C. 20007

                       Defendants.

Case: 1:07-cv-00930
Assigned To : Walton, Reggie B.
Assign. Date : 5/18/2007
Description: General Civil

CLASS ACTION COMPLAINT

**JURY TRIAL DEMANDED**

Plaintiff, Thomas Stevens ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding InPhonic, Inc. ("InPhonic" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.    This is a federal class action on behalf of purchasers of the common stock of InPhonic between August 2, 2006 and May 3, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    InPhonic, along with its subsidiaries, operates as an online seller of wireless services in the United States. It operates in three segments: Wireless Activation and Services, Mobile Virtual Network Enabler Services, and Data Services.

3.    On April 3, 2007, the Company, in a Form 8-K filed with the SEC, shocked investors when it revealed that its financial statements for the quarterly periods ended June 30, 2006 and September 20, 2006, and the Company's financial statements for the year-ended December 31, 2006 should no longer be relied upon as a result of "accounting irregularities." According to the Company, these "accounting irregularities" focused on the improper recognition of revenue from net activation and service revenues.  Further, the Company disclosed that its Audit Committee had determined that "a material weakness" existed in the Company's internal control over financial reporting.

4.    On this news, shares of the Company's stock fell 11.7 percent, or $1.21 per share, to close on April 3, 2007 at $9.15 per share, on unusually heavy trading volume.

5.    Then on May 4, 2007, the Company further clarified the seriousness of its accounting and internal control issues which would force the Company to restate its financial results.  The Company revealed that during fiscal-year 2006, it had misapplied Generally Accepted Accounting Principles ("GAAP") by recording $16 million in net activation and services revenues, $2.5 million in fees due from consumers when contracts were canceled or wireless devices were not returned to the Company, $4.9 million in accrued expenses and reserves for consumer product rebates, and $3 million in "other accounting adjustments." Additionally, the Company revealed that it had identified six (6) material weaknesses in its internal controls over financial reporting.  These material weaknesses were a result of the Company possessing inadequate controls, insufficient processes and procedures, and due to the

2

fact that the Company lacked a sufficient number of employees with appropriate levels of knowledge, expertise and training in the application of general GAAP rules.

6.     On this news, shares of the Company's stock fell an additional 7.5 percent, or $0.64 per share, to close on May 4, 2007 at $7.90 per share, on unusually heavy trading volume.

7.     The Complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being. Specifically, defendants failed to disclose or indicate the following: (1) that the Company's financial results were materially inflated; (2) that the Company prematurely recorded $16 million of net activation and service revenue; (3) that the Company improperly recognized revenue from fees due from customers when contracts were cancelled or devices were unreturned; (4) that the Company failed to accurately account for accrued expenses and reserves in connection with consumer product rebates; (5) that the Company's financial statements were not prepared in accordance with GAAP; (6) that the Company lacked adequate internal and financial controls; and (7) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

8.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to

3

Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

11.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  Additionally, InPhonic's principal place of business is located within this Judicial District.

12.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.    Plaintiff, Thomas Stevens, as set forth in the accompanying certification, incorporated by reference herein, purchased InPhonic's common stock at artificially inflated prices during the Class Period and has been damaged thereby.

14.    Defendant InPhonic is a Delaware corporation with its principal place of business located at 1010 Wisconsin Avenue, Suite 600, Washington DC.

15.    Defendant David A. Steinberg ("Steinberg") was, at all relevant times, the Company's Chief Executive Officer ("CEO"), and Chairman of the Board of Directors.

16.    Defendant Lawrence S. Winkler ("Winkler") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and Treasurer.

17.    Defendants Steinberg and Winkler are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of InPhonic's reports to the

4

SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

18.    InPhonic, along with its subsidiaries, operates as an online seller of wireless services in the United States. It operates in three segments: Wireless Activation and Services, Mobile Virtual Network Enabler Services, and Data Services. Prior to and throughout the Class Period, InPhonic represented to investors that it adhered to Generally Accepted Accounting Principles ("GAAP") and possessed sufficient internal controls over financial reporting.

