# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| | ) CIVIL ACTION NO. 1:07-cv-00930 |
| | ) |
| | ) FIRST AMENDED CLASS ACTION |
| | ) COMPLAINT |
| | ) |
| IN RE INPHONIC, INC. | ) JURY TRIAL DEMANDED |
| SECURITIES LITIGATION | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## FIRST AMENDED CLASS ACTION COMPLAINT

**COHEN, MILSTEIN, HAUSFELD
  & TOLL, P.L.L.C**
**Steven J. Toll (D.C. Bar No. 225623)**
**Andrew N. Friedman (D.C. Bar No. 375595)**
**Elizabeth S. Finberg (D.C. Bar No. 468555)**
**1100 New York Avenue, N.W.**
**West Tower, Suite 500**
**Washington, D.C. 20005**
**Tel:  (202) 408-4600**
**Fax: (202) 408-4699**

*Lead Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page**

I.      NATURE OF THE ACTION ............................................................................. 2

II.     JURISDICTION AND VENUE ....................................................................... 5

III.    PARTIES ......................................................................................................... 6

    A.      Lead Plaintiff ........................................................................................ 6

    B.      Defendants ............................................................................................ 6

    C.      Related Non-Party................................................................................. 7

IV.     DEFENDANTS' FRAUDULENT SCHEME AND CONDUCT ...................... 8

    A.      Prematurely-Recorded Revenue .......................................................... 9

    B.      Inflated Equipment Revenue............................................................... 11

    C.      Uncollectible Disputed Carrier Commissions .................................... 12

    D.      Expenses and Reserves for Rebates.................................................... 12

    E.      Internal Control Deficiencies.............................................................. 13

    F.      False reporting of a Brightstar investment in and definitive agreement with InPhonic. ........................................................................................ 15

V.      MATERIALLY FALSE AND MISLEADING STATEMENTS.................... 16

    A.      First Quarter 2006 Revenue and Earnings Reports............................. 16

    B.      Second Quarter 2006 Revenue and Earnings Reports ........................ 24

    C.      Third Quarter 2006 Revenue and Earnings Reports ........................... 33

    D.      Fourth Quarter 2006 Revenue and Earnings Reports ......................... 45

    E.      The Truth Begins to Emerge ............................................................... 53

    F.      The Restatement.................................................................................. 60

    G.      Continued False and Misleading Statements in the Wake of the Restatement......................................................................................... 61

VI.     DEFENDANTS' VIOLATION OF GAAP RULES ...................................... 70

VII.    LOSS CAUSATION....................................................................................... 75

VIII.   ADDITIONAL SCIENTER ALLEGATIONS............................................... 78

    A.      Defendant Steinberg........................................................................... 81

    B.      Defendant Winkler.............................................................................. 84

    C.      Collective Insider Trading .................................................................. 89

IX.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE .................................................................................. 91

X.      NO SAFE HARBOR ...................................................................................... 92

XI.     PLAINTIFF'S CLASS ACTION ALLEGATIONS ...................................... 93

## TABLE OF CONTENTS

**Page**

XII.   FIRST CLAIM ................................................................................................... 94

XIII.  SECOND CLAIM ............................................................................................... 98

XIV.   PRAYER FOR RELIEF ..................................................................................... 99

Lead Plaintiff, Rodney Caspersen, on behalf of himself and all others similarly situated, alleges the following based upon the investigation by Lead Counsel, which included, among other things, a review of United States Securities and Exchange Commission ("SEC") filings, wire and press releases and other public documents published by and regarding InPhonic, Inc. ("InPhonic" or the "Company"), conference calls and announcements made by Defendants, securities analysts' reports and advisories about the Company, interviews with former employees of InPhonic, and information readily available on the Internet.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     This is a federal class action on behalf of purchasers of the common stock of InPhonic between May 8, 2006 and October 11, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     At all times relevant to this case, InPhonic, along with its subsidiaries, operated as an online seller of wireless services in the United States.

3.     During the Class Period, InPhonic's stock price reached a high of $14.36 per share as a direct result of a deliberate and/or reckless scheme by Defendant David Steinberg and Defendant Larry Winkler (collectively, "Defendants") to improperly inflate InPhonic's stock price by over-reporting the Company's revenues, under-reporting expenses and falsely assuring investors that the Company maintained adequate internal controls to ensure the accuracy of its financial results.

4.     Specifically, in early 2006, Defendants knowingly and recklessly began to improperly record and report overstated revenues and understated expenses related to wireless

activations and equipment and consumer rebates to make InPhonic appear more profitable than it actually was. Each quarter in 2006, Defendants falsely reported that the Company had exceeded revenue and earnings targets and was thriving from a new residual revenue program initiated in early 2006. Defendants also rejected thousands of legitimate rebate requests to boost reported gross margins and to manipulate reported equipment costs.

5.     Ultimately, the breadth and scope of the securities fraud Defendants and the Company perpetrated became too great to conceal. InPhonic was forced to restate its financial results for all of 2006 (hereinafter, the "Restatement"). On April 3, 2007, the Company shocked investors by disclosing that its publicly-released financial statements for the quarterly-periods ended June 30, 2006 and September 20, 2006, and quarter and year-ended December 31, 2006, could no longer be relied upon as a result of "accounting irregularities." The Company initially disclosed that its "accounting irregularities" focused on the improper recognition of revenue from net activation and service revenues. The Company further disclosed that its Audit Committee had determined that "three material weaknesses" existed in the Company's internal control over financial reporting.

6.     On this news, shares of the Company's stock fell 11.7%, or $1.21 per share, as a direct result of this partial disclosure, closing on April 3, 2007 at $9.15 per share, on unusually heavy trading volume.

7.     Then on May 4, 2007, the Company further disclosed that its accounting and internal control deficiencies were more widespread and serious than had been previously disclosed. Defendants revealed at that time that the Company would restate its financial results for all of 2006. At that time, Defendants also disclosed that identified material weaknesses in InPhonic's internal controls over financial reporting had doubled from three to six. Defendants

further revealed that during fiscal-year 2006, they had misapplied Generally Accepted Accounting Principles ("GAAP") and that more than $18 million of InPhonic's total revenue reported during the Class Period was overstated. Defendants also disclosed that they had failed to report properly almost $8 million related to equipment, sales, marketing and other rebate expenses and reserves.

8.      On this news, shares of the Company's stock fell an additional 7.5 %, or $0.64 per share,  closing on May 4, 2007 at $7.90 per share, on unusually heavy trading volume.

9.      Ultimately, on June 1, 2007, the Company did restate all of its publicly disseminated financial results for 2006 and assured investors that the Company had already begun to remediate the severe internal control deficiencies that led to the Restatement.  The Company further disclosed that it had already seen a "substantial improvement" in its collections process with carriers and that it was "well underway of making up for where it had been."

10.      On this news, shares of InPhonic soared, closing at $9.50 per share on June 1, 2007 -- up from a close of $8.76 per share the prior day, on heavy trading volume.

11.      Despite actual knowledge or in reckless indifference of Company's dire financial condition, as partially revealed on the April 3, 2007, and May 4, 2007 and in its restated 2006 financial results, Defendants continued to falsely reassure investors that the Company would right its financial and operational woes.  In a press release filed with the SEC on August 9, 2007, Defendants reported that InPhonic had signed a letter of intent to enter into a "strategic alliance" and agreement with Brightstar Corporation ("Brightstar"), under which Brightstar had allegedly agreed to acquire InPhonic's distribution, inventory and fulfillment assets.  It was also reported that Brightstar had made an "immediate" investment of $5 million in InPhonic, which was part of the Company's new strategy to focus its goals on increasing cash flow and liquidity.

12.     The market reacted favorably to the Brightstar announcement.  InPhonic's shares closed at $4.86 on August 9, 2007 – a 21% increase over the prior day's close.

13.     However, on August 10, 2007 the Company amended (for the second time) its April 3, 2007 announcement that the Company's quarterly and year-end reported financial results should not be relied upon and provided additional details concerning its improper accounting practices and reasons why previously-recorded revenue was uncollectible and should not have been recorded in fiscal 2006.

14.     On this news, shares of the Company's stock declined dramatically to close at $3.50 per share – a decline of $1.36 or roughly 28% from the prior day on extremely heavy trading volume.

15.     Then, on September 5, 2007, Defendants announced that the Company had signed a "definitive agreement" with Brightstar. According to this announcement, the agreement obligated Brightstar to, among other things, (1) further invest $5 million in equity in InPhonic and thereby acquire 2.5% of InPhonic's outstanding shares, and (2) "acquire the distribution, inventory and fulfillment of assets of InPhonic."

16.     Just over a month later, on October 11, 2007, the Defendants issued a press release in which they did an abrupt "about-face" and characterized the previously reported "definitive agreement" with Brightstar as a "proposal" that had been "terminated."  The October 11, 2007 Press Release also revealed that Brightstar's "immediate" $5 million investment in InPhonic, which Defendants had reported took place on August 9, 2007 never occurred, but was instead the subject of a Stock Purchase Agreement dated August 9, 2007, which had also been terminated.

17.    On this news, InPhonic share price dropped dramatically, from $1.94 to a mere $.77 by the close of trading on October 11, 2007.

18.    Less than one month later, on November 8, 2007, InPhonic filed for bankruptcy protection and announced that its outstanding shares had **no value**.  The Company's common stock is now worthless, and investors have lost millions of dollars.

19.    While InPhonic's stock price was inflated during the Class Period, InPhonic insiders unloaded their shares of Company stock on an unsuspecting public that -- unlike Defendants -- did not realize that the stock price was artificially inflated.  Defendants and other insiders reaped more than $38 million in proceeds from selling InPhonic stock during the Class Period.

20.    As a result of Defendants' fraudulent acts and omissions, and the consequential decline in the market value of the Company's common stock upon disclosure of Defendants' fraud, Lead Plaintiff and other Class Members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

21.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

22.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

23.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  Additionally, InPhonic's principal place of business is located within this Judicial District.

24.    In connection with the acts, conduct and other wrongs alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

### III.    PARTIES

#### A.    Lead Plaintiff

25.    Lead Plaintiff, Rodney Caspersen, purchased InPhonic's common stock at artificially-inflated prices during the Class Period and has been damaged thereby. His certification is attached hereto as Exhibit A and incorporated by reference herein

#### B.    Defendants

26.    Defendant David A. Steinberg ("Steinberg") was, at all relevant times, the Company's CEO and Chairman of the Board of Directors.  On September 21, 2007, InPhonic announced that Steinberg was stepping down from his position as CEO, but would remain Chairman of the Company's Board of Directors.  Steinberg knowingly and/or recklessly certified InPhonic's false and misleading financial results and internal controls for each of the first three quarters of 2006 in violation of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") and Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

27.    Defendant Lawrence S. Winkler ("Winkler") was, at all relevant times, the Company's CFO and Treasurer.  On June 1, 2007, InPhonic announced that Winkler had resigned "for personal reasons" effective May 31, 2007.  Winkler knowingly and/or recklessly certified InPhonic's false and misleading financial results and internal controls for each of the first three quarters of 2006 in violation of Sarbanes-Oxley and in violation of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") and Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

28.    The Defendants, because of their positions with the Company, possessed the power and authority to control and did control the contents of InPhonic's reports to the SEC, press releases, presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, each of the Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  The Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Defendants and others acting at their direction.

**C.    Related Non-Party**

29.    InPhonic is a Delaware corporation with its principal place of business located at 1010 Wisconsin Avenue, Suite 600, Washington D.C.  In the wake of its 2004 IPO, InPhonic grew tremendously and had a market capitalization of more than $999 million in 2005.  During the Class Period, InPhonic reported that it had over 35 million shares of stock outstanding and over $400 million in annual revenue.  It is now clear that the Company's incredible growth was fueled by financial statements that were deliberately and/or recklessly overstated, as well as by other fraudulent public statements and practices, which had the effect of presenting InPhonic as a highly profitable company, when in fact Defendants were manipulating InPhonic's reported revenues and gross margins and artificially inflating the price of the Company's stock for their own personal benefit.  On November 8, 2007, InPhonic filed for bankruptcy protection and therefore is not named as a defendant, pursuant to the automatic stay provisions of Chapter 11,

Section 362(a) of the United States Bankruptcy Code.  But for its bankruptcy filing, InPhonic would be named as a defendant in this Amended Complaint.

### IV.    DEFENDANTS' FRAUDULENT SCHEME AND CONDUCT

30.    InPhonic commenced operations in October 1999, during the rapid rise and unprecedented growth of the Internet sector and related dot-com businesses. The Company provided a variety of wireless-related services, which at various times were divided into segments referred to as Wireless Activation and Services, Mobile Virtual Network Enabler Services, and Data Services.  InPhonic's Wireless Activation and Services division, which included the online sale of wireless service plans and equipment, comprised 96% of the Company's business.  The Company's signature business operated as an on-line cell phone store known as "Wirefly.com" and offered cellular telephones and service plans from national wireless companies, including Verizon Wireless, T-Mobile, AT&T, Sprint, Nextel and Alltel.  Offering deep discounts on cell phones, InPhonic's Wirefly.com became the Internet's leading seller of cell phones and wireless plans.

31.    Operating proprietary websites such as Wirefly.com, as well as private-labeled websites for third parties, InPhonic began selling wireless services and devices online.  Fostered by the significant growth in the use of wireless communications, InPhonic's revenues were generated primarily from commissions the Company earned from wireless carriers for the activation of new customer accounts.  InPhonic sold phones and service plans for all of the major wireless carriers and held itself out as the leading online seller of wireless services and products.

32.    InPhonic's business was driven by carrier commissions, which basically consisted of a finder's fee from wireless carriers for signing up new customers.  InPhonic also served as a behind-the-scenes operation that completed activations and cellular telephone shipments to

customers for Web companies like Yahoo! and AOL, who offered cell phones under their own brands.

33.    During the Class Period, in stark contrast to Defendants' public claims of unfettered growth in customers and revenue based upon wireless activations, carrier commissions and residual payments, Defendants deliberately and/or recklessly overstated InPhonic's revenue and profits and hid the true nature of the Company's financial condition. Booking revenue up front before it actually was collected, Defendants publicly claimed that they accurately estimated and deferred revenue and accrued reserves for expenses relating to deactivations by customers through a tight system of internal controls.  In reality the Company's internal controls were materially flawed and/or non-existent, and Defendants' public claims of strict GAAP adherence were blatantly false as Defendants knowingly and/or recklessly: (1) prematurely recorded millions of dollars in net activation and service revenue; (2) inflated equipment revenue by improperly recognizing revenue from fees due from customers who deactivated wireless service or did not return wireless devices; (3) improperly booked uncollectible disputed carrier commissions; and (4) improperly denied consumer rebates and failed to account accurately for accrued expenses and reserves in connection with the rebates.  In addition, Defendants knowingly and recklessly concealed the fact that InPhonic's internal control systems were seriously deficient and that InPhonic's accounting personnel were not trained to process basic accounting to record InPhonic's receivables from wireless activation and services and equipment revenue.

A.    **Prematurely-Recorded Revenue**

34.    During fiscal 2006, Defendants deliberately and/or recklessly prematurely recorded $34.8 million of net activation and service revenue in violation of GAAP.  The Company publicly stated in its SEC filings that revenue in the form of carrier commissions from

wireless subscriber activations was recognized when wireless devices were activated and shipped to customers.  But Defendants also reported that revenue from carrier commissions was reduced for estimated deactivations within certain amounts of time, such as 180 days.  Defendants claimed that they accrued for estimated deactivations with a "high degree of certainty" based on historical experience.

35.    During the Class Period, Defendants deliberately and/or recklessly booked receivables for $34.8 million of carrier commissions that the Company had no historical basis for collecting and could not legitimately claim that it had a reasonable expectation of collecting. The revenue easily was manipulated as Defendants were aware and reported that a 1% change in the deactivation rate applied to receivables had a corresponding dollar-for-dollar increase or decrease in revenue.  By decreasing the estimated deactivation rate and the corresponding reserve for commissions in violation of GAAP, Defendants overstated revenue by $34.8 million in 2006, which was later reversed in the Restatement.

36.    InPhonic reported that it recorded revenue from carrier commissions in accordance with Staff Accounting Bulletin No. 104 ("SAB No. 104").  Under SAB No. 104, revenue is recognized only when: (a) persuasive evidence of an arrangement exists; (b) delivery has occurred or services have been rendered; (c) the seller's price to the buyer is fixed or determinable; and (d) collectibility is reasonably assured.  In the Company's Restatement, InPhonic and Defendants admitted that they "overstated accounts receivable by using a methodology that anticipated future improvements in collections beyond that supported by past experience, and which did not consider certain current factors and other information."  Thus, although there was no historical experience and collectibility was not reasonably assured for

$34.8 million in carrier commissions, Defendants knowingly and recklessly booked it as revenue, which overstated InPhonic's revenue by $34.8 million in 2006.

###    B.    Inflated Equipment Revenue

37.    InPhonic enticed customers to order cell phones and wireless activation services from Wirefly.com and other on-line "stores" by deeply discounting wireless equipment, *i.e.* cell phones.  For example, by offering certain Motorola cell phones that ordinarily retail for $449 for a discounted price of $169, InPhonic sold millions of cell phones and wireless account activations through Verizon and other wireless carriers.  To receive the discount equipment price, customers were required to open a wireless account and submit consumer rebates within a certain set time period, such as 120-180 days.  The discounts were also subject to other undisclosed or hidden details that required customers to maintain their wireless service plan for at least six months and timely pay their wireless bills.  If customers switched wireless plans, then they would be billed for the amount of the discount, which was as much as $250.  Other Equipment Discount Provisions ("EDP") required customers to return the cell phones after canceling their wireless plans prior to the contractually-stated deactivation period.