### Materially False and Misleading
### Statements Issued During the Class Period

19.    The Class Period begins on August 2, 2006. On this day, the Company issued a press release entitled "InPhonic Announces Financial Results for Second Quarter 2006, Residual Subscriber Base Doubles to 336,000." Therein, the Company, in relevant part, stated:

> InPhonic, Inc. (NASDAQ:INPC), a leading online seller of wireless services and products, today reported financial results for second quarter ended June 30, 2006.

5

Revenue was $95.8 million for the second quarter 2006, compared to $75.2 million for the second quarter 2005. Loss from continuing operations for the second quarter 2006 was ($5.1) million or ($0.14) per basic and diluted share compared to a loss from continuing operations of ($1.2) million for the second quarter of 2005 or ($0.04) per basic and diluted share. Excluding the impact of restructuring costs and acquisition earn out expenses, loss from continuing operations would have been ($2.5) million or ($0.07) per basic and diluted share.

* * *

"We are pleased with the financial and operational results for the first half of the year." InPhonic CEO David A. Steinberg commented, "Our new management additions; Andy Zeinfeld, President of E-Commerce, and Brian Curran, Chief Operating Officer, and the existing team continue to impact their respective areas and we expect the combined efforts of InPhonic's expanded management team will have positive contributions to our financial and operational results over the second half of 2006."

Mr. Steinberg added, "We continued our migration to a recurring residual-based compensation model with the signing of two new distribution agreements and continue to believe that additional residual agreements may be completed before year end. Because the two new agreements are incremental to our business, there will be no impact to planned point-of-sales revenue. By quarter end, we had approximately 336,000 residual subscribers, more than double the 161,000 residual subscribers at the end of the first quarter of 2006. A growing residual income stream would improve our operating margins over time and provide better visibility into future financial results."

20.     On August 9, 2006, the Company filed its Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by the Individual Defendants, and reaffirmed the Company's financial results previously announced on August 2, 2006.

21.     The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by the Individual Defendants, which stated:

I, [David A. Steinberg / Lawrence S. Winkler], certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q for the period ended June 30, 2006 of InPhonic, Inc.;

6

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely

to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)  All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

* * *

I, [David A. Steinberg, Chairman and Chief Executive Officer (principal executive officer) / Lawrence S. Winkler, Chief Financial Officer, Executive Vice President and Treasurer (principal financial officer)] of InPhonic, Inc. (the "Registrant"), certify that to the best of my knowledge, based upon a review of the Quarterly Report on Form 10-Q for the period ended June 30, 2006 of the Registrant (the "Report"):

(1)  The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934, as amended; and

(2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant.

22.    On November 6, 2006, the Company issued a press release entitled "InPhonic Announces Financial Results for Third Quarter 2006." Therein, the Company, in relevant part, stated:

InPhonic, Inc. (NASDAQ:INPC), a leading online seller of wireless services and products, today reported financial results for the third quarter ended September 30, 2006. Additionally,

8

InPhonic has reached a settlement in principle with the District of Columbia Attorney General.

Revenue was $102.2 million for the third quarter 2006, compared to $92.0 million for the third quarter 2005. Loss from continuing operations for the third quarter 2006 was ($4.9) million or ($0.13) per basic and diluted share compared to a loss from continuing operations of ($4.4) million for the third quarter of 2005 or ($0.12) per basic and diluted share. Excluding the impact District of Columbia Attorney General Settlement and related expenses of $3.8 million, loss from continuing operations would have been ($1.0) million or ($0.03) per basic and diluted share.

Cash provided from operating activities was $13.8 million for the third quarter 2006, compared to a loss of ($6.3) million for third quarter 2005. Cash provided from operating activities was $6.0 million for the first nine months of 2006, compared to a loss of ($15.6) million for the first nine months of 2005. Cash and cash equivalents totaled $57.5 million at September 30, 2006.

* * *

"We are pleased with our progress in transitioning an increasing amount of InPhonic's business to a residual revenue model characterized by a predictable, high margin and transparent recurring revenue stream." InPhonic CEO David A. Steinberg commented, "Efforts to improve operational efficiency and our disciplined focus on sustainable growth delivered significant improvements in operating cash flow, solid revenue growth and continued margin expansion in the quarter."

23.    On November 9, 2006, InPhonic filed its Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by the Individual Defendants, and reaffirmed the Company's financial results previously announced on November 6, 2006. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 21, *supra*.