38.    During the Class Period, Defendants began to estimate EDP termination fee revenue.  Without disclosing that any EDP-fee revenue was included in reported financial results, Defendants improperly recorded $2.6 million in certain EDP fees purportedly due from consumers for early-termination penalties or failure to return wireless devices as required under their contracts.  To boost reported revenue, Defendants deliberately and/or recklessly used collection percentages that improperly anticipated improvements in excess of past experience.  In the Restatement, Defendants reported that they should not have recorded the revenue and related accounts receivable because of a lack of historical experience in collecting the EDP fees.  By

secretly including uncollectible EDP fees in reported revenue, Defendants overstated InPhonic's equipment revenue by $2.6 million in 2006.

### C.    Uncollectible Disputed Carrier Commissions

39.    During the Class Period, InPhonic reported that it booked an additional $2.8 million of activations and services revenue in Second Quarter 2006, which Defendants estimated to be collectible based on recent improvements in "dispute commissions collections."   In the Restatement, Defendants admitted that the $2.8 million in disputed carrier commissions should not have been recorded until the commissions were actually collected from the carrier, and they reversed the reported revenue.

### D.    Expenses and Reserves for Rebates

40.    Under GAAP, InPhonic was required to record consumer rebates as a reduction of revenue.   Accordingly, InPhonic recognized equipment revenue, less a reserve for customer rebates or "accrued consumer liabilities."   Defendants estimated the amount of the reserve for rebates based upon the Company's historical experience of rebates claimed.   To qualify for rebates, customers often were required to submit a cell phone bill that was at least 120 days old to demonstrate that they had maintained their wireless account for 120 days and paid their bills. But the rebate documents also required consumers to post-mark their rebate submissions within the same 120 days of when the service was activated, which rendered the rebate requirements impossible to meet.

41.    In 2006, InPhonic reported that it had completed over 2.5 million activations for wireless customers.   By denying consumer rebates for a large portion of these customers, Defendants overstated the Company's equipment revenue and gross margins.   After the Attorney General for the District of Columbia responded to thousands of Better Business Bureau

complaints with a consumer protection lawsuit against InPhonic, Defendants paid $7.95 million in delinquent consumer rebates that they referred to as "goodwill" payments.

42.    In the Restatement, Defendants admitted that they improperly recorded accrued expenses and reserves for consumer product rebates totaling $4.9 million during the Class Period.  By so doing, Defendants overstated equipment revenue by $4.9 million in 2006 and artificially boosted the Company's gross margins.  Of the $4.9 million, at least $3.3 million was related to the goodwill rebates paid to consumers in connection with the Attorney General's action.

### E.    Internal Control Deficiencies

43.    Throughout the Class Period, InPhonic's internal controls with respect to financial reporting were egregiously inadequate.  Yet, Defendants repeatedly misrepresented to investors and the market that the Company had adequate internal controls in place to ensure the reliability of InPhonic's financial statements and reported financial condition.  Defendants Steinberg and Winkler each certified that InPhonic's internal controls were designed under their supervision to ensure that material information relating to InPhonic's financial statements was reliable and reported in accordance with GAAP.  Defendants also certified that the information contained in InPhonic's quarterly SEC filings throughout 2006 fairly presented in all material respects the financial condition and results of operations of the Company, when in fact they and others at their direction had knowingly and/or recklessly materially misstated the Company's reported revenues, equipment costs, accounts receivable, operating loss and earnings per share.

44.    Throughout the Class Period, Defendants knowingly and/or recklessly operated InPhonic with a combination of control deficiencies that they knew, or were reckless in not knowing, resulted in material misstatements in the Company's SEC filings and reported financial results.  Ultimately, after InPhonic restated its financial statements for each quarter of 2006, the

Company reported that its internal controls and procedures were not effective in each quarter of 2006 and as of December 31, 2006.

45.     The material weaknesses identified by the Company were pervasive throughout the Company and adversely impacted even the most basic business operations and financial reporting procedures such as: maintaining adequate staffing; personnel training; implementing communications channels to report transactions accurately; and using appropriate accounts to record receivables.

46.     The material weaknesses identified by the Company impacted its ability to report accurately its wireless activations and services revenue, which constituted approximately 96% of the Company's revenue in 2006.  The material weaknesses also impacted InPhonic's ability to report accurately its gross margin percentage, which was a measure of performance followed closely by securities analysts and the market.  Defendants knew that InPhonic's future and the value of their personal InPhonic stock holdings depended on demonstrating that the Company could be profitable and knowingly and/or recklessly manipulated the Company's reported revenue, accounts receivable and reserves related to the commissions and bonuses from carriers to meet or exceed earnings and performance expectations and to prop up the Company's stock price.

47.     In their restated 2006 financial results, Defendants admitted that InPhonic's "material weaknesses resulted in adjustments to our revenue and accounts receivable and certain other financial statement line items … and resulted in the restatement of previously issued consolidated financial statements" for each quarter of 2006.  Consequently, the overall impression created by InPhonic's financial statements was not consistent with the business realities of the Company's financial position and operations during the Class Period.

**F.    False reporting of a Brightstar investment in and definitive agreement with InPhonic.**

48.    In the late summer and early fall of 2007, Defendant Steinberg continued to mislead the investing public, when on August 9, 2007,  InPhonic issued a press release and filed a  Form 8-K (the August 9, 2007 8-K") with the SEC announcing InPhonic's second quarter 2007 financial results.  The press release stated that the Company was focused on improving its cash flow and announced that the Company and Brightstar Corporation ("Brightstar") had signed a letter of intent to form a "strategic alliance."  The Defendants further stated that Brightstar had made an immediate investment of $5 million in InPhonic.

49.    The purpose of the August 9, 2007 8-K was to falsely portray to the market that InPhonic's business and financial future were viable, when in fact, the opposite was true.

50.    On September 5, 2007, in a Form 8-K and Press Release, Defendant Steinberg announced that  InPhonic and Brightstar had "signed" a definitive agreement to form a strategic alliance with Brightstar, which would result in "improved cash flows due to outsourced inventory management, enhanced margins resulting from hardware procurement, reduced current operational and fulfillment expenses, and significant growth opportunities in a new sales and marketing relationship with Brightstar and its domestic and international sales channels."

51.    Barely one month later, in a press release dated October 11, 2007, the Company suddenly and without explanation announced that the Brightstar agreement had been "terminated."  In an 8-K filed with the SEC on October 12, 2007, InPhonic revealed that its creditors had served the Company with a notice of default and reservation of rights because, among other things, it had "failed to enter into a definitive agreement to provide for the outsourcing of the Company's inventory management, logistics and fulfillment operations by October 5, 2007."

## V.    MATERIALLY FALSE AND MISLEADING STATEMENTS
### ISSUED DURING THE CLASS PERIOD

### A.    First Quarter 2006 Revenue and Earnings Reports

52.    The Class Period begins on May 8, 2006.  On this day, the Company issued a press release regarding InPhonic's financial results for its first quarter ended March 31, 2006. The Company reported $87.4 million in revenue for First Quarter 2006, compared to $68.2 million for the first quarter of 2005.  In addition, it reported that the loss from continuing operations for First Quarter 2006 improved to ($4.0) million or ($0.11) per basic and diluted share, compared to a loss of ($7.4) million for the first quarter of 2005 or ($0.22) per basic and diluted share.

53.    On the same day, May 8, 2006, InPhonic filed the press release with the SEC as an exhibit to a Current Report on Form 8-K.  Defendant Winkler signed the Form 8-K.  In the filing and attached press release, Defendant Steinberg announced that the Company was "off to a solid start for the year."  He further stated: "we had strong margin improvements this quarter resulting from improved phone pricing and increasing sales of carrier data features, accessories and device protection."

54.    InPhonic also reported Non-GAAP Adjusted EBITDA for First Quarter 2006 of $2.1 million, compared to non-GAAP Adjusted EBITDA of $1.2 million for the first quarter of 2005, which it stated was "an improvement of $0.9 million year over year."  In addition, the Company reported non-GAAP Adjusted EBT for First Quarter 2006 was $1.4 million, or $0.04 per basic and diluted share.

55.    The market reacted positively.  As reported in a news article dated May 8, 2006, TheStreet.com reported that InPhonic's stock price "surged" 10% after the Company beat first-quarter estimates.  Specifically, the article stated that "[a]nalysts expected a penny-a-share loss

on $83.4 million in sales in the first quarter." The article further stated: "Shares of InPhonic—which runs Web sites like Wirefly—were up 38 cents in regular trading, and jumped another 75 cents, or 10%, to $8.10 in the after-hours session."

56.    Two days later, on May 10, 2006, InPhonic filed with the SEC its Form 10-Q for First Quarter 2006, which ended March 31, 2006.  In the Form 10-Q, the Company broke out its previously-announced total revenues of $87.4 million into revenue generated from "Activations and Services" of $67.1 million and from "Equipment" of $20.2 million.  The "Activations and Services" revenue reportedly increased 35% in First Quarter 2006 as compared to the First Quarter 2005, which the Company expressly attributed to "an increase in the number of wireless activations for the three months ended March 31, 2006 that [the Company] generated through marketing partners and increased advertising efforts."  The Company also reported in the Form 10-Q its First Quarter 2006 net loss of ($3.9) million and ($0.11) earnings per share.

57.    In reaction to the positive Company news, on May 10, 2006, InPhonic's stock price increased to close at $8.76 per share.

58.    The First Quarter 2006 Form 10-Q also stated that the Company's consolidated condensed financial statements were "prepared in accordance with generally accepted accounting principles in the United States."  The Company further stated that it based estimates used in preparation of financial statements on historical experience, as well as other assumptions that it believed were "reasonable under the circumstances."

59.    InPhonic also reported in its First Quarter 2006 Form 10-Q that revenue generated from the sale and activation of wireless devices and services accounted for approximately 97% of its consolidated revenue for First Quarter 2006.  With regard to what it styled as "Critical

Accounting Policies and Estimates," the Company disclosed its purported revenue recognition practices for "Activation and Services" as follows:

> We generate revenue primarily from wireless carriers, as well as a satellite television carrier, who pay commissions and volume and performance-based bonuses, for activating wireless services and features on their networks .… We recognize commissions from wireless carriers upon shipment of activated devices to the customer …. Our revenue is reduced for estimated deactivations of the wireless services by customers prior to the expiration of a time period that ranges 120 to 210 days from the date of activation, depending on the wireless carrier. **We estimate deactivations based on historical experience, which we have developed based on our experience with carriers, customer behavior and sources of customers, among other factors, allowing us to accrue estimates with what we believe is a high degree of certainty** .… New channels for which we have insufficient historical data to adequately estimate deactivation experience will be deferred through the expiration period for a period of 24 months, until such time that we can accurately estimate the deactivation experience for the new channel.
>
> \* \* \*
>
> Wireless carriers also periodically offer bonuses for achieving monthly volume and other performance targets and also formerly provided some bonus compensation under annual volume based plans. **We recognize these monthly bonuses as earned in accordance with the provisions of SAB No. 104. Revenue is recognized only when all of the following criteria are met: (1) persuasive evidence of an arrangement exists, (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed or determinable, and (4) collectibility is reasonably assured.** Amounts collected in cash prior to meeting the above criteria are recorded as deferred revenue. Through 2005, commission revenue earned from the activation of carrier features had been deferred until the contractual chargeback period had lapsed. **Beginning in 2006, we began to estimate commission revenue earned from feature activations based on historical experience which we have developed based on our experience with carriers and customer behavior over a period of time in excess of 24-months. This allows us to accrue estimates with what we believe is a high degree of certainty in accordance with SAB 104.**

First Quarter 2006 10-Q, filed on May 10, 2006 (emphasis added).

60.    InPhonic expressly disclosed in its First Quarter 2006 Form 10-Q that the Company monitored a number of factors for determining the reserve for commissions lost through deactivations, and noted the importance of deactivation rates to the Company's revenue, future business and stock price:

> If the rate of our deactivations increases in excess of our historical experience, we would have to increase our deactivation reserve, which, in turn, would cause our revenue to decline. Further, if our estimates vary materially for a future period or periods in relation to revenue and/or net income so that we conclude that our method of determining estimates is not sufficiently accurate, we may be required to change our method of accounting for these estimates. While a change in accounting for deactivations would have no impact on our cash flow, any such change may negatively impact our net income for particular periods and cause a decline in stock price. An increase in our deactivation rate could also cause carriers to modify the commission terms with us or even terminate our agreements.

First Quarter 2006 10-Q, filed on May 10, 2006.

61.    The Company further reported that management, including Defendants Steinberg and Winkler, had evaluated the effectiveness of the Company's disclosure controls and procedures as of March 31, 2006, and that they had concluded that the disclosures controls and procedures were "effective at the reasonable assurance level."

62.    Defendants Steinberg and Winkler each signed the First Quarter 2006 Form 10-Q, and they each further certified the financial information presented in the Quarterly Report, stating that:

> I have reviewed this Quarterly Report on Form 10-Q for the period ended March 31, 2006 of InPhonic, Inc.;
>
> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

63.    With regard to internal controls and procedures, Defendants Steinberg and Winkler each certified the financial results and sound condition of the Company's internal controls and procedures pursuant to Sarbanes-Oxley, stating in pertinent part:

The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

64.    Both Defendants Steinberg and Winkler personally certified the accuracy of the Company's reported financial results as required by Sarbanes-Oxley, stating that:

(1)    The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934, as amended; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant.

65.    The statements contained in ¶¶ 52-54, 56, 58-64 above, were materially false and misleading when made because Defendants Steinberg and Winkler knowingly and/or recklessly reported or failed to disclose or indicate the following:

(a)    that the Company's financial results were materially inflated, and the Company's reported revenues, accounts receivable, operating loss and net loss per share were materially misstated because, as set forth in the Amended Form 10-Q for the First Quarter 2006,

(b)    that the Company prematurely recorded $393 thousand of net activation and service revenue in First Quarter 2006;

(c)    that Defendants secretly and improperly recognized uncollectible revenue from fees due from customers when contracts were cancelled or devices were not returned;

(d)    that Defendants failed to account accurately, and failed to implement adequate controls and procedures to account accurately, for the Company's accrued expenses and reserves in connection with consumer product rebates;

(e)    that Defendants falsely reported Adjusted EBITDA in the inflated amount of $2.1 million (instead of the true amount of $1.7 million) to meet the Company's previously-issued guidance of $2.0-$2.2 million for First Quarter 2006; and

(f)    that the Company's financial statements were not prepared in accordance

with GAAP, and Defendants knowingly and/or recklessly violated SAB

104 because InPhonic did  not and could not accrue estimates of revenue

with any degree of certainty, much less the "high degree of certainty"

publicly reported by the Company due to its egregious lack of adequate

internal controls; and

(g)    InPhonic internal controls were wholly inadequate and/or non-existent in

that the Company: (i) did not maintain sufficient staffing of operational

and financial resources and therefore lacked a sufficient number of

employees with appropriate levels of knowledge, expertise and training in

the application of generally accepted accounting principles in certain

groups; (ii) failed to maintain effective communication channels with its

finance department to adequately identify and record certain transactions

during 2006; (iii) did not maintain effective controls over the recordation,

accuracy and completeness of activations and services revenue and related

accounts receivable; (iv) did not take steps to adequately identify and

appropriately record certain commission and bonus revenue received

during the year from various wireless carriers in a timely and accurate

manner; (v) did not utilize an appropriate methodology during the year in

recording receivables from wireless carriers associated with disputed

deactivations, churn bonuses and other carrier related fees; (vi) did not

maintain effective controls over the determination and accuracy of

equipment revenue and related accounts receivable; (vii) did not maintain

22

effective controls over the accuracy and completeness of consumer product rebate liabilities; and (viii) did not maintain effective controls over the accuracy and completeness of costs of goods sold and amounts due from vendors.

66.    In the Amended Form 10-Q/A for First Quarter 2006, filed with the SEC on June 1, 2007, InPhonic admitted that the Company's previously-issued quarterly report and Defendant Steinberg's and Defendant Winkler's certifications stating that the Company's disclosure controls and procedures were effective as of March 31, 2006, were blatantly false. Specifically, InPhonic reported that "material weaknesses" existed as of March 31, 2006, and the Company's disclosure controls and procedures "were not effective as of March 31, 2006" to ensure information required to be disclosed by the Company to the SEC is timely and properly recorded, processed and summarized.

67.    As Defendants admitted in the First Quarter 10Q-A, at the time the Company's first quarter 2006 financial results were originally reported, InPhonic lacked the basic and essential resource of sufficient personnel in their operational and financial resources units "to provide the level of controls and analysis to required . . .  This resulted in accounting processes and controls not being performed on a timely basis and the **inability** to maintain an adequate control environment . . . ." (emphasis added).

68.    In the 10-Q/A Defendants also admitted that they "failed to maintain effective communication channels to adequately identify and record certain transactions during 2006" and that the failure to provide effective communication channels "contributed to errors relating to accounting and reporting of expenses."

69.    In restating the Company's First Quarter 2006 financial statements, the Defendants further admitted that they did not maintain effective controls over the recordation, accuracy and completeness of activation and services revenue and related accounts receivables. Moreover, they admitted that they had failed to take the steps necessary to adequately identify and appropriately record commissions and revenue in a timely and accurate manner, resulting in overstated account receivables.

70.    In restating the Company's financial results for the First Quarter 2006, Defendants further admitted that InPhonic's material weaknesses had a substantial and direct impact on its previously issued statements for that quarter.  As disclosed in the 10-Q/A, InPhonic's material weaknesses "resulted in adjustments to [the Company's] revenue and accounts receivable and certain other financial statement line items . . . and resulted in the restatement of previously issued consolidated financial statements for the three month period ended March 31, 2006."