24.    On November 15, 2006, the Company issued a press release entitled "InPhonic Announces $30 Million Stock Buyback Program." Therein, the Company, in relevant part, stated:

InPhonic, Inc. (NASDAQ:INPC), a leading online seller of wireless services and products, today announced that its board of directors has approved a stock buyback program of its common stock.

Under the program, InPhonic is authorized to repurchase up to $30 million of outstanding shares of common stock from time to time, depending on market conditions, share price and other factors. Repurchases may be made in the open market or through private transactions, in accordance with SEC requirements. The share repurchase will be funded using the company's existing cash balance and future cash flows.

25.     On February 22, 2007, the Company issued a press release entitled "InPhonic Announces Financial Results for Fourth Quarter and Full Year 2006." Therein, the Company, in relevant part, stated:

InPhonic, Inc. (NASDAQ: INPC), a leading online seller of wireless services and products, today reported financial results for the fourth quarter and full year ended December 31, 2006.

"We are very pleased with our fourth quarter and full year results. In 2006, InPhonic made substantial progress in transitioning our business by putting in place residual-based compensation agreements with most of the major wireless carriers, improving our customer service experience and expanding our industry leading online distribution channel with high-quality partners such as Best Buy, Staples and Amazon," said InPhonic's Chairman and CEO David A. Steinberg. "For 2007, we are focused on continuing the strong operational momentum of this past year while maintaining strong revenue growth, further improving operating and contribution margins and generating sustainable positive operating cash flow."

* * *

Revenue was $405.7 million for the year ended December 31, 2006, compared to $320.5 million for the year ended December 31, 2005. Loss from continuing operations for the year ended December 31, 2006 was ($17.3) million or ($0.48) per basic and diluted share compared to a loss from continuing operations of ($37.8) million for the year ended December 31, 2005 or ($1.10) per basic and diluted share. Excluding the impact of rebate settlement and related expenses, settlement and earnout expenses and restructuring costs of $11.1 million, loss from continuing

operations for the full year of 2006 would have been $6.2 million or ($0.17) per basic and diluted share.

\* \* \*

During the fourth quarter of 2006, InPhonic generated positive cash flow of approximately $6.5 million from its operations. The Company also had changes in working capital reflecting purchases of inventory for the holiday selling season which utilized prompt pay discounts from its suppliers. We also experienced heavy activation volumes in the latter half of the fourth quarter, due to the holiday selling season, which increased accounts receivable that have subsequently converted to cash in the first quarter of 2007.

### Fifth Major Wireless Carrier Signs Up For Residual Compensation

InPhonic recently signed an agreement with another major wireless carrier that provides for monthly residual commission payments. This represents the fifth major wireless carrier to enter into a residual compensation agreement with InPhonic. In addition, InPhonic has residual compensation agreements with two MVNO partners, Virgin Wireless and Amp'd Mobile. "We continue to be successful in negotiating residual based compensation over the life of a subscriber in exchange for a reasonable concession in near-term activation revenue," commented InPhonic CFO Larry Winkler. "We are very pleased with the economics of these residual compensation agreements and believe they are providing increased visibility and value to the business."

InPhonic ended 2006 with approximately 660,000 residual revenue subscribers.

26.    The statements contained in ¶¶ 19 – 25 were materially false and misleading when made because Defendants failed to disclose or indicate the following: (1) that the Company's financial results were materially inflated; (2) that the Company prematurely recorded $16 million of net activation and service revenue; (3) that the Company improperly recognized revenue from fees due from customers when contracts were cancelled or devices were unreturned; (4) that the Company failed to accurately account for accrued expenses and reserves in connection with consumer product rebates; (5) that the Company's financial statements were not prepared in

accordance with GAAP; (6) that the Company lacked adequate internal and financial controls;

and (7) that, as a result of the foregoing, the Company's financial statements were materially

false and misleading at all relevant times.