**B.    Second Quarter 2006 Revenue and Earnings Reports**

71.    On August 2, 2006, the Company issued a press release entitled "InPhonic Announces Financial Results for Second Quarter 2006, Residual Subscriber Base Doubles to 336,000."  The Company reported $95.8 million in revenue for Second Quarter 2006, compared to $75.2 million for the second quarter of 2005.  In addition, it reported that loss from continuing operations for Second Quarter 2006 was ($5.1) million or ($0.14) per basic and diluted share. The Defendants also reported that, excluding the impact of restructuring costs and acquisition earn out expenses, loss from continuing operations would have been ($2.5) million or ($0.07) per basic and diluted share.

72.    InPhonic also reported non-GAAP Adjusted EBITDA for Second Quarter 2006 was $4.2 million, compared to non-GAAP Adjusted EBITDA of $3.5 million for the second

quarter of 2005.  In addition, the Company reported non-GAAP Adjusted EBT for Second Quarter 2006 of $3.4 million, or $0.09 per basic and diluted share.  These reported results fell squarely within the Company's previously-issued guidance.

73.    Also on August 2, 2006, InPhonic held its Second Quarter 2006 Earnings Conference Call.  Defendants Steinberg and Winkler, among others, participated in the call. Defendant Steinberg stated:  "We are pleased to note that second quarter financial results met our expectations that we outlined on the last call and we remain confident in our long-term business strategy to generate profitability and maintain our competitive position in the rapidly growing and dynamic online wireless activation segment."  He also repeated the Company's reported financial results and emphasized that "gross margins for the quarter were 47%, an improvement over the 45% reported in the first quarter of 2006 and the 44% represented a year ago.  For the second consecutive quarter, we were able to generate higher than expected gross margins.  We're clearly very proud of this."

74.    On the Second Quarter 2006 Earnings Conference Call, Defendant Winkler stated:  "our financial results for the second quarter of 2006 demonstrate our continued progress in refocusing the business towards profitable growth and improved customer quality."  He highlighted that the Company's reported revenue of $95.8 million, stating that the increase in revenues was a "27% improvement year-to-year."  He expressly attributed the increase in revenue as being "driven principally by a 24% increase in our core wireless activations and services business."  Defendant Winkler also reported that "adjusted EBITA for the quarter was $4.2 million, an improvement over the $3.5 million in the second quarter of 2005 and double the EBITDA reported in the first quarter of 2006."  He further stated that InPhonic's "gross margin

percentage for the quarter was 47%, compared to 44% a year ago" and reiterated Steinberg's comments that the Company experienced "a significant increase in our gross margin."

75.    On August 9, 2006, InPhonic filed with the SEC its Form 10-Q for Second Quarter 2006, ending June 30, 2006.  Defendants Winkler and Steinberg each signed the Form 10-Q for Second Quarter 2006.  In the Form 10-Q, the Company broke out its previously-announced total revenues of $95.8 million into revenue generated from "Activations and Services" of $77.9 million and from "Equipment" of $17.9 million.  The "Activations and Services" revenue reportedly increased 40% to $77.9 for the three months ended June 30, 2006, as compared to $55 million for the same three-month period in 2005, which the Company expressly attributed to "an increase in the number of wireless activations that [the Company] generated through marketing partners and increased advertising efforts compared to the prior period."

76.    With regard to the six months ended June 30, 2006, the Company reported that total revenue increased 28% to $183.2 million from $143.4 million for the six months ended June 30, 2005.

77.    In addition, the Company reported that "Activations and Services revenue increased 38% to $145.0 million for the six months ended June 30, 2006 from $105.2 million for the six months ended June 30, 2005.  The increase in activations and services revenue of $39.8 million was attributable to "an increase in the number of wireless activations that [the Company] generated through marketing partners and increased advertising efforts compared to prior year periods."  The Company further explained that "Activations and services revenue also consisted of approximately $2.8 million associated with a change in our estimate of the amount of disputed

carrier commissions that are deemed to be collectible.  We believe these disputed commissions to be collectible based on our recent improvements in dispute commissions collections."
Second Quarter 2006 10-Q, filed on August 9, 2006.

78.    In reaction to the positive Company news, on August 10, 2006, InPhonic's stock price increased, closing at $6.79 per share.

79.    The Second Quarter 2006 Form 10-Q also stated that the Company's condensed financial statements were "prepared in accordance with generally accepted accounting principles in the United States."  The Company further stated that it based estimates used in preparation of financial statements (including the reported amount of assets, liabilities, revenue and expenses, and related disclosure of contingent assets and liabilities) on historical experience, as well as other assumptions that it believed were "reasonable under the circumstances."

80.    With regard to what it styled as "Critical Accounting Policies and Estimates," the Company disclosed its revenue recognition practices for "Activation and Services" as follows:

> We generate revenue primarily from wireless carriers, as well as a satellite television carrier, who pay commissions and volume and performance-based bonuses, for activating wireless services and features on their networks. We recognize commissions from wireless carriers upon shipment of activated devices to the customer ….
>
> Our revenue is reduced for estimated deactivations of the wireless services by customers prior to the expiration of a time period that ranges 120 to 180 days from the date of activation, depending on the wireless carrier.  **We estimate deactivations based on historical experience, which we have developed based on our experience with carriers, customer behavior and sources of customers, among other factors, allowing us to accrue estimates with what we believe is a high degree of certainty.** Any increase or decrease in the deactivation amount will cause a corresponding dollar-for-dollar increase or decrease in revenue.

* * *

In addition to receiving commissions for each wireless subscriber activated, we earn performance bonuses from the wireless carriers based on negotiated performance targets. The most significant bonus we earn is the quarterly volume bonus, which we bill wireless carriers for on a monthly basis, based on current month activations. We record these bonuses as deferred revenue at the time of billing until we achieve the quarterly targets. We earn other quarterly bonuses from certain carriers for maintaining low customer churn and signing up customers for certain additional monthly "features" such as data service or text messaging. Wireless carriers also periodically offer bonuses for achieving monthly volume and other performance targets and also formerly provided some bonus compensation under annual volume based plans. **We recognize these monthly bonuses as earned in accordance with the provisions of SAB No. 104. Revenue is recognized only when all of the following criteria are met: (1) persuasive evidence of an arrangement exists, (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed or determinable, and (4) collectibility is reasonably assured.**

Second Quarter 2006 10-Q, filed on August 9, 2006 (emphasis added).

81.    InPhonic's 10-Q for this period disclosed that it booked an additional $2.8 million of activations and services revenue, which it attributed to a purported change in Defendants' "estimate of the amount of disputed carrier commissions that are deemed to be collectible." *Id.*

82.    InPhonic expressly disclosed in its Second Quarter 2006 Form 10-Q that the Company monitored a number of factors for determining the reserve for commissions lost through deactivations.

83.    The Company further reported that management, including Defendants Steinberg and Winkler, had evaluated the effectiveness of the Company's disclosure controls and procedures as of June 30, 2006, and that they had concluded that the disclosures controls and procedures were "effective at the reasonable assurance level."

84.    Defendants Steinberg and Winkler each signed the Second Quarter 2006 Form 10-Q, and they each further certified the financial information presented in the Quarterly Report

and the accuracy of the Company's reported financial results and efficacy of the Company's internal controls  as required by Sarbanes-Oxley, as set forth in ¶¶62-64, above, and incorporated by reference, herein.

85.     The statements contained in ¶¶71-77, 79-84 were materially false and misleading when made because Defendants knowingly and/or recklessly reported or failed to disclose or indicate the following:

(a)     that the Company's financial results were materially inflated, and the Company's reported revenues, accounts receivable, operating loss and net loss per share were materially misstated;

(b)     that the Company prematurely recorded $3.7 million of net activation and service revenue in Second Quarter 2006;

(c)     that the Company understated equipment cost of revenue by $0.6 million;

(d)     that the Company improperly recognized revenue from uncollectible fees due from customers when contracts were cancelled or devices were unreturned;

(e)     that the Company failed to account accurately, and failed to implement adequate controls and procedures to account accurately, for accrued expenses and reserves in connection with consumer product rebates;

(f)     that Defendants falsely reported Adjusted EBITDA in the inflated amount of $4.2 million (instead of the true amount of a loss of ($0.2) million) to meet the Company's previously-issued guidance of $4.0-$4.4 million for Second Quarter 2006;

(g)     that the Company's financial statements were not prepared in accordance

with GAAP, and Defendants knowingly and/or recklessly violated SAB 104 because InPhonic did  not and could not accrue estimates of revenue with any degree of certainty, much less the "high degree of certainty" publicly reported by the Company due to its egregious lack of adequate internal controls; and

(h)      InPhonic internal controls were wholly inadequate and/or non-existent in that the Company: (i) did not maintain sufficient staffing of operational and financial resources and therefore lacked a sufficient number of employees with appropriate levels of knowledge, expertise and training in the application of generally accepted accounting principles in certain groups; (ii) failed to maintain effective communication channels with its finance department to adequately identify and record certain transactions during 2006; (iii) did not maintain effective controls over the recordation, accuracy and completeness of activations and services revenue and related accounts receivable; (iv) did not take steps to adequately identify and appropriately record certain commission and bonus revenue received during the year from various wireless carriers in a timely and accurate manner; (v) did not utilize an appropriate methodology during the year in recording receivables from wireless carriers associated with disputed deactivations, churn bonuses and other carrier related fees; (vi) did not maintain effective controls over the determination and accuracy of equipment revenue and related accounts receivable; (vii) did not maintain effective controls over the accuracy and completeness of consumer

30

product rebate liabilities; and (viii) did not maintain effective controls over the accuracy and completeness of costs of goods sold and amounts due from vendors.

86.     In its restated financial results for Second Quarter 2006, filed on June 1, 2007, Defendants admitted that the need to restate financial statements arose from errors in the application of revenue recognition of certain receivables, including improperly recorded activations and commissions for which "collectibility was not reasonably assured."   The Company reduced revenue and accounts receivable by $3.7 million, which for Second Quarter 2006 decreased revenues from the previously-reported $95.8 million to $92.1 million; increased net loss from continuing operations from the previously-reported ($5.1) million to ($9.6) million, and increased the net loss per share from ($0.14) to ($0.26).

87.     For the six months ended June 30, 2006, the Company restated and increased its net loss by $4.7 million, adjusting from the previously-reported $9.195 million to $13,889 million.

88.     The restated Form 10-Q/A also added language regarding equipment revenue which disclosed that InPhonic in Second Quarter 2006 "included $0.8 million of estimated equipment discount provisions ("EDP") to be collected from customers, who opt not to return their phones after canceling their plans prior to a contractually stated deactivation period." Defendants knew or reckless disregarded that this revenue should not have been recorded under GAAP, and they intentionally and/or recklessly omitted this material disclosure in InPhonic's reported Second Quarter 2006 results to prop up the Company's gross margins and reported EBITDA and to inflate artificially the Company's stock price.

89.    In its Second Quarter 2006 Form 10-Q/A, Defendants also admitted there was no basis for their statement in InPhonic's Second Quarter 2006 Form 10-Q supporting the booking of an additional $2.8 million of activations and services revenue: "we believe it was inappropriate to have recorded revenue associated with this matter until such commissions are collected from the carrier."

90.    In addition, in the Form 10-Q/A for Second Quarter 2006, InPhonic admitted that the Company's previously-issued quarterly report and Defendant Steinberg's and Defendant Winkler's certifications stating that the Company's disclosure controls and procedures were effective as of June 30, 2006, were blatantly false.  Specifically, InPhonic reported that "material weaknesses" existed as of June 30, 2006, and the Company's disclosure controls and procedures "were not effective as of June 30, 2006" to ensure information required to be disclosed by the Company to the SEC is timely and properly recorded, processed and summarized.

91.    As Defendants admitted in the Second Quarter 2006 Form 10-Q/A, at the time the Company's Second Quarter 2006 financial results were originally reported, InPhonic lacked the basic and essential resource of sufficient personnel in their operational and financial resources units "to provide the level of controls and analysis required . . . .  This resulted in accounting processes and controls not being performed on a timely basis and the **inability** to maintain an adequate control environment . . . ." (emphasis added).

92.    In the Second Quarter 2006 Form 10-Q/A Defendants also admitted that they "failed to maintain effective communication channels to adequately identify and record certain transactions during 2006" and that the failure to provide effective communication channels "contributed to errors relating to  accounting and reporting of expenses . . . ."

93.    In restating the Company's Second Quarter 2006 financial statements, the Defendants further admitted that they did not maintain effective controls over the recordation, accuracy and completeness of activation and services revenue and related accounts receivables. Moreover, they admitted that they had failed to take the steps necessary to adequately identify and appropriately record commissions and revenue in a timely and accurate manner, resulting in overstated account receivables.

94.    Defendants also admitted that they did not maintain effective controls sufficient to accurately determine equipment revenue and related expenses and failed to utilize an appropriate methodology fees due from consumers when contracts were cancelled, which resulted in overstatement of related accounts receivable.

95.    Defendants further admitted that InPhonic's "material weaknesses resulted in adjustments to our revenue and accounts receivable and certain other financial statement line items … and resulted in the restatement of previously issued consolidated financial statements for the three and six-month periods ended June 30, 2006."

### C.    Third Quarter 2006 Revenue and Earnings Reports

96.    On November 6, 2006, InPhonic held its Third Quarter 2006 Earnings Conference Call.  Defendant Steinberg emphasized that the Company's financial performance had "met the expectations that we outlined on our last call and reiterate that we remain confident of the long-term benefits of transitioning our business' compensation structure to include a component of residual, recurring compensation from our wireless carrier partners."  He expressly stated that the Company was "already starting to generate predictable growth from our residual customers and this is positively impacting our cash flow and profit margins."

97.    Specifically, defendant Steinberg stated on the call that "gross margins for the quarter were at 48%, an improvement over the 47% reported in the second quarter '06, and a 25% improvement over the 42% reported a year ago."

98.    Defendant Winkler discussed in detail the Company's quarterly results, emphasizing that "the primary financial highlights for the third quarter include the following, total revenue for the quarter was $102.2 million, compared to $92 million for the third quarter of 2005." He expressly attributed the increase in revenue as being "the result of growth in our core activations wireless business." "We are very pleased with the top line results," Winkler said and also highlighted that "[g]ross margin percentage for the third quarter was 48%, compared to 42% a year ago." He attributed the improvement in gross margin to "better handset pricing, increase in residual revenue and the sales of accessories, device protection and carrier data features." He also reported that total revenue was $102.2 million; revenue from activations and services was $85.2 million; adjusted EBITDA was $6.7 million; and gross profit was $48.7 million for third quarter 2006.

99.    The market reacted favorably to these reported results. As reported in TheStreet.com, on November 7, 2006, InPhonic's shares "jumped in early trading after the company sa[id] it trimmed its losses and raised sales guidance." The article stated that shares were up $1.27, or 14%, to $10.31 early on November 7, 2006. The stock price continued to climb and closed on November 8, 2006, at $11.29 per share. News of the Company's projected fourth-quarter revenue was well received according to TheStreet.com because "analysts were looking for sales of $118 million."

100.    Also, in reaction to the Company's positive earnings report, analysts at Deutsche Bank upgraded InPhonic's stock to a "Buy" on November 7, 2006, and raised price targets per

share to $14 (from $7). Deutsche Bank analysts premised their optimistic outlook for InPhonic based in part upon the Company's better-than-expected third quarter results, improving residual revenue streams, improving financial controls, free cash flow and improving pro forma operating margins.

101.    Similarly, Kaufman Bros. Equity Research reiterated its "Buy" recommendation for InPhonic's stock and raised its price target from $12 to $13 on November 7, 2006.

102.    In its 10-Q for Third Quarter 2006, filed with the SEC on November 9, 2006, the Company broke out its previously-announced total revenues of $102.2 million into revenue generated from "Activations and services" of $85.2 million and from "Equipment" of $17.0 million. The "Activations and Services" revenue reportedly increased 30% to $85.2 for the three months ended September 30, 2006, as compared to $65.4 million for the same three-month period in 2005. The Company expressly attributed the $19.8 million increase in activations and services revenue to "an increase in the number of wireless activations that [the Company] generated through marketing partners and increased advertising efforts compared to the prior period."

103.    With regard to the nine months ended September 30, 2006, the Company reported that total revenue increased 21% to $285.4 million from $235.3 million for the nine months ended September 30, 2005. The Company further stated that it expected that "revenue from the sale and activation of wireless devices and services will continue to increase during 2006 compared to 2005 performance."

104.    In addition, the Company reported that "Activations and services revenue increased 35% to $230.0 million for the nine months ended September 30, 2006 from $170 million for the nine months ended September 30, 2005. The increase in activations and services

35

revenue of $59.5 million was attributable to "an increase in the number of wireless activations that [the Company] generated through marketing partners and increased advertising efforts compared to prior year periods."

105.    The Company also reported in the Form 10-Q its Third Quarter 2006 adjusted net loss from continuing operations of ($4.88) million and ($0.13) earnings per share for the quarter-ended September 30, 2006, and adjusted net loss from continuing operations of ($13.9) million and ($0.39) earnings per share for the nine-month period ended September 30, 2006.

106.    The Third Quarter 2006 Form 10-Q also stated that the Company's consolidated financial statements were "prepared in accordance with generally accepted accounting principles in the United States" and that the statements include "all the adjustments and accruals necessary for a fair presentation of the results of the periods presented herein."  The Company further stated that it based estimates used in preparation of financial statements (including the reported amount of assets, liabilities, revenue and expenses, and related disclosure of contingent assets and liabilities) on historical experience, as well as other assumptions that it believed were "reasonable under the circumstances."

107.    InPhonic also reported in its Third Quarter 2006 Form 10-Q that "revenue generated from the sale and activation of wireless devices and services accounted for approximately 96% of its consolidated revenue for the nine months ended September 30, 2006." With regard to what it styled as "Critical Accounting Policies and Estimates," the Company disclosed its revenue recognition practices for "Activation and Services" as follows:

> We generate revenue primarily from wireless carriers, as well as a satellite television carrier, who pay commissions and volume and performance-based bonuses, for activating wireless services and features on their networks.  We recognize commissions from wireless carriers upon shipment of activated devices to the customer ….