## The Truth Begins to Emerge

27.     On April 3, 2007, InPhonic filed a Form 8-K with the SEC to report an

unscheduled material event.  Therein, the Company, in relevant part, revealed:

> On April 2, 2007, the Company's management and Audit
> Committee concluded that **the Company's unaudited financial
> statements for the quarterly periods ended June 30, 2006 and
> September 30, 2006 each as filed on Form 10-Q (the "2nd and
> 3rd Quarter Financials") as well as the unaudited financial
> results for the quarter and year-ended December 31, 2006
> included in the Company's earnings release issued on
> February 22, 2007 (the "Year End Results") should no longer
> be relied upon as a result of certain errors discovered
> subsequent to the issuance of the Year End Results.** At this time
> the Company has identified the matters set forth below which will
> require changes to the 2nd and 3rd Quarter Financials and
> unaudited Year End Results. Certain additional matters are also
> subject to review. The matters for which changes will be required
> are:
>
> **In 2006, the Company recorded net activation and services
> revenue as a change in its estimate of certain disputed carrier
> commissions which it had deemed collectible. The Company
> now believes that it was inappropriate to have recorded
> revenue associated with this matter until such collections are
> received.** If the Company is ultimately able to collect any of these
> disputed carrier commissions, the amount would be recorded as
> revenue at the time of collection. We have subsequently collected
> some of these receivables and recorded them as revenue.
>
> **The Company has also identified a deficiency in its process for
> recording certain fees due from consumers when contracts are
> canceled within specified time periods and the wireless device
> is not returned to the Company as is required under the
> contract with the customer ("EDPs").** The Company believes that
> revenue originally recorded as being earned under generally
> accepted accounting principles and the related accounts receivable
> amount should be reduced to be reflective of such historical
> experience. If the Company ultimately is able to collect on or sell

these pools of consumer receivables at a more favorable rate, a gain may be recorded at the time of such collection or sale, subject to the terms of the agreements. The Company has identified a third party marketplace for the sale of its EDP receivables and is actively marketing these assets.

**The Company expects to amend the previously filed Form 10-Qs for the 2nd and 3rd Quarter Financials with an aggregate impact of a reduction of revenue for the quarterly periods ended June 30, 2006 and September 30, 2006. The Company also anticipates revising the Year End Results.** The amendments to the prior period financial statements, including for our year-end results, for the above and certain other entries are one-time, non-cash charges that **the Company expects will increase its previously reported net loss for 2006 by a range from approximately $5 million to $7 million in the aggregate.** The foregoing is an estimate subject to change until the Company's accounting review and outside audit is complete. The reduction in revenue will have corresponding impacts to previously reported quarterly revenue and will result in increased net losses for each period.

**Additionally, the Company has identified three material weaknesses in its internal controls over financial reporting.** At the entity level, management identified a material weakness in its control environment because it lacked a sufficient number of employees with appropriate levels of knowledge, expertise and training in the application of generally accepted accounting principles in certain groups. At the transactional level, due to the lack of sufficient personnel, the Company was unable to properly perform certain accounting procedures in a timely manner relating to the recording of carrier commissions. Also, at the transactional level, the Company identified a material weakness in its process for recording revenue relating to EDPs. The Company will be required to provide an assessment of the effectiveness of the Company's internal control structure and procedures for financial reporting when it files its Annual Report on Form 10-K for the fiscal year ended December 31, 2006. Management has already taken action to remediate the material weaknesses described above based on an evaluation of the accounting staffing, systems, policies and procedures relating to revenue recognition, however, our efforts to remediate deficiencies surrounding the levels of our staffing may take some time to remediate over the next several quarters.

The Company intends to file its restated financial statements for the quarterly periods ended June 30, 2006 and September 30, 2006

together with its Annual Report on Form 10-K for the fiscal year ended December 31, 2006. [Emphasis added.]

28.    On this news, shares of the Company's stock fell $1.21 per share, or 11.7 percent, to close on April 3, 2007 at $9.15 per share, on unusually heavy trading volume.