Our revenue is reduced for estimated deactivations of the wireless services by customers prior to the expiration of a time period that ranges 120 to 180 days from the date of activation, depending on the wireless carrier. **We estimate deactivations based on historical experience, which we have developed based on our experience with carriers, customer behavior and sources of customers, among other factors, allowing us to accrue estimates with what we believe is a high degree of certainty.** Any increase or decrease in the deactivation amount will cause a corresponding dollar-for-dollar increase or decrease in revenue.

\* \* \*

In addition to receiving commissions for each wireless subscriber activated, we earn performance bonuses from the wireless carriers based on negotiated performance targets. The most significant bonus we earn is the quarterly volume bonus, which we bill wireless carriers for on a monthly basis, based on current month activations. We record these bonuses as deferred revenue at the time of billing until we achieve the quarterly targets. We earn other quarterly bonuses from certain carriers for maintaining low customer churn and signing up customers for certain additional monthly "features" such as data service or text messaging. Wireless carriers also periodically offer bonuses for achieving monthly volume and other performance targets and also formerly provided some bonus compensation under annual volume based plans. **We recognize these monthly bonuses as earned in accordance with the provisions of SAB No. 104. Revenue is recognized only when all of the following criteria are met: (1) persuasive evidence of an arrangement exists, (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed or determinable, and (4) collectibility is reasonably assured.**

Third Quarter 2006, 10-Q, filed on November 9, 2006 (emphasis added).

108.    As set forth above, InPhonic expressly disclosed in its Third Quarter 2006 Form 10-Q that the Company monitored a number of factors for determining the reserve for commissions lost through deactivations.

109.    The Company further reported that management, including Defendants Steinberg and Winkler, had evaluated the effectiveness of the Company's disclosure controls and

procedures as of September 30, 2006, and that they had concluded that the disclosures controls and procedures were "effective at the reasonable assurance level."

110.    Defendants Steinberg and Winkler each signed the Second Quarter 2006 Form 10-Q, and they each further certified the financial information presented in the Quarterly Report and the accuracy of the Company's reported financial results and efficacy of the Company's internal controls  as required by Sarbanes-Oxley, as set forth in ¶¶62-64, above, and incorporated by reference, herein.

111.    In response to this news, InPhonic's share price soared by more than 21%, closing at $10.98 per share on November 7, 2006, up from the prior day's close of 9.04 per share on very heavy trading volume.

112.    As disclosed in its Form 10-Q for the Third Quarter 2006 and in a Form 8-K, filed on November 9, 2006 (the "November 9, 2006 8-K"), on November 7, 2006, InPhonic entered into a Credit Agreement with various lenders under the coordination by Goldman Sachs as Lead Arranger, Lead Bookrunner and Lead Syndication Agent (the "November 6, 2006 Credit Agreement" or the "Credit Agreement")  to borrow up to $100 million.

113.    The November 9, 2006 8-K was signed by Defendant Steinberg and reads, in pertinent part, as follows:

> **InPhonic Announces the Sale of Secondary Shares in Conjunction with Debt Financing**
>
> **InPhonic, Inc. (NASDAQ:INPC),** a leading online seller of wireless services and products, today announced that in conjunction with the recently announced $100 million debt financing a group of InPhonic shareholders sold secondary shares to multiple participants in the debt financing in a private transaction at a price discounted to market.  David Steinberg, CEO, and Lawrence Winkler, CFO participated in this group.  Mr. Steinberg, through vehicles set up for trusts and estate purposes, sold 450,000 InPhonic shares and Mr. Winkler sold 100,000 InPhonic shares.  **These sales were one-time private**

> **transactions and neither Mr. Steinberg nor Mr. Winkler has any plan to sell additional InPhonic shares in the foreseeable future.** Mr. Steinberg continues to own approximately 5 million InPhonic shares, total options, and restricted units in the company.

Form 8-K, filed on November 9, 2006 (emphasis added).

114.    Defendants' statements contained in ¶¶96-98, 102-110 and 113 were materially false and misleading when made because Defendants knowingly and recklessly failed to disclose or indicate the following:

(a)    that the Company's financial results were materially inflated, and the Company's reported revenues, accounts receivable, operating loss and net loss per share for the nine months ending September 30, 2006 were materially misstated;

(b)    that Defendants prematurely recorded $4.5 million of net activation and service revenue in Third Quarter 2006;

(c)    that the Company overstated equipment revenue by $2.6 million in Third Quarter 2006;

(d)    that Defendants understated equipment cost of revenue by $0.2 million for Third Quarter 2006 and $0.8 million for the nine months ended September 30, 2006;

(e)    that Defendants understated marketing expenses by $0.1 million and understated general and administrative expenses by $3.3 million in Third Quarter 2006;

(f)    that Defendants improperly recognized revenue from fees due from customers when contracts were cancelled or devices were unreturned;

(g)    that Defendants failed to account accurately for accrued expenses and

reserves in connection with consumer product rebates;

(h)    that the Company's financial statements were not prepared in accordance with GAAP, and Defendants knowingly and/or recklessly violated SAB 104 because InPhonic did  not and could not accrue estimates of revenue with any degree of certainty, much less the "high degree of certainty" publicly reported by the Company due to its egregious lack of adequate internal controls;

(i)    InPhonic internal controls were wholly inadequate and/or non-existent in that the Company: (i) did not maintain sufficient staffing of operational and financial resources and therefore lacked a sufficient number of employees with appropriate levels of knowledge, expertise and training in the application of generally accepted accounting principles in certain groups; (ii) failed to maintain effective communication channels with its finance department to adequately identify and record certain transactions during 2006; (iii) did not maintain effective controls over the recordation, accuracy and completeness of activations and services revenue and related accounts receivable; (iv) did not take steps to adequately identify and appropriately record certain commission and bonus revenue received during the year from various wireless carriers in a timely and accurate manner; (v) did not utilize an appropriate methodology during the year in recording receivables from wireless carriers associated with disputed deactivations, churn bonuses and other carrier related fees; (vi) did not maintain effective controls over the determination and accuracy of

equipment revenue and related accounts receivable; (vii) did not maintain effective controls over the accuracy and completeness of consumer product rebate liabilities; and (viii) did not maintain effective controls over the accuracy and completeness of costs of goods sold and amounts due from vendors; and

(j)    that Defendant Winkler did, in fact, plan to sell, and did sell an additional 100,000 shares of InPhonic stock for proceeds of over $1 million on January 3, 2007—less than 2 months after announcing that he had no plans to sell additional shares in the foreseeable future.

115.    In the restated financial results for Third Quarter 2006, filed with the SEC on June 1, 2007, Defendants admitted that they had improperly recorded additional amounts of activations and services revenue for "certain types of residual and churn bonuses due from wireless carriers for activations" that occurred during Third Quarter in the amount of $2.92 million for which "collectibility of such amounts was not reasonably assured pursuant to SAB 104 based on the nature of the amounts due and [the Company's] collection experience of similar items."

116.    In its restated Third Quarter 2006 financial statements, the Company also reduced activation and services revenue and accounts receivable by $1.55 million that it admitted should have been written off in Third Quarter 2006. Thus, Defendants knowingly and/or recklessly misrepresented in InPhonic's previously-filed Form 10-Q for Third Quarter 2006 that deactivations were "based on historical experience" and that Defendants developed based on their "experience with carriers, customer behavior and sources of customers" and that estimates were accrued with "a high degree of certainty."

117.    Defendants also disclosed--for the first time--in the restated Third Quarter 2006 that "beginning on April 1, 2006, [the Company] began to estimate EDP termination fee revenue based on historical experience of customer collection behavior" and prior to "June 30, 2006, pursuant to SAB 104 revenue recognition of such fee was deferred as [the Company] did not have adequate historical collection data to reasonably estimate the ultimate collectibility of the receivable."  This change in accounting procedure was not timely disclosed in the Company's Third Quarter 2006 Form 10-Q.  By secretly including uncollectible EDP fees in reported revenue, Defendants overstated InPhonic's equipment revenue 18% in Third Quarter 2006.  In its restated financial results, InPhonic reduced equipment revenue by $2.6 million for Third Quarter 2006, which reduced reported equipment revenue from $17 million to $14.3 million.

118.    In its restated quarterly financials for the Third Quarter 2006, the Company further admitted that the need to restate financial statements for Third Quarter 2006 was due to errors in the application of revenue recognition of certain receivables, including improperly recorded activations and commissions for which collectibility "was not reasonably assured."

119.    As a result of the Restatement, for the nine months ended September 30, 2006, the Company:

- reduced accounts receivable by more than $11 million;

- reduced activations and services revenue by $8.5 million;

- reduced equipment revenue by $2.6 million;

- increased the net loss by $15.4 million  from ($14.0 million to ($29.3) million; and

- increased its net loss per share by ($0.43) from ($0.39) to ($0.82).

42

120.   The Company also reported that during the three months ended September 30, 2006, in addition to the errors for accounting for activations and services revenue, the Company had identified errors in accounting for equipment revenue and rebates and amounts paid to consumers as "goodwill" prior to its settlement with the District of Columbia Attorney General. In its restated results for Third Quarter 2006, the Company increased its general and administrative expenses by $3.3 million from previously-reported $19.69 million to $22.98 million.  The $3.3 million was paid by the Company to consumers for rebates that the Company purportedly believed had not satisfied all the terms and conditions of InPhonic's rebate program.

121.   In the restated Form 10-Q/A for Third Quarter 2006, the Company increased accrued consumer liabilities from $10.2 million to $14.1 million, and Defendants admitted that they failed to properly accrue and account for expenses and reserves for consumer product rebates and rebates paid to consumers as "goodwill."

122.   In addition, in the Amended Form 10-Q for Third Quarter 2006, InPhonic admitted that the Company's previously-issued quarterly report and Defendant Steinberg's and Defendant Winkler's certifications stating that the Company's disclosure controls and procedures were effective as of September 30, 2006, were blatantly false.  Specifically, InPhonic reported that "material weaknesses" existed as of September 30, 2006, and the Company's disclosure controls and procedures "were not effective as of September 30, 2006" to ensure information required to be disclosed by the Company to the SEC is timely and properly recorded, processed, summarized and reported.

123.   As Defendants admitted in the 10-Q/A, at the time the Company's Third Quarter 2006 financial results were originally reported, InPhonic lacked the basic and essential resource of sufficient personnel in their operational and financial resources units "to provide the level of

controls and analysis to required . . . This resulted in certain accounting processes and controls not being performed on a timely basis and the **inability** to maintain an adequate control environment . . ." (emphasis added).

124.    In the 10-Q/A Defendants also admitted that they "failed to maintain effective communication channels to adequately identify and record certain transactions during 2006" and that the failure to provide effective communication channels "contributed to errors relating to accounting and reporting of expenses."

125.    In restating the Company's Third Quarter 2006 financial statements, the Defendants further admitted that they did not maintain effective controls over the recordation, accuracy and completeness of activation and services revenue and related accounts receivable. Moreover, they admitted that they had failed to take the steps necessary to adequately identify and appropriately record commissions and revenue in a timely and accurate manner, resulting in overstated account receivables.

126.    Defendants also admitted that they did not maintain effective controls sufficient to accurately determine equipment revenue and related expenses and failed to utilize an appropriate methodology fees due from consumers when contracts were cancelled, which resulted in overstatement of related accounts receivable.

127.    Similarly, in restating the Company's Third Quarter 2006 financial results, Defendants admitted that they did not maintain effective controls sufficient to accurately and completely determine consumer product rebate liabilities, resulting in the understatement of the Company's consumer product rebate liability.

128.    Moreover, as admitted in the restated Third Quarter 2006 financial results, Defendants did not have adequate documentation to support proper accounting for inventory movements, resulting in overstated inventory and receivables in-kind.

129.    Defendants further admitted that InPhonic's "material weaknesses resulted in adjustments to [InPhonic's] revenue and accounts receivable and certain other financial statement line items . . . and resulted in the restatement of previously issued consolidated financial statements for the three and nine-month periods ended September 30, 2006."

130.    Moreover, the statement contained in the November 9, 2006 8-K that "neither Mr. Steinberg nor Mr. Winkler has any plan to sell additional InPhonic shares in the foreseeable future" was rendered blatantly false and misleading by Winkler's January 3, 2007 sale of an additional 100,000 shares of InPhonic stock which garnered proceeds of $1,074,000 million.

**D.    Fourth Quarter 2006 Revenue and Earnings Reports**

131.    On February 22, 2007, the Company issued a press release entitled "InPhonic Announces Financial Results for Fourth Quarter and Full Year 2006" and reported "Record Fourth Quarter and Full Year 2006 Results" (the "February 22, 2007 earnings release" or the "earnings release"). The earnings release was filed the same day with the SEC as an exhibit to a Form 8-K, and Defendant Winkler signed the Form 8-K.

132.    In the February 22, 2007 earnings release, the Company reported $120.3 million in revenue for Fourth Quarter 2006, compared to $85.2 million for the Fourth Quarter of 2005. In addition, it reported that loss from continuing operations for Fourth Quarter 2006 was ($3.4) million or ($0.09) per basic and diluted share, compared to a loss from continuing operations of ($24.8) million for the fourth quarter of 2005 or ($0.70) per basic and diluted share.

133.    In its earnings release, InPhonic also reported that non-GAAP Adjusted EBITDA for Fourth Quarter 2006 was $11.4 million, compared to non-GAAP Adjusted EBITDA of

($12.4) million for the fourth quarter of 2005.  Defendants reported non-GAAP Adjusted EBT for Fourth Quarter 2006 of $10.6 million, or $0.28 per basic share, compared to non-GAAP Adjusted EBT of ($14.6) million, or ($0.41) per basic share for the fourth quarter of 2005.

134.    For the full-year ended December 31, 2006, Defendants reported revenue of $405.7 million and loss from continuing operations of ($17.3) million or ($0.48) per basic and diluted share, compared to revenue of $320.5 million  and a loss from continuing operations of ($37.8) million for the year ended December 31, 2005 or ($1.10) per basic and diluted share. InPhonic also reported  that excluding the impact of rebate settlement and related expenses, settlement and earnout expenses and restructuring costs of $11.1 million, loss from continuing operations for the full year of 2006 would have been ($6.2) million or ($0.17) per basic and diluted share.

135.    Also, on February 22, 2007, InPhonic held its Fourth Quarter and Year-end 2006 Earnings Conference Call (the "February 22, 2007 conference call").  During the call, Defendant Steinberg gave a long, glowing report regarding the financial performance and condition of the Company, which included the following:

> Let me focus on a few highlights from the quarter and the year. InPhonic reported record fourth quarter and full year results. Revenue for the fourth quarter was [$120.3 million].  That is an increase of 41% when compared with the fourth quarter of 2005. For the full year, revenue was [$405.7 million], an increase of 27% when compared to the full year of 2005.
>
> * * *
>
> Gross margins for the quarter were 50%, an improvement from the 47.8% reported in the third quarter of 2006 and the 34% for the fourth quarter of 2005.  For the fourth consecutive quarter, we were able to demonstrate improvements in gross margin, while generating growth in our ending balance of residual subscribers. Gross margin for the full year of 2006 were 48%.
>
> That is an improvement over the 40% for full year 2005.  We believe gross margins in the very high 40s are sustainable in the

near term, given our transition to residual compensation with a fifth wireless carrier, improved handset pricing and our focus on adding incremental high margin revenue streams, such as wireless accessory sales and direct marketing opportunities to our database and existing traffic.

136.    During the February 22, 2007 conference call, Defendant Winkler reported similar record results of $120.3 million in total revenue for fourth quarter 2006 and $405.7 million for the full year 2006, compared to $85.2 million for fourth quarter 2005 and $320.5 million for full year 2005.  Winkler stated that the "increase in revenue was the result of growth in our core wireless activations and service business."  He stated that "activations and services revenue for the full year of 2006 represents $330 million, and equipment revenue represents $75.6 million … for the year wireless activation services, generated $391.8 million of revenue …."  On the call, he added further "primary financial highlights" for fourth quarter 2006, stating that "Adjusted EBITA for the quarter was $11.4 million, compared to a loss of $12.4 million in the fourth quarter of 2005."  He also reported that "Adjusted EBITDA for the full year of 2006 was $24.5 million, compared to $7.2 million for the full year of 2005" and expressly attributed the increase in EBITDA to "improved gross margins and tight controls on the operating expenses, as well as growth in our business."

137.    More specifically, with respect to gross margins, Defendant Winkler reported on the call that "gross margin percentage for the quarter was 50%, compared to 34% a year ago. Gross margin for the full year 2006 was 48%, compared to 40% for the full year of 2005."  He added that "gross profits for the quarter more than doubled to $59.9 million when compared to $29.4 million for the fourth quarter of 2005." Winkler expressly attributed these reported increases in gross margin to "better handset pricing, increases in residual revenue, and the sales of accessories, device protection, and the launch of third-party offers to a component of our customer database, and the sale of carrier data features."  He also boasted that the Company was

"focused on a disciplined approach to channel mix management, which includes optimizing cost and yield of our market expenses," stating that "sales and marketing costs for the full year of 2006 … were $114.8 million or 28% of revenue."

138.    Defendant Winkler also emphasized on the call that the Company, during fourth quarter 2006, "generated positive cash flow of approximately $6.5 million from its operations."

139.    In reaction to Defendants' positive earnings reports, on February 23, 2007, analysts at Deutsche Bank issued a glowing research report, headlined **"4Q margin upside a positive – Solid '07 outlook – BUY."**  The analysts maintained a favorable "BUY" rating on InPhonic's stock, and raised price targets per share to $16 from $14.  Deutsche Bank analysts stated that the Company's "scaling of the residual revenue model paid dividends in 4Q, as gross margins and EBITDA outperformed expectations."