29.    On April 6, the Company issued a press release entitled " InPhonic Receives NASDAQ Notice." Therein, the Company, in relevant part, stated:

> InPhonic, Inc. (NASDAQ: INPC - the "Company"), announced that the Company received, as expected, a NASDAQ Staff Determination letter on April 3, 2007, indicating that the Company is not in compliance with the NASDAQ continued listing requirements set forth in Marketplace Rule 4310(c)(14) because the Company has not yet filed its Form 10-K for the fiscal year-ended December 31, 2006. Marketplace Rule 4310(c)(14) requires the Company to file with NASDAQ copies of all reports filed or required to be filed with the U.S. Securities and Exchange Commission. The Company will appeal this determination and request a hearing before the NASDAQ Listing Qualifications Panel. The Company's appeal and hearing request will automatically stay the delisting of the Company's common stock at least until the hearing is held (generally within 30 to 45 days from the request for such hearing). The Company is committed and fully expects to regain compliance with all SEC filing requirements and all NASDAQ listing requirements, as soon as possible.

30.    Then on May 4, 2007, the Company filed a Form 8-K/A with the SEC to further clarify and expand on the Company's recent disclosures. Therein, the Company, in relevant part, stated:

> The following includes an update of the information first disclosed in the Company's Form 8-K dated April 2, 2007.
>
> The Company's Audit Committee has conducted additional review using the services of independent counsel and other experts with respect to the matters identified below. **It is the conclusion of the Audit Committee that these matters resulted from misapplication of GAAP; improperly recognized revenue and improperly deferred expenses; inadequate controls and insufficient processes, procedures and expertise. In response, the Company is currently developing and implementing a**

remediation plan, which will include a reorganization of the finance and accounting functions within the Company.

### Fiscal Year 2006

On April 2, 2007, the Company's management and Audit Committee concluded that the Company's unaudited financial statements for the quarterly periods ended June 30, 2006 and September 30, 2006 each as filed on Form 10-Q (the "2nd and 3rd Quarter Financials") as well as the unaudited financial results for the quarter and year-ended December 31, 2006 included in the Company's earnings release issued on February 22, 2007 (the "Year End Results") **should no longer be relied upon as a result of certain errors discovered** subsequent to the issuance of the Year End Results. At this time the Company has identified the matters set forth below which will require changes to the 2nd and 3rd Quarter Financials and unaudited Year End Results. Certain additional matters are also subject to an ongoing review. The matters for which changes will be required are:

**In 2006, the Company recorded net activation and services revenue of approximately $16 million related to certain carrier commissions and bonuses which it had deemed collectible. The Company now believes that it was inappropriate to have recorded revenue associated with these matters** until such collections are received. The Company will continue its efforts to collect amounts outstanding and will record related receipts as revenue at the time of collection.

**The Company has identified a deficiency in its process for recording certain fees due from consumers when contracts are canceled within specified time periods or the wireless device is not returned to the Company** as is required under the contract with the customer ("Equipment Discount Provisions" or "EDPs"). **The Company believes that $2.5 million in revenue originally recorded as being earned and the related accounts receivable amount should be reduced** to be reflective of such historical experience without regard to improvements in collections expected in the future from additional collection processes being employed. If the Company ultimately is able to collect on or sell these pools of consumer receivables at a more favorable rate, a gain may be recorded at the time of such collection or sale, subject to the terms of the agreements. The Company has identified a third party marketplace for the sale of its EDP receivables and is actively marketing these assets.

**The Company has identified an error in the recording of accrued expenses and reserves for consumer product rebates totaling $4.9 million.** These amounts should have been recorded as either an expense or reduction to equipment revenue in 2006. The Company believes that $3.3 million of the total adjustment is related to additional expenses for rebates paid to consumers as "goodwill" prior to its settlement with the Attorney General of the District of Columbia.

**The Company has identified other accounting adjustments of approximately $3 million,** net, related to the correction of certain equipment expenses, sales and marketing expenses, and general and administrative expenses associated with accruals of professional fees, unbilled inventory, the write-off of certain assets on the balance sheet, and other adjustments.

The Company expects to amend the previously filed Form 10-Qs for the 2nd and 3rd Quarter Financials and the Year End Results with an aggregate impact greater than anticipated at the time of the Company's original April 2, 2007 Form 8-K filing. The Company currently expects that it will increase its previously reported net loss to reflect an aggregate net loss of approximately $43 million to $49 million for the year. A portion of these adjustments should be mitigated by dollars that have already been reserved. The foregoing continues to be an estimate and is subject to change until the Company's outside audit is complete. In addition, given the adjustments and errors identified to date as described above and the ongoing audit of 2006, the Company's management and Audit Committee have concluded that the unaudited financial statements for the quarter ended March 31, 2006 should no longer be relied upon. At the present time, no matters have come to the Company's attention that would result in a restatement of the March 31, 2006 financial statements. The Company expects to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2006 within two to three weeks. The Company will file its restated financial statements for the quarterly periods ended June 30, 2006, and September 30, 2006, as well as its Form 10-Q for the first quarter of 2007 together with the filing of the Annual Report on Form 10-K.