140.    The same day, Kaufman Bros. Equity Research analysts issued a research report, stating that they "continued to gain confidence in the INPC turnaround," and reiterated their "Buy" recommendation for InPhonic's stock.  They also raised their price target from $15 to $16 and reported that gross margins came in at 49.8%, an increase of 15 percentage points over fourth quarter 2005, which was driven by "better handset pricing" and "growth in residual revenue."

141.    Defendants Steinberg and Winkler's statements contained in ¶¶132-138 were materially false and misleading when made because Defendants knowingly and recklessly failed to disclose or indicate the following:

>    (a)    that the Company's financial results were materially inflated, and the Company's reported revenues, accounts receivable, operating loss and net loss per share were materially misstated;

(b)     that Defendants improperly recorded $34.8 million of net activation and

service revenue in 2006;

(c)     that the Company's net loss from operations in fiscal 2006 was ($63.7)

million and not ($37.8) million as initially reported;

(d)     that the net loss from continuing operations in fourth quarter 2006 was

actually ($34.3) million, which was ten times what Defendants initially

reported;

(e)     that Defendants overstated revenues for fourth quarter 2006 by almost $25

million, and overstated revenues for full year 2006 by more than $34

million;

(f)     that Defendants improperly recognized revenue from fees due from

customers when contracts were cancelled or devices were unreturned;

(g)     that Defendants failed to account accurately for accrued expenses and

reserves in connection with consumer product rebates and understated

expenses relating to consumer rebates by at least $4.9 million; that the

Company's financial statements were not prepared in accordance with

GAAP, and Defendants knowingly and/or recklessly violated SAB 104

because InPhonic did  not and could not accrue estimates of revenue with

any degree of certainty, much less the "high degree of certainty" publicly

reported by the Company due to its egregious lack of adequate internal

controls; and

(h)     that InPhonic internal controls were wholly inadequate and/or non-existent

in that the Company: (i) did not maintain sufficient staffing of operational

and financial resources and therefore lacked a sufficient number of employees with appropriate levels of knowledge, expertise and training in the application of generally accepted accounting principles in certain groups; (ii) failed to maintain effective communication channels with its finance department to adequately identify and record certain transactions during 2006; (iii) did not maintain effective controls over the recordation, accuracy and completeness of activations and services revenue and related accounts receivable; (iv) did not take steps to adequately identify and appropriately record certain commission and bonus revenue received during the year from various wireless carriers in a timely and accurate manner; (v) did not utilize an appropriate methodology during the year in recording receivables from wireless carriers associated with disputed deactivations, churn bonuses and other carrier related fees; (vi) did not maintain effective controls over the determination and accuracy of equipment revenue and related accounts receivable; (vii) did not maintain effective controls over the accuracy and completeness of consumer product rebate liabilities; and (viii) did not maintain effective controls over the accuracy and completeness of costs of goods sold and amounts due from vendors.

142.    As revealed in its late-filed Form 10-K, Defendants admitted that the previously reported financial results for the fourth quarter ending December 31, 2006 had materially overstated revenues and understated losses and costs.  The corrected financial results for the Fourth Quarter of 2006 decreased revenues from $120.3 million to $95.4 million; increased net

loss from ($17.3) million to ($34.3) million; and increased the net loss per share by ($0.82) from ($0.09) to ($0.91).

143.    Defendants further admitted that for fiscal 2006, the Company's internal controls over financial reporting were woefully inadequate and materially impacted the accuracy of its publicly disseminated financial results.  As they explained in its late-filed Annual Report, Form 10-K for 2006:

> A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.  Management identified material weaknesses in our internal controls including the following:
>
> *We did not maintain sufficient staffing of operational and financial resources.*  We did not maintain staffing in operational and financial resources sufficient to provide the level of controls and analysis required on a timely basis in light of the increasing complexity and growth of our business.  This resulted in certain accounting processes and controls not being performed on a timely basis and the inability to maintain an adequate control environment, resulting in numerous material adjusting entries being made after year end.  This material weakness contributed to errors such as those relating to revenue recognition and accounts receivable, accrual of rebates and other liabilities and adjustments made to properly account for certain amounts due from our vendors described below.
>
> *We did not always effectively communicate information to our finance department.*  Specifically, we failed to maintain effective communication channels to adequately identify and record certain transactions during 2006.  The failure to provide this communication contributed to errors relating to accounting and reporting of expenses and liabilities.  This material weakness caused or contributed to, adjustments necessary to appropriately record amounts due to marketing partners, accounts receivable allowances and reserves for deactivations.
>
> *We did not maintain effective controls over the recordation, accuracy and completeness of activations and services revenue and related accounts receivable.*

We did not take steps to adequately identify and appropriately record certain commission and bonus revenue received during the year from various wireless carriers in a timely and accurate manner. Recording amounts received from carriers in the appropriate accounts in a timely and accurate manner is an important business process control that is essential to the correct reporting of amounts in the financial statements. This material weakness contributed to errors relating to accounting and reporting for revenue and accounts receivable.

We did not utilize an appropriate methodology during the year in recording receivables from wireless carriers associated with disputed deactivations, churn bonuses and other carrier related fees. We overstated accounts receivable by using a methodology that anticipated future improvements in collections beyond that supported by past experience, and which did not consider certain current factors and other information. As a result of this material weakness, an adjustment was necessary to properly record revenue and related receivables from these fees.

We recorded additional allowances for doubtful accounts receivable during our restatement process. The proper accounting for the allowance for doubtful accounts requires that estimates must be made on the future collectibility of receivables. Specifically after analysis we concluded that reserves were required for doubtful collections on disputed accounts receivable, an additional reserve was necessary to provide for disputed accounts receivable arising from the most recent month of carrier commissions arising from December activations. In addition, our estimating process failed to take into account all information from ongoing collections processes in order to properly state our reserves. An addition to our reserves was necessary as a result of this material weakness.

*We did not maintain effective controls over the determination and accuracy of equipment revenue and related accounts receivable.* We did not utilize an appropriate methodology during the year in recording certain fees due from consumers when contracts are cancelled within specified time periods or the wireless device is not returned to us.  Specifically, related accounts receivable were overstated to the extent that we used collection percentages which anticipated improvements in excess of past experience.  As a result of this material weakness, an adjustment was necessary to properly record revenue and related receivables from these fees.

*We did not maintain effective controls over the accuracy and completeness of consumer product rebate liabilities.*  Specifically

we did not utilize an appropriate methodology during the year in recording rebates payable to eligible consumers. We understated the consumer product rebate liability by not considering the appropriate amount of open periods eligible for rebates and the backlog of possible eligible rebates that had been delivered to outsourced payment service providers. As a result of this material weakness, an adjustment was necessary to properly record product rebate expenses and related payables.

*We did not maintain effective controls over the accuracy and completeness of costs of goods sold and amounts due from vendors.* Specifically, we did not maintain adequate documentation to support the proper accounting for inventory movements related to support phone shipments for refitting and refurbishment. We overstated inventory or receivables in-kind by not maintaining adequate documentation of these phones provided to outside services providers. As a result of this material weakness, an adjustment was necessary to properly record costs of goods sold and amounts due from vendors.

### E.    The Truth Begins to Emerge

144.    On April 3, 2007, InPhonic filed a Form 8-K with the SEC to report an unscheduled material event. In particular, the Company revealed that its previous publicly-filed financial statements for the first three quarters of 2006 and publicly disseminated information concerning its fourth quarter 2006 financial results could no longer be relied upon and would need to be restated. The Company also disclosed that its internal controls over financial reporting were materially weak. The Company, in relevant part, revealed:

On April 2, 2007, the Company's management and Audit Committee concluded that **the Company's unaudited financial statements for the quarterly periods ended June 30, 2006 and September 30, 2006 each as filed on Form 10-Q (the "2nd and 3rd Quarter Financials") as well as the unaudited financial results for the quarter and year-ended December 31, 2006 included in the Company's earnings release issued on February 22, 2007 (the "Year End Results") should no longer be relied upon as a result of certain errors discovered subsequent to the issuance of the Year End Results.** At this time the Company has identified the matters set forth below which will require changes to the 2nd and 3rd Quarter Financials and unaudited Year End Results. Certain additional matters are also

subject to review.  The matters for which changes will be required are:

**In 2006, the Company recorded net activation and services revenue as a change in its estimate of certain disputed carrier commissions which it had deemed collectible.  The Company now believes that it was inappropriate to have recorded revenue associated with this matter until such collections are received.**  If the Company is ultimately able to collect any of these disputed carrier commissions, the amount would be recorded as revenue at the time of collection.  We have subsequently collected some of these receivables and recorded them as revenue.

**The Company has also identified a deficiency in its process for recording certain fees due from consumers when contracts are canceled within specified time periods and the wireless device is not returned to the Company as is required under the contract with the customer** ("EDPs").  The Company believes that revenue originally recorded as being earned under generally accepted accounting principles and the related accounts receivable amount should be reduced to be reflective of such historical experience.  If the Company ultimately is able to collect on or sell these pools of consumer receivables at a more favorable rate, a gain may be recorded at the time of such collection or sale, subject to the terms of the agreements.  The Company has identified a third party marketplace for the sale of its EDP receivables and is actively marketing these assets.

**The Company expects to amend the previously filed Form 10-Qs for the 2nd and 3rd Quarter Financials with an aggregate impact of a reduction of revenue for the quarterly periods ended June 30, 2006 and September 30, 2006.  The Company also anticipates revising the Year End Results.**  The amendments to the prior period financial statements, including for our year-end results, for the above and certain other entries are one-time, non-cash charges that **the Company expects will increase its previously reported net loss for 2006 by a range from approximately $5 million to $7 million in the aggregate.**  The foregoing is an estimate subject to change until the Company's accounting review and outside audit is complete.  The reduction in revenue will have corresponding impacts to previously reported quarterly revenue and will result in increased net losses for each period.

**Additionally, the Company has identified three material weaknesses in its internal controls over financial reporting.**  At the entity level, management identified a material weakness in its

54

control environment because it lacked a sufficient number of employees with appropriate levels of knowledge, expertise and training in the application of generally accepted accounting principles in certain groups. At the transactional level, due to the lack of sufficient personnel, the Company was unable to properly perform certain accounting procedures in a timely manner relating to the recording of carrier commissions. Also, at the transactional level, the Company identified a material weakness in its process for recording revenue relating to EDPs. The Company will be required to provide an assessment of the effectiveness of the Company's internal control structure and procedures for financial reporting when it files its Annual Report on Form 10-K for the fiscal year ended December 31, 2006. Management has already taken action to remediate the material weaknesses described above based on an evaluation of the accounting staffing, systems, policies and procedures relating to revenue recognition, however, our efforts to remediate deficiencies surrounding the levels of our staffing may take some time to remediate over the next several quarters.

The Company intends to file its restated financial statements for the quarterly periods ended June 30, 2006 and September 30, 2006 together with its Annual Report on Form 10-K for the fiscal year ended December 31, 2006.

April 3, 2007 8-K (emphasis added).

145. On this news, shares of the Company's stock fell $1.21 per share, or 11.7%, to close on April 3, 2007 at $9.15 per share, on unusually heavy trading volume. InPhonic's stock price plummeted in response to this disclosure because the market and investing public now knew some, but not all, of the truth regarding Defendants' and the Company's prior misrepresentations with respect to InPhonic's revenue, receivables, net loss and poor internal controls.

146. On April 6, 2007 the Company issued a press release entitled "InPhonic Receives NASDAQ Notice." In it, the Company, disclosed that it had received a Determination letter from NASDAQ that it was not in compliance with Marketplace Rules requiring the timely filing of its Annual Report with the SEC and was, therefore, in danger of being delisted.

147.    Then on May 4, 2007, the Company filed a Form 8-K/A with the SEC to further clarify and expand on the Company's recent disclosures.  The 8-K/A informed investors that its audit committee, with the assistance of independent counsel had determined that <u>none</u> of the Company's financial results for fiscal 2006 should be relied upon and that it would need to restate its reported financials for the Second and Third quarters 2006, and further correct its publicly announced financial results for the Fourth quarter of 2006.  According to the 8-K/A the need for Restatement of the Company's 2006 financial results was the result of numerous misapplications of GAAP; improperly recognized revenue and improperly deferred expenses; inadequate controls and insufficient processes, procedures and expertise. The Company, in relevant part, stated:

> The following includes an update of the information first disclosed in the Company's Form 8-K dated April 2, 2007.
>
> The Company's Audit Committee has conducted additional review using the services of independent counsel and other experts with respect to the matters identified below.  **It is the conclusion of the Audit Committee that these matters resulted from misapplication of GAAP; improperly recognized revenue and improperly deferred expenses; inadequate controls and insufficient processes, procedures and expertise.  In response, the Company is currently developing and implementing a remediation plan, which will include a reorganization of the finance and accounting functions within the Company.**
>
> <u>**Fiscal Year 2006**</u>
>
> On April 2, 2007, the Company's management and Audit Committee concluded that the Company's unaudited financial statements for the quarterly periods ended June 30, 2006 and September 30, 2006 each as filed on Form 10-Q (the "2nd and 3rd Quarter Financials") as well as the unaudited financial results for the quarter and year-ended December 31, 2006 included in the Company's earnings release issued on February 22, 2007 (the "Year End Results") **should no longer be relied upon as a result of certain errors discovered** subsequent to the issuance of the Year End Results.  At this time the Company has identified the matters set forth below which will require changes to the 2nd and

3rd Quarter Financials and unaudited Year End Results. Certain additional matters are also subject to an ongoing review. The matters for which changes will be required are:

**In 2006, the Company recorded net activation and services revenue of approximately $16 million related to certain carrier commissions and bonuses which it had deemed collectible. The Company now believes that it was inappropriate to have recorded revenue associated with these matters** until such collections are received. The Company will continue its efforts to collect amounts outstanding and will record related receipts as revenue at the time of collection.

**The Company has identified a deficiency in its process for recording certain fees due from consumers when contracts are canceled within specified time periods or the wireless device is not returned to the Company** as is required under the contract with the customer ("Equipment Discount Provisions" or "EDPs"). **The Company believes that $2.5 million in revenue originally recorded as being earned and the related accounts receivable amount should be reduced** to be reflective of such historical experience without regard to improvements in collections expected in the future from additional collection processes being employed. If the Company ultimately is able to collect on or sell these pools of consumer receivables at a more favorable rate, a gain may be recorded at the time of such collection or sale, subject to the terms of the agreements. The Company has identified a third party marketplace for the sale of its EDP receivables and is actively marketing these assets.

**The Company has identified an error in the recording of accrued expenses and reserves for consumer product rebates totaling $4.9 million.** These amounts should have been recorded as either an expense or reduction to equipment revenue in 2006. The Company believes that $3.3 million of the total adjustment is related to additional expenses for rebates paid to consumers as "goodwill" prior to its settlement with the Attorney General of the District of Columbia.

**The Company has identified other accounting adjustments of approximately $3 million,** net, related to the correction of certain equipment expenses, sales and marketing expenses, and general and administrative expenses associated with accruals of professional fees, unbilled inventory, the write-off of certain assets on the balance sheet, and other adjustments.

The Company expects to amend the previously filed Form 10-Qs for the 2nd and 3rd Quarter Financials and the Year End Results with an aggregate impact greater than anticipated at the time of the Company's original April 2, 2007 Form 8-K filing. The Company currently expects that it will increase its previously reported net loss to reflect an aggregate net loss of approximately $43 million to $49 million for the year. A portion of these adjustments should be mitigated by dollars that have already been reserved. The foregoing continues to be an estimate and is subject to change until the Company's outside audit is complete. In addition, given the adjustments and errors identified to date as described above and the ongoing audit of 2006, the Company's management and Audit Committee have concluded that the unaudited financial statements for the quarter ended March 31, 2006 should no longer be relied upon. At the present time, no matters have come to the Company's attention that would result in a restatement of the March 31, 2006 financial statements. The Company expects to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2006 within two to three weeks. The Company will file its restated financial statements for the quarterly periods ended June 30, 2006, and September 30, 2006, as well as its Form 10-Q for the first quarter of 2007 together with the filing of the Annual Report on Form 10-K.

**Additionally, the Company has identified six material weaknesses in its internal controls over financial reporting.** At the entity level, management identified a material weakness in its control environment because **it lacked a sufficient number of employees with appropriate levels of knowledge, expertise and training in the application of generally accepted accounting principles in certain groups.** At the transactional level, due to the lack of sufficient personnel, the Company was unable to properly perform certain accounting procedures in a timely manner relating to the recording of carrier commissions. Additionally, the Company inappropriately recorded receivables from the carriers that were not supported by historical experience. Also, the Company identified a material weakness in its process for recording revenue relating to EDPs as well as a material weakness due to a failure within the Company to effectively communicate information to its finance department necessary to record certain marketing expenses on a timely basis. Finally, the Company did not utilize an appropriate methodology for recording consumer product rebates. The Company will be required to provide an assessment of the effectiveness of the Company's internal control structure and procedures for financial reporting when it files its Annual Report on Form 10-K for the fiscal year ended December 31, 2006. Management has already taken some action

to remediate the material weaknesses described above based on an evaluation of the accounting staffing, systems, policies and procedures relating to revenue recognition, however, our efforts to remediate deficiencies surrounding the levels of our staffing and related levels of expertise may take some time to remediate over the next several quarters.

**Fiscal Year 2005**

In addition to the 2006 issues discussed above, the Company has identified an error regarding a marketing expense of approximately $1.2 million that should have been recorded in the quarter and year ended December 31, 2005. Of such amount, $600,000 was recorded in the quarter ended December 31, 2006. If it had been properly recorded, such additional expense would have increased the Company's net loss for the quarter ended December 31, 2005 from approximately $24.8 million to approximately $26.0 million. As a result of this new disclosure, on May 1, 2007, the Company's management and Audit Committee concluded that the Company's audited financial statements for the fiscal year ended December 31, 2005 should no longer be relied upon. The Company and the Audit Committee are continuing their review and have not yet determined whether a restatement of financial results for the year ended December 31, 2005 will be required. As a result of its review the Company may discover additional errors to its previously filed financial statements. [Emphasis added.]