**Additionally, the Company has identified six material weaknesses in its internal controls over financial reporting.** At the entity level, management identified a material weakness in its control environment because **it lacked a sufficient number of employees with appropriate levels of knowledge, expertise and training in the application of generally accepted accounting principles in certain groups.** At the transactional level, due to the

lack of sufficient personnel, the Company was unable to properly perform certain accounting procedures in a timely manner relating to the recording of carrier commissions. Additionally, the Company inappropriately recorded receivables from the carriers that were not supported by historical experience. Also, the Company identified a material weakness in its process for recording revenue relating to EDPs as well as a material weakness due to a failure within the Company to effectively communicate information to its finance department necessary to record certain marketing expenses on a timely basis. Finally, the Company did not utilize an appropriate methodology for recording consumer product rebates. The Company will be required to provide an assessment of the effectiveness of the Company's internal control structure and procedures for financial reporting when it files its Annual Report on Form 10-K for the fiscal year ended December 31, 2006. Management has already taken some action to remediate the material weaknesses described above based on an evaluation of the accounting staffing, systems, policies and procedures relating to revenue recognition, however, our efforts to remediate deficiencies surrounding the levels of our staffing and related levels of expertise may take some time to remediate over the next several quarters.

**Fiscal Year 2005**

**In addition to the 2006 issues discussed above, the Company has identified an error regarding a marketing expense of approximately $1.2 million that should have been recorded in the quarter and year ended December 31, 2005.** Of such amount, $600,000 was recorded in the quarter ended December 31, 2006. If it had been properly recorded, such additional expense would have increased the Company's net loss for the quarter ended December 31, 2005 from approximately $24.8 million to approximately $26.0 million. As a result of this new disclosure, on May 1, 2007, the Company's management and Audit Committee concluded that the Company's audited financial statements for the fiscal year ended December 31, 2005 should no longer be relied upon. The Company and the Audit Committee are continuing their review and have not yet determined whether a restatement of financial results for the year ended December 31, 2005 will be required. As a result of its review the Company may discover additional errors to its previously filed financial statements. [Emphasis added.]

31.    On the release of this news, shares of the Company's stock fell an additional 7.5 percent, or $0.64 per share, to close on April 4, 2007 at $7.90 per share, on unusually heavy

trading volume.

## INPHONIC'S VIOLATION OF GAAP RULES
## IN ITS FINANCIAL STATEMENTS
## FILED WITH THE SEC

32.    These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for, and disclosure about its revenues, in violation of GAAP rules.

33.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

34.    Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

       (a)    The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

       (b)    The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in

making rational investment, credit, and similar decisions" was violated
(FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that "financial reporting should provide information about
the economic resources of an enterprise, the claims to those resources, and
effects of transactions, events, and circumstances that change resources
and claims to those resources" was violated (FASB Statement of Concepts
No. 1, ¶40);

(d)    The principle that "financial reporting should provide information about
an enterprise's financial performance during a period" was violated (FASB
Statement of Concepts No. 1, ¶42);

(e)    The principle that "financial reporting should provide information about
how management of an enterprise has discharged its stewardship
responsibility to owners (stockholders) for the use of enterprise resources
entrusted to it" was violated (FASB Statement of Concepts No. 1, ¶50);

(f)    The principle that "financial reporting should be reliable in that it
represents what it purports to represent" was violated (FASB Statement of
Concepts No. 2, ¶¶ 58-59);

(g)    The principle that "completeness, meaning that nothing is left out of the
information that may be necessary to insure that it validly represents
underlying events and conditions" was violated (FASB Statement of
Concepts No. 2, ¶79); and

(h)    The principle that "conservatism be used as a prudent reaction to
uncertainty to try to ensure that uncertainties and risks inherent in business

situations are adequately considered" was violated (FASB Statement of Concepts No. 2, ¶95).