148. The market reacted strongly to this partial disclosure, as shares of the Company's stock fell an additional 7.5%, or $0.64 per share, to close on May 4, 2007 at $7.90 per share, on unusually heavy trading volume.

149. On May 18, 2007, InPhonic announced that it had received an additional NASDAQ Staff Determination notice stating that the Company was not in compliance with NASDAQ Rules because the Company had not timely filed its Form 10-Q for First Quarter 2007.

150. Defendant Winkler was forced to resign from the Company effective May 31, 2006. In the Company's Annual Report on Form 10-K for fiscal 2006, which was late-filed on

June 1, 2007, one of the actions explicitly identified to remediate material weaknesses was the replacement of Winkler, the Company's CFO.

**F.    The Restatement**

151.    On June 1, 2007, InPhonic late filed with the SEC its Annual Report on Form 10-K for the year-ended December 31, 2006, and it also filed Amended Quarterly Reports on Form 10-Q/A for the quarters-ended March 31, June 30, and September 30, 2006.  Defendants restated all of InPhonic's quarterly financial statements for 2006 and corrected the results that they had announced for fourth quarter and year-end 2006.  Total revenue for the full-year 2006 was reported as $369.6 million, which was substantially lower than the $405.7 million previously misrepresented by Defendants.  Accounts receivable and revenue had been reduced by $34.8 million and equipment revenue was reduced by $2.6 million.  In addition, rebate-related expenses and payments had been increased by $4.9 million, and $3.9 million in other revenue and expenses were adjusted.  These changes were material to InPhonic's financial statements.

152.    The restated financial results also reported the net loss from operations for full-year 2006 as ($63.7) million, which was a ($46.4) million greater loss than what Defendants publicly reported months earlier prior to the Restatement.  On a June 1, 2007 earnings conference call (the "June 1, 2007 conference call") to discuss the reported results and restated financial statements, Defendant Steinberg personally apologized to shareholders, employees and other stakeholders for the Company's amended financial filings.  He indicated that the need to restate the Company's financial statements was not something that Defendants wanted to have happen and blithely stated: "If we can make some lemonade out of lemons we have learned a lot about how to better operate this business…obviously this has been a big bump in the road and we are glad to be moving past it."

153.    Defendant Steinberg claimed that InPhonic was "transforming its business from one focused on revenue growth to one focused on cash flow generation and profitability." Steinberg also falsely blamed intentional and fraudulent manipulations of InPhonic's reserve accounting on what he described as "back office processes [that] have not appropriately scaled with the rapid transaction growth of our business."

### G.    Continued False and Misleading Statements in the Wake of the Restatement

154.    Despite having to restate and/or correct all of the Company's financials for fiscal 2006 resulting in material downward adjustments to revenue and upward adjustments to InPhonic's costs and operating losses, InPhonic was unrelenting in its efforts to woo new investors and assuage existing ones.    Moreover, the full extent of InPhonic's pervasive fraudulent accounting practices were not disclosed at the time of the Restatement.

155.    In the June 1, 2007 conference call discussing the Restatement and the Company's financial future, Defendant Steinberg and other Company officers discussed the key findings of the Company's investigation surrounding the Restatement and claimed that InPhonic's financial failings and internal reporting problems stemmed from the Company's "rapid growth."  As he explained:

> It had become clear through this effort that certain back office processes have not appropriately scaled with the rapid transaction growth of our business . . . .  To put the business in perspective, for the first four years of this business life, we operated the Company with a strong focus on growth.  For the last two years as a newly public company, we focused on generating positive EBITDA. Going forward, we will be completely focused on generating positive cash flow and EBITDA.

156.    On the June 1, 2007 conference call, Steinberg also detailed a "three-step" plan "to correct [the Company's] immediate issues and, while at the same time putting [the Company] in a better position to manage our business for profitability and cash flow."  The plan consisted

of: (1) personnel changes, including the resignation of Defendant Winkler on May 31, 2007, the promotion of Andy Zeinfeld (former President of the Company's e-commerce unit) to President of the Company, and the fact that Brian Curran, the CFO, would be "assuming even greater levels of operational responsibility"; (2) the reorganization of the Company's Accounting and Finance Groups "in order to greatly improve the efficiency and accuracy of [InPhonic's] internal processes;" and (3) the creation of a team composed of senior operations, finance personnel to expediate [the Company's] move to generating free cash flow."

157.    On the June 1, 2007 conference call, Steinberg further reported that the Company had already implemented changes to reduce the Company's monthly cash expenses by $2 million per month, through reductions in InPhonic's capital expenditures, sales and marketing and general and administrative expenses, as well as a 10% reduction in the InPhonic work force. Steinberg stressed that the cuts represented "improvements in [the Company's] efficiency and not a reduction in [the Company's] capacity to manage the growth of the business."

158.    Steinberg also provided guidance on total revenue for 2007, stating that "Revenue will be between $460 million and $480 million" – a 24-30% increase in the $396.6 million in total revenue reported in its restated financial results for 2006.

159.    In the wake of this news, the Company's stock price surged closing at $9.50 per share on June 1, 2007 -- up from a close of $8.76 per share the prior day, on heavy trading volume.

160.    Analysts also welcomed the news.  On June 4, 2007, Kaufman Brothers reiterated its Buy recommendation for InPhonic shares, pointing to the resignation of Defendant Winkler, the 3-step plan outlined by Defendant Steinberg and the Company's new focus on generating

positive cash flow as key factors in their analysis. Deutsche Bank also maintained its Buy rating for the Company noting the same factors.

161.    Just three weeks after the Restatement, on June 20, 2007, Defendant Steinberg participated in an earnings conference call to discuss the Company's First Quarter 2007 financial results. There, he and other Company officers again stressed the Company's commitment to various cost saving measures and emphasized that "InPhonic remains the dominant player in the rapidly growing on-line activation marketplace."

162.    On the June 20, 2007 conference call, in response to a question concerning an 18% increase in the Company's sales and marketing costs and an 80% increase overall in the Company's General and Administrative Expenses ("G&A"), and whether there were "strategic alternatives" for solving the issues, Steinberg responded:

> First and foremost, [] we have been approached by a number of entities as it relates to strategic alternatives, and we're looking at some of them. I think there's some very interesting opportunities out there for us right now. The G&A was artificially stood up by the costs of the investigation and the audit . . . . But strategically, we have been approached, and we are having conversations.

163.    The next day, on June 21, 2007, Kaufman Brothers, again reiterated its Buy rating, noting that while revenues for the quarter were sub par, the Company's new focus on cost-savings, coupled with the fact that Company was now current with its SEC filings boded well for its future, noting "with the required filings submitted, we believe management should have more time to focus in on the business . . . **we believe that at this point the bulk of the bad news is out** . . . ." (emphasis added).

164.    Sidoti & Company issued a similar continued Buy rating on June 21, 2007, wherein it downplayed the significance of the Company's Restatement: "We view the restatement of 2006 results as a distraction from positive wireless industry trends and company-

specific operational restructuring that has positioned INPC for a strong recovery beginning in 2H:07."

165.    On August 9, 2007, InPhonic announced its Second Quarter 2007 financial results and issued a Press Release, which was filed with the SEC as an attachment to a Form 8-K dated the same day (the "August 9, 2007 8-K").  In the August 9, 2007 8-K and Press Release, the Company stated that it had entered into letter of intent with Brightstar under which "Brightstar would acquire the distribution, inventory and fulfillment assets of InPhonic and become InPhonic's exclusive provider of hardware (wireless handsets, SIM cards, and accessories), direct-to-consumer distribution, on-hand inventory, value added customization and logistics."

166.    The Company emphasized the importance of a definitive agreement with Brightstar noting that such an agreement would improve provide InPhonic benefits in three key areas -- improved cash flows due to outsourced inventory management, enhanced margins resulting from hardware procurement and significant growth opportunities in a new marketing relationship with Brightstar and its vast domestic and international sales channels.

167.    In the press release filed with the August 9, 2007 8-K further informed investors that Brightstar "strengthened its commitment to this new alliance further by making an investment of approximately $5 million in InPhonic through the purchase of approximately 925,000 newly issued restricted shares."  InPhonic claimed that this immediate $5 million investment had helped to improve InPhonic's liquidity position:

> InPhonic ended the second quarter of 2007 with $22.5 million in cash and cash equivalents.  The Company was able to improve its liquidity position by working with Citicorp and Goldman Sachs to complete an agreement to draw an additional $15 million from the existing credit agreement.  The total balance of the note will be $90 million.
>
> **The immediate new equity investment of $5 million from Brightstar** plus the new borrowings from the Lending Group will

provide an aggregate infusion of $20 million into InPhonic. [emphasis added].

168.    In response to this news, the share price for InPhonic stock rose dramatically from a close of $3.97 per share on August 8, 2007 to $4.86 per share on August 9, 2007 -- an increase of more than 20% in a single day on heavy trading volume.

169.    Then, on August 10, 2007, in a Form 8-K/A further amending the Company's April 3, 2007 and May 4, 2007 announcements (the "August 10, 2007 8-K/A"), the Company disclosed additional details of the improper accounting practices that led to the Restatement. Specifically, the Company revealed that:

- the Company miscalculated the number of months that remained subject to rebate redemption in which the contractual redemption period had not expired or qualifying rebates from this period remained unpaid. As a result of this miscalculation, the Company underestimated its rebate reserve by approximately $1.6 million.

- The Company recorded certain amounts as receivable or as a reduction or accounts payable related $4.0 million of certain handset equipment that has been returned to its equipment vendors for repair and replacement. Subsequent to year-end, the Company determined that it would not collect or receive credit for certain amounts related to these returns. The Company will continue its efforts to collect amounts outstanding and will record related receipts as a reduction of equipment cost of revenue at the time of collection.

- The Company has identified other accounting adjustments of approximately $2.7 million, net, related to the correction of certain equipment expenses, sales and marketing expenses, general and administrative expenses and depreciation expense associated with the following:

  (in millions)

| | | |
|---|---|---|
| Write-off of long-term assets | $ 0.9 | a |
| Co-op related cost of revenue and [sales/marketing] expense | 0.8 | b |
| Shared advertising accrual | 0.6 | c |
| Accrued [FTC] rebate consent agreement | 0.4 | d |
| Accrued sales and marketing for satellite business unit | 0.3 | e |
| Accrued VMC settlement | 0.2 | f |

| | | |
|---|---:|---|
| Accrued price protection credits | 0.1 | g |
| Accrued shipping costs | 0.1 | h |
| Accrued audit and related fees | (0.6 ) | i |
| Depreciation expense | (0.1 ) | j |
| Total | $ 2.7 | |

a.      Amounts relate to an adjustment to write off certain costs capitalized for potential acquisitions that were deemed no longer valid at December 31, 2006;

b.      Amounts relate to an adjustment to reverse specific co-op equipment cost of revenue and sales and marketing expenses for items deemed non-collectible or deemed a duplication error at December 31, 2006;

c.      The Company identified an error regarding a marketing expense of approximately $1.2 million that should have been recorded in the quarter and year ended December 31, 2005. Of such amount, $0.6 million was recorded in the fourth quarter ended December 31, 2006;

d.      Subsequent to the issuance of the Year End Results, the Company entered into a consent agreement with the Federal Trade Commission. At that time, the Company was able to estimate that approximately $0.4 million of rebates would be paid to customers for which rebates had previously been denied. Prior to the consent agreement, the Company was unable to reasonably estimate the amounts to be paid;

e.      As a result of the negotiation of an amendment to an operating agreement with the provider of satellite television services which was completed and signed subsequent to the issuance of the Year End Results but including certain activity completed in 2006, the Company determined it had incurred an additional $0.3 million of sales and marketing expense under the terms and conditions of the amended agreement;

f.      Subsequent to the issuance of the Year End Results, the Company entered into an agreement to settle a dispute regarding amounts owed under the asset purchase agreement with VMC Satellite, Inc. Such dispute was pending as of December 31, 2006. As a result of the agreement, the Company accrued $0.2 million of additional general and administrative expense;

g.      Amounts relate to an adjustment for the over-accrual of price protection credits during 2006;

h.      Amounts relate to an adjustment for under-accrued shipping costs identified subsequent to the issuance of the Year End Results;

i.      Amounts relate to an adjustment to reverse over-accrued audit and related fees in fiscal year 2006 that were incurred in fiscal year 2007; and

j.      Amounts relate to an adjustment for amounts that were over-depreciated prior to December 31, 2006.

Form 8-K/A, filed on August 10, 2007.

170.    On this news, shares of InPhonic stock plunged, losing almost 28% in value.  The stock closed at $3.50 per share on August 10, 2007, down from a close of $4.86 per share the prior day on very heavy volume.

171.    On September 5, 2007, in a press release entitled "Brightstar and InPhonic Sign Definitive Agreement to Form Strategic Alliance" and attached to a Form 8-K filed the same day with the SEC, InPhonic announced that the Brightstar deal had been "signed," subject only to unspecified closing conditions.  The press release emphasized that InPhonic and Brightstar had signed a "definitive agreement."  It stated, in pertinent part:

> **Washington, D.C. and Miami – September 5, 2007** – Brightstar Corp., a global leader in customized distribution and supply chain solutions for the wireless industry, and InPhonic, Inc. (NASDAQ: INPC), a leading online seller of wireless services and products, today announced the signing of a definitive agreement to form a new strategic alliance.
>
> Upon the closing of the agreement, there would be four principal components of the new relationship:
>
> Brightstar will acquire the distribution, inventory and fulfillment assets of InPhonic and will become InPhonic's exclusive provider of hardware (wireless handsets, SIM cards and accessories), direct-to-consumer distribution, on-hand inventory, value added customization and logistics.
>
> Brightstar will make a $5 million equity investment in InPhonic representing approximately 2.5% of InPhonic's outstanding shares.

Brightstar will leverage InPhonic's online activation and enablement platform for its existing consumer businesses. Brightstar serves approximately 11,000 points of sale in the United States with some of the most recognized retail store brands.

Brightstar also serves approximately 160,000 points of sale worldwide providing both companies global expansion opportunities with their new combined capabilities.

The terms of this new strategic alliance encompass collaboration across a number of functional areas with a focus on providing InPhonic benefits in four key areas – **improved cash flows due to outsourced inventory management, enhanced margins resulting from hardware procurement, reduced current operational and fulfillment expenses, and significant growth opportunities in a new sales and marketing relationship with Brightstar and its domestic and international sales channels.** Subject to closing conditions, the transaction is expected to close in mid to late September 2007.

"This strategic partnership with Brightstar will allow us to focus on our core competencies as an online wireless leader in customer acquisition. **This new alliance would provide an initial cash infusion, and we believe a significant positive impact to InPhonic's working capital and cash flow as well.** We believe the combination of InPhonic's activation and retail consumer platform along with Brightstar's operational excellence in fulfillment and logistics present significant growth potential for both companies," said David A. Steinberg, InPhonic's Chairman and CEO. "By combining our efforts, the companies can bring a powerful and unique value proposition to Brightstar's existing customers, as well as expanded capabilities and improved fulfillment services for our distribution channels." [emphasis added]

172.    The statements contained in ¶¶144, 147, 151-153, 155-157,167 and 171 were materially false and misleading when made because:

(a)    InPhonic's accounting irregularities were far more pervasive than had been disclosed in the June 1, 2007 Restatement, or at any time prior;

(b)    Brightstar did not make an "immediate" investment of $5 million in InPhonic on August 9, 2007, or at any other time subsequent.

68

(c)    Brightstar and InPhonic never entered into a definitive agreement.

173.    In the August 10, 2007 8-K/A, the Company admitted that in millions of dollars in "adjustments" to its previously reported financial results were due to widespread accounting improprieties, including failure to properly account for equipment returns, equipment expenses, rebates, sales and marketing expenses, general and administrative expenses and depreciation expenses.

174.    Defendant Steinberg admitted the falsity of the Company's disclosures regarding InPhonic's alleged strategic alliance and business agreement with Brightstar in a Press Release dated October 11, 2007 (the "October 11, 2007 Press Release") and Form 8-K filed on October 12, 2007, where the Company revealed that it had received a notice of default and reservation of rights from its secured lenders under a November 7, 2007 Credit Agreement and reported that the events of default included "failure to enter into a definitive agreement to provide for the outsourcing of the Company's inventory management, logistics and fulfillment obligations by October 5, 2007."

175.    In the October 11, 2007 Press Release, the Company referred to the "definitive agreement" it had entered into with Brightstar as a "proposed" partnership that had been "terminated."

176.    The Form 8-K filed on October 12, 2007 also revealed that the "Stock Purchase Agreement entered into by and between the Company and Brightstar was also terminated."

177.    Also "terminated" was Brian Curran, the Company's Chief Operating Officer who was fired on October 10, 2007.

178. On this news, InPhonic's share price dropped from a close of $1.94 on the prior day's trading to a shocking $.77 on October 11, 2007 – **a decrease of almost 60% on a volume of more than 10 times that of the prior day**.

179. Less than one month later, on November 8, 2007 the Company filed a voluntary petition for bankruptcy. In its Form 8-K announcing the filing of InPhonic's bankruptcy petition, the Company revealed that Defendant Steinberg had tendered his resignation the prior day, on November 7, 2007, and was effective immediately.

180. Also resigning just prior to InPhonic's bankruptcy filing were Board of Director members Ira Brind and Blake Bath, who resigned on November 6, 2007 and November 7, 2007, respectively.