35.    The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

36.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased InPhonic's common stock between August 2, 2006 and May 3, 2007, inclusive (the "Class Period") and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

37.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, InPhonic's common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by InPhonic or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

38.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of

federal law that is complained of herein.

39.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

40.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        (a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

        (b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of InPhonic; and

        (c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

41.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

42.    The market for InPhonic's common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, InPhonic's common stock traded at artificially inflated prices during the Class Period.

Plaintiff and other members of the Class purchased or otherwise acquired InPhonic's common stock relying upon the integrity of the market price of InPhonic's common stock and market information relating to InPhonic, and have been damaged thereby.

43.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of InPhonic's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

44.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about InPhonic's financial well-being. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of InPhonic and its financial well-being, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

45.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

46.    During the Class Period, Plaintiff and the Class purchased common stock of InPhonic at artificially inflated prices and were damaged thereby.  The price of InPhonic's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

47.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding InPhonic their control over, and/or receipt and/or modification of InPhonic's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning InPhonic, participated in the fraudulent scheme alleged herein.

48.    Also, during the Class Period, and with the Company's stock trading at artificially inflated prices, Company insiders were able to sell 836,440 shares of Company stock for gross proceeds of $9,067,540, including over $6.8 million in gross proceeds received by the Individual Defendants.  This inside trading is evidenced by the following chart:

| Date of Trade | Inside Trader | Number of Shares | Price per Share | Gross Proceeds |
|---|---|---|---|---|
| February 28, 2007 | BRIND IRA | 1,403 | $13.64 | $19,136 |
| February 27, 2007 | WINKLER LAWRENCE | 4,872 | $12.79 | $62,312 |



| February 27, 2007 | SCULLEY JOHN | 5,165 | $12.08 | $62,393 |
|---|---|---|---|---|
| February 2, 2007 | SCULLEY JOHN | 12,300 | $14.00 | $172,200 |
| February 1, 2007 | SCULLEY JOHN | 12,700 | $14.00 - $14.10 | $178,000 |
| January 24, 2007 | SCULLEY JOHN | 25,000 | $13.00 - $13.03 | $325,000 |
| January 3, 2007 | WINKLER LAWRENCE | 100,000 | $10.74 | $1,074,000 |
| December 4, 2006 | SCULLEY JOHN | 25,000 | $12.00 - $12.04 | $301,000 |
| November 21, 2006 | SCULLEY JOHN | 50,000 | $11.60 - $11.75 | $584,000 |
| November 7, 2006 | STEINBERG DAVID | 450,000 | $10.45 | $4,702,500 |
| November 7, 2006 | WINKLER LAWRENCE | 100,000 | $10.45 | $1,044,999 |
| November 7, 2006 | SCULLEY JOHN | 50,000 | $10.65 - $11.01 | $542,000 |
| | **TOTAL:** | **836,440 Shares** | | **$9,067,540 Gross Proceeds** |

## Applicability of Presumption of Reliance:
## Fraud On The Market Doctrine

49.    At all relevant times, the market for InPhonic's common stock was an efficient market for the following reasons, among others:

(a)    InPhonic's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, InPhonic filed periodic public reports with the SEC and the NASDAQ;

(c)    InPhonic regularly communicated with public investors <u>via</u> established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    InPhonic was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

50.    As a result of the foregoing, the market for InPhonic's common stock promptly digested current information regarding InPhonic from all publicly-available sources and reflected such information in InPhonic's stock price. Under these circumstances, all purchasers of InPhonic's common stock during the Class Period suffered similar injury through their purchase of InPhonic's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

51.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of InPhonic who knew that those statements were false when made.

## FIRST CLAIM
### Violation of Section 10(b) of

## The Exchange Act and Rule 10b-5
## Promulgated Thereunder Against All Defendants

52.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

53.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase InPhonic's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

54.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for InPhonic's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.     All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

55.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about InPhonic's financial well-being, business relationships, and prospects, as specified herein.

56.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to assure investors of InPhonic's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about InPhonic and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of InPhonic's common stock during the Class Period.