181. Grant Thornton LLP, the Company's independent registered public accounting firm, also resigned on November 8, 2007.

182. In announcing the Bankruptcy, Defendant Steinberg and the Company informed the investing public that "[t]he Company believes that its currently outstanding stock has no value."

## VI. DEFENDANTS' VIOLATION OF GAAP RULES IN INPHONIC'S FINANCIAL STATEMENTS FILED WITH THE SEC

183. As has now been revealed, InPhonic was only able to make it appear that it was experiencing growth and generating revenue through numerous accounting improprieties that violated fundamental GAAP precepts. When these GAAP violations were disclosed, shareholders lost millions of dollars.

184. The SEC requires that public companies file quarterly and annual financial statements that are prepared in conformity with GAAP. SEC Rule 4-01(a) of Regulation S-X

states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1).

185.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

186.    At all relevant times during the Class Period, InPhonic financial statements were represented to have been prepared in accordance with Generally Accepted Accounting Principles ("GAAP").

187.    Furthermore, the SEC issues accounting guidance from time to time in the form of Staff Accounting Bulletins, also referred to as "SABs".  The Staff of the SEC issued Staff Accounting Bulletin ("SAB") No. 104, Revenue Recognition ("SAB 104") on December 17, 2003, which discussed the application of existing accounting literature, including FASCON 5, ¶83, by SEC registrants such as InPhonic.  SAB 104 provides, in relevant part:

> The staff believes that revenue generally is realized or realizable and earned when all of the following criteria are met:
>
> •    Persuasive evidence of an arrangement exists,
>
> •    Delivery has occurred or services have been rendered,
>
> •    The seller's price to the buyer is fixed or determinable, and

- **Collectibility is reasonably assured**. (SAB 104 Topic 13.A.1) (Footnotes removed)

SEC, SAB 104 (emphasis added).

188. During the Class Period, Defendants (1) prematurely recorded millions of dollars in net activation and service revenue; (2) inflated equipment revenue by improperly recognizing revenue from fees due from customers who deactivated wireless service or did not return wireless devices; (3) improperly booked uncollectible disputed carrier commissions; and (4) improperly denied consumer rebates, and (5) failed to account accurately for accrued expenses and reserves in connection with the rebates.

189. In addition, Defendants knowingly and recklessly concealed the fact that InPhonic's internal control systems were seriously deficient and that InPhonic accounting personnel were not trained to process basic accounting to record InPhonic receivables from wireless activation and services and equipment revenue.

190. InPhonic's Class Period financial statements and other publicly issued statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for, and disclosure about its revenues, in violation of GAAP rules.

191. Given these accounting irregularities, the Company's publicly reported financial results that were in violation of GAAP and the following principles:

(a)  The principle that financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions (FASB Statement of Concepts No. 1, ¶34);

72

(b)     The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" (FASB Statement of Concepts No. 1, ¶40);

(c)     The principle that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Concepts No. 1, ¶42);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it (FASB Statement of Concepts No. 1, ¶50);

(e)     The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶ 58-59);

(f)     The principle that completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79);

(g)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶95);

(h)     The principle that revenue should be recognized only when Delivery has

occurred or services have been rendered, the seller's price to the buyer is fixed or determinable, and Collectibility is reasonably assured. (SAB 104 Topic 13.A.1); and

(i)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10).

192.    The undisclosed adverse information concealed by Defendants during the Class Period, as set forth in this Complaint, is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed. Defendants' failure to disclose adverse information during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

193.    A Restatement is reserved only for the revising of financial statements to correct **material errors** in previously reported financial statements. (FAS 154 ¶¶2, B30). The Defendants' Restatement of InPhonic publicly filed financial statements for the quarters ended March 31, 2006, June 30, 2006, September 30, 2006 and December 31, 2006 therefore constitutes an <u>admission</u> that those financial statements were materially false and misleading.

194.    By failing to file financial statements with the U.S. Securities and Exchange Commission ("SEC") that conformed to GAAP (and the rules and regulations of the SEC), Defendants repeatedly disseminated financial statements that are "presumed to be misleading or inaccurate."

## VII.    LOSS CAUSATION

195.    During the Class Period, as detailed herein, the Defendants engaged in a fraudulent scheme to deceive the market through a course of conduct that artificially inflated InPhonic's share price and operated as a fraud and deceit on Class Period purchasers of InPhonic stock through the misrepresentation of the Company's financial results and the blatantly false reporting of a definitive agreement with and investment in InPhonic by Brightstar.

196.    As the truth concerning InPhonic's false and misleading statements and lack of internal controls entered the market and became known to investors, InPhonic's share price fell precipitously as the artificial inflation came out of the Company's stock price.  As of result of their purchases of InPhonic stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, i.e. damages under the federal securities laws.

197.    By overstating InPhonic revenue and understating losses and expenses, misrepresenting that the Company had adequate internal controls, omissions concerning the severity of its accounting irregularities and through blatantly false statements concerning Brightstar, Defendants falsified the Company's financial results and presented a highly inaccurate and misleading picture of InPhonic's financial health and business prospects to the investing public.  *See* ¶¶52-182.

198.    The false and misleading statements complained of herein caused and maintained the artificial inflation in InPhonic's stock price throughout the Class Period.  As a result, during the Class Period, InPhonic's stock traded at artificially inflated levels-- reaching a Class Period high of $14.36 per share on February 7, 2007.

199.    On April 3, 2007, the Company revealed that its publicly-released financial statements for the quarterly-periods ended June 30, 2006 and September 20, 2006, and the year-ended December 31, 2006, could no longer be relied upon as a result of "accounting

irregularities." The Company further disclosed that its Audit Committee had determined that "three material weaknesses" existed in the Company's internal control over financial reporting.

200.    On this news, shares of the Company's stock fell 11.7%, or $1.21 per share, as a direct result of this partial disclosure, closing on April 3, 2007 at $9.15 per share, on unusually heavy trading volume.

201.    Despite the April 3, 2007 disclosure, InPhonic's shares were still trading at artificially inflated levels, because investors were unaware of the scope and magnitude of Defendants' fraud, which was so egregious and pervasive that the Company would ultimately restate and/or correct all of its financial results for 2006, terminate its senior executives (including Defendant Winkler), default on the terms of its Credit Agreement, file for bankruptcy and declare that its outstanding stock was "worthless."

202.    On May 4, 2007, the Company further disclosed that its accounting and internal control deficiencies were more widespread and serious than had been previously disclosed. In the May 4, 2007 disclosure, Defendants revealed that the Company would restate and/or correct all of its financial results for 2006. At that time, Defendants disclosed that identified material weaknesses in InPhonic's internal controls over financial reporting had doubled from three to six.

203.    On this news, shares of the Company's stock fell an additional 7.5 %, or $0.64 per share, closing on May 4, 2007 at $7.90 per share, on unusually heavy trading volume.

204.    Even after the May 4, 2007 disclosures, InPhonic shares continued to trade at artificially high prices, since investors were yet unaware of the magnitude of the fraud. In fact, by June 1, 2007, when the Company at last restated its financial results for 2006 and heralded a new focus on increasing positive cash flow and issued guidance of an expected 24-30% increase

in revenue for 2007, (*see* ¶¶151-182), investors rewarded the announcement with a 9% increase in InPhonic's share price, closing at $9.50 on June 1, 2007, up from $8.76 on May 31, 2007, on a volume of 3,856,600 --  more than double that of the prior day.

205.    On August 9, 2007, InPhonic announced that it had entered into a letter of intent with Brightstar and that Brightstar had made an "immediate" investment of $5 million in InPhonic through a share acquisition.  In response, the Company's stock experienced the single highest one-day increase in its share price since November 9, 2006, when the Company issued its false financial results for the Third Quarter 20006.  InPhonic's shares closed up $.89 cents at $4.86 per share – a 22% increase over the prior day's close of $3.97 per share.

206.    On August 10, 2007, InPhonic revealed that, in addition to the previously disclosed severe internal control weaknesses, millions of dollars in "adjustments" to its 2006 financial results were due to widespread accounting irregularities. As a result, the Company's share price dropped by nearly than 28%, closing at $3.50 on that day.

207.    InPhonic's share price continued  to reflect misinformation about the true nature of the Brightstar "deal," -- which on September 5, 2007, the Company characterized as a "definitive agreement" -- until October 11, 2007, when InPhonic disclosed that it had received a notice of default and reservation of rights from its secured lenders under a November 7, 2006 Credit Agreement and reported that the events of default included "failure to enter into a definitive agreement to provide for the outsourcing of the Company's inventory management, logistics and fulfillment obligations by October 5, 2007."

208.    On this shocking news, **shares of InPhonic stock fell by almost 60%** closing at $.77 on extremely heavy trading volume of over 22 million shares.

209.    The timing and magnitude of InPhonic's stock price declines negates any inference that the loss suffered by Lead Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.* damages, suffered by lead plaintiff and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate InPhonic's stock price and the subsequent significant and catastrophic decline in InPhonic's share price when the full truth was gradually revealed to the market.

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

210.    As alleged herein, Defendants acted with scienter.  Defendants each and in concert knowingly and/or recklessly engaged in acts, practices and a scheme and course of business that artificially inflated InPhonic's stock price beginning at least in May 2006 and continuing during the Class Period.  Defendants also knew or recklessly disregarded that the public documents and statements they personally made or issued or disseminated in the name of the Company were materially false and misleading; knew and/or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and/or recklessly participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their acts, practices and course of business, including receipt of information reflecting the true facts regarding InPhonic, their control over, and/or receipt and/or modification of InPhonic's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning InPhonic, participated in the fraudulent scheme alleged herein, the principal purpose and effect

of which was to create the false appearance of revenue and profitability intending to deceive investors and the market.

211. Each of the Defendants knew and/or recklessly disregarded that InPhonic's reported activations and service revenue, equipment revenue, accounts receivable and gross margins were materially overstated. Defendants Steinberg and Winkler knowingly and/or recklessly included uncollectible revenue and fees in InPhonic's reported financial results in each quarter of 2006 and falsely reported related information to investors and the public. Throughout the Class Period, Defendants deliberately and/or recklessly overstated InPhonic's revenue and profits and hid the true nature of the Company's financial condition. Defendants publicly claimed and certified in writing that they accurately estimated and deferred revenue and accrued for expenses relating to deactivations by customers through a tight system of internal controls, when in fact, Defendants knew or recklessly disregarded that the controls were non-existent or materially flawed.

212. Defendants also knew and/or recklessly disregarded that their public claims of InPhonic's strict GAAP adherence were blatantly false as Defendants knowingly and recklessly: (1) prematurely recorded millions of dollars in net activation and service revenue; (2) inflated equipment revenue by improperly recognizing revenue from fees due from customers who deactivated wireless service or did not return wireless devices; (3) improperly booked uncollectible disputed carrier commissions; and (4) improperly denied consumer rebates and failed to account accurately for accrued expenses and reserves in connection with the rebates. Defendants deliberately and/or recklessly adjusted the estimated percentage of collectibility for EDP and other receivables when they knew that there was not only no historic basis for doing so, and knew that their actions violated GAAP, but also knowingly and recklessly increased the

estimated future collectibility of such receivables with no justification other than to boost improperly the Company's reported financial performance and condition for their own personal benefit.

213.    In addition, Defendants knowingly and/or recklessly concealed the fact that InPhonic's internal control systems were seriously deficient and that InPhonic's accounting personnel were not trained to process basic accounting to record InPhonic's receivables from wireless activation and services and equipment revenue.  Moreover, Defendants knowingly and/or recklessly falsely certified that the Company's internal controls and financial reporting in violation of Sarbanes-Oxley. Defendants knew and/or recklessly disregarded that the Company's internal controls were not adequate because they personally were manipulating the Company's accounting and computer systems to overstate InPhonic's revenues and gross margins.

214.    Defendant    Steinberg    knowingly    and/or    recklessly    made    material misrepresentations concerning the Company's now-discredited claims that it had entered into a "definitive agreement" with Brightstar, pursuant to which, in August of 2007, Brightstar made an "immediate" investment of $5 million in InPhonic.

215.    Furthermore, as described below, Defendants had the motive to commit the fraud as they enjoyed rich compensation packages, which depended in large part upon the Company's financial performance and its stock price.  Defendants were eligible for bonuses tied to the Company's financial performance.  They also received numerous options on InPhonic's stock, and as the Company's stock price increased, so did the value of the options granted to the Defendants.  Their options also were subject to vesting schedules that stretched for four years after the grant dates, which created the need for Defendants to artificially boost the Company's stock price above the exercise price so that Defendants' options could vest and be sold.

A.    **Defendant Steinberg**

216.    During the Class Period, Defendant Steinberg approved and participated in acts and practices that he knew or recklessly disregarded were designed to create a false impression of profitability for InPhonic's business and false revenues, which were recorded by InPhonic during the Class Period.

217.    As Chairman and CEO of the Company, Steinberg personally signed InPhonic's First Quarter, Second Quarter and Third Quarter 2006 Quarterly Reports of Form 10-Q, which he knew and/or recklessly disregarded were false and misleading and omitted material information that was necessary under the circumstances to avoid making statements that were misleading. He also certified the Company's financial results and sound internal controls in each of these Form 10-Qs.  Steinberg also deliberately and/or recklessly gave materially false and misleading oral reports regarding the Company's financial results and condition for each quarter and year-end 2006 in conference calls with analysts and investors.  Steinberg had a duty to speak truthfully on the calls and correct any false or misleading information provided to analysts, investors and the public, and he knowingly and/or recklessly breached this duty.

218.    As CEO and a Chairman of InPhonic's Board, Steinberg was responsible for ensuring that InPhonic properly reported its financial statements in accordance with GAAP and properly reported revenue and the true nature of the Company's internal controls.  In fact, Steinberg certified in writing in each of the Quarterly Reports on Form 10-Q for 2006 that he was the certifying officer responsible for establishing and maintaining disclosure controls and procedures.  Steinberg also certified in writing in each of these quarterly reports filed with the SEC that he had reviewed the financial statements and that they fairly presented in all material respects the financial condition, results of operations and cash flows of InPhonic and that they were free of material misstatements and omissions.

219.    As alleged herein, Steinberg participated in InPhonic's fraudulent acts, practices and scheme and course of business.  Therefore, he knew and/or recklessly disregarded that the Company's financial statements did not comply with GAAP and that InPhonic was overstating its revenues without disclosing improper changes to its revenue recognition policies and collection estimates that were implemented to overstate the revenue and gross margins of the Company throughout the Class Period.  Steinberg also knew and/or recklessly disregarded that the Company's systematic rejection of legitimate rebates was improperly artificially inflating the profitability and revenues of the Company.  Steinberg breached his duty (both as CEO and Chairman of the Board and as InPhonic's certifying officer) to make sure that InPhonic's financial statements presented a true picture of the Company's operations and financial condition, which they did not because of the undisclosed improper recognition of revenue, rejection of consumer rebates and manipulation of deactivation and collectibility estimates.

220.    Throughout the Class Period, Steinberg knew and/or recklessly disregarded that the overall impression created by InPhonic's financial statements was not consistent with the business realities of the Company's financial position and operations.

221.    Steinberg's motive to commit fraud included his ability to profit from sales of the Company stock at artificially-inflated prices.  Steinberg engaged in lucrative insider trading during the Class Period, taking advantage of InPhonic's stock price, which was artificially inflated by his own, Defendant Winkler's and the Company's fraud.  Steinberg enjoyed a rich compensation package, which depended in large part on the Company's stock price, and of course, the continuing viability of the Company.  The bulk of Steinberg's compensation was dependent on the price of InPhonic's stock.  Steinberg received numerous options on InPhonic's stock.  As InPhonic's stock increased in price, so did the value of options granted to him and

other insiders. Throughout the Class Period, Steinberg shared with Winkler and others an overriding motive to enrich himself through sales of InPhonic stock at prices inflated by fraud.

222.    As reported in the Company's 2006 10-K, Steinberg's compensation was tied to the Company's financial performance.  As reported therein:

> In February 2000, we entered into an employment agreement with Mr. Steinberg, which was subsequently amended in March and May 2004 . . . .  Under this agreement, Mr. Steinberg receives an annual base salary to be established from time to time by the board of directors, which shall not be less than $290,000 per year, and he is eligible for an annual bonus equal to 65% of his then current annual salary based on the attainment of reasonable performance objectives established by the Compensation Committee of the Board of Directors.

223.    InPhonic's Proxy Statement filed with the SEC in May 2006, states that in 2005 Steinberg received a base salary of $320,000, and he was awarded 100,000 shares of restricted InPhonic stock and granted 666,667 options for shares of InPhonic stock in 2004.  On December 31, 2006, Steinberg was granted an additional 500,000 shares of InPhonic restricted stock.  Collectively, in shares, options and restricted stock, Steinberg beneficially owned over 5 million shares of InPhonic stock, or 13.9% of the outstanding shares of the Company.  But a large portion of his stock and option holdings were restricted, unvested or out of the money.  With a potential large fortune in InPhonic stock holdings, Steinberg stood to vastly increase his personal wealth if the Company met revenue and earnings targets and if the price of InPhonic's common stock continued to rise.

224.    During the Class Period, on November 7, 2006, Defendant Steinberg sold 450,000 shares of InPhonic stock.  He sold the stock at $10.45 per share, reaping proceeds of $4,702,500 -- a substantial amount representing almost 15 times his ordinary annual compensation.

225.    Steinberg's November 2006 stock sale was a private transaction in conjunction with the $100 million debt financing by Goldman Sachs and other lenders in which Defendants

Steinberg and Winkler and other insiders sold secondary shares to participants in the debt financing. Steinberg's stock sale was his only sale during the Class Period and was suspiciously timed and calculated to maximize personal benefit from undisclosed inside information during the Class Period when Steinberg and others were aware of, or were reckless in not knowing of material non-public information concerning the Company's inappropriate and unsupportable accounting methodologies, resulting in materially false and overstated revenues and accounts receivable and understated expenses, as well as the Company's total lack of adequate internal controls.