57.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

58.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such

defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing InPhonic's financial well-being, business relationships, and prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being, throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

59.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of InPhonic's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of InPhonic's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired InPhonic's common stock during the Class Period at artificially high prices and were damaged thereby.

60.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that InPhonic was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their InPhonic common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at

the artificially inflated prices which they paid.

61.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

62.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

63.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

64.    The Individual Defendants acted as controlling persons of InPhonic within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

65.    In particular, each of these defendants had direct and supervisory involvement in

29

the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

66.    As set forth above, InPhonic and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: May 18, 2007

Respectfully submitted,

By:

Steven J. Toll (D.C. Bar No. 225623)
Daniel S. Sommers (D.C. Bar No. 416549)
**COHEN, MILSTEIN HAUSFELD**
**& TOLL, P.L.L.C.**
1100 New York Ave., N.W.
West Tower, Suite 500
Washington, D.C. 20005
(202) 408-4600
(202) 408-4699 (fax)

**SCHIFFRIN BARROWAY**
**TOPAZ & KESSLER, LLP**
Richard A. Maniskas
D. Seamus Kaskela
280 King of Prussia Rd.
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)

**Attorneys for Plaintiff**

31

## CERTIFICATION

I, (print name) *THOMAS A. STEVENS* ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

    1.    Plaintiff has reviewed the Complaint, authorizes its filing, and retains Schiffrin Barroway Topaz & Kessler, LLP and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

    2.    Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

    3.    Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

    4.    Plaintiff's purchase and sale transaction(s) in the InPhonic, Inc. (Nasdaq: INPC) security that is the subject of this action during the Class Period is/are as follows :

| Type of Security (common stock, preferred, option, or bond) | Number of Shares | Bought (B) | Sold (S) | Date | Price per share |
|---|---|---|---|---|---|
| COMMON STOCK | 200 | B | | 3/9/07 | 11.70 |
| COMMON STOCK | 200 | | S | 5/4/07 | 7.57 |
| | | | | | |
| | | | | | |

(Please list additional purchase and sale information on a separate sheet of paper, if necessary)

    5.    Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

    6.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as described below:_____.

    7.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14 day of *MAY*, 2007.

_____
Signature

_____
*THOMAS A. STEVENS*
Print Name

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Thomas Stevens, 260 Hembree Road, Roswell, GA 30075 | Inphonic, Inc., David A. Steinberg and Lawrence S. Winkler, 1010 Wisconsin Ave., N.W., Washington, D.C. 20007 |

| | |
|---|---|
| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF        Fulton<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)<br>Steven J. Toll, Daniel S. Sommers<br>Cohen, Milstein, Hausfeld & Toll P.L.L.C.<br>1100 New York Ave., N.W., West Tower Suite 500<br>Washington, D.C. 20005, (202) 408-4600<br><br>Richard A. Maniskas, D. Seamus Kaskela<br>Schiffrin Barroway Topaz & Kessler, LLP<br>280 King of Prussia Road, Radnor, PA 19087, (610) 667-7706 | ATTORNEYS (IF KNOWN) |

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ● 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE an x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. Antitrust | ○ B. Personal Injury/ Malpractice | ○ C. Administrative Agency Review | ○ D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ● E. General Civil (Other) | OR | ○ F. Pro Se General Civil |
|---|---|---|

| Real Property<br>☐210 Land Condemnation<br>☐220 Foreclosure<br>☐230 Rent, Lease & Ejectment<br>☐240 Torts to Land<br>☐245 Tort Product Liability<br>☐290 All Other Real Property<br><br>Personal Property<br>☐370 Other Fraud<br>☐371 Truth in Lending<br>☐380 Other Personal Property Damage<br>☐385 Property Damage Product Liability | Bankruptcy<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>Prisoner Petitions<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>Property Rights<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>Federal Tax Suits<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | Forfeiture/Penalty<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>Other Statutes<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☒ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. Sections 78j(b) and 78t(a)), and Rule 10b-5

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ☒ ACTION UNDER F.R.C.P. 23 | **DEMAND $** _____ **JURY DEMAND:** | Check YES only if demanded in complaint YES ☒ NO ☐ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☒  NO ☐  If yes, please complete related case form.

DATE May 18, 2007    SIGNATURE OF ATTORNEY OF RECORD _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.