226. Indeed, Steinberg's November 7, 2006 stock sale occurred on the very same day that the Company announced that it had secured a $100 million credit facility through Goldman Sachs, which caused InPhonic's to sky-rocket by more than 22% that day.

227. Prior to November 2006, when Goldman Sachs threw InPhonic a debt-financing lifeline, Defendant Steinberg's largest block sale was 150,000 shares—a mere 25% of the 450,000 shares he sold on the day the Credit Agreement was executed. Prior to that, in November 2004, Steinberg had sold 105,263 shares of stock in the wake of the Company's IPO. In June, July and August 2005, Defendant Steinberg sold 150,000, 112,500 and 75,000 shares of stock, respectively, purportedly pursuant to a previously-established "10b5-1" trading plan. Through his November 7, 2006 stock sale Defendant Steinberg garnered proceeds of over $4.7 million, while in possession of material non-public information, which he knowingly and/or recklessly failed to disclose.

**B.     Defendant Winkler**

228. During the Class Period, Defendant Winkler knowingly and/or recklessly approved and participated in acts and practices that created a false impression of profitability for

InPhonic's business and false revenues, which were recorded by InPhonic during the Class Period.

229. As CFO of the Company, Winkler personally signed InPhonic's First Quarter, Second Quarter and Third Quarter 2006 Quarterly Reports of Form 10-Q, which he knew and/or recklessly disregarded were false and misleading and omitted material information that was necessary under the circumstances to avoid making statements that were misleading. He also certified the Company's financial results and sound internal controls in each of these Form 10-Qs. Throughout the Class Period, Winkler also signed the Company's Form 8-Ks, which that released false and misleading quarterly and year-end revenue and earnings, which Winkler knew or recklessly disregarded were false when he signed the Form 8-Ks and caused them to be publicly issued. Winkler also knowingly and/or recklessly personally gave materially false and misleading oral reports regarding the Company's financial results and condition for each quarter and year-end 2006 in conference calls with analysts and investors. Winkler had a duty to speak truthfully on the call and correct any false or misleading information provided to analysts, investors and the public, and he knowingly and recklessly breached this duty.

230. As CFO for InPhonic, Winkler was responsible for ensuring that InPhonic properly reported its financial statements in accordance with GAAP and properly reported revenue and the true nature of the Company's internal controls. In fact, Winkler certified in writing in each of the Quarterly Reports on Form 10-Q for 2006 that he was the certifying officer responsible for establishing and maintaining disclosure controls and procedures. Winkler also certified in writing in each of these quarterly reports filed with the SEC that he had reviewed the financial statements and that they fairly presented in all material respects the financial condition,

results of operations and cash flows of InPhonic and that they were free of material misstatements and omissions.

231.    As alleged herein, Winkler participated in InPhonic's fraudulent acts, practices and scheme and course of business.  Therefore, he knew and/or recklessly disregarded that the Company's financial statements did not comply with GAAP and that InPhonic was overstating its revenues without disclosing improper changes to its revenue recognition policies and collection estimates that were implemented to overstate the revenue and gross margins of the Company throughout the Class Period.  Winkler also knew and/or recklessly disregarded that the Company's systematic rejection of legitimate rebates was improperly artificially inflating the profitability and revenues of the Company.  Winkler breached his duty (both as CFO and as InPhonic's certifying officer) to make sure that InPhonic's financial statements presented a true picture of the Company's operations and financial condition, which they did not because of the undisclosed improper recognition of revenue, rejection of consumer rebates and manipulation of deactivation and collectibility estimates.

232.    Throughout the Class Period, Winkler knew and/or recklessly disregarded that the overall impression created by InPhonic's financial statements was not consistent with the business realities of the Company's financial position and operations.

233.    Winkler's motive to commit fraud included his ability to profit from sales of the Company stock at artificially-inflated prices.  Winkler engaged in lucrative insider trading during the Class Period, taking advantage of InPhonic's stock price, which was artificially inflated by his own, Defendant Steinberg's and the Company's fraud.  Winkler enjoyed a rich compensation package, which depended in large part on the Company's stock price, and of course, the continuing viability of the Company.  The bulk of Winkler's compensation was dependent on the

price of InPhonic's stock.  Winkler received numerous options on InPhonic's stock.  As InPhonic's stock increased in price, so did the value of options granted to him and other insiders. Throughout the Class Period, Winkler shared with Steinberg and others an overriding motive to enrich himself through sales of InPhonic stock at prices inflated by fraud.

234.    Winkler also engaged in fraud to maintain the illusion of growth of revenues and profitability for the Company that provided a rich compensation package to him.

235.    InPhonic's Proxy Statement filed with the SEC in 2006, states that Winkler received a base salary of $300,000 and a bonus of $30,000.  The Proxy Statement also revealed that Winkler was eligible for a $175,000 annual bonus "subject to his achieving certain annual performance goals."  Winkler also was awarded 250,000 shares of restricted InPhonic stock and granted 433,334 options for shares of InPhonic stock in 2004.  The options were set to become exercisable over varying three to four-year periods, with 33% of most options vesting on the first anniversary of the grant and subsequently vested in equal installments over the next two years. The options had an exercise price of $5.88 per share.  Between February 2005 and 2006, InPhonic's stock had fallen more than 80%.  By the end of February 2006, all of Winkler's options were out of the money.

236.    On June 13, 2006, Winkler was granted 25,000 shares of restricted stock, and on December 28, 2006, Winkler was granted options for an additional 100,000 shares of InPhonic restricted stock.  But a large portion of his stock and option holdings were restricted, unvested or out of the money.  With a potential large fortune in InPhonic stock holdings, Winkler's personal wealth was tied to the Company meeting revenue and earnings targets and upon the price of InPhonic's common stock.

237.    On November 7, 2006, Defendant Winkler sold 100,000 shares of InPhonic stock. He sold the stock at $10.45 per share, reaping proceeds of $1,044,999 -- a substantial amount representing more than 3 times his ordinary annual compensation.

238.    Winkler's November 2006 stock sale was a private transaction in conjunction with the $100 million debt financing by Goldman Sachs and other lenders in which Defendants Steinberg and Winkler and other insiders sold secondary shares to participants in the debt financing. Winkler's stock sale was suspiciously timed and calculated to maximize personal benefit from undisclosed inside information during the Class Period when he and Defendant Steinberg were aware of, or were reckless in not knowing of material non-public information concerning the Company's inappropriate and unsupportable accounting methodologies, resulting in materially false and overstated revenues and accounts receivable and understated expenses, as well as the Company's total lack of adequate internal controls.

239.    Indeed, Winkler's November 7, 2006 stock sale occurred on the very same day that the Company announced that it had secured a $100 million credit facility through Goldman Sachs, which caused InPhonic's share price to sky-rocket by more than 21% that day.

240.    The number of shares sold by Defendant Winkler that day in relation to his overall Company holdings was also suspicious. According to the Form 4 reporting Winkler's November 6, 2007 sale, which was filed with the SEC on November 9, 2006, Winkler's sale of 100,000 InPhonic shares on November 7, 2006 constituted a disposal of over 28% of his total shares in the Company.

241.    On January 3, 2007, in contravention of representations made in the November 9, 2006 8-K, Winkler sold another 100,000 shares of InPhonic stock at $10.74 per share, reaping proceeds of $1,074,000. Winkler reported that his January 2007 stock sale was pursuant to a

previously-established "10b5-1" trading plan, but his prior sales in 2005 demonstrate that the January 2007 sale of 100,000 shares was anomalous to the blocks of 25,000 shares he sold in June and July 2005 pursuant to a previously-established trading plan. On each of June 10, June 13, July 1 and July 5, 2005, Winkler sold blocks of 25,000 shares, which were designated as pursuant to a trading plan and were his only sales in 2005. In contrast, Winkler sold 200,000 shares of stock within a two-month period in November 2006 to January 2007.

242.    According to the Form 4 reporting Winkler's January 3, 2007, which was filed with the SEC on January 5, 2007, Winkler's sale of 100,000 InPhonic shares on that date constituted a disposal of over 22% of his total shares in the Company.

### C.    <u>Collective Insider Trading</u>

243.    During the Class Period, and with the Company's stock trading at artificially inflated prices, Company insiders were able to sell 3,587,568 shares of Company stock for gross proceeds of $38,329,828, including over $6.8 million in gross proceeds received by Defendants Steinberg and Winkler. The InPhonic Board members' and Defendants' stock sales during the Class Period were suspiciously timed and calculated to maximize personal benefit from undisclosed inside information during the Class Period when Defendants Steinberg, Winkler and other insiders were aware of, or were reckless in not knowing of material non-public information concerning the Company's inappropriate and unsupportable accounting methodologies, resulting in materially false and overstated revenues and accounts receivable and understated expenses, as well as the Company's total lack of adequate internal controls.

244.    The sales in early November 2006 by Defendants, John Sculley and Jay Hoag and his affiliated venture capital funds, TCV IV, L.P. and TCV Strategic Partners, L.P. ("TCV"), in conjunction with Goldman Sach's debt financing are suspicious also and demonstrate that Defendants were mainly focused on obtaining personal pecuniary benefit.

245.    During the Class Period, while InPhonic's stock was trading at artificially-inflated prices, TCV sold 2.756 million shares of InPhonic's stock.  Defendant Steinberg is affiliated with a trust that is a limited partner of TCV, and Jay Hoag (one of InPhonic's Board members during the Class Period who resigned in October 2006, immediately prior to the Goldman Sachs financing announcement), was one of the general partners of TCV.  TCV reaped proceeds in excess of $29 million during the Class Period from sales of InPhonic stock.

246.    In the wake of the Company's procurement of $100 million credit facility through the Credit Agreement, between November 7, 2006, the day the Credit Agreement was executed, and November 9, 2006, Company insiders sold 2.6 million shares and realized profits of nearly $28 million.

247.    The collective insider trading during the Class Period is evidenced by the following chart:

| Date of Trade | Inside Trader | Number of Shares | Price per Share | Gross Proceeds |
|---|---|---|---|---|
| February 28, 2007 | BRIND IRA | 1,403 | $13.64 | $19,136 |
| February 27, 2007 | SCULLEY JOHN | 5,165 | $12.08 | $62,393 |
| February 2, 2007 | SCULLEY JOHN | 12,300 | $14.00 | $172,200 |
| February 1, 2007 | SCULLEY JOHN | 12,700 | $14.00 - $14.10 | $178,000 |
| January 24, 2007 | SCULLEY JOHN | 25,000 | $13.00 - $13.03 | $325,000 |
| January 3, 2007 | WINKLER LAWRENCE | 100,000 | $10.74 | $1,074,000 |
| December 4, 2006 | SCULLEY JOHN | 25,000 | $12.00 - $12.04 | $301,000 |
| November 21, 2006 | SCULLEY JOHN | 50,000 | $11.60 - $11.75 | $584,000 |
| November 14, 2006 | HOAG JAY/TCV | 756,000 | $10.35 | $7,824,600 |
| November 9, 2006 | HOAG JAY/TCV | 2,000,000 | $10.75 | $21,500,000 |
| November 7, 2006 | STEINBERG DAVID | 450,000 | $10.45 | $4,702,500 |
| November 7, 2006 | WINKLER LAWRENCE | 100,000 | $10.45 | $1,044,999 |
| November 7, 2006 | SCULLEY JOHN | 50,000 | $10.65 - $11.01 | $542,000 |
|  | **TOTAL:** | **3,587,568 Shares** |  | **$38,329,828 Gross Proceeds** |

## IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

248.    At all relevant times, the market for InPhonic's common stock was an efficient market for the following reasons, among others:

      (a)    InPhonic's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

      (b)    As a regulated issuer, InPhonic filed periodic public reports with the SEC and the NASDAQ;

      (c)    InPhonic regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire

services and through other wide-ranging public disclosures, such as
communications with the financial press and other similar reporting
services; and

(d)    InPhonic was followed by several securities analysts employed by major
brokerage firms who wrote reports which were distributed to the sales
force and certain customers of their respective brokerage firms. Each of
these reports was publicly available and entered the public marketplace.

249.    As a result of the foregoing, the market for InPhonic's common stock promptly
digested current information regarding InPhonic from all publicly-available sources and reflected
such information in InPhonic's stock price. Under these circumstances, all purchasers of
InPhonic's common stock during the Class Period suffered similar injury through their purchase
of InPhonic's common stock at artificially inflated prices and a presumption of reliance applies.

## X.    NO SAFE HARBOR

250.    The statutory safe harbor provided for forward-looking statements under certain
circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.
Many of the specific statements pleaded herein were not identified as "forward-looking
statements" when made. To the extent there were any forward-looking statements, there were no
meaningful cautionary statements identifying important factors that could cause actual results to
differ materially from those in the purportedly forward-looking statements. Alternatively, to the
extent that the statutory safe harbor does apply to any forward-looking statements pleaded
herein, Defendants are liable for those false forward-looking statements because at the time each
of those forward-looking statements was made, the particular speaker knew that the particular
forward-looking statement was false, and/or the forward-looking statement was authorized

and/or approved by an executive officer of InPhonic who knew that those statements were false when made.

## XI.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

251.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased InPhonic's common stock during the Class Period, between May 8, 2006 and October 11, 2007, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

252.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, InPhonic's common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by InPhonic or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

253.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

254.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

255.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of InPhonic; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

256.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.    FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

257.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

258.    As senior officers of the Company during the Class Period, the Defendants are liable as direct participants of the wrongs complained of herein.  Through their positions of control and authority, Defendants had the ability to, and did, control all of the Company's false

and misleading statements and omissions, including the content of all of its public filings, statements, reports and press releases, as set forth in detail, above.  In addition, certain of the false and misleading statements constitute "group published information," which the Defendants were responsible for creating.

259.    As set forth above, Defendants knew of the material misrepresentations and/or omissions set forth herein, or acted in reckless disregard of the truth in that they failed to check information that they had a duty to monitor, even though such information was available to them. Defendants' material misrepresentations and/or omissions were made knowingly and/or recklessly for the purpose and effect of concealing InPhonic's true financial and operating condition from the investing public and supporting the artificially inflated price of InPhonic's shares, from which they personally realized substantial personal economic gain.

260.    During the Class Period, Defendants and InPhonic carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase InPhonic's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

261.    Defendants and InPhonic (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for InPhonic's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued either as primary

participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

262.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about InPhonic's financial well-being, business relationships, and prospects, as specified herein.

263.    Each of the Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of the Defendants enjoyed significant personal contact and familiarity with the other Defendant and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of the Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

264.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing InPhonic's financial well-being, business relationships, and

prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's financial well-being, throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by refraining from taking those steps necessary to discover whether those statements were false or misleading.

265.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of InPhonic's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of InPhonic's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired InPhonic's common stock during the Class Period at artificially high prices and were damaged thereby.

266.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that InPhonic was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their InPhonic common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

267.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

268.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## XIII.   SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Defendants

269.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

270.    The Defendants acted as controlling persons of InPhonic within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

271.    The Defendants were provided with or had unfettered access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or after these statements were issued and had the ability and the duty to prevent the issuance of material misstatements and/or omissions or cause the misstatements and omissions to be corrected.

272.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

273.    As set forth above, the Defendants and the Company each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Defendants are liable pursuant to Section 20(a) of the Exchange Act.

274.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XIV.   <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(i)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(ii)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(iii)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(iv)    Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:  May 5, 2008                                     Respectfully submitted,

                                                        **COHEN, MILSTEIN, HAUSFELD**
                                                        **& TOLL, P.L.L.C**


                                                        /s/ Andrew N. Friedman
                                                        Steven J. Toll (D.C. Bar No. 225623)
                                                        Andrew N. Friedman (D.C. Bar No. 375595)
                                                        Elizabeth S. Finberg (D.C. Bar No. 468555)
                                                        1100 New York Avenue, N.W.
                                                        West Tower, Suite 500
                                                        Washington, D.C. 20005
                                                        Tel:  (202) 408-4600
                                                        Fax: (202) 408-4699

                                                        **Lead Counsel for Plaintiffs**

**CERTIFICATE OF SERVICE**

I certify that on May 5, 2008, I electronically filed the foregoing First Amended Class

Action Complaint, with Exhibit A, with the Clerk of Court, using the Court's generic email

address (dcd_cmecf@dcd.uscourts.gov), which will send notification of such filing to counsel of

record in this matter, who are all registered on the CM/ECF system.  I further certify that, in

addition to notification via the Court's CM/ECF system, copies of the foregoing were sent by

U.S. Mail and email on counsel for the defendants, as follows:

LATHAM & WATKINS LLP
Laurie Smilan
J. Christian Word
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2200
Facsimile:  (202) 637-2201
Email: laurie.smilan@lw.com
christian.word@lw.com

*Attorneys for Defendants*

/s/Elizabeth S. Finberg
Elizabeth S. Finberg, Esq.

# Exhibit A

CERTIFICATION OF PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

I, _Rodney J Caspersen_ , ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed a class action complaint asserting securities claims against Inphonic, Inc. (INPC) and wish to join as a plaintiff retaining Cohen, Milstein, Hausfeld & Toll, P.L.L.C. as my counsel.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    My transactions in Inphonic, Inc. (INPC) during the Class Period of August 2, 2006 – May 3, 2007 were as follows:

| DATE | TRANSACTION (buy/sell) | NO. OF SHARES | PRICE PER SHARE |
|------|------------------------|----------------|------------------|
| 3/29/07 | Buy | 100 | 10.61 |
| 5/7/07 | Buy | 80 | 8.01 |
| 3/21/07 | Buy | 100 | 10.87 |
| 3/7/07 | Buy | 125 | 11.55 |

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in any action under the federal securities laws except as follows:

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing true and correct.

Executed this _18_ Day of _May_ , 2007.