**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| IN RE INPHONIC, INC.<br>SECURITIES LITIGATION | Case No.: 1:07-cv-00930-RBW |

## DEFENDANTS' MOTION TO DISMISS
## THE FIRST AMENDED CLASS ACTION COMPLAINT

Pursuant to Rule 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 *et seq.*, Defendants David A.

Steinberg and Lawrence S. Winkler, by their undersigned counsel, respectfully move this Court

to dismiss Plaintiff's First Amended Class Action Complaint for failure to state a claim upon

which relief can be granted. In support of their motion, Defendants submit an accompanying

Memorandum of law and proposed order.


Dated: September 5, 2008

Respectfully submitted,

/s/ David A. Becker
Laurie Smilan (DCB # 474002)
J. Christian Word (DCB # 461346)
David A. Becker (DCB # 456396)
LATHAM & WATKINS LLP
555 11th Street, N.W.
Suite 1000
Washington, D.C. 20004
Phone: (202) 637-2200
Fax: (202) 637-2201

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

IN RE INPHONIC, INC.
SECURITIES LITIGATION

Case No.:  1:07-cv-00930-RBW

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iv

INTRODUCTION ............................................................................................1

FACTUAL BACKGROUND ..............................................................................4

ARGUMENT ..................................................................................................10

I.      THE AMENDED COMPLAINT FAILS TO PLEAD PLAINTIFF'S SECTION
        10(B) CLAIM WITH THE SPECIFICITY REQUIRED BY THE PRIVATE
        SECURITIES LITIGATION REFORM ACT................................................11

II.     PLAINTIFF'S GENERIC AND CONCLUSORY ALLEGATIONS DO NOT
        SUPPORT A STRONG INFERENCE THAT DEFENDANTS ACTED WITH
        SCIENTER WITH RESPECT TO THE RESTATEMENT ALLEGATIONS. ..............13

        A.      Plaintiff Does Not Advance A Single Witness Or Document Evidencing
                Fraud Or Contemporaneous Knowledge Thereof...................................13

        B.      Scienter May Not Be Inferred On The Basis Of Position, Access, GAAP
                Violations, Or A Restatement. ................................................14

        C.      Defendants' Stock Transactions Are Inconsistent With Any Inference Of
                Scienter. .........................................................................14

III.    INVESTORS WHO PURCHASED AFTER INPHONIC DISAVOWED ITS
        PRIOR FINANCIAL RESULTS CANNOT DEMONSTRATE REASONABLE
        RELIANCE ON THE ERRONEOUS FINANCIAL STATEMENTS............................20

IV.     THE AMENDED RESTATEMENT ALLEGATIONS FAIL BECAUSE
        PLAINTIFF FAILS TO DEMONSTRATE SCIENTER, FALSITY, OR LOSS
        CAUSATION. ..................................................................................21

        A.      Again, Plaintiff Fails To Assert Any Evidence Of Scienter. .................22

        B.      Plaintiff Fails To Plead Facts Demonstrating That The Restatement Was
                Materially False Or Misleading. .............................................23

        C.      There Are No Facts Demonstrating That Any Statement Caused The
                Claimed Loss. ..................................................................25

        D.      In Any Event, There Can Be No Section 10(b) Claim By Persons Who
                Purchased Shares Before The Alleged Misstatement Was Made Or After It
                Was Corrected...................................................................25

V.    THE AMENDED COMPLAINT FAILS TO PLEAD SCIENTER FOR THE
      BRIGHSTAR ALLEGATIONS, AND ALSO FAILS TO IDENTIFY AN
      ACTUAL MISSTATEMENT. ........................................................................26

      A.    There Are No Facts Giving Rise To Any Inference Of Fraud...............................27

      B.    The Brightstar Statements Are Not Shown To Be False. .....................................27

      C.    Any Claim Could Be Maintained Only By Persons Purchasing After An
            Alleged Brightstar Misstatement Was Made And Before It Was Corrected. ........30

VI.   PLAINTIFF'S CLAIM UNDER SECTION 20(A) FAILS BECAUSE THE
      AMENDED COMPLAINT DOES NOT PLEAD THE REQUISITE PRIMARY
      VIOLATION...............................................................................................30

VII.  CONCLUSION...........................................................................................31

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Abrams v. Baker Hughes, Inc.*,
  292 F.3d 424 (5th Cir. 2002) ..................................................................................19

*Bovee v, Coopers & Lybrand, C.P.A.*,
  272 F.3d 356 (6th Cir. 2001) ....................................................................................4

*Central Laborers' Pension Fund v. Integrated Electric Services, Inc.*,
  497 F.3d 546 (5th Cir. 2007) ..................................................................................15

*In re Burlington Coat Factory Securities Litigation*,
  114 F.3d 1410 (3d Cir. 1997)..................................................................................20

*In re Ceridian Corp. Securities Litigation*,
  504 F. Supp. 2d 603 (D. Minn. 2007)......................................................................18

*City of Brockton Retirement System v. Shaw Group, Inc.*,
  540 F. Supp. 2d 464 (S.D.N.Y. 2008)................................................................14, 17

*Crowell GST Trust v. Possis Medical, Inc.*,
  519 F.3d 778 (8th Cir. 2008) ..................................................................................15

*In re Digital Island Securities Litigation*,
  357 F.3d 322 (3d Cir. 2004)....................................................................................19

*\*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336, 125 S. Ct. 1627 (2005)...........................................................25, 26, 30

*In re Enron Corp. Securities Litigation*,
  258 F. Supp. 2d 576 (S.D. Tex. 2003) .....................................................................27

*In re Fannie Mae Securities Litigation*,
  247 F.R.D. 32 (D.D.C. 2008)............................................................................20, 21

*\*In re Fannie Mae Securities Litigation*,
  503 F. Supp. 2d 25 (D.D.C. 2007)...........................................................12, 14, 17, 31

*In re First Union Corp. Securities Litigation*,
  128 F. Supp. 2d 871 (W.D.N.C. 2001) .....................................................................19

*Frazier v. VitalWorks, Inc.*,
  341 F. Supp. 2d 142 (D. Conn. 2004).......................................................................18

*Grillo v. Tempur-Pedic International, Inc.*,
    553 F. Supp. 2d 809 (E.D. Ky. 2008) ........................................................18

*In re IAC/InterActiveCorp Securities Litigation*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007).......................................................17

*Indiana Electric Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
    --F.3d --, 2008 WL 2894793 (5th Cir. July 29, 2008) ...........................16, 19

*In re Intelligroup Securities Litigation.*,
    527 F. Supp. 2d 262 (D.N.J. 2007) ...........................................................19

*Metzler Investment GMBH v. Corinthian Colleges, Inc.*,
    -- F.3d --, 2008 WL 3905427 (9th Cir. July 25, 2008) ................................17

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000)......................................................................29

*In re Party City Securities Litigation*,
    147 F. Supp. 2d 282 (D.N.J. 2001) ...........................................................18

*Phillips v. Scientific-Atlanta, Inc.*,
    374 F.3d 1015 (11th Cir. 2004) .................................................................13

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ....................................................................15

*Republic Property Trust v. Republic Properties Corp.*,
    540 F. Supp. 2d 144 (D.D.C. 2008) ...............................................11, 25, 31

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ....................................................................17

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)..........................................................................4

*SEC v. Mangan*,
    2008 U.S. Dist. LEXIS 64814 (W.D.N.C. Aug. 20, 2008)..........................28

*SEC v. Steadman*,
    967 F.2d 636 (D.C. Cir. 1992) ..................................................................12

*Semerenko v. Cendant Corp.*,
    223 F.3d 165 (3d Cir. 2000).......................................................................21

*Southland Securities Corp. v. Inspire Insurance Solutions Inc.*,
    365 F.3d 353 (5th Cir. 2004) ...................................................................13

*In re Spectrum Brands, Inc. Securities Litigation*,
    461 F. Supp. 2d 1297 (N.D. Ga. 2006) .....................................................17

*In re Take-Two Interactive Securities Litigation*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)...........................................18, 19, 22

*Teachers' Retirement System v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) ........................................................15, 17, 19

*\*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    — U.S. —, 127 S. Ct. 2499 (2007)...............................4, 11, 12, 13, 14, 23

*In re Trex Co. Securities Litigation*,
    454 F. Supp. 2d 560 (W.D. Va. 2006) .......................................................15

*In re U.S. Office Products Securities Litigation*,
    326 F. Supp. 2d 68 (D.D.C. 2004) ......................................................14, 16

*In re Vantive Corp. Securities Litigation*,
    283 F.3d 1079 (9th Cir. 2002) ...................................................................16

*Winer Family Trust v. Queen*,
    503 F.3d 319 (3d Cir. 2007)..........................................................22, 26, 31

*In re XM Satellite Radio Holdings Securities Litigation*,
    479 F. Supp. 2d 165 (D.D.C. 2007) ....................................................4, 16, 30

*Zack v. Allied Waste Industrial, Inc., No. CIV04-1640*,
    2005 WL 3501414 (D. Ariz. Dec. 15, 2005) ............................................18

## STATUTES

*\*15 U.S.C. § 78u-4 et seq.* ...........................................................4, 11, 12, 13, 25

15 U.S.C. § 78u-5 *et seq.* ..............................................................................30

17 C.F.R. § 240.10b5-1(c)(1)(i)(B)(3).............................................................16

H.R. Rep. No. 104-369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730 ..............11

S.Rep. No. 104-98 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679......................11

**OTHER AUTHORITIES**

Michael R. Young & Jack H. Nusbaum,
   *Accounting Irregularities and Financial Fraud: A Governance Guide*,
   (3d ed., CCH, 2006)...........................................................................................5

Defendants David A. Steinberg and Lawrence S. Winkler submit this Memorandum in support of their Motion to Dismiss the First Amended Class Action Complaint (the "Amended Complaint" or "Am. Compl.").

## <u>INTRODUCTION</u>

This is a classic "fraud by hindsight" securities class action based upon InPhonic's correction of accounting errors in its 2006 restatement and its ultimate business failure, culminating in bankruptcy in November 2007. Other than fraud-by-hindsight speculation, Plaintiff offers no facts suggesting that InPhonic's misfortunes reflect fraud. Instead, the fact that the individual Defendants, including InPhonic's founder, invested and lost their own fortunes in the Company undermines *any* inference of scienter, much less the strong inference the Private Securities Litigation Reform Act requires Plaintiff to plead. Accordingly, this action lacks merit and must be dismissed.

InPhonic, a wireless services company, announced in April 2007 that following its own investigation, it had discovered accounting errors. As a result, InPhonic advised investors that certain of its reported 2006 financial results could not be relied upon and would be restated. Although there has never been any suggestion that the Company's restatement was due to anything other than accounting *errors*, Plaintiff reflexively filed this suit contending that the restatement "must have been" due to fraud.

Recognizing the weakness of his original claim, Plaintiff has supplemented his complaint in purporting to amend it, hoping to extend his alleged class period to include two discrete later events, neither of which supports any inference of fraud. First, Plaintiff claims that InPhonic's August 10, 2007, announcement clarifying its restatement revealed the restatement to be false. Second, Plaintiff challenges as false wholly unrelated statements about a potential equity investment by Brightstar, a proposed business partner of InPhonic, solely because the investment

did not ultimately occur.

Plaintiff's claims relating to each of these discrete events fail on numerous grounds. As a threshold matter, *none* of Plaintiff's allegations – about the restatement, the additional detail about the restatement, or Brightstar – are sufficient to give rise to the strong inference of scienter required under the heightened pleading standards of the Reform Act. First, there is *no* circumstantial evidence to support any such inference – not one document, email, meeting, or witness substantiating Plaintiff's assertions of scienter or fraud. Plaintiff instead alleges only that Defendants "must have known" of improper accounting and inadequate internal controls based upon their positions as senior executives and signing of SEC filings – rote allegations universally rejected by the courts. Further, as noted, Defendants' conduct is *inconsistent* with any inference of scienter. This is so for several reasons: (1) Defendant Steinberg lost millions – more than any other individual shareholder – on the significant stake he retained in the Company; (2) Defendant Winkler actually accumulated *more* stock during the relevant period, all of which became worthless when InPhonic declared bankruptcy; and (3) all of Defendants' sales during the period were required by InPhonic's lenders – forcing Steinberg and Winkler to sell the lenders some of their shares at below market prices – or were pursuant to a 10b5-1 trading plan. Stock sales alone do not give rise to *any* inference of scienter unless they are suspicious in timing or amount. Here, especially in the context of Defendants' far more significant *losses,* the relatively minimal sales, pre-planned or required by third parties, at prices well below the class-period highs give rise to no inference of scienter at all.

Second, Plaintiff's attempt to extend his class period by alleging that InPhonic's August 10th, 2007, Form 8-K/A revealed that the June 2007 restatement was false and misleading also fails. First and foremost, this new claim fails because the August 10th Form 8-K/A revealed only

- 2 -

"additional details" – not any prior misstatements – that were uncovered in the continuing review referenced in the Company's April and May disclosures and that did not change the Company's restated results at all. In addition, Plaintiff has not pled facts demonstrating that this disclosure actually caused any decline in stock price. The August 10th stock price decline identified in the Amended Complaint cannot have been caused by the August 10th Form 8-K/A because the 8K/A was issued *after the market closed.*

Third, Plaintiff's unrelated, newly-minted claim that InPhonic mischaracterized the timing of an investment by Brightstar Corporation and the existence of a signed definitive agreement fails for the simple reason that what InPhonic *actually* said is not shown to be false. Moreover, Plaintiff offers no facts to indicate that any misrepresentations were the result of fraud.

Finally, only plaintiffs who purchased prior to the issuance of the April 3, 2007 press release which disavowed the prior 2006 results can assert a claim that the 2006 financials were false. The April 3 disclosure that the 2006 financials should not be relied upon rendered any subsequent purchaser's reliance on those financials unreasonable as a matter of law. Similarly, only investors who purchased after the June 1, 2007 restatement and before the August 10th Form 8-K/A could assert any claim that the original restatement was false or misleading. The same logic holds true for the Brightstar announcement; only those who purchased after the possible transaction was announced can claim losses caused by its failure to come to fruition. Moreover, neither the Brightstar nor the restatement amendment claim implicates Mr. Winkler because he resigned on May 31, 2007, before the restatement or the Brightstar transaction was announced.

In sum, Plaintiff fails entirely to allege facts suggesting fraud. Instead, Plaintiff sets forth

only hindsight allegations that there "must have been" fraud based on the restatement and that Defendants "must have known" because of their positions within the Company and because they sold some stock. Instead, the fact that no fraud was identified in the restatement, external auditors signed off on the restatement, and Defendants lost millions is inconsistent with any inference of scienter at all. Further, Plaintiff fails to demonstrate reasonable reliance and/or loss causation for his newly-minted claims. As Plaintiff has fully investigated the matter and cannot cure the defects in his Amended Complaint, the case must be dismissed with prejudice against both Defendants. 15 U.S.C. § 78u-4(b)(3)(A) (complaint which fails to satisfy the Reform Act's stringent standards "shall" be dismissed).

## FACTUAL BACKGROUND

After going public in 2004, InPhonic, headquartered in Washington, D.C., grew rapidly into a successful internet provider of wireless services and equipment. Am. Compl. ¶¶ 29, 30; 5/1/06 DEF 14A, Ex. A to Declaration of David A. Becker ("Decl."), at 25.[1] David Steinberg, the Company's founder, served as chairman and chief executive officer from the Company's inception until just before its bankruptcy in November 2007. Am. Compl. ¶ 26; Ex. 99.1 to 9/24/07 Form 8-K, Ex. B to Decl. Mr. Winkler was chief financial officer, executive vice president, and treasurer of the Company from January 2004 until he resigned for personal

---

[1]      Defendants' stock holdings and sales data are taken from the Complaint and Defendants' Form 4's as filed with the SEC. On a motion to dismiss, a court must consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, --- U.S. ---, 127 S. Ct. 2499, 2509 (2007). In a securities fraud action, the Court may consider, in addition to facts stated and documents incorporated in the Complaint, documents filed with the SEC. *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 174 (D.D.C. 2007) (citing *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)). A court "may consider the full text of the SEC filings, prospectus, analysts' reports, and statements 'integral to the complaint,' even if not attached, without converting the motion into one for summary judgment." *Id.* at 174 n.8 (quoting *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360-61 (6th Cir. 2001)).

reasons on May 31, 2007.  Am. Compl. ¶ 27; 6/1/07 Form 8-K, Ex. C to Decl.; 5/1/06 DEF 14A,

Ex. A to Decl., at 13-14.  Like many "new economy" companies, InPhonic proved unable to

sustain its early success, and its rapid growth did not translate into long-term profitability.

InPhonic suffered a net loss of $63.7 million for 2006 (as restated), compared to a net loss of

$38.2 million for 2005.  *See* Am. Compl. ¶ 141(c); Ex. 99.1 to 6/6/07 Form 8-K, Ex. D to Decl.,

at 5.  After a hoped-for transaction with Brightstar was terminated in October 2007, the

Company found itself in default under its credit facility, unable to pay interest on its loans and

conclude certain transactions required by its Credit Agreement.  Am. Compl. ¶ 51; 10/12/07

Form 8-K, Ex. E to Decl.  On November 8, 2007, InPhonic filed for Chapter 11 bankruptcy

protection.  Am. Compl. ¶ 179; 11/8/07 Form 8-K, Ex. F to  Decl., at 1.  Defendants saw their

significant holdings in the Company become worthless.

### A.    Accounting Errors and Misstatements

Following the issuance of its 2006 year-end financial results on February 22, 2007,

InPhonic discovered certain identified accounting errors due to certain enumerated internal

control deficiencies.[2]  Am. Compl. ¶ 144; 4/3/07 Form 8-K, Ex. G to Decl., at 1.  On April 3,

2007, InPhonic filed a Form 8-K with the SEC, and under the heading "Non-Reliance On

Previously Issued Financial Statements Or A Related Audit Report Or Completed Interim

Review," stated that the Company's financial statements for the second and third periods of 2006

and its earnings release for the fourth quarter and fiscal year 2006 "should no longer be relied

upon as a result of certain errors discovered subsequent to the issuance of the Year End Results."

---

[2]    The term "errors," as defined by the accounting literature, refers to "*unintentional*
misstatements or omissions of amounts or disclosures in financial statements," as distinct from
accounting *fraud*.  Michael R. Young and Jack H. Nusbaum, *Accounting Irregularities and
Financial Fraud* 2-4 (3d ed. 2006) (emphasis added) (citing Statement on Auditing Standards
(SAS) No. 53 (superseded by SAS No. 82, which substituted the term "fraud" for the term
"irregularities" used in SAS No. 53)).

4/3/07 Form 8-K, Ex. G to Decl., at 1.  The Company further advised that "certain additional matters are under review."  *Id.*  The price of the stock declined as the market digested this news, falling 11.7% from $10.36 to close at $9.15 on April 3.  Am. Compl. ¶ 145; *see* Ex. H to Decl. (detailing historical prices of InPhonic stock from May 8, 2006 through October 11, 2007).  As InPhonic had warned, further review uncovered additional internal control weaknesses and detail concerning the accounting errors, which the Company promptly disclosed in an amended Form 8-K on May 4, 2007.  Am. Compl. ¶ 147; *see* 5/4/07 Form 8-K/A, Ex. I to Decl at 1.

InPhonic's largest individual stockholder at the time of the announcement and ensuing stock price decline was Defendant Steinberg, who directly held 4,085,093 common shares and consequently lost over $4.9 million when the Company's stock declined following its April 3, 2007 announcement.  *See* 3/1/07 Form 4 (Steinberg), Ex. J to Decl.  Defendant Winkler, who signed the April 3, 2007 Form 8-K announcing the discovery of the accounting errors and the need to restate, also was a significant InPhonic shareholder.[3]  *See* 3/1/07 Form 4 (Winkler), Ex. L to Decl.  The next day's price decline caused Mr. Winkler to lose over $414,000 on his 342,444 shares.  *Id.*

Upon completing its review, InPhonic issued its restatement on June 1, 2007.  At the same time, Defendant Winkler handed in his resignation.  *See* 6/1/07 Form 8-K, Ex. C to Decl. The restated financials comprehensively addressed and corrected the errors that had been revealed on April 3 (and further detailed on May 4).  *Id.*; *see also* 5/4/07 Form 8-K/A, Ex. I to Decl., at 1; 4/3/07 Form 8-K, Ex. G to Decl., at 1.  The Company issued amended Form 10-Q/As

---

[3]      Notably, both Defendants retained substantial holdings in the Company from the start of the purported class period through the time of the April 3, 2007 curative disclosure and beyond; Mr. Winkler actually owned 100,000 *more* shares at the end of the original class period than he did at the start.  *Compare* 9/15/05 Form 4 (Winkler), Ex. K to Decl. (250,000 shares), *with* 3/1/07 Form 4 (Winkler), Ex. L to Decl. (342,000 shares).

for the first three quarters of 2006 and an amended Form 10-K/A for 2006 adjusting its fourth quarter unaudited financial results previously released on February 22, 2007.  *See* 6/1/07 1Q 2006 Form 10-Q/A, Ex. M to Decl.; 6/1/07 2Q 2006 Form 10-Q/A, Ex. N to Decl.; 6/1/07 3Q 2006 Form 10-Q/A, Ex. O to Decl.; 2006 Form 10-K/A, Ex. P to Decl.  In total, the restatement reduced revenue for 2006 by $36.1 million, from $405.7 million to $369.6 million.  Am. Compl. ¶ 151; *see* Ex. 99.1 to 2/22/07 Form 8-K, Ex. Q to Decl.; 2006 Form 10-K, Ex. R to Decl., at F-40.

### B.     Post-Restatement Period

Concurrently with the issuance of the restatement, InPhonic held an earnings conference call to discuss the restatement and the Company's outlook.  Am. Compl. ¶ 152.  During this call, management expressed optimism that the operational and internal control reforms it was implementing would lead to improved results going forward.  Ex. 99.1 to 6/6/07 Form 8-K, Ex. D to Decl., at 3-5.  But management also warned analysts and investors that such forward-looking statements "involve risks and uncertainties concerning InPhonic's expected performance, as well as InPhonic's strategic and operational plans," and that "[a]ctual results may differ materially from projected results and reported historical results should not be considered as an indication of future performance."  *Id*. at 2.  Specific risks the Company identified included "financial results that could result in volatility of our stock price; decreases in subscriber growth rates; acceptance of new products and services; and risks related to the integration of recent acquisitions."  *Id*.

Unfortunately for InPhonic and its shareholders, some of these risks came to pass.  The Company announced disappointing results in its August 9, 2007 earnings release for the second quarter of 2007:  revenue for the quarter was $79.4 million, down from $92.1 million for the second quarter of 2006.  *See* Ex. 99.1 to 8/9/07 Form 8-K, Ex. S to Decl., at 1.  Similarly, the

Company's loss from continuing operations was $40.6 million, down from $9.4 million for the prior year's second quarter. *Id.* On this news, InPhonic's share price dropped 28% to close at $3.50 the next day, August 10. *See* historical stock price table, Ex. H to Decl., at 8.

After the market closed on August 10, InPhonic filed a further amendment to its April 3 Form 8-K, to "update" and "clarify" information reported in the April 3rd Form 8-K and the May 4th Form 8-K/A. Am. Compl. ¶ 169; *see* 8/10/07 Form 8-K/A, Ex. T to Decl., at 2. *This filing did not change any of the restated financial results disclosed in the restatement.* Rather, it simply supplemented the previous disclosures to reflect additional details underlying the results of the June 1 restatement. *Id.*; *see also* 4/3/07 Form 8-K, Ex. G to Decl. In particular, the August 10th Form 8-K/A merely broke down the specific dollar amounts attributable to the already-identified categories of adjustments underlying the already-restated numbers without changing the amount of the overall restatement.[4] *Compare* 8/10/07 Form 8-K/A, Ex. T to Decl., at 3-4, *with* 2006 Form 10-K/A, Ex. P to Decl., at F-40-42. Indeed, there was no significant market reaction to this additional disclosure, and neither the August Form 8-K/A nor any other disclosure subsequent to the issuance of InPhonic's restated financials changed the restated results.

### C. The Proposed Brightstar Alliance

Wholly separate and apart from the accounting issues giving rise to the restatement, the Company announced in its August 9, 2007 press release regarding second quarter 2007 earnings that it had entered into a letter of intent for a strategic alliance with Brightstar Corporation. Am. Compl. ¶ 165. The proposed venture contemplated that Brightstar would acquire InPhonic's

---

[4] The August 10 Form 8-K/A further broke down the errors identified with respect to accounting for various categories of expenses into ten discrete line items, two of which (accrued audit and related fees, and depreciation expense) identified adjustments to *decrease* previously-reported expenses. *See* 8/10/07 Form 8-K/A, Ex. T to Decl. at 3-4.

fulfillment, inventory, and distribution assets, and would make a $5 million equity investment. *Id.*; Ex. 99.1 to 8/9/07 Form 8-K, Ex. S to Decl., at 1.  The Company stated that it "*expect[ed] to sign a definitive agreement by September 30, 2007.*"  *Id.* (emphasis added).  At the same time, the Company warned in the release of the "risks and uncertainties" associated with its projected consummation of the transaction.  *Id.* at 3.

On September 5, InPhonic announced that the two companies had signed the definitive agreement.  Am. Compl. ¶ 171; Ex. 99.1 to 9/5/07 Form 8-K, Ex. U to Decl., at 1.  InPhonic outlined the major components the relationship would comprise *if the transaction were to close*, including the aforementioned transfer of assets, exclusive provider relationship, and $5 million equity investment.  *Id.*  Again the Company warned of the risks and uncertainties associated with forward-looking statements such as these, and specifically cautioned that the closing was "subject to the satisfaction of closing conditions, including Brightstar board approval… ."  *Id.* at 2.  InPhonic further warned that "we can provide no assurance that the conditions set forth in the agreement with Brightstar will be satisfied or that the closing will occur."  *Id.*  Ultimately, the Company's warnings became reality when Brightstar failed to consummate the partnership and terminated the definitive agreement.  *See* Ex. 99.1 to 10/12/07 Form 8-K, Ex. E to Decl., at 2.

Without the Brightstar equity infusion, InPhonic struggled to remain solvent.  The failure to close the transaction led to default under the Company's Credit Agreement and ultimately to its November 2007 bankruptcy petition, rendering the Company's stock worthless.  *See* Am. Compl. ¶ 179; 11/8/07 Form 8-K, Ex. F to Decl., at 1.  At the same time, the Company announced that Mr. Steinberg had resigned from the Board.[5]  *Id.* at 3.

---

[5]    Mr. Steinberg had already resigned as chief executive officer.  Am. Compl. ¶ 26; 9/24/07 Form 8-K, Ex. B to Decl.  Mr. Winkler had resigned his positions in May 2007, shortly prior to issuance of the restatement.  Am. Compl. ¶ 27; 6/1/07 Form 8-K, Ex. C.

### D.    Plaintiff's Claims

Plaintiff asserts two claims in his Amended Complaint.  The first, brought under Section 10(b) of the Securities Exchange of 1934 ("Exchange Act") and Rule 10b-5 thereunder, alleges that Defendants knowingly or with extreme recklessness committed securities fraud by making false or misleading statements about InPhonic's financial condition in connection with each of the three events described above:  InPhonic's accounting errors in its 2006 financials; the Company's representations in its restated financials and other post-restatement public statements; and the Company's statements about its alliance with Brightstar.  Am. Compl. ¶¶ 257-68.  Plaintiff brings his second claim under Section 20(a) of the Exchange Act, alleging that Defendants are liable as "controlling persons" for controlling someone who committed a primary violation of Section 10(b) and Rule 10b-5.  *Id.* ¶¶ 269-74.

## ARGUMENT

Plaintiff's Section 10(b) claim can be broken down into three discrete instances of alleged fraud.  First, Plaintiff alleges that Defendants fraudulently misstated its financial results for 2006 and later restated those results (the "Restatement Allegations").  Second, Plaintiff claims that Defendants' disclosure of InPhonic's restated financial results was itself a fraudulent misstatement, as reflected by later clarifications of the restatement (the "Amended Restatement Allegations").  Third, Plaintiff argues that Defendants fraudulently described InPhonic's strategic alliance agreement with Brightstar (the "Brightstar Allegations").  As shown below, Plaintiff has failed to state a claim as a matter of law as to any of these three instances, for numerous reasons.  Of particular note, the Amended Complaint does not create a strong inference of scienter with respect to *any* alleged act of fraud, and can be dismissed in its entirety on this basis alone.

I.    **THE AMENDED COMPLAINT FAILS TO PLEAD PLAINTIFF'S SECTION 10(B) CLAIM WITH THE SPECIFICITY REQUIRED BY THE PRIVATE SECURITIES LITIGATION REFORM ACT.**

The Private Securities Litigation Reform Act of 1995 (the "Reform Act"), was enacted to put an end to strike suits (like this one) "based on nothing more than a company's announcement of bad news, not evidence of [a particular defendant's] fraud."  S. Rep. No. 104-98, at 4 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 683; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* — U.S. —, 127 S. Ct. 2499, 2504 (2007).  Congress designed the Reform Act to serve "as a check against abusive [securities] litigation," by, *inter alia*, installing "exacting pleading requirements" as a barrier to baseless complaints.  *Tellabs*, 127 S.Ct. at 2504.

As an initial matter, the Reform Act requires plaintiffs to plead "with particularity" the reason or reasons why each challenged statement or omission was false or misleading.  H.R. Rep. No. 104-369, at 41 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 740; 15 U.S.C. § 78u-4(b)(1).  A plaintiff must specify exactly which statements it contends to be fraudulent and explain why the statements were false, and known to be false, when made.  *Republic Prop. Trust v. Republic Props. Corp.*, 540 F. Supp. 2d 144, 153 (D.D.C. 2008) (citing *Tellabs*, 127 S. Ct. at 2504).

A plaintiff asserting a claim for securities fraud must also demonstrate that the defendants acted with the requisite scienter.  In this Circuit, a plaintiff must establish that the defendant acted with at least "'extreme recklessness,' meaning an 'extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"  *In re Fannie Mae Sec. Litig.*, 503 F. Supp. 2d 25, 37 (D.D.C. 2007) ("*Fannie Mae I*") (quoting *SEC v. Steadman*, 967 F.2d 636, 641-42 (D.C. Cir. 1992)).  Unlike Rule 9(b), which permits scienter to be averred generally, the Reform Act provides that a plaintiff must state with particularity facts giving rise

to a *strong inference* that a defendant acted with scienter.  15 U.S.C. § 78u-4(b)(2); *Tellabs*, 127

S. Ct. at 2508.  As the Supreme Court recently noted in *Tellabs*, the Reform Act's "[e]xacting"

and "strict[]" pleading standards "unequivocally raise the bar for pleading scienter."  127 S. Ct.

at 2506.

Moreover, the "strong" inference requirement alters the presumptions applicable in

typical cases under Rule 12(b)(6).  As the Supreme Court made plain, securities plaintiffs are *not*

entitled to have all "reasonable" inferences decided in their favor.  *Tellabs,* 127 S. Ct. at 2504,

2509-10.  Instead, *Tellabs* confirms that "in determining whether the pleaded facts give rise to a

'strong' inference of scienter, the court must take into account plausible opposing inferences."

*Id.* at 2509.  "To qualify as 'strong' . . ., an inference of scienter must be more than merely

plausible or reasonable – it must be cogent and at least as compelling as any opposing inference

of nonfraudulent intent."  *Id.* at 2504-05.

Plaintiffs may not plead scienter generally but must satisfy the strong inference standard

as to *each* defendant and as to *each* challenged statement and omission.  *See Fannie Mae I*, 503

F. Supp. 2d at 40 ("[B]ecause the explicit language of the PSLRA requires plaintiffs to 'state

with particularity facts giving rise to a strong inference that *the* defendant acted with the required

state of mind,' it is, in this Court's judgment, eminently reasonable to interpret the PSLRA

references to '*the* defendant' as only intended to mean each defendant in multiple defendant

cases.") (emphasis in original) (internal citations omitted).[6]

As shown below, Plaintiff fails to meet these exacting standards.  The Amended

---

[6]    *See also Tellabs*, 127 S. Ct. at 2511 n.6 (failing to disturb the Court of Appeals'
proscription against "group pleading"); *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1018
(11th Cir. 2004) ("scienter must be alleged with respect to each alleged violation of the statute");
*Southland Sec. Corp. v. Inspire Ins. Solutions Inc.*, 365 F.3d 353, 364-65 (5th Cir. 2004) ("the
statute's language requires particularized pleading as to each defendant").

Complaint provides no specific factual allegations demonstrating fraud. Instead, Plaintiff suggests only that there "must have been" fraud based on the restatement and that Defendants "must have known" because of their positions within the Company and because they sold some stock. Established facts – that that no fraud was identified in the restatement, that external auditors signed off on the restatement, and that Defendants lost millions in their continued investment in InPhonic – demonstrate that the inference *against* fraud is far more compelling.

In sum, the Amended Complaint does not satisfy the Reform Act's stringent pleading standards. Accordingly, the Reform Act requires that it "shall" be dismissed. 15 U.S.C. § 78u-4(b)(3)(A) ("[T]he Court shall, upon the motion of any defendant, dismiss the complaint if the [Act's] requirements . . . are not met.").

## II.     PLAINTIFF'S GENERIC AND CONCLUSORY ALLEGATIONS DO NOT SUPPORT A STRONG INFERENCE THAT DEFENDANTS ACTED WITH SCIENTER WITH RESPECT TO THE RESTATEMENT ALLEGATIONS.

### A.     Plaintiff Does Not Advance A Single Witness Or Document Evidencing Fraud Or Contemporaneous Knowledge Thereof.

The Amended Complaint baldly asserts that the Company's restatement, as originally announced and later slightly amended, reflects fraud. Plaintiff does not identify *any* internal corporate documents or witnesses or any corporate admission showing that the accounting errors "related to the misapplication of our accounting policies and determination of certain estimates," were the result of fraud, rather than innocent mistakes. 6/1/07 3Q 2006 Form 10-Q/A, Ex. O to Decl. at 2. The absence of such indicia of fraud obviously and decidedly tips the scale against a strong inference of scienter. *Tellabs*, 127 S. Ct. at 2511 (deeming vague allegations insufficient to show scienter because "omissions and ambiguities count against inferring scienter"); *see also City of Brockton Ret. Sys. v. Shaw Group, Inc.*, 540 F. Supp. 2d 464, 473 (S.D.N.Y. 2008) (requiring allegations of "specific facts" to show scienter, including "access to particular,

identified internal reports that would have alerted them" to fraud). Indeed, that there are no such facts weighs even more strongly against an inference of scienter or fraud here since Plaintiff claims to have interviewed former InPhonic employees and otherwise investigated his allegations. Am. Compl. at 1.

> **B.      Scienter May Not Be Inferred On The Basis Of Position, Access, GAAP Violations, Or A Restatement.**

In the absence of circumstantial evidence, Plaintiff attempts to draw a strong inference of fraud from the fact that both Defendants were corporate insiders with access to unspecified internal documents. *See, e.g.*, Am. Compl. ¶¶ 28, 210, 217-18, 229-30. However, as Judge Leon recently stated in *Fannie Mae I*, "scienter cannot be inferred solely because a defendant is a corporate officer." 503 F. Supp. 2d at 40; *see also id.* at 41 (Allegations "that a securities fraud defendant 'should have known' of deficient internal controls are insufficient, alone, to demonstrate a strong inference of scienter" (citation omitted)).

Moreover, "generic allegations that [the Company's] accounting treatment violated GAAP and was restated" do not give rise to a strong inference of scienter. *Id.* at 42 (emphasis omitted); *In re U.S. Office Prods. Sec. Litig.*, 326 F. Supp. 2d 68, 77 (D.D.C. 2004) (refusing to "consider the defendants' restatement of earnings required by SAB 96 as supporting a strong inference of scienter"). The Amended Complaint does not contain any facts showing that any GAAP violation or the restatement reflects financial fraud or any Defendant's knowledge thereof. Am. Compl. ¶¶ 211-12.

> **C.      Defendants' Stock Transactions Are Inconsistent With Any Inference Of Scienter.**

Plaintiff's effort to infer scienter on the basis of a single stock sale by Mr. Steinberg and two sales by Mr. Winkler also fails. As noted, stock sales alone are not probative of scienter. *In re U.S. Office Prods. Sec. Litig*, 326 F. Supp. 2d 68, 76 n. 1 (D.D.C. 2004) (no inference of

scienter from alleged stock sales not shown to be "in suspicious amounts or at suspicious times"), citing *In re The Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 19 (D.D.C. 2000); *Crowell GST Trust v. Possis Med., Inc.*, 519 F.3d 778, 783 (8th Cir. 2008) ("Insider stock sales are not inherently suspicious[.]" (internal quotations and citations omitted)). "[B]ecause executives sell stock all the time, stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter." *Pugh v. Tribune Co.,* 521 F.3d 686, 695 (7th Cir. 2008); *see also, e.g.*, *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 553 (5th Cir. 2007) (sales must be "unusual in timing or scope"); *Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007) (timing or amount must be "unusual or suspicious").

Here, the circumstances of Defendants' sales are inconsistent with any inference of scienter at all. First, Defendants' November 2006 sales were not "calculated to maximize personal benefit from inside information." Am. Compl. ¶ 225. Messrs. Steinberg and Winkler sold these shares in a private transaction with the banks that participated in InPhonic's contemporaneous debt financing, at the banks' insistence and as a precondition to that financing. 11/9/06 Form 8-K, Ex. Y to Decl. Defendants sold these shares at a price "discounted to market" and 27 percent below the class-period high. *Id.* These circumstances render Defendants' conduct inconsistent with the improper and illegal "profit maximizing" motive Plaintiff attributes to them.

Second, the amounts of the sales were small relative to the individuals' total holdings. To facilitate the financing transaction, Mr. Winkler sold 28 percent of his holdings, and Mr. Steinberg sold less than 10 percent of the holdings he controlled. *See* 11/9/06 Form 4 (Steinberg), Ex. V to Decl.; 11/9/06 Form 4 (Winkler), Ex. W to Decl. Courts routinely hold that sales well exceeding these amounts fail to support an inference of scienter. *See, e.g., Indiana*

*Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, --- F.3d ---, 2008 WL 2894793, at *12 (5th Cir. July 29, 2008) (sale of 57% of stock did not raise inference of scienter).[7]

The timing and other circumstances of the only other stock sale by either Defendant – Mr. Winkler's sale pursuant to a 10b5-1 plan in January 2007 – are inherently *not* suspicious.[8] *See* 17 C.F.R. § 240.10b5-1(c)(1)(i)(B)(3). First, 10b5-1 trading plans do not "permit the person to exercise any subsequent influence over how, when, or whether to effect purchases or sales." *Id.* The Amended Complaint does not plead any details suggesting that Mr. Winkler's 10b5-1 plan was improperly adopted or otherwise created under suspicious circumstances. Accordingly, such a pre-planned automatic sale is not the product of any knowing or intentional conduct based on any inside information; it is simply not probative of scienter *at all*. *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colleges, Inc*., --- F.3d ---, 2008 WL 3905427, at *13 n.11 (9th Cir. July 25, 2008) ("Sales according to pre-determined plans may 'rebut an inference of scienter.'" (alteration omitted)); *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 604 (S.D.N.Y. 2007) ("Because [defendant's] sales were part of a periodic divestment plan, the timing and

---

[7]    *See also In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) (defendants' aggregate sale of 38% of holdings did not raise strong inference of fraud); *In re Trex Co. Sec. Litig.,* 454 F. Supp. 2d 560, 586-87 (W.D. Va. 2006) (sale of 36.5% of holdings was not "so substantial as to raise a strong inference of scienter").

[8]    The Amended Complaint alleges that InPhonic's statement in November 2006 that Mr. Winkler did not have any intention of selling stock in the foreseeable future was "rendered blatantly false and misleading" because Mr. Winkler sold stock two months later. Am. Compl. ¶ 130. Judge Urbina denied an identical claim in *U.S. Office Products* as improperly pleading "fraud by hindsight." 326 F. Supp. 2d at 78-79 (rejecting argument that "because [the defendant] ultimately did sell some of his shares and leave USOP, his statement was false and misleading"). Similarly, a January 2007 automatic sale of stock pursuant to a pre-existing 10b5-1 plan does not call into question the veracity of Mr. Winkler's stated intentions in November 2006. *Id.; see also XM*, 479 F. Supp. 2d at 176 ("[s]ecurities fraud claims may not be based on 'fraud by hindsight.'").

amount of the sales do not raise a strong inference of scienter.").[9]

Second, the timing of this 10b5-1 sale was not suspicious for the further reason that it did not occur at a time or at a price that maximized profits. Mr. Winkler's automatic sale occurred at $10.74, a price 26 percent below the class-period high of $14.36, and Mr. Winkler did not sell any other shares when the InPhonic stock price subsequently climbed to its peak. *See* 1/5/07 Form 4 (Winkler), Ex. X to Decl.; Ex. H to Decl. (class-period high close of $14.36 on February 7 and 8, 2007); *Hunter*, 477 F.3d at 184 (no strong inference of scienter when sales made at prices that were "not especially high" for the class period).[10]

Third, the sale did not occur close in time to the release of market-moving information. Here, the three-month gap between Mr. Winkler's stock sale and the April 3, 2007 disclosure about InPhonic's intention to restate its financial results renders the sale unsuspicious. *See, e.g.*, *Brockton Ret. Sys.*, 540 F. Supp. 2d at 475-76 (ten-week gap between sales and disclosure of misstatements renders sales not suspicious); *In re Spectrum Brands, Inc. Sec. Litig.*, 461 F. Supp. 2d 1297, 1317-18 (N.D. Ga. 2006) (no scienter based on stock sales made more than two months prior to disclosure of misstatements).[11] Nor does the Amended Complaint allege that the sale

---

[9]    Defendants are not raising the existence of Mr. Winkler's From 10b5-1 Plan as an affirmative defense, but, rather, as a fact inconsistent with an inference of scienter. *See* 17 C.F.R. § 240.10b5-1(c); *Fannie Mae I*, 503 F. Supp. 2d at 48 (discussing trading plan in context of insider trading claims under Section 20A). As such, it is properly considered at this stage to determine whether the Amended Complaint pleads facts showing that Mr. Winkler's sale pursuant to the plan was suspicious.

[10]    *See also, e.g.*, *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) ("When insiders miss the boat this dramatically, their sales do not support an inference that they are preying on ribbon clerks who do not know what the insiders know."); *Brockton Ret. Sys.*, 540 F. Supp. 2d at 476 ("Shaw's stock price rose shortly after the insider stock sales, which further rebuts plaintiffs' purported motive and opportunity allegations.").

[11]    *See also, e.g.*, *Grillo v. Tempur-Pedic Int'l, Inc.*, 553 F. Supp. 2d 809, 822 (E.D. Ky. 2008) (four to five months); *In re Ceridian Corp. Sec. Litig.*, 504 F. Supp. 2d 603, 618 (D. Minn. 2007) (five months); *Frazier v. VitalWorks, Inc.*, 341 F. Supp. 2d 142, 161-62 (D. Conn. 2004)

was near in time to a misstatement that artificially inflated the stock price. *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 279 (S.D.N.Y. 2008) (lapse of three months between alleged misstatement and sale and four months between sale and disclosure "inescapably attenuates any inference of scienter").

Finally, the size of Mr. Winkler's automatic sale was not so large as to raise suspicion. To start, Plaintiff greatly overstates Mr. Winkler's profit from this sale. As disclosed on the Form 4 relied upon by Plaintiff, Mr. Winkler's pre-tax profits were actually $486,000, not the $1,074,000 suggested by the Amended Complaint. 11/9/06 Form 4 (Winkler), Ex. W to Decl. (showing the remaining $588,000 was paid to exercise stock options). Nor was this sale out of line with Mr. Winkler's other recent stock sales pursuant to his 10b5-1 plan. *See* 7/6/05 Form 4 (Winkler), Ex. Z to Decl.; 6/14/05 Form 4 (Winkler), Ex. AA to Decl. (reflecting sales of 100,000 shares in June and July 2005 under 10b5-1 plan). The Amended Complaint also fails to acknowledge that Mr. Winkler actually held 37 percent *more* stock when InPhonic announced that it would restate its financial results (and the stock price declined) than at the outset of the class period. *Compare* 3/1/07 Form 4 (Winkler), Ex. L to Decl., (342,444 shares as of last filing before April 3, 2007) *with* 9/15/05 Form 4 (Winkler), Ex. K to Decl. (250,000 shares as of last filing before May 8, 2006). Mr. Winkler's accumulation of InPhonic stock "gives rise to an inference of good faith." *Zack v. Allied Waste Indus., Inc.*, No. CIV04-1640, 2005 WL 3501414, at *14 (D. Ariz. Dec. 15, 2005), *aff'd*, 2008 U.S. App. LEXIS 9963 (9th Cir. Apr. 29, 2008); *see also In re First Union Corp. Sec. Litig*, 128 F. Supp. 2d 871, 898 (W.D.N.C. 2001) (dismissing securities action where defendants increased holdings during class period). Moreover, the automatic sale of 22 percent of Mr. Winkler's then-total holdings is less than non-planned stock

(seven weeks and nine weeks); *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001) (three months).

sales other courts have found not suspicious.  *See, e.g.*, *Hunter*, 477 F.3d at 185 (sale of 92%, 100% and 82% of stock, without counting vested options, did not create a strong inference of fraudulent intent).[12]

Plaintiff's allegations that Defendants' broader compensation packages, which included stock options and incentives, provided a motive sufficient to give rise to an inference of scienter also fail.  Incentive compensation merely "indicat[es] that the defendant had certain goals or aspirations . . . common to the law-abiding business community," *In re Intelligroup Securities. Litiation.*, 527 F. Supp. 2d 262, 284 (D.N.J. 2007), and "can hardly be the basis on which an allegation of fraud is predicated."  *Indiana Elec. Workers' Pension*, --- F.3d ---, 2008 WL 2894793, at *14; *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 434 (5th Cir. 2002) ("It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent.").[13]  Instead, the fact that Defendants' fortunes were tied to the success of the Company demonstrates that Defendants' only motive was for the company to succeed.  *In re Digital Island Sec. Litig.*, 357 F.3d 322, 331 (3d Cir. 2004) (theory for scienter "makes little economic sense" because Defendants' own substantial holdings "would have been devalued") (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1422 n.12 (3d Cir. 1997) ("[T]emporary inflations of price through the dissemination of false information hurts the long-term stock price of the company and thereby presumably hurts managerial compensation that may be tied to the long-term performance of the company.")).

In sum, Plaintiff's conclusory allegations that Defendants held executive positions, made

---

[12]     *See also supra* p. 15 & n. 7.

[13]     *See also, e.g.*, *Take-Two*, 551 F. Supp. 2d at 273 (defendant's "desire to increase his incentive compensation by maximizing Take-Two's year-end earnings may not, as a matter of law, form the basis for Lead Plaintiff's scienter allegations"); *Intelligroup*, 527 F. Supp. 2d at 284 (including incentive compensation among facts insufficient to "amount to a valid motive for the purposes of showing scienter").

isolated stock sales, and received incentive compensation – all actions common among corporate executives – do not raise any inference of fraud, much less the strong inference of scienter required by the Reform Act.

### III.    INVESTORS WHO PURCHASED AFTER INPHONIC DISAVOWED ITS PRIOR FINANCIAL RESULTS CANNOT DEMONSTRATE REASONABLE RELIANCE ON THE ERRONEOUS FINANCIAL STATEMENTS.

In addition to failing to plead scienter – a failure alone sufficient to justify dismissal – Plaintiff's Restatement Allegations fail as a matter of law with respect to investors who purchased their shares after InPhonic disavowed its previously issued financial results.  Am. Compl. ¶¶ 265-66.  That is because "to prevail on a securities fraud claim, a plaintiff *must* show" that this reliance was "*reasonable*."  *In re Fannie Mae Sec. Litig.*, 247 F.R.D. 32, 38 (D.D.C. 2008) ("*Fannie Mae II*") (emphasis added).  Here, on April 3, 2007, InPhonic told investors that it had discovered errors in its 2006 year-end financial results and its second and third quarter financial results, and unequivocally warned investors that those financial results "should no longer be relied upon."  Am. Compl. ¶ 144.  The Company also warned that its ongoing review could uncover additional errors.  *Id.*

Accordingly, persons who purchased shares after InPhonic disavowed its prior financial statements cannot reasonably have relied on the accuracy of those results.  As this Court stated in *Fannie Mae II*: "Where companies disclose accounting irregularities, courts generally find it unreasonable as a matter of law for investors to rely thereafter on the company's prior financial statements."  247 F.R.D. at 39 (citing *Semerenko v. Cendant Corp.*, 223 F.3d 165, 181 (3d Cir. 2000) ("neither the market nor the Class members could have reasonably relied upon [the defendant's] prior financial statements or its audit reports" after disclosure of errors in financial statements)).

Nor does the fact that additional details about the financial errors are later discovered

alter the curative nature of the initial disclosure of misstatements.  Again, as held in *Fannie Mae II*, 247 F.R.D. at 38-39, a warning that investors should not rely on past, to-be-restated financial results prevents subsequent reliance "even though additional information regarding the accounting irregularities came to light."

Therefore, the Restatement Allegations portion of Plaintiff's Section 10(b) claim on behalf of persons who purchased InPhonic stock after the April 3, 2007 disclosure should be dismissed for failure to plead reasonable reliance.

## IV.    THE AMENDED RESTATEMENT ALLEGATIONS FAIL BECAUSE PLAINTIFF FAILS TO DEMONSTRATE SCIENTER, FALSITY, OR LOSS CAUSATION.

The Amended Restatement Allegations assert that InPhonic's restatement of its financial results on June 1, 2007 understated the scope of the restatement.[14]  Am. Compl. ¶¶ 154-64, 172(a).  These alleged misstatements in the restatement were supposedly revealed on August 10, 2007, when InPhonic filed certain documents with the SEC "to clarify or provide additional details of information first disclosed in the Company's" April 3, 2007 Form 8-K, as amended. *Id.* ¶¶ 169; 173; 8/10/07 Form 8-K/A, Ex. T to Decl. at 2.  The August 10 Form 8-K/A did not render these prior disclosures false; it merely assigned specific dollar amounts to line items (*e.g.*, customer rebates, customer equipment returns, and recordation of certain administrative expenses (Am. Compl. ¶ 169)) underlying the errors already identified and accounted for in the restatement.  *Compare* 8/10/07 Form 8-K/A, Ex. T to Decl., at 3-4, *with* 2006 Form 10-K/A, Ex.

---

[14]    Plaintiff appears to claim that InPhonic's April and May initial disclosures about the status of the Company's ongoing inquiry into the errors in its financial statements were also misleading.  Am. Compl. ¶ 172(a).  As explained below, such a claim is untenable since the Amended Complaint does not contain any allegations suggesting that information disclosed in June or later was known in April or May.  Defendants reasonably believe this portion of Plaintiff's claim to be based upon the June 1 statements concerning the completed investigation and restatement.

P to Decl., at F-40-42.

As an initial matter, Plaintiff's claim based on these alleged misstatements must be dismissed as to Mr. Winkler since he resigned from InPhonic on May 31, 2007, before the alleged misrepresentations were made.  Am. Compl. ¶ 27; *see also, e.g.*, *Take-Two*, 551 F. Supp. 2d at 267 (dismissing claims against executive as to company filings and statements made following his resignation).

The claim based on Amended Restatement Allegations also should be dismissed because the Amended Complaint (1) pleads absolutely no facts supporting a strong inference of scienter for this independent act of alleged fraud, (2) pleads no facts showing that any of the prior statements about the restatement were materially false, and (3) claims no loss caused by the alleged curative disclosure.  Moreover, this portion of the claim cannot as a matter of law be maintained by persons who, like Plaintiff, purchased InPhonic stock before the alleged misstatements were made (*i.e.*, before June 1, 2007) or after they were corrected (*i.e.*, August 10, 2007).[15]

A.    **Again, Plaintiff Fails To Assert Any Evidence Of Scienter.**

As shown, Plaintiff's conclusory allegations do not give rise to a strong inference of scienter.  *See* pp. 13-19 *supra*.  Moreover, Mr. Steinberg's stock sale, already shown to be innocuous, is irrelevant because it occurred nearly seven months prior to the first alleged misstatement on June 1, 2007.  Again, because no inference of scienter (strong or weak) can be drawn, this portion of Plaintiff's Section 10(b) claim should be dismissed.[16]

_____

[15]    *See Winer Family Trust v. Queen*, 503 F.3d 319, 325 (3d Cir. 2007) (limiting standing to "claims based on activity prior to" the purchase of stock).

[16]    Moreover, Plaintiff's theory is illogical.  According to Plaintiff, Mr. Steinberg caused InPhonic to issue a correction of InPhonic's financial statements in June 2007, but at the same time to misleadingly tell only part of the story, and then to correct those new false statements two

**B.    Plaintiff Fails To Plead Facts Demonstrating That The Restatement Was Materially False Or Misleading.**

Plaintiff's assertion that the August Form 8-K/A was an acknowledgement that InPhonic's June 1 restated financial results were false or misleading is simply incorrect. Am. Compl. ¶¶ 169, 173.  As stated in the August Form 8-K/A, InPhonic was not correcting or changing its restated financial results, but rather updating information first disclosed in April and May (prior to the completion of the restatement in June).  8/10/07 Form 8-K/A, Ex. T to Decl. at 2 ("The following includes an update to clarify or provide additional details of information first disclosed in the Company's Form 8-K dated April 2, 2007 as amended by Form 8-K/A filed on May 4, 2007.").  InPhonic did not change or alter any of the restated financial results as reported on June 1, 2007.  The August Form 8-K/A merely provides additional detail concerning line items underlying the broader financials restated in June.  *Id.* at 2-4 (assigning specific dollar amounts to line items underlying the already-restated numbers for certain already-identified categories of accounting errors).  The accounting errors identified in the August Form 8-K/A are exactly as accounted for in the June restatement.[17]  Plaintiff has not alleged any facts suggesting otherwise.

Plaintiff is particularly off-base with respect to his apparent allegation that interim

---

months later – all without taking any action to profit.  Such a strained inference of scienter simply is not "cogent" at all, much less "compelling" or "strong."  *Tellabs*, 127 S. Ct. at 2510.

[17]    InPhonic also filed two amended quarterly statements on August 10, 2007.  8/10/07 1Q 2006 Form 10-Q/A, Ex. BB to Decl.; 8/10/07 2Q 2006 Form 10-Q/A, Ex. CC to Decl.  These filings, like the August Form 8-K/A, merely augmented the June 2007 restated quarterlies with additional detail concerning line items underlying the restated financial results.  *See* 8/10/07 2Q 2006 Form 10-Q/A, Ex. CC to Decl. at 2 (filed to "further clarify those disclosures in Note 1(c)" to the restated financials and "to clarify our disclosure of changes in internal control").  The Form 10-Q/As did not disturb the restated financial results, affirming that InPhonic's August 10 Form 8-K/A did not change any of the restated financials.  *Compare* 8/10/07 2Q 2006 Form 10-Q/A, Ex. CC to Decl. at 7-8 (table of financial statements) *with* 6/1/07 2Q 2006 Form 10-Q/A, Ex. N to Decl. at 7-8 (identical table).

progress reports concerning the ongoing restatement review, contained in the April and May Form 8-Ks, were false and misleading. The April and May statements made clear that they were interim progress reports intended to give investors meaningful insight into the known extent of the errors, not a final and complete description of all errors. 4/3/07 Form 8-K, Ex. G to Decl. at 1 ("At this time the Company has identified the matters set forth below which will require changes to the 2nd and 3rd Quarter Financials and unaudited Year End Financials. Certain additional matters are also subject to review."); 5/4/07 Form 8-K/A, Ex. I to Decl. at 1 (same). The fact that additional matters were discovered *after* these interim reports in no way shows that these interim reports were false in failing to disclose what had not yet been discovered. It was not until June 1 that the complete restatement was finished and disclosed to investors. Plaintiff points to no facts to the contrary.

Furthermore, Plaintiff's allegation that the August Form 8-K/A shows Mr. Steinberg's description of InPhonic's remedial plans on a June 1 conference call to be false lacks – and defies – any explanation. Am. Compl. ¶¶ 155-57, 172. The August Form 8-K/A merely provides additional detail regarding the scope of the 2006 accounting errors. 8/10/07 Form 8-K/A, Ex. T to Decl. at 2. The Form 8-K/A does not discuss the Company's plans and prospects, much less show Mr. Steinberg's candid discussion of remedial measures to be false in any way.

For these reasons, Plaintiff has failed to comply with the Reform Act directive to plead with particularized facts the existence of a materially false or misleading statement. 15 U.S.C. § 78u-4(b)(1); *Republic Prop. Trust*, 540 F. Supp. 2d at 153. The Section 10(b) claim relating to the Amended Restatement Allegations should be dismissed on this independent basis.

C.    **There Are No Facts Demonstrating That Any Statement Caused The Claimed Loss.**

Plaintiff is also mistaken in his allegations (1) that the August Form 8-K/A caused the InPhonic stock drop and (2) that the stock drop demonstrates that the earlier disclosures about the expected and ultimately final restatement were materially false. Am. Compl. ¶ 170. The reason is that InPhonic did not file the Form 8-K/A until *after* the market closed on Friday, August 10. 8/10/07 Form 8-K/A, Ex. T to Decl. (accepted by the SEC at 5:06 p.m. on August 10, 2007).[18] The August 10th stock price decline was likely a reaction to disappointing news about InPhonic's second quarter financial results that was disclosed after the market closed on August 9th. Ex. 99.1 to 8/9/07 Form 8-K, Ex. S to Decl., at 2 (accepted by the SEC at 5:04 p.m. on August 9, 2007).[19]

The Amended Complaint thus fails to plead the requisite "causal connection" between the August 10th curative disclosure and the preceding August 10th stock price decline. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342, 125 S. Ct. 1627, 1631 (2005) (loss causation element requires allegations showing stock price decline caused by disclosure of true facts). This provides another independent basis to dismiss this portion of Plaintiff's Section 10(b) claim.

D.    **In Any Event, There Can Be No Section 10(b) Claim By Persons Who Purchased Shares Before The Alleged Misstatement Was Made Or After It Was Corrected.**

Plaintiff claims that false and misleading information entered the market on June 1, 2007, and was corrected on August 10. Am. Compl. ¶¶ 154-164, 169, 172(a), 173. It is axiomatic that persons who purchased InPhonic stock before or after this period cannot maintain a Section

---

[18]    The NASDAQ market closes at 4:00 p.m. daily. *See* About NASDAQ – NASDAQ Trading Schedule, http://www.NASDAQ.com/about/schedule.stm (last visited Aug. 28, 2008).

[19]    Contrary to Plaintiff's contention that the market immediately reacted negatively to the August Form 8-K/A, the stock price opened on August 13, the first trading day after the disclosure, $0.20 higher than it closed on August 10, before the disclosure. Ex. H to Decl.

10(b) claim based upon the allegedly misrepresented restatement.  *See Dura*, 544 U.S. at 339-46,

125 S. Ct. at 1629-34 (protecting investors only "against those economic losses that

misrepresentations actually cause").  Persons purchasing stock before the restatement was

announced in June cannot show that they invested in reliance upon the June restatement.  *See id*;

*Winer Family Trust*, 503 F.3d at 325 (rejecting claims based on misstatements made after

plaintiff's stock purchase).  Moreover, as discussed above, persons purchasing stock after a

curative disclosure, *i.e.*, those who purchased after the August Form 8-K/A, cannot reasonably

have relied upon any contrary statement in the June restatement.  *See* pp. 19-20 *supra*.  Plaintiff's

claims on behalf of such persons (including Plaintiff himself) should be dismissed.

## V.    THE AMENDED COMPLAINT FAILS TO PLEAD SCIENTER FOR THE BRIGHSTAR ALLEGATIONS, AND ALSO FAILS TO IDENTIFY AN ACTUAL MISSTATEMENT.

The new Brightstar Allegations concern only the tail end of the alleged class period.

Specifically, Plaintiff contends that InPhonic's August 9 and September 5, 2007 statements about

a strategic alliance between Brightstar and InPhonic were false and misleading.  Plaintiff claims

that the "true facts" were disclosed when, on October 11, 2007, InPhonic announced that

Brightstar had terminated the parties' agreement.  Am. Compl. ¶¶ 167, 171, 214.

Again, Plaintiff's claims against Mr. Winkler must be dismissed because Mr. Winkler

was no longer an InPhonic officer when these events occurred.  *Id.* ¶ 156.  Moreover, the claim

must be dismissed as to Mr. Steinberg as well because, again, there are no allegations of

fraudulent intent and Plaintiff's assertion that InPhonic misrepresented its prospective

relationship with Brightstar relies on distortions inconsistent both with logic and with what

InPhonic actually disclosed.  In any event, only persons who purchased after the allegedly

misleading statement, *i.e.*, after August 9th, would have standing to assert a claim.

A.    **There Are No Facts Giving Rise To Any Inference Of Fraud.**

Again, the Amended Complaint does not contain a single allegation describing any conduct by Mr. Steinberg demonstrating scienter with respect to the Brightstar Statements. For all the reasons already discussed at length, Plaintiff's generic and conclusory allegations of fraud are inadequate, and this portion of Plaintiff's Section 10(b) claim should be dismissed along with the rest.[20]

B.    **The Brightstar Statements Are Not Shown To Be False.**

Plaintiff's Brightstar Allegations are first premised on an unreasonable and unsupportable interpretation of InPhonic's August 9, 2007 press release, announcing that InPhonic and Brightstar had signed a letter of intent to form a strategic alliance. Am. Compl. ¶ 165; *see* Ex. 99.1 to 8/9/07 Form 8-K, Ex. S to Decl., at 1-2. InPhonic announced that the "immediate new equity investment of $5 million from Brightstar plus the new borrowings from the Lending Group *will provide* an aggregate infusion of $20 million into InPhonic." Ex. 99.1 to 8/9/07 Form 8-K, Ex. S to Decl., at 2. (emphasis added).[21] Plaintiff claims that InPhonic's announcement misled the market into believing that Brightstar had invested $5 million in InPhonic immediately upon signing the letter of intent. Am. Compl. ¶ 167. This is clearly not what was meant.

---

[20]    Common sense also belies any suggestion of fraud. In order to perpetrate this alleged scam, InPhonic would need to convince Brightstar to go along with InPhonic's misrepresentations or risk Brightstar exposing the misstatements. There is no obvious reason why Brightstar would participate in the alleged fraud, and the Amended Complaint does not offer one. Moreover, as in the case of the dog that did not bark, Brightstar apparently did nothing in response to InPhonic's statements. As described below, the most plausible inference from these facts is that InPhonic's statements were truthful and there was no intent to mislead. *See, e.g.*, *In re Enron Corp. Sec. Litig.*, 258 F. Supp. 2d 576, 617 (S.D. Tex. 2003) (fact that accounting treatment was never questioned by outside auditors "negate[s]" "[e]ven a strong inference of negligence, which requires a much lower showing than [the] severe recklessness" or knowledge required to support a claim).

[21]    Reasonable investors understand that parties to a letter of intent would not typically consummate part of a proposed transaction (*i.e.*, the equity investment) at that stage of the transactional process.

Reasonable investors understood that no investment would be made unless the transaction close.

In any event, any potential misunderstanding was eliminated the same day on the August 9, 2007 investor conference call.  On that call, InPhonic made clear that Brightstar's investment would occur only upon the closing of the transaction.  8/9/07 InPhonic Q2 2007 Earnings Conf. Call Tr., Ex. DD to Decl., at 3 ("[W]e have drawn down $15 million from our existing debt financing with Citicorp and Goldman Sachs, and *expect an equity investment of $5 million from Brightstar*.") (emphasis added).[22]  Moreover, InPhonic's September 5, 2007 press release confirmed that which reasonable investors would have already understood: "[u]pon the closing of the agreement . . . Brightstar *will make* a $5 million equity investment in InPhonic . . . ."  *Id.* ¶ 171 (emphasis added).  That the market did not negatively react to this statement indicates that it was not new news.  *See SEC v. Mangan*, No. 3:06CV531, 2008 U.S. Dist. LEXIS 64814, at *13-*16 (W.D.N.C. Aug. 20, 2008) (deeming information immaterial where public disclosure has a negligible effect on the price of a stock (citing *Oran v. Stafford*, 226 F.3d 275, 283 (3d Cir. 2000))).  Plaintiff thus has not shown and cannot demonstrate that the August 9th statement was false or misleading.

Plaintiff next alleges that the September 5, 2007 joint press release issued by InPhonic and Brightstar was false and misleading because it stated that the companies had "signed a 'definitive agreement.'"  Am. Compl. ¶ 171.  Plaintiff contrasts this September 5th announcement with InPhonic's October 11, 2007 Form 8-K stating that the Company defaulted on its credit agreement, in part because of the "failure to enter into a definitive agreement to provide for the outsourcing of the Company's inventory management, logistics and fulfillment

---

[22]    The transcript of the conference call is properly considered at this stage because Plaintiff has stated that the allegations in his complaint are based upon an investigation by his lawyers that included a review of "conference calls and announcements made by Defendants" and "information readily available on the Internet."  Am. Compl. at 1.

obligations by October 5, 2007." *Id.* ¶ 174.  Contrary to Plaintiff's mischaracterization, the Form

8-K does not show that the September announcement of a definitive agreement was false, *i.e.*,

that no agreement was ever signed.  Instead, the October 11 release disclosed that the previously

signed definitive agreement had been terminated:  "On October 5, 2007, the Master Product and

Services Agreement dated September 3, 2007 by and between the Company and Brightstar US,

Inc. *was terminated*."  10/12/07 Form 8-K, Ex. E to Decl. (emphasis added).  In other words,

InPhonic and Brightstar had signed a definitive agreement on September 3rd, the parties

terminated that agreement on October 5th, and, as a result, InPhonic was in default under its

credit agreement.[23]

Accordingly, the Amended Complaint fails to plead the requisite particularized facts

demonstrating that either challenged statement – the August 9 statement concerning a potential

investment by Brightstar or the September 5 statement regarding a definitive agreement with

Brightstar – was false.[24]  This failure provides an additional and independent basis to dismiss the

---

[23]    The Amended Complaint notes that in the text of the press release attached to the Form 8-K, InPhonic referred to the Brightstar transaction as a "'proposed' partnership that had been 'terminated.'"  Am. Compl. ¶ 175.  It is not clear what, if any, significance Plaintiff attaches to this euphemistic characterization, especially since the filing clearly states that the definitive agreement was terminated.

[24]    Moreover, the August 9 and September 5 statements identifying an anticipated investment and agreement are forward-looking and are not actionable under the Reform Act. The Reform Act explicitly created a "safe harbor" to shield defendants absolutely from liability for "forward-looking statements" accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. § 78u-5(c); *see also XM*, 479 F. Supp. 2d at 177, 186 n.14 (the Reform Act's safe harbor protects from liability forward-looking statements "accompanied by meaningful cautionary language").  InPhonic's August 9 statement that Brightstar "will provide" an equity investment and its September 5 statement anticipating closing of an agreement with Brightstar were inactionable predictions regarding future events, and both releases contained cautionary language directly applicable to its statements concerning Brightstar.  On August 9, InPhonic warned investors that "plans to grow our business . . . involve risks and uncertainties" and cautioned that "the timing of events could differ materially from those anticipated in such forward-looking statements as a result of these risks and uncertainties."  Ex. 99.1 to 8/9/07 Form

Brightstar Allegations portion of Plaintiff's claim.

**C.      Any Claim Could Be Maintained Only By Persons Purchasing After An Alleged Brightstar Misstatement Was Made And Before It Was Corrected.**

For the reasons explained above, investors who bought InPhonic shares before an alleged Brightstar misstatement (including Plaintiff himself) or after any misimpression was corrected do not have a Section 10(b) claim based on that misstatement. *See supra* pp. 25-26; *Dura*, 544 U.S. at 344-45, 125 S. Ct. at 1632-33. This means that there are no potential class members who can maintain a claim based upon Brightstar's equity investment statement made after the market closed on August 9th, since that statement was cured almost simultaneously during the investor conference call and before the market opened the following day.[25] Moreover, the alleged misstatement about the signing of a definitive agreement was made on September 5th, and the agreement was terminated on October 11th. Only purchasers who bought between those dates have any potential claim. The Brightstar Allegations portion of Plaintiff's Section 10(b) claim should be dismissed as to everyone, but, at a minimum, as to everyone outside this small group.[26]

**VI.      PLAINTIFF'S CLAIM UNDER SECTION 20(A) FAILS BECAUSE THE AMENDED COMPLAINT DOES NOT PLEAD THE REQUISITE PRIMARY VIOLATION.**

Because Plaintiff has failed to state a claim for any 10b-5 violation, his "controlling person" claim under Section 20(a) fails as well. It is well-settled that there can be no control

---

8-K, Ex. S to Decl., at 3. On September 5, InPhonic cautioned that the agreement with Brightstar was "subject to the satisfaction of closing conditions, including Brightstar board approval" and that it "can provide no assurance that the conditions set forth in the agreement with Brightstar will be satisfied or that the closing will occur." Ex. 99.1 to 9/5/07 Form 8-K, Ex. U to Decl., at 2. Accordingly, these statements are immune from liability under the Reform Act's safe harbor. *See* 15 U.S.C. § 78u-5(i)(A), (D).

[25]    The September 5, 2007 Form 8-K similarly stated that Brightstar's equity investment would occur in the future at the closing of the transaction.

[26]    *See Winer Family Trust*, 503 F.3d at 325 (rejecting claims based on activity after plaintiff's stock purchase).

person liability in the absence of an underlying violation. *Republic Prop. Trust*, 540 F. Supp. 2d at 163 ("It is undisputed, however, that there can be no control person liability without a primary violation by the person allegedly controlled."); *Fannie Mae I*, 503 F. Supp. 2d at 43 n.14 (dismissing control person liability claims predicated upon invalid Exchange Act claims). Furthermore, because Mr. Winkler resigned on May 31, 2007, he cannot be held liable as a "control person" for misstatements made after that date. For each and all of these reasons, Plaintiff's Section 20(a) claim must be dismissed.

## VII.    CONCLUSION

This Court should dismiss the Amended Complaint in its entirety for failure to plead facts giving rise to a strong inference of scienter or fraud as to any challenged statements or to demonstrate reasonable reliance, loss causation, or falsity as to any statements made after April 3, 2007. Moreover, because Plaintiff has had two opportunities to plead this case, and claims to have conducted an investigation, including interviews of former employees, yet provides no facts but only speculation in support of his claims, dismissal should be with prejudice.

Dated: September 5, 2008

LATHAM & WATKINS LLP


By:    /s/ David A. Becker
      Laurie Smilan (DCB # 474002)
      J. Christian Word (DCB # 461346)
      David A. Becker (DCB # 456396)
      555 Eleventh Street, NW
      Suite 1000
      Washington, DC 20004-1304
      Telephone: (202) 637-2200
      Facsimile:  (202) 637-2201

      *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of September 2008, I caused the Defendants' Motion to Dismiss the First Amended Class Action Complaint, Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss the First Amended Class Action Complaint, Declaration of David A. Becker in Support of Defendants' Motion to Dismiss the First Amended Class Action Complaint. Proposed Order to be served via CM/ECF system, which will electronically send a notice of such filing to the following CM/ECF users:

Elizabeth S. Finberg
efinberg@cmht.com

Andrew N. Friedman
afriedman@cmht.com

Steven J. Toll
stoll@cmht.com

/s/ David A. Becker
David A. Becker (DCB # 456396)
LATHAM & WATKINS LLP
555 11th Street, N.W.
Suite 1000
Washington, D.C. 20004
Phone: (202) 637-2200
Fax: (202) 637-2201

*Attorney for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE INPHONIC, INC.
SECURITIES LITIGATION

Case No.:  1:07-cv-00930-RBW

## DECLARATION OF DAVID A. BECKER IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT

I, David A. Becker, declare as follows:

(1)    I am over 21 years of age and am otherwise competent to make this declaration.

(2)    I am an attorney at Latham & Watkins LLP, am licensed to practice in the District of Columbia, and am appearing before this Court in the above-captioned matter on behalf of Defendants David A. Steinberg and Lawrence S. Winkler ("Defendants").

(3)    I swear to and submit this Declaration in support of Defendants' Motion to Dismiss the First Amended Class Action Complaint.

(4)    Attached hereto as Exhibit A is a true and correct copy of InPhonic, Inc.'s SEC Form DEF 14/A, filed May 1, 2006.

(5)    Attached hereto as Exhibit B is a true and correct copy of InPhonic, Inc.'s SEC Form 8-K, filed September 24, 2007.

(6)     Attached hereto as Exhibit C is a true and correct copy of InPhonic, Inc.'s SEC Form 8-K, filed June 1, 2007.

(7)     Attached hereto as Exhibit D is a true and correct copy of InPhonic, Inc.'s SEC Form 8-K, filed June 6, 2007.

(8)     Attached hereto as Exhibit E is a true and correct copy of InPhonic, Inc.'s SEC Form 8-K, filed October 12, 2007.

(9)     Attached hereto as Exhibit F is a true and correct copy of InPhonic, Inc.'s SEC Form 8-K, filed November 8, 2007.

(10)     Attached hereto as Exhibit G is a true and correct copy of InPhonic, Inc.'s SEC Form 8-K, filed April 3, 2007.

(11)     Attached hereto as Exhibit H is a table of historical pricing and trading data for InPhonic, Inc. stock from May 8, 2006 through October 11, 2007, copied from Yahoo! Finance, Historical Prices for InPhonic, Inc., *at* http://finance.yahoo.com/q/hp?s=INPC.PK (last visited Sept. 4, 2008).

(12)     Attached hereto as Exhibit I is a true and correct copy of InPhonic, Inc.'s SEC Form 8-K/A, filed May 4, 2007.

(13)     Attached hereto as Exhibit J is a true and correct copy of the SEC Form 4 Statement for David A. Steinberg, filed March 1, 2007.

(14)     Attached hereto as Exhibit K is a true and correct copy of the SEC Form 4 Statement for Lawrence S. Winkler, filed September 15, 2005.

(15)     Attached hereto as Exhibit L is a true and correct copy of the SEC Form 4 Statement for Lawrence S. Winkler, filed March 1, 2007.

(16)     Attached hereto as Exhibit M is a true and correct copy of InPhonic, Inc.'s SEC Form 10Q/A for the First Quarter of 2006, filed June 1, 2007.

(17)     Attached hereto as Exhibit N is a true and correct copy of InPhonic, Inc.'s SEC Form 10Q/A for the Second Quarter of 2006, filed June 1, 2007.

(18)     Attached hereto as Exhibit O is a true and correct copy of InPhonic, Inc.'s SEC Form 10Q/A for the Third Quarter of 2006, filed June 1, 2007.

(19)     Attached hereto as Exhibit P is a true and correct copy of InPhonic, Inc.'s SEC Form 10K/A for 2006, filed June 5, 2007.

(20)     Attached hereto as Exhibit Q is a true and correct copy of InPhonic, Inc.'s SEC Form 8-K, filed February 22, 2007.

(21)     Attached hereto as Exhibit R is a true and correct copy of pages 1 through 80 and F-1 through F-42 of InPhonic, Inc.'s SEC Form 10-K for 2006, filed June 1, 2007.

(22)     Attached hereto as Exhibit S are a true and correct copy of InPhonic, Inc.'s SEC Form 8-K, filed August 9, 2007 and the related "SEC EDGAR Filing Information" from the SEC web site at http://www.sec.gov/Archives/edgar/data/1133324/000119312507177 618/000111193125-07-177618-index.htm (last visited Sept. 4, 2008).

(23)     Attached hereto as Exhibit T are a true and correct copy of InPhonic, Inc.'s SEC Form 8-K/A, filed August 10, 2007 and the related "SEC EDGAR Filing Information" from the SEC web site at http://www.sec.gov/Archives/edgar/data/1133324/00011 9312507179164/0001193125-07-179164-index.htm (last visited Sept. 4, 2008).

(24)     Attached hereto as Exhibit U is a true and correct copy of InPhonic, Inc.'s SEC Form 8-K, filed September 5, 2007.

(25)    Attached hereto as Exhibit V is a true and correct copy of the SEC Form 4 Statement for David A. Steinberg, filed November 9, 2006.

(26)    Attached hereto as Exhibit W is a true and correct copy of the SEC Form 4 Statement for Lawrence S. Winkler, filed November 9, 2006.

(27)    Attached hereto as Exhibit X is a true and correct copy of the SEC Form 4 Statement for Lawrence S. Winkler, filed January 5, 2007.

(28)    Attached hereto as Exhibit Y is a true and correct copy of InPhonic, Inc.'s SEC Form 8-K, filed November 9, 2006.

(29)    Attached hereto as Exhibit Z is a true and correct copy of the SEC Form 4 Statement for Lawrence S. Winkler, filed July 6, 2005.

(30)    Attached hereto as Exhibit AA is a true and correct copy of the SEC Form 4 Statement for Lawrence S. Winkler, filed June 14, 2005.

(31)    Attached hereto as Exhibit BB is a true and correct copy of InPhonic, Inc.'s SEC Form 10-Q/A for the First Quarter of 2006, filed August 10, 2007.

(32)    Attached hereto as Exhibit CC is a true and correct copy of InPhonic, Inc.'s SEC Form 10-Q/A for the Second Quarter of 2006, filed August 10, 2007.

(33)    Attached hereto as Exhibit DD is a true and correct copy of the transcript of InPhonic, Inc.'s Earnings Conference Call for the Second Quarter of 2007, recorded on August 9, 2007 as published by Fair Disclosure Wire, copyright Voxant, Inc. (2007) and CCBN, Inc. (2007).

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 5th day of September, 2008, in Washington, D.C.

/s/ David A. Becker
David A. Becker (DCB # 456396)
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2200
Facsimile:  (202) 637-2201

*Attorney for Defendants*

# EXHIBIT A

# SCHEDULE 14A

## (Rule 14a-101)

### INFORMATION REQUIRED IN PROXY STATEMENT

#### SCHEDULE 14A INFORMATION

### Proxy Statement Pursuant to Section 14(a) of the
### Securities Exchange Act of 1934

Filed by the Registrant  ☒     Filed by a Party other than the Registrant  ☐

Check the appropriate box:

☐   Preliminary Proxy Statement

☐   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒   Definitive Proxy Statement

☐   Definitive Additional Materials

☐   Soliciting Material Pursuant to Rule 14a-11(c) or Rule 14a-12

# INPHONIC, INC.

**(Name of Registrant as Specified in Its Charter)**

_____

**(Name of Person(s) Filing Proxy Statement if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☒   No fee required.

☐   Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

    (1)   Title of each class of securities to which transaction applies:

    (2)   Aggregate number of securities to which transaction applies:

    (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee is calculated and state how it was determined):

    (4)   Proposed maximum aggregate value of transaction:

    (5)   Total fee paid:

☐   Fee paid previously with preliminary materials.

☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the form or schedule and the date of its filing.

    (1)   Amount previously paid:

    (2)   Form, schedule or registration statement no.:

    (3)   Filing party:

    (4)   Date filed:

**INPHONIC, INC.**

---

**NOTICE OF ANNUAL MEETING OF STOCKHOLDERS**
*to be held June 22, 2006*

---

To the Stockholders of InPhonic, Inc.:

NOTICE IS HEREBY GIVEN that the 2006 Annual Meeting of Stockholders (the "Annual Meeting") of InPhonic, Inc., a Delaware corporation (the "Company"), will be held at The Madison, 1177 15th Street, NW, Washington, D.C. 20005 on Thursday, June 22, 2006 at 10:00 a.m., local time, for the following purposes:

1. To elect one Class II director for a three-year term ending in 2009.

2. To ratify the selection of Grant Thornton LLP as the Company's Independent Registered Public Accounting Firm for the fiscal year ending December 31, 2006.

3. To act upon any other matter which may properly come before the Annual Meeting or any adjournment or postponement thereof.

The Board of Directors of the Company has fixed the close of business on April 25, 2006, as the record date for determining stockholders of the Company entitled to notice of and to vote at the Annual Meeting. A list of the stockholders as of the record date will be available for inspection by stockholders at the Company's offices during business hours for a period of 10 days prior to the Annual Meeting.

Your attention is directed to the attached Proxy Statement and the Annual Report of the Company for the fiscal year ended December 31, 2005.

By Order of the Board of Directors,

---

David A. Steinberg
*Chairman and Chief Executive Officer*

Washington, DC
May 1, 2006

**EVEN IF YOU PLAN TO ATTEND THE MEETING, PLEASE PROMPTLY COMPLETE, SIGN, DATE AND RETURN THE ENCLOSED PROXY. IF YOU ATTEND THE MEETING YOU MAY REVOKE YOUR PROXY AND VOTE IN PERSON.**

**INPHONIC, INC.**
**1010 Wisconsin Avenue, Suite 600**
**Washington, DC 20007**

---

**PROXY STATEMENT**

---

**INFORMATION CONCERNING SOLICITATION AND VOTING**

**General**

This Proxy Statement is being furnished to stockholders of InPhonic, Inc., a Delaware corporation (the "Company"), in connection with the solicitation by the Board of Directors of proxies for use at the Annual Meeting of Stockholders (the "Annual Meeting") to be held at The Madison, 1177 15th Street, NW, Washington, D.C. 20005 on Thursday, June 22, 2006 at 10:00 a.m., local time, and at any adjournment or postponement thereof.

**Solicitation**

The Company will bear the entire cost of the solicitation, including the preparation, assembly, printing and mailing of this proxy statement, including the proxy card and any additional solicitation materials furnished to the stockholders. Copies of solicitation materials will be furnished to brokerage houses, fiduciaries and custodians holding shares in their names that are beneficially owned by others so that they may forward this solicitation material to such beneficial owners. The Company may reimburse such persons for their reasonable expenses in forwarding solicitation materials to beneficial owners. The original solicitation of proxies by mail may be supplemented by a solicitation by personal contacts, telephone, facsimile, electronic mail or any other means by directors, officers or employees of the Company. No additional compensation will be paid to these individuals for any such services. Except as described above, the Company does not presently intend to solicit proxies other than by mail.

This proxy statement and the accompanying solicitation materials are being sent to stockholders on or about May 15, 2006.

**Revocation of Proxies**

A proxy may be revoked at any time prior to its exercise by the filing of a written notice of revocation with the Secretary of the Company, by delivering to the Company a duly executed proxy bearing a later date or by attending the Annual Meeting and voting in person. However, if you are a stockholder whose shares are not registered in your own name, you will need documentation from your record holder stating your ownership as of April 25, 2006, in order to vote personally at the Annual Meeting.

**Quorum and Voting Requirements**

The close of business on April 25, 2006, has been fixed by the Board of Directors of the Company as the record date (the "Record Date") for determining the stockholders of the Company entitled to notice of and to vote at the Annual Meeting. On the Record Date, there were 36,790,512 shares of the Company's common stock, $0.01 par value per share (the "Common Stock"), outstanding. The presence at the Annual Meeting, in person or by a proxy relating to any matter to be acted upon at the meeting, of a majority of the outstanding shares, or 18,395,257 shares, is necessary to constitute a quorum for the Annual Meeting. Each outstanding share is entitled to one vote on all matters. For purposes of the quorum and the discussion below regarding the vote necessary to take stockholder action, stockholders of record who are present at the meeting in person or by proxy and who abstain, including brokers holding customers' shares of record who cause abstentions to be recorded at the Annual Meeting, are considered stockholders who are present and entitled to vote and they count toward the

1

quorum. In the event that there are not sufficient votes for a quorum or to approve any proposal at the Annual Meeting, the Annual Meeting may be adjourned in order to permit the further solicitation of proxies.

Brokers holding shares of record for customers generally are not entitled to vote on certain matters unless they receive voting instructions from their customers. "Broker non-votes" mean the votes that could have been cast on the matter in question if the brokers had received instructions from their customers, and as to which the brokers have notified the Company on a proxy form in accordance with industry practice or have otherwise advised the Company that they lack voting authority.

Directors are elected by a plurality and the nominee who receives the most votes will be elected. Abstentions and broker non-votes will have no effect on the outcome of the election. On all other matters, the affirmative vote of the majority of the shares present in person or by proxy at the meeting and entitled to vote on the matter is required to approve such matter. On such matters, broker non-votes are not considered shares entitled to vote on the matter and therefore will not be taken into account in determining the outcome of the vote on the matter. Abstentions are considered shares entitled to vote on the matter and therefore will have the effect of a vote against the matter.

All outstanding shares of the Company's Common Stock represented by valid and unrevoked proxies received in time for the Annual Meeting will be voted. A stockholder may, with respect to the election of the director (1) vote for the election of the named director nominee or (2) withhold authority to vote for such director nominee. A stockholder may, with respect to the other matter specified in the notice of meeting (1) vote "FOR" the matter, (2) vote "AGAINST" the matter or (3) "ABSTAIN" from voting on the matter. Shares will be voted as instructed in the accompanying proxy on each matter submitted to stockholders. If no instructions are given, the shares will be voted FOR the election of the named director nominee and FOR the ratification of Grant Thornton LLP as the Company's Independent Registered Public Accounting Firm.

The Board of Directors knows of no additional matters that will be presented for consideration at the Annual Meeting. Return of a valid proxy, however, confers on the designated proxy holders the discretionary authority to vote the shares in accordance with their best judgment on such other business, if any, that may properly come before the Annual Meeting or any adjournment or postponement thereof. Proxies solicited hereby will be tabulated by inspectors of election designated by the Board of Directors.

**PROPOSALS TO BE VOTED ON AT THE ANNUAL MEETING**

**PROPOSAL 1. ELECTION OF DIRECTOR WHOSE TERM WILL EXPIRE IN 2009**

Ira Brind has been nominated to be a Class II director for a three-year term expiring at the annual meeting of stockholders in 2009, and until his successor shall be elected and qualified.

The persons named in the enclosed proxy intend to vote properly executed and returned proxies **FOR** the election of the nominee proposed by the Board of Directors unless authority to vote is withheld. In the event that the nominee is unable or unwilling to serve, the persons named in the proxy will vote for such substitute nominee or nominees as they, in their discretion, shall determine. The Board of Directors has no reason to believe that the nominee named herein will be unable or unwilling to serve.

Set forth below is information concerning the named director nominee.

| Name | Age | Director Since | Positions with the Company |
|------|-----|----------------|----------------------------|
| Ira Brind | 65 | 2000 | Director |

*Ira Brind* has served on our board of directors since December 2000. Since May 1989, Mr. Brind has served as president and chief executive officer of Brind Investments, Inc. Mr. Brind was the president and co-founder of Brind-Lindsay & Co., Inc., a private equity and venture capital firm, from 1987 to December 2004. From 1967 until 1983, Mr. Brind was the chief executive officer of Brind Leasing Corporation, a full service truck leasing company, which he sold to McDonnell Douglas. He was chief executive officer and president of McDonnell Douglas Truck Services, a truck leasing company, from 1983 until 1987. Mr. Brind is currently the chairman emeritus of the board of trustees of Thomas Jefferson University Hospital, vice chairman of the Board of Trustees of University of the Arts, member of the Board of Trustees of the Wistar Institute, the Connelly Foundation, Thomas Jefferson University and the Jefferson Health System. Mr. Brind serves on the board of directors of several private companies. Mr. Brind holds a B.A. and a J.D. from the University of Pennsylvania.

**The Board of Directors recommends a vote FOR election of the named director nominee.**

**Information Regarding the Board of Directors and Certain Committees**

Our board of directors currently consists of seven members. Our board of directors is divided into three classes of directors who serve in staggered three-year terms, as follows:

- The Class I directors are Messrs. Steinberg, Hoag and Harris, and their terms will expire at the annual meeting of stockholders to be held in 2008.

- The Class II directors are Messrs. Brind and Wheeler. If Mr. Brind is reelected at the Annual Meeting his term will expire at the annual meeting of stockholders to be held in 2009. Mr. Wheeler has announced that he is retiring from the Board of Directors when his term expires at the Annual Meeting and will serve as chairman of the Company's advisory board. The Nominating and Governance Committee has determined that Mr. Wheeler's board seat will remain vacant after the Annual Meeting until the vacancy is filled in accordance with our bylaws.

- The Class III directors are Messrs. Kemp and Sculley, and their terms will expire at the annual meeting of stockholders to be held in 2007.

The Board of Directors held 10 meetings during 2005. No director attended fewer than 75% of the total number of meetings of the Board of Directors and of the committees of which he was a member during 2005. It is the Company's policy to have each director attend the Annual Meeting and all future meetings of stockholders. In 2005, six of our seven directors attended the annual meeting of stockholders. The Board of Directors has

3

determined that each member of the Board of Directors who will continue to be a member following the Annual Meeting, other than Mr. Steinberg, is independent in accordance with applicable rules of The Nasdaq National Market and the rules and regulations of the Securities Exchange Commission. The Board of Directors has an Audit Committee, a Compensation Committee, a Nominating and Governance Committee and a Mergers and Acquisitions Committee. The Board of Directors has adopted a charter for the Audit Committee, Compensation Committee and the Nominating and Governance Committee, copies of which are available on our website at http://investor.inphonic.com/corpgov/corpgov.cfm.

The Audit Committee consists of Messrs. Harris, Brind and Hoag. The Board of Directors has determined that each of the members of the Audit Committee is independent in accordance with applicable rules of The Nasdaq National Market and the rules and regulations of the Securities Exchange Commission. The Board of Directors has determined that each of the members of the Audit Committee is an "audit committee financial expert" as that term is defined in Item 401 of Regulation S-K under the Securities Exchange Act of 1934. The Audit Committee held 18 meetings during 2005. The Audit Committee oversees the Company's corporate accounting and financial reporting process and the audits of the Company's financial statements. Among other matters, the Audit Committee:

- is responsible for the appointment, compensation and retention of the Company's Independent Registered Public Accounting Firm and reviews and evaluates the auditors' qualifications, independence and performance;

- oversees the Independent Registered Public Accounting Firm's audit work and reviews and pre-approves all audit and non-audit services that may be performed by them;

- reviews and approves the planned scope of the Company's annual audit;

- monitors the rotation of partners of the Independent Registered Public Accounting Firm on the Company's engagement team as required by law;

- reviews the Company's consolidated financial statements and discusses with management and the Independent Registered Public Accounting Firm the results of the annual audit and the review of the Company's unaudited quarterly financial statements;

- reviews the Company's critical accounting policies and estimates;

- oversees the adequacy of the Company's accounting and financial controls;

- annually reviews the Audit Committee charter and the committee's performance;

- reviews and approves all related-party transactions; and

- establishes and oversees procedures for the receipt, retention and treatment of complaints regarding accounting, internal controls or auditing matters and oversees enforcement, compliance and remedial measures under the Company's code of conduct.

The Compensation Committee consists of Messrs. Hoag, Kemp and Sculley. The Board of Directors has determined that each of the members of the Compensation Committee is independent in accordance with applicable rules of The Nasdaq National Market. The Compensation Committee held six meetings during 2005. The Compensation Committee approves, administers and interprets the Company's compensation and benefit policies, and administers the Company's stock option and benefit plans. The Compensation Committee:

- reviews and approves corporate goals and objectives relevant to compensation of the chief executive officer and the other executive officers;

- evaluates the performance of the chief executive officer and the other executive officers in light of those goals and objectives;

- sets compensation of the chief executive officer and the other executive officers;

4

- approves all executive officer employment, severance, or change-in-control agreements, including all special or supplemental benefits, and all agreements to indemnify executive officers or directors;

- administers the issuance of stock options and other awards to executive officers and directors under the Company's stock plans; and

- reviews and evaluates, annually, the performance of the Compensation Committee and its members.

The Nominating and Governance Committee consists of Messrs. Brind, Wheeler and Sculley. Mr. Wheeler has announced that he is retiring from the Board of Directors when his term expires at the Annual Meeting and will serve as chairman of the Company's advisory board. The Nominating and Governance Committee has determined that Mr. Wheeler's board seat will remain vacant after the Annual Meeting until the vacancy is filled in accordance with our bylaws. The Board of Directors has determined that each of the members of the Nominating and Governance Committee is independent in accordance with applicable rules of The Nasdaq National Market. The Nominating and Governance Committee was formed in May 2004 and held one meeting during 2005. The Nominating and Governance Committee:

- identifies individuals qualified to become directors;

- recommends to the Board of Directors director nominees for each election of directors;

- develops and recommends to the Board of Directors criteria for selecting qualified director candidates;

- considers committee member qualifications, appointment and removal;

- recommends corporate governance guidelines applicable to the Company; and

- provides oversight in the evaluation of the Board of Directors and each committee.

The Mergers and Acquisitions Committee consists of Messrs. Hoag, Sculley, Steinberg and Wheeler. Mr. Wheeler has announced that he is retiring from the Board of Directors when his term expires at the Annual Meeting and will serve as chairman of the Company's advisory board. The Mergers and Acquisitions Committee held three meetings during 2005. The Mergers and Acquisitions Committee reviews, monitors and advises the Board of Directors in connection with potential mergers and acquisitions.

**Director Nominations**

Consistent with its charter, the Nominating and Governance Committee will evaluate and recommend to the Board of Directors director nominees for each election of directors.

In fulfilling its responsibilities, the Nominating and Governance Committee considers the following factors in reviewing possible candidates for nomination as director:

- the appropriate size of the Company's Board of Directors and its committees;

- the perceived needs of the Board of the Directors for particular skills, background and business experience;

- the skills, background, reputation, and business experience of nominees compared to the skills, background, reputation, and business experience already possessed by other members of the Board of Directors;

- nominees' independence from management;

- applicable regulatory and listing requirements, including independence requirements and legal considerations, such as antitrust compliance;

- the benefits of a constructive working relationship among directors; and

- the desire to balance the considerable benefit of continuity with the periodic injection of the fresh perspective provided by new members.

5

The Nominating and Governance Committee's goal is to assemble a Board of Directors that brings to the Company a variety of perspectives and skills derived from high quality business and professional experience. Directors should possess the highest personal and professional ethics, integrity and values, and be committed to representing the best interests of our stockholders. They must also have an inquisitive and objective perspective and mature judgment. Director candidates, in the judgment of the Nominating and Governance Committee, must have sufficient time available to perform all Board of Directors and committee responsibilities. Members of the Board of Directors are expected to prepare for, attend and participate in all Board of Directors and applicable committee meetings.

Other than the foregoing, there are no stated minimum criteria for director nominees, although the Nominating and Governance Committee may also consider such other factors as it may deem, from time to time, to be in the best interests of the Company and its stockholders.

**Identifying and Evaluating Candidates for Nomination as Director**

The Nominating and Governance Committee annually evaluates the current members of the Board of Directors whose terms are expiring and who are willing to continue in service against the criteria set forth above in determining whether to recommend these directors for election. The Nominating and Governance Committee regularly assesses the optimum size of the Board of Directors and its committees and the needs of the Board of Directors for various skills, background and business experience in determining whether it is advisable to consider additional candidates for nomination.

Candidates for nomination as director may come to the attention of the Nominating and Governance Committee from time to time through incumbent directors, management, stockholders or third parties. These candidates may be considered at meetings of the Nominating and Governance Committee at any point during the year. Such candidates are evaluated against the criteria set forth above. If the Nominating and Governance Committee believes at any time that it is desirable that the Board of Directors consider additional candidates for nomination, the committee may poll directors and management for suggestions or conduct research to identify possible candidates and may, if the Nominating and Governance Committee believes it is appropriate, engage a third party search firm to assist in identifying qualified candidates. In March 2006, the Nominating and Governance Committee nominated, and the Board of Directors appointed, Mr. Harris as a director. Mr. Harris was recommended as a nominee by the Nominating and Governance Committee.

The Nominating and Governance Committee will evaluate any recommendation for director nominee proposed by a stockholder. In order to be evaluated in connection with the Nominating and Governance Committee's established procedures for evaluating potential director nominees, any recommendation for director nominee submitted by a stockholder must be sent in writing to the Corporate Secretary, InPhonic, Inc., 1010 Wisconsin Avenue, Suite 600, Washington, DC 20007, at least 120 days prior to the anniversary of the date definitive proxy materials were mailed to stockholders in connection with the prior year's annual meeting of stockholders and must contain the following information:

- the candidate's name, age, contact information and present principal occupation or employment; and

- a description of the candidate's qualifications, skills, background, and business experience during, at a minimum, the last five years, including his/her principal occupation and employment and the name and principal business of any corporation or other organization in which the candidate was employed or served as a director.

In addition, the Company's by-laws permit stockholders to nominate directors for consideration at an annual meeting provided they notify the Company at least 120 days prior to the anniversary of the date when definitive proxy materials were mailed to stockholders in connection with the prior year's annual meeting of stockholders.

6

All directors and director nominees must submit a completed form of directors' and officers' questionnaire as part of the nomination process. The evaluation process may also include interviews and additional background and reference checks for non-incumbent nominees, at the discretion of the Nominating and Governance Committee.

**Stockholder Communications with the Board of Directors**

Stockholders may communicate with directors of the Company by transmitting correspondence by mail or facsimile, addressed to the director or the full Board of Directors as follows:

Board of Directors
c/o Walter W. Leach III, General Counsel
InPhonic, Inc.
1010 Wisconsin Avenue
Suite 600
Washington, DC 20007
Fax: 202-333-8280

The Corporate Secretary will maintain a log of such communications and transmit as soon as practicable such communications to the identified director(s), except where security concerns militate against further transmission of the communication or the communication relates to commercial matters not related to the sender's interest as a stockholder, as determined by the General Counsel, Walter W. Leach III. The Board of Directors or individual directors so addressed will be advised of any communication withheld for such reasons.

**Code of Conduct**

We have adopted a code of business conduct and ethics, and a policy providing for the reporting of potential violations of the code, for directors, officers (including our principal executive officer, principal financial officer and controller) and employees, known as the Code of Conduct and Policy Regarding Reporting of Possible Violations (the "Code of Conduct"). The Code of Conduct is available on our website at http://investor.inphonic.com/corpgov/conduct.cfm.

Additionally, stockholders may request a free copy of the Code of Conduct from:

InPhonic, Inc.
Attention: Investor Relations
1010 Wisconsin Avenue
Suite 600
Washington, DC 20007
(202) 333-0001

**Compensation of Directors**

In 2005, members of our Board of Directors received $10,000 in annual cash compensation for their service on the Board of Directors. In addition, members of the Board of Directors serving on the Compensation Committee, Nominating and Governance Committee or Mergers and Acquisitions Committee received annual cash compensation of $5,000 per committee. Members of the Audit Committee received $7,500 in annual cash compensation and the chairman of the Audit Committee received $10,000 in annual cash compensation. The employee member of our Board of our Directors received no additional compensation for his service on the Board. The members of our Board of Directors were reimbursed for travel, lodging and other reasonable expenses incurred in attending Board of Directors and committee meetings. Under our 2004 Equity Incentive Plan, non-employee directors received grants of options to purchase up to 30,000 shares of our common stock

7

upon joining our Board of Directors, and awards of 7,000 shares of restricted stock and grants of options to purchase 3,000 shares of our common stock annually.

In March 2006, the Compensation Committee approved a new outside director compensation program for non-employee directors for the 2006 fiscal year. Pursuant to this program, directors who are not employees receive an annual cash retainer fee of $50,000 and a fee of $1,000 for participation in each meeting of the Board of Directors or meeting of a committee of the Board of Directors. For service on the Audit Committee, each regular member shall receive annual cash compensation of $10,000, while the chairman of the Audit Committee will receive $50,000 annual cash compensation, in recognition of the additional time commitment required of the chairman in reviewing the Company's continuing compliance with Section 404 of the Sarbanes-Oxley Act of 2002. Non-employee directors will also receive annual restricted stock awards valued at approximately $100,000 on the date of approval of the award, which will be issued under the 2004 Equity Incentive Plan and will vest over a two-year period. For the 2006 fiscal year, members of the Board of Directors received an award of an aggregate of 15,480 shares of restricted stock, with 10,836 shares vesting on March 22, 2007 and the remainder vesting on March 22, 2008. Directors will also be reimbursed for travel, lodging and other reasonable expenses related to attendance at Board of Directors and committee meetings.

8

**PROPOSAL 2. RATIFICATION OF APPOINTMENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

On September 19, 2005, the Audit Committee of the Board of Directors of the Company engaged Grant Thornton LLP ("Grant Thornton") as the Company's Independent Registered Public Accounting Firm to audit the Company's financial statements and internal control over financial reporting for the year ending December 31, 2005. The Audit Committee has selected the firm of Grant Thornton to serve as the Independent Registered Public Accounting Firm for the fiscal year ending December 31, 2006. A representative of Grant Thornton is expected to be present at the Annual Meeting, may make a statement if they desire to do so and is expected to be available to respond to appropriate questions from stockholders. Grant Thornton currently serves as the Company's Independent Registered Public Accounting Firm.

We are asking our stockholders to ratify the selection of Grant Thornton as our Independent Registered Public Accounting Firm. Although ratification is not required by our by-laws or otherwise, the board is submitting the selection of Grant Thornton to our stockholders for ratification as a matter of good corporate practice. In the event our stockholders fail to ratify the appointment, the Audit Committee may reconsider this appointment. Even if the selection is ratified, the Audit Committee in its discretion may select a different independent registered public accounting firm at any time during the year if it determines that such a change would be in the best interests of the Company and our stockholders.

Unless marked to the contrary, the shares represented by the enclosed proxy, if properly executed and returned, will be voted FOR the ratification of the appointment of Grant Thornton as the Independent Registered Public Accounting Firm of the Company for the fiscal year ending December 31, 2006.

**The Board of Directors recommends a vote FOR ratification of Grant Thornton LLP.**

9

# FEES AND SERVICES

The following table summarizes fees billed to the Company by Grant Thornton for the fiscal year 2005 and KPMG LLP ("KPMG") for audit and other work performed in 2005 and fiscal year 2004. KPMG was dismissed as the Company's primary independent public accounting firm in September 2005 ($'s in thousands):

| Services | 2005 | | 2004 |
| --- | --- | --- | --- |
| | Grant Thornton | KPMG | KPMG |
| Audit Fees (a) | $    1,437 | $1,381 | $1,568 |
| Audit-Related Fees (b) | $      62 | — | — |
| Tax Fees (c) | — | $  101 | $  187 |
| All Other Fees (d) | — | — | — |
| Total Fees | $    1,499 | $1,482 | $1,755 |

(a)   The audit fees for the years ended December 31, 2005 and 2004 were for professional services rendered during the audits of the Company's consolidated financial statements and its controls over financial reporting, for reviews of the Company's consolidated financial statements included in the Company's quarterly reports on Form 10-Q and for reviews of other filings made by the Company with the Securities and Exchange Commission ("SEC").

(b)   Audit-related fees consist of fees for assurance and related services that are reasonably related to the performance of the audit and the review of our financial statements and which are not reported under "Audit Fees." These services relate to due diligence and accounting advice related to mergers and acquisitions.

(c)   Tax fees consist of fees for tax compliance, tax advice and tax planning services.

(d)   All other fees consist of fees for products and services other than the services reported above.

## Independent Registered Public Accounting Firm

On September 12, 2005, the Audit Committee of the Board of Directors dismissed KPMG as the Company's independent registered public accounting firm, effective immediately.

The audit reports of KPMG on the consolidated financial statements of the Company as of and for the years ended December 31, 2004 and 2003, did not contain an adverse opinion or disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles, except that the audit reports as of and for the years ended December 31, 2004 and 2003, contained separate paragraphs stating that the Company adopted EITF 00-21, *Revenue Arrangements with Multiple Deliverables,* effective July 1, 2003.

During the two most recently completed fiscal years and through September 12, 2005, there have been no disagreements with KPMG on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of KPMG, would have caused KPMG to make reference to the subject matter of the disagreement in connection with its reports on the Company's financial statements for the past two fiscal years. In addition, there have been no "reportable events" (as defined in Item 304(a)(1)(v) of Regulation S-K) during the two most recently completed fiscal years and through September 12, 2005.

The Company has provided KPMG with a copy of the disclosures above and requested that KPMG furnish it with a letter addressed to the Securities and Exchange Commission stating whether or not it agrees with the above statements. A copy of that letter, dated September 20, 2005, was filed as Exhibit 16.1 to our report on Form 8-K filed with the SEC on September 20, 2005.

On September 19, 2005, the Audit Committee of the Board of Directors engaged Grant Thornton as the Company's independent registered public accounting firm to audit the Company's financial statements and internal control over financial reporting for the year ending December 31, 2005.

Prior to engaging Grant Thornton, the Company did not consult with Grant Thornton during the two most recently completed fiscal years and through September 19, 2005 regarding (i) either the application of accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on the Company's financial statements, and neither was a written report nor oral advice provided to the Company that Grant Thornton concluded was an important factor considered by the Company in reaching a decision as to the accounting, auditing or financial reporting; or (ii) any matter which was the subject of either a "disagreement" or a "reportable event" (as each is defined in Items 304(a)(1)(iv) and (v) of Regulation S-K, respectively).

**Pre-Approval of Non-Audit Services**

The Audit Committee has established a policy governing the Company's use of Grant Thornton for non-audit services. Under the policy, management may use Grant Thornton for non-audit services that are permitted under SEC rules and regulations, provided that management obtains the Audit Committee's approval before such services are rendered. In fiscal years 2005 and 2004, all audit, audit related, and tax fees were pre-approved by the Audit Committee. Under the SEC rules, subject to certain permitted de minimis criteria, pre-approval is required for all professional services rendered by the Company's principal accountant for all services rendered on or after May 6, 2003. We are in compliance with these SEC rules.

11

**AUDIT COMMITTEE REPORT**

The Audit Committee of the Board of Directors consists of three independent directors, as required by Nasdaq listing standards. The Audit Committee operates under a written charter adopted by the Board of Directors, and is responsible for overseeing the Company's financial reporting process on behalf of the Board of Directors. The members of the Audit Committee are Messrs. Brind, Harris and Hoag. Each year, the Audit Committee selects, subject to stockholder ratification, the Company's Independent Registered Public Accounting Firm.

Management is responsible for the Company's consolidated financial statements and the financial reporting process, including internal controls. The Independent Registered Public Accounting Firm is responsible for performing an independent audit of the Company's consolidated financial statements in accordance with U.S. generally accepted auditing standards and for issuing a report thereon. The Audit Committee's responsibility is to monitor and oversee these processes.

In this context, the Audit Committee has met and held discussions with management and Grant Thornton, the Company's Independent Registered Public Accounting Firm. Management represented to the Audit Committee that the Company's consolidated financial statements were prepared in accordance with U.S. generally accepted accounting principles, and the Audit Committee has reviewed and discussed the consolidated financial statements with management and the Independent Registered Public Accounting Firm. The Audit Committee discussed with Grant Thornton the matters required to be discussed by Statement on Auditing Standards No. 61 (Communication with Audit Committees). These matters included a discussion of Grant Thornton's judgments about the quality (not just the acceptability) of the Company's accounting principles as applied to the Company's financial reporting.

Grant Thornton LLP also provided the Audit Committee with the written disclosures required by Independence Standards Board Standard No. 1 (Independence Discussions with Audit Committees), and the Audit Committee discussed with Grant Thornton that firm's independence. The Audit Committee further considered whether the provision by Grant Thornton of the non-audit services described above is compatible with maintaining the auditors' independence.

Based upon the Audit Committee's discussion with management and the Independent Registered Public Accounting Firm and the Audit Committee's review of the representations of management and the disclosures by the Independent Registered Public Accounting Firm to the Audit Committee, the Audit Committee recommended to the Board of Directors that the Company's audited consolidated financial statements be included in the Company's Annual Report on Form 10-K as of and for the year ended December 31, 2005, for filing with the Securities and Exchange Commission. The Audit Committee also selected Grant Thornton as the Company's Independent Registered Public Accounting Firm for the fiscal year ending December 31, 2006.

> Audit Committee
> Laurence E. Harris, Chairman
> Ira Brind
> Jay C. Hoag

12

## MANAGEMENT

The Company's executive officers, key employees and directors are as follows:

| Name | Age | Position |
| --- | --- | --- |
| *Executive Officers:* | | |
| David A. Steinberg (4) | 36 | Chairman of the Board and Chief Executive Officer |
| Lawrence S. Winkler | 39 | Chief Financial Officer, Executive Vice President and Treasurer |
| | | |
| *Non-Management Directors:* | | |
| John Sculley (1)(2)(4) | 67 | Vice Chairman of the Board |
| Ira Brind (2)(3) | 65 | Director |
| Laurence E. Harris (3) | 70 | Director |
| Jay C. Hoag (1)(3)(4) | 47 | Director |
| Jack F. Kemp (1) | 70 | Director |
| Thomas E. Wheeler (2)(4)* | 60 | Director |
| | | |
| *Key Employees:* | | |
| Frank C. Bennett III | 47 | President, MVNE Services |
| Walter W. Leach III | 43 | General Counsel and Corporate Secretary |
| Gary J. Smith | 39 | Chief Information Officer |
| Michael E. Walden | 36 | Executive Vice President, Corporate Development |
| Brian T. Westrick | 37 | President, Wireless Activation and Services |

(1)    Member of the Compensation Committee.

(2)    Member of the Nominating and Governance Committee.

(3)    Member of the Audit Committee.

(4)    Member of the Mergers and Acquisitions Committee.

 *    Mr. Wheeler has announced that he is retiring from the Board of Directors when his term expires at the Annual Meeting and will serve as chairman of the Company's advisory board.

Set forth below is certain information regarding the positions and business experience of each executive officer, director and key employee of the Company (other than the director nominee, whose biography is set forth above under Proposal No. 1).

## Executive Officers

*David A. Steinberg,* our founder, has served as our chairman of the board of directors and chief executive officer since our inception and served as president from August 2002 until March 2004. Prior to founding InPhonic, Mr. Steinberg was chairman, president and chief executive officer of Sterling Cellular, Inc., a distributor of wireless products that he founded in November 1993. In April 2004, Mr. Steinberg was appointed to the board of the United States Chamber of Commerce. In June 2002, Mr. Steinberg was named the Greater Washington Ernst & Young Entrepreneur of the Year in the communications category. Mr. Steinberg holds a B.A. from Washington & Jefferson College.

*Lawrence S. Winkler* has served as our chief financial officer, executive vice president and treasurer since January 2004. Prior to joining us, Mr. Winkler was managing director of Stanmore Capital, a private equity and mergers and acquisitions advisory firm, from April 2002 to January 2004. From January 2000 to April 2002,

13

Mr. Winkler served as president and chief operating officer and as chief financial officer of OmniSky Corporation, a wireless data company. Prior to OmniSky, Mr. Winkler was the chief finance officer and treasurer of PSINet, Inc., an Internet carrier, from December 1997 to April 2000. Prior to joining PSINet, Mr. Winkler was with Black and Decker, a global marketer of consumer products, the Mills Corporation, a real estate investment trust, C.R.I. Inc., a private equity investment firm, and Arthur Andersen & Co, where he held various senior leadership positions in finance and operations. Mr. Winkler also serves on the Board of Trustees for the National Foundation for Advancement in the Arts. Mr. Winkler holds a B.A. from the University of Maryland and an M.B.A. from Loyola College.

**Non-Management Directors**

*John Sculley* is vice chairman of our board of directors and has served on our board of directors since February 2000. Since June 1994, Mr. Sculley has served as a partner of Sculley Brothers LLC, a private investment and advisory services company. Prior to forming Sculley Brothers, Mr. Sculley was chief executive officer of Apple Computer, Inc. from 1983 until 1993. From 1967 to 1983, Mr. Sculley held marketing and management positions at the Pepsi-Cola Company, including serving as its president and chief executive officer from 1978 to 1983. Mr. Sculley serves on the board of directors of MetroPCS, Inc. and several private companies. Mr. Sculley holds a B.A. from Brown University and an M.B.A. from The Wharton School of the University of Pennsylvania.

*Laurence E. Harris* has served as a director since March 2006. He is *"of counsel"* at the law firm Patton Boggs LLP and was a partner with the firm from May 2001 until December 2004. From December 1996 to April 2001, Mr. Harris was senior vice president and general counsel of Teligent, Inc., an international telecommunications company. From 1992 to 1996, Mr. Harris served as senior vice president of law and public policy for MCI Communications Corporation. From 1982 to 1992, Mr. Harris was president and chief operating officer of Metromedia Telecommunications, Inc. and CRICO Communications, a privately-held paging company. Prior to Metromedia, Mr. Harris served as chief of the Federal Communication Commission's Mass Media Bureau. From 1972 to 1982, Harris served as a vice president of law and public policy for MCI, managing corporate relations for the Federal Communications Commission (FCC) and the office of telecommunications policy at the White House. Mr. Harris was a lieutenant in the U.S. Navy, serving in the destroyer fleet. Mr. Harris serves on the board of directors of MCI, where he is a member of the risk and corporate governance committees. Mr. Harris also serves on the board of directors and is chairman of the audit committee for Sports Brands International, Inc. Mr. Harris holds a B.A. degree from Columbia College and J.D. from Georgetown University.

*Jay C. Hoag* has served on our board of directors since June 2003. Since June 1995, Mr. Hoag has been a general partner at Technology Crossover Ventures, a venture capital firm. Mr. Hoag serves on the board of directors of Altiris, Inc., eLoyalty Corporation, Netflix, Inc. and several private companies. Mr. Hoag holds a B.A. from Northwestern University and an M.B.A. from the University of Michigan.

*Jack F. Kemp* has served on our board of directors since June 2002. Mr. Kemp is founder and chairman of Kemp Partners, a strategic consulting firm which seeks to provide clients with strategic counsel, relationship development, and marketing advice in helping them accomplish business and policy objectives. From January 1993 until July 2004, Mr. Kemp was co-director of Empower America, Inc., a Washington, D.C.-based public policy and advocacy organization he co-founded with William Bennett and Ambassador Jeane Kirkpatrick. In 1996, Mr. Kemp was the Republican Party candidate for Vice President. Prior to founding Empower America, Mr. Kemp served as U.S. Secretary of Housing and Urban Development from 1989 to 1992, and in the U.S. House of Representatives from 1971 to 1989. Mr. Kemp also serves as a director of Hawk Corporation, IDT Corporation, Oracle Corporation, Six Flags, Inc. and WorldSpace, Inc. Mr. Kemp holds a B.A. from Occidental College.

*Thomas E. Wheeler* has served on our board of directors since January 2004. From June 1992 to November 2003, Mr. Wheeler held the position of president and chief executive officer of the Cellular Telecommunications

14

& Internet Association. Mr. Wheeler has served as a member of the board of trustees for the John F. Kennedy Center for the Performing Arts since 1994. Since July 2004, Mr. Wheeler has been associated with Core Capital Partners, L.P., where he is presently a managing director. In this capacity, he assists in identifying opportunities and increasing portfolio companies' presence in the telecommunications industry. Mr. Wheeler is a director of Earthlink Inc. and WiderThan Co., Ltd., where he serves on the audit committee. Mr. Wheeler holds a B.S. from Ohio State University.

## Key Employees

*Frank C. Bennett III* has served as our president, MVNE services since March 2004, and prior to that he served as our chief operating officer from April 2002. From August 2000 to August 2001, Mr. Bennett was the senior vice president and group operations officer for the retail group of Verizon. From October 1999 to August 2000, Mr. Bennett served as vice president, e-commerce and technology of Bell Atlantic Corporation (now part of Verizon). From February 1998 to October 1999, he was vice president, customer billing of Bell Atlantic. In addition, from July 1996 to December 1998, Mr. Bennett served as a founder and vice president, call center development of Bell Atlantic Plus, a provider of bundled wireline and wireless services. Mr. Bennett holds a B.A. from the University of Virginia and an M.B.A. from The Wharton School of the University of Pennsylvania.

*Gary J. Smith* has served as our chief information officer since July 2000. From July 1999 to July 2000, Mr. Smith served as chief information officer and vice president of technology of Varsity Group Inc., formerly known as VarsityBooks.com, LLC, an online retailer of textbooks. From September 1987 to July 1999, Mr. Smith served in various technology management positions at Discovery Communications Inc., an international media company, including most recently vice president of technology. Mr. Smith holds a B.S. from the University of Maryland.

*Walter W. Leach, III* has served as our general counsel since January 2001. Mr. Leach served as corporate counsel of Snyder Communications, a marketing and communications solution provider from June 1997 to January 2001. From October 1992 to June 1997, Mr. Leach served as deputy corporate counsel for Inductotherm Industries, Inc., a privately held manufacturer. Mr. Leach holds a B.A. from Syracuse University and a J.D. from Vermont Law School.

*Michael E. Walden* has served in various executive-level positions at our company since joining us in October 2000 and is currently our executive vice president of corporate development. From December 1999 to October 2000, Mr. Walden served as vice president of new media and entertainment at Etensity, Inc., an e-business consulting firm. From October 1998 to December 1999, Mr. Walden served as vice president of operations for Professional Resource Services, a technology consulting and recruiting firm, a spin-out of NDC Group, a technology consulting firm. From November 1995 to October 1998, Mr. Walden served as director of telecommunications services for NDC Group. From 1991 to 1994, Mr. Walden served on the Washington D.C. legislative staff of U.S. Senator Arlen Specter. Mr. Walden holds a B.S. from the University of Richmond.

*Brian T. Westrick* has served as president of our wireless activation and services division since July 2002 and has held various executive-level positions since joining us in June 2000. From December 1994 to June 2000, Mr. Westrick was vice president of sales and marketing for Universal Jet Trading. From July 1991 to December 1994, Mr. Westrick was marketing director for Lease Audit and Analysis Services, a real estate consulting company. From June 1990 to July 1991, Mr. Westrick was a marketing representative with Xerox Corporation. Mr. Westrick holds a B.S. from the Wallace E. Carroll School of Management at Boston College.

Mr. Winkler was an executive officer of OmniSky within two years prior to OmniSky filing for protection under federal bankruptcy laws (which filed for bankruptcy protection in December 2001).

### SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth information regarding the beneficial ownership of common stock of the Company as of April 25, 2006, unless otherwise indicated, by (1) all stockholders known by the Company to beneficially own more than five percent of the outstanding common stock, (2) each of the directors, (3) each executive officer of the Company named in the Summary Compensation Table and (4) all directors and executive officers of the Company as a group. The Company has relied upon information provided to the Company by its directors and executive officers and copies of documents sent to the Company that have been filed with the Securities and Exchange Commission by others for purposes of determining the number of shares each person beneficially owns. Beneficial ownership is determined in accordance with the rules and regulations of the Securities and Exchange Commission and generally includes those persons who have voting or investment power with respect to the securities. Except as otherwise indicated, and subject to applicable community property laws, the persons named in the table have sole voting and investment power with respect to all shares of the Company's common stock beneficially owned by them. Shares of the Company's common stock subject to options or warrants that are exercisable within 60 days of April 25, 2006 are also deemed outstanding for purposes of calculating the percentage ownership of that person, and if applicable, the percentage ownership of executive officers and directors as a group, but are not treated as outstanding for the purpose of calculating the percentage ownership of any other person. Percentages of shares beneficially owned are based on 36,790,512 shares of the Company's common stock outstanding as of April 25, 2006.

| Beneficial Owner (1) | Number of Shares | Percent Owned |
|---|---|---|
| **Directors and Named Executive Officers:** | | |
| David A. Steinberg (2) | 5,150,306 | 13.9% |
| Brian T. Westrick (3) | 86,601 | * |
| Frank C. Bennett III (4) | 379,664 | 1.0 |
| Richard D. Calder, Jr. (5) | 197,763 | * |
| Lawrence S. Winkler (6) | 487,498 | 1.3 |
| Ira Brind (7) | 144,589 | * |
| Laurence E. Harris (8) | 16,980 | * |
| Jay C. Hoag (9) | 7,643,018 | 20.4% |
| Jack F. Kemp (10) | 78,103 | * |
| John Sculley (11) | 627,413 | 1.7% |
| Thomas E. Wheeler (12) | 37,687 | * |
| All directors and executive officers as a group (11 persons) (13) | 14,849,622 | 38.4% |
| **Five Percent Stockholders (14):** | | |
| Entities affiliated with TCV IV, L.P. (15) | 7,613,871 | 20.4% |
| Chilton Investment Company, LLC (16) | 1,807,935 | 4.9% |
| Cumberland Associates LLC (17) | 1,790,000 | 4.9% |
| Trafelet & Company, LLC (18) | 2,427,000 | 6.6% |

\* less than 1%

(1)   Unless otherwise indicated, the address of each stockholder is c/o InPhonic, Inc., 1010 Wisconsin Avenue, Suite 600, Washington, DC 20007.

(2)   Includes (1) 346,817 shares beneficially owned by a trust created for the benefit of Mr. Steinberg's children, (2) 450,000 shares held by a family-owned limited liability company created for estate planning purposes, (3) 333,331 shares issuable upon exercise of vested stock options and (4) 100,000 shares of restricted stock that are subject to vesting. Mr. Steinberg shares dispositive and voting control over these shares. Mr. Steinberg disclaims beneficial ownership of these shares except to the extent of his pecuniary interest.

(3)   Includes (a) 28,601 shares issuable upon exercise of vested stock options and (b) 58,000 shares of restricted stock that are subject to vesting.

16

(4) Includes (a) 315,064 shares issuable upon exercise of vested stock options and (b) 64,600 shares of restricted stock that are subject to vesting.

(5) Includes (a) 147,763 shares issuable upon exercise of vested stock options and (b) 50,000 shares of restricted stock that are subject to vesting. Effective April 30, 2006, Mr. Calder's employment with us has terminated.

(6) Includes (a) 237,498 shares issuable upon exercise of vested stock options and (b) 250,000 shares of restricted stock that are subject to vesting.

(7) Includes (a) 13,334 shares issuable upon exercise of vested options, (b) 22,480 shares of restricted stock that are subject to vesting, (c) 1,832 shares issuable upon exercise of warrants, and (d) 17,779 shares issuable upon exercise of warrants, beneficially owned by Brind Investment Partners II, of which Mr. Brind is a partner, and as to which shares Mr. Brind shares dispositive and voting control. Mr. Brind disclaims beneficial ownership of these shares except to the extent of his pecuniary interest. The address of Mr. Brind is c/o Brind Investment Partners II, 1926 Arch Street, Philadelphia, PA 19103.

(8) Includes 15,480 shares of restricted common stock that is subject to vesting.

(9) Includes 6,667 shares issuable upon exercise of vested options, 22,480 shares of restricted stock subject to vesting, and the following shares as to which Mr. Hoag shares dispositive and voting power: (a) 6,764,515 shares of common stock and 575,652 shares issuable upon exercise of warrants beneficially owned by TCV IV, L.P.; and (b) 252,238 shares of common stock and 21,466 shares issuable upon exercise of warrants beneficially owned by TCV IV Strategic Partners, L.P. Mr. Hoag, one of our directors, is a managing member of Technology Crossover Management IV, L.L.C., ("TCM"). TCM is the general partner of TCV IV, L.P. and TCV IV Strategic Partners, L.P. The address of Mr. Hoag is c/o Technology Crossover Ventures, 528 Ramona Street, Palo Alto, CA 94301.

(10) Includes (a) 11,455 shares of common stock and 3,334 shares issuable upon exercise of warrants beneficially owned by the Jack Kemp Family Trust, (b) 22,480 shares of restricted stock subject to vesting and (c) 40,834 shares issuable upon exercise of vested options. Mr. Kemp disclaims beneficial ownership of these shares except to the extent of his pecuniary interest.

(11) Includes (a) 22,480 shares of restricted stock subject to vesting, (b) 130,002 shares issuable upon exercise of vested options and (c) 25,055 shares issuable upon exercise of warrants. Also includes (a) 2,292 shares owned by John Sculley Irrevocable Trust Udt 12/30/97 FBO Oliver Allnatt and (b) 2,292 shares owned by John Sculley Irrevocable Trust Udt 12/30/97 FBO Madeline Allnatt. Mr. Sculley disclaims beneficial ownership of these shares except to the extent of his pecuniary interest. The address of Mr. Sculley is 152 West 57th Street, 23rd floor, New York, New York 10019.

(12) Includes (a) 22,480 shares of restricted stock subject to vesting and (b) 15,207 shares issuable upon exercise of vested options.

(13) Includes (a) 1,268,301 shares issuable upon exercise of vested options, (b) 650,480 shares of restricted stock subject to vesting and (c) 645,118 shares issuable upon exercise of warrants.

(14) Mr. Steinberg is also a holder of greater than 5% of our common stock.

(15) Includes (a) 6,764,515 shares of common stock and 575,652 shares issuable upon exercise of warrants beneficially owned by TCV IV, L.P. and (b) 252,238 shares of common stock and 21,466 shares issuable upon exercise of warrants beneficially owned by TCV IV Strategic Partners, L.P. Mr. Hoag, one of our directors, is a managing member of TCM. TCM is the general partner of TCV IV, L.P. and TCV IV Strategic Partners, L.P. The address of TCV IV, L.P. is Technology Crossover Ventures, 528 Ramona Street, Palo Alto, CA 94301.

(16) As reported on a Schedule 13G filed by Chilton Investment Company, LLC, an investment adviser, on February 14, 2006. The address of Chilton Investment Company, LLC is 1266 East Main Street, 7 th Floor, Stamford, CT 06902.

(17)   As reported on a Schedule 13G filed by Cumberland Associates LLC, an investment adviser, on March 8, 2006. Includes 1,423,321 shares as to which Cumberland has sole voting and dispositive power and 366,679 shares as to which Cumberland has shared voting and dispositive power. The address of Cumberland Associates LLC is 1114 Avenue of the Americas, New York, NY 10036.

(18)   As reported on a Schedule 13G filed by Trafelet & Company, LLC, and Remy W. Trafelet, its managing member, on February 14, 2006. Represents shares as to which Trafelet has shared voting and dispositive power. The address is 900 Third Avenue, 5 th Floor, New York, NY 10022.

### CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

**Policy Statement**

We have a policy whereby all transactions between us and our officers, directors and affiliates will be on terms no less favorable to us than could be obtained from unrelated third parties. These transactions must be approved by the Audit Committee of our Board of Directors. The transactions set forth below were conducted under application of this policy and we believe were no less favorable to us than we would have obtained in an arms length transaction with an unaffiliated third party.

**Issuance of Options and Restricted Stock**

In July 2005, we awarded each of Messrs. Brind, Hoag, Kemp, Sculley and Wheeler 7,000 shares of restricted stock and granted options to purchase 3,000 shares of our common stock at an exercise price of $16.49 per share.

**Law Firm "Of Counsel" Serving on Board of Directors**

Mr. Laurence E. Harris, a director of the Company since March 2006, is *"of counsel"* in the law firm of Patton Boggs LLP ( *"Patton Boggs"* ). The total cost of various legal services provided by Patton Boggs in 2005 was approximately $1,308,400. Mr. Harris does not share in any of the fees received by Patton Boggs from the Company.

**Investments by Executive Officers**

Mr. Steinberg is a trustee of the KKS DAS DES TRUST, which is a limited partner of TCV V, L.P. and TCV VI, L.P. Mr. Hoag, one of our directors, is a member of Technology Crossover Management V, L.L.C., ("TCM"). TCM is the general partner of TCV V, L.P. and TCV VI, L.P. The KKS DAS DES TRUST's investment comprises less than 0.1% of the capital under management of TCV V, L.P. and TCV VI, L.P., respectively. Neither TCV V, L.P. nor TCV VI, L.P. owns shares of our common stock.

19

## EXECUTIVE COMPENSATION AND OTHER MATTERS

The following table contains summary information concerning annual compensation for the three years ended December 31, 2003, December 31, 2004 and December 31, 2005 for our chief executive officer and each of our other four most highly compensated executive officers whose salary and bonus exceeded $100,000 for the year ended December 31, 2005.

### Summary Compensation Table

| | | Annual Compensation | | Long-Term Compensation | | |
|---|---|---|---|---|---|---|
| Name & Principal Position | Year | Salary | Bonus | Restricted Stock Awards(2) | Number of Shares Underlying Option Awards | All Other Annual Compensation |
| David A. Steinberg | 2005 | 320,000 | | | | |
| Chairman of the Board and Chief Executive Officer | 2004 | $ 290,000 | $ 23,562 | $ 1,649,000(5) | — | $ 19,257(3) |
| | 2003 | 250,000 | 72,665 120,000 | — | 666,667(1) | 24,882(3) 44,286(3) |
| Brian T. Westrick | 2005 | 228,500 | | | | |
| President, Wireless Activation and Services | 2004 | $ 186,300 | $ 88,800 | $ 494,700(6) | 20,000(1) | $ 7,114(4) |
| | 2003 | 174,600 | 30,000 20,000 | — | 157,151(1) — | 6,545(4) 5,400(4) |
| Frank C. Bennett III | 2005 | 265,000 | | | | |
| President, MVNE Services | 2004 | $ 265,000 | $ 30,000 | $ 595,350(7) | 20,000(1) | $ 6,250(4) |
| | 2003 | 265,000 | 30,000 50,000 | — | 13,334(1) — | 6,000(4) 6,000(4) |
| Richard D. Calder, Jr. (11) | 2005 | $250,000 | $ 30,000 | $ 824,500(8) | 20,000(1) | — |
| Former President and Chief Operating Officer | 2004 | 194,000 | 30,000 — | — | 433,334(11) — | — |
| | 2003 | — | | | | — |
| Lawrence S. Winkler | 2005 | $250,000 | $ 30,000 | $ 4,062,000(9) | — | — |
| Chief Financial Officer, Executive Vice President and Treasurer | 2004 | 215,000 | 30,000 — | — | 433,334(10) — | — |
| | 2003 | — | | | | — |

(1) These options become exercisable over a four-year period, with 25% vesting on the one year anniversary of the grant date and the remainder vesting in equal installments over the next three years.

(2) These shares of restricted stock become exercisable over a four-year period, with 25% vesting on the one year anniversary of the grant date and the remainder vesting in equal installments over the next three years.

(3) For 2005, includes (a) $18,649 for life insurance premiums and (b) $612 for health club dues. For 2004, includes (a) $5,998 for transportation allowance, (b) $18,068 for life insurance premiums and (c) $816 for health club dues. For 2003, includes (a) $22,377 for transportation allowance, (b) $21,093 for life insurance premiums and (c) $816 for health club dues.

(4) Represents amounts paid for transportation allowance.

(5) Represents 100,000 shares of common stock, based on a per share value of $16.49 which was the closing market price of the Company's common stock on the date of grant. As of December 31, 2005, the restricted stock has an aggregate value of $869,000, based on the closing market price of $8.69 per share.

(6) Represents 30,000 shares of common stock, based on a per share value of $16.49 which was the closing market price of the Company's common stock on the date of grant. As of December 31, 2005, the restricted stock has an aggregate value of $260,700, based on the closing market price of $8.69 per share.

(7) Represents 6,600 shares of common stock, based on a per share value of $15.25, and 30,000 shares of common stock, based on the per share value of $16.49, both of which are based on a per share value which was the closing market price of the Company's common stock on the date of grant. As of December 31,

2005, the restricted stock has an aggregate value of $318,054, based on the closing market price of $8.69 per share.

(8)   Represents 50,000 shares of common stock, based on a per share value of $16.49 which was the closing market price of the Company's common stock on the date of grant. As of December 31, 2005, the restricted stock has an aggregate value of $434,500, based on the closing market price of $8.69 per share.

(9)   Represents 200,000 shares of common stock, based on a per share value of $16.49, and 50,000 shares of common stock, based on the per share value of $15.28, both of which are based on a per share value which was the closing market price of the Company's common stock on the date of grant. As of December 31, 2005, the restricted stock has an aggregate value of $2,172,500, based on the closing market price of $8.69 per share.

(10)  100,000 of these options vest as follows: 50% immediately and the remaining 50% in equal quarterly installments over the next three years. 333,334 of these options vest as follows: 33% on the first anniversary of the date of grant, less 16,667 shares which vested immediately and the remainder of which vest quarterly over the next two years.

(11)  These options vest as follows: 25% of the options vest on the first anniversary of the date of grant, less 16,667 shares which vested immediately and the remainder of which vest in equal quarterly installments over the next three years. Effective April 30, 2006, Mr. Calder's employment with us has terminated.

21

## STOCK OPTION GRANTS IN LAST FISCAL YEAR

The following table contains information related to the grant of stock options by us during the year ended December 31, 2005 to the executive officers named in the summary compensation table.

| | Number of Securities Underlying Options Granted (1) | Percent of Total Options Granted to Employees In Fiscal Year (2) | Exercise or Base Price ($/Share) (3) | Expiration Date (4) | Potential Realizable Value at Assumed Annual Appreciation Rates of Stock Price for Option Term (5) | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | | 5% | 10% |
| David A. Steinberg | — | — % | $ — | — | $ — | $ — |
| Brian T. Westrick | 20,000 | 1.3 | 16.49 | 7/25/2015 | 207,409 | 525,616 |
| Frank C. Bennett III | 20,000 | 1.3 | 16.49 | 7/25/2015 | 207,409 | 525,616 |
| Richard D. Calder, Jr. (6) | 20,000 | 1.3 | 16.49 | 7/25/2015 | 207,409 | 525,616 |
| Lawrence S. Winkler | — | — | — | — | — | — |

(1) All options were granted under our 2004 equity incentive plan.

(2) The percentage of total options granted to employees is based on an aggregate of 1,580,400 options granted to our employees in 2005.

(3) The exercise price per share reflects the fair market value of the common stock at the time of issuance as determined by the compensation committee of the board of directors.

(4) The options have ten year terms, subject to earlier termination upon death, disability or termination of employment.

(5) The potential realizable value is calculated based on the term of the option at the time of grant. Hypothetical, potential realizable values are net of exercise price, but before taxes associated with exercise. Stock price appreciation of 5% and 10% is assumed pursuant to rules promulgated by the SEC and does not represent our prediction of our stock price performance. The potential realizable values at 5% and 10% appreciation are calculated by assuming that the exercise price on the date of grant represents the fair value of a share of common stock on that date, that the value appreciates annually at the indicated rate for the entire term of the option and that the option is exercised at the exercise price and sold on the last day of its term at the appreciated price.

(6) Effective April 30, 2006, Mr. Calder's employment with us has terminated.

## AGGREGATED OPTION EXERCISES AND FISCAL YEAR-END OPTION VALUES

The following table contains information concerning the aggregated option exercises during the year ended December 31, 2005 and the value of unexercised options held as of December 31, 2005 by the executive officers named in the summary compensation table.

| | Shares Acquired on Exercise | Value Realized (1) | Number of Shares Underlying Unexercised Options at December 31, 2005 | | Value of Unexercised In-the-Money Options at December 31, 2005 (2) | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Exercisable | Unexercisable | Exercisable | Unexercisable |
| | | | | | (in thousands) | |
| David A. Steinberg | — | $    — | 291,665 | 375,002 | $2,534,569 | $3,258,767 |
| Brian T. Westrick | 117,299 | 1,170,253 | 11,175 | 111,529 | 78,160 | 586,253 |
| Frank C. Bennett III | 97,374 | 653,887 | 276,363 | 78,786 | 2,401,594 | 510,850 |
| Richard D. Calder, Jr. (3) | 75,152 | 765,445 | 114,430 | 263,752 | 994,397 | 2,118,205 |
| Lawrence S. Winkler | 100,000 | 989,250 | 201,387 | 131,947 | 1,750,053 | 1,146,619 |

(1)    Based on the market price of the purchased shares on the exercise date less the option exercise price paid for those shares.

(2)    The value of unexercised in-the-money options has been calculated by multiplying the difference between the exercise price per share and the per share closing price of our common stock on December 31, 2005 by the number of shares underlying the options.

(3)    Effective April 30, 2006, Mr. Calder's employment with us has terminated.

## EQUITY COMPENSATION PLAN INFORMATION

The following table provides information with respect to the equity securities that are authorized for issuance under our equity compensation plans as of December 31, 2005:

| | Number of Securities to Be Issued Upon Exercise of Outstanding Options, Warrants and Rights (a) | Weighted-average Exercise Price of Outstanding Options, Warrants and Rights (b) | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column (a)) (c) |
| --- | --- | --- | --- |
| Equity compensation plans approved by security holders | 7,041,710 | $    7.94 | 1,014,668 |
| Equity compensation plans not approved by security holders | 0 | 0 | 0 |
| Total | 7,041,710 | $    7.94 | 1,014,668 |

## Employment Agreements, Termination of Employment and Change in Control Arrangements

We have entered into employment agreements with our named executive officers. The following discussion provides an overview of these agreements; it is not a complete description of all terms of the agreements. For the location of the agreements discussed below in our public SEC filings, please refer to the exhibit index in our Form 10-K for the year ended December 31, 2005.

In February 2000, we entered into an employment agreement with Mr. Steinberg, which was subsequently amended in March and May 2004. The agreement provides that we will employ Mr. Steinberg as our chief executive officer until May 31, 2008. The terms can be extended if we and Mr. Steinberg agree to do so 30 days prior to the end of the current term. Under this agreement, Mr. Steinberg receives an annual base salary to be established from time to time by the board of directors, which shall not be less than $290,000 per year, and he is eligible for an annual bonus equal to 65% of his then current annual salary based on the attainment of reasonable performance objectives established by the Compensation Committee of the Board of Directors. Mr. Steinberg's annual base salary is currently $320,000. Pursuant to the May 2004 amendment, Mr. Steinberg was granted options to purchase 666,667 shares of our common stock, at an exercise price of $5.88 per share, 25% of which vested on the first anniversary of the date of grant and the remainder vest in equal quarterly installments over the next three years. If we terminate Mr. Steinberg's employment without cause or Mr. Steinberg terminates his employment for good reason, Mr. Steinberg is entitled to continue to receive his base salary for one year. If Mr. Steinberg's employment is terminated without cause within 180 days of a change of control, he is entitled to continue to receive his base salary for one year and 50% of his unvested options will immediately become vested and exercisable.

In April 2002, we entered into an employment agreement with Mr. Bennett. Under this agreement, Mr. Bennett receives an annual base salary as determined by the Compensation Committee, which is currently $225,000 per year and is eligible for a bonus of up to $125,000. In connection with his employment, we also granted Mr. Bennett options to purchase 496,443 shares of our common stock, of which 49,644 shares of common stock vested October 18, 2002 and the remainder vest quarterly over the next three and one-half years.

Effective April 30, 2006, Mr. Calder's employment with us terminated.

We entered into an employment agreement with Mr. Winkler effective as of January 2004. This employment agreement provides that we will employ Mr. Winkler as our chief financial officer, executive vice president and treasurer. Under this agreement, Mr. Winkler received an annual base salary of $225,000 and is eligible for a bonus of up to $175,000 subject to his achieving certain annual performance goals. In connection with this employment arrangement, we granted Mr. Winkler options to purchase 433,334 shares of our common stock at an exercise price of $5.88 per share, 33% of which vested on the first anniversary of the date of grant, less 16,667 shares which vested immediately and the remainder of which vest quarterly over the next two years. In March 2006, we entered into an agreement with Mr. Winkler to amend Mr. Winkler's employment agreement. Under the terms of the amendment, if Mr. Winkler's employment is terminated within 180 calendar days following a change of control, 100% of his unvested equity incentive awards will immediately vest. For the 2005 fiscal year, Mr. Winkler's base salary was $250,000 and effective March 2006, his base salary was increased to $300,000.

We enter into agreements with substantially all of our employees containing confidentiality provisions. We enter into non-competition agreements with our executive officers and key employees. The non-competition agreements prohibit these employees from competing with us or disclosing confidential information about us for a period up to 12 months after their employment with our company ends.

24

## COMPENSATION COMMITTEE REPORT ON EXECUTIVE COMPENSATION

The Compensation Committee of the Board of Directors consists entirely of independent directors. The Compensation Committee is responsible for setting and administering the policies that govern annual executive salaries, bonuses and stock ownership programs. The Committee annually evaluates the performance, and determines the compensation, of the chief executive officer and the other executive officers of the Company based upon a mix of the achievement of the corporate goals, individual performance and comparisons with other companies in our industry.

The Compensation Committee's goals with respect to executive officers, including the chief executive officer, are to provide compensation sufficient to attract, motivate and retain executives of outstanding ability and potential, and to establish and maintain an appropriate relationship between executive compensation and the creation of shareholder value. When determining adjustments to an individual's compensation package, the Compensation Committee evaluates the importance to stockholders of that person's continued service.

The Compensation Committee reviews reports that provide industry-specific competitive intelligence and advice about executive compensation program design and competitive compensation levels. The Compensation Committee believes that the Company's compensation policies are appropriate.

The executive officers' compensation structure consists of (1) base salary, (2) cash bonus and (3) equity incentives, including stock options and restricted stock.

*Base Salary.* Salaries for 2006 were set based on the above factors and after review of industry comparables.

The Company's philosophy is to maintain executive base salary at a competitive level sufficient to recruit individuals possessing the skills and values necessary to achieve the Company's vision and mission over the long term. Each individual's base salary is determined by the Compensation Committee after considering a variety of factors that make up market value and prospective value to the Company, including the knowledge, experience and accomplishments of the individual, the individual's level of responsibility, and the typical compensation levels for individuals with similar credentials. The Compensation Committee may, considering the advice of Company management, change the salary of an individual on the basis of its judgment for any reason, including the performance of the individual or the Company, changes in responsibility and changes in the market for executives with similar credentials. Determinations of appropriate base salary levels and other compensation elements are generally made through consideration of a variety of industry surveys and studies, as well as by monitoring developments in relevant industries.

*Cash Bonus.* Bonuses are awarded for accomplishments during the past year. Bonuses are determined by the Compensation Committee with advice from Company management, based upon the Compensation Committee's assessment of the individual's contributions during the year, compared to, but not limited to, a list of individualized goals previously approved by management and the Compensation Committee. In determining bonuses for 2005, the Compensation Committee considered, in addition to the individualized goals, management's response to rapidly changing business conditions in the Company's industry, implementation of new projects and the addition of new customers.

*Equity Incentives.* Stock options and restricted stock are a fundamental element in the Company's executive compensation program because they emphasize long-term Company performance, as measured by creation of stockholder value, and foster a commonality of interest between stockholders and employees. In February 2005, the Compensation Committee began to award restricted stock to help efficiently manage overall stockholder dilution from equity-based incentive awards. Options or restricted stock may be granted to regular full-time and part-time employees, and particularly to key employees likely to contribute significantly to the Company. In determining the size of an option grant or restricted stock award to an executive officer, the Compensation Committee considers competitive factors, changes in responsibility and the executive officer's achievement of

25

individual pre-established goals. In addition, the Company has generally made a grant of stock options when an executive officer joins the Company. The Company generally awards options to officers upon the commencement of employment and at regular intervals, but other awards may be made as well. The Company's stock option plan also provides for option grants to members of the Board of Directors. Options granted to employees generally vest over a period of four years after grant.

In 2005, executive officers other than the chief executive officer received restricted stock awards of 366,600 shares of common stock and options to purchase 60,000 shares of our common stock.

*Chief Executive Officer's Compensation.* As previously indicated, the Compensation Committee believes that the Company's total compensation program is appropriate based upon the Company's business performance, market compensation levels, and personal performance of the Company's executives. The Chief Executive Officer is party to an employment agreement with the Company. Under the terms of the employment agreement, the Compensation Committee reviews and fixes the base salary of the Chief Executive Officer based on those factors described above for other executive officers, as well as the Compensation Committee's assessment of Mr. Steinberg's past performance as Chief Executive Officer and its expectation as to his future contributions. In 2005, Mr. Steinberg received an increase in base salary to $320,000, which was consistent with the underlying market conditions and was considered appropriate. Future salary increases and bonuses will continue to reflect the amounts paid to chief executive officers at other public companies, as well as the Company's financial condition, operating results and attainment of strategic objectives.

Compensation Committee
Jay C. Hoag, Chairman
Jack Kemp
John Sculley

**Compensation Committee Interlocks and Insider Participation**

None of the members of our Compensation Committee has at any time been one of our officers or employees. None of our executive officers serves or in the past has served as a member of the board of directors or compensation committee of any entity that has one or more of its executive officers serving on our Board of Directors or our compensation committee. See "Certain Relationships and Related Transactions."

26

**STOCK PERFORMANCE GRAPH**

The following graph shows the cumulative total return resulting from a hypothetical $100 investment in the Company's common stock on November 16, 2004, the date of its initial public offering, through December 31, 2005. Stock price performance over this period is compared to the same amount invested in the Nasdaq Composite Index and the Goldman Sachs Internet Index over the same period (in each case, assuming reinvestment of dividends). This graph is presented as required by SEC rules. Past performance might not be indicative of future results. While total stockholder return can be an important indicator of corporate performance, the Company believes it is not necessarily indicative of its degree of success in executing its business plan, particularly over short periods.



| | Measurement Point | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 11/16/04 | 12/04 | 3/05 | 6/05 | 9/05 | 12/05 |
| INPHONIC, INC. | $100.00 | $114.50 | $ 94.65 | $ 63.54 | $ 57.29 | $ 36.21 |
| NASDAQ STOCK MARKET (U.S. & FOREIGN) | 100.00 | 103.63 | 103.49 | 102.43 | 116.86 | 124.10 |
| GOLDMAN SACHS INTERNET | 100.00 | 107.23 | 83.47 | 88.36 | 98.04 | 113.92 |

**ADDITIONAL INFORMATION**

**Compliance with Section 16(a) of the Exchange Act**

Section 16(a) of the Exchange Act requires that the Company's executive officers and directors, and persons who own more than ten percent of a registered class of the Company's equity securities, file reports of ownership and changes in ownership with the SEC and provide the Company with copies of such reports. The Company has reviewed such reports received by it and written representations from its directors and executive officers. Based solely on such review, the Company believes that the following persons did not make the following timely filings pursuant to Section 16(a) of the Exchange Act: (i) Thomas E. Wheeler filed a Form 5 on February 14, 2006 with respect to a purchase of shares of the Company's common stock in November 2004 and a sale of the Company's common stock in November 2005; (ii) Robert A. Fox, a former director, filed a Form 4 on October 18, 2005 and a Form 4/A on February 14, 2006 with respect to a gifting of shares of the Company's common stock in August 2005; and (iii) Mark J. Levine, a former director, filed a Form 4 on May 17, 2005 with respect to the exercise of warrants to purchase shares of the Company's common stock and subsequent sales of shares of the Company's common stock all in February 2005.

**Other Matters**

The Board of Directors of the Company knows of no other business which will be presented for consideration at the Annual Meeting. Return of a valid proxy, however, confers on the designated proxy holders discretionary authority to vote the shares in accordance with their best judgment on such other business, if any, that may properly come before the Annual Meeting or any adjournment or postponement thereof.

THE COMPANY WILL PROVIDE WITHOUT CHARGE A COPY OF THE COMPANY'S ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2005, INCLUDING CONSOLIDATED FINANCIAL STATEMENTS AND SCHEDULES, TO EACH OF THE COMPANY'S STOCKHOLDERS OF RECORD ON APRIL 25, 2006, AND TO EACH BENEFICIAL OWNER OF COMMON STOCK ON THAT DATE, UPON RECEIPT OF A WRITTEN REQUEST THEREFOR MAILED TO THE COMPANY'S OFFICES, 1010 WISCONSIN AVENUE, SUITE 600, WASHINGTON, DC 20007, ATTENTION: INVESTOR RELATIONS. IN THE EVENT THAT EXHIBITS TO SUCH FORM 10-K ARE REQUESTED, A FEE WILL BE CHARGED FOR REPRODUCTION OF SUCH EXHIBITS. REQUESTS FROM BENEFICIAL OWNERS OF COMMON STOCK MUST SET FORTH A GOOD FAITH REPRESENTATION AS TO SUCH OWNERSHIP. THE COMPANY'S FILINGS WITH THE SEC ARE AVAILABLE WITHOUT CHARGE ON THE COMPANY'S WEBSITE, WWW.INPHONIC.COM, AS SOON AS REASONABLY PRACTICABLE AFTER FILING.

**Proposals for the 2007 Annual Meeting**

Qualified stockholders who wish to have proposals presented at the 2007 annual meeting of stockholders must deliver them to the Company by January 15, 2007, in order to be considered for inclusion in next year's proxy statement and proxy pursuant to Rule 14a-8 under the Securities Exchange Act of 1934.

Any stockholder proposal or director nomination for our 2007 annual meeting that is submitted outside the processes of Rule 14a-8 will be considered "untimely" if we receive it after January 15, 2007. Such proposals and nominations must be made in accordance with the Company's by-laws. An untimely proposal may be excluded from consideration at our 2007 annual meeting. All proposals and nominations must be delivered to the Company at its principal executive offices in Washington, DC.

By Order of the Board of Directors,

David A. Steinberg
*Chairman and Chief Executive Officer*

May 1, 2006

**THE BOARD OF DIRECTORS HOPES THAT YOU WILL ATTEND THE MEETING. WHETHER OR NOT YOU PLAN TO ATTEND, PLEASE PROMPTLY COMPLETE, DATE, SIGN AND RETURN THE ENCLOSED PROXY. IF YOU ATTEND THE MEETING, YOU MAY REVOKE YOUR PROXY AND VOTE YOUR OWN SHARES.**

29

**INPHONIC, INC.**

**PROXY SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS**
**FOR THE ANNUAL MEETING OF STOCKHOLDERS**
**TO BE HELD JUNE 22, 2006**

The undersigned hereby appoints LAWRENCE S. WINKLER and WALTER W. LEACH III, and each of them, with full power of substitution to each, as attorneys and proxies of the undersigned, to vote all shares which the undersigned is entitled to vote at the Annual Meeting of Stockholders of InPhonic, Inc. (the "Company") to be held at The Madison, 1177 15th Street, NW, Washington, D.C. 20005 on Thursday, June 22, 2006 at 10:00 a.m., local time, and at any adjournment or postponement thereof, upon and in respect of the following matters, and in accordance with the following instructions, with discretionary authority as to any and all other matters that may properly come before the meeting.

The undersigned hereby acknowledges receipt of a copy of the Company's 2005 Annual Report and Notice of Annual Meeting and Proxy Statement relating to such Annual Meeting. The undersigned revokes all proxies heretofore given for said Annual Meeting and any adjournment or postponement thereof.

**THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS. IT MAY BE REVOKED AT ANY TIME PRIOR TO ITS EXERCISE BY SENDING WRITTEN NOTICE TO THE SECRETARY OF THE COMPANY, BY DELIVERING TO THE COMPANY A DULY EXECUTED PROXY BEARING A LATER DATE OR BY ATTENDING THE ANNUAL MEETING AND VOTING IN PERSON.**

**THIS PROXY WILL BE VOTED IN THE MANNER DIRECTED HEREIN BY THE PERSON(S) SIGNING IT. IF NO DIRECTION IS MADE, THIS PROXY WILL BE VOTED "FOR" THE ELECTION OF THE NOMINEE INDICATED AND "FOR" EACH OF THE OTHER PROPOSALS.**

**(Continued and to be signed on the reverse side)**

## ANNUAL MEETING OF STOCKHOLDERS OF

# INPHONIC, INC.

### June 22, 2006

## Please date, sign and mail your proxy card in the envelope provided as soon as possible.

↓ Please detach along perforated line and mail in the envelope provided. ↓

---

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR REELECTION OF THE NAMED DIRECTOR NOMINEE.**
**THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR RATIFICATION OF GRANT THORNTON LLP.**
**PLEASE SIGN, DATE AND RETURN PROMPTLY IN THE ENCLOSED ENVELOPE. PLEASE MARK YOUR VOTE IN BLUE OR BLACK INK AS SHOWN HERE** ☒

---

1. To elect one Class II director for a three-year term ending in 2009.

  NOMINEE:

☐ FOR THE NOMINEE          Ira Brind

☐ WITHHOLD AUTHORITY
  FOR THE NOMINEE

|  | FOR | AGAINST | ABSTAIN |
|---|---|---|---|
| 2. To ratify the selection of Grant Thornton LLP as the Company's Independent Registered Public Accounting Firm for the fiscal year ending December 31, 2006. | ☐ | ☐ | ☐ |

3. To act upon any other matter which may properly come before the Annual Meeting or any adjournment or postponement thereof.

This proxy, when properly executed, will be voted in the manner directed herein by the stockholder. If no direction is made, the proxy will be voted "FOR" the election of the nominee and "FOR" proposals 2 and 3.

**EVEN IF YOU PLAN TO ATTEND THE MEETING, PLEASE PROMPTLY COMPLETE, SIGN, DATE AND RETURN THE ENCLOSED PROXY. IF YOU ATTEND THE MEETING YOU MAY REVOKE YOUR PROXY AND VOTE IN PERSON.**

To change the address on your account, please check the box at right and indicate your new address in the address space above. Please note that changes to the registered name(s) on the account may not be submitted via this method. ☐

| Signature of Stockholder | Date: | Signature of Stockholder | Date: |
|---|---|---|---|

**Note:** Please sign exactly as your name or names appear on this Proxy. When shares are held jointly, each holder should sign. When signing as executor, administrator, attorney, trustee or guardian, please give full title as such. If the signer is a corporation, please sign full corporate name by duly authorized officer, giving full title as such. If signer is a partnership, please sign in partnership name by authorized person.

# EXHIBIT B

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

### CURRENT REPORT
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported):**
**September 18, 2007**

---

# INPHONIC, INC.
**(Exact name of registrant as specified in its charter)**

---

| **Delaware** | **000-51023** | **52-2199384** |
|:---:|:---:|:---:|
| **(State or other jurisdiction of incorporation)** | **(Commission File Number)** | **(IRS Employer Identification No.)** |

**1010 Wisconsin Avenue, Suite 600, Washington, DC 20007**
**(Address of principal executive offices) (ZIP Code)**

**Registrant's telephone number, including area code:**
**(202) 333-0001**

---

**(Former name or former address, if changed since last report.)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 5.02. Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers.**

On September 21, 2007, David A. Steinberg, the Chairman of the Board of Directors of InPhonic, Inc. (the "Company") resigned from his position as chief executive officer of the Company, effective October 1, 2007. Mr. Steinberg will continue to serve as chairman of the Board of Directors of the Company. The Board of Directors appointed Andrew B. Zeinfeld to the position of chief executive officer, effective October 1, 2007.

Andrew B. Zeinfeld, 47, has served as our president of e-commerce since April 2006 and our company president since June 2006. Prior to joining us in April 2006, Mr. Zeinfeld served in a variety of management positions at RadioShack Corporation during a 28-year term that began in 1978, and served most recently as senior vice president and chief retail services officer of RadioShack Corporation.

We entered into an employment agreement with Mr. Zeinfeld on December 20, 2006 when he was appointed as our president, e-commerce. Pursuant to the existing employment agreement, Mr. Zeinfeld earns a base salary of $300,000 per annum. In addition, Mr. Zeinfeld is eligible for a discretionary, annual performance bonus of $100,000. On June 13, 2006, pursuant to his employment, Mr. Zeinfeld received 350,000 shares of our restricted common stock. The shares are subject to vesting over a four-year period. Mr. Zeinfeld has received subsequent restricted stock awards that have been reported on Form 4.

During the term of his employment and for 12 months thereafter, Mr. Zeinfeld has agreed not to (i) render any service (as an employee, officer, director, consultant or otherwise) to any unit or division of any entity involved directly in the Business (as defined in the employment agreement)); (ii) make or hold any investment in any entity in the Business other than the ownership of not more than 5% of the listed stock of any publicly traded entity; or (iii) contact any customer or employee of the Company to request, induce or attempt to induce such customer or employee to terminate any business relationship, agreement or employment with the Company, provided however, if Mr. Zeinfeld is terminated for Good Reason or without Cause, the 12 month period shall be reduced to six months.

If Mr. Zeinfeld's employment is terminated coincident with or within 180 days of a Change in Control (as defined in the employment agreement), fifty percent (50%) of the unvested shares of Restricted Stock will vest immediately following the Change in Control.

The initial term of the employment agreement is four years, and is renewable upon mutual agreement of Mr. Zeinfeld and the Company within 30 days prior to expiration of the term. If we terminate Mr. Zeinfeld's employment (i) without Cause, or (ii) if Mr. Zeinfeld resigns for Good Reason, Mr. Zeinfeld is entitled to receive (i) an amount equal to his base salary for a one-year period; (ii) the pro rata portion of any bonus in effect at the time of termination; (iii) any rights or benefits available under employee benefit plans then in effect, in which Mr. Zeinfeld participated; (iv) reimbursement of expenses in accordance with section 5.2 of the employment agreement; and (v) any vested stock options or restricted stock.

A copy of the press release related to the resignation of Mr. Steinberg and the appointment of Mr. Zeinfeld as chief executive officer is attached as Exhibit 99.1 hereto and is hereby incorporated herein.

On September 18, 2007, Jack F. Kemp resigned from the board of directors of the Company to pursue other interests.

**Section 9 – Financial Statements and Exhibits**

Item 9.01. Financial Statements and Exhibits.

(c) Exhibits.

99.1     Press Release dated September 21, 2007.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

INPHONIC, INC.

/s/ Andrew B. Zeinfeld
Name:  Andrew B. Zeinfeld
Title:   President

Date: September 21, 2007

**INDEX TO EXHIBITS**

| Exhibit No. | Description |
| --- | --- |
| Exhibit 99.1 | Press Release dated September 21, 2007. |

**InPhonic Promotes Andy Zeinfeld to CEO**

**September 21, 2007**

Washington, D.C. – September 21, 2007 – InPhonic, Inc. (NASDAQ: INPC), a leading online seller of wireless services and products, today announced that Andy Zeinfeld, President of the Company, will be promoted to Chief Executive Officer effective as of October 1, 2007. David A. Steinberg, who has served as Chairman and CEO since founding the Company in 1999, will continue as the Chairman of the Board of Directors of the Company and assist with the Company's strategy and direction.

"I hired Andy based on his proven leadership, carrier relationships, and sales experience and with the goal that he would someday assume the role of CEO. I believe the Company will benefit from his promotion and his continued leadership," said David A. Steinberg.

John Sculley, a member of the Company's Board of Directors said, "David is a true visionary and continues to be instrumental in InPhonic maintaining its status as the leading independent online seller of wireless devices. As the Company has matured, both Andy and David have helped us re-position the Company for future success by negotiating residual payment agreements with carriers and more recently through our proposed strategic alliance with Brightstar."

"I came to InPhonic after a 28-year career at RadioShack because I believed in its business model and its market opportunity. After having been here over a year now, I am even more excited about its potential and even more confident in its opportunities. InPhonic is at the right place and right time to seize great opportunities. Along with InPhonic's Board and management team, I intend to make the changes and decisions necessary to bolster InPhonic's future with a relentless path towards achieving positive free cash flow and profitability as quickly as possible," said Andy Zeinfeld, InPhonic's new CEO.

Zeinfeld joined the Company as President of its e-commerce unit in April 2006 and was appointed President of the Company in June 2006. Prior to joining the Company, Zeinfeld served in a variety of management positions over a 28 year career with RadioShack Corporation, most recently as senior vice president and chief retail services officer.

**About InPhonic**

Headquartered in Washington, D.C., InPhonic, Inc. (NASDAQ:INPC) is a leading online seller of wireless services and products. InPhonic sells these services and devices, and provides world-class customer service through websites that it creates and manages for online businesses, national retailers, member-based organizations and associations under their own brands. InPhonic also operates Wirefly (www.wirefly.com), a leading one-stop comparison mobile phones and wireless plans shopping site that has been awarded "Best of the Web" by Forbes magazine and "Best in Overall Customer Experience" by Keynote Performance Systems. InPhonic also delivers a full range of MVNO and mobility solutions to enterprise clients through its Mobile Virtual Network Enablement (MVNE) platform. Among many awards in its history, InPhonic holds the distinction as #1 Company of the Year on the INC. 500 for 2004. For more information on the company, its products and services, visit the InPhonic Corporate Web site at www.inphonic.com .

**Forward Looking Statement**

"Safe Harbor" Statement – Under the Private Securities Litigation Reform Act of 1995, this press release may contain forward-looking statements that involve risks and uncertainties, including statements regarding the impact of operational changes, the Company's proposed strategic partnership with Brightstar and the Company's achieving positive free cash flow and profitability. Important factors, which could cause actual operating results to differ materially from those in the forward-looking statements, are detailed in filings with the Securities and Exchange Commission made from time to time by the Company. This press release and statements are current as of the date of the individual announcements and the Company undertakes no obligation to publicly release any revisions to any forward-looking statement to reflect events or circumstances after the date thereof or to reflect the occurrence of unanticipated events.

# EXHIBIT C

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

### CURRENT REPORT

## Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported): May 30, 2007**

---

# INPHONIC, INC.
**(Exact name of registrant as specified in its charter)**

---

| | | |
|---|---|---|
| **Delaware** | **000-51023** | **52-2199384** |
| **(State or other jurisdiction of incorporation)** | **(Commission File Number)** | **(IRS Employer Identification No.)** |

**1010 Wisconsin Avenue, Suite 600, Washington, DC**       **20007**
**(Address of principal executive offices)**      **(ZIP Code)**

Registrant's telephone number, including area code: **(202) 333-0001**

---

**(Former name or former address, if changed since last report.)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Section 5 — Corporate Governance and Management**

Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.

Effective May 31, 2007, Lawrence S. Winkler resigned from the Company for personal reasons. The Company restated its unaudited financial statements for the quarterly periods ended March 31, 2006, June 30, 2006 and September 30, 2006 each as previously filed on Form 10-Q, as well as the unaudited financial results for the quarter and year-ended December 31, 2006 included in the Company's earnings release issued on February 22, 2007. Pursuant to a short-term consulting agreement, Mr. Winkler will provide consulting services to the Company relating solely to strategy for 1010 Interactive, LLC, a subsidiary of the Company.

Effective May 30, 2007, George Moratis, the Company's Senior Vice President, Financial Reporting Analysis, has been designated as the Company's Executive Vice President and Chief Accounting Officer (the Company's principal financial officer and principal accounting officer). Following the filing of the Company's Form 10-K for the year ended December 31, 2006, Gregory S. Cole will be assuming some of the duties of the Chief Financial Officer in his capacity as Senior Vice President, Corporate Treasurer.

The Company has commenced a search for a new Chief Financial Officer.

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

INPHONIC, INC.

By:   /s/ David A. Steinberg
Name: David A Steinberg
Title:  Chairman and Chief Executive Officer

Date: May 31, 2007

# EXHIBIT D

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 8-K

---

### CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported): May 31, 2007**

---

# INPHONIC, INC.
#### (Exact name of registrant as specified in its charter)

---

| | | |
|---|---|---|
| **Delaware** | **000-51023** | **52-2199384** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| | |
|---|---|
| **1010 Wisconsin Avenue, Suite 600, Washington, DC** | **20007** |
| (Address of principal executive offices) | (ZIP Code) |

### Registrant's telephone number, including area code: (202) 333-0001

---

#### (Former name or former address, if changed since last report.)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Section 1 – Registrant's Business and Operations**

Item 1.01 – Entry into a Material Definitive Agreement.

Effective as of May 15, 2007, InPhonic, Inc. entered into a new Online Authorized Representative Agreement with Sprint Solutions, Inc. ("Sprint") on behalf of Sprint and its affiliates (the "Agreement"). The Agreement authorizes the Company to continue to offer and sell Sprint telecommunications services via electronic commerce and direct response marketing. As a result of the merger and combined operations of Sprint and Nextel, this Agreement supersedes the existing distribution agreement between Sprint Spectrum L.P. and InPhonic, Inc. dated May 1, 2005, as amended and the Online Authorized Representative Agreement between Nextel Communications of the Mid-Atlantic, Inc. and InPhonic, Inc. dated April 3, 2001, as amended.

On May 31, 2007, InPhonic, Inc. (the "Company") entered into Amendment No. 6 to the Credit Agreement, dated as of November 7, 2006, among InPhonic, Inc., the lenders from time to time (the "Lenders") and Citicorp North America, Inc., as Administrative Agent, as amended (the "Amendment"). The Amendment modifies the covenant requiring delivery of audited financial statements for the fiscal quarter ended March 31, 2007 to require delivery by June 15, 2007. The Amendment also modifies the definition of "Consolidated EBITDA" and waives the requirement that the Company deliver an internal control opinion that contains no statement of material weakness provided that the Company cures the material weakness in internal controls relating to staffing by July 1, 2007 and cures certain other material weaknesses by July 1, 2007.

**Section 2 – Financial Information**

Item 2.02 – Results of Operations and Financial Condition.

On June 1, 2007, the Company held a conference call to discuss financial results for the year ending December 31, 2006 and current operational progress. A transcript of the call is furnished as Exhibit 99.1 to this Current Report on Form 8-K.

The information in this section of this Current Report on Form 8-K and Exhibit 99.1 attached hereto shall not be deemed "filed" for the purposes of Section 18 of the Securities Exchange Act of 1934, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, except as shall be expressly set forth by specific reference in such filing.

**Section 5 – Corporate Governance and Management**

Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.

On June 1, 2007, Mr. Andrew B. Zeinfeld was appointed as the Company's President.

**Section 9 – Financial Statements and Exhibits**

Item 9.01. Financial Statements and Exhibits.

(c) Exhibits.

99.1  Transcript of the conference call held June 1, 2007.

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

INPHONIC, INC.

By:     /s/ David A. Steinberg
Name:  David A Steinberg
Title:   Chairman and Chief Executive Officer

Date: June 6, 2007

**INDEX TO EXHIBITS**

| Exhibit No. | Description |
| --- | --- |
| Exhibit 99.1 | Transcript of the conference call held June 1, 2007. |



**Conference Call Transcript**

**INPC - Q1 2007 InPhonic, Inc. Earnings Conference Call**

**Event Date/Time: Jun. 01. 2007 / 9:00AM ET**

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

F INAL T RANSCRIPT

**Jun. 01. 2007 / 9:00AM ET, INPC - Q1 2007 InPhonic, Inc. Earnings Conference Call**

## CORPORATE PARTICIPANTS

**Gary Tiedemann**
*InPhonic—VP—IR*

**David Steinberg**
*InPhonic—Chairman and CEO*

**Greg Cole**
*InPhonic—SVP—Corporate Treasurer*

**Andy Zeinfeld**
*InPhonic—President*

## CONFERENCE CALL PARTICIPANTS

**Jeetil Patel**
*Deutsche Bank Securities—Analyst*

**Steve Mather**
*SMH Capital—Analyst*

**Sameet Sinha**
*Kaufman Brothers—Analyst*

**Bob Lee**
*Sidoti & Co.—Analyst*

**George Grose**
*American Capital—Analyst*

## PRESENTATION

**Operator**

Good day, everyone, and welcome to today's InPhonic's 2006 financial review conference call. Today's call is being recorded. At this time, all participants have been placed in a listen-only mode. The floor will be open to your questions following the presentation.

It is now my pleasure to turn the conference over to the Vice President of Investor Relations, Mr. [Gary Peterman]. Please go ahead, Sir.

**Gary Tiedemann - InPhonic - VP - IR**

Thank you and good morning, everyone. This is Gary Peterman, Vice President of Investor Relations. On the call with me today are InPhonic executives David Steinberg, Andy Zeinfeld and Greg Cole.

Before we begin, I would like to remind you that matters discussed in this call may contain forward-looking statements that involve risks and uncertainties concerning InPhonic's expected performance, as well as InPhonic's strategic and operational plans. Actual results may differ materially from projected results and reported historical results should not be considered as an indication of future performance.

The potential risks and uncertainties include, among others, fluctuation of our financial results that could result in volatility of our stock price; decreases in subscriber growth rates; acceptance of new products and services; and risks related to the integration of recent acquisitions.

All information discussed on this call is as of today June 1, 2007, and InPhonic undertakes no duty to update this information. Other factors that could affect the Company's business and financial results are discussed in the Risk Factor section of the Company's annual report on Form 10-K for the year ended December 31, 2006, which is now on file with the SEC.

In this call we will also discuss some non-GAAP financial measures including adjusted EBITDA and adjusted earnings per share.

**Thomson StreetEvents**    **www.streetevents.com**                    **Contact Us**                    **2**

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Jun. 01. 2007 / 9:00AM ET, INPC - Q1 2007 InPhonic, Inc. Earnings Conference Call**

On our call today, we will begin with David providing a brief update and explanation of recent events and detail an immediate plan of action to refocus and reenergize the Company's drive to profitability and free cash flow. Greg will then provide a brief overview of the 2006 financial results. Andy will conclude the prepared remarks with a forward-looking operational discussion of the Company. The call will end with the question-and-answer session.

Now I would like to turn the call over to David Steinberg.

**David Steinberg - *InPhonic - Chairman and CEO***

Thank you, Gary.

I would like to begin by apologizing to our shareholders, employees and other stakeholders for our delayed and amended financial filings. We take these matters very seriously and have begun immediate actions to ensure that InPhonic is a stronger company going forward so that this experience is not repeated.

During the call today I will review findings from our review of our internal financial controls; detail the collective actions we are implementing to ensure that this does not happen occur again; and update our 2007 financial guidance.

I would ask everyone to read the 10-K which was filed earlier for all of the details regarding the restatement amounts and the other related issues or disclosures. Just a note. We plan to file our first quarter 2007 10-Q within the next couple of weeks.

Over the last several months, we have conducted an extensive Companywide accounting review in partnership with our external auditors and the Audit Committee of our Board of Directors. The Audit Committee which retained outside counsel [Wilmer Hale] and outside financial experts PriceWaterhouseCoopers also conducted a separate review of our accounting practices and concluded no fraud or intentional misconduct by InPhonic or any of InPhonic's employees.

The reviews revealed several material weaknesses in our business and led to a significant restatement of our financial results for 2006.

No restatement for 2005 or prior years will be necessary. Greg will provide a review of these matters later on the call. It is important to note, however, that these adjustments will not have a significant impact on the calculations of adjusted EBITDA for the 2006 period because of the non-cash and non-recurring nature of these charges.

For 2007 we will not include, in the calculation of adjusted EBITDA, the impact from the collections of receivables that had been placed on a cash basis of accounting. We will however detail these collections to you in a reconciliation of adjusted EBITDA for 2007 so that you will maintain full visibility into these collections activities.

Now I would like to spend a few moments discussing some of the key findings, the review process as they related to our back office processes and timely collection of our carryover receivables.

It has become clear through this effort that certain back office processes have not appropriately scaled with the rapid transaction growth of our business. Not having the correct processes in place, combined with the appropriate staffing levels, has resulted in unnecessary delays in the proper collection of our receivables from our carrier partners. As part of the review process of the last couple of months we evaluated our ability to collect these specific carrier receivables.

In some cases we had direct experience in the collection of other similar receivables that assisted us in the evaluation. In other cases we did not. In those cases we did not have specific collection experience. We made the decision in cooperation with our auditors to increase the reserve against those receivables, effectively placing them on a cash basis of accounting.

We will continue to make every effort to collect those receivables in 2007 going forward and record them as revenue when the cash is received. To be clear once again, we will exclude these amounts from our calculation of adjusted EBITDA for 2007.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Jun. 01. 2007 / 9:00AM ET, INPC - Q1 2007 InPhonic, Inc. Earnings Conference Call**

Routine and regular communications with our carrier partners accompanied by well-documented support analysis is absolutely necessary to discuss both dispute and collection of what we have earned in a timely and efficient manner. We carry the burden of ensuring that we are paid for every dollar that we have earned from our carrier partners and will do a better job of doing so in the future.

To put the business in perspective, for the first four years of this business life, we operated the Company with a strong focus on growth. For the last two years as a newly public company we focused on generating positive EBITDA. Going forward, we will be completely focused on generating positive cash flow and EBITDA.

In conjunction with the new Company focus, I would like to discuss a three-step plan meant to address and correct our immediate issues, while at the same time putting us in a position to better manage our business for profitability and cash flow.

First I am very happy to announce at this time that Andy Zeinfeld will be assuming the position of President of InPhonic Inc., effective immediately. In this position Andy will be responsible for directly overseeing the day-to-day management of our wireless sales, marketing, B&C satellite and broadband, MVNE, inventory supply chain, human resources, and carrier OEM relationship and carrier reconciliations and collection.

Andy joined InPhonic just over one year ago as President of e-commerce and has become a critical addition to the Company and added tremendous value to our business through his deep working knowledge of the industry.

Larry Winkler has resigned and will no longer be serving as our Chief Financial Officer. However in order to assist with the transition and enable us to tap into his deep institutional knowledge, I have asked him to continue to provide assistance and expertise to the Company via temporary consulting agreement. Larry has made significant contributions to the success of the business and played a key role in our transition from a private to a public company. He will be missed deeply and we wish him the best of luck in whatever new endeavor he chooses.

Finally, Brian Curran, our current Chief Operating Officer, will be assuming even greater levels of operational responsibility. Bryan will continue to report directly in to me and we will focus on credit activations, customer service, IT and fulfillment.

No. 2. As indicated in our 8-K filing on April 2, we are in the process of significantly reorganizing the Accounting and Finance groups in order to greatly improve the efficiency and accuracy of our internal processes. While there is significant urgency associated with this reorganization process, we are focused on making the right changes for the Company and its shareholders.

The Company has commenced to search for a new chief financial officer. George Moranis, our current Senior Vice President of Financial Reporting and Analysis, will assume the position of Chief Accounting Officer. George will be directly responsible for overseeing all of InPhonic's accounting and reporting processes and the associated employees. George is a seasoned professional with experience at the Securities and Exchange Commission as well as experience as a senior level financial accounting executive at several public companies.

In addition, Greg Cole — our current Senior Vice President Corporate Treasurer — will be assuming certain financial responsibilities following the filing of our first quarter 2007 10-Q. Both Greg and George will report directly to me until a new CFO has been hired.

At this time we have already hired five new persons, all of whom have prior carrier experience, to assist and improve our carrier and consumer collection efforts. These new additions will assist us in the timely and accurate analysis of carrier commission receivables, and improve our ability track and collect (technical difficulties).

Third, I have created a team composed of senior operations, finance personnel to expediate our move to generating free cash flow. We have begun to immediately reduce our monthly cash spend by focusing on activities that drive profitable growth.

I am pleased to say we have already implemented changes that will produce approximately $2 million a month in cash savings. These cuts represent improvements in our efficiency and not reductions in our capacity to manage the growth of the business. We cut fat, not muscle.

These cash savings came primarily from spending reductions in CapEx, sales and marketing, and G&A as well as a recently completed reduction of approximately 10% of the InPhonic workforce.

We deeply appreciate the past contributions of these individuals but felt the decision was necessary to improve the overall efficiency and productivity of the business. We will continue to make efforts to further increase the monthly savings rate over the next six to 12 months by refining our operations and continuing to reduce expenses where appropriate.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

F INAL T RANSCRIPT

**Jun. 01. 2007 / 9:00AM ET, INPC - Q1 2007 InPhonic, Inc. Earnings Conference Call**

All of these expense reductions were undertaken after a serious analysis of our business and intended to better match our resources with the goal of achieving sustainable positive cash flow. These expense reductions should positively affect our net loss, EBITDA and cash flow in the second half of 2007.

Moving now to guidance, we are modifying our 2007 annual financial guidance to reflect the change in accounting for certain menu items with carriers that are being moved to a cash basis versus the previous accrual basis. This will result in pushing some of our expected 2007 revenue into 2008. Conversely, we do expect to see some of the benefit of the '06 activities in '07 in our net income.

However, as previously mentioned, we will exclude those benefits from our adjusted EBITDA calculation and provide a full reconciliation. We are expecting significant non-recurring charges in the first and second quarter of 2007, related to the delayed filing and accounting review as well as non-recurring charges related to the restructuring of the Company to focus on profitability and cash flow.

These charges will fully impact net loss but not EBITDA. Our revised full-year guidance is as follows.

Revenue will be between $460 million and $480 million adjusted EBITDA will be between $26 million and $30 million and adjusted EPS will be between $0.04 and $0.15. We believe we are on course for a million residual subscribers mid this year. The number also includes estimated customers from our recently announced fifth residual carrier.

The residual revenue subscribers come from our wireless, MVNO, MVNE customers as well as our satellite television business. The ARPU on these subscribers ranges between $1.00 per satellite and as high as $3.00 for some of our wireless partners. The average ARPU across these deals may ultimately trend slightly lower, as the wireless industry activates a higher percentage of family plan customers which involves two customers sharing one ARPU.

As of now the weighted churn rate across our entire wireless and other businesses is below 2%.

At this time, I will hand the call over to Greg Cole. Greg?

**Greg Cole - *InPhonic - SVP - Corporate Treasurer***

Thank you, David.

I will begin today with a quick overview of the results of the accounting review and then provide a summary of the restated financials. As a result of the recently completed accounting review, we have identified the following material weaknesses.

Weaknesses at both the entity and transactional level related to appropriate levels of staffing and communication between groups. These have led to other weaknesses in our carrier commissions and revenue reconciliation areas. And finally weaknesses in our consumer revenue area related to product rebates and EDPs.

We have made the following restatements to our previously disclosed 2006 financial results. Our carrier accounts receivable and reserves have adjusted our net accounts receivable and revenue lower by $34.8 million. This primarily reflects the movement to a cash basis of accounting from an accrual basis for certain revenue items.

We will continue to pursue aggressive collection efforts and expect meaningful success here.

Consumer receivables related to equipment discount provisions have also been reduced by $2.6 million. (technical difficulties) expenses related to (technical difficulties) rebate settlement and consumer credit and payments have been increased by $4.9 million. And finally other revenue and expense adjustments totaling $3.9 million.

Complete details of both the material weaknesses and restatement items have been included in our 2006 Form 10-K.

Considering these accounting adjustments, the following is a brief summary of the financial results for the fourth quarter and full-year 2006. Total revenue for the quarter, fourth quarter that is, was $95.4 million compared to $85.2 million for the fourth quarter of 2005. Total revenue for the full-year 2006 was $369.6 million compared to $320.5 million for the full-year 2005.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Jun. 01. 2007 / 9:00AM ET, INPC - Q1 2007 InPhonic, Inc. Earnings Conference Call**

The adjustment to revenue was primarily due to the change in accounting for certain accounts receivable from an accrual basis to a cash basis. And again, unfortunately, these comparisons are truly not apples-to-apples comparisons.

Net loss from operations for the fourth quarter was $34.3 million compared to a net loss of $24.6 million for the fourth quarter of 2005. Net loss from operations for the full year was $63.7 million compared to a loss of $38.2 million for the full year 2005. Cash flow from operations for the full year and the cash ending balance remained unchanged at negative $[16] million and $90 million respectively. None of the accounting adjustments affected our cash balance.

As David discussed earlier, as of June 1, we will have implemented changes that will produce approximately $2 million per month in cash expense reductions. Based on the typical 60 to 90 days of payables experienced, the cash savings will become very noticeable in our statement of cash flows in the third and fourth quarters of this year.

We expect to achieve positive operating results — excuse me — positive operating cash flows in the third quarter and expect to achieve sustainable cash flows in '08. In the first quarter of 2007 we did use significant cash to pay down liabilities and to repurchase stock. Our total stock repurchases to date are in excess of $14 million.

Over the next several months, we will continue to explore additional opportunities to implement cash savings that will positively impact operating cash flow and profitability. This effort is a real positive for InPhonic and I am personally very excited by the opportunity to unlock the potential of the InPhonic business model.

I would like to turn the call now over to Andy.

   **Andy Zeinfeld -** *InPhonic - President*

Thank you, Greg.

I would like to begin by echoing David's sentiments regarding the delayed filings. I know we can do a better job going forward and I consider this my number one priority.

Before I discuss my and Brian Curran's passed and current efforts to improve the operational efficiency of our business, I think it is important to provide a quick reminder of my background so everybody can understand where I'm coming from and what my professional perspective is on InPhonic and the wireless industry.

Prior to joining InPhonic in April of 2006, I spent 28 years working at RadioShack, most recently as RadioShack's Chief Retail Services Officer. My primary responsibilities in that position focused on building and growing one of the largest wireless communication service distribution programs in the United States, and developing strong and productive relationships with the wireless carriers and handset manufacturers. I have spent my professional career building and executing retail strategies and that is what I plan to continue to do here at InPhonic.

In my first year here at InPhonic, we have been successful in building and enhancing deeper and more meaningful relationships with all of our major wireless carriers. This has assisted us in transitioning our core wireless activation business to a more predictive residual revenue stream — building a strong high margin wireless accessories business, improving the inventory management and procurement of handsets, allowing for a greater number of inventory turns and improved gross margins, focusing our sales and marketing dollars in time on the most profitable distribution channels. This has meant instilling a focus on profitability within our sales team in bringing in a new president of our satellite and broadband addition, Lou Provost.

Lou comes to us after many years running one of the largest satellite television retail operations in the country. Lou is here to deliver improved operational focus and expertise to that business. I am personally proud of these Company achievements and over the next year at InPhonic I plan on being able to tell you about our successes in the following areas.

Improving operating cash flow by implementing a more efficient carrier receivable reconciliation and collection process. Increasing customer conversion rates by better messaging the value of our core consumer brand, Wirefly. We offer wireless shoppers a significant value and are delivering a tremendous service by saving them time and money, while providing a one-stop shopping environment featuring an unmatched selection of wireless service and products.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Jun. 01. 2007 / 9:00AM ET, INPC - Q1 2007 InPhonic, Inc. Earnings Conference Call**

We must create new marketing messages to drive consumer awareness of our service and products and better use of flexibility of our online marketing platform to create and deploye target offers designed to cut through the clutter of more generic Internet marketing.

Strengthening the per unit economics of our subscriber acquisition businesses by focusing our attention on distribution channels that offer a positive return on investment and profitable high-quality subscribers; continue increasing our high margin excess tree and devise detection sales. We have done a good job over the last year in growing this business, but there is still room for great improvement.

And to recruit and retain great industry talent and successfully integrating that talent with the entrepreneur business environment of InPhonic.

InPhonic is at the center of a unique opportunity and is ideally positioned in the wireless distribution business. We are the largest independent player in the growing online wireless activation market, while striving to be among the most efficient wireless distribution partner, online or offline. We offer our wireless carriers a significant value through the acquisition of low-cost, profitable subscribers and have become a critical and necessary partner to those wireless carriers.

To the wireless consumers, we offer a targeted and efficient shopping experience that cannot easily be duplicated by any retailer. We are a wireless consumer's best friend and are doing them a great service by providing a better shopping experience. Our objective over the coming months is to build on this significant and powerful position in the marketplace, while increasing the discipline and focus of the organization to deliver improved contribution margins, lower operating expenses, and sustainable positive operating cash flow.

As David indicated earlier, we have already begun to see a significant evaluation of our business that includes changes in the roles and responsibilities of many of our senior management team; restructuring the accounting and finance groups to better serve the needs of the Company; augmenting our carrier revenue and assurance and commission reconciliation teams; and most importantly, focusing on profitability by better managing expenses and improving the efficiency of our wireless activation business.

As a company, we must focus on maximizing every dollar spent while working equally as hard to realize every dollar we have earned. Without this mindset we can't take the next step in the business and earni back the trust and confidence of the investment community.

I look forward to being able to give you positive updates in future calls. I am a firm believer in the potential of our business model. The power of the compounding residual revenue model and its predictable high margin revenue stream — combined with the actions we are taking now — will accelerate our cash flows and move the business closer to sustainable and profitable growth.

As you know, InPhonic has always achieved robust topline revenue growth while clearly demonstrating the fast-growing dynamic nature of our business. However David, Brian and I are now aligned on managing our growth with a clear focus on cash flow and profitability.

With that, our prepared remarks are concluded and at this time we will move to Q&A. Operator, please begin with the Q&A.

**QUESTION AND ANSWER**

**Operator**

(OPERATOR INSTRUCTIONS).

Jeetil Patel from Deutsche Bank Securities.

    **Jeetil Patel — *Deutsche Bank Securities—Analyst***

First of all, can you talk about how many more people do you need to bring in to accommodate the financial and operating infrastructure that you have today? You added five people in Finance. How many more do you need to add to be compliant and have the right number of folks in?

And a question for Andy. Where do you think you stand in the collections process today as you take on that additional responsibility? I guess, how long will it take you to actually have the right processes in place and people in place to actually collect faster? And I have a quick follow-up.

---

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Jun. 01. 2007 / 9:00AM ET, INPC - Q1 2007 InPhonic, Inc. Earnings Conference Call**

### David Steinberg — *InPhonic—Chairman and CEO*

Sure. I will take the first part of that. The number of people I think we need to successfully remediate some of the things that we want to fix here, I think another five persons would be appropriate. We have already hired five and we really hired some top-quality talent from the existing wireless carriers.

These people come with years of experience doing reconciliation work, and in some cases actually billing some of the systems that are used to generate the bills. So that kind of experience is just something we really are glad to have. I think that will go a long way. So I think another five persons would be appropriate and then a little bit of reallocation of some of the other folks that we have will do us just fine.

### Andy Zeinfeld — *InPhonic—President*

And for the other part of your question, I can tell you the data and the information that has been put together already since these new individuals have started with the company is a substantial improvement over what we had been providing and we have already given the information to the carriers. So we are well underway of making up for where we had been.

### Jeetil Patel — *Deutsche Bank Securities—Analyst*

Andy, just a couple of follow-ups, but where do you think you will have the immediate impact in the business? Do you think it's more on the collection side? Is it marketing efficiency? Or is it the upsell opportunity that you discussed?

Second I guess there seems to be a lot consumers that have churned off or a lot of dollars that seem to be in dispute. Have you done any sort of analysis of where these consumers have gone to? Whether they have gone back to their original phone plan or stuck with that carrier? Have you dug into any detail or done any testing of all the subs in dispute where they are and whether they actually moved over to that new carrier or not?

### Andy Zeinfeld — *InPhonic—President*

That's a lot of questions there. No. 1, the vast majority of these customers did not deactivate. They're — we believe that they are still on the system. It is our job to be able to give the documentation and prove that these are monies that are owed to us.

There has been a tremendous amount of work done over the last 60 days getting this information together. You have to understand that the carrier systems are as complicated as our systems and getting the information matched is difficult. It takes time.

The key for us is doing it accurately, doing it timely and making sure that we have the information in a format that we can provide to the carriers that they understand equally as well.

### David Steinberg — *InPhonic—Chairman and CEO*

The complexity of the carrier commissioning systems I will remind you are — you have got some of these carriers have cobbled together sometimes 10 different acquisitions to build their national footprint. They still run multiple geographic point of sales systems that roll into multiple commissioning systems. As those commissioning systems roll statements together we get, for example on some activations, we get paid part of the money but not all of the money. In other activations you get paid nothing and it's just not matching.

In the past when we were smaller and, really, all of our problems stem from growing the business 6000% over the last six years per year. The reality is that as the transactional growth has gotten there, if you used to bleed out 4 or 5% of commissions five or six years ago, it was not a lot of money.

Now it's tens of millions of dollars and that is one of the reasons we have put Andy in charge of this. One of the groups he ran at Radio Shack was the Reconciliation Group as a part of his carrier commissioning systems.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Jun. 01. 2007 / 9:00AM ET, INPC - Q1 2007 InPhonic, Inc. Earnings Conference Call**

### Greg Cole — *InPhonic—SVP—Corporate Treasurer*

One other thing which I think is important is just as an operational nuts and bolts thing. We actually have built some internal databases and systems that we hadn't had before which just allows us to better analyze the data that we have because of the complexity David has mentioned. We — it requires a lot larger of an effort because we are getting paid on multiple plans. Different rates. Things like that.

So even the ability to do better analysis through database mining is something that we weren't doing as good a job of as we would have liked. Those are things that we have begun and those new persons are helping. So I think all of those things will provide some immediate improvement.

### David Steinberg — *InPhonic—Chairman and CEO*

So for example to further emphasize what Greg was just saying, you might get paid on one particular customer, an activation commission. A revenue multiple of the feature they activated. A revenue multiple of whatever data plan they activated, co-op fees and market development funds on that one activation. So if you are doing 30,000 activations with one carrier you could have to reconcile as much as 150,000 to 200,000 commission points on that one carrier. And we just had not focused on the way we should have and that is one of the reasons I'm so excited to now have Andy in charge of it because he is going to really be able to take that to the next level.

That being said, you know, you hate to say this, but at the end of the day if anything good came out of this process, it was learning how to better manage our financial operations on a going-forward basis and save money on a number of areas that we were spending money that was not returning the results we needed. Next question.

### Operator

Steve Mather from SMH Capital.

### Steve Mather — *SMH Capital—Analyst*

As a rule it is good to be forward-looking, but I just want to spend a moment on 2006 because that's the basis for predicting the future here.

Operating profit was obviously a loss of $63 million. That's a pretty good-sized hole. I'm just wondering in hindsight now, a couple of things. What's really prevented you from already implementing some of these changes? And where do you really see most of the muscle coming from? Is it sort of internal control systems? Is it marketing returns? You talked about marketing ROI before.

You know, different strategies, different websites etc., white label partners. What has prevented you — looking from an '06 basis what has prevented you already? And then where do you see the juice coming from?

### Greg Cole — *InPhonic—SVP—Corporate Treasurer*

I'll start. In my opinion I think one of the things that we have done is just changed the focus of the way we want to manage this business and focus a little less on things like EBITDA and more on things like cash flow and profitability.

At the end of the day, those are the metrics that are most important in driving our business. So we are — I hate to say it but the focus is really trying to manage it all the way through to the bottom line so that we can get the greatest profitable return out of each of the sales that we do. So I think some of it has been focus.

### Andy Zeinfeld — *InPhonic—President*

I will also say just from a marketing perspective had you not had to reverse all these revenues, our sales and marketing cost would have been down dramatically in '06 from '07 and to '06. And had we known at the time that we were going to have to recognize these revenues on a cash basis versus an accrual basis we would have rightsized other things we were doing in the business. And we would have focused much more handedly on it. So I echo Greg's opinion on focus.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Jun. 01. 2007 / 9:00AM ET, INPC - Q1 2007 InPhonic, Inc. Earnings Conference Call**

I think the most important thing we need to do going forward is focus on getting our marketing costs down as a percentage of revenues, which we continue to do and have been very effective in doing in '07. If you — I'm sorry — no in '07 is first quarter because I've seen the numbers. So the reality is effective at getting the cost down.

The other things that I think that we need to do is we need to focus on not spending as much money on CapEx. That doesn't affect EBITDA or net income that it certainly affects cash flow. And we have looked at a number of the projects internally and said wow, in some cases we had people who were no longer working with the Company had been hired back as consultants by individual business divisions and were being paid exorbitant rates per hour on projects that were rightly capitalizing. None of the review came up with any problems in the way we were allocating that capitalized labor.

But it's just the project was not going to return the type of ROI for the investment we were making for what I think the cash flow was costing us. So those were decisions we made and then of course we just did a 10% headcount reduction, which is going to take our cost down and that was something you don't like doing as a business. But it was something we felt was the right thing to do as we move to focusing on profitability and cash flow.

**Operator**

Sameet Sinha from Kaufman Brothers.

**Sameet Sinha — *Kaufman Brothers—Analyst***

A couple of things. In your 10-K you detailed that your cash balance came down in the first quarter. So $14 million in stock back. How many shares do you actually buy back?

**David Steinberg — *InPhonic – Chairman and CEO***

Our average price was in the 10 to 11 range.

**Sameet Sinha — *Kaufman Brothers—Analyst***

In terms of the deactivation rates that seem to have crept up a little. Can you talk to that?

**Andy Zeinfeld — *InPhonic—President***

The deactivation return rate crept up just a point or so. Mostly based on marketing and partnership relationships. We did find that a few of the marketing partners that we puton last year had a higher deactivation rate than we originally expected. We pared some of those guys back, but it's only up a point or two. We are actually okay with where it is.

Our goal is to continue to bring that down and we do expect to bring it down handedly this year once again as we focus on cash flow and EBITDA.

**Sameet Sinha — *Kaufman Brothers—Analyst***

Next question very quickly, in terms of the changes in accounting does that impact your (inaudible) revenue calculation as well? And the follow-up, can you give a breakdown of EBITDA guidance between the core and the (inaudible) business?

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

F INAL T RANSCRIPT

**Jun. 01. 2007 / 9:00AM ET, INPC - Q1 2007 InPhonic, Inc. Earnings Conference Call**

### Greg Cole — *InPhonic—SVP—Corporate Treasurer*

We are actually going to provide those breakdowns that you are looking for when we do the first quarter call, but what I will tell you about the overall impact on residuals is that we continue to see the residuals being extremely strong. There were very minor adjustments if any to the residual strains that we booked. So I still feel very strongly about our ability to continue to make that a big driver for this business.

### David Steinberg — *InPhonic—Chairman and CEO*

Yes I don't recall anything being impacted. If anything it was a few dollars. But the reality is that, no, we don't expect it to affect it going forward. And residuals will make up a substantially larger percentage of our EBITDA than originally expected. We are going to see residuals be higher dollarwise than we originally expected when we put out the breakout between the two. But a larger portion of the core business is going to be pushed from '07 into '08 and that is how we ended up with guidance in the 26 to 30 range for the year versus our original guidance.

### Sameet Sinha — *Kaufman Brothers—Analyst*

One final question, you went over certain ARPU details in terms of satellite customers and wireless customers. If I understand, your residual revenue average that you get, currently you say $2 per month per subscriber. That's a percentage of ARPU? And can you talk about the impact as more the — you know as people take on more data plan, more (inaudible) how should we expect to say that going up?

### Greg Cole — *InPhonic—SVP—Corporate Treasurer*

Well you have it moving in the the directions. On some of our customers we are seeing substantially higher than $2.00. In fact, in some cases you are seeing as much as $3.00 to $5.00. In some customers you are seeing as low as $1.00 based on family plans.

So we think the blended average will continue to be in the approximately 2% range but slightly below as we add more family plans. When we say slightly we mean slightly.

### Operator

Bob Lee from Sidoti & Co.

### Bob Lee — *Sidoti & Co.—Analyst*

Do you have any updates on the, I guess getting the final carriers onto the residual plans? Any kind of news on that?

### Andy Zeinfeld — *InPhonic—President*

We continue to work on adding additional carriers to our residual model. At this time there is nothing to announce. We have five of the six major carriers already involved in the program.

### Bob Lee — *Sidoti & Co.—Analyst*

What is the schedule that you have in place for retaining a permanent CFO?

### David Steinberg — *InPhonic—Chairman and CEO*

We have retained a recruiting firm already and are working diligently on bringing a new one in. We take it very, very seriously.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Jun. 01. 2007 / 9:00AM ET, INPC - Q1 2007 InPhonic, Inc. Earnings Conference Call**

**Bob Lee — *Sidoti & Co.—Analyst***

This next question is going to go historically and go into '07. Is that —? Concerning the accounts receivables since you mentioned that you need to I'd guess crosscheck your database against the carrier activations and the carrier databases. When you submit these requests to the carriers, for lack of a better term, do you see that the carriers will need to crosscheck again and when you see that cash conversion coming into play? Is it going to be at the end of this year or is there some occurring right now?

**David Steinberg — *InPhonic—Chairman and CEO***

We did collect some this quarter. We say some it was into the millions and we expect — but I expect to see and I will defer to Greg and Andy. Most of this is coming in the third and fourth quarter. We do call those disputes so what happens is we go back with the dispute. We have reconciled it. The carrier does need to then verify that reconciliation and that is a time-consuming process.

**Greg Cole — *InPhonic—SVP—Corporate Treasurer***

Yes. Basically since we are almost done with the second quarter you can assume this is coming in the third and fourth.

**David Steinberg — *InPhonic—Chairman and CEO***

Go ahead? anything?

**Bob Lee — *Sidoti & Co.—Analyst***

Yes. There's one more. Concerning the $2 million that you had announced as a savings in terms of third quarter, I guess can you kind of — ?

**David Steinberg — *InPhonic—Chairman and CEO***

That was per month.

**Bob Lee — *Sidoti & Co.—Analyst***

Per month. Can you go into detail as to what the savings are? Is it from the employee reductions that you did?

**David Steinberg — *InPhonic—Chairman and CEO***

Yes it's with — Greg you take it.

**Greg Cole — *InPhonic—SVP—Corporate Treasurer***

Essentially you are going to see a big impact from reducing our CapEx and then there's also impacts on improving our sales and marketing spend. There's just some things there that we felt were not as profitable as other avenues of our marketing efforts. And then lastly there is a piece for G&A. In fact the smallest portion of it is in fact the headcount reduction piece.

**David Steinberg — *InPhonic—Chairman and CEO***

So just to put it in perspective one of the reasons you are seeing us grow the business a little more slowly than we originally thought was not just the counting differentiation, although that is probably 90% of it. It was also looking at some marketing investment we were making and saying, "Okay, paid this is not giving us profitable growth. It is just giving us growth."

So the reality is that I think we made the right decisions on that $2 million a month to drive not just to EBITDA of $26 million to $30 million this year but also be free cash flow positive from the third quarter on. And we are looking forward to achieving that.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Jun. 01. 2007 / 9:00AM ET, INPC - Q1 2007 InPhonic, Inc. Earnings Conference Call**

      **Bob Lee — *Sidoti & Co.—Analyst***

Lastly, you hit on the selling and marketing. Is the — I guess, David, you had mentioned that the first quarter you saw significant or I mean you saw some benefit in the — ?

      **David Steinberg — *InPhonic—Chairman and CEO***

I didn't say significant.

      **Bob Lee — *Sidoti & Co.—Analyst***

Yes I changed my terms there. Benefits in the marketing as a percentage of revenue. I guess is that really because of how you look at the growth generated by the marketing and if you can, can you give us more detail as to how your analysis is that got you to that conclusion?

      **David Steinberg — *InPhonic—Chairman and CEO***

We look at it as a cost for acquisition.

      **Andy Zeinfeld — *InPhonic—President***

On an absolute basis.

      **Greg Cole — *InPhonic—SVP—Corporate Treasurer***

So you are effectively looking at those marketing efforts that are not producing the (inaudible) acquisition — acquisition cost is the most desirable for us.

      **David Steinberg — *InPhonic—Chairman and CEO***

We are taking those guys out and have and started that a few months ago.

      **Bob Lee — *Sidoti & Co.—Analyst***

The question here is that you had mentioned in 2005 that that was the activity that you were going to look into for '06. What's different between that point and today?

      **David Steinberg — *InPhonic—Chairman and CEO***

Our cost for acquisition was down 50% in '06 from '07. So the percentage of revenue will deviate based on the revenues we are moving from an accrued basis to a cash basis. But the absolute dollar cost per customer acquisition was down dramatically in '06. In '06 from '05.

We believe it will be down again in '07 from '06. So, obviously, the percentage that it represents of revenue is moving around now based on moving these dollars from an accrual basis to a cash basis. But that is the only thing affecting the marketing costs. It is more of an optics issue. From an absolute dollars to acquire customers, our cost was down substantially in '06 from '05.

**Operator**

George Grose from American Capital.

---

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Jun. 01. 2007 / 9:00AM ET, INPC - Q1 2007 InPhonic, Inc. Earnings Conference Call**

**George Grose — *American Capital—Analyst***

Can you talk a little bit about where your 10% headcount reduction — where that is going to be, across which segment or so?

**David Steinberg — *InPhonic—Chairman and CEO***

It's already completed. We already did it. And let me just further say that we believe that all the headcount reduction that we needed to take has been completed at this time.

That being said, most of it came from a dispersed area across the Company. Every division in the Company really looked at it. One of the things we looked at was, attempted to do it in the most Six Sigma way possible. We do do annual performance reviews. They did play a major part in the people who were let go even though they were great people; and we think everybody who is here was doing a very good job as it relates to their functionality. But I would say for the most part IT, which is the largest expense in the Company, bear the most financial weight but not by dramatic percentages.

**Operator**

That concludes the question-and-answer session for today. I would like to turn the conference back over to Mr. David Steinberg for any additional or closing remarks.

**David Steinberg — *InPhonic—Chairman and CEO***

Once again, I want to apologize to everybody who was involved in this Company from a shareholder and an employee and a stakeholder prospective. This is not something that we wanted to have happen. We are sorry it happened.

The good news is we believe we have put this chapter behind us which we are very happy about. This has been a very long and very time-consuming process for management to get through this. Everybody worked, I would tell you, night and day to get this done for you guys and for us.

So we are very glad to have it behind us. If we can make some lemonade out of lemons we have learned a lot about how to better operate this business. We are moving people into places like Andy and Bryan and Greg and George so that they can be successful and help us go to the next level with the business.

We feel that the operations of the business quite frankly have not changed. The transaction volumes are there. The residuals are growing. Our strategy to move from one-time revenues to residual revenues is really paying off. But obviously this has been a big bump in the road and we are glad to be moving past it. Thank you very much.

**Operator**

Once again, ladies and gentlemen, this will conclude today's conference. We thank you for your participation. You may now disconnect.

**Thomson StreetEvents     www.streetevents.com          Contact Us                    14**
© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Jun. 01. 2007 / 9:00AM ET, INPC - Q1 2007 InPhonic, Inc. Earnings Conference Call**

**DISCLAIMER**

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

© 2005, Thomson StreetEvents All Rights Reserved.

© 2007 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

# EXHIBIT E

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 8-K

---

### CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported): October 5, 2007**

---

# INPHONIC, INC.
#### (Exact name of registrant as specified in its charter)

---

| **Delaware** | **000-51023** | **52-2199384** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

#### 1010 Wisconsin Avenue, Suite 600, Washington, DC 20007
#### (Address of principal executive offices) (ZIP Code)

### Registrant's telephone number, including area code: (202) 333-0001

#### (Former name or former address, if changed since last report.)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Section 2 – Financial Information**

**Item 2.02 – Results of Operations and Financial Condition.**

On October 11, 2007, InPhonic, Inc. issued a press release that, among other matters, provided an update relating to operating results for the third quarter ended September 30, 2007. A copy of the release is furnished as Exhibit 99.1 to this Report on Form 8-K.

The information in this section of this Current Report on Form 8-K and Exhibit 99.1 attached hereto shall not be deemed "filed" for the purposes of Section 18 of the Securities Exchange Act of 1934, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, except as shall be expressly set forth by specific reference in such filing.

**Item 2.04 – Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement**

On October 5, 2007, the Company received of a notice of default and reservation of rights from its secured lenders under that certain Credit Agreement, dated November 7, 2006, as amended (the "Credit Agreement"). The events of default include (i) failure to pay interest on the loans on October 1, 2007; (ii) failure to conclude the Inventory Transaction (as defined in the Credit Agreement); and (iii) failure to enter into a definitive agreement to provide for the outsourcing of the Company's inventory management, logistics and fulfillment obligations by October 5, 2007. The lenders reserve their right to exercise any and all available rights and remedies available under the Credit Agreement. To date, the Company has not received notice that the lenders have exercised any such rights or remedies.

**Item 5.02. Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers.**

On October 10, 2007, the Company terminated the employment of Brian J. Curran, the Chief Operating Officer (principal operating officer) of InPhonic, Inc. without Cause (as defined in Mr. Curran's employment agreement).

**Section 8 – Other Events**

**Item 8.01. Other Events.**

On October 11, 2007, InPhonic, Inc. issued a press release announcing, among other items, (i) an update of the operating results for the third quarter ended September 30, 2007; (ii) the termination of the employment of the Company's chief operating officer, Brian J. Curran; and (iii) the termination of the agreement with Brightstar US, Inc. A copy of the release is furnished as Exhibit 99.1 to this Report on Form 8-K.

On October 5, 2007, the Master Product and Services Agreement dated September 3, 2007 by and between the Company and Brightstar US, Inc. was terminated. On October 5, 2007, the Stock Purchase Agreement dated August 9, 2007 by and between the Company and Brightstar Corp., Inc. was also terminated.

**Section 9 – Financial Statements and Exhibits**

Item 9.01. Financial Statements and Exhibits.

(c) Exhibits.

99.1  Press Release dated October 11, 2007.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

INPHONIC, INC.

/s/ Andrew B. Zeinfeld
Name: Andrew B. Zeinfeld
Title:  Chief Executive Officer

Date: October 11, 2007

## INDEX TO EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| Exhibit 99.1 | Press Release dated October 11, 2007. |



**InPhonic Announces Appointment of Lazard as Financial Advisor**
**— Third Quarter 2007 Results to Fall Below Guidance —**

**WASHINGTON, D.C. – October 11, 2007 –** InPhonic, Inc. (NASDAQ: INPC), a leading online seller of wireless services and products, today announced that its Board of Directors has selected Lazard Middle Market to conduct, in conjunction with management, a full review of the Company's financing and strategic alternatives to increase the Company's cash liquidity and to maximize shareholder value. These alternatives could include a re-financing of existing credit arrangements, merger, sale, strategic alliance or other transaction.

"We believe Lazard will provide us critical financial advisory services as we explore different strategic directions for the Company," said Andy Zeinfeld, Chief Executive Officer of InPhonic. Lazard is one of the world's preeminent financial advisory and asset management firms. The firm provides advice on mergers and acquisitions, restructuring and capital investment, as well as strategic financial services to corporations and governments.

### Third Quarter Results

The Company also announced that its financial results for the third quarter 2007 are significantly below previously announced guidance.

"Our results for the third quarter did not meet our expectations. We have taken significant cost-cutting steps and are working with Lazard to address our financing requirements. The Company requires funding to continue operations, fund our losses incurred to date and to transition our operations to achieve profitability," said Ken Schwarz, InPhonic's Chief Financial Officer. "This has been a turbulent year for InPhonic. We believe the critical changes that we have already begun to implement are necessary for our ongoing business and to achieve profitable operations, but we cannot provide any assurance that we will receive the funding required in the near term to continue these changes for the business."

Management will provide a revised outlook on financial condition and operational changes at a later date.

### Senior Management Restructuring

On October 1, 2007, Andy Zeinfeld was promoted by the Board of Directors to assume the role of Chief Executive Officer. Mr. Zeinfeld came to InPhonic last year after 28 years with RadioShack Corporation where he had most recently served as Chief Retail Services Officer. In July 2007, Ken Schwarz was named InPhonic's Chief Financial Officer after a financial career that spanned more than twenty-five years at public and private companies including MCI, Cable & Wireless, WinStar Communications, Intersections and Deloitte & Touche. InPhonic has also terminated Brian Curran as the Company's Chief Operating Officer. The Company

has reassigned Mr. Curran's responsibilities across existing business divisions as part of a more streamlined operating structure.

**Brightstar Termination**

The Company also announced the termination of the proposed Brightstar supply chain services partnership which was announced last month. "While I am disappointed the Brightstar deal could not be implemented, we believe that there continue to be potential opportunities for us to work together," said Andy Zeinfeld, InPhonic's CEO.

**Further Information**

With respect to the review of strategic alternatives, there can be no assurances that any particular alternative will be pursued or that any transaction will occur, or on what terms. The Company does not plan to release additional information about the status of the review of alternatives until a definitive agreement is entered into or the process is otherwise completed.

**About InPhonic**

Headquartered in Washington, D.C., InPhonic, Inc. (NASDAQ:INPC) is a leading online seller of wireless services and products. InPhonic sells these services and devices, and provides world-class customer service through websites that it creates and manages for online businesses, national retailers, member-based organizations and associations under their own brands. InPhonic also operates Wirefly ( www.wirefly.com ), a leading one-stop comparison mobile phones and wireless plans shopping site that has been awarded "Best of the Web" by Forbes magazine and "Best in Overall Customer Experience" by Keynote Performance Systems. InPhonic also delivers a full range of MVNO and mobility solutions to enterprise clients through its Mobile Virtual Network Enablement (MVNE) platform. Among many awards in its history, InPhonic holds the distinction as #1 Company of the Year on the INC. 500 for 2004. For more information on the company, its products and services, visit the InPhonic Corporate Web site at www.inphonic.com .

Click here to join our email alert list:  http://www.b2i.us/irpass.asp?BzID=1461&to=ea&s=0

*"Safe Harbor" Statement —Under the Private Securities Litigation Reform Act of 1995, this press release may contain forward-looking statements that involve risks and uncertainties, including, but not limited to, statements regarding potential strategic, financing or other transactions and the future operations of the business. Important factors, which could cause actual operating results to differ materially from those in the forward-looking statements, are detailed in filings with the Securities and Exchange Commission made from time to time by the Company. This press release and statements are current as of the date of the individual announcements and the Company undertakes no obligation to publicly release any revisions to any forward-looking statement to reflect events or circumstances after the date thereof or to reflect the occurrence of unanticipated events.*

**Contact:**

**InPhonic, Inc.**
Tripp Donnelly
SVP, Corporate Communications
(202) 333-0001
tdonnelly@inphonic.com

# EXHIBIT F

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 8-K

---

### CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

#### Date of Report (Date of earliest event reported): November 6, 2007

---

# INPHONIC, INC.
##### (Exact name of registrant as specified in its charter)

---

| **Delaware** | **000-51023** | **52-2199384** |
|:---:|:---:|:---:|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **1010 Wisconsin Avenue, Suite 600, Washington, DC** | **20007** |
|:---:|:---:|
| (Address of principal executive offices) | (ZIP Code) |

#### Registrant's telephone number, including area code: (202) 333-0001

---

##### (Former name or former address, if changed since last report.)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Section 1 – Registrant's Business and Operations**

**Item 1.01.    Entry into a Material Definitive Agreement.**

The information set forth in Item 1.03 below with respect to the asset purchase agreement and the debtor-in-possession financing is incorporated herein by reference.

**Item 1.03.    Bankruptcy or Receivership.**

On November 8, 2007, InPhonic, Inc., a Delaware corporation (the "Company"), filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). In connection with the bankruptcy filing, the Company entered into a $25 million debtor-in-possession financing facility with Versa Capital Management, a private equity investment firm ("Versa").

The Bankruptcy Court assumed jurisdiction over the assets of the Company as of the date of the filing of the bankruptcy petition. The Company remains in possession of its assets, and continues to manage and operate its business and properties, as debtor-in-possession, subject to the provisions of the Bankruptcy Code and the supervision and orders of the Bankruptcy Court. Subject to Court approval, the Company will use the cash flow from operations and the debtor-in-possession financing to meet its capital needs during the reorganization process.

On November 8, 2007, the Company signed an asset purchase agreement with Versa to effect the sale of substantially all of the Company's assets under Section 363 of the Bankruptcy Code. As part of the asset purchase agreement, the Company has filed motions for orders granting authority to sell its assets to Versa pursuant to Section 363 of the Bankruptcy Code, establishing bidding procedures and setting a hearing date on the sale of the assets.

The Company believes that its currently outstanding common stock has no value.

There can be no assurance that the Company can remain in possession of its assets and control of its business as a debtor-in-possession and that a trustee will not be appointed to operate the business of the Company. The Company's current business relationships and arrangements, and the Company's ability to negotiate future business arrangements may be adversely affected by the filing of the bankruptcy petition.

In addition to historical information, this Current Report on Form 8-K contains "forward-looking statements" within the meaning of the Securities Act of 1933, as amended, and the Securities Exchange Act of 1934, as amended. These statements involve risks and uncertainties that could cause the Company's actual results to differ materially from the future results expressed or implied by the forward-looking statements. All statements other than statements of historical facts included in this Current Report on Form 8-K, including statements regarding the Company's future financial position and results, are forward-looking statements. Factors that might cause such a difference in results include, but are not limited to: the effects of the chapter 11 filing; the ability to maintain adequate liquidity; the ability to obtain and maintain normal terms with customers, suppliers and service providers; the ability to continue as a going concern; the ability to operate pursuant to the terms of our credit agreement; the ability to obtain Bankruptcy Court approval and any other required approvals with respect to motions in the chapter 11 case prosecuted by us from time to time; the ability to develop, prosecute, confirm and consummate one or more plans of reorganization with respect to the chapter 11 case; risks associated with third parties seeking and obtaining Bankruptcy Court approval to either terminate or shorten the exclusivity period that we have to propose and confirm one or more plans of reorganization; risks associated with third parties seeking and obtaining Bankruptcy Court approval to appoint a chapter 11 trustee; risks associated with third parties seeking and obtaining Bankruptcy Court approval to convert the chapter 11 filing to a chapter 7 filing; the ability to maintain contracts that are critical to our operation; the ability to conclude our exploration of strategic alternatives; risks associated with the timely development, production and acceptance of new products and services; increased competition; dependence on third party partners and suppliers; the failure to achieve expected product mix and revenue levels; failure to manage costs and generate improved operating results and cash flows; failure to maintain compliance with debt covenants; and failure to maintain adequate cash resources for the operation of the business. Additionally, due to material uncertainties, it is not possible to predict the length of time we will operate under chapter 11 protection, the outcome of the proceeding in general, whether we will continue to operate under our current organizational structure, or the effect of the proceeding on our businesses and the interests of various creditors and security holders.

These statements speak only as of the date of this Current Report on Form 8-K, and we disclaim any intention or

obligation to update or revise any forward-looking statements to reflect new information, future events or developments or otherwise, except as required by law. We have provided additional information in our filings with the Securities and Exchange Commission, which readers are encouraged to review, concerning other factors that could cause actual results to differ materially from those indicated in the forward-looking statements.

## Section 2 – Financial Information

### Item 2.06.    Material Impairments.

In connection with its decision to seek bankruptcy protection, the Company is currently assessing its long-lived assets for potential impairment. Further information will be provided once this assessment is completed.

## Section 3 – Securities and Trading Markets

### Item 3.01.    Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing

On November 6, 2007, the Company received a Staff Determination letter from the NASDAQ Stock Market, Inc. ("NASDAQ") stating that the Company fails to comply with the requirements for continued listing because it no longer satisfies the majority independent director and audit committee composition requirements set forth in NASDAQ Marketplace Rules 4350(c)(1) and 4350(d)(2), respectively. As previously announced, Laurence E. Harris and John Sculley resigned from the Company's Board of Directors on October 18, 2007, and as a result, at that time, the Company had two independent directors on its five member board and two independent directors on its Audit Committee. Rule 4350 (c)(1) requires a listed issuer to maintain a majority of the board of directors comprised of independent directors and Rule 4350(d)(2) requires a listed issuer to have an Audit Committee consisting of at least three independent directors.

## Section 4 – Matters Related to Accountants and Financial Statements

### Item 4.01.    Changes in Registrant's Certifying Accountant.

(a) On November 8, 2007, the Company received notice that Grant Thornton LLP ("GT") had resigned as the Company's independent registered public accounting firm, effective immediately.

The audit reports of GT on the consolidated financial statements of the Company as of and for the years ended December 31, 2006 and 2005, did not contain an adverse opinion or disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles.

During the two most recently completed fiscal years and through November 8, 2007, there have been no disagreements with GT on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of GT, would have caused GT to make reference to the subject matter of the disagreement in connection with its reports on the Company's financial statements for the past two fiscal years.

During the fiscal years ended December 31, 2006 and 2005 and through November 8, 2007, there were no reportable events within the meaning of Item 304(a)(1)(v) of Regulations S-K, except for the material weaknesses in internal control over financial reporting described in the following paragraph.

In the Annual Report on Form 10-K for the year ended December 31, 2006, the Company reported the following material weaknesses in internal controls:

- Failure to maintain staffing in operational and financial resources sufficient to provide the level of controls and analysis required on a timely basis in light of the increasing complexity and growth of the business; and

- Failure to maintain effective communication channels to adequately identify and record certain transactions during 2006. The failure to provide this communication contributed to errors relating to accounting and reporting of expenses and liabilities;

- Lack of effective controls over the recordation, accuracy and completeness of activations and services revenue and related accounts receivable;

- Failure to utilize an appropriate methodology during the year in recording certain fees due from consumers when contracts are cancelled within specified time periods or the wireless device is not returned to the Company;

- Failure to utilize an appropriate methodology during the year in recording rebates payable to eligible consumers; and

- Lack of effective controls over the accuracy and completeness of costs of goods sold and amounts due from vendors.

GT's report on the Company's internal control over financial reporting stated that based on the effect of these material weaknesses on the achievement of the objectives of the control criteria, we had not maintained effective internal control over financial reporting as of December 31, 2006.

GT discussed these matters with the Audit Committee, and we have authorized GT to respond fully to the inquiries of its successor as our independent registered public accounting firm concerning the subject matter of these material weaknesses.

The Company provided GT with a copy of this Current Report on Form 8-K and has requested that GT furnish it with a letter addressed to the Securities and Exchange Commission stating whether or not it agrees with the above statements.

## Section 5 – Corporate Governance and Management

**Item 5.02.    Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On November 6, 2007, Ira Brind notified the Company that he was resigning from the Board of Directors effective as of November 7, 2007. Mr. Brind served on the Company's Board of Directors since December 2000 and was the chairman of the Compensation Committee and a member the Nominating and Corporate Governance Committee and the Audit Committee.

On November 7, 2007, Blake Bath notified the Company that he was resigning from the Board of Directors effective as of November 7, 2007. Mr. Bath served on the Company's Board of Directors since October 2006 and was a member of the Nominating and Corporate Governance Committee and the Audit Committee.

On November 7, 2007, David Steinberg notified the Company that he was resigning from the Board of Directors effective as of November 7, 2007. Mr. Steinberg was the founder of the Company and served as Chairman of the Company's Board of Directors since the Company's inception. He served as the Company's Chief Executive Officer from inception through September 2007 and also served as the Company's president from August 2002 until March 2004.

**Item 5.03.    Amendments to Articles of Incorporation or Bylaws: Change in Fiscal Year.**

On November 8, 2007, the board of directors of the Company amended Section 2.2 of the Company's Fourth Amended and Restated Bylaws to reduce the number of directors on the board from five (5) to two (2).

**Section 9 – Financial Statements and Exhibits**

**Item 9.01.    Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit No. | Description |
|---|---|
| 99.1 | Chapter 11 Reorganization Press Release dated November 8, 2007 |

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

INPHONIC, INC.

/s/ Kenneth D. Schwarz

Name:  Kenneth D. Schwarz
Title:   Executive Vice President and Chief Financial Officer

Date: November 8, 2007

Exhibit Index

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Chapter 11 Reorganization Press Release dated November 8, 2007 |



**InPhonic Signs Purchase Agreement with Versa Capital and Files Voluntary
Petition for Chapter 11 to Facilitate Transaction**
*— Announces Sale to Versa Capital - Secures DIP Financing -
Business as Usual for Customers and Partners —*

**WASHINGTON, D.C. – November 8, 2007 –** InPhonic, Inc. (NASDAQ: INPC), a leading online seller of wireless services and products, today announced that it has entered into an agreement to sell substantially all of its assets to an affiliate of Versa Capital Management, a Philadelphia based private equity firm.

In order to implement the sale, InPhonic filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. InPhonic's Board of Directors has unanimously determined that Chapter 11 process will provide an efficient environment for completion of the sale. The sale is subject to higher and better offers, and InPhonic anticipates completing the sale before the end of the year, subject to court approval. InPhonic will continue to conduct normal business operations at all of its facilities consistent with its obligations as a Chapter 11 debtor-in-possession.

Versa will also be providing a Debtor-in-Possession ("DIP") financing facility to provide working capital and financial resources necessary to fund the transition in operations to new ownership pending court approval of the sale to Versa.

The Company's recently appointed Management team believes that this expedited process is necessary to promptly institute its improved business plan and that the filing and sale are in the best long-term interest of the Company, as well as its customers, partners, vendors and employees. Lazard Middle Market, the Company's financial advisor, is assisting the board through this process.

"We intend to use this filing to take the actions necessary to position InPhonic for future success. We want to assure our customers, our employees and our partners that InPhonic is operating business as usual during this transition," said Andy Zeinfeld, InPhonic's Chief Executive Officer. "I am confident in InPhonic's business model and with the cost-cutting measures and profit-driving initiatives we have implemented across the organization. The new direction I have set is comprehensive and our dedication to customer, partner and employee satisfaction is unwavering. InPhonic plays a critical role as a leader in the wireless marketplace and through this sale to Versa, it will operate on stable financial footing and its leading role will be preserved."

Ken Schwarz, InPhonic's Chief Financial Officer added, "This sale will strengthen the Company and foster a sustained turnaround for InPhonic. This milestone marks a fundamental, comprehensive and systemic change at InPhonic. Our customers, partners and employees want the Company to succeed because of InPhonic's significant value in the wireless marketplace. We expect to proceed quickly with this sale and that the business will have a significantly improved balance sheet, greater operating flexibility and a swift path to profitability."

The Company expects that shares of its common stock will have no value as a result of the Chapter 11 filing.

The filings were made today in the federal courts in Wilmington, Delaware.

More information about InPhonic's reorganization is available at a special website: www.inphonic.com/reorg .

### About Versa Capital Management

Philadelphia-based Versa Capital Management, Inc., formerly known as Chrysalis Capital Partners, L.P., is a private equity investment firm which focuses on special situation investments including turnarounds, restructurings, reorganizations and recapitalizations in a wide range of industries and circumstances throughout the United States. More information can be found at www.versafund.com .

### About InPhonic

Headquartered in Washington, D.C., InPhonic, Inc. (NASDAQ:INPC) is a leading online seller of wireless services and products. InPhonic sells these services and devices, and provides world-class customer service through websites that it creates and manages for online businesses, national retailers, member-based organizations and associations under their own brands. InPhonic also operates Wirefly ( www.wirefly.com ), a leading one-stop comparison mobile phones and wireless plans shopping site that has been awarded "Best of the Web" by Forbes magazine and "Best in Overall Customer Experience" by Keynote Performance Systems. InPhonic also delivers a full range of MVNO and mobility solutions to enterprise clients through its Mobile Virtual Network Enablement (MVNE) platform. Among many awards in its history, InPhonic holds the distinction as #1 Company of the Year on the INC. 500 for 2004. For more information on the company, its products and services, visit the InPhonic Corporate Web site at www.inphonic.com .

Click here to join our email alert list:  http://www.b2i.us/irpass.asp?BzID=1461&to=ea&s=0

*"Safe Harbor" Statement —Under the Private Securities Litigation Reform Act of 1995, this press release may contain forward-looking statements that involve risks and uncertainties. Important factors, which could cause actual operating results to differ materially from those in the forward-looking statements, are detailed in filings with the Securities and Exchange Commission made from time to time by the Company. This press release and statements are current as of the date of the individual announcements and the Company undertakes no obligation to publicly release any revisions to any forward-looking statement to reflect events or circumstances after the date thereof or to reflect the occurrence of unanticipated events.*

### Contact:

**InPhonic, Inc.**
Tripp Donnelly
SVP, Corporate Communications
(202) 333-0001
media@inphonic.com

# EXHIBIT G

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 8-K

---

### CURRENT REPORT

## Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

#### Date of Report (Date of earliest event reported): April 2, 2007

---

# INPHONIC, INC.
#### (Exact name of registrant as specified in its charter)

---

| **Delaware** | **000-51023** | **52-2199384** |
|:---:|:---:|:---:|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**1010 Wisconsin Avenue, Suite 600, Washington, DC**                    **20007**
(Address of principal executive offices)                                   (ZIP Code)

### Registrant's telephone number, including area code: (202) 333-0001

---

#### (Former name or former address, if changed since last report.)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 4.02. Non-Reliance On Previously Issued Financial Statements Or A Related Audit Report Or Completed Interim Review.**

On April 2, 2007, the Company's management and Audit Committee concluded that the Company's unaudited financial statements for the quarterly periods ended June 30, 2006 and September 30, 2006 each as filed on Form 10-Q (the "2nd and 3rd Quarter Financials") as well as the unaudited financial results for the quarter and year-ended December 31, 2006 included in the Company's earnings release issued on February 22, 2007 (the "Year End Results") should no longer be relied upon as a result of certain errors discovered subsequent to the issuance of the Year End Results. At this time the Company has identified the matters set forth below which will require changes to the 2nd and 3rd Quarter Financials and unaudited Year End Results. Certain additional matters are also subject to review. The matters for which changes will be required are:

In 2006, the Company recorded net activation and services revenue as a change in its estimate of certain disputed carrier commissions which it had deemed collectible. The Company now believes that it was inappropriate to have recorded revenue associated with this matter until such collections are received. If the Company is ultimately able to collect any of these disputed carrier commissions, the amount would be recorded as revenue at the time of collection. We have subsequently collected some of these receivables and recorded them as revenue.

The Company has also identified a deficiency in its process for recording certain fees due from consumers when contracts are canceled within specified time periods and the wireless device is not returned to the Company as is required under the contract with the customer ("EDPs"). The Company believes that revenue originally recorded as being earned under generally accepted accounting principles and the related accounts receivable amount should be reduced to be reflective of such historical experience. If the Company ultimately is able to collect on or sell these pools of consumer receivables at a more favorable rate, a gain may be recorded at the time of such collection or sale, subject to the terms of the agreements. The Company has identified a third party marketplace for the sale of its EDP receivables and is actively marketing these assets.

The Company expects to amend the previously filed Form 10-Qs for the 2nd and 3rd Quarter Financials with an aggregate impact of a reduction of revenue for the quarterly periods ended June 30, 2006 and September 30, 2006. The Company also anticipates revising the Year End Results. The amendments to the prior period financial statements, including for our year-end results, for the above and certain other entries are one-time, non-cash charges that the Company expects will increase its previously reported net loss for 2006 by a range from approximately $5 million to $7 million in the aggregate. The foregoing is an estimate subject to change until the Company's accounting review and outside audit is complete. The reduction in revenue will have corresponding impacts to previously reported quarterly revenue and will result in increased net losses for each period.

Additionally, the Company has identified three material weaknesses in its internal controls over financial reporting. At the entity level, management identified a material weakness in its control environment because it lacked a sufficient number of employees with appropriate levels of knowledge, expertise and training in the application of generally accepted accounting principles in certain groups. At the transactional level, due to the lack of sufficient personnel, the Company was unable to properly perform certain accounting procedures in a timely manner relating to the recording of carrier commissions. Also, at the transactional level, the Company identified a material weakness in its process for recording revenue relating to EDPs. The Company will be required to provide an assessment of the effectiveness of the Company's internal control structure and procedures for financial reporting when it files its Annual Report on Form 10-K for the fiscal year ended December 31, 2006. Management has already taken action to remediate the material weaknesses described above based on an evaluation of the accounting staffing, systems, policies and procedures relating to revenue recognition, however, our efforts to remediate deficiencies surrounding the levels of our staffing may take some time to remediate over the next several quarters.

The Company intends to file its restated financial statements for the quarterly periods ended June 30, 2006 and September 30, 2006 together with its Annual Report on Form 10-K for the fiscal year ended December 31, 2006.

The Company's management and its Audit Committee have discussed the matters described in this Form 8-K with Grant Thornton LLP, the Company's independent registered public accounting firm.

**Item 8.01 Other Items**

On March 30, 2007, the Company entered into Amendment No. 2 to its Credit Agreement dated November 7, 2006 with Goldman Sachs Credit Partners L.P., as Lead Arranger, Lead Bookrunner and Lead Syndication Agent, Citicorp North America, Inc., as Administrative Agent, and the lenders from time to time party thereto (the "Amendment"). The Amendment provided, among other matters, additional time to comply with covenants requiring delivery of full-year audited financial statements within 90 days of the fiscal year end (December 31, 2006).

*Business Outlook*

The Company does not believe that the charges described above should substantially affect Adjusted EBITDA for 2006 due primarily to their non-recurring or non-cash nature. Also, the Company does not believe that this will negatively affect the 2007 business outlook. The foregoing is an estimate subject to change until the Company's accounting review and outside audit is complete.

The Company is revising the 2007 business outlook that it released as of February 22, 2007 to reflect the current expectation for first quarter and the full-year 2007 as set forth below. It is currently expected that the outlook will not be updated until the release of InPhonic's next quarterly earnings announcement, notwithstanding subsequent developments; however, InPhonic may update the outlook or any portion thereof at any time.

|  | FY 2007 | Q1 2007 |
|---|---|---|
| Revenue (in millions) | $500 -$510 | $108 -$110 |
| Adjusted EBITDA (in millions) | $33.5 -$35 | $5.0 -$5.5 |
| Adjusted EPS per basic and diluted share | $0.24 -$0.27 | $0.00 -$0.02 |

Adjusted EPS per basic and diluted share is defined as earnings per share as calculated on the face of the income statement adjusted for stock-based compensation expense and depreciation of intangibles.

Note: Certain statements in this Current Report on Form 8-K concerning InPhonic's revenue restatement, results or prospects are "forward-looking statements" under the Private Securities Litigation Reform Act of 1995. There can be no assurances that forward-looking statements will be achieved, and actual events or results could differ materially from the events or results predicted or from any other forward-looking statements made by, or on behalf of, InPhonic, and should not be considered as an indication of future events or results. Important factors that could cause actual events or results to differ materially include: the completion of our restatement, which could result in changes in revenue actually reported for the quarterly periods ended June 30, 2006, September 30, 2006 and December 31, 2006 and year-ended December 31, 2006 that differ from the amounts disclosed herein; our ability to complete the restatement in a timely manner and timely file all required reports under the Securities Exchange Act of 1934; our ability to remediate the material weaknesses in internal controls over financial reporting; our fluctuating operating results, seasonality in our business, our ability to acquire products on reasonable terms, our online business model, demand for our products, the strength of our brand, competition, our ability to fulfill orders; and other risks described in filings with the Securities and Exchange Commission. InPhonic makes no commitment to revise or update any forward-looking statements in order to reflect changes in events or circumstances after the date any such statement is made, except as may be required pursuant to applicable law.

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

INPHONIC, INC.

/s/ Lawrence S. Winkler
Name: Lawrence S. Winkler
Title:   Chief Financial Officer, Executive Vice President
          and Treasurer


/s/ David A. Steinberg
Name: David A. Steinberg
Title:   Chairman and Chief Executive Officer

Date: April 2, 2007

# EXHIBIT H

**Historical Prices of InPhonic Stock During Putative Class Period**

(from Yahoo! Finance, Historical Prices for InPhonic, Inc., *at*
http://finance.yahoo.com/q/hp?s=INPC.PK (last visited Sept. 4, 2008))

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 5/8/2006 | 7 | 7.35 | 6.92 | 7.35 | 684000 |
| 5/9/2006 | 8.98 | 9.28 | 8.14 | 8.76 | 5411000 |
| 5/10/2006 | 8.71 | 8.97 | 8.37 | 8.76 | 838700 |
| 5/11/2006 | 8.72 | 8.95 | 8.4 | 8.67 | 2044400 |
| 5/12/2006 | 8.6 | 8.68 | 8.36 | 8.38 | 429400 |
| 5/15/2006 | 8.32 | 8.58 | 8.04 | 8.39 | 468300 |
| 5/16/2006 | 8.35 | 8.61 | 8.27 | 8.28 | 198900 |
| 5/17/2006 | 8.29 | 8.52 | 8.13 | 8.41 | 187200 |
| 5/18/2006 | 8.37 | 8.4 | 8.07 | 8.14 | 303800 |
| 5/19/2006 | 8.18 | 8.37 | 7.9 | 8.22 | 157700 |
| 5/22/2006 | 8.18 | 8.33 | 7.75 | 8.12 | 328500 |
| 5/23/2006 | 8.22 | 8.41 | 7.64 | 7.71 | 335900 |
| 5/24/2006 | 7.68 | 7.72 | 7.08 | 7.35 | 323000 |
| 5/25/2006 | 7.4 | 7.67 | 7.35 | 7.55 | 134800 |
| 5/26/2006 | 7.57 | 8 | 7.57 | 7.74 | 108900 |
| 5/30/2006 | 7.71 | 7.85 | 7.48 | 7.48 | 142500 |
| 5/31/2006 | 7.48 | 7.71 | 7.14 | 7.2 | 355600 |
| 6/1/2006 | 7.2 | 7.36 | 7.04 | 7.24 | 281400 |
| 6/2/2006 | 7.31 | 7.87 | 7.25 | 7.84 | 331700 |
| 6/5/2006 | 7.81 | 7.85 | 7.27 | 7.33 | 376100 |
| 6/6/2006 | 7.3 | 7.47 | 7.1 | 7.19 | 193300 |
| 6/7/2006 | 7.17 | 7.43 | 7.09 | 7.34 | 226200 |
| 6/8/2006 | 7.3 | 7.57 | 7.14 | 7.49 | 288900 |
| 6/9/2006 | 7.45 | 7.55 | 7.11 | 7.13 | 158300 |
| 6/12/2006 | 7.17 | 7.17 | 6.82 | 6.98 | 211500 |
| 6/13/2006 | 6.95 | 7.19 | 6.36 | 6.51 | 586900 |
| 6/14/2006 | 6.63 | 6.63 | 6.21 | 6.4 | 450800 |
| 6/15/2006 | 6.46 | 6.57 | 6.2 | 6.28 | 374300 |
| 6/16/2006 | 6.28 | 6.6 | 6.23 | 6.47 | 734700 |
| 6/19/2006 | 6.53 | 6.65 | 6.36 | 6.44 | 355500 |
| 6/20/2006 | 6.42 | 6.49 | 6.2 | 6.23 | 279800 |
| 6/21/2006 | 6.27 | 6.55 | 6.2 | 6.41 | 319100 |
| 6/22/2006 | 6.38 | 6.65 | 6.33 | 6.5 | 206700 |
| 6/23/2006 | 6.53 | 6.75 | 6.31 | 6.67 | 189100 |
| 6/26/2006 | 6.67 | 6.83 | 6.52 | 6.68 | 115200 |
| 6/27/2006 | 6.72 | 6.73 | 6.08 | 6.19 | 356300 |
| 6/28/2006 | 6.18 | 6.21 | 5.88 | 6.06 | 607300 |
| 6/29/2006 | 6.13 | 6.4 | 6.06 | 6.39 | 254800 |
| 6/30/2006 | 6.44 | 6.54 | 6.26 | 6.3 | 1038900 |

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 7/3/2006 | 6.29 | 6.44 | 6.25 | 6.4 | 167800 |
| 7/5/2006 | 6.37 | 6.37 | 6.05 | 6.08 | 203700 |
| 7/6/2006 | 6.06 | 6.4 | 6.06 | 6.33 | 297000 |
| 7/7/2006 | 6.3 | 6.4 | 6.05 | 6.08 | 173000 |
| 7/10/2006 | 6.1 | 6.17 | 5.92 | 5.92 | 191500 |
| 7/11/2006 | 5.92 | 6 | 5.8 | 5.95 | 275300 |
| 7/12/2006 | 5.97 | 5.97 | 5.66 | 5.68 | 213500 |
| 7/13/2006 | 5.75 | 6.2 | 5.7 | 6.04 | 531600 |
| 7/14/2006 | 6.01 | 6.02 | 5.9 | 5.9 | 309900 |
| 7/17/2006 | 5.87 | 6.33 | 5.87 | 6.3 | 394700 |
| 7/18/2006 | 6.3 | 6.4 | 6.15 | 6.37 | 224400 |
| 7/19/2006 | 6.44 | 6.8 | 6.25 | 6.66 | 483800 |
| 7/20/2006 | 6.75 | 6.84 | 6.5 | 6.54 | 384800 |
| 7/21/2006 | 6.55 | 6.64 | 6.48 | 6.51 | 250900 |
| 7/24/2006 | 6.51 | 6.74 | 6.51 | 6.65 | 220700 |
| 7/25/2006 | 6.66 | 6.66 | 6.5 | 6.57 | 221000 |
| 7/26/2006 | 6.6 | 6.65 | 6.49 | 6.61 | 151300 |
| 7/27/2006 | 6.66 | 6.66 | 6.4 | 6.49 | 234500 |
| 7/28/2006 | 6.55 | 6.57 | 6.4 | 6.47 | 258100 |
| 7/31/2006 | 6.51 | 6.65 | 6.42 | 6.56 | 973200 |
| 8/1/2006 | 6.56 | 6.6 | 6.1 | 6.29 | 486500 |
| 8/2/2006 | 6.36 | 6.55 | 6.23 | 6.42 | 479700 |
| 8/3/2006 | 5.76 | 6.32 | 5.69 | 6.16 | 1144000 |
| 8/4/2006 | 6.16 | 6.47 | 6.16 | 6.47 | 507300 |
| 8/7/2006 | 6.47 | 6.77 | 6.41 | 6.76 | 476700 |
| 8/8/2006 | 6.67 | 6.8 | 6.5 | 6.69 | 310000 |
| 8/9/2006 | 6.76 | 6.76 | 6.43 | 6.61 | 208800 |
| 8/10/2006 | 6.58 | 6.83 | 6.36 | 6.79 | 329700 |
| 8/11/2006 | 6.76 | 6.79 | 6.35 | 6.41 | 175500 |
| 8/14/2006 | 6.5 | 6.52 | 6.19 | 6.23 | 204800 |
| 8/15/2006 | 6.26 | 6.45 | 6.1 | 6.26 | 191800 |
| 8/16/2006 | 6.23 | 6.47 | 6.09 | 6.16 | 227800 |
| 8/17/2006 | 6.17 | 6.3 | 6.05 | 6.25 | 161100 |
| 8/18/2006 | 6.29 | 6.32 | 6.15 | 6.3 | 73500 |
| 8/21/2006 | 6.24 | 6.3 | 6.2 | 6.21 | 129000 |
| 8/22/2006 | 6.28 | 6.28 | 5.99 | 6.06 | 302700 |
| 8/23/2006 | 6.21 | 6.3 | 6.13 | 6.25 | 321500 |
| 8/24/2006 | 6.25 | 6.51 | 6.11 | 6.49 | 163200 |
| 8/25/2006 | 6.44 | 6.54 | 6.29 | 6.41 | 113300 |
| 8/28/2006 | 6.43 | 6.53 | 6.22 | 6.49 | 174200 |
| 8/29/2006 | 6.52 | 6.7 | 6.44 | 6.68 | 298800 |
| 8/30/2006 | 6.75 | 7.1 | 6.74 | 7.07 | 372000 |
| 8/31/2006 | 7.14 | 7.23 | 7.04 | 7.08 | 223700 |
| 9/1/2006 | 7 | 7.29 | 7 | 7.25 | 188600 |

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 9/5/2006 | 7.28 | 7.29 | 6.96 | 7.06 | 604700 |
| 9/6/2006 | 7.02 | 7.1 | 6.81 | 6.87 | 367500 |
| 9/7/2006 | 6.81 | 6.95 | 6.72 | 6.88 | 766100 |
| 9/8/2006 | 6.9 | 6.98 | 6.76 | 6.95 | 584200 |
| 9/11/2006 | 6.85 | 6.9 | 6.76 | 6.89 | 142000 |
| 9/12/2006 | 6.91 | 7.19 | 6.79 | 7.18 | 202500 |
| 9/13/2006 | 7.16 | 7.36 | 7.14 | 7.3 | 282300 |
| 9/14/2006 | 7.26 | 7.28 | 7.05 | 7.16 | 207100 |
| 9/15/2006 | 7.25 | 7.26 | 7.05 | 7.15 | 340200 |
| 9/18/2006 | 7.15 | 8.13 | 7.15 | 8 | 862100 |
| 9/19/2006 | 7.99 | 8.09 | 7.76 | 7.98 | 376300 |
| 9/20/2006 | 8.07 | 8.13 | 7.95 | 8.05 | 383900 |
| 9/21/2006 | 8.04 | 8.08 | 7.91 | 8 | 170400 |
| 9/22/2006 | 7.96 | 8.12 | 7.9 | 8 | 424500 |
| 9/25/2006 | 8.1 | 8.5 | 8 | 8.44 | 357200 |
| 9/26/2006 | 8.4 | 8.46 | 8.2 | 8.4 | 303600 |
| 9/27/2006 | 8.35 | 8.35 | 7.91 | 7.95 | 265000 |
| 9/28/2006 | 7.94 | 8 | 7.61 | 7.91 | 192800 |
| 9/29/2006 | 7.88 | 8.1 | 7.88 | 7.92 | 286500 |
| 10/2/2006 | 7.89 | 7.9 | 7.34 | 7.73 | 282200 |
| 10/3/2006 | 7.68 | 7.72 | 7.35 | 7.48 | 100600 |
| 10/4/2006 | 7.51 | 7.98 | 7.43 | 7.92 | 174200 |
| 10/5/2006 | 7.89 | 8.1 | 7.71 | 7.88 | 232200 |
| 10/6/2006 | 8.04 | 8.17 | 7.92 | 8.05 | 520300 |
| 10/9/2006 | 8.05 | 8.21 | 7.93 | 8.19 | 295700 |
| 10/10/2006 | 8.3 | 9.32 | 8.3 | 9.16 | 1520400 |
| 10/11/2006 | 9.15 | 9.35 | 8.95 | 8.97 | 678400 |
| 10/12/2006 | 9.05 | 9.06 | 8.73 | 8.85 | 286400 |
| 10/13/2006 | 8.85 | 9 | 8.7 | 8.79 | 144600 |
| 10/16/2006 | 8.75 | 9.3 | 8.43 | 9.25 | 509100 |
| 10/17/2006 | 9.2 | 9.91 | 9 | 9.84 | 740700 |
| 10/18/2006 | 9.89 | 9.95 | 9.53 | 9.73 | 513200 |
| 10/19/2006 | 9.73 | 9.95 | 9.61 | 9.8 | 602400 |
| 10/20/2006 | 9.79 | 9.8 | 9.55 | 9.7 | 141600 |
| 10/23/2006 | 9.66 | 9.71 | 9.35 | 9.5 | 140100 |
| 10/24/2006 | 9.5 | 9.52 | 9.18 | 9.26 | 252400 |
| 10/25/2006 | 9.22 | 9.44 | 9.06 | 9.27 | 200900 |
| 10/26/2006 | 9.5 | 9.69 | 9.32 | 9.49 | 321600 |
| 10/27/2006 | 9.42 | 9.57 | 9.26 | 9.37 | 464000 |
| 10/30/2006 | 9.36 | 9.47 | 9.19 | 9.33 | 154700 |
| 10/31/2006 | 9.31 | 9.45 | 9.1 | 9.17 | 196900 |
| 11/1/2006 | 9.02 | 9.11 | 8.75 | 8.87 | 325400 |
| 11/2/2006 | 8.85 | 9.3 | 8.56 | 9.17 | 327000 |
| 11/3/2006 | 9.2 | 9.32 | 8.97 | 9.31 | 265300 |

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 11/6/2006 | 9.3 | 9.38 | 8.83 | 9.04 | 392700 |
| 11/7/2006 | 10.6 | 11.26 | 10.5 | 10.98 | 3898000 |
| 11/8/2006 | 11.16 | 11.46 | 10.92 | 11.29 | 1769500 |
| 11/9/2006 | 10.7 | 11 | 10.69 | 10.75 | 1221600 |
| 11/10/2006 | 10.79 | 10.85 | 10.6 | 10.79 | 584600 |
| 11/13/2006 | 10.74 | 10.99 | 10.74 | 10.9 | 1019500 |
| 11/14/2006 | 10.9 | 10.9 | 10.75 | 10.85 | 329200 |
| 11/15/2006 | 10.82 | 11.58 | 10.82 | 11.46 | 2478400 |
| 11/16/2006 | 11.51 | 11.56 | 11.3 | 11.52 | 637800 |
| 11/17/2006 | 11.45 | 11.89 | 11.3 | 11.89 | 699100 |
| 11/20/2006 | 11.89 | 11.89 | 11.29 | 11.47 | 1091100 |
| 11/21/2006 | 11.58 | 11.76 | 11.5 | 11.63 | 515500 |
| 11/22/2006 | 11.5 | 11.8 | 11.5 | 11.76 | 464600 |
| 11/24/2006 | 11.65 | 11.82 | 11.57 | 11.67 | 225000 |
| 11/27/2006 | 11.65 | 11.68 | 11 | 11.05 | 672000 |
| 11/28/2006 | 11 | 11.27 | 10.7 | 11.25 | 597400 |
| 11/29/2006 | 11.25 | 11.64 | 11.22 | 11.23 | 671100 |
| 11/30/2006 | 11.28 | 11.49 | 11.15 | 11.27 | 659000 |
| 12/1/2006 | 11.23 | 11.77 | 11.21 | 11.6 | 580400 |
| 12/4/2006 | 11.6 | 12.35 | 11.6 | 12.18 | 1315500 |
| 12/5/2006 | 12.25 | 12.45 | 11.98 | 11.99 | 532800 |
| 12/6/2006 | 12.04 | 12.12 | 11.79 | 11.94 | 584800 |
| 12/7/2006 | 12 | 12.18 | 11.77 | 11.92 | 785700 |
| 12/8/2006 | 11.94 | 11.94 | 11.42 | 11.59 | 635500 |
| 12/11/2006 | 11.58 | 11.85 | 11.57 | 11.81 | 610300 |
| 12/12/2006 | 11.85 | 11.85 | 11.55 | 11.72 | 612900 |
| 12/13/2006 | 11.73 | 11.83 | 11.59 | 11.62 | 374300 |
| 12/14/2006 | 11.67 | 11.78 | 11 | 11.1 | 1087100 |
| 12/15/2006 | 11.11 | 11.49 | 11.1 | 11.26 | 654000 |
| 12/18/2006 | 11.25 | 11.44 | 10.92 | 11.14 | 351600 |
| 12/19/2006 | 11.1 | 11.25 | 10.97 | 11.21 | 183100 |
| 12/20/2006 | 11.26 | 11.39 | 11.1 | 11.29 | 537200 |
| 12/21/2006 | 11.33 | 11.39 | 10.88 | 10.95 | 290500 |
| 12/22/2006 | 10.97 | 11.15 | 10.85 | 11.06 | 201300 |
| 12/26/2006 | 11.07 | 11.23 | 10.88 | 11.11 | 246200 |
| 12/27/2006 | 11.11 | 11.29 | 11.02 | 11.17 | 176400 |
| 12/28/2006 | 11.14 | 11.24 | 11.04 | 11.11 | 203300 |
| 12/29/2006 | 11.1 | 11.23 | 10.84 | 11.09 | 299300 |
| 1/3/2007 | 11.06 | 11.2 | 10.56 | 10.66 | 830700 |
| 1/4/2007 | 10.58 | 10.87 | 10.5 | 10.78 | 413200 |
| 1/5/2007 | 10.75 | 10.89 | 10.31 | 10.74 | 488200 |
| 1/8/2007 | 10.71 | 10.73 | 10.35 | 10.64 | 284200 |
| 1/9/2007 | 10.71 | 11.12 | 10.71 | 11.07 | 642700 |
| 1/10/2007 | 11.03 | 11.72 | 11.01 | 11.51 | 752200 |

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 1/11/2007 | 11.55 | 11.67 | 11.35 | 11.45 | 362900 |
| 1/12/2007 | 11.42 | 11.61 | 11.42 | 11.59 | 271000 |
| 1/16/2007 | 11.69 | 11.8 | 11.5 | 11.76 | 296700 |
| 1/17/2007 | 11.69 | 11.83 | 11.55 | 11.58 | 166100 |
| 1/18/2007 | 11.6 | 11.78 | 11.33 | 11.41 | 377300 |
| 1/19/2007 | 11.37 | 11.8 | 11.3 | 11.73 | 200700 |
| 1/22/2007 | 11.69 | 11.89 | 11.67 | 11.83 | 346200 |
| 1/23/2007 | 11.81 | 12.55 | 11.81 | 12.5 | 830700 |
| 1/24/2007 | 12.52 | 13.39 | 12.34 | 13.27 | 1984900 |
| 1/25/2007 | 13.1 | 13.4 | 12.97 | 13.37 | 754400 |
| 1/26/2007 | 13.35 | 13.99 | 13.17 | 13.92 | 1838400 |
| 1/29/2007 | 14 | 14 | 13.4 | 13.74 | 1032100 |
| 1/30/2007 | 13.73 | 13.88 | 13.73 | 13.86 | 752400 |
| 1/31/2007 | 13.76 | 13.93 | 13.68 | 13.88 | 786300 |
| 2/1/2007 | 13.89 | 14.11 | 13.8 | 13.97 | 561200 |
| 2/2/2007 | 13.97 | 14.1 | 13.78 | 14 | 346300 |
| 2/5/2007 | 14 | 14.29 | 14 | 14.2 | 1519300 |
| 2/6/2007 | 14.22 | 14.3 | 14.09 | 14.26 | 552200 |
| 2/7/2007 | 14.31 | 14.43 | 14.18 | 14.36 | 301400 |
| 2/8/2007 | 14.3 | 14.49 | 14.15 | 14.36 | 879300 |
| 2/9/2007 | 14.32 | 14.44 | 14 | 14.16 | 478000 |
| 2/12/2007 | 14.12 | 14.15 | 14.04 | 14.1 | 299600 |
| 2/13/2007 | 14.08 | 14.35 | 14 | 14.26 | 526100 |
| 2/14/2007 | 14.27 | 14.29 | 14.03 | 14.16 | 307800 |
| 2/15/2007 | 14.17 | 14.25 | 14.04 | 14.11 | 298000 |
| 2/16/2007 | 14.15 | 14.15 | 13.65 | 13.85 | 614800 |
| 2/20/2007 | 13.79 | 14.24 | 13.65 | 14.04 | 725300 |
| 2/21/2007 | 13.9 | 14.14 | 13.78 | 13.88 | 450400 |
| 2/22/2007 | 13.95 | 14.13 | 13.9 | 13.99 | 684100 |
| 2/23/2007 | 13.31 | 13.77 | 13.2 | 13.25 | 2694500 |
| 2/26/2007 | 13.24 | 13.24 | 12.7 | 12.79 | 1455600 |
| 2/27/2007 | 12.5 | 12.55 | 12.02 | 12.08 | 1458100 |
| 2/28/2007 | 12.06 | 12.44 | 12 | 12.43 | 1660700 |
| 3/1/2007 | 12.05 | 12.42 | 12.05 | 12.28 | 1140600 |
| 3/2/2007 | 12.27 | 12.38 | 12.07 | 12.21 | 1057000 |
| 3/5/2007 | 12.07 | 12.11 | 11.58 | 11.63 | 545000 |
| 3/6/2007 | 11.69 | 11.77 | 11.26 | 11.34 | 1266400 |
| 3/7/2007 | 11.44 | 11.76 | 11.33 | 11.54 | 2077000 |
| 3/8/2007 | 11.64 | 11.85 | 11.36 | 11.69 | 578500 |
| 3/9/2007 | 11.6 | 11.88 | 11.6 | 11.72 | 412200 |
| 3/12/2007 | 11.7 | 11.89 | 11.69 | 11.79 | 453100 |
| 3/13/2007 | 11.54 | 11.86 | 11.54 | 11.63 | 772700 |
| 3/14/2007 | 11.57 | 11.91 | 11.57 | 11.81 | 652600 |
| 3/15/2007 | 11.76 | 11.86 | 11.64 | 11.84 | 524400 |

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 3/16/2007 | 11.86 | 11.97 | 11.61 | 11.8 | 437200 |
| 3/19/2007 | 11.78 | 11.98 | 11.19 | 11.36 | 591000 |
| 3/20/2007 | 11.4 | 11.48 | 10.89 | 10.9 | 999400 |
| 3/21/2007 | 10.98 | 11.16 | 10.81 | 11 | 933400 |
| 3/22/2007 | 11.05 | 11.05 | 10.81 | 10.82 | 913200 |
| 3/23/2007 | 10.85 | 10.88 | 10.73 | 10.8 | 521700 |
| 3/26/2007 | 10.75 | 10.79 | 10.65 | 10.7 | 335800 |
| 3/27/2007 | 10.65 | 10.79 | 10.62 | 10.69 | 278800 |
| 3/28/2007 | 10.74 | 10.74 | 10.36 | 10.45 | 926900 |
| 3/29/2007 | 10.61 | 10.8 | 10.4 | 10.67 | 390900 |
| 3/30/2007 | 10.66 | 10.91 | 10.63 | 10.9 | 330300 |
| 4/2/2007 | 10.6 | 10.76 | 10.32 | 10.36 | 553900 |
| 4/3/2007 | 9.4 | 9.93 | 8.99 | 9.15 | 4435500 |
| 4/4/2007 | 9.15 | 9.9 | 9.15 | 9.5 | 1416000 |
| 4/5/2007 | 9.65 | 10.19 | 9.48 | 9.84 | 864400 |
| 4/9/2007 | 9.86 | 10.3 | 9.86 | 10.14 | 811700 |
| 4/10/2007 | 10.09 | 10.65 | 10.02 | 10.56 | 512000 |
| 4/11/2007 | 10.65 | 11 | 10.54 | 10.71 | 836000 |
| 4/12/2007 | 10.65 | 10.65 | 10.42 | 10.53 | 469400 |
| 4/13/2007 | 10.49 | 10.49 | 10.1 | 10.17 | 671000 |
| 4/16/2007 | 10.2 | 10.48 | 10.12 | 10.25 | 483800 |
| 4/17/2007 | 10.24 | 10.42 | 9.96 | 10.11 | 317800 |
| 4/18/2007 | 9.95 | 9.95 | 9.77 | 9.82 | 533500 |
| 4/19/2007 | 9.93 | 10 | 9.66 | 9.98 | 368000 |
| 4/20/2007 | 10.08 | 10.08 | 9.84 | 9.99 | 631900 |
| 4/23/2007 | 9.99 | 10.02 | 9.87 | 9.91 | 287800 |
| 4/24/2007 | 10 | 10.04 | 9.73 | 9.96 | 615200 |
| 4/25/2007 | 10.01 | 10.01 | 9.72 | 9.96 | 391700 |
| 4/26/2007 | 10.01 | 10.18 | 9.95 | 10.04 | 505000 |
| 4/27/2007 | 10 | 10.23 | 9.8 | 9.94 | 523900 |
| 4/30/2007 | 9.97 | 10.02 | 9.47 | 9.54 | 504600 |
| 5/1/2007 | 9.53 | 9.57 | 9.05 | 9.13 | 897100 |
| 5/2/2007 | 9.11 | 9.41 | 9.1 | 9.36 | 657800 |
| 5/3/2007 | 9.34 | 9.4 | 8.45 | 8.54 | 1305700 |
| 5/4/2007 | 8.44 | 8.5 | 7.38 | 7.9 | 3865600 |
| 5/7/2007 | 7.91 | 8.24 | 7.91 | 7.96 | 938200 |
| 5/8/2007 | 7.95 | 8.42 | 7.95 | 8.34 | 858600 |
| 5/9/2007 | 8.25 | 8.41 | 8.1 | 8.21 | 584900 |
| 5/10/2007 | 8.16 | 8.19 | 7.95 | 8 | 377300 |
| 5/11/2007 | 8.03 | 8.4 | 7.96 | 8.29 | 206100 |
| 5/14/2007 | 8.26 | 8.33 | 7.7 | 7.84 | 371300 |
| 5/15/2007 | 7.81 | 7.87 | 7.45 | 7.66 | 740200 |
| 5/16/2007 | 7.67 | 7.73 | 7.48 | 7.58 | 942800 |
| 5/17/2007 | 7.55 | 7.6 | 7.4 | 7.56 | 474100 |

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 5/18/2007 | 7.63 | 8.01 | 7.51 | 8.01 | 681100 |
| 5/21/2007 | 7.8 | 8.14 | 7.8 | 8.02 | 333200 |
| 5/22/2007 | 8.01 | 8.01 | 7.86 | 7.89 | 380900 |
| 5/23/2007 | 7.9 | 8.07 | 7.85 | 7.93 | 597000 |
| 5/24/2007 | 7.91 | 8.11 | 7.9 | 8.09 | 293600 |
| 5/25/2007 | 8.16 | 8.71 | 8.06 | 8.38 | 645200 |
| 5/29/2007 | 8.49 | 9.25 | 8.34 | 8.96 | 488100 |
| 5/30/2007 | 8.89 | 8.98 | 8.65 | 8.91 | 399200 |
| 5/31/2007 | 8.84 | 8.97 | 8.65 | 8.76 | 462200 |
| 6/1/2007 | 8.87 | 9.5 | 8.87 | 9.5 | 1035100 |
| 6/4/2007 | 9.45 | 9.45 | 8.74 | 8.9 | 775500 |
| 6/5/2007 | 8.85 | 9.05 | 8.64 | 8.66 | 404900 |
| 6/6/2007 | 8.64 | 8.7 | 8.43 | 8.5 | 253700 |
| 6/7/2007 | 8.45 | 8.45 | 8 | 8.12 | 463200 |
| 6/8/2007 | 8.14 | 8.33 | 8.1 | 8.12 | 438700 |
| 6/11/2007 | 8.21 | 8.21 | 7.92 | 8 | 303400 |
| 6/12/2007 | 7.94 | 8.07 | 7.69 | 7.84 | 253300 |
| 6/13/2007 | 7.83 | 7.83 | 7.46 | 7.5 | 707000 |
| 6/14/2007 | 7.5 | 7.93 | 7.5 | 7.57 | 586700 |
| 6/15/2007 | 7.84 | 7.84 | 7.45 | 7.61 | 532300 |
| 6/18/2007 | 7.65 | 7.71 | 7.5 | 7.58 | 496200 |
| 6/19/2007 | 7.53 | 7.71 | 7.43 | 7.6 | 670700 |
| 6/20/2007 | 7.6 | 7.66 | 6.5 | 6.63 | 3385500 |
| 6/21/2007 | 6.6 | 6.67 | 5.94 | 5.97 | 3572100 |
| 6/22/2007 | 5.75 | 5.89 | 5.07 | 5.18 | 4768400 |
| 6/25/2007 | 5.23 | 5.23 | 4.8 | 4.85 | 1975700 |
| 6/26/2007 | 4.85 | 4.98 | 4.69 | 4.78 | 1367700 |
| 6/27/2007 | 4.68 | 4.84 | 4.62 | 4.8 | 1659500 |
| 6/28/2007 | 4.78 | 4.83 | 4.57 | 4.6 | 1924800 |
| 6/29/2007 | 4.6 | 4.74 | 4.47 | 4.68 | 1525100 |
| 7/2/2007 | 4.68 | 4.69 | 4.35 | 4.44 | 1792400 |
| 7/3/2007 | 4.42 | 4.44 | 4.34 | 4.38 | 857200 |
| 7/5/2007 | 4.42 | 4.77 | 4.38 | 4.66 | 1278400 |
| 7/6/2007 | 4.66 | 5.09 | 4.6 | 5.04 | 692500 |
| 7/9/2007 | 5.02 | 5.28 | 5 | 5.14 | 637600 |
| 7/10/2007 | 5.09 | 5.13 | 4.93 | 4.96 | 415100 |
| 7/11/2007 | 5.01 | 5.01 | 4.82 | 4.87 | 431700 |
| 7/12/2007 | 4.91 | 5.21 | 4.85 | 5.12 | 1797600 |
| 7/13/2007 | 5.16 | 5.23 | 5.11 | 5.16 | 228300 |
| 7/16/2007 | 5.12 | 5.36 | 5.07 | 5.34 | 503100 |
| 7/17/2007 | 5.35 | 5.35 | 5.15 | 5.25 | 1152600 |
| 7/18/2007 | 5.22 | 5.29 | 5.07 | 5.17 | 919400 |
| 7/19/2007 | 5.22 | 5.3 | 5.16 | 5.2 | 423200 |
| 7/20/2007 | 5.23 | 5.23 | 4.81 | 4.91 | 469300 |

| Date | Open | High | Low | Close | Volume |
|---|---|---|---|---|---|
| 7/23/2007 | 4.92 | 5.05 | 4.74 | 4.75 | 297600 |
| 7/24/2007 | 4.73 | 4.89 | 4.72 | 4.75 | 304900 |
| 7/25/2007 | 4.8 | 4.96 | 4.62 | 4.73 | 406400 |
| 7/26/2007 | 4.69 | 4.7 | 4.15 | 4.21 | 899800 |
| 7/27/2007 | 4.3 | 4.44 | 4.16 | 4.24 | 440500 |
| 7/30/2007 | 4.21 | 4.35 | 4.18 | 4.18 | 632400 |
| 7/31/2007 | 4.24 | 4.27 | 3.11 | 3.6 | 1912800 |
| 8/1/2007 | 3.58 | 3.85 | 3.53 | 3.67 | 883500 |
| 8/2/2007 | 3.64 | 3.73 | 3.26 | 3.38 | 965100 |
| 8/3/2007 | 3.42 | 3.42 | 3.15 | 3.18 | 803500 |
| 8/6/2007 | 3.05 | 3.13 | 2.53 | 2.69 | 1834400 |
| 8/7/2007 | 2.93 | 2.93 | 2.51 | 2.69 | 2916800 |
| 8/8/2007 | 2.73 | 4.18 | 2.73 | 3.97 | 2546500 |
| 8/9/2007 | 3.9 | 5.1 | 3.9 | 4.86 | 3510400 |
| 8/10/2007 | 3.82 | 4.64 | 3.32 | 3.5 | 2778700 |
| 8/13/2007 | 3.7 | 4.1 | 2.96 | 3.04 | 1720900 |
| 8/14/2007 | 2.75 | 2.92 | 2.55 | 2.74 | 2574900 |
| 8/15/2007 | 2.77 | 3.07 | 2.75 | 2.88 | 2318000 |
| 8/16/2007 | 2.84 | 3.05 | 2.52 | 2.84 | 1590800 |
| 8/17/2007 | 3.15 | 3.15 | 2.79 | 2.82 | 750800 |
| 8/20/2007 | 2.84 | 2.98 | 2.8 | 2.88 | 718800 |
| 8/21/2007 | 2.93 | 3.47 | 2.88 | 3.18 | 988000 |
| 8/22/2007 | 3.31 | 3.4 | 3.1 | 3.24 | 582100 |
| 8/23/2007 | 3.26 | 3.38 | 3.05 | 3.13 | 178200 |
| 8/24/2007 | 3.14 | 3.22 | 3.06 | 3.17 | 542500 |
| 8/27/2007 | 3.17 | 3.2 | 3.02 | 3.1 | 367900 |
| 8/28/2007 | 3.08 | 3.1 | 2.9 | 2.9 | 719200 |
| 8/29/2007 | 2.93 | 3.06 | 2.91 | 2.95 | 607000 |
| 8/30/2007 | 2.96 | 3.15 | 2.92 | 3.05 | 586700 |
| 8/31/2007 | 3.13 | 3.35 | 3.06 | 3.34 | 649700 |
| 9/4/2007 | 3.33 | 3.7 | 3.32 | 3.55 | 1017700 |
| 9/5/2007 | 3.57 | 3.57 | 3.41 | 3.42 | 492700 |
| 9/6/2007 | 3.4 | 3.47 | 3.15 | 3.21 | 533900 |
| 9/7/2007 | 3.16 | 3.18 | 2.93 | 3.11 | 514000 |
| 9/10/2007 | 3.12 | 3.16 | 2.91 | 3.06 | 299700 |
| 9/11/2007 | 3.05 | 3.09 | 2.8 | 2.83 | 1303400 |
| 9/12/2007 | 2.83 | 2.84 | 2.72 | 2.75 | 1076300 |
| 9/13/2007 | 2.75 | 2.82 | 2.69 | 2.69 | 549000 |
| 9/14/2007 | 2.7 | 2.79 | 2.56 | 2.67 | 583200 |
| 9/17/2007 | 2.69 | 2.72 | 2.58 | 2.62 | 355100 |
| 9/18/2007 | 2.63 | 2.73 | 2.55 | 2.67 | 325300 |
| 9/19/2007 | 2.69 | 2.75 | 2.64 | 2.64 | 690300 |
| 9/20/2007 | 2.67 | 2.7 | 2.65 | 2.69 | 223800 |
| 9/21/2007 | 2.73 | 2.73 | 2.55 | 2.63 | 820800 |

| Date | Open | High | Low | Close | Volume |
|---|---|---|---|---|---|
| 9/24/2007 | 2.78 | 3.16 | 2.61 | 2.66 | 1937100 |
| 9/25/2007 | 2.7 | 3.04 | 2.67 | 2.93 | 1925000 |
| 9/26/2007 | 2.97 | 3.2 | 2.94 | 2.99 | 983400 |
| 9/27/2007 | 2.99 | 3.05 | 2.95 | 2.97 | 373000 |
| 9/28/2007 | 2.99 | 3 | 2.75 | 2.77 | 751900 |
| 10/1/2007 | 2.79 | 2.92 | 2.65 | 2.78 | 728700 |
| 10/2/2007 | 2.79 | 2.92 | 2.67 | 2.67 | 638700 |
| 10/3/2007 | 2.65 | 2.73 | 2.53 | 2.54 | 1085100 |
| 10/4/2007 | 2.55 | 2.62 | 2.05 | 2.21 | 2574600 |
| 10/5/2007 | 2.22 | 2.44 | 2.15 | 2.44 | 753700 |
| 10/8/2007 | 2.46 | 2.55 | 2.4 | 2.51 | 796900 |
| 10/9/2007 | 2.53 | 2.53 | 2.03 | 2.17 | 2503100 |
| 10/10/2007 | 2.2 | 2.2 | 1.86 | 1.94 | 2099600 |
| 10/11/2007 | 1.96 | 2.04 | 0.4 | 0.77 | 22738400 |

# EXHIBIT I

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 8-K/A

---

### CURRENT REPORT

## Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

#### Date of Report (Date of earliest event reported): April 2, 2007

---

# INPHONIC, INC.
**(Exact name of registrant as specified in its charter)**

---

| **Delaware** | **000-51023** | **52-2199384** |
|---|---|---|
| **(State or other jurisdiction of incorporation)** | **(Commission File Number)** | **(IRS Employer Identification No.)** |

**1010 Wisconsin Avenue, Suite 600, Washington, DC**  **20007**
**(Address of principal executive offices)**  **(ZIP Code)**

### Registrant's telephone number, including area code: (202) 333-0001
**(Former name or former address, if changed since last report.)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 4.02.    Non-Reliance On Previously Issued Financial Statements Or A Related Audit Report Or Completed Interim Review.**

The following includes an update of the information first disclosed in the Company's Form 8-K dated April 2, 2007.

The Company's Audit Committee has conducted additional review using the services of independent counsel and other experts with respect to the matters identified below. It is the conclusion of the Audit Committee that these matters resulted from misapplication of GAAP; improperly recognized revenue and improperly deferred expenses; inadequate controls and insufficient processes, procedures and expertise. In response, the Company is currently developing and implementing a remediation plan, which will include a reorganization of the finance and accounting functions within the Company.

**Fiscal Year 2006**

On April 2, 2007, the Company's management and Audit Committee concluded that the Company's unaudited financial statements for the quarterly periods ended June 30, 2006 and September 30, 2006 each as filed on Form 10-Q (the "2nd and 3rd Quarter Financials") as well as the unaudited financial results for the quarter and year-ended December 31, 2006 included in the Company's earnings release issued on February 22, 2007 (the "Year End Results") should no longer be relied upon as a result of certain errors discovered subsequent to the issuance of the Year End Results. At this time the Company has identified the matters set forth below which will require changes to the 2nd and 3rd Quarter Financials and unaudited Year End Results. Certain additional matters are also subject to an ongoing review. The matters for which changes will be required are:

- In 2006, the Company recorded net activation and services revenue of approximately $16 million related to certain carrier commissions and bonuses which it had deemed collectible. The Company now believes that it was inappropriate to have recorded revenue associated with these matters until such collections are received. The Company will continue its efforts to collect amounts outstanding and will record related receipts as revenue at the time of collection.

- The Company has identified a deficiency in its process for recording certain fees due from consumers when contracts are canceled within specified time periods or the wireless device is not returned to the Company as is required under the contract with the customer ("Equipment Discount Provisions" or "EDPs"). The Company believes that $2.5 million in revenue originally recorded as being earned and the related accounts receivable amount should be reduced to be reflective of such historical experience without regard to improvements in collections expected in the future from additional collection processes being employed. If the Company ultimately is able to collect on or sell these pools of consumer receivables at a more favorable rate, a gain may be recorded at the time of such collection or sale, subject to the terms of the agreements. The Company has identified a third party marketplace for the sale of its EDP receivables and is actively marketing these assets.

- The Company has identified an error in the recording of accrued expenses and reserves for consumer product rebates totaling $4.9 million. These amounts should have been recorded as either an expense or reduction to equipment revenue in 2006. The Company believes that $3.3 million of the total adjustment is related to additional expenses for rebates paid to consumers as "goodwill" prior to its settlement with the Attorney General of the District of Columbia.

- The Company has identified other accounting adjustments of approximately $3 million, net, related to the correction of certain equipment expenses, sales and marketing expenses, and general and administrative expenses associated with accruals of professional fees, unbilled inventory, the write-off of certain assets on the balance sheet, and other adjustments.

The Company expects to amend the previously filed Form 10-Qs for the 2nd and 3rd Quarter Financials and the Year End Results with an aggregate impact greater than anticipated at the time of the Company's original April 2, 2007 Form 8-K filing. The Company currently expects that it will increase its previously reported net loss to reflect an aggregate net loss of approximately $43 million to $49 million for the year. A portion of these adjustments should be mitigated by dollars that have already been reserved. The foregoing continues to be an estimate and is subject to change until the Company's outside audit is complete. In addition, given the adjustments and errors identified to date as described above and the ongoing audit of 2006, the Company's management and Audit Committee have concluded that the unaudited financial statements for the quarter ended March 31, 2006 should no longer be relied upon. At the present time, no matters have come to the Company's attention that would result in a restatement of the March 31, 2006 financial statements. The Company expects to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2006 within two to three weeks. The Company will file its restated financial statements for the quarterly periods ended June 30, 2006, and September 30, 2006, as well as its Form 10-Q for the first quarter of 2007 together with the filing of the Annual Report on Form 10-K.

Additionally, the Company has identified six material weaknesses in its internal controls over financial reporting. At the entity level, management identified a material weakness in its control environment because it lacked a sufficient number of employees with appropriate levels of knowledge, expertise and training in the application of generally accepted accounting principles in certain groups. At the transactional level, due to the lack of sufficient personnel, the Company was unable to properly perform certain accounting procedures in a timely manner relating to the recording of carrier commissions. Additionally, the Company inappropriately recorded receivables from the carriers that were not supported by historical experience. Also, the Company identified a material weakness in its process for recording revenue relating to EDPs as well as a material weakness due to a failure within the Company to effectively communicate information to its finance department necessary to record certain marketing expenses on a timely basis. Finally, the Company did not utilize an appropriate methodology for recording consumer product rebates. The Company will be required to provide an assessment of the effectiveness of the Company's internal control structure and procedures for financial reporting when it files its Annual Report on Form 10-K for the fiscal year ended December 31, 2006. Management has already taken some action to remediate the material weaknesses described above based on an evaluation of the accounting staffing, systems, policies and procedures relating to revenue recognition, however, our efforts to remediate deficiencies surrounding the levels of our staffing and related levels of expertise may take some time to remediate over the next several quarters.

**Fiscal Year 2005**

In addition to the 2006 issues discussed above, the Company has identified an error regarding a marketing expense of approximately $1.2 million that should have been recorded in the quarter and year ended December 31, 2005. Of such amount, $600,000 was recorded in the quarter ended December 31, 2006. If it had been properly recorded, such additional expense would have increased the Company's net loss for the quarter ended December 31, 2005 from approximately $24.8 million to approximately $26.0 million. As a result of this new disclosure, on May 1, 2007, the Company's management and Audit Committee concluded that the Company's audited financial statements for the fiscal year ended December 31, 2005 should no longer be relied upon. The Company and the Audit Committee are continuing their review and have not yet determined whether a restatement of financial results for the year ended December 31, 2005 will be required. As a result of its review the Company may discover additional errors to its previously filed financial statements.

The Company's management and its Audit Committee have discussed the matters described in this Form 8-K/A with Grant Thornton LLP, the Company's independent registered public accounting firm.

**Item 8.01    Other Items**

The Company has entered into amendments to its Credit Agreement dated November 7, 2006 with Goldman Sachs Credit Partners L.P. ("Goldman Sachs"), as Lead Arranger, Lead Bookrunner and Lead Syndication Agent, Citicorp North America, Inc., as Administrative Agent, and the lenders from time to time party thereto which have provided, among other matters, that the Company has until May 31, 2007 to comply with covenants requiring delivery of full-year audited financial statements for fiscal 2006.

**Business Update**

- The Company had total activation transactions of approximately 380,000 of wireless phones and other services for the first quarter of 2007 and

- The Company now expects to pass the milestone of 1,000,000 residual subscribers by mid-year 2007.

  Note that these are key business indicators only and the Company expects to update its financials results when the Company files its Form 10-Q for the first quarter of 2007.

Note: Certain statements in this Current Report on Form 8-K concerning InPhonic's revenue restatement, results or prospects are "forward-looking statements" under the Private Securities Litigation Reform Act of 1995. There can be no assurances that forward-looking statements will be achieved, and actual events or results could differ materially from the events or results predicted or from any other forward-looking statements made by, or on behalf of, InPhonic, and should not be considered as an indication of future events or results. Important factors that could cause actual events or results to differ materially include: the completion of our restatement, which could result in changes in revenue and losses reported for the quarterly periods ended June 30, 2006, September 30, 2006 and December 31, 2006 and year-ended December 31, 2006 that differ from the amounts disclosed herein; the completion of the review of the fiscal year ended December 31, 2005; our ability to complete the restatement in a timely manner and timely file all required reports under the Securities Exchange Act of 1934; our ability to maintain our NASDAQ Global Markets listing; our ability to remediate the material weaknesses in internal controls over financial reporting; our fluctuating operating results, seasonality in our business, our ability to acquire products on reasonable terms, our online business model, demand for our products, the strength of our brand, competition, our ability to fulfill orders; and other risks described in filings with the Securities and Exchange Commission. InPhonic makes no commitment to revise or update any forward-looking statements in order to reflect changes in events or circumstances after the date any such statement is made, except as may be required pursuant to applicable law.

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**INPHONIC, INC.**

/s/ Lawrence S. Winkler
Name: Lawrence S. Winkler
Title:   Chief Financial Officer, Executive Vice
          President and Treasurer

/s/ David A. Steinberg
Name: David A. Steinberg
Title:   Chairman and Chief Executive Officer

Date: May 3, 2007

# EXHIBIT J

# FORM 4

[ ] Check this box if no
longer subject to Section 16.
Form 4 or Form 5
obligations may continue.
*See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden
hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **Steinberg David** <br> (Last)      (First)      (Middle) | **INPHONIC INC [ INPC ]** | __ X __ Director                     __ X __ 10% Owner |
| **1010 WISCONSIN AVENUE, NW, SUITE 600** <br> (Street) | 3. Date of Earliest Transaction (MM/DD/YYYY) <br><br> **2/27/2007** | __ X __ Officer (give title below)    _____ Other (specify below) <br> **Chairman of the Board and CEO** |
| **WASHINGTON, DC 20007** <br> (City)      (State)      (Zip) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) <br> _ X _ Form filed by One Reporting Person <br> ___ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| **Common Stock** | 2/27/2007 | | F (1) | | 2147 | D | $0 | 4085093 | D | |
| **Common Stock** | | | | | | | | 50000 | I | See Note (2) |
| **Common Stock** | | | | | | | | 296817 | I | See Note (3) |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

( **1** )  Restricted Stock withheld by Issuer to satisfy tax withholding obligation on vesting of restricted stock.

( **2** )  Shares held by family-owned limited liability company created for estate planning purposes. Mr. Steinberg has voting and dispositive power with respect to these shares.

( **3** )  Shares held by the 2002 BB&LB Trust dated June 24, 2002. Mr. Steinberg shares dispositive and voting control over these shares. Mr. Steinberg disclaims beneficial ownership of these shares.

**Remarks:**
The total for all Common Stock directly and indirectly owned by Mr. Steinberg and all Common Stock subject to options held by Mr. Steinberg is 4,801,760 shares. (This excludes the 296,817 shares held by the BB&LB Trust dated June 24, 2002. Mr. Steinberg disclaims beneficial ownership of these shares.)

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| **Steinberg David**<br>**1010 WISCONSIN AVENUE, NW**<br><br>**SUITE 600**<br>**WASHINGTON, DC 20007** | **X** | **X** | **Chairman of the Board and CEO** | |

**Signatures**

| | |
|---|---|
| **Walter W. Leach, III, Attorney-in-Fact** | **3/1/2007** |
| \*\* Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*       If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

# EXHIBIT K

# FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue.
*See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden hours per response... 0.5

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **WINKLER LAWRENCE** <br><br> (Last)   (First)   (Middle) <br><br> **1010 WISCONSIN AVENUE, NW, SUITE 600** <br> (Street) <br><br> **WASHINGTON, DC 20007** <br> (City)   (State)   (Zip) | **INPHONIC INC [ INPC ]** <br><br> 3. Date of Earliest Transaction (MM/DD/YYYY) <br><br> **9/14/2005** <br><br><br> 4. If Amendment, Date Original Filed (MM/DD/YYYY) | ____ Director  _____ 10% Owner <br> _ **X** _ Officer (give title below)  _____ Other (specify below) <br> **CFO, EVP and Treasurer** <br><br> 6. Individual or Joint/Group Filing (Check Applicable Line) <br> _ **X** _ Form filed by One Reporting Person <br> ___ Form filed by More than One Reporting Person |

## Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| **Common Stock** | 9/14/2005 | | A | | 50000 | A | (1) | 250000 | D | |

## Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

( 1)  Mr. Winkler was granted 50,000 shares of restricted common stock by the Compensation Committee of the Board of Directors on September 14, 2005. The shares will vest over a four-year period, such that 25% of the shares will vest on the first anniversary of the September 14, 2005 vesting commencement date, and the remainder will vest ratably every 90 days over the remaining three-year period.

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| **WINKLER LAWRENCE** <br> **1010 WISCONSIN AVENUE, NW** <br><br> **SUITE 600** <br> **WASHINGTON, DC 20007** | | | **CFO, EVP and Treasurer** | |

**Signatures**

**Walter W. Leach, III, Attorney in Fact**                    **9/15/2005**

    ** Signature of Reporting Person                       Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*        If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

# EXHIBIT L



**FORM 4**

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue.
*See* Instruction 1(b).

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

OMB APPROVAL

OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden
hours per response... 0.5

### STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **WINKLER LAWRENCE** <br> (Last)   (First)   (Middle) <br><br> **1010 WISCONSIN AVENUE, NW, SUITE 600** <br> (Street) <br><br> **WASHINGTON, DC 20007** <br> (City)   (State)   (Zip) | **INPHONIC INC [ INPC ]** <br><br> 3. Date of Earliest Transaction (MM/DD/YYYY) <br><br> **2/27/2007** <br><br> 4. If Amendment, Date Original Filed (MM/DD/YYYY) | ____ Director          _____ 10% Owner <br> _ **X** __ Officer (give title below)    _____ Other (specify below) <br> **CFO, EVP and Treasurer** <br><br> 6. Individual or Joint/Group Filing (Check Applicable Line) <br> _ **X** _ Form filed by One Reporting Person <br> ___ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| **Common Stock** | 2/27/2007 | | F | (1) | 4872 | D | $12.79 | 342444 | D | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

( **1** )   Restricted stock withheld by Issuer to satisfy tax withholding obligation on vesting of restricted stock.

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| **WINKLER LAWRENCE** <br> **1010 WISCONSIN AVENUE, NW** <br><br> **SUITE 600** <br> **WASHINGTON, DC 20007** | | | **CFO, EVP and Treasurer** | |

**Signatures**

| | |
|---|---|
| **Walter W. Leach, III, Attorney-in-Fact** | **3/1/2007** |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*       If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

# EXHIBIT M

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# Form 10-Q/A
**(Amendment No. 1)**

---

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES AND EXCHANGE ACT OF 1934**

**For the quarter ended March 31, 2006**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____ .**

**Commission File Number 000-51023**

---

# INPHONIC, INC.
**(Exact name of Registrant as specified in its Charter)**

---

| | |
|---|---|
| **Delaware** | **52-2199384** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer identification no.)** |
| **1010 Wisconsin Avenue, Suite 600, Washington, DC** | **20007** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code: (202) 333-0001**

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒ .  No ☐ .

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐      Accelerated filer ☒      Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act.).   Yes ☐ .   No ☒ .

The registrant had 35,835,157 shares of common stock outstanding as of April 28, 2006.

Table of Contents

## EXPLANATORY NOTE

We filed our Quarterly Report on From 10-Q for the three months ended March 31, 2006 with the Securities and Exchange Commission (the "SEC") on May 10, 2006. We are filing this Form 10-Q/A Amendment No. 1 to amend and restate our unaudited financial statements for the three months ended March 31, 2006 and related footnote disclosures to correct errors in our accounting for activations and services revenue identified during the year-end audit. These adjustments reduced our activation and services revenue and increased our net loss by $393,000 for the three months ended March 31, 2006. Our net loss per share for the three months ended March 31, 2006 increased $0.01 to ($0.12) per share.

All referenced amounts in this report as of and for the three months ended March 31, 2006 reflect balances and amounts on a restated basis. All of our future Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q and Form 10-Q/A will reflect the restated information in this Form 10-Q/A, as applicable.

This Amendment No. 1 to our Quarterly Report on Form 10-Q for the three months ended March 31, 2006 amends only the following items:

Part I, Item 1 – Financial Statements

Part I, Item 2 – Management's Discussion and Analysis of Financial Condition and Results of Operations

Part I, Item 4 – Controls and Procedures

Part II, Item 6 – Exhibits and reports on Form 8-K

## INPHONIC, INC.

## INDEX

## FORM 10-Q

## PART I. – FINANCIAL INFORMATION

| | | Page |
|---|---|---|
| Item 1. | Financial Statements | 3 |
| | Unaudited Condensed Consolidated Balance Sheets at December 31, 2005 and March 31, 2006 | 3 |
| | Unaudited Condensed Consolidated Statements of Operations for the Three Months Ended March 31, 2005 and March 31, 2006 | 4 |
| | Unaudited Condensed Consolidated Statements of Stockholders' Equity for the Three Months Ended March 31, 2006 | 5 |
| | Unaudited Condensed Consolidated Statements of Cash Flows for the Three Months Ended March 31, 2005 and March 31, 2006 | 6 |
| | Notes to Unaudited Condensed Consolidated Financial Statements | |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 15 |
| Item 4. | Controls and Procedures | 24 |

## PART II. – OTHER INFORMATION

| | | |
|---|---|---|
| Item 6. | Exhibits | 25 |
| SIGNATURES | | 26 |

2

Table of Contents

PART I

ITEM 1.    FINANCIAL STATEMENTS

### INPHONIC, INC. & SUBSIDIARIES
Condensed Consolidated Balance Sheets
(in thousands, except per share and share amounts)

| | December 31, 2005 | March 31, 2006 (restated) (unaudited) |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 70,783 | $ 63,854 |
| Short-term investments | — | 5,000 |
| Accounts receivable, net of allowance of $2,042 and $1,695, respectively | 34,606 | 34,823 |
| Inventory, net | 17,693 | 23,079 |
| Prepaid expenses | 2,405 | 3,417 |
| Other current assets | 6,823 | 2,821 |
| Current assets of discontinued operations | 2,430 | 1,527 |
| Total current assets | 134,740 | 134,521 |
| Restricted cash and cash equivalents | 400 | — |
| Property and equipment, net | 12,121 | 14,032 |
| Goodwill | 31,140 | 34,125 |
| Intangible assets, net | 12,651 | 11,606 |
| Deposits and other assets | 3,058 | 3,745 |
| Total assets | $ 194,110 | $ 198,029 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Current maturities of long-term debt and capital leases | $ 377 | $ 15,385 |
| Accounts payable | 29,556 | 38,721 |
| Accrued expenses and other liabilities | 31,588 | 29,457 |
| Deferred revenue | 14,135 | 13,929 |
| Current liabilities of discontinued operations | 3,130 | 1,681 |
| Total current liabilities | 78,786 | 99,173 |
| Long term debt and capital lease obligations, net of current maturities | 15,474 | 385 |
| Total liabilities | 94,260 | 99,558 |
| Stockholders' equity: | | |
| Common stock, $0.01 par value | | |
| Authorized 200,000,000 shares at December 31, 2005 and March 31, 2006; issued and outstanding 35,232,869 and 35,356,326 shares at December 31, 2005 and March 31, 2006, respectively | 353 | 354 |
| Additional paid-in capital | 264,155 | 267,088 |
| Accumulated deficit | (164,658) | (168,971) |
| Total stockholders' equity | 99,850 | 98,471 |
| Total liabilities and stockholders' equity | $ 194,110 | $ 198,029 |

See accompanying notes to unaudited condensed consolidated financial statements

3

Table of Contents

**INPHONIC, INC. & SUBSIDIARIES**
**Unaudited Condensed Consolidated Statements of Operations**
**(in thousands, except per share and share amounts)**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2005 | 2006 |
| | | (restated) |
| Revenue: | | |
|     Activations and services | $ 49,751 | $ 66,742 |
|     Equipment | 18,400 | 20,236 |
|         Total revenue | 68,151 | 86,978 |
| Cost of revenue, exclusive of depreciation and amortization: | | |
|     Activations and services | 1,173 | 260 |
|     Equipment | 38,950 | 47,921 |
|         Total cost of revenue | 40,123 | 48,181 |
| Operating expenses: | | |
|     Sales and marketing, exclusive of depreciation and amortization | 17,498 | 26,722 |
|     General and administrative, exclusive of depreciation and amortization | 16,278 | 13,231 |
|     Depreciation and amortization | 1,777 | 3,483 |
|     Restructuring costs | 149 | — |
|         Total operating expenses | 35,702 | 43,436 |
| Operating loss | (7,674) | (4,639) |
| Other income (expense): | | |
|     Interest income | 482 | 627 |
|     Interest expense | (226) | (336) |
|         Total other income | 256 | 291 |
|         Loss from continuing operations | (7,418) | (4,348) |
| Discontinued operations: | | |
|     Income from discontinued operations | 424 | 35 |
|     Net loss | $ (6,994) | $ (4,313) |
| Basic and diluted net loss per share: | | |
|     Net loss from continuing operations | $ (0.22) | $ (0.12) |
|     Net income from discontinued operations | 0.01 | 0.00 |
|     Basic and diluted net loss per share | $ (0.21) | $ (0.12) |
|     Basic and diluted weighted average shares outstanding | 32,901,398 | 35,348,335 |

See accompanying notes to unaudited condensed consolidated financial statements

4

**Table of Contents**

**INPHONIC, INC. & SUBSIDIARIES**
**Unaudited Condensed Consolidated Statements of Stockholders' Equity**
**(in thousands, except share amounts)**

| | Common stock | | Additional paid-in capital | Accumulated deficit (restated) | Total |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| **Balance, December 31, 2005** | 35,232,869 | $ 353 | $264,155 | $ (164,658) | $99,850 |
| Stock-based compensation expense | — | — | 3,002 | — | 3,002 |
| Repurchase and retirement of common stock | (62,761) | (1) | (502) | — | (503) |
| Exercise of common stock options, restricted stock awards, and other | 186,218 | 2 | 433 | — | 435 |
| Net loss | — | — | — | (4,313) | (4,313) |
| **Balance, March 31, 2006 (restated)** | 35,356,326 | $ 354 | $267,088 | $ (168,971) | $98,471 |

See accompanying notes to unaudited condensed consolidated financial statements

5

Table of Contents

**INPHONIC, INC. & SUBSIDIARIES**
**Unaudited Condensed Consolidated Statements of Cash Flows**
**(in thousands)**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2005 | 2006 |
| | | (restated) |
| Cash flows from operating activities: | | |
| Net loss | $ (6,994) | $ (4,313) |
| Adjustments to reconcile net loss to net cash provided (used) by operating activities: | | |
| Depreciation and amortization | 1,777 | 3,483 |
| Non-cash interest expense, net | 162 | 16 |
| Stock-based compensation | 7,004 | 2,882 |
| Changes in operating assets and liabilities, net of assets and liabilities received from business acquisition: | | |
| Accounts receivable | (9,975) | (690) |
| Inventory | (5,129) | (5,386) |
| Prepaid expenses | (1,316) | (1,012) |
| Other current assets | (197) | 4,006 |
| Deposits and other assets | (312) | (109) |
| Accounts payable | 3,387 | 8,432 |
| Accrued expenses and other liabilities | (1,594) | (5,878) |
| Deferred revenue | 3,703 | (206) |
| Net cash provided (used) in operating activities | (9,484) | 1,225 |
| Cash flows from investing activities: | | |
| Capitalized expenditures, including internal capitalized labor | (2,078) | (4,199) |
| Cash paid for acquisitions | (45) | — |
| Purchase of short-term investments | (4,967) | (5,000) |
| Proceeds from the sale of assets of discontinued operations | — | 794 |
| Reduction in restricted cash and cash equivalents | — | 400 |
| Net cash used in investing activities | (7,090) | (8,005) |
| Cash flows from financing activities: | | |
| Principal repayments on debt | (80) | (81) |
| Cash paid for repurchase of common stock | — | (502) |
| Proceeds from exercise of warrants and options | 647 | 434 |
| Net costs of initial public offering | (203) | — |
| Net cash provided (used) by financing activities | 364 | (149) |
| Net decrease in cash and cash equivalents | (16,210) | (6,929) |
| Cash and cash equivalents, beginning of the period | 100,986 | 70,783 |
| Cash and cash equivalents, end of the period | $ 84,776 | $63,854 |
| Supplemental disclosure of cash flows information: | | |
| Cash paid during the period for: | | |
| Interest | $ 62 | $ 260 |
| Income taxes | — | — |
| Supplemental disclosure of non-cash activities: | | |
| Issuance of common stock in business acquisition | $ 3,736 | $ — |
| Release of funds in escrow related to A1 Wireless acquisition | 10,700 | — |
| VMC earn-out consideration included in accrued liabilities | — | 2,985 |

See accompanying notes to unaudited condensed consolidated financial statements

6

Table of Contents

**(1)  The Company and Basis of Presentation**

    *(a)  Preparation of Interim Financial Statements*

        We have prepared the accompanying condensed consolidated financial statements pursuant to the rules and regulations of the U.S Securities and Exchange Commission (the "SEC") for interim financial reporting. The financial information included herein, other than the consolidated balance sheet as of December 31, 2005, has been prepared without audit. The consolidated balance sheet at December 31, 2005 has been derived from, but does not include all the disclosures contained in the audited financial statements for the year ended December 31, 2005. The preparation of consolidated financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of certain assets and liabilities, the disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reported period. In the opinion of management, these unaudited statements include all the adjustments and accruals necessary for a fair presentation of the results of the periods presented herein. These condensed consolidated financial statements should be read in conjunction with the consolidated financial statements and accompanying notes included in our Annual Report on Form 10-K for the year ended December 31, 2005. The results of operations for the interim periods presented are not necessarily indicative of the results that may be expected for a full year. Certain prior year amounts have been reclassified to conform to the current period presentation.

    *(b)  Business*

        We are a leading online seller of wireless services and devices based on the number of activations of wireless services sold online in the United States. We sell wireless service plans and devices, including satellite television services through our own branded websites; including Wirefly.com, A1 Wireless.com, and VMCsatellite.com and through websites that we create and manage for third parties. We offer marketers the ability to sell wireless voice and data services and devices under mobile virtual network enabler ("MVNE") agreements. This service utilizes the same e-commerce platform, operational infrastructure and marketing relationships that we use in our operations. We provide customers the ability to organize personal communication by providing real time wireless access to e-mail, voicemail, faxes, contacts, scheduling, calendar and conference calling functionality through a website or telephone.

    *(c)  Restatement*

        We have restated our consolidated financial statements to reflect the correction of an error in the application of revenue recognition of certain receivables. During the three months ended March 31, 2006, we had recorded revenue or certain of our features activations and commissions in which it was subsequently determined that collectibility was not reasonably assured. As a result, we reduced our revenue and accounts receivable by $393 for this adjustment. The impact of the restatement on the three months ended March 31, 2006 is shown in the table below:

|  | March 31, 2006 (reported) | March 31, 2006 (adjustments) | March 31, 2006 (restated) |
|---|---|---|---|
| Accounts receivable | $ 35,216 | $ (393) | $ 34,823 |
| Total current assets | 134,914 | (393) | 134,521 |
| Total assets | 198,422 | (393) | 198,029 |
| Accumulated deficit | (168,578) | (393) | (168,971) |
| Total stockholders' equity | 98,864 | (393) | 98,471 |
| Total liabilities and stockholders' equity | 198,422 | (393) | 198,029 |

7

**Table of Contents**

|  | For the three months ended | | |
|---|---|---|---|
|  | 31-Mar (reported) | 31-Mar (adjustments) | 31-Mar (restated) |
| Revenue: | | | |
|     Activations and services | $67,135 | $ (393) | $66,742 |
| Total revenue | 87,371 | (393) | 86,978 |
| Operating loss | (4,246) | (393) | (4,639) |
| Loss from continuing operations | (3,955) | (393) | (4,348) |
| Net loss | (3,920) | (393) | (4,313) |
| Net loss per share: | | | |
|     Net loss from continuing operations | (0.11) | (0.01) | (0.12) |
|     Basic and diluted net loss per share | (0.11) | (0.01) | (0.12) |

|  | For the three months ended | | |
|---|---|---|---|
|  | 31-Mar (reported) | 31-Mar (adjustments) | 31-Mar (restated) |
| Cash flows from operating activities: | | | |
| Net loss | $ (3,920) | $ (393) | $(4,313) |
| Accounts receivable | (1,083) | 393 | $ (690) |

### (d)   Risks and Uncertainties

Our operations are subject to certain risks and uncertainties including, among others, actual and potential competition by entities with greater financial resources, rapid technological changes, the need to retain key personnel and protect intellectual property and the availability of additional capital financing on terms acceptable to us.

Since inception we have incurred net losses attributable to common stockholders of approximately $168,971. To date, management has relied on debt and equity financings to fund our operating deficit. While we currently have $68,854 of cash and cash equivalents and short-term investments on hand as of March 31, 2006, we may require additional financing to fund future operations.

### (e)   Acquisitions and Discontinued Operations

We acquired certain assets and assumed certain liabilities of A1 Wireless USA, Inc. ("A1 Wireless") on January 4, 2005 and VMC Satellite, Inc. ("VMC") on April 26, 2005. We accounted for these transactions using the purchase method of accounting in accordance with Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations.* Accordingly our results of operations include the operating results of A1 Wireless effective January 1, 2005 and VMC as of the April 26, 2005 acquisition date.

On December 31, 2005, we completed the sale of substantially all of the operating assets of our mobile virtual network operator ("MVNO") Liberty Wireless ("Liberty") to Teleplus Wireless Corp, a subsidiary of Teleplus Enterprises, Inc. The Liberty sale has enabled us to streamline and focus our resources on our other operations including the growth of our MVNE . The sale of Liberty was recorded as a discontinued operation in the financial statements pursuant to SFAS No. 144, *Accounting for Impairment or Disposal of Long Lived Assets.*

Table of Contents

(2)  **Summary of Significant Accounting Policies**

    (a)  *Revenue Recognition*

      *Activations and Services Revenue*

      We recognize revenue from the sale of wireless services and the provisioning of MVNE and data services.

      *Wireless Services:* We generate revenue from wireless carriers, including a satellite television carrier, who pay commissions and volume and performance-based bonuses, for activating wireless subscribers. We recognize commissions from wireless carriers upon shipment of activated devices to the customer. In addition to activation commissions certain carriers pay us a monthly residual fee either for as long as a customer who we activate for that carrier continues to be its subscriber, or for a fixed period of time depending on the carrier. We purchase satellite activation certificates evidencing activation rights in advance of their resale to customers. Revenue from satellite television customers includes sales of these satellite activation certificates, net of the certificate cost, as we are acting as an agent in the transaction. Our wireless revenue is reduced for estimated deactivations of customers prior to the expiration of a time period that ranges 120 to 210 days from the date of activation, depending on the wireless carrier. We estimate deactivations based on historical experience, which we developed based on our experience with carriers, customer behavior and sources of customers, among other factors, allowing us to accrue estimates with what we believe is a high degree of certainty. If we determine that we cannot accurately predict future deactivation experience, we may be required to defer 100% of our carrier commissions revenue until the expiration of the appropriate chargeback period. Our reserves for deactivations are included in accounts receivables and deferred revenue on the accompanying balance sheets.

      In addition to receiving commissions for each wireless subscriber activated, we earn performance bonuses from the wireless carriers based on negotiated performance targets. The most significant bonus we earn is the quarterly volume bonus, which we bill wireless carriers for on a monthly basis, based on current month activations. We record these bonuses as deferred revenue at the time of billing until we achieve the quarterly targets. We also earn other quarterly bonuses from certain carriers for maintaining low customer churn and signing up customers for certain additional monthly "features" such as text messaging or data service. Wireless carriers also periodically offer bonuses for achieving monthly volume and other performance targets. We recognize these monthly bonuses as earned in accordance with the provisions of Staff Accounting Bulletin ("SAB") No. 104, *Revenue Recognition in Financial Statements* . Revenue is recognized only when all of the following criteria are met: (1) persuasive evidence of an arrangement exists, (2) delivery has occurred or services have been rendered, (3) the seller's price to the buyer is fixed or determinable, and (4) collectibility is reasonably assured. Amounts collected in cash prior to meeting the above criteria are recorded as deferred revenue. Through 2005, commission revenue earned from the activation of carrier features had been deferred until the contractual chargeback period had lapsed. Beginning in 2006, we began to estimate commission revenue earned from feature activations based on historical experience which we have developed based on our experience with carriers and customer behavior over a period of time in excess of 24-months. This allows us to accrue estimates with what we believe is a high degree of certainty in accordance with SAB 104. Activation and service revenue included $669 as a result of this change.

      *MVNE Services:* We offer marketers the ability to sell wireless services to their customers under their own brands using our e-commerce platform and operational infrastructure through MVNE contracts. We receive fees for the development of the network platform, as well as for operational support services. We defer the fees attributable to the production of the network platform and recognize these fees and costs over the expected life of the agreement (typically 12 to 48 months). Prepaid fees are deferred until all revenue criteria have been satisfied. Deferred revenue as of December 31, 2005 and March 31, 2006 included $1,852 and $1,918, respectively, from MVNE contracts.

      *Data Services:* We sell data services, including a service that allows customers to access email, voicemail, facsimiles, contacts and personal calendar information through a website or a telephone; wireless email; and mobile marketing services. We bill customers and recognize revenue monthly, as the services are performed.

    *Equipment Revenue*

      Revenue from the sale of wireless devices and accessories in a multiple-element arrangement with services are recognized at the time of sale in accordance with *Emerging Issues Task Force* EITF No. 00-21, *Revenue Arrangements with Multiple Deliverables,* when fair value of the services element exists. Customers have the right to return devices within a specific period of time or usage, whichever occurs first. We provide an allowance for estimated returns of devices based on historical experience. In accordance with the provisions of SAB

Table of Contents

No. 104, we determined we have sufficient operating history to estimate equipment returns. In connection with wireless activations, we sell customers wireless devices at a significant discount, which is generally in the form of a rebate. Rebates are recorded as a reduction of revenue. We recognize equipment revenue, less a reserve for customer rebates (accrued consumer liabilities), which is based on historical experience of rebates claimed. Future experience could vary based upon rates of consumers redeeming rebates.

**(b)    Concentrations of Credit Risk**

Financial instruments that potentially subject us to a concentration of credit risk consist principally of accounts receivable. We extend credit to wireless network carriers ("carriers") on an unsecured basis in the normal course of business. Three carriers accounted for 67% and 70% of accounts receivable, net of the deactivation reserve, as of December 31, 2005 and March 31, 2006, respectively.

For the three months ended March 31, 2005 and 2006, revenue from three carriers exceeded 10% of our total revenue. Revenue as a percentage of total revenue for these carriers was as follows:

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2005 | 2006 |
| Customer A | 24% | 35% |
| Customer B | 24% | 16% |
| Customer C | 22% | 15% |
| Total | 70% | 66% |

**(c)    Accrued Expenses and Other Liabilities**

Accrued expenses and other liabilities at December 31, 2005 and March 31, 2006 consisted of:

|  | As of | |
| --- | --- | --- |
|  | December 31, 2005 | March 31, 2006 |
| Accrued consumer liabilities | $   18,289 | $15,478 |
| Accrued payroll and related expenses | 1,452 | 1,073 |
| Accrued acquisition costs and severance costs | 5,063 | 7,769 |
| Accrued taxes payable | 593 | 389 |
| Other | 6,191 | 4,748 |
|  | $   31,588 | $29,457 |

**(d)    Restructuring Costs**

We implemented a restructuring plan in the first quarter of 2005 following the acquisition of A1 Wireless, to take advantage of synergies gained through the acquisition and to restructure our operations for efficiency purposes. For the three months ended March 31, 2005, we recognized $149 in restructuring costs, all of which related to workforce reduction. All costs related to this plan were paid out in 2005.

**(e)    Stock-Based Compensation**

We adopted Statement of Financial Accounting Standards "SFAS" No. 123 (revised 2004), *Share Based Payment* (SFAS No. 123(R)) on January 1, 2006 using the modified prospective application method ("MPA"). SFAS No. 123(R) established standards for the accounting for transactions in which an entity exchanges its equity instruments for goods or services. SFAS No. 123(R) requires us to measure the cost of employee services received in exchange for an award of equity instruments (usually stock options or unvested (restricted) stock awards) based on the grant-date fair value of the award. That cost is recognized over the period during which an employee is required to provide service in exchange for the award – the requisite service period (usually the vesting period).

Prior to our adoption of SFAS No. 123(R), we applied the intrinsic value method of accounting for employee stock-based compensation as prescribed by Accounting Principles Board ("APB") Opinion No. 25, *Accounting for Stock Issued to Employees,* and related interpretations including FASB Interpretation ("FIN") No. 44, *Accounting for Certain Transactions involving Stock Compensation an Interpretation of APB Opinion No. 25* , to account for our stock option grants to employees. Under this method, compensation expense was

Table of Contents

recorded on the date of the grant only if the current market price of the underlying stock exceeded the exercise price. SFAS No. 123, *Accounting for Stock-Based Compensation* ("SFAS No. 123"), established accounting and disclosure requirements using a fair value-based method of accounting for stock-based employee compensation plans. As permitted by SFAS No. 123, we had elected to continue to apply the intrinsic value-based method of accounting described above, and had adopted the disclosure requirements of SFAS No. 123. All shares of restricted stock awarded to employees were accounted for at fair value in accordance with SFAS No. 123.

Under the MPA method, compensation cost for all share-based payments granted prior to, but not vested as of December 31, 2005, is based on the grant date fair value estimated in accordance with the pro forma provisions of SFAS No. 123, and compensation cost for all share based payments granted subsequent to December 31, 2005, will be based on the grant date fair value estimated in accordance with the provisions of SFAS No.123(R). Results for prior periods have not been restated. We use the ratable method of attributing the value of stock-based compensation to expense. SFAS No. 123(R) requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. In our pro forma information required under SFAS No. 123 for the periods prior to January 1, 2006, we accounted for forfeitures as they occurred. The fair value of each option granted is estimated on the grant date using the Black-Scholes option pricing model which takes into account as of the grant date the exercise price and expected life of the option, the current price of the underlying stock and its expected volatility, expected dividends on the stock and the risk-free interest rate for the term of the option.

*Stock Options* – We have two stock plans under which we have issued or may issue options to purchase shares of our common stock. The 1999 Stock Incentive Plan (the "1999 Plan"), provided for grants of stock-based awards from time to time to employees, officers, directors and consultants of the Company at exercise prices determined by the board of directors. Options granted under the 1999 Plan generally vest over a four-year period and expire ten years from the grant date. As of November 19, 2004, no additional options were available for grant under the 1999 Plan due to the adoption of the 2004 Equity Incentive Plan (the "2004 Plan").

The 2004 Plan allows for grants of stock-based awards from time to time to employees, officers, directors and consultants at exercise prices determined by the board of directors. For incentive stock options, the exercise price must be at least equal to fair market value at the date of grant. For nonqualified stock options, the option may be granted with an exercise price less than fair market value. Options granted under the 2004 Plan vest over a period to be determined by the administrator, generally four years, and expire ten years from the grant date.

For the three months ended March 31, 2006 as a result of our adoption of SFAS No. 123 (R), we recognized stock-based compensation expense related to employee options granted prior to January 1, 2006 of $1,899 of which $148 was capitalized in accordance with our compensation policies and SFAS No. 123(R).

In addition on March 22, 2006, we granted options to certain of our employees to purchase 679,900 shares of our common stock at an exercise price of $6.46 per share. The grant date fair value of employee share options was estimated using the Black Scholes option-pricing model with the following assumptions: an expected life averaging 5.77 years; an average volatility of 72%; no dividend yield; and a risk-free interest rate averaging 4.69%. The weighted average fair value per share of options granted was $4.28. Compensation cost of the grant was reduced by an estimated forfeiture amount based on an annual experience rate of 9.93%. As of the date of grant, total compensation cost related to the grant including estimated forfeitures was approximately $2,324. Stock-based compensation expense for this grant for the three months ended March 31, 2006 was $29.

The impact of adopting SFAS No. 123(R) increased stock-based compensation expense included in our operating expenses and reduced net income from continuing operations by approximately $850 for the three months ended March 31, 2006 or $0.02 per basic and diluted share. There was no impact from the adoption on cash flow from operations or cash flows from financing activities.

11

**Table of Contents**

The following table summarizes the activity for stock options granted to employees and non-employees for the three months ended March 31, 2006.

| | Number of options | Weighted average exercise price | Weighted average contractual term | Aggregate intrinsic value |
|---|---|---|---|---|
| Balance January 1, 2006 | 5,115,969 | $    9.47 | | |
| Granted | 679,900 | 6.46 | | |
| Exercised | (93,409) | 5.07 | | |
| Forfeited | (151,929) | 13.06 | | |
| Balance March 31, 2006 | 5,550,531 | $    9.06 | 8.17 | $  4,870 |
| Ending vested & expected to vest | 5,119,324 | $    9.02 | 8.09 | $  4,603 |
| Exercisable at March 31, 2006 | 2,406,746 | $    8.13 | 7.28 | $  2,590 |

The weighted-average grant date fair value of options granted during the three months ended March 31, 2006 was $4.28. The total intrinsic value of options exercised during the three months ended March 31, 2006 was $139.

*Restricted Common Stock* – During the three months ended March 31, 2006, we granted 462,709 shares of restricted common stock to certain of our key employees. The restrictions on this common stock lapse and the stock vests over periods ranging up to 4 years from the grant date. The following table summarizes the activity for restricted stock for the three months ended March 31, 2006.

| | Number of restricted stock awards | Weighted-average grant-date fair value |
|---|---|---|
| Nonvested at January 1, 2006 | 1,137,878 | $    16.48 |
| Granted | 462,709 | 6.46 |
| Vested | (92,809) | 16.83 |
| Surrendered for taxes | (4,710) | 13.31 |
| Forfeited | (63,067) | 20.04 |
| Nonvested at March 31, 2006 | 1,440,001 | $    13.23 |

As of March 31, 2006, there was approximately $12,200 of total unrecognized compensation cost related to restricted share-based compensation arrangements. That cost is expected to be recognized over a weighted-average period of 1.65 years. The total fair value of shares vested during the three months ended March 31, 2006 was approximately $1,600.

*Warrants* – During the three month period ended March 31, 2006, we did not grant any warrants to purchase shares of our common stock. Warrants outstanding at March 31, 2006, were exercisable for 787,863 shares of our common stock.

Our pro forma net loss per common share, basic and diluted, for the three months ended March 31, 2005 was as follows:

| | Three Months Ended March 31, 2005 |
|---|---|
| Net loss as reported | $    (6,994) |
| Add: Stock-based employee compensation expense included in net loss as reported | 6,643 |
| Less: Total stock-based employee compensation determined under fair value based methods for all stock awards, net of related tax effects | (2,518) |
| Pro forma net loss | $    (2,869) |
| Net loss per common share, basic and diluted, as reported | $    (0.21) |
| Net loss per common share, basic and diluted, pro forma | $    (0.09) |
| Basic and dilutive weighted average common shares outstanding | 32,901,398 |

12

Table of Contents

Stock-based compensation which includes compensation recognized on stock option grants and restricted stock awards has been included in the following line items in the accompanying condensed consolidated financial statements. There was no tax benefit recognized in the statements of operations for stock-based awards in either period:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2005 | 2006 |
| Balance Sheets: | | |
| Property and equipment, net | $ — | $ 148 |
| Statements of operations: | | |
| Sales and marketing | 596 | 719 |
| General and administrative | 6,345 | 2,163 |
| Income from discontinued operations | 63 | — |
| | $ 7,004 | $ 2,882 |

*(f)*  *Net Loss per Share*

We calculate net loss per share in accordance with SFAS No. 128, *Earnings Per Share* . Basic net loss per common share excludes any dilutive effects of options, warrants, restricted stock and convertible securities and is calculated by dividing net loss attributable to common stockholders by the weighted average number of common shares issuable and outstanding for the period. Diluted net loss per common share equals basic net loss per common share, as the effects of options, warrants, restricted stock and convertible securities will be anti-dilutive.

The following table reconciles net loss and basic and diluted weighted average common shares outstanding to the historical or pro forma net loss and the pro forma basic and diluted weighted average common shares outstanding for the three months ended March 31, 2005 and 2006.

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2005 | restated 2006 |
| Net loss from continuing operations | $ (7,418) | $ (4,348) |
| Net income from discontinued operations | 424 | 35 |
| Net loss | $ (6,994) | $ (4,313) |
| Weighted average shares outstanding | 32,901,398 | 35,348,335 |
| Basic and diluted earnings per share: | | |
| Net loss from continuing operations | $ (0.22) | $ (0.12) |
| Net income from discontinued operations | 0.01 | 0.00 |
| Basic and diluted earnings per share | $ (0.21) | $ (0.12) |
| Anti dilutive weighted average shares excluded from diluted loss per share | 8,149,335 | 1,348,878 |

**(3)  Discontinued Operations**

On December 31, 2005, we completed the sale of substantially all of the operating assets of our Liberty Wireless business. During the three months ended March 31, 2006 we collected $794 of notes receivable recorded at December 31, 2005 related to the divestiture.

Summary of operating results for the discontinued operations are as follows:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2005 | 2006 |
| Revenue | $ 8,456 | $ — |
| Costs and expenses | (8,032) | 35 |
| Income from discontinued operations | $ 424 | $ 35 |

Table of Contents

Balance sheet data included:

|  | As of | |
|---|---|---|
|  | December 31, 2005 | March 31, 2006 |
| Accounts and notes receivable, net | $ 1,848 | $ 1,527 |
| Other current assets | 582 | — |
| Assets of discontinued operations | $ 2,430 | $ 1,527 |
| Accounts payable | $ 931 | $ 199 |
| Other accrued expenses | 2,199 | 1,482 |
| Liabilities of discontinued operations | $ 3,130 | $ 1,681 |

**(4)   Intangible Assets and Goodwill**

*(a)   Acquired Intangible Assets*

We amortize intangible assets on a straight-line basis over periods ranging from one to ten years. Supplier relationships and trade name have indefinite lives. Amortized intangible assets comprised the following:

|  | December 31, 2005 | | |
|---|---|---|---|
|  | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Software and technology | $ 1,123 | $ 1,045 | $ 78 |
| Customer contracts | 885 | 885 | — |
| Affiliate and carrier relationships | 3,960 | 676 | 3,284 |
| Non-compete agreement | 5,049 | 1,431 | 3,618 |
| Supplier relationships | 3,730 | — | 3,730 |
| Trade name | 1,110 | — | 1,110 |
| Other | 1,935 | 1,104 | 831 |
| Total | $ 17,792 | $ 5,141 | $12,651 |

|  | March 31, 2006 | | |
|---|---|---|---|
|  | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Software and technology | $ 90 | $ 16 | $ 74 |
| Affiliate and carrier relationships | 3,960 | 874 | 3,086 |
| Non-compete agreement | 5,049 | 1,993 | 3,056 |
| Supplier relationships | 3,730 | — | 3,730 |
| Trade name | 1,110 | — | 1,110 |
| Other | 1,935 | 1,385 | 550 |
| Total | $15,874 | $ 4,268 | $11,606 |

The following table reflects the changes to goodwill for the three months ended March 31, 2006.

| | |
|---|---|
| Balance as of December 31, 2005 | $31,140 |
| Goodwill arising from VMC earn-out [1] | 2,985 |
| Balance as of March 31, 2006 | $34,125 |

(1)   We achieved the earn-out performance target stipulated in the VMC Asset Purchase Agreement on February 28, 2006 and accordingly recorded additional goodwill of $2,985. The earn-out consideration consisted of amounts that will be payable in cash of $2,363 and 119,389 shares of our common stock with a fair value of $622. Such consideration was reflected in accrued expenses and other liabilities in the accompanying balance sheet at March 31, 2006. We distributed the cash consideration and shares of common stock in April 2006.

14

**Table of Contents**

**(5)  Debt**

We maintain a revolving operating line of credit which allows for aggregate borrowings of up to $25,000 subject to certain limits based on accounts receivable and inventory levels. At March 31, 2006 and December 31, 2005, there was $15,000 outstanding under this line of credit. As of March 31, 2006, we have an additional $176 of availability under the line of credit based on the limits described above. The line of credit expires effective January 1, 2007 and accordingly the outstanding balance has been classified as a current liability as of March 31, 2006. Borrowings outstanding under the line of credit are secured by substantially all of the company's assets. Under the terms of our line of credit facility we are required to maintain a current ratio, as defined, of no less than 1.1 to 1. We are also required to maintain an unrestricted cash balance of no less than $10,000 held at the bank and to meet certain minimum levels of EBITDA, as defined. As of March 31, 2006, we were in compliance with the EBITDA covenant under the credit facility.

**(6)  Repurchase of Common Stock**

On August 17, 2005, our Board of Directors authorized the repurchase of up to $30,000 of our common stock through August 2006. The shares may be repurchased by us from time to time at prevailing market prices. The timing and amount of any shares repurchased are based on market conditions and other factors. Repurchases may also be made under a Rule 10b5-1 plan, which permits shares to be repurchased when we might otherwise be precluded from doing so by laws prohibiting insider trading or by self imposed trading black out periods. There is no guarantee as to the exact number of shares that will be repurchased under the stock repurchase program, and we may discontinue purchases at any time. We intend to fund our share repurchases with cash on hand and cash generated from future operations. During the three months ended March 31, 2006, we repurchased 62,761 shares of our common stock at an average price of $8.01 per share for approximately $502. All shares repurchased were returned to the status of authorized but unissued shares of common stock as of March 31, 2006. Since the inception of this program, we have repurchased 1,144,248 shares for an aggregate consideration of $13,591.

**(7)  Commitments and Contingencies**

*Legal Matters*

We are subject to litigation, claims and assessments in the normal course of business including those arising from asset acquisitions or business combinations. We do not believe that any existing or anticipated litigation, claims or assessments will have a material effect on our consolidated financials statements.

On August 5, 2004, Avesair, Inc., a company whose assets we acquired, filed suit against us demanding, among other matters, that we issue to Avesair shares of our common stock valued at approximately $4,000 as of June 30, 2004. The stock demanded by Avesair represents the maximum value of shares that they could have earned for achieving certain performance-based targets under the asset purchase agreement. We believe the performance-based targets were not achieved and intend to vigorously contest this matter.

On July 25, 2005, the Federal Communications Commission ("FCC") issued a Notice of Apparent Liability, asserting that we registered with the FCC and reported and contributed to the Universal Service Fund ("USF") and the Telecommunications Relay Service Fund later than required by FCC rules. The FCC has preliminarily proposed to fine us approximately $820 for late payment of such fees. In a letter dated August 24, 2005 we responded to the FCC's preliminary finding and asserted that no fine is appropriate under the circumstances. However, any adverse resolution of this matter could have a material adverse impact on our financial results.

## ITEM 2.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion and analysis should be read in conjunction with our consolidated financial statements and related notes and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of our Annual Report on Form 10-K for the fiscal year ended December 31, 2005.*

### Forward-Looking Statements

This Quarterly Report on Form 10-Q, as amended contains statements that are forward-looking within the meaning of the Securities Act of 1933, and the Securities Exchange Act of 1934 that involve risks and uncertainties. In some cases, forward-looking statements are identified by words such as "believe", "anticipate", "expect", "intend", "plan", "will", "may" and similar expressions. All of these forward-looking statements are based on information available to us at this time and we assume no obligation to update any of these statements. These statements are not guarantees of future performance and are

Table of Contents

subject to certain risks and uncertainties that are difficult to predict, including, among other things: our limited operating history; the ability to maintain strong relationships with wireless carriers; ongoing consolidation among wireless carriers; a decrease in the new subscriber growth rate; increased competition with additional retail and on-line distributors of wireless services and devices; increase in the rate of deactivations of active accounts; ability to attract new customers; ability to successfully integrate acquisitions; ability to accurately estimate reserve for future deactivations; interruptions or delays in service from third parties; our ability to effectively manage business growth; ability to attract and retain key personnel; and government regulation.

Existing and prospective investors are cautioned not to place undue reliance on these forward-looking statements, due to the risks listed below and other risks described; under Item 1A, "Risk Factors" of our Form 10-Q filed May 10, 2006.

## Overview

We are a leading online seller of wireless services and devices based on the number of activations of wireless services sold online in the United States. We sell wireless service plans and devices, including satellite television services through our own branded websites; including Wirefly.com, A1 Wireless.com, and VMCsatellite.com and through websites that we create and manage for third parties. We offer marketers the ability to sell wireless voice and data services and devices, under mobile virtual network enabler ("MVNE") agreements. This service utilizes the same e-commerce platform, operational infrastructure and marketing relationships that we use in our operations. We provide customers the ability to organize personal communications by providing real time wireless access to e-mail, voicemail, faxes, contacts, scheduling, calendar and conference calling functionality through a website or telephone.

We measure our performance based on our financial results and various non-financial measures. Key financial factors that we focus on in evaluating our performance include revenue growth within a period, contribution margin (defined as revenue less cost of revenue and marketing expenses), and operating income (defined as contribution margin less other operating expenses including sales, general and administrative and depreciation and amortization expenses). Our financial results can, and do, vary significantly from quarter-to-quarter as a result of a number of factors which include economic conditions specific to online commerce and wireless communications industries, the timing of introduction of popular devices by mobile phone manufacturer, our ability to attract visitors to our websites, changes in wireless carrier commission and bonus structures, the timing of recognition of bonuses paid to us by wireless carriers and our competitors' pricing and marketing strategies.

Key non-financial measures of our success are customer feedback and customer satisfaction ratings compiled by third parties. We believe that maintaining high overall customer satisfaction is critical to our ongoing efforts to promote the use of the private-labeled websites that we create and manage for our marketers, as well as our own branded websites, and to improve our operating results. We actively solicit customer feedback on our website functionality as well as the entire purchase experience. To maintain a high level of performance by our customer service representatives, we also undertake an ongoing customer feedback process. If we are unable to meet customer expectations with respect to price or do not successfully expand our product lines or otherwise fail to maintain high overall customer satisfaction, our business and results of operations would be harmed.

Our revenue include commissions, bonuses and other payments we receive from wireless carriers, including a satellite television provider, in connection with the activation of customers on their networks, as well as payments from customers for wireless services and devices. Our revenue continues to increase as a result of internal growth and acquisitions. As further described below, total revenue and net loss from continuing operations for the three months ended March 31, 2006 were $87.0 million and $4.3 million, respectively compared to total revenue and net loss of $68.2 million and $7.4 million, respectively for the three months ended March 31, 2005. Revenue from our top three wireless carriers represented 66% and 70% of our total consolidated revenue for the three months ended March 31, 2006 and 2005, respectively.

As a key extension of our current services, on March 14, 2006 we launched Wirefly.biz, a new business unit dedicated to the unique needs of small business customers. With this launch we extended the Wirefly brand to the small business market place to assist small customers with an array of services, discounts and customer support typically afforded only to larger enterprise companies.

Since we began operations in 1999, we have incurred significant losses and have had negative cash flow from operations. As of March 31, 2006, we had a positive cash flow from operations of $1.2 million. Our accumulated deficit was $169.0 million and our total stockholders' equity $98.5 million. In order to achieve profitability in the future, we are depending upon our ability to produce revenue at levels that exceed the costs of that revenue plus operating expenses.

In 2006, we have continued to concentrate our resources on the growth of our wireless activations and the MVNE services we provide. Three of our key goals include (i) improving the customer experience platform that we utilize for order

16

processing, customer service and rebate handling to automate additional processes and make more efficient use of our system and internal work force and the outsourced call center resources; (ii) further balancing spending on marketing initiatives with customer activation and revenue generation characteristics; and (iii) reducing certain general and administrative operating expenses.

**Restatement**

As described in this Quarterly Report on Forms 10-Q/A for the first quarter ended March 31, 2006. (See Note 1(c) to the Condensed Consolidated Financial Statements.)

### Comparison of the Results of Operations for the Three Months Ended March 31, 2006 and 2005

We acquired certain assets and assumed certain liabilities of A1 Wireless on January 4, 2005 and VMC on April 26, 2005. We accounted for these transactions using the purchase method of accounting in accordance with SFAS No. 141. Accordingly our results of operations discussed below include the operating results of the A1 Wireless effective January 1, 2005 and VMC as of the April 26, 2005 acquisition date.

As a result of the sale of our MVNO operations on December 31, 2005, we no longer believe that segment information, in accordance with SFAS No. 131, *Disclosures About Segments of an Enterprise and Related Information,* is applicable as our Wireless Activation and Services segment ("WAS") represents greater than 95% of our total revenue and cost of revenue. Accordingly we will no longer report segment data separately in the notes to our financial statements. Our Management's Discussion and Analysis of Results of Operations will continue to provide a comparison of our revenue and cost of revenue of our wireless activation and services and other components of revenue and cost of revenue to the extent MVNE and data services fluctuations appear significant in explaining and describing such results of operation.

| (amounts in thousands) | Three Months Ended March 31, | | | | Change Between 2005 and 2006 | |
| | 2005 | | 2006 | | | |
| | Amount | % of Revenue | (restated) Amount | % of Revenue | Amount | % |
|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | |
| Activation and services | $49,751 | 73% | $66,742 | 77% | $ 16,991 | 34% |
| Equipment | 18,400 | 27% | 20,236 | 23% | 1,836 | 10% |
| Total Revenue | $68,151 | 100% | $86,978 | 100% | $ 18,827 | 28% |
| | | | | | | |
| **Cost of revenue** | | | | | | |
| Activation and services | $ 1,173 | 2% | $   260 | 0% | $   (913) | (78)% |
| Equipment | 38,950 | 57% | 47,921 | 55% | 8,971 | 23% |
| Total Cost of revenue | $40,123 | 59% | $48,181 | 55% | $ 8,058 | 20% |
| | | | | | | |
| **Selected operating expenses:** | | | | | | |
| Sales and marketing | $17,498 | 26% | $26,722 | 31% | $ 9,224 | 53% |
| General and administrative | 16,278 | 24% | 13,231 | 15% | (3,047) | (19)% |
| Depreciation and amortization | 1,777 | 3% | 3,483 | 4% | 1,706 | 96% |

17

**Table of Contents**

## REVENUE

*Revenue*

 Revenue consists of activations and services revenue, and equipment revenue. Activations and services revenue consists of (i) revenue from the activation of services of wireless carriers and a satellite television carrier through private-labeled websites that we create and manage for marketers as well as through our own branded websites. Wireless carriers pay us commissions, bonuses and other payments for activating their wireless services; (ii) revenue from the provisioning of MVNE Services which provide marketers the ability to sell MVNO services to their customers under their own brands using our e-commerce platform and operational infrastructure; and, (iii) revenue from data services under which we provide subscribers with real-time wireless access to work and personal information, including email, calendar, corporate directories, personal contacts and documents in addition to wireless entertainment and content. Equipment revenue consists mainly of revenue from the sale of wireless devices to our customers that subscribe to wireless services through our private-labeled websites or those websites that we manage for other marketers. The following further details the components of our revenue and a comparative discussion of performance:

| | Three Months Ended March 31, | | | | Change Between 2005 and 2006 | |
| | 2005 | | 2006 | | | |
| (amounts in thousands) | Amount | % of Revenue | (restated) Amount | % of Revenue | Amount | % |
|---|---|---|---|---|---|---|
| *Activations and services:* | | | | | | |
|  Wireless activation | $47,131 | 69% | $64,154 | 74% | $ 17,023 | 36% |
|  MVNE and data services | 2,620 | 4% | 2,588 | 3% | (32) | (1)% |
| | $49,751 | 73% | $66,742 | 77% | $ 16,991 | 34% |
| *Equipment:* | | | | | | |
|  Wireless activation | $18,400 | 27% | $20,236 | 23% | $ 1,836 | 10% |
| *Total Revenue:* | | | | | | |
|  Wireless activation | $65,531 | 96% | $84,390 | 97% | $ 18,859 | 29% |
|  MVNE and data services | 2,620 | 4% | 2,588 | 3% | (32) | (1)% |
| | $68,151 | 100% | $86,978 | 100% | $ 18,827 | 28% |

*Activations and Services*

 Our activations and services revenue increased 34% to $66.7 million for the first quarter of 2006 from $49.8 million for the same period of 2005. The increase in activations and services revenue of $17.0 million was attributable to an increase in the number of wireless activations for the three months ended March 31, 2006 that we generated through marketing partners and increased advertising efforts. Gross carrier commissions for current period activations subject to chargeback increased 25.9% to $71.3 million for the three months ended March 31, 2006 from $56.6 million for the three months ended March 31, 2005. Also contributing to the increase in revenue was an increase in MVNE revenue of $0.4 million, which was the result of an increase in the number of MVNOs that we provide support services to, offset by data services revenue decrease of $0.4 million, which was the result of a fewer number of subscribers to those services.

*Equipment*

 Our revenue from sales of equipment increased 10% to $20.2 million for the first quarter of 2006 from $18.4 million for the same period of 2005. The increase in equipment revenue of $1.8 million was attributable to a greater number of customers purchasing wireless devices and higher average sales prices.

*Total revenue*

 Total revenue increased 28% to $87.0 million for the first quarter of 2006 from $68.2 million for the first quarter of 2005. Revenue generated from the sale and activation of wireless devices and services accounted for approximately 96% and 97% of consolidated revenue for the three months ended March 31, 2005 and 2006, respectively. Revenue from our top three wireless carriers represented 70% and 66% of consolidated revenue for the three months ended March 31, 2005 and 2006, respectively. Wireless activations and services revenue and equipment sales revenue may vary from period to period based on our promotional efforts, which include subsidizing the costs of devices purchased by our customers. We expect that revenue from the sale and activation of wireless devices and services will continue to increase during 2006 compared to 2005 performance.

Table of Contents

## COST OF REVENUE

Cost of revenue consists mainly of the cost of wireless devices (equipment) sold to our wireless activations and services customers. Our cost of revenue related to wireless equipment sales increased to $47.9 million for the first quarter of 2006 as a result of a higher volume of devices sold during the period at a higher unit cost compared to sales of such devices in the first quarter of 2005. Total cost of revenue increased 20% to $48.2 million for the first quarter of 2006 from $40.1 million for the first quarter of 2005. Cost of revenue from the sale of wireless devices accounted for approximately 97% and 99% of consolidated cost of revenue for the three months ended March 31, 2005 and 2006, respectively. As a percentage of wireless total activations revenue, cost of equipment revenue decreased to 57% of revenue for the three months ended March 31, 2006 compared to 59% for the three months ended March 31, 2005.

*Sales and Marketing*

Our sales and marketing expenses increased 53% to $26.7 million for 2006 from $17.5 million for 2005. The increase was comprised mainly of a $9.1 million from the growth of existing marketing relationships and adding new marketing partner relationships since the first quarter of 2005. Our marketing expenses largely comprise payments to on-line advertisers, search engines and third-party marketing partners based on orders or activations. We incurred approximately $23.7 million of third-party marketing expenses in the first quarter of 2006. Such expenses were higher than first quarter 2005 due to increased wireless activation competition, and increased rates and volume of advertising, which caused our customer acquisition costs to increase. In addition, advertising placement and search costs also increased. We expect that marketing expenses will continue to represent a significant percentage of our revenue in future periods.

*General and Administrative*

Our general and administrative expenses decreased 19% to $13.2 million for first quarter 2006 from $16.3 million for first quarter 2005. The expense decrease of $3.0 million was mainly composed of the following: $4.2 million related to stock-based compensation expense; offset by increase of $0.2 million related to increased payroll related expenses from a larger workforce; $0.2 million from increased credit card processing fees and other costs associated with a higher volume of orders processed in the first quarter 2006; $0.2 million related to increased facilities costs and telecommunication related expenses and $0.6 million related to consulting and other expenses. As noted above, stock-based compensation expense decreased $4.2 million for the period. For the three months ended March 31, 2005 period, stock-based compensation included $5.3 million related to the modification of option grant and awards of two employees that were terminated during that quarter. Absent this, stock based compensation expense would have increased approximately $1.1 million as a result of compensation expense from options and stock awards granted after the first quarter of 2005 and the impact of the adoption of SFAS No. 123(R).

*Depreciation and Amortization*

Our depreciation and amortization expenses, which are amortized over periods ranging from 18 to 24 months, increased 96% to $3.5 million for the first quarter 2006 from $1.8 million for the first quarter 2005. The increase was due to the costs associated with developing new functionality related to our websites and product offerings and amortization expense related to the VMC acquisition which occurred in April 2005.

*Loss from continuing operations*

Loss from operations decreased to $4.3 million for the first quarter 2006 from $7.4 million for first quarter 2005 as a result of a significant growth in revenue in the first quarter 2006 over first quarter 2005. Although we experienced this significant growth cost of revenue and operating expenses both increased as described above in order to support the revenue growth we experienced.

*Net Loss*

Net loss decreased to $4.3 million for the first quarter 2006 from $7.0 million for first quarter 2005.

## Liquidity and Capital Resources

Since inception, we have funded our operations principally through the sale of equity securities and to a lesser extent, through subordinated debt, credit facilities, capital leases and lines of credit. In addition, certain of our vendors from whom we purchase handsets and other wireless equipment that we sell to our customers allow us to purchase up to approximately $40.0 million of such equipment on extended payment terms. The significant components of our working capital are inventory and liquid assets such as cash and cash equivalents, short-term investments and trade accounts receivable, reduced by accounts payable, accrued expenses and deferred revenue.

**Table of Contents**

As of March 31, 2006, we had cash and cash equivalents of $63.9 million, short-term investments of $5.0 million and debt and capital lease obligations of $15.8 million. As of December 31, 2005, we had cash and cash equivalents of $70.8 million, and debt and capital lease obligations of $15.9 million.

### *Cash Flows*

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2005 | 2006 |
| | | (restated) |
| | (amounts in thousands) | |
| Net cash provided (used) in operating activities | $ (9,484) | $ 1,225 |
| Net cash used in investing activities | (7,000) | (8,005) |
| Net cash provided (used) in financing activities | 364 | (149) |
| Change in cash and cash equivalents | (16,210) | (6,929) |
| Short term investments on March 31, 2005 and 2006 | — | 5,000 |
| Change in cash and cash equivalents and investments | $(16,210) | $(1,929) |

Net cash provided by operating activities was $1.2 million for the three months ended March 31, 2006 compared to net cash used in operating activities of ($9.5) million for the three months ended March 31, 2005. For the three months ended March 31, 2006, net loss after adjustments for items to reconcile net loss to net cash provided by operating activities was approximately $2.1 million. Such items included depreciation and amortization, non-cash interest expense and stock-based compensation.

Changes in operating assets and liabilities from December 31, 2005 decreased net cash provided by operating activities by approximately $0.8 million. Changes in working capital balances included an increase of current assets of approximately $3.1 million, excluding cash and cash equivalents, short-term investments and cash collected from notes receivable of discontinued operations. The increase in these current assets was primarily the result of increased accounts receivable and inventory balances from December 31, 2005. Such increases were mainly the result of an increase in revenue for the three months ended March 31, 2006 compared to the three months ended December 31, 2005 and the timing of collections from carriers. Inventory balances increased during the three months ended March 31, 2006 as a result of an increase in handset device purchases and receipts during the period. Such amounts were offset by a decrease in other current assets, which decreased primarily as a result of prepaid inventory purchases made in 2005 for which the equipment was received in the three months ended March 31, 2006.

Current liabilities, excluding debt and capital lease balances and acquisition earn-out obligations accrued during the period increased $2.3 million from December 31, 2005. The increase during the period was mainly the result of a net increase in accounts payable and accrued liabilities and expenses. Accounts payable at March 31, 2006 increased from December 31, 2005 primarily as a result of higher inventory levels and the timing of payments made to equipment vendors during the period offset by reductions in accrued expenses including accrued consumer liabilities.

Net cash used in investing activities for the three months ended March 31, 2006 and 2005 was $8.0 million and $7.1 million, respectively. The increase in net cash used in investing activities was due to an increase in the purchase of property and equipment and capitalized labor costs, primarily associated with enhancing our infrastructure, offset somewhat by proceeds received from the note receivable from with the Liberty sale, and a reduction in restricted cash balances. Capital expenditures for the three months ended March 31, 2006 comprised $2.9 million of software and web site development and $1.3 million of property, plant and equipment **.** We saw an increase from the prior periods due to increased spending on our e-commerce platform, enhancing functionality and new products such as upgrades and prepaid services. Cash from investing activities included short-term investments of $5.0 million for the three months ended March 31, 2006.

Net cash used in financing activities was $0.2 million for the three months ended March 31, 2006 compared to net cash provided by financing activities of $0.4 million for the three months ended March 31, 2005. Financing activities consisted of cash used to repurchase common stock of $0.5 million and principal payments of capital leases of $0.1 million, partially offset by the proceeds received from the exercise of options of $0.4 million.

*Borrowings Under Line of Credit.* We have previously borrowed money to finance our operations and purchase equipment. We maintain a revolving operating line of credit with Comerica Bank which allows for aggregate borrowing of up to $25.0 million subject to certain limits based on accounts receivable and inventory level. As of March 31, 2006, we had an aggregate principal amount of $15.0 million outstanding under the facility and an additional $176 of availability under the line of credit based on the limits described above. Interest on advances under the revolving line of credit is payable monthly at a rate of LIBOR plus 2.0%. Under the terms of our line of credit we are required to maintain a current ratio, as defined of

Table of Contents

1.1 to 1. We are also required to maintain an unrestricted cash balance of no less than $10.0 million held at Comerica and to meet certain minimum levels of EBITDA, as defined. As of March 31, 2006, we were in compliance with the EBITDA covenant under the credit facility. Our line of credit matures on January 1, 2007. We expect to refinance the facility or extend its maturity date prior to its maturity.

*Common Stock Repurchase Program.* Our Board of Directors has authorized us to repurchase shares of our common stock up to an aggregate amount of $30.0 million. During the first quarter of 2006, we repurchased an aggregate of 62,761 shares of our common stock for approximately $0.5 million. We expect to continue our share purchases through August 2006 at prevailing market rates using existing cash balances and funds generated from operating activities. There can be no assurances that we will repurchase up to the full amount that we have been authorized by our Board of Directors over this time period.

## Contractual Obligations

The following table summarizes our contractual obligations, including interest on capital leases, and the expected effect on liquidity and cash flows as of March 31, 2006.

| | Total | Less than 1 year | 1 - 3 years | 4 - 5 years | Over 5 years |
|---|---|---|---|---|---|
| | | | (amounts in thousands) | | |
| Line of credit | $15,000 | $15,000 | $ — | $ — | $ — |
| Capital leases | 770 | 385 | 385 | — | — |
| Operating leases | 4,523 | 1,481 | 3,042 | — | — |
| Commitment with vendor (a) | 2,000 | 2,000 | — | — | — |
| Obligations under VMC APA (b) | 5,985 | 5,985 | — | — | — |
| | $28,278 | $24,851 | $ 3,427 | $ — | $ — |

(a) Represents fixed commitment under participation agreement with a vendor. Payment made to vendor in April 2006. Additional commitments under participation agreement become fixed once launch of our storefront occurs.

(b) Under the VMC Asset Purchase Agreement, as amended, we are required to issue selling stockholders shares of our common stock or cash with a fair value of $3.0 million on the distribution date of the second tranche of common stock consideration. In addition, earn-out consideration of $2,985 consisting of cash of $2,363 and 119,389 shares of common stock with a fair value of $622 was distributed in April 2006. The second tranche of stock consideration and the earn-out payment are recorded as current other liabilities as of March 31, 2006. In addition to these amounts, we may be obligated to pay shareholders of VMC an additional $2.7 million in cash and 167,144 shares of our common stock upon achieving certain future operating targets. Such potential obligations have not been included in the table above.

## Recent Accounting Pronouncements

In November 2004, the FASB issued SFAS No. 151, Inventory Costs that is an amendment to ARB No. 43, Chapter 4 ("SFAS No. 151"), amends chapter 4 "Inventory Pricing" of ARB No. 43 and paragraph A3 of SFAS No. 144. Previously, ARB 43 did not define the term so abnormal which could lead to unnecessary incomparable financial reporting. SFAS No. 151 clarifies that abnormal costs related to idle facility expense, freight, handling costs, and wasted materials (spoilage) should be recognized as period costs. SFAS No. 151 is effective for fiscal year beginning after June 15, 2005. We adopted the pronouncement effective January 1, 2006. There was no material effect on our financial position, cash flows or result of operations as a result of this adoption.

In May 2005, the FASB issued SFAS No. 154, Accounting Changes and Error Corrections ("SFAS No. 154")., a replacement of APB Opinion No. 20, Accounting Changes, and SFAS No. 3, Reporting Accounting Changes in Interim Financial Statements. SFAS No. 154 changes the requirements for the accounting for, and reporting of, a change in accounting principle. Previously, voluntary changes in accounting principles were generally required to be recognized by way of a cumulative effect adjustment within net income during the period of the change. SFAS No. 154 requires retrospective application to prior financial statements of changes in accounting principles, unless it is impracticable to determine either the period-specific effects or the cumulative effect of the change. SFAS No. 154 is effective for accounting changes made in fiscal years beginning after December 15, 2005; however, the statement does not change the transition provisions of any existing accounting pronouncements. We adopted the pronouncement effective January 1, 2006. There was no material effect on our financial position, cash flows or result of operations as a result of this adoption.

21

Table of Contents

## Application of Critical Accounting Policies and Estimates

Our discussion and analysis of our financial condition and results of operations are based upon our consolidated condensed financial statements which have been prepared in accordance with generally accepted accounting principles in the United States. The preparation of these statements requires us to make estimates and judgments that affect the reported amount of assets, liabilities, revenue and expenses, and related disclosure of contingent assets and liabilities. We base our estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making the judgments about our revenue, cost of revenue and the carrying values of assets and liabilities that are not readily apparent from other sources. Because this can vary in each situation, actual results may differ from the estimates under different assumptions and conditions.

The following is a summary of the most critical of these estimates. For additional information, see Item 7, Part II, "Management Discussion and Analysis of Financial Condition and Results of Operations—Application of Critical Accounting Policies and Estimates" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2005. Although we believe that our estimates, assumptions, and judgments are reasonable, they are based upon information presently available. Actual results may differ significantly from these estimates under different assumptions, judgments, or conditions

### Revenue Recognition

*Activation and Services* – We generate revenue primarily from wireless carriers, as well as a satellite television carrier, who pay commissions and volume and performance-based bonuses, for activating wireless services and features on their networks. We may also charge for devices shipping and handling. We recognize commissions from wireless carriers upon shipment of activated devices to the customer. In addition to activation commissions, under certain conditions, certain carriers pay us a monthly residual fee for as long as a customer we activate for the carrier continues to be its subscriber, or for a fixed period of time depending on the carrier. We purchase satellite activation certificates evidencing activation rights in advance of their resale to customers. Revenue from satellite television customers includes sales of these satellite activation certificates, net of the certificate cost, since we are acting as an agent in the transaction.

Our revenue is reduced for estimated deactivations of the wireless services by customers prior to the expiration of a time period that ranges 120 to 210 days from the date of activation, depending on the wireless carrier. We estimate deactivations based on historical experience, which we have developed based on our experience with carriers, customer behavior and sources of customers, among other factors, allowing us to accrue estimates with what we believe is a high degree of certainty. Any increase or decrease in the deactivation amount will cause a corresponding dollar-for-dollar increase or decrease in revenue. As an example, the impact of a 1% change in the deactivation rate applied to the quarter ended March 31, 2006 would have an increase or decrease in revenue and the corresponding reserve of $0.7 million. Any decrease in revenue resulting from an increase in deactivations would also be offset, in part, by returns of wireless devices. Our reserves for deactivations are included in accounts receivable and deferred revenue on our balance sheet. If we determine that we cannot accurately predict future deactivation experience, we may be required to defer 100% of our carrier commission revenue until the expiration of the appropriate chargeback period. New channels for which we have insufficient historical data to adequately estimate deactivation experience will be deferred through the expiration period for a period of 24 months, until such time that we can accurately estimate the deactivation experience for the new channel.

In addition to receiving commissions for each wireless subscriber activated, we earn performance bonuses from the wireless carriers based on negotiated performance targets. The most significant bonus we earn is the quarterly volume bonus, which we bill wireless carriers for on a monthly basis, based on current month activations. We record these bonuses as deferred revenue at the time of billing until we achieve the quarterly targets. We earn other quarterly bonuses from certain carriers for maintaining low customer churn and signing up customers for certain additional monthly "features" such as data service or text messaging. Wireless carriers also periodically offer bonuses for achieving monthly volume and other performance targets and also formerly provided some bonus compensation under annual volume based plans. We recognize these monthly bonuses as earned in accordance with the provisions of SAB No. 104. Revenue is recognized only when all of the following criteria are met: (1) persuasive evidence of an arrangement exists, (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed or determinable, and (4) collectibility is reasonably assured. Amounts collected in cash prior to meeting the above criteria are recorded as deferred revenue. Through 2005, commission revenue earned from the activation of carrier features had been deferred until the contractual chargeback period had lapsed. Beginning in 2006, we began to estimate commission revenue earned from feature activations based on historical experience which we have developed based on our experience with carriers and customer behavior over a period of time in excess of 24-months. This allows us to accrue estimates with what we believe is a high degree of certainty in accordance with SAB 104.

22

Table of Contents

*Equipment revenue* —Revenue from the sale of devices and accessories in a multiple-element arrangement with services is recognized at the time of sale in accordance with EITF No. 00-21. Customers have the right to return devices within a specific period of time or usage, whichever occurs first. We provide an allowance for estimated returns on devices based on historical experience. In connection with our wireless activations, we sell the customer the wireless device at a significant discount, which may be in the form of a rebate. Rebates are recorded as a reduction of revenue and as a current liability until paid. We recognize rebate amounts based on the historical experience of rebates claimed. Future rebate experience could vary based upon rates of consumers redeeming rebates.

As of the most recent quarter ended March 31, 2006, our handset return rate was 9.8% of handset revenue. We have recorded handset return rates of 10.4% and 11.2% for the years ended December 31, 2005 and 2004, respectively. Any increase or decrease in the actual handset return experience will cause a corresponding dollar-for-dollar decrease or increase in revenue. The impact of a 1% change in the handset returns rate applied to the quarter ended March 31, 2006 would have resulted in an increase or decrease in revenue of approximately $0.2 million.

### Inventory Valuation

Our inventory consists of wireless devices and accessories. The carrying value of inventory is stated at the lower of cost or market value. Cost is determined using a method which approximates the first-in-first-out accounting method. We write down inventory for estimated obsolescence or unmarketable inventory equal to the difference between the cost of inventory and the estimated market value or replacement cost based upon assumptions about future demand and market conditions. If actual market conditions are less favorable than those projected, additional inventory write-downs may be required. Historically, we have not experienced significant write-offs, with the exception of returned, unmarketable inventory.

### Stock-based Compensation

We adopted SFAS No. 123(R) on January 1, 2006 using the MPA method. SFAS No. 123(R) established standards for the accounting for transactions in which an entity exchanges its equity instruments for goods or services. SFAS No. 123(R) requires us to measure the cost of employee services received in exchange for an award of equity instruments (usually stock options or unvested (restricted) stock awards based on the grant date fair value of the award. That cost is recognized over the period during which an employee is required to provide service in exchange for the award – the requisite service period (usually the vesting period). The amount of compensation expense recognized using the fair value method requires us to exercise judgment and make assumptions relating to the factors that determine the fair value of our stock option grants.

### Provision for Income Taxes

We have historically reported net losses and, in accordance with accounting principles generally accepted in the United States, have not recorded any income tax benefits from those losses. Although we intend to utilize net operating loss carryforwards to offset taxable income that may be generated in 2006, we expect alternative minimum tax amounts to be payable primarily due to the net operating loss carryforward limitations associated with the alternative minimum tax calculation. We continue to maintain a valuation allowance against our deferred tax assets, consisting primarily of net operating loss carryforwards, and we may recognize deferred tax assets in future periods when they are estimated to be realizable. To the extent we report taxable income in future periods, we intend to use our net operating loss carryforwards to the extent available to offset taxable income and reduce cash outflows for income taxes

23

Table of Contents

## ITEM 4.    CONTROLS AND PROCEDURES

### Disclosure Controls and Procedures

Management had previously concluded that our disclosure controls and procedures were effective as of March 31, 2006. However, in connection with the restatement of our March 31, 2006, June 30, 2006 and September 30, 2006 interim financial statements as fully described in Note 1 of this Form 10-Q/A, management determined that the material weaknesses described below existed as of March 31, 2006. Accordingly, our Chief Executive Officer and Chief Accounting Officer have now concluded that disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) were not effective as of March 31, 2006 to ensure information required to be disclosed by us in the reports we file or submit under the Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified within the SEC's rules and forms and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Accounting Officer, as appropriate, to allow timely decisions regarding required disclosure.

Not withstanding the material weaknesses described below, management believes the condensed consolidated financial statements included in this Quarterly Report on Form 10-Q/A fairly present in all material respects our financial condition, results of operations and cash flows for all periods presented.

A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood, that a material misstatement of the annual or interim quarterly financial statements will not be prevented or detected. Management identified material weaknesses in our internal controls including the following:

- *We did not maintain sufficient staffing of operational and financial resources.* We did not maintain staffing in operational and financial resources sufficient to provide the level of controls and analysis required on a timely basis in light of the increasing complexity and growth of our business. This resulted in certain accounting processes and controls not being performed on a timely basis and the inability to maintain an adequate control environment, resulting in numerous material adjusting entries being made after year end. This material weakness contributed to errors such as those relating to proper revenue recognition and accounts receivable described below.

- *We did not always effectively communicate information to our finance department* . Specifically, we failed to maintain effective communication channels to adequately identify and record certain transactions during 2006. The failure to provide this communication contributed to errors relating to accounting and reporting of expenses and liabilities. This material weakness caused or contributed to, adjustments necessary to appropriately record accounts receivable allowances and reserves for deactivations described below .

- *We did not maintain effective controls over the recordation, accuracy and completeness of activations and services revenue and related accounts receivable.*

  We did not take steps to adequately identify and appropriately record certain commission and bonus revenue received during the year from various wireless carriers in a timely and accurate manner. Recording amounts received from carriers in the appropriate accounts in a timely and accurate manner is an important business process control that is essential to the correct reporting of amounts in the financial statements. This material weakness contributed to errors relating to accounting and reporting for revenue and accounts receivable.

  We did not utilize an appropriate methodology during the year in recording receivables from wireless carriers associated with disputed deactivations, churn bonuses and other carrier related fees. We overstated accounts receivable by using a methodology that anticipated future improvements in collections beyond that supported by past experience, and which did not consider certain current factors and other information. As a result of this material weakness, an adjustment was necessary to properly record revenue and related receivables from these fees.

These material weaknesses resulted in adjustments to our revenue and accounts receivable and certain other financial statement line items as referred to above and resulted in the restatement of previously issued consolidated financial statements for the three month period ended March 31, 2006.

### Internal Controls over Financial Reporting

With the exception of the items described above, there have been no significant changes in our internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting for this current period.

24

Table of Contents

**PART II**

**ITEM 6.    EXHIBITS**

| Exhibit No. | Description |
| --- | --- |
| 31.1 | Rule 13a-14(a) Certification of Principal Executive Officer. |
| 31.2 | Rule 13a-14(a) Certification of Principal Financial Officer. |
| 32.1 | Section 1350 Certification of Chief Executive Officer. |
| 32.2 | Section 1350 Certification of Chief Financial Officer. |

25

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

INPHONIC, INC.

By:      /S/ DAVID A. STEINBERG
            **David A. Steinberg**
            **Chairman of the Board and**
            **Chief Executive Officer**

By:      /S/ GEORGE Z. MORATIS
            **George Z. Moratis**
            **Executive Vice President and**
            **Chief Accounting Officer**

Date: May 31, 2007

26

**CERTIFICATION PURSUANT TO**
**SECTION 302 OF**
**THE SARBANES-OXLEY ACT OF 2002**

I, David A. Steinberg, certify that:

1.   I have reviewed this Quarterly Report on Form 10-Q, as amended for the period ended March 31, 2006 of InPhonic, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)   All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: May 31, 2007

/s/ David A. Steinberg
David A. Steinberg
Chairman of the Board and Chief Executive Officer

**CERTIFICATION PURSUANT TO**
**SECTION 302 OF**
**THE SARBANES-OXLEY ACT OF 2002**

I, George Z. Moratis, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q, as amended for the period ended March 31, 2006 of InPhonic, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: May 31, 2007

/s/ George Z. Moratis
George Z. Moratis
Executive Vice President and Chief Accounting Officer

**EXHIBIT 32.1**

**Certification of Principal Executive Officer**
**Pursuant to 18 U.S.C. 1350**
**(Section 906 of the Sarbanes-Oxley Act of 2002)**

I, David A. Steinberg, Chairman and Chief Executive Officer (principal executive officer) of InPhonic, Inc. (the "Registrant"), certify that to the best of my knowledge, based upon a review of the Quarterly Report on Form 10-Q, as amended for the period ended March 31, 2006 of the Registrant (the "Report"):

(1)   The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934, as amended; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant.

/s/ David A. Steinberg
Name: David A. Steinberg
Date:  May 31, 2007

EXHIBIT 32.2

**Certification of Principal Financial Officer**
**Pursuant to 18 U.S.C. 1350**
**(Section 906 of the Sarbanes-Oxley Act of 2002)**

I, George Z. Moratis, Executive Vice President and Chief Accounting Officer (principal financial officer) of InPhonic, Inc. (the "Registrant"), certify that to the best of my knowledge, based upon a review of the Quarterly Report on Form 10-Q, as amended for the period ended March 31, 2006 of the Registrant (the "Report"):

(1)    The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934, as amended; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant.

/s/ George Z. Moratis
Name:  George Z. Moratis
Date:   May 31, 2007

# EXHIBIT N

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# Form 10-Q/A
### (Amendment No. 1)

---

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES AND EXCHANGE ACT OF 1934**

**For the quarter ended June 30, 2006**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____.**

**Commission File Number 000-51023**

---

# INPHONIC, INC.
#### (Exact name of Registrant as specified in its Charter)

---

| | |
|---|---|
| **Delaware** | **52-2199384** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer identification no.) |

| | |
|---|---|
| **1010 Wisconsin Avenue, Suite 600, Washington, DC** | **20007** |
| (Address of principal executive offices) | (Zip Code) |

**Registrant's telephone number, including area code: (202) 333-0001**

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒ .    No ☐ .

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐      Accelerated filer ☒      Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act.).    Yes ☐ .    No ☒ .

The registrant had 36,157,751 shares of common stock outstanding as of August 1, 2006.

Table of Contents

## EXPLANATORY NOTE

We filed our Quarterly Report on From 10-Q for the three and six months ended June 30, 2006 with the Securities and Exchange Commission (the "SEC") on August 9, 2006. We are filing this Form 10-Q/A Amendment No. 1 to amend and restate our unaudited financial statements for the three and six months ended June 30, 2006 and related footnote disclosures to correct errors in our accounting for activations and services and cost of revenue identified during the 2006 year-end audit. These adjustments reduced our activation and services revenue by $3.7 and $4.1 million and increased our equipment cost of revenue by $0.6 and $0.6 million for the three and six months ended June 30, 2006 respectively. Our net loss per share for the three and six months ended June 30, 2006 increased by $0.12 and $0.13 to ($0.26) and ($0.39), respectively. Please refer to Note 1(c) to the unaudited condensed consolidated financial statements for further explanation.

All referenced amounts in this report as of and for the three and six months ended June 30, 2006 reflect balances and amounts on a restated basis. All of our future Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q and Form 10-Q/A will reflect the restated information in this Form 10-Q/A, as applicable.

This Amendment No. 1 to our Quarterly Report on Form 10-Q for the three and six months ended June 30, 2006 amends only the following items:

Part I, Item 1 – Financial Statements

Part I, Item 2 – Management's Discussion and Analysis of Financial Condition and Results of Operations

Part I, Item 4 – Controls and Procedures

Part II, Item 6 – Exhibits and reports on Form 8-K

## INPHONIC, INC.

## INDEX

## FORM 10-Q

## PART I. – FINANCIAL INFORMATION

| | | Page |
|---|---|---|
| Item 1. | Financial Statements | 3 |
| | Unaudited Condensed Consolidated Balance Sheets at December 31, 2005 and June 30, 2006 | 3 |
| | Unaudited Condensed Consolidated Statements of Operations for the Three and Six Months Ended June 30, 2005 and June 30, 2006 | 4 |
| | Unaudited Condensed Consolidated Statements of Stockholders' Equity for the Six Months Ended June 30, 2006 | 5 |
| | Unaudited Condensed Consolidated Statements of Cash Flows for the Six Months Ended June 30, 2005 and June 30, 2006 | 6 |
| | Notes to Unaudited Condensed Consolidated Financial Statements | 7 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 19 |
| Item 4. | Controls and Procedures | 31 |

## PART II. – OTHER INFORMATION

| | | |
|---|---|---|
| Item 6. | Exhibits | 32 |
| **SIGNATURES** | | 33 |

Table of Contents

PART I

ITEM 1.    FINANCIAL STATEMENTS

INPHONIC, INC.
Condensed Consolidated Balance Sheets
(in thousands, except per share and share amounts)

| | December 31, 2005 | June 30, 2006 (restated) (unaudited) |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 70,783 | $ 47,411 |
| Short-term investments | — | 5,000 |
| Accounts receivable, net of allowance of $2,042 and $1,045, respectively | 34,606 | 56,672 |
| Inventory, net | 17,693 | 21,147 |
| Prepaid expenses | 2,405 | 4,741 |
| Deferred costs and other current assets | 6,823 | 2,532 |
| Current assets of discontinued operations | 2,430 | 597 |
| Total current assets | 134,740 | 138,100 |
| Restricted cash and cash equivalents | 400 | — |
| Property and equipment, net | 12,121 | 16,154 |
| Goodwill | 31,140 | 34,124 |
| Intangible assets, net | 12,651 | 10,721 |
| Deposits and other assets | 3,058 | 6,568 |
| Total assets | $ 194,110 | $205,667 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Current maturities of long-term debt and capital leases | $ 377 | $ 15,384 |
| Accounts payable | 29,556 | 51,524 |
| Accrued expenses and other liabilities | 31,588 | 25,489 |
| Current portion of deferred revenue | 13,851 | 9,858 |
| Current liabilities of discontinued operations | 3,130 | 1,601 |
| Total current liabilities | 78,502 | 103,856 |
| Long-term debt and capital lease obligations, net of current maturities | 15,474 | 406 |
| Deferred revenue, net of current portion | 284 | 599 |
| Total liabilities | 94,260 | 104,861 |
| Stockholders' equity: | | |
| Common stock, $0.01 par value | | |
| Authorized 200,000,000 shares at December 31, 2005 and June 30, 2006; issued and outstanding 35,232,869 and 36,106,153 shares at December 31, 2005 and June 30, 2006, respectively | 353 | 360 |
| Additional paid-in capital | 264,155 | 278,993 |
| Accumulated deficit | (164,658) | 178,547 |
| Total stockholders' equity | 99,850 | 100,806 |
| Total liabilities and stockholders' equity | $ 194,110 | $205,667 |

See accompanying notes to unaudited condensed consolidated financial statements

3

**Table of Contents**

**INPHO NIC, INC.**
**Unaudited Condensed Consolidated Statements of Operations**
**(in thousands, except per share and share amounts)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2005 | 2006 (restated) | 2005 | 2006 (restated) |
| Revenue: | | | | |
| Activations and services | $ 55,452 | $ 74,216 | $ 105,203 | $ 140,958 |
| Equipment | 19,774 | 17,912 | 38,174 | 38,148 |
| Total revenue | 75,226 | 91,128 | 143,377 | 179,106 |
| Cost of revenue, exclusive of depreciation and amortization: | | | | |
| Activations and services | 286 | 1,065 | 1,459 | 1,325 |
| Equipment | 41,718 | 50,510 | 80,668 | 98,431 |
| Total cost of revenue | 42,004 | 51,575 | 82,127 | 99,756 |
| Operating expenses: | | | | |
| Sales and marketing, exclusive of depreciation and amortization | 19,827 | 27,408 | 37,325 | 54,130 |
| General and administrative, exclusive of depreciation and amortization | 12,299 | 16,908 | 28,577 | 30,139 |
| Depreciation and amortization | 2,142 | 3,960 | 3,919 | 7,443 |
| Restructuring costs | 245 | 1,906 | 394 | 1,906 |
| Investment write-off | 228 | — | 228 | — |
| Total operating expenses | 34,741 | 50,182 | 70,443 | 93,618 |
| Operating loss | (1,519) | (9,629) | (9,193) | (14,268) |
| Other income (expense): | | | | |
| Interest income | 545 | 547 | 1,027 | 1,174 |
| Interest expense | (188) | (288) | (414) | (624) |
| Total other income | 357 | 259 | 613 | 550 |
| Loss from continuing operations | (1,162) | (9,370) | (8,580) | (13,718) |
| Discontinued operations: | | | | |
| Loss from discontinued operations | (490) | (206) | (66) | (171) |
| Net loss | $ (1,652) | $ (9,576) | $ (8,646) | $ (13,889) |
| Basic and diluted net loss per share: | | | | |
| Net loss from continuing operations | $ (0.04) | $ (0.26) | $ (0.26) | $ (0.38) |
| Net loss from discontinued operations | (0.01) | (0.01) | (0.00) | (0.01) |
| Basic and diluted net loss per share | $ (0.05) | $ (0.27) | $ (0.26) | $ (0.39) |
| Basic and diluted weighted average shares outstanding | 33,847,007 | 35,856,253 | 33,380,156 | 35,529,454 |

See accompanying notes to unaudited condensed consolidated financial statements

4

**Table of Contents**

**INPHONIC, INC.**
**Unaudited Condensed Consolidated Statements of Stockholders' Equity**
**(in thousands, except share amounts)**

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit (restated) | Total |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| **Balance, December 31, 2005** | 35,232,869 | $ 353 | $264,155 | $ (164,658) | $ 99,850 |
| Stock-based compensation expense | — | — | 7,511 | — | 7,511 |
| Issuance of common stock in connection with the acquisition and earnouts of: | | | | | |
|    A1 Wireless, Inc. | 15,408 | — | 235 | — | 235 |
|    VMC Satellite, Inc. | 482,146 | 5 | 3,617 | — | 3,622 |
| Issuance of common stock warrant | — | — | 3,228 | — | 3,228 |
| Repurchase and retirement of common stock | (62,761) | (1) | (502) | — | (503) |
| Exercise of common stock options, restricted stock awards and other | 438,491 | 3 | 749 | — | 752 |
| Net loss | — | — | — | (13,889) | (13,889) |
| **Balance, June 30, 2006 (restated)** | 36,106,153 | $ 360 | $278,993 | $ (178,547) | $100,806 |

See accompanying notes to unaudited condensed consolidated financial statements

5

Table of Contents

**INPHONIC, INC.**
**Unaudited Condensed Consolidated Statements of Cash Flows**
**(in thousands)**

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2005 | 2006 |
| | | (restated) |
| Cash flows from operating activities: | | |
| Net loss | $  (8,646) | $(13,889) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 3,919 | 7,443 |
| Non-cash sales and marketing expense related to common stock warrant | — | 135 |
| Non-cash interest expense, net | 324 | — |
| Stock-based compensation | 9,796 | 7,110 |
| Non-cash write-off of investment | 228 | — |
| Changes in operating assets and liabilities, net of assets and liabilities received from business acquisition: | | |
| Accounts receivable | (20,542) | (21,925) |
| Inventory | (6,931) | (3,454) |
| Prepaid expenses | (741) | (2,336) |
| Deferred costs and other assets | 164 | 4,295 |
| Deposits and other assets | (439) | 161 |
| Accounts payable | 7,376 | 21,037 |
| Accrued expenses and other liabilities | 4,117 | (2,722) |
| Deferred revenue | 2,137 | (3,678) |
| Net cash used in operating activities | (9,238) | (7,823) |
| Cash flows from investing activities: | | |
| Capitalized expenditures, including internal capitalized labor | (6,026) | (8,874) |
| Cash paid for acquisitions | (6,269) | (3,028) |
| Cash paid for intangible assets | (2,439) | (193) |
| Purchase of short-term investments | (17,860) | (5,000) |
| Proceeds from the sale of assets of discontinued operations | — | 1,110 |
| Reduction in restricted cash and cash equivalents | — | 400 |
| Net cash used in investing activities | (32,594) | (15,585) |
| Cash flows from financing activities: | | |
| Principal repayments on debt | (146) | (213) |
| Cash paid for repurchase of common stock | — | (503) |
| Proceeds from exercise of warrants and options | 6,543 | 752 |
| Net costs of initial public offering | (291) | — |
| Net cash provided by financing activities | 6,106 | 36 |
| Net decrease in cash and cash equivalents | (35,726) | (23,372) |
| Cash and cash equivalents, beginning of the period | 100,986 | 70,783 |
| Cash and cash equivalents, end of the period | $ 65,260 | $ 47,411 |
| Supplemental disclosure of cash flows information: | | |
| Cash paid during the period for: | | |
| Interest | $       90 | $      263 |
| Income taxes | — | — |
| Supplemental disclosure of non-cash activities: | | |
| Issuance of common stock in business acquisitions | 8,209 | 3,856 |
| Issuance of common stock in intangible asset purchase | 1,549 | — |
| Release of funds in escrow related to A1 Wireless acquisition | 10,700 | — |
| Issuance of warrant to purchase common stock to vendor | — | 3,228 |
| Purchase consideration in accrued liabilities | 3,000 | — |

See accompanying notes to unaudited condensed consolidated financial statements

6

Table of Contents

INPHONIC, INC.

**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(in thousands, except per share and share amounts)**

**(1)    The Company and Basis of Presentation**

**(a)    *Preparation of Interim Financial Statements***

We have prepared the accompanying condensed consolidated financial statements pursuant to the rules and regulations of the U.S. Securities and Exchange Commission (the "SEC") for interim financial reporting. The financial information included herein, other than the consolidated balance sheet as of December 31, 2005, has been prepared without audit. The consolidated balance sheet at December 31, 2005 has been derived from, but does not include all the disclosures contained in the audited financial statements for the year ended December 31, 2005. The preparation of consolidated financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of certain assets and liabilities, the disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reported period. In the opinion of management, these unaudited statements include all the adjustments and accruals necessary for a fair presentation of the results of the periods presented herein. These condensed consolidated financial statements should be read in conjunction with the consolidated financial statements and accompanying notes included in our Annual Report on Form 10-K for the year ended December 31, 2005. The results of operations for the interim periods presented are not necessarily indicative of the results that may be expected for a full year. Certain prior year amounts have been reclassified to conform to the current period presentation.

**(b)    *Business***

We are a leading online seller of wireless services and devices based on the number of activations of wireless services sold online in the United States. We sell wireless service plans and devices, including satellite television services through our own branded websites; including Wirefly.com, A1 Wireless.com, and VMCsatellite.com and through websites that we create and manage for third parties. We offer marketers the ability to sell wireless voice and data services and devices under mobile virtual network enabler ("MVNE") agreements. This service utilizes the same e-commerce platform, operational infrastructure and marketing relationships that we use in our operations. We provide customers the ability to organize personal communication by providing real time wireless access to e-mail, voicemail, faxes, contacts, scheduling, calendar and conference calling functionality through a website or telephone.

**(c)    *Restatement***

We have restated our consolidated financial statements as of and for the three and six month periods ended June 30, 2006 to reflect the correction of the following errors related to the application of our revenue recognition and cost of revenue accounting policies which had been identified in the audit of our financial statements for the year ended December 31, 2006:

During the three months ended March 31, 2006, we had recorded revenue for certain of our features activations and services commissions in which it was subsequently determined that collectibility was not reasonably assured. As a result we reduced our revenue and accounts receivable by approximately $393 for this adjustment.

During the three months ended June 30, 2006, we had recorded activations and services revenue net of related reserves as a change in estimate of certain carrier commissions in dispute which we had previously deemed as collectible. Upon further evaluation, we believe that it was inappropriate to have recorded revenue associated with this matter until such commissions are collected from the carrier. In addition, we identified other errors related to the recording of activations and services revenue of approximately $923 as it was subsequently determined that collectibility of these amounts was not reasonably assured based on our collection experience. Accordingly, we reduced our revenue and accounts receivable by approximately $3,674 for this adjustment.

In addition during the three months ended June 30, 2006, we identified errors that occurred in the recordation of cost of revenue and accounts receivable in the amount of $627 that have been corrected in the accompanying financial statements. The impact on our financial statements for these items for the three and six months ended June 30, 2006 is shown in the table below:

|  | June 30, 2006 (reported) | June 30, 2006 (adjustments) | June 30, 2006 (restated) |
|---|---|---|---|
| Accounts receivable | $ 61,366 | $ (4,694) | $ 56,672 |
| Total current assets | 142,794 | (4,694) | 138,100 |
| Total assets | 210,361 | (4,694) | 205,667 |
| Accumulated deficit | (173,853) | (4,694) | (178,547) |
| Total stockholders' equity | 105,500 | (4,694) | 100,806 |
| Total liabilities and stockholders' equity | 210,361 | (4,694) | 205,667 |

Table of Contents

| | Three Months Ended June 30, 2006 | | | For the six months ended | | |
|---|---|---|---|---|---|---|
| | 30-Jun (reported) | 30-Jun (adjustments) | 30-Jun (restated) | 30-Jun (reported) | 30-Jun (adjustments) | 30-Jun (restated) |
| Revenue: | | | | | | |
| Activations and services | $77,890 | $ (3,674) | $74,216 | $145,025 | $ (4,067) | $140,958 |
| Total revenue | 95,802 | (3,674) | 92,128 | 183,173 | (4,067) | 179,106 |
| Cost of revenue, exclusive of depreciation and amortization Equipment | $49,883 | $ 627 | $50,510 | $ 97,804 | $ 627 | $ 98,431 |
| Total cost of revenue | 50,948 | 627 | 51,575 | 99,129 | 627 | 99,756 |
| Operating loss | (5,328) | (4,301) | (9,629) | (9,574) | (4,694) | (14,268) |
| Loss from continuing operations | (5,069) | (4,301) | (9,370) | (9,024) | (4,694) | (13,718) |
| Net loss | (5,275) | (4,301) | (9,576) | (9,195) | (4,694) | (13,889) |
| Net loss per share: | | | | | | |
| Net loss from continuing operations | (0.14) | (0.12) | (0.26) | (0.25) | (0.13) | (0.38) |
| Basic and diluted net loss per share | (0.15) | (0.12) | (0.27) | (0.26) | (0.13) | (0.39) |

| | For the six months ended | | |
|---|---|---|---|
| | 30-Jun (reported) | 30-Jun (adjustments) | 30-Jun (restated) |
| Cash flows from operating activities: | | | |
| Net loss | $ (9,195) | $ (4,694) | $(13,889) |
| Accounts receivable | (26,619) | 4,694 | $(21,925) |

*(d)   Risks and Uncertainties*

Our operations are subject to certain risks and uncertainties including, among others, actual and potential competition by entities with greater financial resources, rapid technological changes, the need to retain key personnel and protect intellectual property and the availability of additional capital financing on terms acceptable to us.

Since inception we have incurred net losses attributable to common stockholders of approximately $178,547. To date, management has relied on debt and equity financings to fund our operating deficit. While we currently have $52,411 of cash and cash equivalents and short-term investments on hand as of June 30, 2006, we may require additional financing to fund future operations.

*(e)   Acquisitions and Discontinued Operations*

We acquired certain assets and assumed certain liabilities of A1 Wireless USA, Inc. ("A1 Wireless") on January 4, 2005; VMC Satellite, Inc. ("VMC") on April 26, 2005; and FONcentral.com, Inc. ("FC") on May 26, 2005. We accounted for these transactions using the purchase method of accounting in accordance with Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations.*  Accordingly our results of operations include the operating results of A1 Wireless effective January 1, 2005, VMC as of April 26, 2005 and FC as of May 26, 2005.

On December 31, 2005, we completed the sale of substantially all of the operating assets of our mobile virtual network operator ("MVNO") Liberty Wireless ("Liberty") to Teleplus Wireless Corp, a subsidiary of Teleplus Enterprises, Inc. The sale of Liberty has enabled us to streamline and focus our resources on our other operations including the growth of our MVNE business. The sale of Liberty was recorded as a discontinued operation in the financial statements pursuant to SFAS No. 144, *Accounting for Impairment or Disposal of Long Lived Assets.* Cash flows pertaining to discontinued operations are not disclosed separately in the Unaudited Condensed Consolidated Statements of Cash Flows.

**(2)   Summary of Significant Accounting Policies**

*(a)   Revenue Recognition*

*Activations and Services Revenue*

We recognize revenue from the sale of wireless services and the provisioning of MVNE and data services.

*Wireless Services:* We generate revenue from wireless carriers, including a satellite television carrier, who pay commissions and volume and performance-based bonuses, for activating wireless subscribers. We recognize commissions from wireless carriers upon shipment of activated devices to the customer. In addition to activation

Table of Contents

commissions certain carriers pay us a monthly residual fee either for as long as a customer who we activate for that carrier continues to be its subscriber, or for a fixed period of time depending on the carrier. We purchase satellite activation certificates evidencing activation rights in advance of their resale to customers. Revenue from satellite television customers includes sales of these satellite activation certificates, net of the certificate cost, as we are acting as an agent in the transaction. Our wireless revenue is reduced for estimated deactivations of customers prior to the expiration of a time period that ranges 120 to 180 days from the date of activation, depending on the wireless carrier. We estimate deactivations based on historical experience, which we developed based on our experience with carriers, customer behavior and sources of customers, among other factors, allowing us to accrue estimates with what we believe is a high degree of certainty. If we determine that we cannot accurately predict future deactivation experience, we may be required to defer 100% of our carrier commissions revenue until the expiration of the appropriate chargeback period. Our reserves for deactivations are included in accounts receivable and deferred revenue on the accompanying balance sheets.

In addition to receiving commissions for each wireless subscriber activated, we earn performance bonuses from the wireless carriers based on negotiated performance targets. The most significant bonus we earn is the quarterly volume bonus, which we bill wireless carriers for on a monthly basis, based on current month activations. We record these bonuses as deferred revenue at the time of billing until we achieve the quarterly targets. We also earn other quarterly bonuses from certain carriers for maintaining low customer churn and signing up customers for certain additional monthly "features" such as text messaging or data service. Wireless carriers also periodically offer bonuses for achieving monthly volume and other performance targets. We recognize these monthly bonuses as earned in accordance with the provisions of Staff Accounting Bulletin ("SAB") No. 104, *Revenue Recognition in Financial Statements* . Revenue is recognized only when all of the following criteria are met: (1) persuasive evidence of an arrangement exists, (2) delivery has occurred or services have been rendered, (3) the seller's price to the buyer is fixed or determinable, and (4) collectibility is reasonably assured. Amounts collected in cash prior to meeting the above criteria are recorded as deferred revenue. Through 2005, commission revenue earned from the activation of carrier features had been deferred until the contractual chargeback period had lapsed. Beginning in 2006, we began to estimate commission revenue earned from feature activations based on historical experience which we have developed based on our experience with carriers and customer behavior over a period of time in excess of 24 months.

*MVNE Services:* We offer marketers the ability to sell wireless services to their customers under their own brands using our e-commerce platform and operational infrastructure through MVNE contracts. We receive fees for the development of the network platform, for custom functional enhancements to the network platform, and for operational support services. We defer the fees attributable to the production of the network platform and recognize these fees and costs over the expected life of the agreement (typically 12 to 48 months). Fees received for custom functional enhancements to the network platform and for operational services are deferred until all revenue criteria have been satisfied. Deferred revenue from MVNE contracts as of December 31, 2005 and June 30, 2006 was $1,852 and $1,776, respectively.

*Data Services:* We sell data services, including a service that allows customers to access email, voicemail, facsimiles, contacts and personal calendar information through a website or a telephone; wireless email; and mobile marketing services. We bill customers and recognize revenue monthly, as the services are performed.

9

Table of Contents

*Equipment Revenue*

    Revenue from the sale of wireless devices and accessories in a multiple-element arrangement with services are recognized at the time of sale in accordance with *Emerging Issues Task Force* EITF No. 00-21, *Revenue Arrangements with Multiple Deliverables,* when fair value of the services element exists. Customers have the right to return devices within a specific period of time or usage, whichever occurs first. We provide an allowance for estimated returns of devices based on historical experience. In accordance with the provisions of SAB No. 104, we determined we have sufficient operating history to estimate equipment returns. In connection with wireless activations, we sell customers wireless devices at a significant discount (equipment discount provision or "EDP"), which is generally in the form of a rebate. Rebates are recorded as a reduction of revenue. We recognize equipment revenue, less a reserve for customer rebates (accrued consumer liabilities), which is based on historical experience of rebates claimed. Future experience could vary based upon rates of consumers redeeming rebates.

    In the event a customer terminates their wireless service with the carrier within six months of activation and opts not to return the wireless device to us within the time frames permitted within our return policy, in many instances our sales contracts with the customer permit us to charge the customer an EDP termination fee for each unreturned device. Prior to the three months ended June 30, 2006, revenue recognition of such fee was deferred until such fee was collected from the customer pursuant to SAB 104 as we did not have adequate historical collection data to reasonably estimate the ultimate collectibility of the receivable. Beginning April 1, 2006, we began to estimate EDP termination fee revenue based on historical experience of customer collection behavior which we have developed over a time period of 24 months which provides the basis on which to accrue revenue with an appropriate assurance of collectibility pursuant to SAB 104. As of March 31, 2006, $293 of such revenue was deferred, which would have been accrued for in the event that we had adequate customer collection history, less an estimated reserve for uncollectible amounts. As of June 30, 2006, we had accrued as accounts receivable approximately $786 in such EDP fees.

(b) **Concentrations of Credit Risk**

    Financial instruments that potentially subject us to a concentration of credit risk consist principally of accounts receivable. We extend credit to wireless network carriers ("carriers") on an unsecured basis in the normal course of business. Three carriers accounted for 67% and 76% of accounts receivable, net of the deactivation reserve, as of December 31, 2005 and June 30, 2006, respectively.

    For the three and six months ended June 30, 2005 and 2006, revenue from three carriers exceeded 10% of our total revenue. Revenue as a percentage of total revenue for these carriers was as follows:

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
|  | 2005 | 2006 | 2005 | 2006 |
| Customer A | 27% | 35% | 25% | 35% |
| Customer B | 13% | 16% | 16% | 15% |
| Customer C | 14% | 16% | 13% | 16% |
| Total | 54% | 67% | 54% | 66% |

(c) **Accrued Expenses and Other Liabilities**

    Accrued expenses and other liabilities at December 31, 2005 and June 30, 2006 consisted of:

|  | As of | |
| --- | --- | --- |
|  | December 31, 2005 | June 30, 2006 |
| Accrued consumer liabilities | $ 18,289 | $14,377 |
| Commitment to provide inventory to vendor | — | 4,000 |
| Accrued payroll and related expenses | 1,452 | 1,301 |
| Accrued acquisition costs and severance costs | 5,063 | 896 |
| Accrued taxes payable | 593 | 321 |
| Other | 6,191 | 4,594 |
|  | $ 31,588 | $25,489 |

(d) **Restructuring Costs**

    We implemented a restructuring plan following the acquisition of A1 Wireless, to take advantage of synergies gained through the acquisition and to restructure our operations for efficiency purposes. For the three months ended June 30, 2005, we recognized $245 in restructuring costs, $219 of which related to workforce

Table of Contents

reduction and the remaining $26 to excess facilities. During the six months ended June 30, 2005, we recognized $394 in restructuring costs, of which $358 related to workforce reduction and the remaining $36 to excess facilities. All costs related to this plan were paid out in 2005.

11

Table of Contents

During the three months ended June 30, 2006, we implemented a restructuring plan related to changes in our management and operational structure. For the three and six months ended June 30, 2006, we recognized $1,906 related to the termination of our former president and chief operating officer and thirteen other senior executives and employees. Of this amount, $594 related to severance benefits that will be paid out in cash to the recipients on a monthly or bi-monthly basis over the terms of their respective severance agreements and $1,312 related to severance expenses incurred as a result of the modification of stock-based compensation awards under which vesting of 50% of unvested restricted share and option awards was accelerated for three of the former employees.

At June 30, 2006, we had an accrued liability recorded of $553 of which approximately $473 will be paid out in cash by December 31, 2006. In addition, accrued liabilities included $368 related to the acceleration of the stock-based compensation awards described above under which the underlying shares of common stock were not distributed to two of the recipients by June 30, 2006. We expect to distribute these shares in the third quarter of 2006.

*(e)* **Loss on investment**

During the six months ended June 30, 2005, we sold all data service software acquired from Avesair Inc. in May 2003, to a third party vendor and wrote off related capitalized labor, intangible assets, goodwill and other costs related to this asset. As a result of this transaction, we recognized a loss of $228 during the three months ended June 30, 2005.

*(f)* **Stock-Based Compensation**

We adopted Statement of Financial Accounting Standards "SFAS" No. 123 (revised 2004), *Share Based Payment* (SFAS No. 123(R)) on January 1, 2006 using the modified prospective application method ("MPA"). SFAS No. 123(R) established standards for the accounting for transactions in which an entity exchanges its equity instruments for goods or services. SFAS No. 123(R) requires us to measure the cost of employee services received in exchange for an award of equity instruments (usually stock options or unvested (restricted) stock awards) based on the grant-date fair value of the award. That cost is recognized over the period during which an employee is required to provide service in exchange for the award – the requisite service period (usually the vesting period).

Prior to our adoption of SFAS No. 123(R), we applied the intrinsic value method of accounting for employee stock-based compensation as prescribed by Accounting Principles Board ("APB") Opinion No. 25, *Accounting for Stock Issued to Employees,* and related interpretations including FASB Interpretation ("FIN") No. 44, *Accounting for Certain Transactions involving Stock Compensation an Interpretation of APB Opinion No. 25* , to account for our stock option grants to employees. Under this method, compensation expense was recorded on the date of the grant only if the current market price of the underlying stock exceeded the exercise price. SFAS No. 123, *Accounting for Stock-Based Compensation* ("SFAS No. 123"), established accounting and disclosure requirements using a fair value-based method of accounting for stock-based employee compensation plans. As permitted by SFAS No. 123, we had elected to continue to apply the intrinsic value-based method of accounting described above, and had adopted the disclosure requirements of SFAS No. 123. All shares of restricted stock awarded to employees were accounted for at fair value in accordance with SFAS No. 123.

Under the MPA method, compensation cost for all share-based payments granted prior to, but not vested as of December 31, 2005, is based on the grant date fair value estimated in accordance with the pro forma provisions of SFAS No. 123, and compensation cost for all share based payments granted subsequent to December 31, 2005, will be based on the grant date fair value estimated in accordance with the provisions of SFAS No.123(R). Results for prior periods have not been restated. We use the ratable method of attributing the value of stock-based compensation to expense. SFAS No. 123(R) requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. In our pro forma information required under SFAS No. 123 for the periods prior to January 1, 2006, we accounted for forfeitures as they occurred. The fair value of each option granted is estimated on the grant date using the Black-Scholes option pricing model which takes into account as of the grant date the exercise price and expected life of the option, the current price of the underlying stock and its expected volatility, expected dividends on the stock and the risk-free interest rate for the term of the option.

12

*Stock Options* – We have two stock plans under which we have issued or may issue options to purchase shares of our common stock. The 1999 Stock Incentive Plan (the "1999 Plan"), provided for grants of stock-based awards from time to time to employees, officers, directors and consultants of the Company at exercise prices determined by the board of directors. Options granted under the 1999 Plan generally vest over a four-year period and expire ten years from the grant date. As of November 19, 2004, no additional options were available for grant under the 1999 Plan due to the adoption of the 2004 Equity Incentive Plan (the "2004 Plan").

The 2004 Plan allows for grants of stock-based awards from time to time to employees, officers, directors and consultants at exercise prices determined by the board of directors. For incentive stock options, the exercise price must be at least equal to fair market value at the date of grant. For nonqualified stock options, the option may be granted with an exercise price less than fair market value. Options granted under the 2004 Plan vest over a period to be determined by the administrator, generally four years, and expire ten years from the grant date.

For the three and six months ended June 30, 2006 as a result of our adoption of SFAS No. 123 (R), we recognized stock-based compensation expense related to employee options granted prior to January 1, 2006 of $2,299 and $3,858, of which $88 and $235, respectively, was capitalized in accordance with our compensation policies and SFAS No. 123(R).

In addition on March 22 and June 13 of 2006, we granted options to certain of our employees to purchase 679,900 and 207,000 shares of our common stock, respectively. The options granted on March 22, 2006 and June 13, 2006 were granted at an exercise price of $6.46 and $6.51 per share, respectively. The grant date fair value of employee share options was estimated using the Black Scholes option-pricing model with the following assumptions: an expected life averaging 5.77 years; an average volatility of 72%; no dividend yield; and a risk-free interest rate averaging 4.75%. The weighted average fair value per share of options granted was $4.29. Compensation cost of the grant was reduced by an estimated forfeiture amount based on an annual experience rate of 9.93%. As of the date of grants, total compensation cost related to the grants including estimated forfeitures was approximately $2,324 and $715 for the March 22, 2006 and June 13, 2006 grants, respectively. Stock-based compensation expense for these grants for the three and six months ended June 30, 2006 was $97 and $126 respectively.

The impact of adopting SFAS No. 123(R) increased stock-based compensation expense included in our operating expenses and reduced net income from continuing operations by approximately $1,244 and $1,748 for the three and six months ended June 30, 2006 respectively or $0.03 and $0.05 per basic and diluted share. There was no impact from the adoption on cash flow from operations or cash flows from financing activities.

The following table summarizes the activity for stock options granted to employees and non-employees for the six months ended June 30, 2006.

| | Number of options | Weighted average exercise price | Weighted average contractual term | Aggregate intrinsic value |
|---|---|---|---|---|
| Balance January 1, 2006 | 5,115,969 | $ 9.47 | | |
| Granted | 886,900 | 6.35 | | |
| Exercised | (152,847) | 4.93 | | |
| Forfeited | (550,717) | 11.37 | | |
| Balance June 30, 2006 | 5,299,305 | $ 8.89 | 7.96 | $2,537,656 |
| Ending vested & expected to vest | 4,962,939 | $ 8.85 | 7.88 | $2,465,793 |
| Exercisable at June 30, 2006 | 2,754,733 | $ 8.29 | 7.18 | $1,743,915 |

The weighted-average grant date fair value of options granted during the six months ended June 30, 2006 was $4.29. The total intrinsic value of options exercised during the six months ended June 30, 2006 was $324.

Table of Contents

*Restricted Common Stock* – During the six months ended June 30, 2006, we granted 1,205,127 shares of restricted common stock to certain of our key employees. The restrictions on this common stock lapse and the stock vests over periods ranging up to four years from the grant date. The following table summarizes the activity for restricted stock for the six months ended June 30, 2006.

| | Number of Restricted Stock Awards | Weighted-average grant date fair value |
|---|---|---|
| Nonvested at January 1, 2006 | 1,137,878 | $ 16.48 |
| Granted | 1,205,127 | 6.21 |
| Vested | (304,938) | 16.06 |
| Surrendered for taxes | (31,921) | 15.72 |
| Forfeited | (112,230) | 17.52 |
| Nonvested at June 30, 2006 | 1,893,916 | $ 10.00 |

As of June 30, 2006, there was approximately $14,014 of total unrecognized compensation cost related to restricted share-based compensation arrangements. That cost is expected to be recognized over a weighted-average period of 1.71 years. The total fair value of shares vested during the six months ended June 30, 2006 was approximately $4,899.

*Stock Purchase Warrants* – In April 2006, we issued a warrant to purchase 566,324 shares of our common stock at an exercise price of $7.35 per share. The estimated fair value of the warrant granted was determined using the Black Scholes Model. The weighted average grant date fair value per share of this warrant was $5.70. The following table summarizes warrant activity for the six months ended June 30, 2006:

| | Number of warrants | Weighted average exercise price | Range of exercise |
|---|---|---|---|
| Balance January 1, 2006 | 787,863 | $ 8.44 | $ 0.03 -15.60 |
| Granted | 566,324 | 7.35 | 7.35 |
| Exercised | (17,270) | 0.28 | 0.03 - 14.04 |
| Surrendered for cashless exercise | (627) | 2.25 | 0.03 - 2.49 |
| Balance June 30, 2006 | 1,336,290 | $ 8.08 | $ 0.03 -15.60 |

In April 2006, we issued an additional warrant to purchase 188,775 shares of our common stock to a vendor that is exercisable upon certain performance conditions. The exercise price of the warrant will be based on the trading price of our common stock at the time the performance conditions are met by the vendor. Once it is probable that the vendor will achieve the performance conditions set forth under the terms of the warrant, the fair value of the warrant will be amortized to sales and marketing expense over the remaining contractual term of the vendor commitment.

Warrants outstanding at June 30, 2006 were exercisable for 1,336,290 shares of our common stock, excluding this contingent warrant.

14

Table of Contents

Our pro forma net loss per common share, basic and diluted, for the three and six months ended June 30, 2005 was as follows:

| | Three Months Ended June 30, 2005 | Six Months Ended June 30, 2005 |
|---|---|---|
| Net loss as reported | $ (1,652) | $ (8,646) |
| Add: Stock-based employee compensation expense included in net loss as reported, net of related tax effects | 2,529 | 9,172 |
| Less: Total stock-based employee compensation determined under fair value based methods for all stock award, net of related tax effects | (2,653) | (5,171) |
| Pro forma net loss | $ (1,776) | $ (4,645) |
| Net loss per common share, basic and diluted, as reported | $ (0.05) | $ (0.26) |
| Net loss per common share, basic and diluted, pro forma | $ (0.05) | $ (0.14) |
| Basic and diluted weighted average common shares outstanding | 33,847,007 | 33,380,156 |

Stock-based compensation which includes compensation recognized on stock option grants and restricted stock awards has been included in the following line items in the accompanying condensed consolidated financial statements. There was no tax benefit recognized in the statements of operations for stock-based awards in either period.

| | As of | |
|---|---|---|
| | December 31, 2005 | June 30, 2006 |
| Balance Sheet: | | |
| Property and equipment, net | $ — | $ 286 |

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2005 | 2006 | 2005 | 2006 |
| Statement of operations: | | | | |
| Sales and marketing | $ 456 | $ 819 | $1,052 | $1,538 |
| General and administrative | 2,210 | 2,097 | 8,555 | 4,260 |
| Restructuring | — | 1,312 | — | 1,312 |
| Income from discontinued operations | 126 | — | 189 | — |
| | $ 2,792 | $4,228 | $9,796 | $7,110 |

During the three and six months ended June 30, 2006, we modified the stock-based awards of 5 employees which accelerated the vesting of 81,035 shares of restricted stock and options underlying 122,258 shares of our common stock. As a result of the expedited vesting, we accelerated expense recognition of the compensation cost associated with the newly vested shares. Accordingly, stock-based compensation expense includes $1,312 from these actions. Incremental compensation cost arising from the modifications to the vesting terms of the awards was not significant.

**(g)** *Net Loss per Share*

We calculate net loss per share in accordance with SFAS No. 128, *Earnings Per Share* . Basic net loss per common share excludes any dilutive effects of options, warrants, restricted stock and convertible securities and is calculated by dividing net loss attributable to common stockholders by the weighted average number of common shares issuable and outstanding for the period. Diluted net loss per common share equals basic net loss per common share, as the effects of options, warrants, restricted stock and convertible securities will be anti-dilutive.

15

Table of Contents

The following table reconciles net loss and basic and diluted weighted average common shares outstanding to the historical or pro forma net loss and the pro forma basic and diluted weighted average common shares outstanding for the three and six months ended June 30, 2005 and 2006.

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2005 | 2006 | 2005 | 2006 |
| | | (restated) | | (restated) |
|---|---|---|---|---|
| Net loss from continuing operations | $ (1,162) | $ (9,370) | $ (8,580) | $ (13,718) |
| Net loss from discontinued operations | (490) | (206) | (66) | (171) |
| Net loss | $ (1,652) | $ (9,576) | $ (8,646) | $ (13,889) |
| Weighted average shares outstanding | | | | |
| Basic and diluted earnings per share: | 33,847,007 | 35,856,253 | 33,380,156 | 35,529,454 |
|    Net loss from continuing operations | $ (0.04) | $ (0.26) | $ (0.26) | $ (0.38) |
|    Net loss from discontinued operations | (0.01) | (0.01) | (0.00) | (0.01) |
| Basic and diluted earnings per share | $ (0.05) | $ (0.27) | $ (0.26) | $ (0.39) |

During the three and six months ended June 30, 2006 and 2005, we incurred a net loss. If our outstanding common stock equivalents were exercised or converted into common stock, the result would have been anti-dilutive and, accordingly, basic and diluted net loss attributable to common stockholders per share are identical for all periods presented in the accompanying condensed consolidated statements of operations. The following summarizes our potential outstanding common stock as of the end of each period:

| | June 30, | |
| | 2005 | 2006 |
|---|---|---|
| Options to purchase common stock | 5,881,423 | 5,299,305 |
| Restricted stock awards | 269,266 | 1,893,916 |
| Warrants to purchase common stock | 942,380 | 1,525,065 |
| Options awarded in connection with the VMC acquisition | 210,379 | — |
| Total options, warrants and restricted stock awards convertible into common stock | 7,303,448 | 8,718,286 |

**(3)    Discontinued Operations**

On December 31, 2005, we completed the sale of substantially all of the operating assets of our Liberty Wireless business. During the six months ended June 30, 2006 we collected $1,110 of notes receivable recorded at December 31, 2005 related to the divestiture.

Summary of operating results for the discontinued operations is as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2005 | 2006 | 2005 | 2006 |
|---|---|---|---|---|
| Revenue | $ 6,392 | $ — | $ 14,848 | $ — |
| Costs and expenses | (6,882) | (206) | (14,914) | (171) |
| Loss from discontinued operations | $ (490) | $ (206) | $ (66) | $ (171) |

16

Table of Contents

Balance sheet data included:

| | As of | |
| --- | --- | --- |
| | December 31, 2005 | June 30, 2006 |
| Accounts and notes receivable, net | $ 1,848 | $ 597 |
| Other current assets | 582 | — |
| Assets of discontinued operations | $ 2,430 | $ 597 |
| Accounts payable | $ 931 | $ — |
| Other accrued expenses | 2,199 | 1,601 |
| Liabilities of discontinued operations | $ 3,130 | $1,601 |

**(4)    Goodwill**

The following table reflects the changes to goodwill for the six months ended June 30, 2006:

| | |
| --- | --- |
| Balance as of December 31, 2005 | $ 31,140 |
| Goodwill arising from VMC Satellite, Inc. earn-out [1] | 2,984 |
| Balance as of June 30, 2006 | $ 34,124 |

---

(1)    We achieved the earn-out performance target stipulated in the VMC Asset Purchase Agreement on February 28, 2006 and accordingly recorded additional goodwill of $2,984. The earn-out consideration consisted of amounts that were paid in cash of $2,362 and 119,389 shares of our common stock with a fair value of $622. Such consideration was in April 2006.

**(5)    Debt**

We maintain a revolving operating line of credit which allows for aggregate borrowings of up to $25,000 subject to certain limits based on accounts receivable and inventory levels. At June 30, 2006 and December 31, 2005, there was $15,000 outstanding under this line of credit. As of June 30, 2006, we had no additional borrowing availability under the facility based on the limits described above. The line of credit expires effective January 1, 2007 and accordingly the outstanding balance has been classified as a current liability as of June 30, 2006. Borrowings outstanding under the line of credit are secured by substantially all of our assets. Under the terms of the facility, we are required to maintain a current ratio, as defined, of no less than 1.1 to 1. We are also required to maintain an unrestricted cash balance of no less than $10,000 held at the bank and to meet certain minimum levels of EBITDA, as defined. As of June 30, 2006, we were in compliance with the financial covenants under the credit facility.

**(6)    Repurchase of Common Stock**

On August 17, 2005, our Board of Directors authorized the repurchase of up to $30,000 of our common stock through August 17, 2006. The shares may be repurchased by us from time to time at prevailing market prices. The timing and amount of any shares repurchased are based on market conditions and other factors. Repurchases may also be made under a Rule 10b5-1 plan, which permits shares to be repurchased when we might otherwise be precluded from doing so by laws prohibiting insider trading or by self imposed trading black out periods. There is no guarantee as to the exact number of shares that will be repurchased under the stock repurchase program, and we may discontinue purchases at any time. We intend to fund our share repurchases with cash on hand and cash generated from future operations. During the six months ended June 30, 2006, we repurchased 62,761 shares of our common stock at an average price of $8.01 per share for approximately $503. All shares repurchased were returned to the status of authorized but unissued shares of common stock as of June 30, 2006. Since the inception of this program, we have repurchased 1,144,248 shares for an aggregate consideration of $13,591.

**(7)    Commitments and Contingencies**

*Legal Matters*

On August 5, 2004, Avesair, Inc., one of the companies the assets of which we acquired, filed suit against us demanding, among other matters, that we issue to Avesair shares of our common stock valued at approximately $4,000 as of June 30, 2004. The stock demanded by Avesair represents the maximum value of

17

Table of Contents

shares that they could have earned for achieving certain performance-based targets under the asset purchase agreement. We believe the performance-based targets were not achieved and intend to vigorously contest this matter. However, any adverse resolution of this matter could have a material adverse impact on our financial results if we are required to issue additional shares and would result in dilution to our stockholders.

On July 25, 2005, the Federal Communications Commission (FCC) issued a Notice of Apparent Liability, asserting that we registered with the FCC and reported and contributed to the Universal Service Fund (USF) and the Telecommunications Relay Service Fund later than required by FCC rules. The FCC has preliminarily proposed to fine us approximately $820 for late payment of such fees. In a letter dated August 24, 2005 we responded to the FCC's preliminary finding and asserted that no fine is appropriate under the circumstances. However, any adverse resolution of this matter could have a material adverse impact on our financial results.

Eight related putative nationwide class actions have been filed against us arising out of InPhonic-sponsored rebate offers for online purchases of wireless telephones. Five of the eight putative class actions also name a third-party rebate processor as a defendant. The rebate processor began to process claims for InPhonic-sponsored rebate offers in or about July 2005, and our agreement with this rebate processor expired in or about July 2006.

We have filed a motion with the Judicial Panel on Multidistrict Litigation ("JPML") to consolidate the eight actions in the United States District Court for the District of Columbia. The rebate processor and a majority of the putative class representative plaintiffs have joined our request for consolidation of these cases in the District of Columbia. Other plaintiffs seek consolidation of these cases in the District of Arizona. Our JPML motion is fully briefed and likely to be heard by the JPML in the latter part of September 2006. We expect a decision from the JPML by the fourth quarter of 2006.

Three of the actions were originally filed in the United States District Court for the District of Columbia. Three actions were originally filed in the United States District Court for the District of Arizona. One action was originally filed in New Jersey state court, but was subsequently removed to, and remains pending in, the United States District Court for the District of New Jersey. The remaining action was originally filed in the United States District Court for the Northern District of Illinois.

The putative class action complaints allege, among other things, violations of the consumer protection laws of various states and (in certain lawsuits) the federal RICO (anti-racketeering) statute in connection with our disclosure and implementation of the terms and conditions of rebate offers. The class action plaintiffs seek statutory penalties, treble damages, attorneys' fees, and punitive damages under the consumer protection statutes, and treble damages and attorneys' fees under the RICO statute, as well as injunctions concerning the content of our websites.

The federal lawsuits are in an early stage. We have made motions in each of the courts where these cases are pending to defer pre-trial deadlines until the JPML makes its decision on transfer and consolidation. To date, the federal court in the District of Columbia has stayed all proceedings in two of the lawsuits pending the JPML's ruling, and the federal court in the Northern District of Illinois has entered a substantially similar order. Similar motions remain pending in the New Jersey action and in one of the Arizona actions. We intend to vigorously defend these actions but cannot predict their outcomes.

On June 8, 2006, the Attorney General of the District of Columbia brought a lawsuit in the Superior Court of the District of Columbia (the "DCAG Action"), alleging violations of the D.C. consumer protection statute based on factual allegations that are substantively the same as those in the private putative nationwide class actions. The DCAG Action seeks injunctive relief, restitution for consumers, statutory penalties, and attorneys' fees. The DCAG Action cannot be removed to federal court or consolidated with the eight federal putative class actions. However, we have asked the JPML to transfer the private actions to the federal court in the District of Columbia so that they can be informally coordinated with the DCAG Action. We answered the complaint on July 28, 2006. We intend to vigorously defend this action, but cannot predict its outcome.

From time to time we are party to other disputes or legal proceedings. We do not believe that any of the pending proceedings are likely to have a material adverse effect on our business.

18

**Table of Contents**

**ITEM 2.     MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion and analysis should be read in conjunction with our consolidated financial statements and related notes and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of our Annual Report on Form 10-K for the fiscal year ended December 31, 2005.*

## Forward-Looking Statements

This Quarterly Report on Form 10-Q, as amended, contains statements that are forward-looking within the meaning of the Securities Act of 1933, and the Securities Exchange Act of 1934 that involve risks and uncertainties. In some cases, forward-looking statements are identified by words such as "believe", "anticipate", "expect", "intend", "plan", "will", "may" and similar expressions. All of these forward-looking statements are based on information available to us at this time and we assume no obligation to update any of these statements. These statements are not guarantees of future performance and are subject to certain risks and uncertainties that are difficult to predict, including, among other things: our limited operating history; the ability to maintain strong relationships with wireless carriers; ongoing consolidation among wireless carriers; a decrease in the new subscriber growth rate; increased competition with additional retail and on-line distributors of wireless services and devices; increase in the rate of deactivations of active accounts; ability to attract new customers; ability to successfully integrate acquisitions; ability to accurately estimate reserve for future deactivations; interruptions or delays in service from third parties; our ability to effectively manage business growth; ability to attract and retain key personnel; and government regulation.

Existing and prospective investors are cautioned not to place undue reliance on these forward-looking statements, due to the risks listed below and other risks described under Item 1A, "Risk Factors" of our Form 10-Q filed on August 9, 2006.

## Overview

We are a leading online seller of wireless services and devices based on the number of activations of wireless services sold online in the United States. We sell wireless service plans and devices, including satellite television services through our own branded websites; including Wirefly.com, A1 Wireless.com, and VMCsatellite.com and through websites that we create and manage for third parties. We offer marketers the ability to sell wireless voice and data services and devices, under mobile virtual network enabler ("MVNE") agreements. This service utilizes the same e-commerce platform, operational infrastructure and marketing relationships that we use in our operations. We provide customers the ability to organize personal communications by providing real time wireless access to e-mail, voicemail, faxes, contacts, scheduling, calendar and conference calling functionality through a website or telephone.

We measure our performance based on our financial results and various non-financial measures. Key financial factors that we focus on in evaluating our performance include revenue growth within a period, contribution margin (defined as revenue less cost of revenue and marketing expenses), and operating income (defined as contribution margin less other operating expenses including sales, general and administrative and depreciation and amortization expenses). Our financial results can, and do, vary significantly from quarter-to-quarter as a result of a number of factors which include economic conditions specific to online commerce and wireless communications industries, the timing of introduction of popular devices by mobile phone manufacturer, our ability to attract visitors to our websites, changes in wireless carrier commission and bonus structures, the timing of recognition of bonuses paid to us by wireless carriers and our competitors' pricing and marketing strategies.

Key non-financial measures of our success are customer feedback and customer satisfaction ratings compiled by third parties. We believe that maintaining high overall customer satisfaction is critical to our ongoing efforts to promote the use of the private-labeled websites that we create and manage for our marketers, as well as our own branded websites, and to improve our operating results. We actively solicit customer feedback on our website functionality as well as the entire purchase experience. To maintain a high level of performance by our customer service representatives, we also undertake an ongoing customer feedback process. If we are unable to meet customer expectations with respect to price or do not successfully expand our product lines or otherwise fail to maintain high overall customer satisfaction, our business and results of operations would be harmed.

Revenues include commissions, bonuses and other payments we receive from wireless carriers, including a satellite television provider, in connection with the activation of customers on their networks, as well as payments from customers for wireless services and devices. Our revenue continues to increase as a result of internal growth and acquisitions. As further described below, total revenue and net loss from continuing operations for the three months ended June 30, 2006 were $92.1 million and $9.4 million, respectively, compared to total revenue and net loss from continuing operations of $75.2 million and $1.2 million, respectively, for the three months ended June 30, 2005. Revenue from our top three wireless carriers

19

**Table of Contents**

represented 67% and 54% of our total consolidated revenue for the three months ended June 30, 2006 and 2005, respectively. For the six months ended June 30, 2006 total revenue and net loss from continuing operations were $179.1 million and $13.7 million, respectively, compared to total revenue and net loss from continuing operations of $143.4 million and $8.6 million, respectively, for the same period of 2005. Revenue from our top three wireless carriers represented 66% and 54% of our total consolidated revenue for the six months ended June 30, 2006 and 2005, respectively.

As a key extension of our current services, on March 14, 2006 we launched Wirefly.biz, a new business unit dedicated to the unique needs of small business customers. With this launch we extended the Wirefly brand to the small business market place to assist small business customers with an array of services, discounts and customer support typically afforded only to larger enterprise companies. On April 4, 2006 we launched a new Motorola-branded online store-in-store. Motorola will make its popular portfolio of mobile handsets, accessories and in-home products available across thousands of our shopping websites, including the popular Wirefly.com. On April 6, 2006 we signed an agreement with a strategic business partner to host the data service platform for the upcoming launch of its family-oriented wireless service.

Since we began operations in 1999, we have incurred significant losses and have had negative cash flow from operations. For the six months ended June 30, 2006, we used $7.8 million of cash in operations. As of June 30, 2006, accumulated deficit was $178.5 million and our total stockholders' equity was $100.8 million. In order to achieve profitability in the future, we are depending upon our ability to produce revenue at levels that exceed the costs of that revenue plus operating expenses.

In 2006, we have continued to concentrate our resources on the growth of our wireless activations and the MVNE services we provide. Three of our key goals include (i) improving the customer experience platform that we utilize for order processing, customer service and rebate handling to automate additional processes and make more efficient use of our system and internal work force and the outsourced call center resources; (ii) further balancing spending on marketing initiatives with customer activation and revenue generation characteristics; and (iii) reducing certain general and administrative operating expenses as a percentage of revenue.

We acquired certain assets and assumed certain liabilities of A1 Wireless USA, Inc. ("A1 Wireless") on January 4, 2005; VMC Satellite, Inc. ("VMC") on April 26, 2005; and FONcentral.com, Inc. ("FC") on May 26, 2005. We accounted for these transactions using the purchase method of accounting in accordance with Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations*. Accordingly our results of operations include the operating results of A1 Wireless effective January 1, 2005, VMC as of April 26, 2005 and FC as of May 26, 2005.

As a result of the sale of our MVNO operations on December 31, 2005, we no longer believe that segment information, in accordance with SFAS No. 131, *Disclosures About Segments of an Enterprise and Related Information,* is applicable as our Wireless Activation and Services segment ("WAS") represents greater than 95% of our total revenue and cost of revenue. Accordingly we will no longer report segment data separately in the notes to our financial statements. Our Management's Discussion and Analysis of Results of Operations will continue to provide a comparison of our revenue and cost of revenue of our wireless activation and services and other components of revenue and cost of revenue to the extent MVNE and data services fluctuations appear significant in explaining and describing such results of operations.

## Restatement

As described in the Quarterly Report on Forms 10-Q/A for the first quarter ended March 31, 2006 and in this Quarterly Report on Form 10-Q/A we restated our financial statements for each of the quarters ended March 31, and June 30, 2006. (See Note 1(c) to the Condensed Consolidated Financial Statements.)

20

Table of Contents

### Comparison of the Results of Operations for the Three Months Ended June 30, 2006 and 2005

| (amounts in thousands) | Three Months Ended June 30, | | | | Change Between 2005 and 2006 | |
| | 2005 | | 2006 | | | |
| | Amount | % of Revenue | Amount | % of Revenue | Amount | % |
| | | | (restated) | | | |
|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | |
| Activation and services | $55,452 | 74% | $74,216 | 81% | $18,764 | 34% |
| Equipment | 19,774 | 26% | 17,912 | 19% | (1,862) | -9% |
| Total revenue | $75,226 | 100% | $91,228 | 100% | $16,902 | 22% |
| **Cost of revenue** | | | | | | |
| Activation and services | $    286 | 0% | $  1,065 | 1% | $    779 | 272% |
| Equipment | 41,718 | 55% | 50,510 | 55% | 8,792 | 21% |
| Total cost of revenue | $42,004 | 56% | $51,575 | 56% | $  9,571 | 23% |
| **Selected operating expenses:** | | | | | | |
| Sales and marketing | $19,827 | 26% | $27,408 | 30% | $  7,581 | 38% |
| General and administrative | 12,299 | 16% | 16,908 | 18% | 4,609 | 37% |
| Depreciation and amortization | 2,142 | 3% | 3,960 | 4% | 1,818 | 85% |
| Restructuring | 245 | 0% | 1,906 | 2% | 1,661 | 678% |

### REVENUE

*Revenue*

Revenue consists of activations and services revenue, and equipment revenue. Activations and services revenue consists of (i) revenue from commissions, bonuses and other payments for the activation of services of wireless carriers and a satellite television carrier through private-labeled websites that we create and manage for marketers as well as through our own branded websites; (ii) revenue from the provisioning of MVNE Services which provide marketers the ability to sell MVNO services to their customers under their own brands using our e-commerce platform and operational infrastructure; and, (iii) revenue from data services under which we provide subscribers with real-time wireless access to work and personal information, including email, calendar, corporate directories, personal contacts and documents in addition to wireless entertainment and content. Activations and services revenue also includes amounts due from carriers resulting from ongoing disputes relating to commissions revenue. Such disputes arise in the normal course of reconciliation with carrier commission reports and we continue to update and improve our processes and procedures surrounding the collection of such disputed items. Equipment revenue consists mainly of revenue from the sale of wireless devices to our customers that subscribe to wireless services through our private-labeled websites or those websites that we manage for other marketers. The following further details the components of our revenue and a comparative discussion of performance:

| (amounts in thousands) | Three Months Ended June 30, | | | | Change Between 2005 and 2006 | |
| | 2005 | | 2006 | | | |
| | Amount | % of Revenue | Amount | % of Revenue | Amount | % |
| | | | (restated) | | | |
|---|---|---|---|---|---|---|
| *Activations and services:* | | | | | | |
| Wireless activation | $53,622 | 71% | $69,226 | 76% | $15,604 | 29% |
| MVNE and data services | 1,830 | 3% | 4,990 | 5% | 3,160 | 173% |
| | $55,452 | 74% | $74,216 | 81% | $18,764 | 34% |
| *Equipment:* | | | | | | |
| Wireless activation | $19,774 | 26% | $17,912 | 19% | $ (1,862) | -9% |
| *Total Revenue:* | | | | | | |
| Wireless activation | $73,396 | 98% | $87,138 | 95% | $13,742 | 19% |
| MVNE and data services | 1,830 | 3% | 4,990 | 5% | 3,160 | 173% |
| | $75,226 | 100% | $92,128 | 100% | $16,902 | 22% |

21

Table of Contents

*Activations and Services*

Activations and services revenue increased 34% to $74.2 million for the three months ended June 30, 2006 from $55.5 million for the three months ended June 30, 2005. The increase in activations and services revenue of $18.8 million was attributable to an increase in the number of wireless activations that we generated through marketing partners and increased advertising efforts compared to the prior period. Gross carrier commissions for activations subject to chargeback increased 27% to $80.4 million for the three months ended June 30, 2006 from $63.4 million for the three months ended June 30, 2005. Activations and services revenue of MVNE and data services increased $3.2 million to $5.0 million for the three months ended June 30, 2006. The increase in revenue was primarily the result of project development work completed and accepted by a customer in early June 2006.

*Equipment*

Revenue from sales of equipment for the three months ended June 30, 2006 decreased 9% to $17.9 million from $19.8 million for the three months ended June 30, 2005. The decrease in equipment revenue of $1.9 million was attributable to lower average sales prices due to an increase in instant discounts provided to customers as compared to the three months ended June 30, 2005. Equipment revenue for the three months ended June 30, 2006 included $0.8 million of estimated equipment discount provisions ("EDP") to be collected from customers, who opt not to return their phones after canceling their plans prior to a contractually stated deactivation period.

*Total revenue*

Total revenue increased 22% to $92.1 million for the three months ended June 30, 2006 respectively from $75.2 million for the three months ended June 30, 2005. Revenue generated from the sale and activation of wireless devices and services accounted for approximately 81% of consolidated revenue for the three months ended June 30, 2006 compared to 74% for the three months ended June 30, 2005. Revenue from our top three wireless carriers represented 67% of consolidated revenue for the three months ended June 30, 2006 compared to 54% for the comparable period of 2005. Wireless activations and services revenue and equipment sales revenue may vary from period to period based on our promotional efforts, which include subsidizing the costs of devices purchased by our customers. We expect that revenue from the sale and activation of wireless devices and services will continue to increase during 2006 compared to 2005 performance.

## COST OF REVENUE

Cost of revenue consists mainly of the cost of wireless devices (equipment) sold to our wireless activations and services customers. Our cost of revenue related to wireless equipment sales increased to $50.5 million for the three months ended June 30, 2006 as a result of a higher volume of devices sold during the period compared to sales of such devices in the three months ended June 30, 2005. Total cost of revenue increased 23% to $51.6 million for the three months ended June 30, 2006 compared to $42.0 million for the three months ended June 30, 2005. Cost of revenue from the sale of wireless devices accounted for approximately 98% of consolidated cost of revenue for the three months ended June 30, 2006 and 99% for the three months ended June 30, 2005. As a percentage of wireless total activations revenue, cost of equipment revenue was 55% of revenue for the three months ended June 30, 2006 and 2005.

## OPERATING EXPENSES

*Sales and Marketing*

Sales and marketing expenses increased 38% to $27.4 million for the three months ended June 30, 2006 from $19.8 million for the corresponding period of 2005. The increase of $7.6 million was comprised mainly of a $6.2 million increase from the growth of existing marketing relationships and the addition of new marketing partner relationships since the three months ended June 30, 2005. Our marketing expenses largely comprise payments to on-line advertisers, search engines and third-party marketing partners based on orders or activations. We incurred approximately $24.1 million of third-party marketing expenses in the three months ended June 30, 2006. Such expenses were higher than corresponding periods of 2005 due to increased wireless activation competition, and increased rates and volume of advertising, which caused our customer acquisition costs to increase. In addition, advertising placement and search costs also increased. We expect that marketing expenses will continue to represent a significant percentage of our revenue in future periods.

*General and Administrative*

General and administrative expenses increased 37% to $16.9 million for the three months ended June 30, 2006 from $12.3 million for the corresponding period of 2005. The expense increase of $4.6 million was mainly composed of the

Table of Contents

following: $2.6 million related to increased payroll related expenses from a larger workforce, $0.9 million related to consulting and other expenses; $0.7 million due to a settlement with A1 Wireless and $0.3 million related to increased facilities costs and telecommunication related expenses. Stock-based compensation expense decreased $0.1 million for the period. For the three months ended June 30, 2005 stock-based compensation included $1.1 million related to the modification of option grants and awards of two employees that were terminated during that quarter. Absent this, stock-based compensation expense would have increased approximately $1.0 million as a result of compensation expense from options and stock awards granted after the first quarter of 2005 and the impact of the adoption of SFAS No. 123(R).

*Depreciation and Amortization*

Depreciation and amortization expenses, which are amortized over periods ranging from 18 months to 7 years, increased 85% to $4.0 million for the three months ended June 30, 2006 from $2.1 million for the three months ended June 30, 2005. The increase was primarily due to the costs associated with developing new functionality related to our websites, product offerings and amortization expense related to VMC and FC acquisitions on April 26, 2005 and May 26, 2005, and normal fixed asset depreciation on an increased amount of capital expenditures as compared to the corresponding period of 2005.

*Restructuring*

We implemented a restructuring plan following the acquisition of A1 Wireless, to take advantage of synergies gained through the acquisition and to restructure our operations for efficiency purposes. For the three months ended June 30, 2005, we recognized $0.2 million in restructuring costs which related to workforce reduction excess facilities. All costs related to this plan were paid out in 2005.

During the three months ended June 30, 2006, we implemented a restructuring plan related to changes in our management and operational structure. For the three months ended June 30, 2006, we recognized $1.9 million related to the termination of our former president and chief operating officer and thirteen other senior executives and employees. Of this amount, $0.6 million related to severance benefits that will be paid out in cash to the recipients on a monthly or bi-monthly basis over the terms of their respective severance agreements and $1.3 million related to severance expenses incurred as a result of the modification of stock-based compensation awards under which vesting of 50% of unvested restricted share and option awards was accelerated for three of the former employees.

*Loss from continuing operations*

Loss from continuing operations increased to $9.4 million for the three months ended June 30, 2006 from $1.2 million for the three months ended June 30, 2005 as a result of increasing cost of revenue and general operating expenses as described above in order to support overall revenue growth.

23

Table of Contents

*Net Loss*

Net loss increased to $9.6 million for the three months ended June 30, 2006 from $1.7 million for the three months ended June 30, 2005.

**Comparison of the Results of Operations for the Six Months Ended June 30, 2006 and 2005**

| (amounts in thousands) | Six Months Ended June 30, | | | | Change Between 2005 and 2006 | |
| | 2005 | | 2006 | | | |
| | Amount | % of Revenue | Amount (restated) | % of Revenue | Amount | % |
|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | |
| Activation and services | $105,203 | 73% | $140,598 | 79% | $35,755 | 34% |
| Equipment | 38,174 | 27% | 38,148 | 21% | (26) | 0% |
| Total revenue | $143,377 | 100% | $179,106 | 100% | $35,729 | 25% |
| **Cost of revenue:** | | | | | | |
| Activation and services | $ 1,459 | 1% | $ 1,325 | 1% | $ (134) | (9)% |
| Equipment | 80,668 | 56% | 98,431 | 55% | 17,763 | 22% |
| Total cost of revenue | $ 82,127 | 57% | $ 99,756 | 56% | $17,629 | 21% |
| **Selected operating expenses:** | | | | | | |
| Sales and marketing | $ 37,325 | 26% | $ 54,130 | 30% | $16,805 | 45% |
| General and administrative | 28,577 | 20% | 30,139 | 17% | 1,562 | 5% |
| Depreciation and amortization | 3,919 | 3% | 7,443 | 4% | 3,524 | 90% |
| Restructuring | 394 | 0% | 1,906 | 1% | 1,512 | 384% |

**REVENUE**

| (amounts in thousands) | Six Months Ended June 30, | | | | Change Between 2005 and 2006 | |
| | 2005 | | 2006 | | | |
| | Amount | % of Revenue | Amount (restated) | % of Revenue | Amount | % |
|---|---|---|---|---|---|---|
| *Activations and services:* | | | | | | |
| Wireless activation | $100,753 | 70% | $133,380 | 75% | $ 32,627 | 32% |
| MVNE and data services | 4,450 | 3% | 7,578 | 4% | 3,128 | 70% |
| | 105,203 | 74% | 140,958 | 79% | 35,755 | 34% |
| *Equipment:* | | | | | | |
| Wireless activation | $ 38,174 | 27% | $ 38,148 | 21% | $ (26) | 0% |
| *Total Revenue:* | | | | | | |
| Wireless activation | $138,927 | 97% | $171,528 | 96% | $ 32,601 | 23% |
| MVNE and data services | 4,450 | 3% | 7,578 | 4% | 3,128 | 70% |
| | $143,377 | 100% | $179,106 | 100% | $ 35,729 | 25% |

*Activations and Services*

Activations and services revenue increased 34% to $141.0 million for the six months ended June 30, 2006 from $105.2 million for the six months ended June 30, 2005. The increase in activations and services revenue of $35.8 million was attributable to an increase in the number of wireless activations that we generated through marketing partners and increased advertising efforts compared to prior year periods. Gross carrier commissions for activations subject to chargeback increased 26% to $151.7 million for the six months ended June 30, 2006 from $120.0 million for the six months ended 2005. Activations and services revenue of MVNE and data services increased $3.1 million to $7.6 million for the six months ended June 30, 2006. The increase in revenue was primarily the result of project development work completed and accepted by a customer in early June 2006.

*Equipment*

Revenue from sales of equipment for the six months ended June 30, 2006 were $38.1 million compared to $38.2 million for the six months ended June 30, 2005. Although revenue remained flat between the corresponding six month

**Table of Contents**

periods, we experienced a reduction in equipment sales revenue in the six months ended June 30, 2006 as described above, primarily due to a decrease in price per unit as a result of an increase in discounts offered. Equipment revenue for the six months ended June 30, 2006 included $0.3 million of estimated EDP to be collected from customers, who opt not to return their phones after canceling their plans prior to a contractually stated deactivation period.

*Total revenue*

Total revenue increased 25% to $179.1 million for the six months ended June 30, 2006 respectively from $143.4 million for the six months ended June 30, 2005. Revenue generated from the sale and activation of wireless devices and services accounted for approximately 79% of consolidated revenue for the six months ended June 30, 2005 compared to 73% for the three months ended June 30, 2005. Revenue from our top three wireless carriers represented 66% of consolidated revenue for the six months ended June 30, 2006 compared to 54% for the comparable period of 2005.

## COST OF REVENUE

Cost of revenue consists mainly of the cost of wireless devices (equipment) sold to our wireless activations and services customers. Our cost of revenue related to wireless equipment sales increased to $98.4 million for the six months ended June 30, 2006 as a result of a higher volume of devices sold during the period compared to sales of such devices for the six months ended June 30, 2005. Total cost of revenue increased 21% to $99.8 million for the six months ended June 30, 2006 as compared to $82.1 million for the six months ended June 30, 2005. Cost of revenue from the sale of wireless devices accounted for approximately 99% of consolidated cost of revenue for the six months ended June 30, 2006 and 98% for the six months ended June 2005. As a percentage of wireless total activations revenue, cost of equipment revenue decreased to 55% of revenue for the six months ended June 30, 2006 compared to 56% for the six months ended June 30, 2005.

## OPERATING EXPENSES

*Sales and Marketing*

Sales and marketing expenses increased 45% to $54.1 million for the six months ended June 30, 2006 from $37.3 million for the corresponding period of 2005. The increase was comprised mainly of a $15.3 million increase from the growth of existing marketing relationships and adding new marketing partner relationships since the six months ended June 30, 2005. Our marketing expenses largely comprise payments to on-line advertisers, search engines and third-party marketing partners based on orders or activations. We incurred approximately $47.8 million of third-party marketing expenses in the six months ended June 30, 2006. Such expenses were higher than corresponding periods of 2005 due to increased wireless activation competition, and increased rates and volume of advertising, which caused our customer acquisition costs to increase. In addition, advertising placement and search costs also increased.

*General and Administrative*

General and administrative expenses increased 5% to $30.1 million for the six months ended June 30, 2006 from $28.6 million for the corresponding period of 2005. The expense increase of $1.6 million was mainly composed of the following: $2.9 million related to increased payroll expenses from a larger workforce; $1.7 million related to consulting and other expenses; $0.7 million due to a settlement with A1 Wireless; and $0.5 million related to increased facilities costs and telecommunication related expenses. Offsetting these increases, stock-based compensation expense decreased $4.3 million for the period. For the six months ended June 30, 2005, stock-based compensation included $2.2 million related to the modification of option grant and awards of two employees that were terminated during that quarter. Absent this, stock-based compensation expense would have decreased approximately $2.1 million as a result of compensation expense from options and stock awards granted after the first quarter of 2005 and the impact of the adoption of SFAS No. 123(R).

*Depreciation and Amortization*

Depreciation and amortization expenses, which are amortized over periods ranging from 18 months to 7 years, increased 90% to $7.4 million for the six months ended June 30, 2006 from $3.9 million for the six months ended June 30, 2005. The increase was primarily due to the costs associated with developing new functionality related to our websites, product offerings and amortization expense related to VMC and FC acquisitions on April 26, 2005 and May 26, 2005, and normal fixed asset depreciation on an increased amount of capital expenditures as compared to the corresponding period of 2005.

*Restructuring*

We implemented a restructuring plan following the acquisition of A1 Wireless, to take advantage of synergies gained through the acquisition and to restructure our operations for efficiency purposes. During the six months ended June 30, 2005, we recognized $394 in restructuring costs, of which $3 million related to workforce reduction and the remaining $36 to excess facilities. All costs related to this plan were paid out in 2005.

During the six months ended June 30, 2006, we implemented a restructuring plan related to changes in our management and operational structure. For the three and six months ended June 30, 2006, we recognized $1.9 million related to the termination of our former president and chief operating officer and thirteen other senior executives and employees. Of this amount, $0.6 million related to severance benefits that will be paid out in cash to the recipients on a monthly or bi-monthly basis over the terms of their respective severance agreements and $1.3 million related to severance expenses incurred as a result of the modification of stock-based compensation awards under which vesting of 50% of unvested restricted share and option awards were accelerated for three of the former employees.

*Loss from continuing operations*

Loss from continuing operations increased to $13.7 million for the six months ended June 30, 2006 from $8.6 million for the corresponding period in 2005. Although we experienced significant revenue growth, cost of revenue and operating expenses both increased as described above in order to support the revenue growth we experienced.

*Net Loss*

Net loss increased to $13.9 million for the six months ended June 30, 2006 from $8.6 for the same period of 2005.

**Liquidity and Capital Resources**

Since inception, we have funded our operations principally through the sale of equity securities and to a lesser extent, through subordinated debt, credit facilities, capital leases and lines of credit. In addition, certain of our vendors from whom we purchase handsets and other wireless equipment that we sell to our customers allow us to purchase up to approximately $49.0 million of such equipment on extended payment terms. The significant components of our working capital are inventory and liquid assets such as cash and cash equivalents, short-term investments and trade accounts receivable, reduced by accounts payable, accrued expenses and deferred revenue.

Our future capital and operating requirements will depend on many factors, including the level of our revenues, the expansion of our sales and marketing activities, the cost of our fulfillment operations, potential investments in businesses or technologies and continued market acceptance of our products. Additionally, poor financial results, unanticipated expenses, acquisitions of technologies or business or strategic investments could give rise to additional financing requirements sooner than we expect. In the event that cash on hand and available borrowings are not sufficient to fund working capital requirements that are not satisfied through net cash provided by operating activities or future cash requirements, we could be required, or could elect, to seek additional funding through a public or private equity or debt financing in the future, and this financing may not be available on terms acceptable to us, or at all.

As of June 30, 2006, we had cash and cash equivalents of $47.4 million, short-term investments of $5.0 million and debt and capital lease obligations of $15.8 million. As of December 31, 2005, we had cash and cash equivalents of $70.8 million, and debt and capital lease obligations of $15.9 million.

26

Table of Contents

*Consolidated Cash Flows*

|  | Six Months Ended June 30, | |
| --- | --- | --- |
|  | 2005 | 2006 |
|  |  | (restated) |
|  | (amounts in thousands) | |
| Net cash used in operating activities | $ (9,238) | $ (7,823) |
| Net cash used in investing activities | (32,594) | (15,585) |
| Net cash provided by financing activities | 6,106 | 36 |
| Change in cash and cash equivalents | (35,726) | (23,372) |
| Short term investments on June 30, 2005 and 2006 | — | 5,000 |
| Change in cash and cash equivalents and investments | $(35,726) | $(18,372) |

Net cash used in operating activities was $7.8 million for the six months ended June 30, 2006 compared to net cash used in operating activities of $9.2 million for the six months ended June 30, 2005. For the six months ended June 30, 2006, net income (loss) after adjustments for items to reconcile net income (loss) to net cash provided by operating activities was approximately $0.8 million. Such items included depreciation and amortization, non-cash interest expense and stock-based compensation.

Changes in operating assets and liabilities from December 31, 2005 decreased net cash provided by operating activities of approximately $8.6 million. Changes in working capital balances included an increase of current assets of approximately $23.4 million, excluding cash and cash equivalents, short-term investments and cash collected from notes receivable related to discontinued operations. The increase in these current assets was primarily the result of increased accounts receivable and inventory balances from December 31, 2005. The accounts receivable increase at June 30, 2006 was the result of higher commission balances owed to us by the carriers as a result of increased revenue and the timing of collections at the end of the month of June. Approximately $9.7 million of our June 30, 2006 accounts receivable balance was collected within the first two business days of July. Inventory balances increased as a result of product demand and anticipated business in the third quarter of 2006. We expect inventory balances to decrease during the three months ended September 30, 2006 as we take advantage of our buying leverage.

In addition, at June 30, 2006, we held inventory on our balance sheet committed to a vendor in an exchange for cash of $4.0 million which we had received by June 30, 2006 and 1.5 million of advertising trade credits. The inventory was expected to be delivered to the vendor in July and early August 2006, but we do not expect to recognize any revenue from this transaction and any gain from the exchange will be recognized as a reduction to our marketing expenses as we receive the advertising services from the vendor through the first quarter of 2007. At June 30, 2006, we had an accrued liability recorded on our balance sheet to reflect the cash proceeds received from the vendor.

Current liabilities, excluding debt and capital lease balances and acquisition earn-out obligations accrued during the period increased $14.6 million from December 31, 2005. The increase was mainly the result of an increase in accounts payable offset by decreases in accrued liabilities and deferred revenue. The increase in accounts payable at June 30, 2006 was the result of the timing of cash collections at the end of the month of June, as explained above, which slowed our payments to certain of our vendors; and higher inventory levels for which payment was not yet due. Accrued expenses decreased as a result of reductions in accrued consumer liabilities and cash amounts paid to fund the VMC earnout payment made in May 2006, partially offset by the $4.0 million commitment to provide inventory to a vendor described above. Deferred revenue decreased as a result of MVNE contract deliveries for which we were able to recognize revenue and an improvement in our deactivation rates.

Net cash used in investing activities for the six months ended June 30, 2006 and 2005 was $15.6 million and $32.6 million, respectively. The $17.0 million decrease in net cash used in investing activities was due to decreases from the 2005 period in the purchase of short term investments of approximately $12.9 million and cash paid for acquisitions and intangible assets of $5.5 million and increases of $1.1 million from proceeds received from the sale of discontinued operations and reductions in restricted cash balances in 2006. These amounts were partially offset by an increase of $2.8 million in the purchase of property and equipment and capitalized labor costs, primarily associated with enhancing our operating infrastructure and E-commerce platform to enable expanded and new functionality. Capital expenditures for the six months ended June 30, 2006 comprised $6.9 million of software and web site development and $1.6 million of other property, plant and equipment . Cash from investing activities included short-term investments of $5.0 million for the six months ended June 30, 2006.

Table of Contents

Net cash provided by financing activities was $36,000 for the six months ended June 30, 2006 compared to net cash provided by financing activities of $6.1 million for the six months ended June 30, 2005. Financing activities consisted of cash used to repurchase common stock of $0.5 million and principal payments of capital leases of $0.2 million, partially offset by the proceeds received from the exercise of options of approximately $0.8 million.

*Borrowings Under Line of Credit and Vendor Trade Credit.* We maintain a revolving operating line of credit with Comerica Bank which allows for aggregate borrowing of up to $25.0 million subject to certain limits based on accounts receivable and inventory level. As of June 30, 2006, we had an aggregate principal amount of $15.0 million outstanding under the facility, however no further borrowing capacity under the facility was available as of June 30, 2006 based on the limits described above. Interest on advances under the revolving line of credit is payable monthly at a rate of LIBOR plus 2.0%. Under the terms of our line of credit we are required to maintain a current ratio, as defined of 1.1 to 1. We are also required to maintain an unrestricted cash balance of no less than $10.0 million held at Comerica and to meet certain minimum levels of EBITDA, as defined. As of June 30, 2006, we were in compliance with the EBITDA covenant under the credit facility. Our line of credit matures on January 1, 2007. We expect to refinance the facility or extend its maturity date prior to its maturity.

We have customary trade terms with many of our vendors including the carriers and original equipment manufacturers that provide wireless devices to us for sale to our customers. Based upon our vendor trade credit programs with the providers of our inventory, we had approximately $25.0 million of credit available to us for the purchase of wireless devices as of August 1, 2006.

*Common Stock Repurchase Program.* Our Board of Directors has authorized us to repurchase shares of our common stock up to an aggregate amount of $30.0 million. During the six months ended we repurchased an aggregate of 62,761 shares of our common stock for approximately $0.6 million. We expect to continue our share purchases through August 2006 at prevailing market rates using existing cash balances and funds generated from operating activities. There can be no assurances that we will repurchase up to the authorized amount over this time period.

## Contractual Obligations

The following table summarizes our significant contractual obligations, including interest on capital leases, and the expected effect on liquidity and cash flows as of June 30, 2006.

| | Total | Less than 1 year | 1 - 3 years | 4 - 5 years | Over 5 years |
|---|---|---|---|---|---|
| | | | (amounts in thousands) | | |
| Line of credit | $15,000 | $15,000 | $ — | $ — | $ — |
| Capital leases | 917 | 433 | 475 | 9 | — |
| Operating leases | 4,225 | 1,871 | 2,354 | — | — |
| Obligation to purchase certain advertising (a) | 4,550 | 4,550 | — | — | — |
| Commitment to provide inventory to vendor (b) | 4,000 | 4,000 | — | — | — |
| Obligations under VMC APA (c) | — | — | — | — | — |
| | $24,692 | $21,854 | $ 2,829 | $ 9 | $ — |

(a)   We have a minimum purchase commitment to purchase a minimum level of advertising and media services from a vendor by March 31, 2007. Such commitment period may be extended at the option of the vendor.

(b)   We have a commitment to provide a vendor wireless devices and accessories for which we have already received a $4.0 million cash payment as of June 30, 2006. The inventory was shipped to the buyer in the third quarter of 2006.

(c)   Under the VMC Asset Purchase Agreement, we may be obligated to pay shareholders of VMC an additional $2.7 million in cash and 167,144 shares of our common stock upon achieving certain future operating targets. Such potential obligation has not been included in the table above.

Table of Contents

## Recent Accounting Pronouncements

In June, 2006, the Financial Accounting Standards Board ("FASB") issued FASB Interpretation No. 48, "Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109" ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with SFAS No. 109, "Accounting for Income Taxes." FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosure, and transition. FIN 48 will apply to fiscal years beginning after December 15, 2006, with earlier adoption permitted. We are currently in process of assessing the impact of the adoption of this statement on our financial results.

In November 2004, the FASB issued SFAS No. 151, Inventory Costs that is an amendment to ARB No. 43, Chapter 4 ("SFAS No. 151"), amends chapter 4 "Inventory Pricing" of ARB No. 43 and paragraph A3 of SFAS No. 144. Previously, ARB 43 did not define the term so abnormal which could lead to unnecessary incomparable financial reporting. SFAS No. 151 clarifies that abnormal costs related to idle facility expense, freight, handling costs, and wasted materials (spoilage) should be recognized as period costs. SFAS No. 151 is effective for fiscal year beginning after June 15, 2005. We adopted the pronouncement effective January 1, 2006. There was no material effect on our financial position, cash flows or result of operations as a result of this adoption.

In May 2005, the FASB issued SFAS No. 154, Accounting Changes and Error Corrections ("SFAS No. 154"), a replacement of APB Opinion No. 20, Accounting Changes, and SFAS No. 3, Reporting Accounting Changes in Interim Financial Statements. SFAS No. 154 changes the requirements for the accounting for, and reporting of, a change in accounting principle. Previously, voluntary changes in accounting principles were generally required to be recognized by way of a cumulative effect adjustment within net income during the period of the change. SFAS No. 154 requires retrospective application to prior periods' financial statements of changes in accounting principles, unless it is impracticable to determine either the period-specific effects or the cumulative effect of the change. SFAS No. 154 is effective for accounting changes made in fiscal years beginning after December 15, 2005; however, the statement does not change the transition provisions of any existing accounting pronouncements. We adopted the pronouncement effective January 1, 2006. There was no material effect on our financial position, cash flows or result of operations as a result of this adoption.

## Application of Critical Accounting Policies and Estimates

Our discussion and analysis of our financial condition and results of operations are based upon our consolidated condensed financial statements which have been prepared in accordance with generally accepted accounting principles in the United States. The preparation of these statements requires us to make estimates and judgments that affect the reported amount of assets, liabilities, revenue and expenses, and related disclosure of contingent assets and liabilities. We base our estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making the judgments about our revenue, cost of revenue and the carrying values of assets and liabilities that are not readily apparent from other sources. Because this can vary in each situation, actual results may differ from the estimates under different assumptions and conditions.

The following is a summary of the most critical of these estimates. For additional information, see Item 7, Part II, "Management Discussion and Analysis of Financial Condition and Results of Operations—Application of Critical Accounting Policies and Estimates" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2005. Although we believe that our estimates, assumptions, and judgments are reasonable, they are based upon information currently available. Actual results may differ significantly from these estimates under different assumptions, judgments, or conditions

### Revenue Recognition

*Activation and Services* – We generate revenue primarily from wireless carriers, as well as a satellite television carrier, who pay commissions and volume and performance-based bonuses, for activating wireless services and features on their networks. We recognize commissions from wireless carriers upon shipment of activated devices to the customer. In addition to activation commissions, under certain conditions, certain carriers pay us a monthly residual fee for as long as a customer we activate for the carrier continues to be its subscriber, or for a fixed period of time depending on the carrier. We purchase satellite activation certificates evidencing activation rights in advance of their resale to customers. Revenue from satellite television customers includes sales of these satellite activation certificates, net of the certificate cost, since we are acting as an agent in the transaction.

29

**Table of Contents**

Our revenue is reduced for estimated deactivations of the wireless services by customers prior to the expiration of a time period that ranges 120 to 180 days from the date of activation, depending on the wireless carrier. We estimate deactivations based on historical experience, which we have developed based on our experience with carriers, customer behavior and sources of customers, among other factors, allowing us to accrue estimates with what we believe is a high degree of certainty. Any increase or decrease in the deactivation amount will cause a corresponding dollar-for-dollar increase or decrease in revenue. As an example, the impact of a 1% change in the deactivation rate applied to the quarter ended June 30, 2006 would have an increase or decrease in revenue and the corresponding reserve of $0.8 million. Any decrease in revenue resulting from an increase in deactivations would also be offset, in part, by returns of wireless devices. Our reserves for deactivations are included in accounts receivable and deferred revenue on our balance sheet. If we determine that we cannot accurately predict future deactivation experience, we may be required to defer 100% of our carrier commission revenue until the expiration of the appropriate chargeback period. New channels for which we have insufficient historical data to adequately estimate deactivation experience will be deferred through the expiration period for a period of 24 months, until such time that we can accurately estimate the deactivation experience for the new channel.

In addition to receiving commissions for each wireless subscriber activated, we earn performance bonuses from the wireless carriers based on negotiated performance targets. The most significant bonus we earn is the quarterly volume bonus, which we bill wireless carriers for on a monthly basis, based on current month activations. We record these bonuses as deferred revenue at the time of billing until we achieve the quarterly targets. We earn other quarterly bonuses from certain carriers for maintaining low customer churn and signing up customers for certain additional monthly "features" such as data service or text messaging. Wireless carriers also periodically offer bonuses for achieving monthly volume and other performance targets and also formerly provided some bonus compensation under annual volume based plans. We recognize these monthly bonuses as earned in accordance with the provisions of SAB No. 104. Revenue is recognized only when all of the following criteria are met: (1) persuasive evidence of an arrangement exists, (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed or determinable, and (4) collectibility is reasonably assured. Amounts collected in cash prior to meeting the above criteria are recorded as deferred revenue. Through 2005, commission revenue earned from the activation of carrier features had been deferred until the contractual chargeback period had lapsed. Beginning in 2006, we began to estimate commission revenue earned from feature activations based on historical experience which we have developed based on our experience with carriers and customer behavior over a period of time in excess of 24-months. This allows us to accrue estimates with what we believe is a high degree of certainty in accordance with SAB 104.

*Equipment revenue* —Revenue from the sale of devices and accessories in a multiple-element arrangement with services is recognized at the time of sale in accordance with EITF No. 00-21. Customers have the right to return devices within a specific period of time or usage, whichever occurs first. We provide an allowance for estimated returns on devices based on historical experience. In connection with our wireless activations, we sell the customer the wireless device at a significant discount, which may be in the form of a rebate. Rebates are recorded as a reduction of revenue and as a current liability until paid. We recognize rebate amounts based on the historical experience of rebates claimed. Future rebate experience could vary based upon rates of consumers redeeming rebates.

In the event a customer terminates their wireless service with the carrier within six months of activation and opts not to return the wireless device to us within the time frames permitted within our return policy, in many instances our sales contracts with the customer permit us to charge the customer an EDP termination fee for each unreturned device. Prior to the three months ended June 30, 2006, revenue recognition of such fee was deferred until such fee was collected from the customer pursuant to SAB 104 as we did not have adequate historical collection data to reasonably estimate the ultimate collectibility of the receivable. Beginning April 1, 2006, we began to estimate EDP termination fee revenue based on historical experience of customer collection behavior which we have developed over a time period of 24 months which provides the basis on which to accrue revenue with an appropriate assurance of collectibility pursuant to SAB 104. As of March 31, 2006, $0.3 million of such revenue was deferred, which would have been accrued for in the event that we had adequate customer collection history, less an estimated reserve for uncollectible amounts. As of June 30,, 2006, we had accrued as accounts receivable approximately $0.8 million in such EDP fees.

As of the most recent quarter ended June 30, 2006, our handset return rate was 9.5% of handset revenue. We have recorded handset return rates of 10.4% and 11.2% for the years ended December 31, 2005 and 2004, respectively. Any increase or decrease in the actual handset return experience will cause a corresponding dollar-for-dollar decrease or increase in revenue. The impact of a 1% change in the handset returns rate applied to the quarter ended June 30, 2006 would have resulted in an increase or decrease in revenue of approximately $0.2 million.

*Inventory Valuation*

Our inventory consists of wireless devices and accessories. The carrying value of inventory is stated at the lower of cost or market value. Cost is determined using a method which approximates the first-in-first-out accounting method. We write down inventory for estimated obsolescence or unmarketable inventory equal to the difference between the cost of inventory and the estimated market value or replacement cost based upon assumptions about future demand and market conditions. If actual market conditions are less favorable than those projected, additional inventory write-downs may be required. Historically, we have not experienced significant write-offs, with the exception of returned, unmarketable inventory.

**Table of Contents**

*Stock-based Compensation*

We adopted SFAS No. 123(R) on January 1, 2006 using the modified prospective application ("MPA") method. SFAS No. 123(R) established standards for the accounting for transactions in which an entity exchanges its equity instruments for goods or services. SFAS No. 123(R) requires us to measure the cost of employee services received in exchange for an award of equity instruments (usually stock options or unvested (restricted) stock awards) based on the grant date fair value of the award. That cost is recognized over the period during which an employee is required to provide service in exchange for the award – the requisite service period (usually the vesting period). The amount of compensation expense recognized using the fair value method requires us to exercise judgment and make assumptions relating to the factors that determine the fair value of our stock option grants.

*Provision for Income Taxes*

We have historically reported net losses and, in accordance with accounting principles generally accepted in the United States, have not recorded any income tax benefits from those losses. Although we intend to utilize net operating loss carryforwards to offset taxable income that may be generated in 2006, we expect alternative minimum tax amounts to be payable primarily due to the net operating loss carryforward limitations associated with the alternative minimum tax calculation. We continue to maintain a valuation allowance against our deferred tax assets, consisting primarily of net operating loss carryforwards, and we may recognize deferred tax assets in future periods when they are estimated to be realizable provided they are not subject to ownership change limitations. To the extent we report taxable income in future periods, we intend to use our net operating loss carryforwards to the extent available to offset taxable income and reduce cash outflows for income taxes. Certain of these net operating losses obtained through our acquisitions are not included in the components of the deferred tax assets, as the use of these losses will be significantly limited under Section 382 of the Internal Revenue Code.

## ITEM 4.     CONTROLS AND PROCEDURES

### Disclosure Controls and Procedures

Management had previously concluded that our disclosure controls and procedures were effective as of June 30, 2006. However, in connection with the restatement of our March 31, 2006, June 30, 2006 and September 30, 2006 interim financial statements as fully described in Note 1 of this Form 10-Q/A, management determined that the material weaknesses described below existed as of June 30, 2006. Accordingly, our Chief Executive Officer and Chief Accounting Officer have now concluded that disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) were not effective as of June 30, 2006 to ensure information required to be disclosed by us in the reports we file or submit under the Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified within the SEC's rules and forms and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Accounting Officer, as appropriate, to allow timely decisions regarding required disclosure.

Not withstanding the material weaknesses described below, management believes the condensed consolidated financial statements included in this Quarterly Report on Form 10-Q/A fairly present in all material respects our financial condition, results of operations and cash flows for all periods presented.

A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood, that a material misstatement of the annual or interim quarterly financial statements will not be prevented or detected. Management identified material weaknesses in our internal controls including the following:

- *We did not maintain sufficient staffing of operational and financial resources.* We did not maintain staffing in operational and financial resources sufficient to provide the level of controls and analysis required on a timely basis in light of the increasing complexity and growth of our business. This resulted in certain accounting processes and controls not being performed on a timely basis and the inability to maintain an adequate control environment, resulting in numerous material adjusting entries being made after year end. This material weakness contributed to errors such as those relating to proper revenue recognition and accounts receivable described below.

- *We did not always effectively communicate information to our finance department* . Specifically, we failed to maintain effective communication channels to adequately identify and record certain transactions during 2006. The failure to provide this communication contributed to errors relating to accounting and reporting of expenses and liabilities. This material weakness caused or contributed to, adjustments necessary to appropriately record accounts receivable allowances and reserves for deactivations described below .

- *We did not maintain effective controls over the recordation, accuracy and completeness of activations and services revenue and related accounts receivable.*

We did not take steps to adequately identify and appropriately record certain commission and bonus revenue received during the year from various wireless carriers in a timely and accurate manner. Recording amounts received from carriers in the appropriate accounts in a timely and accurate manner is an important business process control that is essential to the correct reporting of amounts in the financial statements. This material weakness contributed to errors relating to accounting and reporting for revenue and accounts receivable.

We did not utilize an appropriate methodology during the year in recording receivables from wireless carriers associated with disputed deactivations, churn bonuses and other carrier related fees. We overstated accounts receivable by using a methodology that

anticipated future improvements in collection beyond that supported by past experience, and which we did not consider certain current factors and other information. As a result of this material weakness, an adjustment was necessary to properly record revenue and related receivables from these fees.

- *We did not maintain effective controls over the determination and accuracy of equipment revenue and related accounts receivable.* We did not utilize an appropriate methodology during the year in recording certain fees due from consumers when contracts are cancelled within specified time periods and the wireless device is not returned to us. Specifically, related accounts receivable were overstated to the extent that we used collection percentages which anticipated improvements in excess of past experience. As a result of this material weakness, an adjustment was necessary to properly record revenue and related receivables from these fees.

These material weaknesses resulted in adjustments to our revenue and accounts receivable and certain other financial statement line items as referred to above and resulted in the restatement of previously issued consolidated financial statements for the three and six-month periods ended June 30, 2006.

**Changes in Internal Control over Financial Reporting**

With the exception of the items described above, there have been no significant changes in our internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting for this current period.

Table of Contents

**PART II**

**ITEM 6.     EXHIBITS**

| Exhibit No. | Description |
| --- | --- |
| 31.1 | Rule 13a-14(a) Certification of Principal Executive Officer. |
| 31.2 | Rule 13a-14(a) Certification of Principal Financial Officer. |
| 32.1 | Section 1350 Certification of Chief Executive Officer. |
| 32.2 | Section 1350 Certification of Chief Financial Officer. |

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

INPHONIC, INC.

By: _____ / s / DAVID A. STEINBERG _____

**David A. Steinberg**
**Chairman of the Board and**
**Chief Executive Officer**

By: _____ / s / GEORGE Z. MORATIS _____

**George Z. Moratis**
**Executive**
**Vice President and Chief Accounting Officer**

Date: May 31, 2007

33

**CERTIFICATION PURSUANT TO
SECTION 302 OF
THE SARBANES-OXLEY ACT OF 2002**

I, David A. Steinberg, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q, as amended for the period ended June 30, 2006 of InPhonic, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: May 31, 2007

/s/ David A. Steinberg
David A. Steinberg
Chairman of the Board and Chief Executive Officer

**CERTIFICATION PURSUANT TO
SECTION 302 OF
THE SARBANES-OXLEY ACT OF 2002**

I, George Z. Moratis, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q, as amended for the period ended June 30, 2006 of InPhonic, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: May 31, 2007

/s/ George Z. Moratis
George Z. Moratis
Executive Vice President and Chief Accounting Officer

**EXHIBIT 32.1**

**Certification of Principal Executive Officer**
**Pursuant to 18 U.S.C. 1350**
**(Section 906 of the Sarbanes-Oxley Act of 2002)**

I, David A. Steinberg, Chairman and Chief Executive Officer (principal executive officer) of InPhonic, Inc. (the "Registrant"), certify that to the best of my knowledge, based upon a review of the Quarterly Report on Form 10-Q, as amended for the period ended June 30, 2006 of the Registrant (the "Report"):

(1)    The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934, as amended; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant.

                                        /s/ David A. Steinberg
                                        Name: David A. Steinberg
                                        Date:   May 31, 2007

**EXHIBIT 32.2**

**Certification of Principal Financial Officer**
**Pursuant to 18 U.S.C. 1350**
**(Section 906 of the Sarbanes-Oxley Act of 2002)**

I, George Z. Moratis, Executive Vice President and Chief Accounting Officer (principal financial officer) of InPhonic, Inc. (the "Registrant"), certify that to the best of my knowledge, based upon a review of the Quarterly Report on Form 10-Q, as amended for the period ended June 30, 2006 of the Registrant (the "Report"):

(1)   The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934, as amended; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant.

/s/ George Z. Moratis
Name: George Z. Moratis
Date:   May 31, 2007

# EXHIBIT O

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# Form 10-Q/A
### (Amendment No. 1)

---

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES AND EXCHANGE ACT OF 1934**

**For the quarter ended September 30, 2006**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from            to            .**

**Commission File Number 000-51023**

---

# INPHONIC, INC.
**(Exact name of Registrant as specified in its Charter)**

---

| | |
|---|---|
| **Delaware** | **52-2199384** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer identification no.)** |
| **1010 Wisconsin Avenue, Suite 600, Washington, DC** | **20007** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code: (202) 333-0001**

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒ .  No ☐ .

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐     Accelerated filer ☒     Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act.).   Yes ☐ .   No ☒ .

The registrant had 36,633,309 shares of common stock outstanding as of November 1, 2006.

Table of Contents

## EXPLANATORY NOTE

We filed our Quarterly Report on Form 10-Q for the three and nine months ended September 30, 2006 with the Securities and Exchange Commission (the "SEC") on November 9, 2006. We are filing this Form 10-Q/A Amendment No. 1 to amend and restate our unaudited financial statements for the three and nine months ended September 30, 2006 and related footnote disclosures to correct errors identified during the year-end audit and related to the misapplication of our accounting policies and determination of certain estimates. These adjustments reduced our activations and services revenue $4.5 million and $8.5 million; and equipment revenue $2.6 million and $2.6 million for the three and nine months ended September 30, 2006, respectively; and increased equipment cost of revenue $0.2 million and $0.8 million, sales and marketing expenses by $0.1 million and $0.1 million and general and administrative expenses $3.3 million and $3.3 million for the three and nine months ended September 30, 2006, respectively. In addition our net loss per share increased by $0.30 and $0.42 to ($0.43) and ($0.82) for the three and nine months ended, respectively. Please refer to Note 1(c) to the unaudited condensed consolidated financial statements for further explanation.

All referenced amounts in this report as of and for the three and nine months ended September 30, 2006 reflect balances and amounts on a restated basis. All of our future Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q and Form 10-Q/A will reflect the restated information in this Form 10-Q/A, as applicable.

This Amendment No. 1 to our Quarterly Report on Form 10-Q for the three and nine months ended September 30, 2006 amends only the following items:

> Part I, Item 1 – Financial Statements
>
> Part I, Item 2 – Management's Discussion and Analysis of Financial Condition and Results of Operations
>
> Part I, Item 4 – Controls and Procedures
>
> Part II, Item 6 – Exhibits and reports on Form 8-K

## INPHONIC, INC.

## INDEX

## FORM 10-Q/A

|  |  | Page |
|---|---|---|
| **PART I.—FINANCIAL INFORMATION** | | |
| Item 1. | Financial Statements | 3 |
|  | Unaudited Condensed Consolidated Balance Sheets at December 31, 2005 and September 30, 2006 | 3 |
|  | Unaudited Condensed Consolidated Statements of Operations for the Three and Nine Months Ended September 30, 2005 and September 30, 2006 | 4 |
|  | Unaudited Condensed Consolidated Statements of Stockholders' Equity for the Nine Months Ended September 30, 2006 | 5 |
|  | Unaudited Condensed Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2005 and September 30, 2006 | 6 |
|  | Notes to Unaudited Condensed Consolidated Financial Statements | 7 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 17 |
| Item 4. | Controls and Procedures | 28 |
| **PART II.—OTHER INFORMATION** | | |
| Item 6. | Exhibits | 29 |
| **SIGNATURES** | | 30 |

Table of Contents

## PART I

ITEM 1.    FINANCIAL STATEMENTS

### INPHONIC, INC.

**Condensed Consolidated Balance Sheets**
**(in thousands, except per share and share amounts)**

| | December 31, 2005 | September 30, 2006 (restated) (unaudited) |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 70,783 | $ 57,537 |
| Accounts receivable, net of allowance for doubtful accounts of $2,042 and $973, respectively | 34,606 | 45,363 |
| Inventory, net | 19,680 | 18,160 |
| Prepaid expenses | 2,405 | 6,650 |
| Deferred costs and other current assets | 6,823 | 2,220 |
| Current assets of discontinued operations | 2,430 | 392 |
| Total current assets | 136,727 | 130,322 |
| Restricted cash and cash equivalents | 400 | — |
| Property and equipment, net | 12,121 | 19,439 |
| Goodwill | 31,140 | 36,634 |
| Intangible assets, net | 12,651 | 9,660 |
| Deposits and other assets | 3,058 | 8,721 |
| Total assets | $ 196,097 | $ 204,776 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 31,543 | $ 58,336 |
| Accrued expenses and other liabilities | 31,588 | 23,388 |
| Current portion of deferred revenue | 13,851 | 10,169 |
| Current liabilities of discontinued operations | 3,130 | 1,178 |
| Current maturities of capital leases | 377 | 350 |
| Total current liabilities | 80,489 | 93,421 |
| Long term debt and capital lease obligations, net of current maturities | 15,474 | 20,258 |
| Deferred revenue, net of current portion | 284 | 553 |
| Total liabilities | 96,247 | 114,232 |
| Stockholders' equity: | | |
| Common stock, $0.01 par value | | |
| Authorized 200,000,000 shares at December 31, 2005 and September 30, 2006; issued and outstanding 35,232,869 and 36,564,298 shares at December 31, 2005 and September 30, 2006, respectively | 353 | 366 |
| Additional paid-in capital | 264,155 | 284,244 |
| Accumulated deficit | (164,658) | (194,066) |
| Total stockholders' equity | 99,850 | 90,544 |
| Total liabilities and stockholders' equity | $ 196,097 | $ 204,776 |

See accompanying notes to unaudited condensed consolidated financial statements

3

Table of Contents

## INPHONIC, INC.

### Unaudited Condensed Consolidated Statements of Operations
(in thousands, except per share and share amounts)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2005 | 2006 (restated) | 2005 | 2006 (restated) |
| Revenue: | | | | |
| Activations and services | $ 65,405 | $ 80,704 | $ 170,608 | $ 221,662 |
| Equipment | 26,555 | 14,399 | 64,729 | 52,547 |
| Total revenue | 91,960 | 95,103 | 235,337 | 274,209 |
| Cost of revenue, exclusive of depreciation and amortization: | | | | |
| Activations and services | (564) | 551 | 895 | 1,876 |
| Equipment | 54,317 | 52,970 | 134,985 | 151,401 |
| Total cost of revenue | 53,753 | 53,521 | 135,880 | 153,277 |
| Operating expenses: | | | | |
| Sales and marketing, exclusive of depreciation and amortization | 24,274 | 29,605 | 61,599 | 83,735 |
| General and administrative, exclusive of depreciation and amortization | 15,750 | 22,982 | 44,326 | 53,121 |
| Depreciation and amortization | 2,460 | 4,543 | 6,379 | 11,986 |
| Restructuring costs | 453 | 209 | 848 | 2,115 |
| Investment write-off | — | — | 228 | — |
| Total operating expenses | 42,937 | 57,339 | 113,380 | 150,957 |
| Operating loss | (4,730) | (15,757) | (13,923) | (30,025) |
| Other income (expense): | | | | |
| Interest income | 549 | 442 | 1,576 | 1,616 |
| Interest expense | (185) | (276) | (599) | (900) |
| Total other income | 364 | 166 | 977 | 716 |
| Loss from continuing operations | (4,366) | (15,591) | (12,946) | (29,309) |
| Discontinued operations: | | | | |
| Income (loss) from discontinued operations | (587) | 72 | (653) | (99) |
| Net loss | $ (4,953) | $ (15,519) | $ (13,599) | $ (29,408) |
| Basic and diluted net loss per share: | | | | |
| Net loss from continuing operations | $ (0.12) | $ (0.43) | $ (0.38) | $ (0.82) |
| Net income (loss) from discontinued operations | (0.02) | 0.00 | (0.02) | (0.00) |
| Basic and diluted net loss per share | $ (0.14) | $ (0.43) | $ (0.40) | $ (0.82) |
| Basic and diluted weighted average shares outstanding | 35,515,210 | 36,304,160 | 34,099,325 | 35,836,331 |

See accompanying notes to unaudited condensed consolidated financial statements

4

Table of Contents

**INPHONIC, INC.**

**Unaudited Condensed Consolidated Statements of Stockholders' Equity**
**(in thousands, except share amounts)**

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit (restated) | Total |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| **Balance, December 31, 2005** | **35,232,869** | **$ 353** | **$264,155** | **$ (164,658)** | **$ 99,850** |
| Stock-based compensation expense | — | — | 10,944 | — | 10,944 |
| Issuance of common stock in connection with the acquisition earnouts of: | | | | | |
| A1 Wireless, Inc. | 15,408 | — | 235 | — | 235 |
| VMC Satellite, Inc. | 697,045 | 7 | 4,939 | — | 4,946 |
| Issuance of common stock warrant | — | — | 3,228 | — | 3,228 |
| Repurchase and retirement of common stock | (62,761) | (1) | (502) | — | (503) |
| Exercise of common stock options, restricted stock awards and other | 681,737 | 7 | 1,245 | — | 1,252 |
| Net loss | — | — | — | (29,408) | (29,408) |
| **Balance, September 30, 2006 (restated)** | **36,564,298** | **$ 366** | **$284,244** | **$ (194,066)** | **$ 90,544** |

See accompanying notes to unaudited condensed consolidated financial statements

5

**Table of Contents**

**INPHONIC, INC.**

**Unaudited Condensed Consolidated Statements of Cash Flows**
**(in thousands)**

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2005 | 2006 (restated) |
| Cash flows from operating activities: | | |
| Net loss | $ (13,599) | $(29,408) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization | 6,379 | 11,986 |
| Non-cash sales and marketing expense related to common stock warrant | — | 296 |
| Non-cash interest expense, net | 486 | — |
| Stock-based compensation | 13,721 | 10,088 |
| Non-cash write-off of investment | 228 | — |
| Changes in operating assets and liabilities, net of assets and liabilities received from business acquisitions: | | |
| Accounts receivable | (23,621) | (10,412) |
| Inventory | (23,201) | 3,843 |
| Prepaid expenses | (1,267) | (5,723) |
| Deferred costs and other assets | (1,060) | 4,607 |
| Deposits and other assets | (1,357) | (2,153) |
| Accounts payable | 17,144 | 25,598 |
| Accrued expenses and other liabilities | 5,538 | (5,641) |
| Deferred revenue | 5,028 | (3,413) |
| Net cash used in operating activities | (15,581) | (332) |
| Cash flows from investing activities: | | |
| Capitalized expenditures, including internal capitalized labor | (8,745) | (15,525) |
| Cash paid for acquisitions | (8,670) | (3,989) |
| Cash paid for intangible assets | (2,532) | (193) |
| Purchase of short-term investments | (5,005) | (5,000) |
| Proceeds from the maturity of short-term investments | — | 5,000 |
| Proceeds from the sale of assets of discontinued operations | — | 1,111 |
| Reduction in restricted cash and cash equivalents | — | 400 |
| Net cash used in investing activities | (24,952) | (18,196) |
| Cash flows from financing activities: | | |
| Principal repayments on debt | (215) | (1,751) |
| Borrowings on line of credit | 15,000 | — |
| Trade borrowings on line of credit | — | 6,355 |
| Cash paid for repurchase of common stock | (3,090) | (503) |
| Proceeds from exercise of warrants and options | 9,669 | 1,181 |
| Net costs of initial public offering | (291) | — |
| Net cash provided by financing activities | 21,073 | 5,282 |
| Net decrease in cash and cash equivalents | (19,460) | (13,246) |
| Cash and cash equivalents, beginning of the period | 100,986 | 70,783 |
| Cash and cash equivalents, end of the period | $ 81,526 | $ 57,537 |
| Supplemental disclosure of cash flows information: | | |
| Cash paid during the period for: | | |
| Interest | $     107 | $     774 |
| Supplemental disclosure of non-cash activities: | | |
| Release of funds in escrow related to acquisitions | 10,700 | — |
| Issuance of common stock in business acquisitions | 8,209 | 5,181 |
| Issuance of warrant to purchase common stock to vendor | — | 3,228 |
| Purchase consideration in accrued liabilities | 3,000 | 224 |
| Inventory issued for advertising credits | — | 2,323 |
| Issuance of common stock in intangible asset purchase | 1,549 | — |
| Stock-based compensation capitalized as internal labor | — | 443 |
| Equipment purchased on capital lease | 366 | 152 |

See accompanying notes to unaudited condensed consolidated financial statements

Table of Contents

**INPHONIC, INC.**

**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(in thousands, except per share and share amounts)**

**(1) The Company and Basis of Presentation**

*(a) Preparation of Interim Financial Statements*

We have prepared the accompanying condensed consolidated financial statements pursuant to the rules and regulations of the U.S Securities and Exchange Commission (the "SEC") for interim financial reporting. The financial information included herein, other than the consolidated balance sheet as of December 31, 2005, has been prepared without audit. The consolidated balance sheet at December 31, 2005 has been derived from, but does not include all the disclosures contained in the audited financial statements for the year ended December 31, 2005. The preparation of consolidated financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of certain assets and liabilities, the disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reported period. In the opinion of management, these unaudited statements include all the adjustments and accruals necessary for a fair presentation of the results of the periods presented herein. These condensed consolidated financial statements should be read in conjunction with the consolidated financial statements and accompanying notes included in our Annual Report on Form 10-K for the year ended December 31, 2005. The results of operations for the interim periods presented are not necessarily indicative of the results that may be expected for a full year. Certain prior year amounts have been reclassified to conform to the current period presentation.

The accompanying financial statements for the three month period ended September 30, 2005 include adjustments to reduce depreciation and amortization expense by $733. These adjustments to depreciation were made to correct a computational error in the fixed asset subledger that caused depreciation expense to be overstated in each prior period between fiscal years 2001 and 2004 and for the six months ended June 30, 2005. We do not believe the impact of the adjustments to be material to the three month or nine month periods ended September 30, 2005 or any other prior period.

*(b) Business*

We are a leading online seller of wireless services and devices based on the number of activations of wireless services sold online in the United States. We sell wireless service plans and devices, including satellite television services through our own branded websites; including Wirefly.com, A1 Wireless.com, and VMCsatellite.com and through websites that we create and manage for third parties. We offer marketers the ability to sell wireless voice and data services and devices under mobile virtual network enabler ("MVNE") agreements. This service utilizes the same e-commerce platform, operational infrastructure and marketing relationships that we use in our operations. We provide customers the ability to organize personal communication by providing real time wireless access to e-mail, voicemail, faxes, contacts, scheduling, calendar and conference calling functionality through a website or telephone.

We have restated our consolidated financial statements as of and for the three and nine month periods ended September 30, 2006 to reflect the correction of the following errors related to the application of our revenue recognition, cost of revenue and other accounting policies which had been identified in our audit for the year ended December 31, 2006:

*(c) Restatement*

During the three months ended March 31, 2006, we had recorded revenue for certain of our features activations and services commissions in which it was subsequently determined that collectibility was not reasonably assured pursuant to SAB 104. As a result we reduced our revenue and accounts receivable $393 for this matter.

During the three months ended June 30, 2006, we had recorded activations and services revenue net of related reserves as a change in estimate of certain carrier commissions in dispute which we had previously deemed as collectible. Upon further evaluation, we believe that it was inappropriate to have recorded revenue associated with this matter until such commissions are collected from the carrier. In addition, we identified other errors related to the recording of activations and services revenue of approximately $923 as it was subsequently determined that collectibility of these amounts was not reasonably assured based on our collection experience. Accordingly, we reduced our revenue and accounts receivable by approximately $3,674 for this matter.

In addition during the three months ended June 30, 2006, we identified errors that occurred in the determination of cost of revenue and accounts receivable in the amount of $627 that have been corrected in the accompanying financial statements.

During the three months ended September 30, 2006, we identified errors in accounting for our activations and services revenue, equipment revenue and rebates and amounts paid to consumers as "goodwill" prior to our settlement with the Attorney General of the District of Columbia.

*Activations and services revenue* - We had recorded revenue for certain types of residual and churn bonuses due from wireless carriers for activations which occurred during the quarter. Upon further evaluation, we subsequently determined revenue recognition was in error as collectibility of such amounts was not reasonably assured pursuant to SAB 104 based on the nature of the amounts due and our collection experience of similar items. Accordingly, we reduced revenue and accounts receivable by $2,917 and will not record revenue on such items in

the future until collections are received.

In addition, upon further evaluation of carrier commission receivable balances, we identified several receivable balances that the respective carriers were disputing. Based on correspondence and other information received from the carrier during the three months ended September 30, 2006, although we may continue our collection pursuits, we now believe that based on the nature of the response we should have written off these balances during our third quarter. Accordingly we have reduced activation and services revenue and accounts receivable by $1,551 and will not record revenue on such items in the future until collections are received.

*Equipment revenue* - We identified a deficiency in our process for recording certain fees due from consumers when they cancel their wireless service contract within specified time periods or the wireless device is not returned to us as is required under the contract with the customer. As a result of this deficiency we reduced equipment revenue and accounts receivable $1,961 during the quarter.

*Consumer product rebates and rebates paid to consumers as "goodwill"* - We identified an error in accounting for accrued expenses and reserves for consumer product rebates ("accrued consumer liabilities") totaling $3,950 for the quarter. Of this amount, we determined that our reserve for such liabilities was understated $3,297 from payments made to consumers during the three month period which were outside our customary rebate validation process ("goodwill payments") which erroneously reduced accrued consumer liabilities when paid rather than expensing such amounts. Accordingly, we increased general and administrative expenses and accrued consumer liabilities for $3,297 during the three months ended September 30, 2006. In addition, we identified that we under-estimated our accrued consumer liability reserve requirements $653 as a result of misestimating the number of periods that continued to be subject to consumer rebate eligibility. Accordingly, we decreased equipment revenue and increased our reserve for accrued consumer liabilities for this amount.

*Other* - We identified errors that occurred in the recordation of selling and marketing and general and administrative expenses cost of revenue and accounts receivable in the amount of $325 that also have been corrected in the accompanying financial statements.

The impact on our financial statements for these items for the three and nine months ended September 30, 2006 is shown in the table below:

| | September 30, 2006 (reported) | September 30, 2006 (adjustments) | September 30, 2006 (restated) |
|---|---|---|---|
| Accounts receivable | $ 56,545 | $ (11,182) | $ 45,363 |
| Total current assets | 141,504 | (11,182) | 130,322 |
| Total assets | 215,958 | (11,182) | 204,776 |
| | | | |
| Accounts payable | 58,071 | 265 | 58,336 |
| Accrued expenses and other current liabilities | 19,438 | 3,950 | 23,388 |
| Total current liabilities | 89,206 | 4,215 | 93,421 |
| Total liabilities | 110,017 | 4,215 | 114,232 |
| | | | |
| Accumulated deficit | (178,669) | (15,397) | (194,066) |
| Total stockholders' equity | 105,941 | (15,397) | 90,544 |
| Total liabilities and stockholders' equity | 215,958 | (11,182) | 204,776 |

7

Table of Contents

| | For the three months ended | | | For the nine months ended | | |
|---|---|---|---|---|---|---|
| | 30-Sep (reported) | 30-Sep (adjustments) | 30-Sep (restated) | 30-Sep (reported) | 30-Sep (adjustments) | 30-Sep (restated) |
| **Revenue:** | | | | | | |
| Activations and services | $ 85,171 | $ (4,467) | $ 80,704 | $230,196 | $ (8,534) | $221,662 |
| Equipment | 17,013 | (2,614) | 14,399 | 55,161 | (2,614) | 52,547 |
| Total revenue | 102,184 | (7,081) | 95,103 | 285,357 | (11,148) | 274,209 |
| Cost of revenue, exclusive of depreciation and amortization Equipment | 52,770 | 200 | 52,970 | 150,574 | 827 | 151,401 |
| Total cost of revenue | 53,321 | 200 | 53,521 | 152,450 | 827 | 153,277 |
| Sales and marketing, exclusive of depreciation and amortization | 29,480 | 125 | 29,605 | 83,610 | 125 | 83,735 |
| General and administrative, exclusive of depreciation and amortization | 19,685 | 3,297 | 22,982 | 49,824 | 3,297 | 53,121 |
| Total operating expenses | 53,917 | 3,422 | 57,339 | 147,535 | 3,422 | 150,957 |
| Operating loss | (5,054) | (10,703) | (15,757) | (14,628) | (15,397) | (30,025) |
| Loss from continuing operations | (4,888) | (10,703) | (15,591) | (13,912) | (15,397) | (29,309) |
| Net loss | (4,816) | (10,703) | (15,519) | (14,011) | (15,397) | (29,408) |
| Net loss per share: | | | | | | |
| Net loss from continuing operations | (0.13) | (0.30) | (0.43) | (0.39) | (0.43) | (0.82) |
| Basic and diluted net loss per share | (0.13) | (0.30) | (0.43) | (0.39) | (0.43) | (0.82) |

| | For the nine months ended | | |
|---|---|---|---|
| | 30-Sep (reported) | 30-Sep (adjustments) | 30-Sep (restated) |
| **Cash flows from operating activities:** | | | |
| Net loss | $(14,011) | $ (15,397) | $(29,408) |
| Accounts receivable | (21,594) | 11,182 | (10,412) |
| Accounts payable | 25,333 | 265 | 25,598 |
| Accrued expenses and other liabilities | (9,856) | 4,215 | (5,641) |

### (d) Risks and Uncertainties

Our operations are subject to certain risks and uncertainties including, among others, actual and potential competition by entities with greater financial resources, rapid technological changes, the need to retain key personnel and protect intellectual property and the availability of additional capital financing on terms acceptable to us.

Since inception we have incurred net losses attributable to common stockholders of approximately $194,066. To date, management has relied on debt and equity financings to fund our operating deficit. While we currently have $57,537 of cash and cash equivalents on hand as of September 30, 2006, we may require additional financing to fund future operations.

### (e) Acquisitions and Discontinued Operations

We acquired certain assets and assumed certain liabilities of A1 Wireless USA, Inc. ("A1 Wireless"); VMC Satellite, Inc. ("VMC"); and FONcentral.com, Inc. ("FC"). We accounted for these transactions using the purchase method of accounting in accordance with Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations.* Accordingly our results of operations include the operating results of A1 Wireless effective January 1, 2005, VMC as of April 26, 2005 and FC as of May 26, 2005, their respective acquisition dates.

On December 31, 2005, we completed the sale of substantially all of the operating assets of our mobile virtual network operator ("MVNO") Liberty Wireless ("Liberty") to Teleplus Wireless Corp, a subsidiary of Teleplus Enterprises, Inc. The sale of Liberty has enabled us to streamline and focus our resources on our other operations including the growth of our MVNE business. The sale of Liberty was recorded as a discontinued operation in the financial statements pursuant to SFAS No. 144, *Accounting for Impairment or Disposal of Long Lived Assets.* Cash flows pertaining to discontinued operations are not disclosed separately in the Unaudited Condensed Consolidated Statements of Cash Flows.

### (2) Summary of Significant Accounting Policies

### (a) Revenue Recognition

*Activations and Services Revenue*

We recognize revenue from the sale of wireless services and the provisioning of MVNE and data services.

*Wireless Services:* We generate revenue from wireless carriers, including a satellite television carrier, who pay commissions and volume and performance-based bonuses, for activating wireless services and features on their networks. We recognize commissions from wireless carriers upon shipment of activated devices to the customer. In addition to activation commissions, certain carriers pay us a monthly residual fee either for as long as a customer who we activate for that carrier continues to be its subscriber, or for a fixed period of time depending on the carrier. We purchase satellite activation certificates evidencing activation rights in advance of their resale to customers. Revenue from satellite television customers includes sales of these satellite activation certificates, net of the certificate cost, as we are acting as an agent in the

8

Table of Contents

transaction. Our wireless revenue is reduced for estimated deactivations of customers prior to the expiration of a time period that ranges 90 to 180 days from the date of activation, depending on the wireless carrier. We estimate deactivations based on historical experience, which we developed based on our experience with carriers, customer behavior and sources of customers, among other factors, allowing us to accrue estimates with what we believe is a high degree of certainty. If we determine that we cannot accurately predict future deactivation experience, we may be required to defer 100% of our carrier commissions revenue until the expiration of the appropriate chargeback period. Our reserves for deactivations are included in accounts receivable and deferred revenue on the accompanying balance sheets.

In addition to receiving commissions for each wireless subscriber activated, we earn performance bonuses from the wireless carriers based on negotiated performance targets. The most significant bonus we earn is the quarterly volume bonus, which we bill wireless carriers for on a monthly basis, based on current month activations. We record these bonuses as deferred revenue at the time of billing until we achieve the quarterly targets. We also earn other quarterly bonuses from certain carriers for maintaining low customer churn and signing up customers for certain additional monthly "features" such as text messaging or data service. Wireless carriers also periodically offer bonuses for achieving monthly volume and other performance targets. We recognize these monthly bonuses as earned in accordance with the provisions of Staff Accounting Bulletin ("SAB") No. 104, *Revenue Recognition in Financial Statements* . Revenue is recognized only when all of the following criteria are met: (1) persuasive evidence of an arrangement exists, (2) delivery has occurred or services have been rendered, (3) the seller's price to the buyer is fixed or determinable, and (4) collectibility is reasonably assured. Amounts collected in cash prior to meeting the above criteria are recorded as deferred revenue. Through 2005, commission revenue earned from the activation of carrier features had been deferred until the contractual chargeback period had lapsed. Beginning in 2006, we began to estimate commission revenue earned from feature activations based on historical experience which we have developed based on our experience with carriers and customer behavior over a period of time in excess of 24 months.

*MVNE Services:* We offer marketers the ability to sell wireless services to their customers under their own brands using our e-commerce platform and operational infrastructure through MVNE contracts. We receive fees for the development of the network platform, for custom functional enhancements to the network platform, and for operational support services. We defer the fees attributable to the production of the network platform and recognize these fees and costs over the expected life of the agreement (typically 12 to 48 months). Fees received for custom functional enhancements to the network platform and for operational services are deferred until all revenue criteria have been satisfied. Deferred revenue from MVNE contracts as of December 31, 2005 and September 30, 2006 was $1,852 and $1,590, respectively.

*Data Services:* We sell data services, including a service that allows customers to access email, voicemail, facsimiles, contacts and personal calendar information through a website or a telephone; wireless email; and mobile marketing services. We bill customers and recognize revenue monthly, as the services are performed.

### Equipment Revenue

Revenue from the sale of wireless devices and accessories in a multiple-element arrangement with services are recognized at the time of sale in accordance with *Emerging Issues Task Force* EITF No. 00-21, *Revenue Arrangements with Multiple Deliverables,* when fair value of the services element exists. Customers have the right to return devices within a specific period of time or usage, whichever occurs first. We provide an allowance for estimated returns of devices based on historical experience. In accordance with the provisions of SAB No. 104, we determined we have sufficient operating history to estimate equipment returns. In connection with wireless activations, we sell customers wireless devices at a significant discount, which is generally in the form of a rebate. Rebates are recorded as a reduction of revenue. We recognize equipment revenue, less a reserve for customer rebates (accrued consumer liabilities), which is based on historical experience of rebates claimed. Future experience could vary based upon rates of consumers redeeming rebates.

During the three and nine months ended September 30, 2006, we incurred and paid $3,297 to consumers outside our customary rebate redemption process to parties that we believed generally had not satisfied all the terms and conditions of the respective rebate redemption program. Such amounts were paid to satisfy customer complaints and are viewed by us as "goodwill payments" and reflected in general and administrative expenses.

In the event a customer terminates their wireless service with the carrier within six months of activation and opts not to return the wireless device to us within the time frames permitted within our return policy, in many instances our sales contracts with the customer permit us to charge the customer an EDP termination fee for each unreturned device. Prior to the three months ended June 30, 2006, pursuant to SAB 104 revenue recognition of such fee was deferred as we did not have adequate historical collection data to reasonably estimate the ultimate collectibility of the receivable. Beginning April 1, 2006, we began to estimate EDP termination fee revenue based on historical experience of customer collection behavior which we have developed over a time period of 24 months which provides the basis on which to accrue a revenue with an appropriate assurance of collectibility pursuant to SAB 104.

### (b) Concentrations of Credit Risk

Financial instruments that potentially subject us to a concentration of credit risk consist principally of accounts receivable. We extend credit to wireless network carriers ("Carriers") on an unsecured basis in the normal course of business. Three Carriers accounted for 67% and 69% of accounts receivable, net of the deactivation reserve, as of December 31, 2005 and September 30, 2006, respectively.

For the three and nine months ended September 30, 2005 and 2006, revenue from three Carriers exceeded 10% of our total revenue. Revenue as a percentage of total revenue for these Carriers was as follows:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2005 | 2006 | 2005 | 2006 |
| Carrier A | 32% | 37% | 29% | 35% |
| Carrier B | 13% | 19% | 16% | 17% |
| Carrier C | 17% | 15% | 21% | 16% |
| Total | 62% | 71% | 66% | 68% |

### (c) Accrued Expenses and Other Liabilities

Accrued expenses and other liabilities at December 31, 2005 and September 30, 2006 consisted of:

|  | As of | |
| --- | --- | --- |
|  | December 31, 2005 | September 30, 2006 |
| Accrued consumer liabilities | $ 18,289 | $ 14,103 |
| Accrued payroll and related expenses | 1,452 | 1,479 |
| Accrued acquisition costs and severance costs | 5,063 | 591 |
| Accrued taxes payable | 593 | 386 |
| Other | 6,191 | 6,829 |
|  | $ 31,588 | $ 23,388 |

### (d) Restructuring Costs

We implemented a restructuring plan following the acquisition of A1 Wireless, to take advantage of synergies gained through the acquisition and to restructure our operations for efficiency purposes. For the three months ended September 30, 2005, we recognized $453 in restructuring costs, all of which related to workforce reduction. During the nine months ended September 30, 2005, we recognized $848 in restructuring costs, of which $812 related to workforce reduction and the remaining $36 to excess facilities. All costs related to this plan were paid out in 2005.

During 2006, we implemented a restructuring plan related to changes in our management and operational structure. For the nine months ended September 30, 2006, we recognized $2,115 related to the termination of our former president and chief operating officer and thirteen other senior executives and employees. Of this amount, $594 related to severance benefits that will be paid out in cash to the recipients on a monthly or semi-monthly basis over the terms of their respective severance agreements, $1,312 related to severance expenses incurred as a result of the modification of stock-based compensation awards under which vesting of 50% of unvested restricted share and option awards was accelerated for three of the former employees, and $209 related to other costs primarily due to relocation expenses for certain key employees. At September 30, 2006, we had an accrued liability recorded of $367 of which approximately $222 will be paid out in cash by December 31, 2006.

### (e) Loss on investment

During the nine months ended September 30, 2005, we sold all data service software acquired from Avesair Inc. in May 2003, to a third party vendor and wrote off related capitalized labor, intangible assets, goodwill and other costs related to this asset. As a result of this transaction, we recognized a loss of $228 during the period.

### (f) Stock-Based Compensation

We adopted Statement of Financial Accounting Standards "SFAS" No. 123 (revised 2004), *Share Based Payment* (SFAS No. 123(R)) on January 1, 2006 using the modified prospective application method ("MPA"). SFAS No. 123(R) established standards for the accounting for transactions in which an entity exchanges its equity instruments for goods or services. SFAS No. 123(R) requires us to measure the cost of employee services received in exchange for an award of equity instruments (usually stock options or unvested (restricted) stock awards) based on the grant-date fair value of the award. That cost is recognized over the period during which an employee is required to provide service in exchange for the award—the

10

**Table of Contents**

requisite service period (usually the vesting period). In March 2005, the Securities and Exchange Commission ("SEC") issued Staff Accounting Bulletin No. 107 ("SAB 107") relating to the interaction of the adoption of SFAS No. 123(R) and the SEC rules and regulations. We have applied the provisions of SAB 107 in our adoption of SFAS 123(R).

Prior to our adoption of SFAS No. 123(R), we applied the intrinsic value method of accounting for employee stock-based compensation as prescribed by Accounting Principles Board ("APB") Opinion No. 25, *Accounting for Stock Issued to Employees,* and related interpretations including FASB Interpretation ("FIN") No. 44, *Accounting for Certain Transactions involving Stock Compensation an Interpretation of APB Opinion No. 25* , to account for our stock option grants to employees. Under this method, compensation expense was recorded on the date of the grant only if the current market price of the underlying stock exceeded the exercise price. SFAS No. 123, *Accounting for Stock-Based Compensation* ("SFAS No. 123"), established accounting and disclosure requirements using a fair value-based method of accounting for stock-based employee compensation plans. As permitted by SFAS No. 123, we had elected to continue to apply the intrinsic value-based method of accounting described above, and had adopted the disclosure requirements of SFAS No. 123. All shares of restricted stock awarded to employees were accounted for at fair value in accordance with SFAS No. 123.

Under the MPA method, compensation cost for all share-based payments granted prior to, but not vested as of December 31, 2005, is based on the grant date fair value estimated in accordance with the pro forma provisions of SFAS No. 123, and compensation cost for all share based payments granted subsequent to December 31, 2005, will be based on the grant date fair value estimated in accordance with the provisions of SFAS No.123(R). Results for prior periods have not been restated. We use the ratable method of attributing the value of stock-based compensation to expense. SFAS No. 123(R) requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. In our pro forma information required under SFAS No. 123 for the periods prior to January 1, 2006, we accounted for forfeitures as they occurred. The fair value of each option granted is estimated on the grant date using the Black-Scholes option pricing model which takes into account as of the grant date the exercise price and expected life of the option, the current price of the underlying stock and its expected volatility, expected dividends on the stock and the risk-free interest rate for the term of the option.

*Stock Options* —We have two stock plans under which we have issued or may issue options to purchase shares of our common stock. The 1999 Stock Incentive Plan (the "1999 Plan"), provided for grants of stock-based awards from time to time to employees, officers, directors and consultants of the Company at exercise prices determined by the board of directors. Options granted under the 1999 Plan generally vest over a four-year period and expire ten years from the grant date. As of November 19, 2004, no additional options were available for grant under the 1999 Plan due to the adoption of the 2004 Equity Incentive Plan (the "2004 Plan").

The 2004 Plan allows for grants of stock-based awards from time to time to employees, officers, directors and consultants at exercise prices determined by the board of directors. For incentive stock options, the exercise price must be at least equal to fair market value at the date of grant. For nonqualified stock options, the option may be granted with an exercise price less than fair market value. Options granted under the 2004 Plan vest over a period to be determined by the administrator, generally four years, and expire ten years from the grant date.

For the three and nine months ended September 30, 2006 as a result of our adoption of SFAS No. 123(R), we recognized stock-based compensation expense related to employee options granted prior to January 1, 2006 of $1,394 and $4,770, of which $24 and $260, respectively, was capitalized in accordance with our compensation policies and SFAS No. 123(R).

In addition on March 22 and June 13, 2006, we granted options to certain of our employees to purchase 679,900 and 207,000 shares of our common stock, respectively. The options granted on March 22 and June 13, 2006 were granted at an exercise price of $6.46 and $6.51 per share, respectively. The grant date fair value of employee share options was estimated using the Black-Scholes option-pricing model with the following assumptions: an expected life averaging 5.77 years; an average volatility of 72%; no dividend yield; and a risk-free interest rate averaging 4.75%. The weighted average fair value per share of options granted was $4.29. Compensation cost of the grant was reduced by an estimated forfeiture amount based on an annual experience rate of 9.93%. As of the date of grants, total compensation cost related to the grants including estimated forfeitures was approximately $2,324 and $715 for the March 22, and June 13, 2006 grants, respectively. Stock-based compensation expense for these grants for the three and nine months ended September 30, 2006 was $101 and $227 respectively.

The impact of adopting SFAS No. 123(R) increased stock-based compensation expense included in our operating expenses and increased net loss from continuing operations by approximately $718 and $1,715 for the three and nine months ended September 30, 2006 respectively or $0.02 and $0.05 per basic and diluted share. There was no impact from the adoption on cash flow from operations or cash flows from financing activities.

**Table of Contents**

The following table summarizes the activity for stock options granted to employees and non-employees for the nine months ended September 30, 2006.

| | Number of options | Weighted average exercise price | Weighted average contractual term (years) | Aggregate intrinsic value |
|---|---|---|---|---|
| Balance January 1, 2006 | 5,115,969 | $    9.47 | | |
| Granted | 886,900 | 6.47 | | |
| Exercised | (257,599) | 4.95 | | |
| Forfeited | (813,324) | 11.88 | | |
| Balance September 30, 2006 | 4,931,946 | $    8.77 | 7.66 | $    7,230 |
| Ending vested & expected to vest | 4,681,171 | $    8.74 | 7.60 | $    6,924 |
| Exercisable at September 30, 2006 | 2,849,165 | $    8.40 | 6.97 | $    4,428 |

The weighted-average grant date fair value of options granted during the nine months ended September 30, 2006 was $4.29. The total intrinsic value of options exercised during the nine months ended September 30, 2006 was $663.

*Restricted Common Stock* —During the nine months ended September 30, 2006, we granted 1,205,127 shares of restricted common stock to certain of our key employees. The restrictions on this common stock lapse and the stock vests over periods ranging up to four years from the grant date. The following table summarizes the activity for restricted stock for the nine months ended September 30, 2006.

| | Number of Restricted Stock Awards | Weighted-average grant date fair value |
|---|---|---|
| Non-vested at January 1, 2006 | 1,137,878 | $    15.58 |
| Granted | 1,205,127 | 6.61 |
| Vested | (443,432) | 14.65 |
| Surrendered for taxes | (37,768) | 15.83 |
| Forfeited | (170,979) | 15.10 |
| Non-vested at September 30, 2006 | 1,690,826 | $    9.47 |

As of September 30, 2006, there was approximately $12,566 of total unrecognized compensation cost related to restricted share-based compensation arrangements. That cost is expected to be recognized over a weighted-average period of 1.54 years. The total fair value of shares vested during the nine months ended September 30, 2006 was approximately $6,495.

*Stock Purchase Warrants* —In April 2006, we issued a warrant to purchase 566,324 shares of our common stock at an exercise price of $7.35 per share. The estimated fair value of the warrant granted was determined using the Black-Scholes Model. The weighted average grant date fair value per share of this warrant was $5.70. The following table summarizes warrant activity for the nine months ended September 30, 2006:

| | Number of warrants | Weighted average exercise price | Range of exercise |
|---|---|---|---|
| Balance January 1, 2006 | 787,863 | $    8.44 | $0.03 - 24.00 |
| Granted | 566,324 | 7.35 | 7.35 |
| Exercised | (17,270) | 0.28 | 0.03 - 14.04 |
| Surrendered for cashless exercise | (627) | 2.25 | 0.03 - 2.49 |
| Forfeited | (3,334) | 24.00 | 24.00 |
| Balance at September 30, 2006 | 1,332,956 | $    8.04 | $0.03 - 15.60 |

In April 2006, we issued an additional warrant to purchase 188,775 shares of our common stock to a vendor that is exercisable upon certain performance conditions. The exercise price of the warrant will be based on the trading price of our common stock at the time the performance conditions are met by the vendor. Once it is probable that the vendor will achieve the performance conditions set forth under the terms of the warrant, the fair value of the warrant will be amortized to sales and marketing expense over the remaining contractual term of the vendor commitment.

12

**Table of Contents**

Warrants outstanding at September 30, 2006 were exercisable for 1,332,956 shares of our common stock, excluding this contingent warrant.

Our pro forma net loss per common share, basic and diluted, for the three and nine months ended September 30, 2005 was as follows:

| | Three Months Ended September 30, 2005 | Nine Months Ended September 30, 2005 |
|---|---|---|
| Net loss as reported | $    (4,953) | $    (13,599) |
| Add: Stock-based employee compensation expense included in net loss as reported, net of related tax effects | 3,874 | 13,046 |
| Less: Total stock-based employee compensation determined under fair value based methods for all stock award, net of related tax effects | (4,615) | (9,786) |
| Pro forma net loss | $    (5,694) | $    (10,339) |
| Net loss per common share, basic and diluted, as reported | $    (0.14) | $    (0.40) |
| Net loss per common share, basic and diluted, pro forma | $    (0.16) | $    (0.30) |
| Basic and diluted weighted average common shares outstanding | 35,515,210 | 34,099,325 |

Stock-based compensation which includes compensation recognized on stock option grants and restricted stock awards has been included in the following line items in the accompanying condensed consolidated financial statements. There was no tax benefit recognized in the statements of operations for stock-based awards in either period:

| | As of | |
|---|---|---|
| | December 31, | September 30, |
| Balance Sheet: | 2005 | 2006 |
| Property and equipment, net | $    — | $    404 |

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| Statement of operations: | 2005 | 2006 | 2005 | 2006 |
| Sales and marketing | $    709 | $    674 | $ 1,761 | $ 2,212 |
| General and administrative | 3,148 | 2,304 | 11,703 | 6,564 |
| Restructuring costs | — | — | — | 1,312 |
| Net income (loss) from discontinued operations | 69 | — | 258 | — |
| | $    3,926 | $    2,978 | $13,722 | $10,088 |

During the nine months ended September 30, 2006, we modified the stock-based awards of 5 employees which accelerated the vesting of 81,035 shares of restricted stock and options underlying 122,258 shares of our common stock. As a result of the expedited vesting, we accelerated expense recognition of the compensation cost associated with the newly vested shares. Accordingly, stock-based compensation expense includes $1,312 from these actions. Incremental compensation cost arising from the modifications to the vesting terms of the awards was not significant.

*(g) Net Loss per Share*

We calculate net loss per share in accordance with SFAS No. 128, *Earnings Per Share* . Basic net loss per common share excludes any dilutive effects of options, warrants, restricted stock and convertible securities and is calculated by dividing net loss attributable to common stockholders by the weighted average number of common shares issuable and outstanding for the period. Diluted net loss per common share equals basic net loss per common share, as the effects of options, warrants, restricted stock and convertible securities are anti-dilutive.

The following table reconciles net loss and basic and diluted weighted average common shares outstanding to the historical or pro forma net loss and the pro forma basic and diluted weighted average common shares outstanding for the three and nine months ended September 30, 2005 and 2006.

**Table of Contents**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | **2005** | **(restated) 2006** | **2005** | **(restated) 2006** |
| Net loss from continuing operations | $ (4,366) | $ (15,591) | $ (12,946) | $ (29,309) |
| Net income (loss) from discontinued operations | (587) | 72 | (653) | (99) |
| Net loss | $ (4,953) | $ (15,519) | $ (13,599) | $ (29,408) |
| Weighted average shares outstanding | | | | |
| Basic and diluted earnings per share: | 35,515,210 | 36,304,160 | 34,099,325 | 35,836,331 |
|     Net loss from continuing operations | $ (0.12) | $ (0.43) | $ (0.38) | $ (0.82) |
|     Net income (loss) from discontinued operations | (0.02) | 0.00 | (0.02) | (0.00) |
| Basic and diluted earnings per share | $ (0.14) | $ (0.43) | $ (0.40) | $ (0.82) |

During the three and nine months ended September 30, 2006 and 2005, we incurred a net loss. If our outstanding common stock equivalents were exercised or converted into common stock, the result would have been anti-dilutive and, accordingly, basic and diluted net loss attributable to common stockholders per share are identical for all periods presented in the accompanying condensed consolidated statements of operations. The following summarizes our potential outstanding common stock equivalents as of the end of each period:

| | September 30, | |
| --- | --- | --- |
| | **2005** | **2006** |
| Options to purchase common stock | 5,502,930 | 4,931,946 |
| Restricted stock awards | 1,021,266 | 1,690,826 |
| Warrants to purchase common stock | 897,647 | 1,521,731 |
| Shares awarded in connection with the VMC acquisition | 210,379 | — |
| Total common stock equivalents convertible into common stock | 7,632,222 | 8,144,503 |

### (3) Discontinued Operations

On December 31, 2005, we completed the sale of substantially all of the operating assets of our Liberty Wireless business. During the nine months ended September 30, 2006 we collected $1,111 of notes receivable recorded at December 31, 2005 related to the divestiture. Summary operating results for discontinued operations was as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | **2005** | **2006** | **2005** | **2006** |
| Revenue | $ 4,777 | $ — | $ 19,625 | $ — |
| Costs and expenses | (5,364) | 72 | (20,278) | (99) |
| Income (loss) from discontinued operations | $ (587) | $ 72 | $ (653) | $ (99) |

Balance sheet data included:

| | As of | |
| --- | --- | --- |
| | December 31, 2005 | September 30, 2006 |
| Accounts and notes receivable, net | $ 1,848 | $ 392 |
| Other current assets | 582 | — |
|     Assets of discontinued operations | $ 2,430 | $ 392 |
| Accounts payable | $ 931 | $ — |
| Other accrued expenses | 2,199 | 1,178 |
|     Liabilities of discontinued operations | $ 3,130 | $ 1,178 |

### (4) Goodwill

The following table reflects the changes to goodwill for the nine months ended September 30, 2006:

| | |
| --- | --- |
| Balance as of December 31, 2005 | $31,140 |
| Goodwill arising from VMC Satellite, Inc. earn-outs [1] | 5,494 |
| Balance as of September 30, 2006 | $36,634 |

[1]  We achieved the earn-out performance target stipulated in the VMC Asset Purchase Agreement on February 28, 2006 and accordingly recorded additional goodwill of $2,984. The earn-out consideration consisted of amounts that were paid in cash of $2,362 and 119,389 shares of our common stock with a fair value of $622. Such consideration was paid in April 2006. An additional $2,510 of goodwill was

earned in connection with achieved earn-out performance targets on August 21, 2006 and consisted of $4,986 in cash, of which $224 was still payable as of September 30, 2006, and 214,899 shares of our common stock with a fair value of $1,324. We may also be obligated to pay shareholders of VMC an additional $1,568 in cash based on future performance targets.

14

Table of Contents

## (5) Debt

We maintain a revolving operating line of credit which allows for aggregate borrowings of up to $25,000 subject to certain limits based on accounts receivable and inventory levels. On September 28, 2006, we entered into a Seventh Amendment (the "Amendment") to Third Amended and Restated loan and Security Agreement (the "Agreement") with Comerica Bank (the "Bank"). The Amendment amended the maturity date from January 1, 2007 to July 1, 2007, reduced the applicable interest to the Bank's LIBOR plus a margin of 1.75% from the Bank's LIBOR plus a margin of 2.00%, and modified the terms of the limits on our aggregate borrowing base. At September 30, 2006 and December 31, 2005, there were $19,924 and $15,000 outstanding under this line of credit, respectively. As of September 30, 2006, we had no additional borrowing availability under the facility based on the limits described above. The line of credit expires effective July 1, 2007 and accordingly the outstanding balance has been classified as a current liability as of September 30, 2006. We terminated our line of credit on November 7, 2006.

On November 7, 2006, we executed a $100 million aggregate principal amount senior secured term loan bearing a fixed rate of interest of nine percent per annum and secured by substantially all our assets. The term loan matures in November 2011. Beginning in November 2009, we have the ability to repay principal on the loan without penalty and conversely, the lenders have the right to call the remaining outstanding principal of the debt without penalty. As additional consideration, we also granted the lenders warrants to purchase 1,250,000 shares of our common stock at an exercise price of $0.01 per share. We received $75.0 million of the term loan proceeds on November 7, 2006, and have the option to withdraw the remaining amount at a later date. Proceeds from the term loan will be used to repay all indebtedness under the existing credit facility, fund share repurchases of our common stock, and for general corporate and working capital needs. In conjunction with the loan transaction above, we terminated our credit facility with Comerica Bank and used proceeds from the term loan to repay the outstanding principal obligation of $19,924 plus accrued interest.

## (6) Repurchase of Common Stock

On August 17, 2005, our Board of Directors authorized the repurchase of up to $30,000 of our common. We funded our share repurchases with cash on hand and cash generated from operations. During the nine months ended September 30, 2006, we repurchased 62,761 shares of our common stock at an average price of $8.01 per share for approximately $503. All shares repurchased were returned to the status of authorized but unissued shares of common stock as of September 30, 2006. For the duration of the program, we repurchased 1,144,248 shares for an aggregate consideration of $13,591. The program ended August 17, 2006.

## (7) Commitments and Contingencies

### Legal Matters

On August 5, 2004, Avesair, Inc., one of the companies the assets of which we acquired, filed suit against us demanding, among other matters, that we issue to Avesair shares of our common stock valued at approximately $4,000 as of June 30, 2004. The stock demanded by Avesair represents the maximum value of shares that they could have earned for achieving certain performance-based targets under the asset purchase agreement. We believe the performance-based targets were not achieved and intend to vigorously contest this matter. However, any adverse resolution of this matter could have a material adverse impact on our financial results if we are required to issue additional shares and would result in dilution to our stockholders.

On July 25, 2005, the Federal Communications Commission (FCC) issued a Notice of Apparent Liability, asserting that we registered with the FCC and reported and contributed to the Universal Service Fund (USF) and the

15

Table of Contents

Telecommunications Relay Service Fund later than required by FCC rules. The FCC has preliminarily proposed to fine us approximately $820 for late payment of such fees. In a letter dated August 24, 2005 we responded to the FCC's preliminary finding and asserted that no fine is appropriate under the circumstances. However, any adverse resolution of this matter could have a material adverse impact on our financial results.

Thirteen related putative federal court class actions, have been filed against us arising out of InPhonic-sponsored rebate offers for online purchases of wireless telephones. Eight of these lawsuits also name a third-party rebate processor as a defendant. This rebate processor began to process claims for InPhonic-sponsored rebate offers in or about July 2005, and InPhonic's agreement with the rebate processor expired in or about July 2006. One of these lawsuits also names our current third-party rebate processor as a defendant.

Of the thirteen federal court actions, five are pending in the District of Columbia, another five are pending in the District of Arizona, and one each is pending in the federal courts Newark, New Jersey, Chicago, and Los Angeles.

On October 25, 2006 we received a decision by the Judicial Panel on Multidistrict Litigation ("JPML") granting our motion to consolidate the federal court actions in the United States District Court for the District of Columbia before the Honorable Ellen Segal Huvelle.

The putative class action complaints allege, among other things, violations of the consumer protection laws of various States and (in certain lawsuits) the federal RICO (anti-racketeering) statute in connection with our disclosure and implementation of the terms and conditions of rebate offers. The class action plaintiffs seek statutory penalties, treble damages, attorneys' fees, and punitive damages under the consumer protection statutes, and treble damages and attorneys' fees under the RICO statute, as well as injunctions concerning the content of our websites.

The federal lawsuits are in an early stage. We intend to vigorously defend these actions but cannot predict their outcome.

On June 8, 2006, the Attorney General of the District of Columbia brought a lawsuit in the Superior Court of the District of Columbia (the "DCAG Action"), alleging violations of the D.C. consumer protection statute based on factual allegations that are substantively the same as those in the private putative nationwide class actions. The DCAG Action sought injunctive relief, restitution for consumers, statutory penalties, and attorneys' fees. We reached settlement in principle with the Attorney General of the District of Columbia on November 3, 2006 and are currently negotiating the terms of a definitive agreement.

From time to time we are party to other disputes or legal proceedings. We do not believe that any of the pending proceedings are likely to have a material adverse effect on our business.

16

**Table of Contents**

**ITEM 2.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion and analysis should be read in conjunction with our consolidated financial statements and related notes and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of our Annual Report on Form 10-K for the fiscal year ended December 31, 2005.*

### Forward-Looking Statements

This Quarterly Report on Form 10-Q, as amended contains statements that are forward-looking within the meaning of the Securities Act of 1933, and the Securities Exchange Act of 1934 that involve risks and uncertainties. In some cases, forward-looking statements are identified by words such as "believe", "anticipate", "expect", "intend", "plan", "will", "may" and similar expressions. All of these forward-looking statements are based on information available to us at this time and we assume no obligation to update any of these statements. These statements are not guarantees of future performance and are subject to certain risks and uncertainties that are difficult to predict, including, among other things: our limited operating history; the ability to maintain strong relationships with wireless carriers; ongoing consolidation among wireless carriers; a decrease in the new subscriber growth rate; increased competition with additional retail and on-line distributors of wireless services and devices; increase in the rate of deactivations of active accounts; ability to attract new customers; ability to successfully integrate acquisitions; ability to accurately estimate reserve for future deactivations; interruptions or delays in service from third parties; our ability to effectively manage business growth; ability to attract and retain key personnel; and government regulation.

Existing and prospective investors are cautioned not to place undue reliance on these forward-looking statements, due to the risks listed below and other risks described under Item 1A, "Risk Factors" of our Form 10-Q filed November 9, 2006.

### Overview

We are a leading online seller of wireless services and devices based on the number of activations of wireless services sold online in the United States. We sell wireless service plans and devices, including satellite television services through our own branded websites; including Wirefly.com, A1 Wireless.com, and VMCsatellite.com and through websites that we create and manage for third parties. We offer marketers the ability to sell wireless voice and data services and devices, under mobile virtual network enabler ("MVNE") agreements. This service utilizes the same e-commerce platform, operational infrastructure and marketing relationships that we use in our operations. We provide customers the ability to organize personal communications by providing real time wireless access to e-mail, voicemail, faxes, contacts, scheduling, calendar and conference calling functionality through a website or telephone.

We measure our performance based on our financial results and various non-financial measures. Key financial factors that we focus on in evaluating our performance include revenue growth within a period, contribution margin (defined as revenue less cost of revenue and marketing expenses), and operating income (defined as contribution margin less other operating expenses including sales, general and administrative and depreciation and amortization expenses). Our financial results can, and do, vary significantly from quarter-to-quarter as a result of a number of factors which include economic conditions specific to online commerce and wireless communications industries, the timing of introduction of popular devices by mobile phone manufacturer, our ability to attract visitors to our websites, changes in wireless carrier commission and bonus structures, the timing of recognition of bonuses paid to us by wireless carriers and our competitors' pricing and marketing strategies.

Key non-financial measures of our success are customer feedback and customer satisfaction ratings compiled by third parties. We believe that maintaining high overall customer satisfaction is critical to our ongoing efforts to promote the use of the private-labeled websites that we create and manage for our marketers, as well as our own branded websites, and to improve our operating results. We actively solicit customer feedback on our website functionality as well as the entire purchase experience. To maintain a high level of performance by our customer service representatives, we also undertake an ongoing customer feedback process. If we are unable to meet customer expectations with respect to price or do not successfully expand our product lines or otherwise fail to maintain high overall customer satisfaction, our business and results of operations would be harmed.

Revenues include commissions, bonuses and other payments we receive from wireless carriers, including a satellite television provider, in connection with the activation of customers and features on their networks, as well as payments from customers for wireless services and devices. Our revenue continues to increase as a result of internal growth and acquisitions. As further described below, total revenue and net loss from continuing operations for the three months ended September 30, 2006 were $95.1 million and $15.6 million, respectively, compared to total revenue and net loss from continuing operations of $92.0 million and $4.4 million, respectively, for the three months ended September 30, 2005. Revenue from our top three

Table of Contents

wireless carriers represented 71% and 62% of our total consolidated revenue for the three months ended September 30, 2006 and 2005, respectively. For the nine months ended September 30, 2006 total revenue and net loss from continuing operations were $274.2 million and $29.3 million, respectively, compared to total revenue and net loss from continuing operations of $235.3 million and $12.9 million, respectively, for the same period of 2005. Revenue from our top three wireless carriers represented 68% and 66% of our total consolidated revenue for the nine months ended September 30, 2006 and 2005, respectively.

Since we began operations in 1999, we have incurred significant losses and have had negative cash flow from operations. For the nine months ended September 30, 2006, $0.3 million of cash was used in operations. As of September 30, 2006, our accumulated deficit was $194.1 million and our total stockholders' equity was $90.5 million. In order to achieve profitability in the future, we are depending upon our ability to produce revenue at levels that exceed the costs of that revenue plus operating expenses.

In 2006, we have continued to concentrate our resources on the growth of our wireless activations and the MVNE services we provide. Three of our key goals include (i) improving the customer experience platform that we utilize for order processing, customer service and rebate handling to automate additional processes and make more efficient use of our system and internal work force and the outsourced call center resources; (ii) further balancing spending on marketing initiatives with customer activation and revenue generation characteristics; and (iii) reducing certain general and administrative operating expenses as a percentage of revenue.

In 2005, we acquired certain assets and assumed certain liabilities of A1 Wireless USA, Inc. ("A1 Wireless"); VMC Satellite, Inc. ("VMC"); and FONcentral.com, Inc. ("FC"). We accounted for these transactions using the purchase method of accounting in accordance with Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations.* Accordingly our results of operations include the operating results of A1 Wireless effective January 1, 2005, VMC as of April 26, 2005 and FC as of May 26, 2005, their respective acquisition dates.

As a result of the sale of our MVNO operations on December 31, 2005, we no longer believe that segment information, in accordance with SFAS No. 131, *Disclosures About Segments of an Enterprise and Related Information,* is applicable as our Wireless Activation and Services segment ("WAS") represents greater than 95% of our total revenue and cost of revenue. Accordingly we no longer report segment data separately in the notes to our financial statements. Our Management's Discussion and Analysis of Results of Operations will continue to provide a comparison of our revenue and cost of revenue of our wireless activation and services and other components of revenue and cost of revenue to the extent MVNE and data services fluctuations appear significant in explaining and describing such results of operations.

**Restatement**

As described in the Quarterly Report on Forms 10-Q/A for the first and second quarters of 2006 and in this Quarterly Report on Form 10-Q/A we restated our financial statements for each of the quarters ended March 31, June 30, and September 30, 2006. (See Note 1(c) to the Condensed Consolidated Financial Statements.)

### Comparison of the Results of Operations for the Three Months Ended September 30, 2006 and 2005

| | Three Months Ended September 30, | | | | Change Between 2005 and 2006 | |
| | 2005 | | 2006 | | | |
| | Amount | % of Revenue | Amount | % of Revenue | Amount | % |
| | | | (amounts in thousands) (restated) | | | |
|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | |
| Activation and services | $65,405 | 71% | $80,704 | 85% | $ 15,299 | 23% |
| Equipment | 26,555 | 29% | 14,399 | 15% | (12,156) | -46% |
| Total revenue | $91,960 | 100% | $95,103 | 100% | $  3,143 | 3% |
| **Cost of revenue** | | | | | | |
| Activation and services | $  (564) | -1% | $   551 | 1% | $  1,115 | -198% |
| Equipment | 54,317 | 59% | 52,970 | 56% | (1,347) | -2% |
| Total cost of revenue | $53,753 | 58% | $53,521 | 57% | $   (232) | 0% |
| **Selected operating expenses:** | | | | | | |
| Sales and marketing | $24,274 | 26% | $29,605 | 30% | $  5,331 | 22% |
| General and administrative | 15,750 | 17% | 22,982 | 24% | 7,232 | 46% |
| Depreciation and amortization | 2,460 | 3% | 4,543 | 5% | 2,083 | 85% |
| Restructuring | 453 | 0% | 209 | 0% | (244) | -54% |

Table of Contents

# REVENUE

*Revenue*

Revenue consists of activations and services revenue, and equipment revenue. Activations and services revenue consists of (i) revenue from commissions, bonuses and other payments for the activation of services of wireless carriers and a satellite television carrier through private-labeled websites that we create and manage for marketers as well as through our own branded websites; (ii) revenue from the provisioning of MVNE services which provide marketers the ability to sell MVNO services to their customers under their own brands using our e-commerce platform and operational infrastructure; and, (iii) revenue from data services under which we provide subscribers with real-time wireless access to work and personal information, including email, calendar, corporate directories, personal contacts and documents in addition to wireless entertainment and content. Activations and services revenue also includes amounts due from carriers resulting from ongoing disputes relating to commissions revenue. Such disputes arise in the normal course of reconciliation with carrier commission reports and we continue to update and improve our processes and procedures surrounding the collection of such disputed items. Equipment revenue consists mainly of revenue from the sale of wireless devices to our customers that subscribe to wireless services through our private-labeled websites or those websites that we manage for other marketers. The following further details the components of our revenue and a comparative discussion of performance:

| | Three Months Ended September 30, | | | | Change Between 2005 and 2006 | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2005 | | 2006 | | | |
| | Amount | % of Revenue | Amount | % of Revenue | Amount | % |
| | | | (amounts in thousands) (restated) | | | |
| **Activations and services:** | | | | | | |
| Wireless activation | $63,799 | 69% | $77,659 | 82% | $ 13,860 | 22% |
| MVNE and data services | 1,606 | 2% | 3,045 | 3% | 1,439 | 90% |
| | $65,405 | 71% | $80,704 | 85% | $ 15,299 | 23% |
| **Equipment:** | | | | | | |
| Wireless activation | $26,555 | 29% | $14,399 | 15% | $(12,156) | -46% |
| **Total Revenue:** | | | | | | |
| Wireless activation | $90,354 | 98% | $92,058 | 97% | $ 1,704 | 2% |
| MVNE and data services | 1,606 | 2% | 3,045 | 3% | 1,439 | 90% |
| | $91,960 | 100% | $95,103 | 100% | $ 3,143 | 3% |

*Activations and Services*

Activations and services revenue increased 23% to $80.7 million for the three months ended September 30, 2006 from $65.4 million for the three months ended September 30, 2005. The increase in activations and services revenue of $15.3 million was attributable to an increase in the number of wireless activations that we generated through marketing partners and increased advertising efforts compared to the prior period. Gross carrier commissions for activations subject to chargeback increased 15% to $86.3 million for the three months ended September 30, 2006 from $75.2 million for the three months ended September 30, 2005. Activations and services revenue of MVNE and data services increased $1.4 million to $3.0 million for the three months ended September 30, 2006, primarily as a result of increased MVNE revenue resulting from additional recurring revenue transactions for back-office support. Recurring revenue transactions increased due to a strategic business partnership beginning in April 2006.

*Equipment*

Revenue from sales of equipment for the three months ended September 30, 2006 decreased 46% to $14.4 million from $26.6 million for the three months ended September 30, 2005. The decrease in equipment revenue of $12.2 million was attributable to lower average sales prices due to an increase in point-of-sale discounts and other incentives provided to customers as compared to the three months ended September 30, 2005.

*Total revenue*

Total revenue increased 3% to $95.1 million for the three months ended September 30, 2006 from $92.0 million for the three months ended September 30, 2005. Revenue generated from the sale and activation of wireless devices and services accounted for approximately 97% of consolidated revenue for the three months ended September 30, 2006 compared to 98% for the three months ended September 30, 2005. Revenue from our top three wireless carriers represented 71% of consolidated revenue for the three months ended September 30, 2006 compared to 62% for the comparable period of 2005.

Table of Contents

Wireless activations and services revenue and equipment sales revenue may vary from period to period based on our promotional efforts, which include subsidizing the costs of devices purchased by our customers. We expect that revenue from the sale and activation of wireless devices and services will continue to increase during 2006 compared to 2005 performance.

## COST OF REVENUE

Cost of revenue consists mainly of the cost of wireless devices (equipment) sold to our wireless activations and services customers. Our cost of revenue related to wireless equipment sales increased to $53.0 million for the three months ended September 30, 2006 as a result of a higher volume of devices sold during the period at a lower average cost compared to sales of such devices in the three months ended September 30, 2005. Total cost of revenue decreased to $53.5 million for the three months ended September 30, 2006 compared to $53.8 million for the three months ended September 30, 2005. Cost of revenue from the sale of wireless devices accounted for approximately 99% of consolidated cost of revenue for the three months ended September 30, 2006 and 100% for the three months ended September 30, 2005. As a percentage of total revenue, cost of equipment revenue decreased to 56% of total revenue for the three months ended September 30, 2006 compared to 59% for the three months ended September 30, 2005.

## OPERATING EXPENSES

*Sales and Marketing*

Sales and marketing expenses increased 22% to $29.6 million for the three months ended September 30, 2006 from $24.3 million for the corresponding period of 2005. The increase of $5.3 million mainly comprised a $5.1 million increase from the growth of existing marketing relationships and the addition of new marketing partner relationships since the three months ended September 30, 2005. Our marketing expenses largely comprise payments to on-line advertisers, search engines and third-party marketing partners based on orders or activations. We incurred approximately $25.9 million of third-party marketing expenses in the three months ended September 30, 2006. Such expenses were higher in the three months ended September 30, 2006 than corresponding periods of 2005 due to increased wireless activation competition, and increased rates and volume of advertising, which caused our customer acquisition costs to increase. In addition, advertising placement and search costs also increased. We expect that marketing expenses will continue to represent a significant percentage of our revenue in future periods.

*General and Administrative*

General and administrative expenses increased 46% to $23.0 million for the three months ended September 30, 2006 from $15.8 million for the corresponding period of 2005. General and administrative expenses increased $7.2 million for the three months ended September 30, 2006 mainly as a result of costs incurred to evaluate, research and settle rebate matters associated with the District of Columbia attorney general's action payments made to past customers as "goodwill" for a product rebate that was paid outside our customary validation process and would not have otherwise been paid to the recipient, and increases in costs incurred for other professional services partially offset by decreases in bank related processing fees and severance expenses.

*Depreciation and Amortization*

Depreciation and amortization expenses, which are amortized over periods ranging from 18 months to 7 years, increased 85% to $4.5 million for the three months ended September 30, 2006 from $2.5 million for the three months ended September 30, 2005. The increase was primarily due to the costs associated with developing new functionality related to our websites, product offerings, and normal fixed asset depreciation on an increased amount of capital expenditures as compared to the corresponding period of 2005. In addition, 2005 expenses were reduced by a $0.7 million adjustment to correct a computational error in the fixed asset subledger that caused depreciation expense to be overstated.

*Restructuring*

We implemented a restructuring plan following the acquisition of A1 Wireless, to take advantage of synergies gained through the acquisition and to restructure our operations for efficiency purposes. For the three months ended September 30, 2005, we recognized $0.5 million in restructuring costs which related to workforce reduction and excess facilities. All costs related to this plan were paid out in 2005. For the three months ended September 30, 2006, we incurred $0.2 million of restructuring costs primarily due to additional severance costs and relocation expenses for certain employees related to a plan which commenced in July 2006.

Table of Contents

*Loss from continuing operations*

Loss from continuing operations increased to $15.6 million for the three months ended September 30, 2006 from $4.4 million for the three months ended September 30, 2005 as a result of increased costs for the rebate settlement and related expenses offset by decreasing cost of revenue as a percentage of revenue.

*Net Loss*

Net loss decreased to $15.5 million for the three months ended September 30, 2006 from $5.0 million for the three months ended September 30, 2005.

### Comparison of the Results of Operations for the Nine Months Ended September 30, 2006 and 2005

| | Nine Months Ended September 30, | | | | Change Between 2005 and 2006 | |
| | 2005 | | 2006 | | | |
| | Amount | % of Revenue | Restated Amount | % of Revenue | Amount | % |
| | | | (amounts in thousands) | | | |
|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | |
| Activation and services | $170,608 | 72% | $221,662 | 81% | $ 51,054 | 30% |
| Equipment | 64,729 | 28% | 52,547 | 19% | (12,182) | -19% |
| Total revenue | $235,337 | 100% | $274,209 | 100% | $ 38,872 | 17% |
| **Cost of revenue:** | | | | | | |
| Activation and services | $     895 | 1% | $   1,876 | 1% | $     981 | 110% |
| Equipment | 134,895 | 57% | 151,401 | 54% | 16,506 | 12% |
| Total cost of revenue | $135,790 | 58% | $153,277 | 55% | $ 17,487 | 13% |
| **Selected operating expenses:** | | | | | | |
| Sales and marketing | $ 61,599 | 26% | $ 83,735 | 31% | $ 22,136 | 36% |
| General and administrative | 44,327 | 19% | 53,121 | 19% | 8,794 | 20% |
| Depreciation and amortization | 6,379 | 3% | 11,986 | 4% | 5,607 | 88% |
| Restructuring | 848 | 0% | 2,115 | 1% | 1,267 | 149% |

### REVENUE

| | Nine Months Ended September 30, | | | | Change Between 2005 and 2006 | |
| | 2005 | | 2006 | | | |
| | Amount | % of Revenue | Restated Amount | % of Revenue | Amount | % |
| | | | (amounts in thousands) | | | |
|---|---|---|---|---|---|---|
| *Activations and services:* | | | | | | |
| Wireless activation | $164,552 | 70% | $211,039 | 77% | $ 46,487 | 28% |
| MVNE and data services | 6,056 | 3% | 10,623 | 4% | 4,567 | 75% |
| | 170,608 | 73% | 221,662 | 81% | 51,054 | 30% |
| *Equipment:* | | | | | | |
| Wireless activation | $ 64,729 | 28% | $ 52,547 | 19% | $(12,182) | -19% |
| *Total Revenue:* | | | | | | |
| Wireless activation | $229,281 | 97% | $263,586 | 96% | $ 34,305 | 15% |
| MVNE and data services | 6,056 | 3% | 10,623 | 4% | 4,567 | 75% |
| | $235,337 | 100% | $274,209 | 100% | $ 38,872 | 17% |

*Activations and Services*

Activations and services revenue increased 30% to $221.7 million for the nine months ended September 30, 2006 from $170.6 million for the nine months ended September 30, 2005. The increase in activations and services revenue of $51.1 million was attributable to an increase in the number of wireless activations that we generated through marketing partners and increased advertising efforts compared to prior year periods. Gross carrier commissions for activations subject to chargeback increased 22% to $238.1 million for the nine months ended September 30, 2006 from $195.3 million for the nine months ended

Table of Contents

September 30, 2005. Activations and services revenue of MVNE and data services increased $4.6 million to $10.6 million for the nine months ended September 30, 2006. The increase in revenue was primarily the result of project development work completed and accepted by a customer in early June 2006.

*Equipment*

Revenue from sales of equipment for the nine months ended September 30, 2006 was $52.5 million compared to $64.7 million for the nine months ended September 30, 2005. The decrease in equipment revenue of $12.2 million was attributable to lower average sales prices due to an increase in point-of-sale discounts and other incentives provided to customers as compared to the nine months ended September 30, 2005.

*Total revenue*

Total revenue increased 17% to $274.2 million for the nine months ended September 30, 2006 from $235.3 million for the nine months ended September 30, 2005. Revenue generated from the sale and activation of wireless devices and services accounted for approximately 96% of consolidated revenue for the nine months ended September 30, 2006 compared to 97% for the nine months ended September 30, 2005. Revenue from our top three wireless carriers represented 68% of consolidated revenue for the nine months ended September 30, 2006 compared to 66% for the comparable period of 2005.

## COST OF REVENUE

Our cost of revenue related to wireless equipment sales increased to $151.4 million for the nine months ended September 30, 2006 as a result of a higher volume of devices sold during the period compared to sales of such devices for the nine months ended September 30, 2005. Total cost of revenue increased 13% to $153.3 million for the nine months ended September 30, 2006 as compared to $135.8 million for the nine months ended September 30, 2005. Cost of revenue from the sale of wireless devices accounted for approximately 99% of consolidated cost of revenue for the nine months ended September 30, 2006 and for the nine months ended September 2005. As a percentage of total revenue, cost of equipment revenue decreased to 55% of revenue for the nine months ended September 30, 2006 compared to 57% for the nine months ended September 30, 2005.

## OPERATING EXPENSES

*Sales and Marketing*

Sales and marketing expenses increased 36% to $83.7 million for the nine months ended September 30, 2006 from $61.6 million for the corresponding periods of 2005. The expense increase of $22.0 million was mainly composed of the growth of existing marketing relationships and adding new marketing partner relationships since the nine months ended September 30, 2005. Our marketing expenses largely comprise payments to on-line advertisers, search engines and third-party marketing partners based on orders or activations. We incurred approximately $73.7 million of third-party marketing expenses in the nine months ended September 30, 2006. Such expenses were higher than the corresponding period of 2005 due to increased wireless activation competition, and increased rates and volume of advertising, which caused our customer acquisition costs to increase. In addition, advertising placement and search costs also increased.

*General and Administrative*

General and administrative expenses increased 20% to $53.1 million for the nine months ended September 30, 2006 from $44.3 million for the corresponding period of 2005. The expense increase of $8.8 million was mainly composed of the following: $3.5 million related to increased payroll expenses from a larger workforce; $6.6 million related to legal, consulting, rebate processing and other expenses including but not limited to costs incurred related to the District of Columbia attorney general's action and increased temporary help; $3.3 million of payments made to past customers as "goodwill" for a product rebate that was paid outside our customary validation process and would not have otherwise been paid to the recipient; $0.7 million due to a settlement with A1 Wireless; and $0.3 million related to increased facilities costs and telecommunication related expenses. Offsetting these increases were decreases in stock-based compensation and severance expenses of $5.6 million for the period. For the nine months ended September 30, 2005, stock-based compensation included $6.7 million related to the modification of option grant and awards of two employees that were terminated. Absent this, stock-based compensation expense would have increased approximately $1.1 million as a result of compensation expense from options and stock awards granted after the third quarter of 2005 and the impact of the adoption of SFAS No. 123(R).

Table of Contents

General and administrative expenses for the nine months ended September 30, 2006 included $3.8 million related to expenses from evaluating and researching rebate matters associated with the District of Columbia attorney general's action. Such costs were comprised of rebate processing and exit costs and fees of $1.9 million; legal expenses of $1.3 million and full-time and temporary labor staffing costs of $0.6 million.

*Depreciation and Amortization*

Depreciation and amortization expenses increased 88% to $12.0 million for the nine months ended September 30, 2006 from $6.4 million for the nine months ended September 30, 2005. The increase was primarily due to the costs associated with developing new functionality related to our websites, product offerings and amortization expense related to VMC and FC acquisitions on April 26, 2005 and May 26, 2005, and normal fixed asset depreciation on an increased amount of capital expenditures as compared to the corresponding period of 2005. In addition, 2005 expenses were reduced by a $0.7 million adjustment to correct a computational error in the fixed asset subledger that caused depreciation expense to be overstated.

*Restructuring*

We implemented a restructuring plan following the acquisition of A1 Wireless, to take advantage of synergies gained through the acquisition and to restructure our operations for efficiency purposes. During the nine months ended September 30, 2005, we recognized $0.8 million in restructuring costs which related to workforce reduction excess facilities. All costs related to this plan were paid out in 2005.

During 2006, we implemented a restructuring plan related to changes in our management and operational structure. For the nine months ended September 30, 2006, we recognized $2.1 million related to the termination of our former president and chief operating officer and thirteen other senior executives and employees. Of this amount, $0.6 million related to severance benefits that will be paid out in cash to the recipients on a monthly or bi-monthly basis over the terms of their respective severance agreements and $1.3 million related to severance expenses incurred as a result of the modification of stock-based compensation awards under which vesting of 50% of unvested restricted share and option awards were accelerated for three of the former employees. An additional $0.2 million was incurred for the relocation of certain employees.

*Loss from continuing operations*

Loss from continuing operations increased to $29.3 million for the nine months ended September 30, 2006 from $12.9 million for the corresponding period in 2005. Although we experienced significant revenue growth, cost of revenue and operating expenses both increased as described above in order to support the revenue growth we experienced along with increases in costs for the rebate settlement and related expenses.

*Net Loss*

Net loss increased to $29.4 million for the nine months ended September 30, 2006 from $13.6 million for the same period of 2005.

**Liquidity and Capital Resources**

Since inception, we have funded our operations principally through the sale of equity securities and to a lesser extent, through subordinated debt, credit facilities, capital leases and lines of credit. In addition, certain of our vendors from whom we purchase handsets and other wireless equipment that we sell to our customers allow us to purchase up to approximately $35 million of such equipment on extended payment terms. The significant components of our working capital are inventory and liquid assets such as cash and cash equivalents, short-term investments and trade accounts receivable, reduced by accounts payable, accrued expenses and deferred revenue.

Our future capital and operating requirements will depend on many factors, including the level of our revenues, the expansion of our sales and marketing activities, the cost of our fulfillment operations, potential investments in businesses or technologies and continued market acceptance of our products. Additionally, poor financial results, unanticipated expenses, acquisitions of technologies or business or strategic investments could give rise to additional financing requirements sooner than we expect. In the event that cash on hand and borrowings drawn on our new term loan are not sufficient to fund working capital requirements that are not satisfied through net cash provided by operating activities or future cash requirements, we could be required, or could elect, to seek additional funding through a public or private equity or debt financing in the future.

23

Table of Contents

As of September 30, 2006, we had cash and cash equivalents of $57.5 million and debt and capital lease obligations of $20.6 million. As of December 31, 2005, we had cash and cash equivalents of $70.8 million, and debt and capital lease obligations of $15.8 million.

## Consolidated Cash Flows

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2005 | 2006 restated |
| | (amounts in thousands) | |
| Net cash used in operating activities | $(15,581) | $    (332) |
| Net cash used in investing activities | (24,952) | (18,196) |
| Net cash provided by financing activities | 21,073 | 5,282 |
| Change in cash and cash equivalents | $(19,460) | $(13,246) |

Net cash used in operating activities was $0.3 million for the nine months ended September 30, 2006 compared to net cash used in operating activities of $15.6 million for the nine months ended September 30, 2005. For the nine months ended September 30, 2006, net loss after adjustments for items to reconcile net loss to net cash provided by operating activities was approximately $7.0 million. Such items include depreciation and amortization, non-cash interest expense and stock-based compensation.

Changes in operating assets and liabilities from December 31, 2005 increased net cash used in operating activities by approximately $6.7 million. Changes in working capital balances included a decrease of current assets of approximately $7.7 million, excluding cash and cash equivalents, short-term investments and cash collected from notes receivable related to discontinued operations. The increase in these current assets was primarily the result of increased accounts receivable balances from December 31, 2005. The accounts receivable increase at September 30, 2006 was primarily the result of higher commission balances owed to us by the carriers as a result of increased revenue and the timing of collections at the end of the month of September.

Current liabilities, excluding debt and capital lease balances and acquisition earn-out obligations accrued during the period increased $16.5 million from December 31, 2005. The increase was mainly the result of an increase in accounts payable offset by decreases in accrued liabilities and deferred revenue. The increase in accounts payable and line of credit balances at September 30, 2006 was the result of the timing of cash collections at the end of the month of September, as explained above, which slowed our payments to certain of our vendors; and higher inventory levels for which payment was not yet due and borrowings undertaken in the period specifically used to paydown accounts payable balances. Accrued expenses decreased as a result of reductions in accrued consumer liabilities and cash amounts paid to fund the VMC earnout payment made in May 2006. Deferred revenue decreased as a result of MVNE contract deliveries for which we were able to recognize revenue and an improvement in our deactivation rates.

In addition to the net cash provided by operating activities, we had trade borrowings of $6.4 million under our line of credit to improve payment terms on inventory purchases. These borrowings are shown as net cash provided by financing activities in the Statement of Cash Flows. When considering these trade borrowings with our cash provided by operating activities, total cash provided by our operations would have been $6.0 million.

Net cash used in investing activities for the nine months ended September 30, 2006 and 2005 was $18.2 million and $25.0 million, respectively. The $6.8 million decrease in net cash used in investing activities was due to a decrease of $4.7 million of cash paid for acquisitions, and a decrease of $2.3 million in cash paid for intangible assets, a decrease of $5.0 million used in the cash used for the purchase of short-term investments, and an increase of $1.1 million in proceeds from the sale of assets of discontinued operations. These increases were partially offset by an increase of $6.8 million in the purchase of property and equipment and capitalized labor costs, primarily associated with enhancing our operating infrastructure and E-commerce platform to enable expanded and new functionality. Capital expenditures for the nine months ended September 30, 2006 comprised $13.2 million of software and web site development and $3.0 million of other property and equipment.

Net cash provided by financing activities was $5.3 million for the nine months ended September 30, 2006 compared to net cash provided by financing activities of $21.1 million for the nine months ended September 30, 2005. Financing activities consisted of borrowings on our line of credit of $6.4 million and proceeds from the exercise of options of $1.2 million, partially offset by cash used to repurchase common stock of $0.5 million and principal payments on our line or credit and capital leases of $1.8 million.

24

*Borrowings Under Line of Credit and Vendor Trade Credit.* Through November 7, 2006, we maintained a revolving operating line of credit with Comerica Bank which allowed for aggregate borrowing of up to $25.0 million subject to certain limits based on accounts receivable and inventory levels. As of September 30, 2006, we had an aggregate principal amount of $19.9 million outstanding under the facility, however no further borrowing capacity under the facility was available as of September 30, 2006 based on the limits described above.

On November 7, 2006, we executed a $100 million aggregate amount senior secured term loan bearing a fixed rate of interest of nine percent per annum and secured by substantially all our assets. The term loan matures in November 2011. Beginning in November 2009, we have the ability to repay principal on the loan without penalty and conversely, the lenders have the right to call the remaining outstanding principal of the debt without penalty. As additional consideration, we also granted the lenders warrants to purchase 1,250,000 shares of our common stock at an exercise price of $0.01 per share. We received $75.0 million of the term loan proceeds on November 7, 2006, and have the option to withdraw the remaining amount at a later date. Proceeds from the term loan will be used to repay all indebtedness under the existing credit facility, fund share repurchases of our common stock, and for general corporate and working capital needs. In conjunction with the loan transaction above, we terminated our credit facility with Comerica Bank and used proceeds from the term loan to repay the outstanding principal obligation of $19.9 million plus accrued interest.

We have customary trade terms with many of our vendors including the carriers and original equipment manufacturers that provide wireless devices to us for sale to our customers. Based upon our vendor trade credit programs with the providers of our inventory, we had approximately $35.0 million of credit available to us for the purchase of wireless devices as of October 31, 2006.

*Common Stock Repurchase Program.* Our board of directors has authorized us to repurchase shares of our common stock up to an aggregate amount of $30.0 million. During the nine months ended September 30, 2006 we repurchased an aggregate of 62,761 shares of our common stock for approximately $0.5 million. The program ended August 17, 2006.

## Contractual Obligations

The following table summarizes our significant contractual obligations, including interest on capital leases, and the expected effect on liquidity and cash flows as of September 30, 2006.

| | Total | Less than 1 year | 1 - 3 years | 4 - 5 years | Over 5 years |
|---|---|---|---|---|---|
| | | | (amounts in thousands) | | |
| Line of credit (a) | $19,924 | $19,924 | $    — | $    — | $    — |
| Capital leases | 788 | 384 | 404 | — | — |
| Operating leases | 4,460 | 1,805 | 2,655 | — | — |
| Obligation to purchase certain advertising (b) | 4,544 | 4,544 | — | — | — |
| Obligations under VMC APA (c) | — | — | — | — | — |
| | $29,716 | $26,657 | $ 3,059 | $    — | $    — |

(a)   On November 7, 2006, we entered into a new term loan and repaid all amounts outstanding under the line of credit with Comerica Bank. Our borrowings of $75.0 million under the new term loan mature in November 2011.

(b)   We have a commitment to purchase a minimum level of advertising and media services from a vendor by March 31, 2007. Such commitment period may be extended at the option of the vendor.

(c)   Under the VMC Asset Purchase Agreement, we may be obligated to pay shareholders of VMC an additional $1.8 million in cash upon achieving certain future monthly operating targets. This potential obligation has not been included in the table above.

## Recent Accounting Pronouncements

In September 2006, the Financial Accounting Standards Board ("FASB") issued SFAS No. 157, *Fair Value Measurements* ("SFAS No. 157"). SFAS 157 defines fair value, establishes a framework for measuring fair value under generally accepted accounting principles, and expands disclosures about fair value measurements. SFAS 157 emphasizes that fair value is a market-based measurement, not an entity-specific measurement, and states that a fair value measurement should be determined based on the assumptions that market participants would use in pricing the asset or liability. SFAS 157 will become effective for our fiscal year beginning January 1, 2008. We do not believe the adoption of this pronouncement will have any material effects on our consolidated financial position, results of operations, or cash flows.

Table of Contents

In September 2006, the Securities and Exchange Commission ("SEC") released Staff Accounting Bulletin No. 108, *Considering the Effects of Prior Year Misstatements When Quantifying Misstatements in Current Year Financial Statements* ("SAB 108"). SAB 108 provides guidance on how the effects of the carryover or reversal of prior year financial statement misstatements should be considered in quantifying a current year misstatement. Prior practice allowed the evaluation of materiality on the basis of (1) the error quantified as the amount by which the current year income statement was misstated (rollover method) or (2) the cumulative error quantified as the cumulative amount by which the current year balance sheet was misstated (iron curtain method). Reliance on either method in prior years could have resulted in misstatement of the financial statements. The guidance provided in SAB 108 requires both methods to be used in evaluating materiality. Immaterial prior year errors may be corrected with the first filing of prior year financial statements after adoption. The cumulative effect of the correction would be reflected in the opening balance sheet with appropriate disclosure of the nature and amount of each individual error corrected in the cumulative adjustment, as well as a disclosure of the cause of the error and that the error had been deemed to be immaterial in the past. We do not believe the adoption of this pronouncement will have any material effects on our consolidated financial position, results of operations, or cash flows.

In June, 2006, the FASB issued FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109* ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with SFAS No. 109, "Accounting for Income Taxes." FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosure, and transition. FIN 48 will apply to fiscal years beginning after December 15, 2006, with earlier adoption permitted. We are currently evaluating the impact of the adoption of this pronouncement, if any, on our consolidated financial position, results of operations, or cash flows.

In November 2004, the FASB issued SFAS No. 151, *Inventory Costs that is an amendment to ARB No. 43, Chapter 4* ("SFAS No. 151"), amends chapter 4 "Inventory Pricing" of ARB No. 43 and paragraph A3 of SFAS No. 144. Previously, ARB 43 did not define the term so abnormal which could lead to unnecessary incomparable financial reporting. SFAS No. 151 clarifies that abnormal costs related to idle facility expense, freight, handling costs, and wasted materials (spoilage) should be recognized as period costs. SFAS No. 151 is effective for fiscal year beginning after June 15, 2005. We adopted the pronouncement effective January 1, 2006. There was no material effect on our financial position, cash flows or result of operations as a result of this adoption.

In May 2005, the FASB issued SFAS No. 154, *Accounting Changes and Error Corrections* ("SFAS No. 154"), a replacement of APB Opinion No. 20, *Accounting Changes* , and SFAS No. 3, *Reporting Accounting Changes in Interim Financial Statements* . SFAS No. 154 changes the requirements for the accounting for, and reporting of, a change in accounting principle. Previously, voluntary changes in accounting principles were generally required to be recognized by way of a cumulative effect adjustment within net income during the period of the change. SFAS No. 154 requires retrospective application to prior periods' financial statements of changes in accounting principles, unless it is impracticable to determine either the period-specific effects or the cumulative effect of the change. SFAS No. 154 is effective for accounting changes made in fiscal years beginning after December 15, 2005; however, the statement does not change the transition provisions of any existing accounting pronouncements. We adopted the pronouncement effective January 1, 2006. There was no material effect on our financial position, cash flows or results of operations as a result of this adoption.

**Application of Critical Accounting Policies and Estimates**

Our discussion and analysis of our financial condition and results of operations are based upon our consolidated condensed financial statements which have been prepared in accordance with generally accepted accounting principles in the United States. The preparation of these statements requires us to make estimates and judgments that affect the reported amount of assets, liabilities, revenue and expenses, and related disclosure of contingent assets and liabilities. We base our estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making the judgments about our revenue, cost of revenue and the carrying values of assets and liabilities that are not readily apparent from other sources. Because this can vary in each situation, actual results may differ from the estimates under different assumptions and conditions.

The following is a summary of the most critical of these estimates. For additional information, see Item 7, Part II, "Management Discussion and Analysis of Financial Condition and Results of Operations—Application of Critical Accounting Policies and Estimates" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2005. Although we believe that our estimates, assumptions, and judgments are reasonable, they are based upon information currently available. Actual results may differ significantly from these estimates under different assumptions, judgments, or conditions

26

Table of Contents

## Revenue Recognition

*Activation and Services* —We generate revenue primarily from wireless carriers, as well as a satellite television carrier, who pay commissions and volume and performance-based bonuses, for activating wireless services and features on their networks. We recognize commissions from wireless carriers upon shipment of activated devices to the customer. In addition to activation commissions, under certain conditions, certain carriers pay us a monthly residual fee for as long as a customer we activate for the carrier continues to be its subscriber, or for a fixed period of time depending on the carrier. We purchase satellite activation certificates evidencing activation rights in advance of their resale to customers. Revenue from satellite television customers includes sales of these satellite activation certificates, net of the certificate cost, since we are acting as an agent in the transaction.

Our revenue is reduced for estimated deactivations of the wireless services by customers prior to the expiration of a time period that ranges 90 to 180 days from the date of activation, depending on the wireless carrier. We estimate deactivations based on historical experience, which we have developed based on our experience with carriers, customer behavior and sources of customers, among other factors, allowing us to accrue estimates with what we believe is a high degree of certainty. Any increase or decrease in the deactivation amount will cause a corresponding dollar-for-dollar increase or decrease in revenue. As an example, the impact of a 1% change in the deactivation rate applied to the quarter ended September 30, 2006 would have an increase or decrease in revenue and the corresponding reserve of $0.9 million. Any decrease in revenue resulting from an increase in deactivations would also be offset, in part, by returns of wireless devices. Our reserves for deactivations are included in accounts receivable and deferred revenue on our balance sheet. If we determine that we cannot accurately predict future deactivation experience, we may be required to defer 100% of our carrier commission revenue until the expiration of the appropriate chargeback period. New channels for which we have insufficient historical data to adequately estimate deactivation experience will be deferred through the expiration period for a period of 24 months, until such time as we can accurately estimate the deactivation experience for the new channel.

In addition to receiving commissions for each wireless subscriber activated, we earn performance bonuses from the wireless carriers based on negotiated performance targets. The most significant bonus we earn is the quarterly volume bonus, which we bill wireless carriers for on a monthly basis, based on current month activations. We record these bonuses as deferred revenue at the time of billing until we achieve the quarterly targets. We earn other quarterly bonuses from certain carriers for maintaining low customer churn and signing up customers for certain additional monthly "features" such as data service or text messaging. Wireless carriers also periodically offer bonuses for achieving monthly volume and other performance targets and also formerly provided some bonus compensation under annual volume based plans. We recognize these monthly bonuses as earned in accordance with the provisions of SAB No. 104. Revenue is recognized only when all of the following criteria are met: (1) persuasive evidence of an arrangement exists, (2) delivery has occurred or services have been rendered, (3) the seller's price to the buyer is fixed or determinable, and (4) collectibility is reasonably assured. Amounts collected in cash prior to meeting the above criteria are recorded as deferred revenue. Through 2005, commission revenue earned from the activation of carrier features had been deferred until the contractual chargeback period had lapsed. Beginning in 2006, we began to estimate commission revenue earned from feature activations based on historical experience which we have developed based on our experience with carriers and customer behavior over a period of time in excess of 24-months. This allows us to accrue estimates with what we believe is a high degree of certainty in accordance with SAB 104.

*Equipment revenue* —Revenue from the sale of devices and accessories in a multiple-element arrangement with services is recognized at the time of sale in accordance with EITF No. 00-21. Customers have the right to return devices within a specific period of time or usage, whichever occurs first. We provide an allowance for estimated returns on devices based on historical experience. In connection with our wireless activations, we sell the customer the wireless device at a significant discount, which may be in the form of a rebate. Rebates are recorded as a reduction of revenue and as a current liability until paid. We recognize rebate amounts based on the historical experience of rebates claimed. Future rebate experience could vary based upon rates of consumers redeeming rebates.

In the event a customer terminates their wireless service with the carrier within six months of activation and opts not to return the wireless device to us within the time frames permitted within our return policy, in many instances our sales contracts with the customer permit us to charge the customer an EDP termination fee for each unreturned device. Prior to the three months ended June 30, 2006, pursuant to SAB 104 revenue recognition of such fee was deferred until such fee was collected from the customer. Beginning April 1, 2006, we began to estimate EDP termination fee revenue based on historical experience of customer collection behavior which we have developed over a time period of 24 months which provide the basis on which to accrue a receivable with a degree of certainly pursuant to SAB 104.

As of the most recent quarter ended September 30, 2006, our handset return rate was 10.5% of handset revenue. We have recorded handset return rates of 10.4% and 11.2% for the years ended December 31, 2005 and 2004, respectively. Any increase or decrease in the actual handset return experience will cause a corresponding dollar-for-dollar decrease or increase in revenue. The impact of a 1% change in the handset returns rate applied to the quarter ended September 30, 2006 would have resulted in an increase or decrease in revenue of approximately $0.1 million with a corresponding increase or decrease in our cost of revenue.

## Cost of Revenue

Under certain conditions, consumers' purchasing wireless devices from us may be eligible for a product rebate depending on the wireless device purchased, service contract activated and the consumer maintaining their service with the wireless carrier for a period of up to six months. We estimate and record an accrued consumer liability and cost of revenue for such rebate at the time of sale based on the terms of the rebate and our rebate redemption experience over the most recent 18 months following the lapse of the contractual rebate redemption period. Our rebate redemptions are generally processed by a third party vendor that validates the consumer's rebate redemption materials to ensure that

the redemption request satisfies the terms and conditions of the rebate program to be eligible for payment. Only consumers that satisfy the redemption requirements of the rebate program receive the rebate amount.

During the three and nine months ended September 30, 2006, we incurred and paid $3.3 million to consumers outside our customary rebate redemption process to parties that we believed generally had not satisfied all the terms and conditions of the respective rebate redemption program. Such amounts were paid to satisfy customer complaints and are viewed by us as "goodwill payments" and reflected in general and administrative expenses.

*Inventory Valuation*

Our inventory consists of wireless devices and accessories. The carrying value of inventory is stated at the lower of cost or market value. Cost is determined using a method which approximates the first-in-first-out accounting method. We

27

Table of Contents

write down inventory for estimated obsolescence or unmarketable inventory equal to the difference between the cost of inventory and the estimated market value or replacement cost based upon assumptions about future demand and market conditions. If actual market conditions are less favorable than those projected, additional inventory write-downs may be required. Historically, we have not experienced significant write-offs, with the exception of returned, unmarketable inventory.

*Stock-based Compensation*

We adopted SFAS No. 123(R) on January 1, 2006 using the modified prospective application ("MPA") method. SFAS No. 123(R) established standards for the accounting for transactions in which an entity exchanges its equity instruments for goods or services. SFAS No. 123(R) requires us to measure the cost of employee services received in exchange for an award of equity instruments usually stock options or unvested (restricted) stock awards based on the grant date fair value of the award. That cost is recognized over the period during which an employee is required to provide service in exchange for the award—the requisite service period (usually the vesting period). The amount of compensation expense recognized using the fair value method requires us to exercise judgment and make assumptions relating to the factors that determine the fair value of our stock option grants.

*Provision for Income Taxes*

We have historically reported net losses and, in accordance with accounting principles generally accepted in the United States, have not recorded any income tax benefits from those losses. Although we intend to utilize net operating loss carryforwards to offset taxable income that may be generated in 2006, we expect alternative minimum tax amounts to be payable primarily due to the net operating loss carryforward limitations associated with the alternative minimum tax calculation. We continue to maintain a valuation allowance against our deferred tax assets, consisting primarily of net operating loss carryforwards, and we may recognize deferred tax assets in future periods when they are estimated to be realizable provided they are not subject to ownership change limitations. To the extent we report taxable income in future periods, we intend to use our net operating loss carryforwards to the extent available to offset taxable income and reduce cash outflows for income taxes. Certain of these net operating losses obtained through our acquisitions are not included in the components of the deferred tax assets, as the use of these losses will be significantly limited under Section 382 of the Internal Revenue Code.

## ITEM 4.     CONTROLS AND PROCEDURES

### Disclosure Controls and Procedures

Management had previously concluded that our disclosure controls and procedures were effective as of September 30, 2006. However, in connection with the restatement of our March 31, 2006, June 30, 2006 and September 30, 2006 interim financial statements as fully described in Note 1 of this Form 10-Q/A, management determined that the material weaknesses described below existed as of September 30, 2006. Accordingly, our Chief Executive Officer and Chief Accounting Officer have now concluded that disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) were not effective as of September 30, 2006 to ensure information required to be disclosed by us in the reports we file or submit under the Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified within the SEC's rules and forms and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Accounting Officer, as appropriate, to allow timely decisions regarding required disclosure.

Not withstanding the material weaknesses described below, management believes the condensed consolidated financial statements included in this Quarterly Report on Form 10-Q/A fairly present in all material respects our financial condition, results of operations and cash flows for all periods presented.

A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood, that a material misstatement of the annual or interim quarterly financial statements will not be prevented or detected. Management identified material weaknesses in our internal controls including the following:

- *We did not maintain sufficient staffing of operational and financial resources.* We did not maintain an appropriate level of staffing in operational and financial resources sufficient to provide the level of controls and analysis required on a timely basis in light of the increasing complexity and growth of our business. This resulted in certain accounting processes and controls not being performed on a timely basis and the inability to maintain an adequate control environment, resulting in numerous material adjusting entries being made after year end. This material weakness contributed to errors such as those relating to proper revenue recognition and accounts receivable, proper accrual of rebates and other liabilities and adjustments to properly account for certain amounts due from our vendors described below.

- *We did not always effectively communicate information to our finance department* . Specifically, we failed to maintain effective communication channels to adequately identify and record certain transactions during 2006. The failure to provide this communication contributed to errors relating to accounting and reporting of expenses and liabilities. This material weakness caused or contributed to, adjustments necessary to appropriately record amounts due to marketing partners, accounts receivable allowances and reserves for deactivations .

- *We did not maintain effective controls over the recordation, accuracy and completeness of activations and services revenue and related accounts receivable.*

  We did not take steps to adequately identify and appropriately record certain commission and bonus revenue received during the

year from various wireless carriers in a timely and accurate manner. Recording amounts received from carriers in the appropriate accounts in a timely and accurate manner is an important business process control that is essential to the correct reporting of amounts in the financial statements. This material weakness contributed to errors relating to accounting and reporting for revenue and accounts receivable.

We did not utilize an appropriate methodology during the year in recording receivables from wireless carriers associated with disputed deactivations, churn bonuses and other carrier related fees. We overstated accounts receivable by using a methodology that anticipated future improvements in collections beyond that supported by past experience, and which did not consider certain current factors and other information. As a result of this material weakness, an adjustment was necessary to properly record revenue and related receivables from these fees.

We recorded additional allowances for doubtful accounts receivable during our restatement process. The proper accounting for the allowance for doubtful accounts requires that estimates must be made on the future collectibility of receivables. Specifically after analysis we concluded that reserves were required for doubtful collections on disputed accounts receivable, an additional reserve was necessary to provide for disputed accounts receivable arising from the most recent month of carrier commissions arising from December 2006 activations. In addition, our estimation process failed to take into account all information from ongoing collection processes in order to properly state our reserves. An addition to our reserves at was necessary as a result of this material weakness.

- *We did not maintain effective controls over the determination and accuracy of equipment revenue and related accounts receivable.* We did not utilize an appropriate methodology during the year in recording certain fees due from consumers when contracts are cancelled within specified time periods or the wireless device is not returned to us. Specifically, related accounts receivable were overstated to the extent that we used collection percentages which anticipated improvements in excess of past experience. As a result of this material weakness, an adjustment was necessary to properly record revenue and related receivables from these fees.

- *We did not maintain effective controls over the accuracy and completeness of consumer product rebate liabilities.* Specifically we did not utilize an appropriate methodology during the year in recording rebates payable to eligible consumers. We understated the consumer product rebate liability by not considering the appropriate amount of open periods eligible for rebates and the backlog of possible eligible rebates that had been delivered to outsourced payment service providers. As a result of this material weakness, an adjustment was necessary to properly record product rebate expenses and related payables.

- *We did not maintain effective controls over the accuracy and completeness of costs of goods sold and amounts due from vendors.* Specifically, we did not maintain adequate documentation to support the proper accounting for inventory movements related to support phone shipments for refitting and refurbishment. We overstated inventory or receivables in-kind by not maintaining adequate documentation of these phones provided to outside services providers. As a result of this material weakness, an adjustment was necessary to properly record costs of goods sold and amounts due from vendors.

These material weaknesses resulted in adjustments to our revenue and accounts receivable and certain other financial statement line items as referred to above and resulted in the restatement of previously issued consolidated financial statements for the three and nine-month period ended September 30, 2006.

*Changes in Internal Control over Financial Reporting*

With the exception of the items described above, there have been no significant changes in our internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting for this current period.

**Table of Contents**

PART II

**ITEM 6.   EXHIBITS**

| Exhibit No. | Description |
| --- | --- |
| 10.1(1) | Cingular Wireless Non-Exclusive Dealer Agreement and Cingular Wireless Internet Dealer and master Dealer Addendum (the "Agreements") with Cingular Wireless II, LLC ("Cingular"), effective October 1, 2006 |
| 10.2(2) | Seventh Amendment to Third Amended and Restated Loan and Security Agreement entered into as of September 28, 2006 by and between Comerica Bank, InPhonic, Inc., SimIpc Acquisition Corp., Star Number, Inc., Mobile Technology Services, LLC and CAIS Acquisition II, LLC. |
| 31.1 | Rule 13a-14(a) Certification of Principal Executive Officer. |
| 31.2 | Rule 13a-14(a) Certification of Principal Financial Officer. |
| 32.1 | Section 1350 Certification of Chief Executive Officer. |
| 32.2 | Section 1350 Certification of Chief Financial Officer. |

(1) Confidential treatment requested as to certain portions of this Exhibit pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended, which portions are omitted and filed separately with the Securities and Exchange Commission. Incorporated by reference to our Quarterly Report on Form 10-Q filed on November 9, 2006.

(2) Previously filed as an Exhibit to our Current Report on Form 8-K filed on October 4, 2006.

29

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

INPHONIC, INC.

By: /s/ DAVID A. STEINBERG
      **David A. Steinberg**
      **Chairman of the Board and**
      **Chief Executive Officer**

By: /s/ GEORGE Z. MORATIS
      **George Z. Moratis**
      **Executive Vice President and**
      **Chief Accounting Officer**

Date: May 31, 2007

30

**CERTIFICATION PURSUANT TO**
**SECTION 302 OF**
**THE SARBANES-OXLEY ACT OF 2002**

I, David A. Steinberg, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q, as amended for the period ended September 30, 2006 of InPhonic, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: May 31, 2007

/s/ David A. Steinberg
**David A. Steinberg**
**Chairman of the Board and Chief Executive Officer**

**CERTIFICATION PURSUANT TO**
**SECTION 302 OF**
**THE SARBANES-OXLEY ACT OF 2002**

I, George Z. Moratis, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q, as amended for the period ended September 30, 2006 of InPhonic, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: May 31, 2007

/s/ George Z. Moratis
**George Z. Moratis**
**Executive Vice President**
**and Chief Accounting Officer**

**Certification of Principal Executive Officer**
**Pursuant to 18 U.S.C. 1350**
**(Section 906 of the Sarbanes-Oxley Act of 2002)**

I, David A. Steinberg, Chairman and Chief Executive Officer (principal executive officer) of InPhonic, Inc. (the "Registrant"), certify that to the best of my knowledge, based upon a review of the Quarterly Report on Form 10-Q, as amended for the period ended September 30, 2006 of the Registrant (the "Report"):

(1) The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934, as amended; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant.

/s/ DAVID A. STEINBERG
**Name: David A. Steinberg**
**Date:  May 31, 2007**

**Certification of Principal Financial Officer**
**Pursuant to 18 U.S.C. 1350**
**(Section 906 of the Sarbanes-Oxley Act of 2002)**

I, George Z. Moratis, Executive Vice President and Chief Accounting Officer (principal financial officer) of InPhonic, Inc. (the "Registrant"), certify that to the best of my knowledge, based upon a review of the Quarterly Report on Form 10-Q, as amended for the period ended September 30, 2006 of the Registrant (the "Report"):

(1) The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934, as amended; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant.

/s/ GEORGE Z. MORATIS
**Name: George Z. Moratis**
**Date:  May 31, 2007**

# EXHIBIT P

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

---

# Form 10-K/A
# (Amendment No. 1)

(Mark One)

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2006

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from          to

**Commission File Number: 000-51023**

---

# INPHONIC, INC.
(Exact name of Registrant as specified in its Charter)

| | |
|---|---|
| **Delaware** | **52-2199384** |
| (State or other jurisdiction of<br>incorporation or organization) | (I.R.S. employer<br>identification number) |
| **1010 Wisconsin Avenue, Suite 600**<br>**Washington, D.C.** | **20007** |
| (Address of principal executive offices) | (Zip Code) |

**(202) 333-0001**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| **Common Stock, par value $0.01 per share** | **NASDAQ Stock Market LLC** |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐    No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐    No ☒

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):
Large accelerated filer ☐      Accelerated filer ☒      Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐    No ☒

As of June 30, 2006, the aggregate market value of the common stock held by non-affiliates of the registrant was approximately $117,332,977.

As of May 21, 2007, 36,964,003 shares of the registrant's common stock were outstanding.

---

**DOCUMENTS INCORPORATED BY REFERENCE**

None.

**Explanatory Note**

This Annual Report on Form 10-K/A (Amendment No. 1) (this "Amendment") is being filed by InPhonic, Inc. ("InPhonic") to amend InPhonic's Annual Report on Form 10-K for the year ended December 31, 2006 (the "Original Filing"). The audited financial statements and schedules are being refiled solely to include the conformed signatures of KPMG LLP and are otherwise unchanged from the audited financial statements and schedules included in the Original Filing. Part IV, Item 15 is being amended to file Exhibit 23.2. This Amendment does not otherwise update or amend any exhibits to or disclosure set forth in the Original Filing. Pursuant to Rule 12b-15 under the Securities Exchange Act of 1934, as amended, this Amendment contains new certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

**PART IV**

## ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

The following documents are filed as part of this Annual Report:

(1)   Index to Financial Statements

| | Page Number |
|---|---|
| Report of Grant Thornton LLP, Independent Registered Public Accounting Firm | F-2 |
| Report of KPMG, LLP, Independent Registered Public Accounting Firm | F-4 |
| Consolidated Balance Sheets as of December 31, 2005 and 2006 | F-5 |
| Consolidated Statements of Operations for the years ended December 31, 2004, 2005 and 2006 | F-6 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 2004, 2005 and 2006 | F-7 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2004, 2005 and 2006 | F-8 |
| Notes to Consolidated Financial Statements | F-9 |

(2)   Financial Statement Schedules

The following consolidated financial statement schedule of InPhonic, Inc. and subsidiaries is filed herewith:

| | Page Number |
|---|---|
| Report of Grant Thornton LLP, Independent Registered Public Accounting Firm | S-1 |
| Report of KPMG LLP, Independent Registered Public Accounting Firm | S-2 |
| Schedule II—Valuation and Qualifying Accounts | S-3 |

All other schedules have been omitted because the information required to be shown in the schedules is not applicable or is included elsewhere in our financial statements or the notes thereto.

(3)   Exhibits

| Exhibit No. | Description |
|---|---|
| 2.1(c)(d) | Asset Purchase Agreement dated as of December 17, 2004, between A1 Wireless USA, Inc. and CAIS Acquisition LLC |
| 2.2(d) | First Amendment to the Asset Purchase Agreement dated as of December 17, 2004, between A1 Wireless USA, Inc., CAIS Acquisition LLC and InPhonic, Inc. |
| 2.3(c)(e) | Asset Purchase Agreement dated as of April 26, 2005, between VMC Satellite, Inc., InPhonic, Inc. and CAIS Acquisition II, LLC |
| 2.4(f)(g) | First Amendment to the Asset Purchase Agreement dated as of September 1, 2005, by and among CAIS Acquisition II, LLC, InPhonic, Inc., RR Holding, Inc. (formerly known as VMC Satellite, Inc.) and Rick Rahim |
| 3.1(a) | Eleventh Amended and Restated Certificate of Incorporation of InPhonic, Inc. |
| 3.2(a) | Third Amended and Restated Bylaws of InPhonic, Inc. |

| Exhibit No. | Description |
|---|---|
| 4.1(a) | Specimen stock certificate for shares of common stock of InPhonic, Inc. |
| 10.1(a) | Seventh Amended and Restated Investor Rights Agreement dated as of June 12, 2003 by and among InPhonic, Inc. and the Purchasers listed therein |
| 10.2(s) | Credit Agreement dated as of November 7, 2006 among InPhonic, Inc., The lenders from time to time, Goldman Sachs Credit Partners L.P., and Citicorp North America Inc, as Administrative Agent. |
| 10.3(s) | Amendment No. 1 dated February 6, 2007 to Credit Agreement dated as of November 7, 2006 among InPhonic, Inc., the lenders from time to time, Goldman Sachs Credit Partners, L.P. and Citicorp North America Inc., as Administrative Agent. |
| 10.4(c)(s) | Amendment No. 2 to Credit Agreement dated as of March 30, 2007, to the Credit Agreement dated as of November 7, 2006 among InPhonic, Inc. the lenders from time to the and Citicorp North America, Inc. as Administrative Agent. |
| 10.5(s) | Amendment No. 3 to Credit Agreement dated as of April 9, 2007, to the Credit Agreement dated as of November 7, 2006, as amended, among InPhonic, Inc. the lenders from time to the and Citicorp North America, Inc. as Administrative Agent. |
| 10.6(s) | Amendment No. 4 to Credit Agreement dated as of April 23, 2007, to the Credit Agreement dated as of November 7, 2006, as amended, among InPhonic, Inc. the lenders from time to the and Citicorp North America, Inc. as Administrative Agent. |
| 10.7(s) | Amendment No. 5 to Credit Agreement dated as of May 1, 2007, to the Credit Agreement dated as of November 7, 2006, as amended, among InPhonic, Inc. the lenders from time to the and Citicorp North America, Inc. as Administrative Agent. |
| 10.8(s) | Warrant Agreement dated as of November 7, 2006 by and between InPhonic, Inc., Goldman, Sachs & Co., Citicorp North America, Inc. and AP InPhonic Holdings, LLC |
| 10.9(a) | Form of Assignment of Invention, Nondisclosure and Noncompetition Agreement |
| 10.10(a) | Employment Agreement dated as of February 4, 2000 by and between InPhonic, Inc. and David A. Steinberg, as amended by Amendment No. 1 dated March 1, 2004 and Amendment No. 2 dated May 14, 2004 |
| 10.11(k) | Employment Agreement between InPhonic, Inc. and Lawrence S. Winkler, entered into on July 25, 2005 and effective as of January 19, 2004 |
| 10.12(n) | Employment Agreement between InPhonic, Inc. and Andrew B. Zeinfeld, entered into on December 20, 2006 |
| 10.13(n) | Employment Agreement between InPhonic, Inc. and Brian J. Curran, entered into on December 20, 2006 |
| 10.14(a) | Employment Agreement effective April 2, 2002, by and between InPhonic, Inc. and Frank C. Bennett, III |
| 10.15(a) | Lease dated as of February 26, 2001 by and between Rouse Commercial Properties, LLC, Rouse Office Management, LLC and InPhonic, Inc., as amended by First Amendment to Lease, dated May 29, 2002 |
| 10.16(l) | Second Amendment to Lease dated September 23, 2004 by and between Inglewood Business Park III, LLC and Inglewood Business Park IV, LLC (assignees of Rouse Commercial Properties, LLC), by MTM Builder/Developer, Inc. and InPhonic, Inc., as amended by Third Amendment to Lease made and entered into as of July 19, 2005 |
| 10.17(a) | Lease Agreement dated April 29, 2003 by and between Waterfront Center Limited Partnership and InPhonic, Inc., as amended by Addendum No. 1, dated September 9, 2003 and Addendum No. 2, dated May 14, 2004 |

| Exhibit No. | Description |
|---|---|
| 10.18(l) | Deed of Lease by and between Parkridge Phase Two Associates Limited Partnership and InPhonic, Inc. dated July 27, 2005 |
| 10.19(m) | First Amendment to Lease by and between Parkridge Phase Two Associates Limited Partnership and InPhonic, Inc. dated November 8, 2005 |
| 10.20(h) | Sublease dated November 17, 2004, by and between CareerBuilder, LLC and InPhonic, Inc. |
| 10.21(a)(b) | Premier I-Dealer Agreement dated March 1, 2001 by and between T-Mobile USA, Inc., and its subsidiaries and affiliates and InPhonic, Inc. and its affiliates and related entities, as amended |
| 10.22(o)(r) | Cingular Wireless Non-Exclusive Dealer Agreement and Cingular Wireless Internet Dealer and Master Dealer Addendum ("the Agreements") with Cingular Wireless II, LLC ("Cingular"), effective October 1, 2006 |
| 10.23(c)(j) | Asset Purchase Agreement dated as of May 26, 2005, between FONcentral.com, Inc. and FON Acquisition, LLC |
| 10.24(a) | 1999 Amended and Restated Stock Incentive Plan |
| 10.25(h) | 2004 Equity Incentive Plan |
| 10.26(k) | Form of Stock Option Agreement for options granted under the 2004 Equity Incentive Plan |
| 10.27(k) | Form of Restricted Stock Agreement for awards granted under the 2004 Equity Incentive Plan |
| 10.28(q) | Outside Director Compensation Summary |
| 10.29(p) | First Amendment to Employment Agreement effective March 16, 2006 by and between InPhonic, Inc. and Lawrence S. Winkler |
| 10.30(s) | Employment Agreement effective May 1, 2004 by and between InPhonic, Inc. and Michael Walden. |
| 16.1(n) | Letter from KPMG LLP to the Securities and Exchange Commission dated September 20, 2005 |
| 21.1(s) | Subsidiaries of InPhonic, Inc. |
| 23.1(s) | Consent of Grant Thornton LLP, Independent Registered Public Accounting Firm |
| 23.2 | Consent of KPMG LLP, Independent Registered Public Accounting Firm |
| 31.1 | Rule 13a-14(a) Certification of Principal Executive Officer. |
| 31.2 | Rule 13a-14(a) Certification of Principal Financial and Accounting Officer. |
| 32.1 | Section 1350 Certification of Principal Executive Officer. |
| 32.2 | Section 1350 Certification of Principal Financial and Accounting Officer. |

(a) Incorporated by reference to our Registration Statement on Form S-1 (File No. 333-116420).
(b) Confidential treatment granted for certain portions of this Exhibit pursuant to Rule 406 under the Securities Act of 1933, as amended which portions are omitted and filed separately with the Securities and Exchange Commission.
(c) Confidential treatment granted for certain portions of this Exhibit pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended, which portions are omitted and filed separately with the Securities and Exchange Commission.
(d) Incorporated by reference to our Current Report on Form 8-K filed on January 10, 2005.
(e) Incorporated by reference to our Current Report on Form 8-K/A filed on December 22, 2006.
(f) Appendix 1 to this First Amendment to Asset Purchase Agreement has been omitted in reliance upon the rules of the Securities and Exchange Commission. A copy will be delivered to the Securities and Exchange Commission upon request.

(g) Incorporated by reference to our Current Report on Form 8-K/A filed on December 22, 2006.

(h) Incorporated by reference to our Annual Report on Form 10-K for the year ended December 31, 2004.

(i) Incorporated by reference to our Quarterly Report on Form 10-Q for the three months ended March 31, 2005.

(j) Incorporated by reference to our Current Report on Form 8-K filed on June 3, 2005.

(k) Incorporated by reference to our Current Report on Form 8-K filed on July 29, 2005.

(l) Incorporated by reference to our Quarterly Report on Form 10-Q for the three months ended June 30, 2005.

(m) Incorporated by reference to our Quarterly Report on Form 10-Q for the three months ended September 30, 2005.

(n) Incorporated by reference to our Current Report on Form 8-K filed on December 22, 2006

(o) Incorporated by reference to our Quarterly Report on Form 10-Q for the three months ended September 30, 2006

(p) Incorporated by reference to our Annual Report on Form 10-K for the year ended December 31, 2005.

(q) Incorporated by reference to our Current Report on Form 8-K filed on March 24, 2006.

(r) Confidential treatment requested for certain portions of this Exhibit pursuant to Rule 24b-2 under the Securities Exchange Act of 1939, as amended which portions are omitted and filed separately with the Securities and Exchange Commission.

(s) Incorporated by reference to our Annual Report on Form 10-K for the year ended December 31, 2006.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

INPHONIC, INC.

By:  _____  / s /   D AVID A. S TEINBERG_____
                          **David A. Steinberg**
                          **Chairman of the Board and**
                          **Chief Executive Officer**

Dated: June 4, 2007

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/  D AVID A. S TEINBERG<br>**David A. Steinberg** | Chairman of the Board and Chief Executive Officer (Principal Executive Officer) | June 4, 2007 |
| /s/  G EORGE Z. M ORATIS<br>**George Z. Moratis** | Principal Financial and Accounting Officer | June 4, 2007 |

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

|  | Page Number |
|---|---|
| Reports of Grant Thornton LLP, Independent Registered Public Accounting Firm | F-2 |
| Report of KPMG LLP, Independent Registered Public Accounting Firm | F-6 |
| Consolidated Balance Sheets at December 31, 2005 and 2006 | F-7 |
| Consolidated Statements of Operations for the years ended December 31, 2004, 2005 and 2006 | F-8 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 2004, 2005 and 2006 | F-9 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2004, 2005 and 2006 | F-10 |
| Notes to Consolidated Financial Statements | F-11 |

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Board of Directors and shareholders
Inphonic, Inc.

We have audited the accompanying consolidated balance sheets of Inphonic, Inc. and subsidiaries (the Company) as of December 31, 2006 and 2005, and the related consolidated statements of operations, common stockholders' equity, and cash flows for each of the two years in the period ended December 31, 2006. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2006 and 2005, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2006 in conformity with accounting principles generally accepted in the United States of America.

Our audits were conducted for the purpose of forming an opinion on the basic consolidated financial statements taken as a whole. Schedule II is presented for the purpose of additional analysis and is not a required part of the basic consolidated financial statements. This schedule has been subjected to the auditing procedures applied in the audit of the basic consolidated financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic consolidated financial statements taken as a whole.

As discussed in Note 2 to the Notes to Consolidated Financial Statements, the Company adopted SFAS No. 123R, " *Share-Based Payment* ," effective January 1, 2006.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of the Company's internal control over financial reporting as of December 31, 2006, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) and our report dated May 31, 2007 expressed an unqualified opinion on management's assessment of the effectiveness of the Company's internal control over financial reporting and an adverse opinion on the effectiveness of the Company's internal control over financial reporting.

/s/ Grant Thornton LLP

McLean, Virginia
May 31, 2007

F-2

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Board of Directors and Shareholders
Inphonic, Inc.

We have audited management's assessment, included in the accompanying Management's Report on Internal Control Over Financial Reporting, that Inphonic, Inc. (a Delaware Corporation) and subsidiaries did not maintain effective internal control over financial reporting as of December 31, 2006, because of the effect of material weaknesses in the lack of the appropriate level of financial and operational support or adequate internal communications to process internal controls, the revenue recognition of carrier commissions, bonuses and related allowances, revenue recognition of consumer cancellation fees and accounting for certain inventories based on criteria established in *Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)* . Inphonic's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. The following material weaknesses have been identified and included in management's assessment:

- The Company did not maintain an appropriate level of staffing in operational and financial resources to provide the level of controls and analysis required on a timely basis. The failure to provide an adequate level of staffing resulted in certain accounting processes not being performed on a timely basis and the inability to maintain an adequate control environment. Maintaining appropriate levels of staffing is an important entity level control that is essential to maintaining the operating effectiveness of the underlying process level controls. This material weakness contributed to errors such as those relating to proper revenue recognition.

F-3

- The Company failed to establish effective communication channels between operations and finance to adequately identify and record certain transactions during 2006. The failure to provide this communication manifested itself in situations such as 1) a 2005 liability not being recorded on a timely basis, and 2) accounts receivable reserves not being appropriately stated based on the status of collection efforts involving operational personnel and 3) the deactivation reserve being understated due to the fact that certain consumer focused marketing programs impacting the customer deactivation behavior not being properly reflected in the underlying data and the deactivation reserve model. Establishing effective communication between the Finance Department and operational departments will allow the company to reflect any necessary commitments in the financial statements. This material weakness contributed to errors relating to accounting and reporting of revenue, expenses and liabilities.

- The Company did not utilize an appropriate methodology during the year in recording receivables from carriers associated with disputed deactivations, churn bonuses and other carrier related fees. Similar to other newly disputed amounts with carriers, revenue should not be recorded until the carrier agrees to pay the amount or collection is probable. The Company overstated accounts receivable by using a methodology that could not be supported by past experience and failed to include current results and other information received from the carriers.

In addition, the Company did not take steps to adequately identify and appropriately record certain commission and bonus revenues received during the year from various carriers in a timely and accurate manner. Recording amounts received from carriers in the appropriate accounts in a timely and accurate manner is an important business process control that is essential to the correct reporting of amounts in the financial statements. This material weakness contributed to errors relating to accounting and reporting for revenue and accounts receivable. This material weakness contributed to errors relating to accounting and reporting of revenues.

- The Company did not utilize an appropriate methodology during the year in recording certain Equipment Discount Provision fees due from consumers when contracts are cancelled within specified time periods and the wireless device is not returned to the Company. Specifically, the Company overstated revenue and account receivable by using collection percentages in excess of that which could be supported by past collection experience. As a result of this material weakness, an adjustment was necessary to properly record revenue and related receivables from these fees.

- The Company did not utilize an appropriate methodology during the year in recording rebates payable to eligible consumers. The Company understated the product rebate liability by not considering the appropriate amount of open periods eligible for rebates and the backlog of possible eligible rebates that had been delivered to outsourced payment service providers. Additionally, the Company failed to reflect actual rebate payments made to customers in its calculation of accrued product rebate liability. As a result of this material weakness, an adjustment was necessary to properly record product rebate expense and the related liability.

- The Company did not maintain adequate documentation to support the proper accounting for inventory movements related to phone shipments for refitting and refurbishment. Consequently, the Company overstated inventory or receivables by not maintaining adequate documentation of track phones provided to outside services providers. As a result of this material weakness, an adjustment was necessary to properly record costs of goods sold and amounts due from vendors.

- The Company did not consider all of the factors in determining its estimate of allowance for doubtful accounts. The proper accounting for the allowance for doubtful accounts requires that estimates must be made on the future collectibility of receivables. In the course of concluding on its analysis of reserves necessary related to accounts receivable, the Company concluded that an additional reserve was necessary for current receivables which based on historical experience will not be paid in the initial carrier payment. Receivables not paid in initial carrier payments are reclassified to disputed receivables and the related collection efforts are addressed through a specific process. We recommend that in future periods, management consider in its reserve an estimate of current

F-4

receivables expected to be reclassified as disputed receivables and the related collection experience. As a result of this material weakness, an adjustment was necessary to properly record the allowance for doubtful accounts and bad debt expense.

These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2006 financial statements, and this report does not affect our report dated May 31, 2007, which expressed an unqualified opinion on those financial statements.

In our opinion, management's assessment that Inphonic, Inc. and Subsidiaries did not maintain effective internal control over financial reporting as of December 31, 2006, is fairly stated, in all material respects, based on *Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)*. Also in our opinion, because of the effect of the material weaknesses described above on the achievement of the objectives of the control criteria, Inphonic, Inc. and Subsidiaries has not maintained effective internal control over financial reporting as of December 31, 2006, based on *Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)*.

/s/   Grant Thornton LLP

McLean, Virginia
May 31, 2007

F-5

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Report of Independent Registered Public Accounting Firm

The Board of Directors and Stockholders
InPhonic, Inc. and subsidiaries:

We have audited the accompanying consolidated statement of operations, stockholders' equity (deficit), and cash flows of InPhonic, Inc. and subsidiaries for the year ended December 31, 2004. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the results of operations and the cash flows of InPhonic, Inc. and subsidiaries for the year ended December 31, 2004, in conformity with U.S. generally accepted accounting principles.

/s/ KPMG LLP

McLean, Virginia
March 8, 2005, except
as to note 1(c) and note 4,
which are as of March 16, 2006

F-6

**INPHONIC, INC. & SUBSIDIARIES**
**Consolidated Balance Sheets**
**As of December 31, 2005 and 2006**
**(in thousands, except per share and share amounts)**

| | 2005 | 2006 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 70,783 | $ 89,972 |
| Accounts receivable (net of allowance of $2,042 and $9,749, respectively) | 34,606 | 63,820 |
| Inventory, net | 19,680 | 23,164 |
| Prepaid expenses | 2,405 | 6,507 |
| Deferred costs and other current assets | 6,823 | 3,122 |
| Current assets of discontinued operations | 2,430 | 391 |
| Total current assets | 136,727 | 186,976 |
| Restricted cash and cash equivalents | 400 | 38 |
| Property and equipment, net | 12,121 | 22,746 |
| Goodwill | 31,140 | 38,223 |
| Intangible assets, net | 12,651 | 8,092 |
| Deposits and other assets | 3,058 | 8,330 |
| Total assets | $ 196,097 | $ 264,405 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 31,543 | $ 85,975 |
| Accrued expenses and other current liabilities | 31,588 | 22,521 |
| Current portion of deferred revenue | 13,851 | 16,604 |
| Current maturities of capital leases | 377 | 301 |
| Current liabilities of discontinued operations | 3,130 | 1,103 |
| Total current liabilities | 80,489 | 126,504 |
| Long-term debt and capital lease obligations, net of current maturities | 15,474 | 63,826 |
| Deferred revenue, net of current portion | 284 | 478 |
| Total liabilities | 96,247 | 190,808 |
| Commitments and Contingencies | — | — |
| Stockholders' equity: | | |
| Common stock, $0.01 par value | | |
| Authorized 200,000,000 shares at December 31, 2005 and 2006; issued and outstanding 35,232,869 and 37,138,480 shares at December 31, 2005 and 2006, respectively | 353 | 371 |
| Additional paid-in capital | 264,155 | 301,611 |
| Accumulated deficit | (164,658) | (228,385) |
| Total stockholders' equity | 99,850 | 73,597 |
| Total liabilities and stockholders' equity | $ 196,097 | $ 264,405 |

See accompanying notes to consolidated financial statements

F-7

**INPHONIC, INC. & SUBSIDIARIES**
**Consolidated Statements of Operations**
**Years Ended December 31, 2004, 2005 and 2006**
**(in thousands, except per share and share amounts)**

|  | 2004 | 2005 | 2006 |
|---|---|---|---|
| Revenue: | | | |
|     Activations and services | $ 123,265 | $ 233,730 | $ 298,090 |
|     Equipment | 31,603 | 86,809 | 71,484 |
|         Total revenue | 154,868 | 320,539 | 369,574 |
| Cost of revenue, exclusive of depreciation and amortization: | | | |
|     Activations and services | 1,752 | 1,221 | 2,653 |
|     Equipment | 83,075 | 190,509 | 215,201 |
|         Total cost of revenue | 84,827 | 191,730 | 217,854 |
| Operating expenses: | | | |
|     Sales and marketing, exclusive of depreciation and amortization | 42,867 | 93,726 | 118,756 |
|     General and administrative, exclusive of depreciation and amortization | 34,942 | 63,131 | 76,571 |
|     Depreciation and amortization | 6,444 | 9,840 | 17,067 |
|     Restructuring costs | — | 847 | 2,551 |
|     Loss on investment | 150 | 228 | — |
|         Total operating expenses | 84,403 | 167,772 | 214,945 |
| Operating loss | (14,362) | (38,963) | (63,225) |
| Other income (expense): | | | |
|     Interest income | 757 | 2,167 | 2,329 |
|     Interest expense | (980) | (970) | (2,638) |
|         Total other income (expense) | (223) | 1,197 | (309) |
|         Loss from continuing operations | (14,585) | (37,766) | (63,534) |
| Discontinued operations: | | | |
|     Income (loss) from discontinued operations | 4,346 | (1,784) | (193) |
|     Gain on sale | — | 1,355 | — |
|         Total income (loss) from discontinued operations | 4,346 | (429) | (193) |
|     Net loss | (10,239) | (38,195) | (63,727) |
| Preferred stock dividends and accretion | (22,049) | — | — |
|     Net loss attributable to common stockholders | $ (32,288) | $ (38,195) | $ (63,727) |
| Basic and diluted net loss per share: | | | |
|     Net loss from continuing operations | $ (2.60) | $ (1.10) | $ (1.75) |
|     Net income (loss) from discontinued operations | 0.31 | (0.01) | — |
|     Basic and diluted net loss per share | $ (2.29) | $ (1.11) | $ (1.75) |
|     Basic and diluted weighted average shares outstanding | 14,074,505 | 34,417,954 | 36,312,970 |

See accompanying notes to consolidated financial statements

F-8

**INPHONIC, INC. & SUBSIDIARIES**
**Consolidated Statements of Stockholders' Equity**
**Years Ended December 31, 2004, 2005 and 2006**
**(in thousands, except share amounts)**

| | Series D-5 convertible preferred stock | | Series D-3 convertible preferred stock | | Series D-2 convertible preferred stock | | Series A convertible preferred stock | | Common stock | | Additional paid-in capital | Note receivable from stockholder | Accumulated deficit | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | | | | |
| **Balance, January 1, 2004** | 672,389 | $ 1,884 | 792,775 | $ 2,137 | 416,667 | $ 688 | 668,782 | $ 500 | 11,547,514 | $ 115 | $ 34,540 | $ (1,120) | $ (94,175) | $ (55,431) |
| Issuance of common stock | — | — | — | — | — | — | — | — | 8,504 | 1 | 49 | — | — | 50 |
| Warrants issued in connection with long-term debt | — | — | — | — | — | — | — | — | — | — | 817 | — | — | 817 |
| Stock-based compensation expense | — | — | — | — | — | — | — | — | — | — | 7,381 | — | — | 7,381 |
| Proceeds of initial public offering, net of costs | — | — | — | — | — | — | — | — | 6,500,000 | 65 | 110,773 | — | — | 110,838 |
| Conversion of preferred stock upon initial public offering | (672,389) | (1,884) | (792,775) | (2,137) | (416,667) | (688) | (668,782) | (500) | 13,619,536 | 136 | 92,172 | — | — | 87,099 |
| Conversion of preferred stock to common stock warrants | — | — | — | — | — | — | — | — | — | — | 2,744 | — | — | 2,744 |
| Note receivable from stockholder | — | — | — | — | — | — | — | — | — | — | — | 1,120 | — | 1,120 |
| Dividends and accretion on redeemable preferred stock | — | — | — | — | — | — | — | — | — | — | — | — | (22,049) | (22,049) |
| Preferred stock dividends declared | — | — | — | — | — | — | — | — | — | — | (10,306) | — | — | (10,306) |
| Exercise of common stock warrants and options | — | — | — | — | — | — | — | — | 577,019 | 7 | 71 | — | — | 78 |
| Net loss | — | — | — | — | — | — | — | — | — | — | — | — | (10,239) | (10,239) |
| **Balance, December 31, 2004** | — | — | — | — | — | — | — | — | 32,252,573 | 324 | 238,241 | — | (126,463) | 112,102 |
| Issuance of common stock in connection with the acquisition of: | | | | | | | | | | | | | | |
|   A1 Wireless, Inc. | — | — | — | — | — | — | — | — | 236,526 | 2 | 4,907 | — | — | 4,909 |
|   VMC Satellite, Inc. | — | — | — | — | — | — | — | — | 257,215 | 3 | 3,297 | — | — | 3,300 |
|   FONcentral.com, Inc. | — | — | — | — | — | — | — | — | 131,876 | 1 | 1,548 | — | — | 1,549 |
| Costs related to initial public offering | — | — | — | — | — | — | — | — | — | — | (292) | — | — | (292) |
| Stock-based compensation expense | — | — | — | — | — | — | — | — | — | — | 17,886 | — | — | 17,886 |
| Repurchase and retirement of common stock | — | — | — | — | — | — | — | — | (1,081,487) | (11) | (13,077) | — | — | (13,088) |
| Exercise of common stock warrants, options, restricted stock awards and other | — | — | — | — | — | — | — | — | 3,436,166 | 34 | 11,645 | — | — | 11,679 |
| Net loss | — | — | — | — | — | — | — | — | — | — | — | — | (38,195) | (38,195) |
| **Balance, December 31, 2005** | — | — | — | — | — | — | — | — | 35,232,869 | 353 | 264,155 | — | (164,658) | 99,850 |
| Issuance of common stock in connection with the acquisition of: | | | | | | | | | | | | | | |
|   A1 Wireless, Inc. | — | — | — | — | — | — | — | — | 15,408 | — | 235 | — | — | 235 |
|   VMC Satellite, Inc. | — | — | — | — | — | — | — | — | 697,045 | 7 | 4,960 | — | — | 4,967 |
| Issuance of common stock warrant | — | — | — | — | — | — | — | — | — | — | 15,173 | — | — | 15,173 |
| Stock-based compensation expense | — | — | — | — | — | — | — | — | — | — | 15,551 | — | — | 15,551 |
| Repurchase and retirement of common stock | — | — | — | — | — | — | — | — | (350,261) | (4) | (3,734) | — | — | (3,738) |
| Exercise of common stock warrants, options, restricted stock awards and other | — | — | — | — | — | — | — | — | 1,543,419 | 15 | 5,271 | — | — | 5,286 |
| Net loss | — | — | — | — | — | — | — | — | — | — | — | — | (63,727) | (63,727) |
| **Balance, December 31, 2006** | — | $ — | — | $ — | — | $ — | — | $ — | 37,138,480 | $ 371 | $ 301,611 | $ — | $ (228,385) | $ 73,597 |

See accompanying notes to consolidated financial statements

F-9

**INPHONIC, INC. & SUBSIDIARIES**
**Consolidated Statements of Cash Flows**
**Years Ended December 31, 2004, 2005 and 2006**
**(in thousands)**

| | 2004 | 2005 | 2006 |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Net loss | $ (10,239) | $ (38,195) | $(63,727) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization | 6,444 | 9,840 | 17,067 |
| Non-cash interest expense, sales and marketing expense and other | 306 | 594 | 954 |
| Stock-based compensation | 7,381 | 18,618 | 14,274 |
| Increase in allowance for doubtful accounts | — | — | 7,707 |
| Gain from the sale of Liberty Wireless | — | (1,355) | — |
| Write off of investment | 150 | 228 | — |
| Changes in operating assets and liabilities, net of assets and liabilities received from business acquisition: | | | |
| Accounts receivable | (8,428) | (15,916) | (36,575) |
| Inventory | (7,255) | (7,540) | (1,167) |
| Prepaid expenses | (321) | (1,721) | (5,577) |
| Deferred costs and other current assets | (120) | (4,152) | 4,276 |
| Deposits and other assets | 167 | (2,595) | (1,167) |
| Accounts payable | 3,217 | 8,956 | 53,236 |
| Accrued expenses and other liabilities | 4,143 | 8,973 | (7,297) |
| Deferred revenue | (2,035) | 4,188 | 2,947 |
| Net cash used in operating activities | (6,590) | (20,077) | (15,008) |
| Cash flows from investing activities: | | | |
| Capitalized expenditures, including internal capitalized labor | (5,544) | (11,836) | (22,172) |
| Cash paid for acquisitions | (11,142) | (8,781) | (4,662) |
| Cash paid for purchase of intangible assets | — | (2,725) | (193) |
| Purchase of short-term investments | — | — | (5,000) |
| Proceeds from the maturity of short-term investments | — | — | 5,000 |
| Proceeds from the sale of assets | — | 101 | 1,111 |
| Note receivable from stockholder | 1,120 | — | — |
| Reduction in restricted cash and cash equivalent | 100 | 100 | 362 |
| Net cash used in investing activities | (15,466) | (23,141) | (25,554) |
| Cash flows from financing activities: | | | |
| Principal repayments on long-term debt and capital leases | (11,046) | (284) | (21,784) |
| Borrowings on line of credit | — | 15,000 | 6,355 |
| Proceeds from term loan and other debt, net of fees | 3,976 | — | 73,632 |
| Cash paid for repurchase of common stock | — | (13,088) | (3,738) |
| Proceeds from exercise of warrants and options | 91 | 11,679 | 5,286 |
| Net proceeds (costs) of initial public offering, net of costs | 110,838 | (292) | — |
| Preferred stock dividend payments | (9,865) | — | — |
| Net cash provided by financing activities | 93,994 | 13,015 | 59,751 |
| Net increase (decrease) in cash and cash equivalents | 71,938 | (30,203) | 19,189 |
| Cash and cash equivalents, beginning of year | 29,048 | 100,986 | 70,783 |
| Cash and cash equivalents, end of year | $100,986 | $ 70,783 | $ 89,972 |
| Supplemental disclosure of cash flows information: | | | |
| Cash paid during the period for: | | | |
| Interest | $ 849 | $ 253 | $ 917 |
| Income taxes | — | — | — |
| Supplemental disclosure of non-cash activities: | | | |
| Issuance of warrants to purchase common stock with debt | $ 817 | $ — | $ 11,945 |
| Issuance of warrant to purchase common stock to vendor | — | — | 3,228 |
| Inventory exchanged for advertising credits | — | — | 2,323 |
| Stock-based compensation capitalized as website and internal use software costs | — | — | 616 |
| Issuance of common stock in business acquisitions | — | 8,209 | 5,202 |
| Issuance of common stock in intangible asset purchase | — | 1,549 | — |
| Issuance of common stock to settle a liability | 50 | — | — |
| Equipment purchase on capital lease | 635 | 595 | 152 |
| Release of funds in escrow related to acquisitions | — | 10,700 | — |
| Purchase consideration included in accrued liabilities | — | 3,000 | 1,120 |
| Preferred stock dividends and accretion to redemption value | 22,049 | — | — |
| Conversion of preferred stock, total preferred shares converted into 13,619,536 shares of common stock | 92,308 | — | — |

See accompanying notes to consolidated financial statements

F-10

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(in thousands, except per share and share amounts)**

**(1)    The Company**

*(a)    Business Description*

We are a leading online seller of wireless services and devices based on the number of activations of wireless services sold online in the United States. We are headquartered in Washington D.C. and maintain our technology and operations centers in Largo, Maryland and Reston and Great Falls, Virginia. We sell wireless service plans, including satellite television services through our branded websites; including Wirefly.com, A1 Wireless.com, and VMCsatellite.com and through websites that we create and manage for third parties. We offer marketers the ability to sell wireless voice and data services and devices under mobile virtual network enabler ("MVNE") agreements. We provide customers the ability to organize personal communication by providing real time wireless access to e-mail, voicemail, faxes, contacts, scheduling, calendar and conference calling functionality through a website or telephone.

*(b)    Risk and Uncertainties*

Our operations are subject to certain risks and uncertainties including, among others, actual and potential competition by entities with greater financial resources, rapid technological changes, the need to retain key personnel and protect intellectual property and the availability of additional capital financing on terms acceptable to us.

Since inception, we have incurred net losses attributable to common stockholders of approximately $228,385. To date, management has relied on debt and equity financings to fund our operating deficit. We had $89,972 of cash and cash equivalents on hand at December 31, 2006. We may require additional financing to fund future operations.

*(c)    Discontinued Operations*

On December 31, 2005, we sold the operating assets of our mobile virtual network operator ("MVNO") Liberty Wireless ("Liberty") to Teleplus Wireless Corp., a subsidiary of Teleplus Enterprises, Inc. The sale of Liberty has enabled us to streamline and focus our resources on our other operations including the growth of our MVNE business. The sale of Liberty was recorded as a discontinued operation in the financial statements pursuant to Statement of Financial Accounting Standards ("SFAS") No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets* ("SFAS No. 144"). We have classified these operations as discontinued operations and, accordingly, have segregated assets and liabilities of the discontinued operations in the accompanying Consolidated Balance Sheets as of December 31, 2005 and 2006 and the revenue and expenses of the discontinued operation in the accompanying Consolidated Statements of Operations for each of the three years ended December 31, 2006. Cash flows pertaining to discontinued operations were not disclosed separately in the Consolidated Statements of Cash Flows.

**(2)    Summary of Significant Accounting Policies**

*(a)    Principles of Consolidation and Basis of Presentation*

The consolidated financial statements include the accounts of InPhonic, Inc. and its subsidiaries. All significant intercompany accounts and transactions are eliminated upon consolidation.

F-11

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

*(b)    Use of Estimates*

    The preparation of consolidated financial statements in conformity with generally accepted accounting principles in the United States requires management to make estimates and assumptions that affect the reported amounts of certain assets and liabilities, revenue and expenses, and the related disclosure of contingent assets and liabilities in the consolidated financial statements and accompanying notes. The most significant of such estimates include our reserve for future deactivations, allowance for rebates, allowance for uncollectible accounts receivable, valuation of inventory, estimated useful life of assets, impairment of long-lived assets and goodwill, valuation of deferred tax assets and reserves for contingent tax liabilities. Actual results could differ from these estimates.

    In preparation of the accompanying financial statements for the year ended December 31, 2005, we recorded an adjustment to reduce depreciation and amortization expense by $891. These adjustments to depreciation were made to correct a computational error in the fixed asset subledger that caused depreciation expense to be overstated in each prior period between fiscal years 2001 and 2005. We do not believe the impact of the adjustment was material to fiscal year 2005 or any period prior.

*(c)    Cash and Cash Equivalents*

    We consider all highly liquid investments with an original maturity of three months or less to be cash equivalents.

*(d)    Financial Instruments*

*Fair Value of Financial Instruments*

    Our financial instruments, as defined under SFAS No. 107, *Disclosures about Fair Value of Financial Instruments* , include our cash, accounts receivable, accounts payable, borrowings under our line of credit with Comerica and our term loan. The fair value of cash, accounts receivable, and accounts payable were equal to their respective carrying values at December 31, 2005 and 2006. At December 31, 2005, the borrowings outstanding under our line of credit were equal to the respective carrying value. We retired our line of credit in November 2006. We hold cash and cash equivalents primarily in four financial institutions, which often exceed FDIC insured limits. Historically, we have not experienced any losses due to such concentration of credit risk.

    As of December 31, 2006, the carrying value of the term loan was $63.6 million and the fair value of the debt approximated $72.4 million. The carrying value of the debt was recorded at a discount primarily as the result of a portion of the proceeds allocated to the fair value of detachable warrants issued with the debt. See Note 6 for further discussion.

*Concentration Risk*

    Financial instruments that potentially subject us to a concentration risk consist principally of accounts receivable and accounts payable. We extend credit to wireless network carriers ("carriers") on an unsecured basis in the normal course of business. Three carriers accounted for approximately 74% and 69% of accounts receivable, net of the deactivation reserve, as of December 31, 2005 and 2006, respectively.

F-12

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

For each of the years ended December 31, 2004, 2005 and 2006, revenue from three carriers exceeded 10% of the total revenue. Revenue as a percentage of total revenues for these carriers was as follows:

|  | 2004 | 2005 | 2006 |
|---|---|---|---|
| Carrier A | 22% | 30% | 36% |
| Carrier B | 28% | 16% | 17% |
| Carrier C | 26% | 21% | 15% |
| Total | 76% | 67% | 68% |

We are extended credit from wireless carriers at up to 60 day trade payable terms in the normal course of business to purchase certain handset equipment. The three carriers described above accounted for approximately 31% and 46% of accounts payable as of December 31, 2005 and 2006, respectively.

We depend primarily on our carriers to supply cellular phones and accessories in a timely manner in adequate quantities and consistent quality. If we are unable to obtain cellular phones in adequate quantities, we may incur delays in shipment or be unable to meet demand for our products. At December 31, 2005 and 2006, one carrier accounted for approximately 32% and 25% of our total purchases of cellular phones.

*(e)*  ***Allowance for Doubtful Accounts***

We maintain allowances for doubtful accounts for estimated losses resulting from the inability of customers to pay. The amount of the allowance is based on a combination of factors including the status of collection efforts with the respective wireless carriers on balances in which additional source information or other transaction details continue to be exchanged between us and the carrier. Our allowance for receivables due from carriers is estimated based on previous experience with collection efforts of similar nature. If the financial condition of any of the larger carrier customers we do business with were to deteriorate, resulting in an impairment of their ability to make payments, additional allowances may be required.

*(f)*  ***Inventory***

Inventory consists primarily of wireless devices. The carrying value of inventory is stated at the lower of its cost or market value. Cost is determined using a consistent method which approximates the first-in-first-out method. We write down inventory for estimated obsolescence or unmarketable inventory equal to the difference between the cost of inventory and the estimated market value or replacement cost based upon assumptions about future demand and market conditions. If actual market conditions are less favorable than those projected, additional inventory write-downs may be required. During the years ended December 31, 2004, 2005, and 2006, we wrote down inventory approximately $423, $506, and $179, respectively, in order to record certain inventory to a fair market value, which was lower than our cost. In addition during the year ended December 31, 2006, we have written-off or fully reserved for amounts due from equipment vendors for wireless devices returned to them totaling $3,990 for which credit has yet to be received.

Effective January 1, 2006, we adopted SFAS No. 151, *Inventory Costs that is an amendment to ARB No. 43, Chapter 4* ("SFAS No. 151"), amends chapter 4 "Inventory Pricing" of ARB No. 43 and paragraph A3 of SFAS No. 144. Previously, ARB 43 did not define the term "so abnormal" which could lead to unnecessary incomparable financial reporting. SFAS No. 151 clarifies that abnormal costs related to idle facility expense, freight, handling costs, and wasted materials (spoilage) should be recognized as period costs. There was no material effect on our consolidated financial position, result of operations or cash flows as a result of this adoption.

F-13

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

**(g)** *Long-Lived Assets*

*Property and Equipment*

Property and equipment is recorded at cost or at fair value if it is acquired in a business acquisition. Replacements and improvements that extend the useful life of property and equipment are capitalized. Property and equipment is depreciated over the following useful lives. Leasehold improvements are depreciated over the stated useful life or the contractually stated period of the underlying lease.

|  | Estimated useful life (in years) |
| --- | --- |
| Computer and equipment | 3 |
| Software | 3 |
| Furniture and fixtures | 7 |
| Leasehold improvements | 3 |
| Website development | 1.5 |
| Internal software development | 2 |

We account for the costs relating to the development of our e-commerce platform for internal use based on AICPA Statement of Position ("SOP") No. 98-1, *Accounting for the Costs of Computer Software Developed or Obtained for Internal Use* , and the Emerging Issues Task Force ("EITF") No. 00-02, *Accounting for Web Site Development Costs* . Website development costs consist of internal and external costs incurred to purchase and implement the web software and enhancements to the functionality of the web software, used in our business.

In accordance with SFAS No. 144, we are required to evaluate the carrying value of long-lived assets and certain intangible assets. SFAS No. 144 first requires an assessment of whether circumstances currently exist which suggest the carrying value of long-lived assets may not be recoverable. At December 31, 2005 and 2006, we did not believe any such conditions existed. Had these conditions existed, we would have assessed the recoverability of the carrying value of our long-lived assets and amortizable intangible assets based on estimated undiscounted cash flows to be generated from such assets. In assessing the recoverability of these assets, we would have projected estimated cash flows based on various operating assumptions such as average revenue per activation, deactivation rates, and sales and workforce productivity ratios. If the projection of undiscounted cash flows did not exceed the carrying value of the long-lived assets, we would have been required to record an impairment charge to the extent the carrying value exceeded the fair value of such assets.

*Goodwill and Intangible Assets*

Goodwill and intangible assets with indefinite useful lives are not amortized and are evaluated for impairment at least annually, or when events or circumstances suggest a potential impairment may have occurred. In accordance with SFAS No. 142, *Goodwill and Other Intangible Assets* ("SFAS No. 142"), we have selected the fourth quarter to perform the annual impairment test. SFAS No. 142 requires us to compare the fair value of the reporting unit to its carrying amount on an annual basis to determine if there is a potential impairment. If the fair value of the reporting unit is less than its carrying value, an impairment loss is recorded to the extent that the fair value of the goodwill within the reporting unit is less than the carrying value. The fair value for goodwill and other intangible assets not subject to amortization is determined based on discounted cash flows, market multiples or other measures, as appropriate. Based on our assessment for the year ended December 31, 2006, no impairments of goodwill or other intangible assets were noted.

F-14

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

For the year ended December 31, 2005, we originally determined that a supplier relationship valued at $3,730 had an indefinite useful life as of the April 26, 2005 acquisition date of VMC Satellite, Inc. During 2006, we determined that as of the acquisition date, the supplier relationship had a useful life of ten years in accordance with SFAS No. 142. During the fourth quarter of 2006, we recognized $255 of amortization expense for the period from April 26, 2005 to December 31, 2005. We do not believe the impact of this adjustment in 2006 to be material to the fiscal year 2006 or 2005 as a result of this change.

Intangible assets with determinable useful lives, which primarily consist of software and technology, customer contracts, affiliate relationships, a supplier relationship and a non-compete agreement, were recorded at fair value at the date of acquisition and amortized over the following economic lives:

|  | Estimated economic life (in years) |
| --- | --- |
| Software and technology | 1.5 to 5 |
| Customer contracts | 1.5 to 3 |
| Affiliate relationships | 5 |
| Non-compete agreement | 2 to 5 |
| Supplier relationship | 10 |
| Other | 1.5 to 5 |

Intangible assets not subject to amortization include trade names.

**(h)  *Revenue Recognition***

*Activations and Services Revenue*

We recognize revenue from the sale of wireless services and the provisioning of MVNE and data services.

*Wireless Services:* We generate revenue from wireless carriers, including a satellite television carrier, who pay commissions and volume and performance-based bonuses, for activating wireless services and features on their networks. We recognize commissions from wireless carriers upon shipment of activated devices to the customer. In addition to activation commissions, certain carriers pay us a monthly residual fee either for as long as a customer who we activate for that carrier continues to be its subscriber, or for a fixed period of time depending on the carrier. Within our Satellite Television business unit, we receive satellite activation certificates evidencing activation rights in advance of their resale to customers. Revenue from satellite television customers includes commissions earned at the time of the satellite service activation, net of an estimate for deactivations, as we are acting as an agent in the transaction. Revenue is reduced for estimated deactivations of its wireless services by customers prior to the expiration of a time period that ranges 90 to 180 days from the date of activation, depending on the wireless carrier. We estimate deactivations based on historical experience, which we developed based on our experience with carriers, customer behavior and sources of customers, among other factors, allowing us to accrue estimates with what we believe is a high degree of certainty. If we determine that we cannot accurately predict future deactivation experience, we may be required to defer 100% of our carrier commissions revenue until the expiration of the appropriate chargeback period. Our reserves for deactivations are included in accounts receivable and deferred revenue on the accompanying balance sheets. Accounts receivable at December 31, 2005 and 2006 included reserve for deactivations of $7,540 and $7,639, respectively. Deferred revenue at December 31, 2005 and 2006 included reserve for deactivations of $10,796 and $14,546, respectively.

F-15

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

In addition to receiving commissions for each wireless subscriber activated, we earn performance bonuses from the wireless carriers based on negotiated performance targets. The most significant bonuses we earn are the quarterly volume bonuses, which we collect from wireless carriers on a monthly basis, based on current month activations. We record these bonuses as deferred revenue at the time of billing until we achieve the quarterly targets. We also earn other quarterly bonuses from certain carriers for maintaining low customer churn and signing up wireless customers for certain additional monthly "features" such as data service or text messaging. Wireless carriers also periodically offer bonuses for achieving monthly volume and other performance targets. We recognize these monthly bonuses as earned in accordance with the provisions of the Securities and Exchange Commission's ("SEC") Staff Accounting Bulletin ("SAB") No. 104, *Revenue Recognition in Financial Statements* ("SAB No. 104"). Revenue is recognized only when all of the following criteria are met: (1) persuasive evidence of an arrangement exists, (2) delivery has occurred or services have been rendered, (3) the seller's price to the buyer is fixed or determinable, and (4) collectibility is reasonably assured. Amounts collected in cash prior to meeting the above criteria are recorded as deferred revenue. Through 2005, commission revenue earned from the activation of carrier features had been deferred until the contractual chargeback period had lapsed as we did not have adequate historical information to estimate a reserve. Beginning in 2006, we began to estimate commission revenue earned from feature activations based on historical experience which we have developed based on our experience with carriers and customer behavior over a period of time in excess of 24 months. As of December 31, 2005, $1,383 of feature activations revenue was deferred, which would have been accrued for less an estimated reserve for deactivations, in the event that we had the appropriate experience with carriers and customer behavior at December 31, 2005. As of December 31, 2006, our estimated reserve for deactivations of feature activations was $629.

In the ordinary course of recording and collecting commissions from our wireless carrier partners, we engage in a matching and reconciling process (the "matching process") between source information for customer wireless carrier activations generated and maintained in our back-office sales information systems and each carrier's billing system. Although the substantial majority of our sales information matches to that of the carriers, matching differences do arise. Examples of such differences include (i) instances in which an activation per our records does not correlate to a commission fee payment schedule submitted by the carrier; (ii) commission fee payment collected from the carrier that is less than the expected payment per our sales records; (iii) a deactivation identified on a carrier statement that does not match the carrier's original commission fee payment for such activation and (iv) commission or other fee payment we collect that is in excess of expected payment per our sales records.

Data files supported by our billing records related to differences are submitted monthly to each carrier for resolution. Resolution of these differences is usually an iterative process and it can take up to 12 months or longer for final resolution of any difference. Information is exchanged between us and the carrier throughout this process. We recognize revenue based on the underlying data maintained in our back-office sales information systems unless the carrier provides us details that supersedes our information. Given the nature of these differences and based on our experience in resolving such items with the carriers, we are also able to determine an appropriate reserve against revenue to reflect the likely success or failure of resolving these differences. In certain instances when a wireless carrier denies a claim we may file in resolving differences of this nature, we will write-off the related accounts receivable while pursuing further collection efforts and will record into income at a future date if collected. To the extent that we collect commission or other fee payments in excess of expectations, we will record revenue in the period of receipt net of estimated chargeback requirements.

F-16

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

*MVNE Services:*

We offer marketers the ability to sell wireless services to their customers under their own brands using our e-commerce platform and operational infrastructure through MVNE contracts. We receive fees for development of the network platform, as well as for operational support services. We defer the fees attributable to the production of the network platform and recognize these fees and costs over the expected life of the agreement (typically 12 to 48 months). Fees received for custom functional enhancements to the network platform and for operational services are deferred until all revenue criteria have been satisfied. Deferred revenue from MVNE contracts as of December 31, 2005 and 2006 included $1,852 and $1,195, respectively.

*Other Revenue:*

We sell data services, including a service that allows customers to access email, voicemail, facsimiles, contacts and personal calendar information through a website or a telephone. We bill customers monthly and revenue is recognized monthly, as the services are performed.

*Equipment Revenue:*

Revenue from the sale of wireless devices and accessories in a multiple-element arrangement with services is recognized at the time of sale in accordance with EITF No. 00-21, *Revenue Arrangements with Multiple Deliverables,* when fair value of the services element exists. Customers have the right to return devices within a specific period of time or usage, whichever occurs first. We provide an allowance for estimated returns of devices based on historical experience. Return rights of indirect retailers for wireless devices are limited to warranty claims, which are generally covered by the device manufacturers' original warranties. In accordance with the provisions of SAB No. 104, we determined we have sufficient operating history to estimate equipment returns. In connection with wireless activations, we sell the wireless device to the customer at a significant discount, which is generally in the form of a rebate ("equipment discount provisions" or "EDP"). Rebates are recorded as a reduction of revenue. We recognize equipment revenue net of rebate costs based on historical experience of rebates claimed. Future experience could vary based upon rates of consumers redeeming rebates.

In the event a customer terminates their wireless service with the carrier within six months of activation and opts not to return the wireless device to us within the time frames permitted within our return policy, in many instances our sales contracts with the customer permit us to charge the customer an EDP termination fee for each unreturned device. Prior to the three months ended June 30, 2006, revenue recognition of such fee was deferred until such fee was collected from the customer pursuant to SAB 104 as we did not have adequate historical collection data to reasonably estimate the ultimate collectibility of the receivable. Beginning April 1, 2006, we began to estimate EDP termination fee revenue based on historical experience of customer collection behavior which we have developed over a time period of 24 months which provides the basis on which to accrue revenue with an appropriate assurance of collectibility pursuant to SAB 104. As of March 31, 2006, $293 of such revenue was deferred, which would have been accrued for in the event that we had adequate customer collection history, less an estimated reserve for uncollectible amounts. As of December 31, 2006, we had accrued as accounts receivable approximately $1,686 in such EDP fees.

*(i)*    **Cost of Revenue**

The major components of cost of revenue, exclusive of depreciation and amortization, are:

*Activations and services.* Cost of activations and services revenue includes costs incurred from providers of telecommunications and data center services.

F-17

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

*Equipment.* We purchase wireless devices and accessories from wireless carriers, device manufacturers and third-party vendors to sell to customers and indirect retailers in the WAS business unit. We sell these wireless devices and accessories at a price below cost to encourage the sale and use of the services. We do not manufacture any of this equipment. Costs from the sale of wireless devices and accessories sold directly to customers are recognized at the time of sale. From time to time, we receive price protection credits on equipment purchased from certain vendors. We recognize price protection credits received for equipment that has been sold and shipped as a reduction of cost of revenue. Cost of revenue included shipping expenses of $4,677, $8,575 and $11,385 for the years ended December 31, 2004, 2005 and 2006, respectively.

**(j)    Advertising Costs**

We expense advertising and other marketing costs as incurred and principally include amounts paid to marketing partners based on the delivery of customers to our websites for wireless activation and services. Advertising and other marketing costs for the years ended December 31, 2004, 2005 and 2006 were $36,185, $79,078 and $104,351, respectively.

Beginning in 2007, we expect to begin capitalizing and amortizing a portion of our advertising costs (as direct response advertising) associated with activity pursuant to an agreement with a vendor.

**(k)    Accrued Consumer Liabilities**

Under certain conditions, consumers' purchasing wireless devices from us may be eligible for a product rebate depending on the wireless device purchased, service contract activated and the consumer maintaining their service with the wireless carrier for a period of up to six months. We estimate and record an accrued consumer liability and cost of revenue for such rebate at the time of sale based on the terms of the rebate and our rebate redemption experience over the most recent 18 months following the lapse of the contractual rebate redemption period. Our rebate redemptions are generally processed by a third party vendor that validates the consumer's rebate redemption materials to ensure that the redemption request satisfies all terms and conditions of the rebate program to be eligible for payment. Only consumers that satisfy the redemption requirements of the rebate program receive the rebate amount.

During the last six months of 2006, we incurred and paid $7,950 of payments made to consumers outside our customary rebate redemption process to parties that we believed generally had not satisfied all the terms and conditions of the respective rebate redemption program. Such amounts were paid to satisfy customer complaints and are viewed by us as "customer credits" and reflected in general and administrative expenses.

**(l)    Accounts payable**

Accounts payable at December 31, 2005 and 2006 consisted of:

|  | 2005 | 2006 |
|---|---|---|
| Trade payables for inventory | $14,353 | $50,989 |
| Other accounts payable | 17,190 | 34,986 |
|  | $31,543 | $85,975 |

F-18

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

**(m)  Accrued Expenses and Other Current Liabilities**

Accrued expenses and other liabilities at December 31, 2005 and 2006 consisted of:

| | 2005 | 2006 |
|---|---|---|
| Accrued consumer liabilities, including accrued rebates | $18,289 | $ 8,203 |
| Accrued payroll and related expenses | 1,452 | 1,685 |
| Accrued acquisition costs and severance costs | 5,063 | 1,674 |
| Accrued sales taxes payable | 593 | 443 |
| Accrued interest | 83 | 995 |
| Accrued product costs | 697 | 2,245 |
| Other | 5,411 | 7,276 |
| | $31,588 | $22,521 |

**(n)  Restructuring Costs**

In the first quarter of 2005, we implemented a restructuring plan to take advantage of synergies gained through the acquisition of A1 Wireless and to restructure other operating segments. During the year ended December 31, 2005, we recognized $847 in restructuring costs, $811 of which related to workforce reduction and $36 related to exited facilities and contracts. We paid all restructuring costs related to this plan by December 31, 2005.

During 2006, we implemented a restructuring plan related to changes in our management and operations structure. We recognized $2,551 related to the termination of our former president and chief operating officer and thirty-four other senior executives and employees. Of this amount, $1,017 related to severance benefits that will be paid out in cash to the recipients on a monthly or semi-monthly basis over the terms of their respective severance agreements, $1,513 related to expenses incurred as a result of the modification of stock-based compensation awards under which vesting of 50% of unvested restricted share and option awards was accelerated for three of the former employees, and $21 related to other costs. As of December 31, 2006, we have $303 included in accrued expenses and other current liabilities for these expenses which have not yet been paid. We expect all remaining costs will be paid by June 30, 2007.

**(o)  Income Taxes**

SFAS No. 109, *Accounting for Income Taxes* ("SFAS No. 109"), establishes financial accounting and reporting standards for the effect of income taxes. During the years ended December 31, 2004, 2005 and 2006, we did not have any income tax expense or benefit because a full valuation allowance was provided against our net deferred tax assets. Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized as a component of net income in the period that includes the enactment date.

**(p)  Stock-Based Compensation**

We adopted SFAS No. 123 (revised 2004), *Share Based Payment* ("SFAS No. 123(R)") on January 1, 2006 using the modified prospective application method ("MPA"). SFAS No. 123(R)

F-19

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

established standards for the accounting for transactions in which an entity exchanges its equity instruments for goods or services. SFAS No. 123(R) requires us to measure the cost of employee services received in exchange for an award of equity instruments (usually stock options or unvested (restricted) stock awards based on the grant-date fair value of the award. That cost is recognized over the period during which an employee is required to provide service in exchange for the award—the requisite service period (usually the vesting period). In March 2005, the SEC issued SAB No. 107, *Valuation of Share-Based Payment Arrangements for Public Companies* ("SAB 107") relating to the interaction of the adoption of SFAS No. 123(R) and the SEC rules and regulations. We have applied the provisions of SAB 107 in our adoption of SFAS 123(R).

Prior to our adoption of SFAS No. 123(R), we applied the intrinsic value method of accounting for employee stock-based compensation as prescribed by Accounting Principles Board ("APB") Opinion No. 25, *Accounting for Stock Issued to Employees,* and related interpretations including FASB Interpretation ("FIN") No. 44, *Accounting for Certain Transactions involving Stock Compensation an Interpretation of APB Opinion No. 25* , to account for our stock option grants to employees. Under this method, compensation expense was recorded on the date of the grant only if the current market price of the underlying stock exceeded the exercise price. SFAS No. 123, *Accounting for Stock-Based Compensation* ("SFAS No. 123"), established accounting and disclosure requirements using a fair value-based method of accounting for stock-based employee compensation plans. As permitted by SFAS No. 123, we have elected to continue to apply the intrinsic value-based method of accounting described above, and had adopted the disclosure requirements of SFAS No. 123. All shares of restricted stock awarded to employees were accounted for at fair value in accordance with SFAS No. 123.

Under the MPA method, compensation cost for all share-based payments granted prior to, but not vested as of December 31, 2005, is based on the grant date fair value estimated in accordance with the pro forma provisions of SFAS No. 123, and compensation cost for all share based payments granted or modified subsequent to December 31, 2005, will be based on the grant date fair value estimated in accordance with the provisions of SFAS No. 123(R). Results for prior periods have not been restated. We use the ratable method of attributing the value of stock-based compensation to expense. SFAS No. 123(R) requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. In our pro forma information required under SFAS No. 123 for the periods prior to January 1, 2006, we accounted for forfeitures as they occurred. The fair value of each option granted is estimated on the grant date using the Black-Scholes option pricing model which takes into account as of the grant date the exercise price and expected life of the option, the current price of the underlying stock and its expected volatility, expected dividends on the stock and the risk-free interest rate for the term of the option.

For the year ended December 31, 2006 as a result of our adoption of SFAS No. 123(R), we recognized stock-based compensation expense related to employee options granted prior to January 1, 2006 of $6,260, of which $405 was capitalized in accordance with our compensation policies and SFAS No. 123(R).

F-20

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

In addition, we granted options to certain of our employees to purchase 1,012,200 shares of our common stock during the year ended December 31, 2006. The options granted were granted at a weighted average exercise price of $7.14. The grant date fair value of employee share options was estimated using the Black-Scholes option-pricing model with the following assumptions:

|  | 2004 | 2005 | 2006 |
|---|---|---|---|
| Expected volatility | 70.00% | 70.00% | 72.00% |
| Risk free interest rate | 3.12% | 3.82% | 4.72% |
| Expected dividend rate | 0.00% | 0.00% | 0.00% |
| Expected life (in years) | 4.0 | 4.0 | 5.6 |

The weighted average fair value per share of options granted using these assumptions was $4.65. Compensation cost of the grant was reduced by an estimated forfeiture amount based on an annual experience rate of 9.93%. As of the date of grants, total compensation cost related to the grants including estimated forfeitures was approximately $4,705 for the stock options granted during the year ended December 31, 2006. Stock-based compensation expense for these grants for the year ended December 31, 2006 was $670.

The impact of adopting SFAS No. 123(R) increased stock-based compensation expense included in our operating expenses and increased net loss from continuing operations by approximately $2,464 for the year ended December 31, 2006 or $0.07 per basic and diluted share. There was no impact from the adoption on cash flow from operations or cash flows from financing activities.

Our pro forma net loss applicable to common shareholders, and pro forma net loss per common share, basic and diluted, for periods prior to our adoption of SFAS No. 123(R) was as follows.

|  | For the year ended | |
|---|---|---|
|  | 2004 | 2005 |
| Net loss attributable to common stockholders, as reported | $(32,288) | $(38,195) |
| Add: Stock-based compensation expense included in net loss attributable to common stockholders, as reported | 5,289 | 17,482 |
| Less: Total stock-based compensation expense determined under fair value based methods for all stock awards, net of related tax effects | (6,472) | (15,599) |
| Pro forma net loss attributable to common stockholders | $(33,471) | $(36,312) |
| Net loss per common share, basic and diluted, as reported | $ (2.29) | $ (1.11) |
| Net loss per common share, basic and diluted, pro forma | $ (2.38) | $ (1.06) |

We account for equity grants issued to non-employees at fair value, in accordance with the provisions of SFAS No. 123 and EITF No. 96-16, *Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services* . We use a Black-Scholes model to estimate the fair value of such awards and compensation expense relating to such equity issuances is recognized over the applicable vesting period of the options, warrants, or stock, in accordance with the method prescribed by FIN No. 28, *Accounting for Stock Appreciation Rights and Other Variable Stock Option of Award Plans* .

F-21

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

Stock-based compensation, which includes compensation recognized on stock option grants and restricted stock awards for employees and non-employees was included in the following line items on the accompanying financial statements. We have capitalized $616 of stock-based compensation as internally developed software for the year ended December 31, 2006. No such costs were capitalized in 2005. There were no tax benefits recognized in the statements of operations for stock based awards in any periods:

*Balance Sheets:*

*Statements of operations:*

|  | For the year ended December 31, | | |
| --- | --- | --- | --- |
|  | **2004** | **2005** | **2006** |
| Sales and marketing | $2,111 | $ 2,201 | $ 2,891 |
| General and administrative | 5,096 | 15,585 | 9,860 |
| Restructuring costs | — | — | 1,513 |
| Income (loss) from discontinued operations | 174 | 832 | 112 |
|  | $7,381 | $18,618 | $14,376 |

Stock-based compensation from continuing operations in 2005 included $7,851 related to the modification of the terms of original restricted stock awards or option grants related to six employees that were terminated in 2005. Stock based compensation from continuing operations in 2006 included $1,370 related to the modification of stock-based awards for five employees. Such modifications accelerated the vesting of 81,035 shares of restricted stock and options underlying 122,258 shares of our common stock. Unrecognized compensation cost for all unvested options and restricted stock awards was $36,459 as of December 31, 2006 which will be recognized over a weighted average period of 1.5 years.

*(q)* **Net Loss Per Common Share**

We calculate net loss per common share in accordance with SFAS No. 128, *Earnings Per Share* ("SFAS No. 128"). Basic net loss per common share excludes any dilutive effects of options, warrants, restricted stock awards and convertible securities and is calculated by dividing net loss attributable to common stockholders by the weighted average number of common shares outstanding for the period. Diluted net loss per common share equals basic net loss per common share as the effects of options, warrants, restricted stock awards and convertible securities would have been anti-dilutive.

F-22

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

The following table reconciles net loss attributable to common stockholders and basic and diluted weighted average common shares outstanding to the historical or pro forma net loss attributable to common stockholders and the historical or pro forma basic and diluted weighted average common shares outstanding for the years ended December 31, 2004, 2005 and 2006. Information presented for 2004 has been prepared on a pro forma basis assuming outstanding preferred stock was converted into common stock at the beginning of the period in connection with our initial public offering. Weighted average shares outstanding presented for 2006 includes the effect 1,250,000 shares representing detachable warrants issued with the term loan on November 7, 2006, as described in Note 6. These warrants are exercisable at $0.01 per share.

|  | 2004 | 2005 | 2006 |
|---|---|---|---|
| Numerator: |  |  |  |
| Net loss from continuing operations | $ (14,585) | $ (37,766) | $ (63,534) |
| Preferred stock dividends and accretion | (22,049) | — | — |
| Net loss from continuing operations attributable to common stockholders | (36,634) | (37,766) | (63,534) |
| Income (loss) from discontinued operations | 4,346 | (429) | (193) |
| Net loss attributed to common stockholders | $ (32,288) | $ (38,195) | $ (63,727) |
| Denominator: |  |  |  |
| Weighted average shares outstanding | 14,074,505 | 34,417,954 | 36,312,970 |
| Basic and diluted net gain (loss) per share: |  |  |  |
| Net loss from continuing operations attributable to common stockholders | $ (2.60) | $ (1.10) | $ (1.75) |
| Net income (loss) from discontinued operations | 0.31 | (0.01) | — |
| Basic and diluted earnings per share: | $ (2.29) | $ (1.11) | $ (1.75) |

For the years ended December 31, 2004, 2005 and 2006, we incurred a net loss. If our outstanding common stock equivalents were exercised or converted into common stock, the result would have been anti-dilutive and, accordingly, basic and diluted net loss attributable to common stockholders per share are identical for all periods presented in the accompanying condensed consolidated statements of operations. The following summarizes our potential outstanding common stock equivalents as of the end of each period.

|  | December 31, | | |
|---|---|---|---|
|  | 2004 | 2005 | 2006 |
| Options to purchase common stock | 6,629,469 | 5,115,969 | 4,043,103 |
| Restricted stock awards | — | 1,137,878 | 2,964,649 |
| Warrants to purchase common stock | 1,780,923 | 787,863 | 2,754,740 |
| Total common stock equivalents convertible into common stock | 8,410,392 | 7,041,710 | 9,762,492 |

F-23

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(in thousands, except per share and share amounts)**

*(r)*    *Adoption of SAB 108*

In September 2006, the SEC released Staff Accounting Bulletin No. 108, *Considering the Effects of Prior Year Misstatements When Quantifying Misstatements in Current Year Financial Statements* ("SAB 108"). SAB 108 provides guidance on how the effects of the carryover or reversal of prior year financial statement misstatements should be considered in quantifying a current year misstatement. Prior practice allowed the evaluation of materiality on the basis of (1) the error quantified as the amount by which the current year income statement was misstated (rollover method) or (2) the cumulative error quantified as the cumulative amount by which the current year balance sheet was misstated (iron curtain method). SAB 108 is effective for fiscal years ending after November 15, 2006. SAB 108 requires a dual approach that consists of both the rollover and iron curtain methods. We adopted SAB 108 effective in the fourth quarter ended December 31, 2006. There was no material effect on our financial position, results of operations or cash flows as a result of this adoption.

*(s)*    *Recent Accounting Pronouncements*

In May 2005, the Financial Accounting Standards Board ("FASB") FASB issued SFAS No. 154, *Accounting Changes and Error Corrections* ("SFAS No. 154"), a replacement of APB Opinion No. 20, *Accounting Changes* , and SFAS No. 3, *Reporting Accounting Changes in Interim Financial Statements* . SFAS No. 154 changes the requirements for the accounting for, and reporting of, a change in accounting principle. Previously, voluntary changes in accounting principles were generally required to be recognized by way of a cumulative effect adjustment within net income during the period of the change. SFAS No. 154 requires retrospective application to prior periods' financial statements of changes in accounting principles, unless it is impracticable to determine either the period-specific effects or the cumulative effect of the change. SFAS No. 154 is effective for accounting changes made in fiscal years beginning after December 15, 2005; however, the statement does not change the transition provisions of any existing accounting pronouncements. We adopted the pronouncement effective January 1, 2006. There was no material effect on our financial position, results of operations or cash flows as a result of this adoption.

In June 2006, the FASB ratified the EITF Issue No. 06-3, *How Taxes Collected from Customers and Remitted to Governmental Authorities Should Be Presented in the Income Statement"* ("EITF 06-3"). EITF No. 06-3 requires an entity to disclose transactional tax amounts assess by government authorities that are considered significant. EITF No. 06-3 is effective for interim and annual reporting periods beginning after December 15, 2006. We have determined that the adoption of this pronouncement will have no material impact to our consolidated financial position, results of operations, or cash flows.

In June, 2006, the FASB issued FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109* ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with SFAS No. 109. FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosure, and transition. FIN 48 will apply to fiscal years beginning after December 15, 2006, with earlier adoption permitted. We will adopt FIN 48 effective January 1, 2007. As prescribed in the interpretation, the cumulative effect of applying the provisions of FIN No. 48 should be reflected as an adjustment to the opening balance of Stockholders' Equity. We do not believe the adoption of this pronouncement will have any material effects on our consolidated financial position, results of operations, or cash flows.

F-24

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

In September 2006, the FASB issued SFAS No. 157, *Fair Value Measurements* ("SFAS No. 157"). SFAS 157 defines fair value, establishes a framework for measuring fair value under generally accepted accounting principles, and expands disclosures about fair value measurements. SFAS 157 emphasizes that fair value is a market-based measurement, not an entity-specific measurement, and states that a fair value measurement should be determined based on the assumptions that market participants would use in pricing the asset or liability. SFAS 157 will become effective for our fiscal year beginning January 1, 2008. We do not believe the adoption of this pronouncement will have any material effects on our consolidated financial position, results of operations, or cash flows.

In February 2007, the Financial Accounting Standards Board issued SFAS 159, *The Fair Value Option for Financial Assets and Financial Liabilities—including an amendment of FASB Statement No. 115* ( "SFAS No. 159") , which allows measurement at fair value of eligible financial assets and liabilities that are not otherwise measured at fair value. If the fair value option for an eligible item is elected, unrealized gains and losses for that item will be reported in current earnings at each subsequent reporting date. SFAS 159 also establishes presentation and disclosure requirements designed to draw comparison between the different measurement attributes the company elects for similar types of assets and liabilities. SFAS No. 159 is effective for fiscal years beginning after November 15, 2007. Early adoption is permitted. We do not believe the adoption of this pronouncement will have any material effects on our consolidated financial position, results of operations, or cash flows.

**(3)    Business Acquisitions**

**(a)    *Acquisition of A1 Wireless***

On January 4, 2005, we acquired certain assets and assumed certain obligations of A1 Wireless, Inc. in a transaction accounted for using the purchase method of accounting in accordance with SFAS No. 141, *Business Combinations* ("SFAS No. 141"). A1 Wireless activated and sold wireless services and devices to consumers through their own branded websites, branded partner websites, that it created and managed, and through sophisticated online search advertising campaigns. This acquisition enhanced our existing distribution channels in the WAS business unit. The results of A1 Wireless' operations were included in our financial statements beginning January 1, 2005, and are reported in the WAS business unit.

Purchase consideration consisted of cash and shares of common stock for an aggregate purchase price of $24,582, including acquisition costs of $2,148 and contingent consideration of $5,173. At the closing, we paid approximately $10,700 in cash, which was held by an escrow agent as of December 31, 2004 and issued 160,226 shares of common stock with a fair value of $3,736. The contingent consideration included cash of $4,000 and 76,300 shares of our common stock with a fair value of $1,173.

**(b)    *Acquisition of VMC Satellite, Inc.***

On April 26, 2005, we completed the acquisition of certain assets and liabilities of VMC Satellite, Inc., ("VMC") in a transaction accounted for using the purchase method of accounting in accordance with SFAS No. 141. VMC is a marketer of digital broadcast satellite services. This acquisition has enabled us to expand our service offerings, creating additional revenue opportunities from consumers that visit its portfolio of websites and marketing partners each month. The results of VMC's operations were included in our financial statements beginning April 26, 2005, and are reported in the WAS business unit.

F-25

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

The aggregate consideration for the net assets acquired was approximately $10,979 which consisted of $4,679 in cash paid and includes acquisition costs of approximately $725 and shares of our common stock, with a fair value of $6,300, issuable in two tranches. The first tranche of stock consideration was distributed in July and September 2005 and included a total of 257,215 shares of our common stock with a fair value of approximately $3,300. Pursuant to the asset purchase agreement, as amended, the second tranche of stock consideration was to be distributed by us no later than April 26, 2006, and required us to issue common stock or cash with a fair value of $3,000 on the distribution date. We recorded the second tranche of stock consideration in accrued liabilities as of December 31, 2005 and reclassified the amount to additional paid in capital when the distribution was made in April 2006.

In addition, we agreed to pay up to an aggregate of $5,050 in cash plus 334,288 shares of our common stock upon the acquired operations attaining certain EBITDA (earnings before interest, tax, depreciation and amortization) benchmarks between April 26, 2005 and April 30, 2007. For the year ended December 31, 2006, certain EBITDA benchmarks were met and $5,116 of cash (of which $1,120 was accrued as of December 31, 2006) and shares of common stock with a fair value of $1,967 were issued as a result of VMC attaining certain EBITDA targets. This contingent consideration increased the carrying value of goodwill by $7,083. The goodwill recorded in connection with the transaction is deductible for tax purposes.

**(4)  Discontinued Operations**

On December 31, 2005, we completed the sale of substantially all of the operating assets of our Liberty Wireless business for approximately $2,318 including consideration payable in cash of up to $1,491 and notes receivable of approximately $755, net of $35 discount. Of the consideration payable at closing in cash, approximately $784 was received in January 2006 and $707 was offset against service liabilities assumed by the buyer in the transaction. We recorded a net gain on the sale of $1,355. In connection with this gain recognition on the sale, we considered the guidance of SAB Topic 5:E, *Accounting for a Divesture Of A Subsidiary or Other Business Operation* .

Under the terms of the notes receivable, we received proceeds due in installments through 2006. Although the notes do not bear interest, we have recorded the notes at a discount and accreted interest income over their outstanding terms. Between January 1, 2006 and December 31, 2006, we received scheduled principal repayments of $1,111 on the notes receivable, and have offset certain payables in amounts of $130 regarding collection of the notes receivable. As of December, 31, 2006, $250 of receivables have not yet been collected. However, we believe these amounts are fully collectible.

Summary operating results for the discontinued operating segment were as follows:

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | 2004 | 2005 | 2006 |
| Revenue | $ 49,332 | $ 23,221 | $ — |
| Costs and expenses | 44,986 | 23,650 | 193 |
| Income (loss) from discontinued operations | $  4,346 | $   (429) | $ (193) |

F-26

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

Balance sheet data included:

|  | As of December 31, | |
|---|---|---|
|  | **2005** | **2006** |
| Accounts and notes receivable, net | $1,848 | $ 391 |
| Other current assets | 4 | — |
| Other non-current assets | 578 | — |
| Assets of discontinued operations | $2,430 | $ 391 |
| Accounts payable | $ 931 | $ — |
| Other accrued expenses | 2,199 | 1,103 |
| Liabilities of discontinued operations | $3,130 | $1,103 |

**(5)  Long-lived Assets**

*Property and Equipment*

Property and equipment, stated net of accumulated depreciation and amortization, consisted of the following as of December 31, 2005 and 2006:

|  | **2005** | **2006** |
|---|---|---|
| Computer and equipment | $ 7,117 | $ 10,187 |
| Software | 5,117 | 6,367 |
| Furniture and fixtures | 834 | 785 |
| Leasehold improvements | 1,675 | 2,039 |
| Other equipment | — | 554 |
| Capitalized leases | 1,243 | 1,397 |
| Less: Accumulated depreciation and amortization | (9,504) | (13,101) |
|  | 6,482 | 8,228 |
| Website and internal software development costs | 14,162 | 31,169 |
| Less: Accumulated depreciation and amortization | (8,523) | (16,651) |
| Website and internal software development costs, net | 5,639 | 14,518 |
| Total property and equipment, net | $12,121 | $ 22,746 |

Depreciation expense for the years ended December 31, 2004, 2005 and 2006 was $5,373, $6,702 and $12,315, respectively. The cost of property and equipment under capital leases was $1,243 and $1,397 at December 31, 2005 and 2006, respectively. Accumulated depreciation for assets under capital leases was $278 and $751 at December 31, 2005 and 2006, respectively.

*Website and internal software development costs*

We capitalized a total of approximately $253, $647 and $1,385 during 2004, 2005 and 2006, respectively, relating to the development of the e-commerce platform. In addition, we capitalized costs incurred to develop certain internal use software of approximately $3,008, $6,729 and $15,622 in 2004, 2005 and 2006, respectively. We are amortizing the web development costs over a period of 18 months and internal use software costs over a period of 24 months. These costs are included in depreciation and amortization in the accompanying consolidated statements of operations. Amortization expense on

F-27

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

the e-commerce platform and other internal use software development costs was approximately $2,784, $3,749, and $8,127 during 2004, 2005 and 2006, respectively.

*Goodwill and intangible assets*

Amortizable intangible assets were comprised of the following:

| | December 31, 2005 | | |
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
|---|---|---|---|
| Software and technology | $ 1,123 | $ 1,045 | $ 78 |
| Customer contracts | 885 | 885 | — |
| Affiliate and carrier relationships | 3,960 | 676 | 3,284 |
| Non-compete agreement (a) | 5,049 | 1,431 | 3,618 |
| Other | 1,935 | 1,104 | 831 |
| Total | $ 12,952 | $ 5,141 | $ 7,811 |

(a)  On May 27, 2005, we completed the purchase of certain intangible assets of FONcentral.com, Inc. The aggregate consideration for the assets acquired was approximately $4,139 which consisted of $2,590 in cash, which included acquisition costs and accrued expenses of $151, plus 131,876 shares of common stock with a fair value equal to approximately $1,549.

| | December 31, 2006 | | |
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
|---|---|---|---|
| Software and technology | $ 90 | $ 31 | $ 59 |
| Affiliate and carrier relationships | 3,960 | 1,496 | 2,464 |
| Non-compete agreement | 5,049 | 3,788 | 1,261 |
| Supplier relationships | 3,730 | 628 | 3,102 |
| Other | 2,128 | 2,032 | 96 |
| Total | $ 14,957 | $ 7,975 | $ 6,982 |

Aggregate amortization expense for intangible assets subject to amortization was approximately $3,138 in 2005 and $4,752 in 2006. Estimated amortization expense based on current intangible balances is $2,301, $1,303, $1,303, $465, and $373 for the years ended December 31, 2007, 2008, 2009, 2010 and 2011, respectively.

The carrying value of intangible assets with indefinite lives was $4,840 and $1,110 for December 31, 2005 and 2006, respectively. Intangible assets with indefinite lives consisted of trade names. For the year ended December 31, 2005, we originally determined that a supplier relationship valued at $3,730 had an indefinite life as of the acquisition date. During 2006, we determined that as of the acquisition date, the supplier relationship had a useful life of ten years in accordance with SFAS No. 142. During the fourth quarter of 2006, we recognized $255 of amortization expense for the period from April 26, 2005 to December 31, 2005. We do not believe the impact of this adjustment in 2006 to be material to fiscal year 2006 or 2005 as a result of this change.

F-28

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

The following table reflects the changes to goodwill for the years ended December 31, 2005 and 2006:

| | WAS Segment | Data Services Segment | Total |
|---|---|---|---|
| Balance as of January 1, 2005 | $ 9,258 | $ 221 | $ 9,479 |
| Goodwill arising from the A1 Wireless acquisition | 17,988 | — | 17,988 |
| Goodwill arising from the VMC acquisition | 3,894 | — | 3,894 |
| Sale of Data Services software assets | — | (221) | (221) |
| Balance as of December 31, 2005 | 31,140 | — | 31,140 |
| Goodwill arising from the VMC acquisition | 7,083 | — | 7,083 |
| Balance as of December 31, 2006 | $ 38,223 | $  — | $38,223 |

**(6) Debt**

Debt consisted of the following:

| | December 31, | |
|---|---|---|
| | 2005 | 2006 |
| Borrowings under credit facility | $15,000 | $  — |
| Borrowings under term loan | — | 75,000 |
| Capital leases | 851 | 574 |
| | 15,851 | 75,574 |
| Less discount from warrant issuance | — | (11,447) |
| Less current maturities | (377) | (301) |
| Long-term debt | $15,474 | $ 63,826 |

**(a) $100 million term loan**

On November 7, 2006, we executed a $100,000 aggregate principal amount senior secured term loan with Goldman Sachs Credit Partners, L.P., Citicorp North America, Inc. and AP Inphonic Holdings Inc. bearing a fixed rate of interest of nine percent per annum and secured by substantially all our assets. As of November 7, 2006, the Goldman Sachs Group, Inc., an affiliate of Goldman Sachs Credit Partners, L.P., beneficially-owned approximately 15.5% of our common stock. This term loan matures in November 2011. Beginning in November 2009, we have the ability to repay principal on the loan without penalty and conversely, the lenders have the right to call the remaining outstanding principal of the debt without penalty. As additional consideration, we also granted the lenders warrants to purchase 1,250,000 shares of our common stock at an exercise price of $0.01 per share. We received proceeds of $75,000 aggregate principal amount of the term loan proceeds on November 7, 2006, and have the option to draw-down the remaining amount at a later date. Proceeds from the term loan will be used to repay all indebtedness under the existing credit facility, fund share repurchases of our common stock, and for general corporate and working capital needs. In conjunction with the loan transaction above, we terminated our credit facility with Comerica Bank and used proceeds from the term loan to repay the outstanding principal obligation of $19,924 plus accrued interest. For the period November 7, 2006 to December 31, 2006, we accrued $994 of interest on the term loan, which was included as accrued expenses and other current liabilities on the accompanying balance sheet at December 31, 2006.

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

Under the terms of the term loan, we are required to maintain certain minimum levels of EBITDA on a quarterly basis beginning December 31, 2006, maintain a minimum $25,000 cash balance at a certain financial institution beginning July 31, 2007, maintain a maximum level of capitalized expenditures and maintain certain other financial and non-financial covenants, including our delivery of our audited financial statements with the opinion of our independent registered public accounting firm within 90 days of our year-end in accordance with the financial statement delivery requirements under the term loan agreement. On May 1, 2007, we amended the term loan agreement to extend the draw date for an additional $25 million of borrowings to July 31, 2007. Additionally, we received an extension of time to satisfy the delivery requirements of our annual 2006 and first quarter 2007 financial statements and related certificates under the term loan agreement to May 31, 2007 and June 15, 2007, respectively. We were in compliance with the covenants under the term loan agreement.

The warrants to purchase 1,250,000 shares of common stock at $0.01 per share were valued at $13,715 using a Black-Scholes model. Assumptions used in the model included a five year term based on the contractual life, 72% volatility and a risk free rate of 4.6%. We estimated the fair value of our long-term fixed rate term loan using a discounted cash flow analysis based on a current borrowing rate of companies with a similar debt rating. We assumed a life of the debt equal to the earliest period in which we can repay or refinance the debt. The estimated fair value of the term loan with a fixed interest rate at 9.00% was $72,400. In accordance with APB No. 14, *Accounting for Convertible Debt and Debt Issued with Stock Purchase Warrants,* we allocated the $75,000 proceeds to the term loan and detachable warrants based on the relative fair value of each on a standalone basis. As such, $63,055 and $11,945 of the $75,000 proceeds were allocated to the term loan and the detachable warrants, respectively. The amount of proceeds allocated to the fair value of the detachable warrants has resulted in a discount of $11,945 on the term loan as of November 7, 2006. For the year ended December 31, 2006, $498 of this discount has been amortized using the effective interest method and reflected in interest expense. As of December 31, 2006, the remaining unamortized discount on the debt was $11,447.

As a result of the completion of the financing transaction, we incurred $1,368 of financing costs. For the period of November 7, 2006 to December 31, 2006, we have amortized $76 of these costs, which was reflected as interest expense. As of December 31, 2006, $495 and $797 of these costs are deferred and included in deferred costs and other current assets and deposits and other assets, respectively, on the accompanying balance sheet. Additionally, we are required to pay a $75 management fee on an annual basis. This fee is amortized over the annual period and included in interest expense on the accompanying consolidated statements of operations.

*(b)* **$25 million Credit Facility**

As of December 31, 2005, we maintained a revolving operating line of credit with Comerica Bank, ("Comerica"), which allowed for aggregate borrowing of up to $25,000 subject to certain limits based on accounts receivable and inventory levels and secured by substantially all our assets. At December 31, 2005, we had $15,000 outstanding the revolving line of credit and we had an additional $1,700 of availability under the line of credit based on the limits described above. Borrowings outstanding under the revolving line of credit accrued interest at the bank's LIBOR rate plus a margin of 2%. Interest payments were made on the last business day of each month. We were assessed a line of credit commitment fee quarterly by Comerica, based on the availability under the line of credit. We paid commitment fees of $25 during 2005. The revolving line of credit was repaid on November 7, 2006. At that time, the agreement with Comerica was terminated.

F-30

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

*(c)*    *Standby Letters of Credit*

At December 31, 2005 and 2006, we had approximately $400 and $38, respectively, of standby letters of credit in connection with vendor obligations.

*(c)*    *Capital Leases*

In 2004, 2005 and 2006, we entered into capital leases for the purchase of $635, $595 and $152 of leased computer equipment, respectively. Capital lease obligations totaled $851 as of December 31, 2005 and $574 as of December 31, 2006.

*(d)*    *Maturities of Long-Term Debt*

The aggregate maturities of long-term debt which included amounts outstanding under the term loan and capital lease obligations, at December 31, 2006, approximate the following: $301 in 2007; $216 in 2008; $75,031 in 2009 and $25 in 2010. Under the term loan agreement, we may repay or the lender may require the repayment of the debt on the third anniversary of the agreement. For the purpose of this presentation, we have included the contractual obligation due on the third anniversary. If not prepaid, the debt matures in November 2011.

**(7)    Capital Stock**

As of December 31, 2006, we had 200,000,000 and 10,000,000 authorized shares of common and preferred stock, respectively. At December 31, 2005 and 2006, there were 35,232,869 and 37,138,480 shares of common stock issued and outstanding, respectively. There were no shares of preferred stock outstanding as of December 31, 2005 and 2006.

During the year ended December 31, 2006, we issued 712,453 shares of our common stock related to contingent consideration related to business acquisitions in prior years as described in Notes 3 and 5; repurchased 350,261 shares under a stock repurchase program; issued 998,389 and 539,564 shares in connection with stock option exercises and lapses of restrictions on common stock, respectively; and 33,597 shares were issued in exercise of warrants and other events.

During the year ended December 31, 2005, we issued 625,617 shares of our common stock related to business and intangible asset acquisitions during 2005 as described in Notes 3 and 5; repurchased 1,081,487 shares under a stock repurchase program; issued 2,450,495 and 75,226 shares in connection with stock option exercises and lapses of restrictions on common stock, respectively; and 910,418 shares were issued in exercise of warrants and other events.

On November 19, 2004, we issued 6,500,000 additional shares of our common stock in an initial public offering, at a price of $19.00 per share for proceeds of $110,838 net of issuance costs of $4,017. In connection with this offering, we also issued 13,619,536 shares of common stock in exchange for all outstanding preferred stock.

*(a)*    *Preferred Stock*

In November 2004, upon the closing of the initial public offering, all issued and outstanding shares of our redeemable convertible preferred stock were automatically converted into approximately 13.6 million shares of common stock. Each share of Series A and B preferred stock outstanding was converted into common stock at an exchange ratio of 0.83 shares of common stock for 1 share of preferred stock. Each share of Series C, D, and D-1 preferred stock outstanding was converted into

F-31

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

common stock at an exchange ratio of 0.42 shares of common stock for 1 share of preferred stock. All other shares of preferred stock outstanding were converted into common stock at an exchange ratio of 0.33 shares of common stock for 1 share of preferred stock, as follows:

|  | Shares of common stock issued |
|---|---|
| Series A | 557,320 |
| Series B | 1,902,239 |
| Series C | 2,808,696 |
| Series D and D-1 | 4,412,779 |
| Series D-2 | 138,892 |
| Series D-3 | 264,261 |
| Series D-4 | — |
| Series D-5 | 224,132 |
| Series E | 3,311,217 |
| Shares of common stock issued for preferred stock | 13,619,536 |

**(b)   Common Stock**

Holders of shares of common stock are entitled to one vote per common share held on all matters voted on by the stockholders. Dividends may be declared and paid on common stock shares at the discretion of our board of directors and are subject to any preferential dividend rights of any outstanding preferred stockholders. No dividends on shares of common stock have been declared or paid through December 31, 2006.

**(c)   Repurchase of Common Stock**

In 2005 and 2006, our board had authorized us to repurchase shares of our common stock. For the period August 17, 2005 to December 31, 2005, we repurchased 1,018,487 shares of our common stock at an average price of $12.10 per share for approximately $13,088. In 2006, through August 6, 2006, we purchased an additional 62,761 shares of common stock at an average price of $8.01 per share for approximately $502.

On November 3, 2006, our board of directors authorized the repurchase of up to an additional $30,000 of our common stock through November 2007. The shares may be repurchased from time to time at prevailing market prices. The timing and amount of any shares repurchased will be based on market conditions and other factors. Repurchases may also occur under a Rule 10b5-1 plan, which permit shares to be repurchased when we may otherwise be precluded from doing so by laws prohibiting insider trading or by self imposed trading black out periods. There is no guarantee as to the exact number of shares that will be repurchased under the stock repurchase program, and we may discontinue purchases at any time. We intend to fund the share repurchases with cash on hand, proceeds from the term loan and cash generated from future operations. Between November 3, 2006 and December 31, 2006, we repurchased 287,500 shares of common stock at an average price of $11.25 per share for approximately $3,236.

**(d)   Stock-Based Benefit Plans**

*1999 Stock Incentive Plan*

Our 1999 Stock Incentive Plan (the "1999 Plan"), which was adopted by the board of directors in December 1999, provided for grants of stock-based awards from time to time to our employees,

F-32

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

officers, directors and consultants at exercise prices determined by the board of directors. Options granted under the 1999 Plan generally vest over a four-year period and expire ten years from the grant date. As of November 19, 2004, no additional options were available for grant under the 1999 Plan due to the adoption of the 2004 Equity Incentive Plan (the "2004 Plan").

*2004 Equity Incentive Plan*

The 2004 Plan, which was adopted by the board of directors and approved by the stockholders in September 2004, allows for grants of stock-based awards from time to time to our employees, officers, directors and consultants at exercise prices determined by the board of directors. Options to purchase a total of 3,000,000 shares of common stock were originally authorized for issuance under the 2004 Plan, which number was increased by up to an additional 3,987,853 as of December 31, 2006 from the following sources: (1) shares subject to options or other awards outstanding under the 1999 Plan as of the date of its termination which expire or otherwise terminate for any reason, without having been exercised or settled in full and (2) shares acquired under the 1999 Plan forfeited to us on or after the date of its termination.

For incentive stock options, the exercise price must be at least equal to fair market value at the date of grant. For nonqualified stock options, the option may be granted with an exercise price less than fair market value. Options granted under the 2004 Plan generally vest over a period to be determined by the administrator and expire ten years from the grant date. As of December 31, 2006, 434,272 options were available for future grant under the 2004 Plan.

During 2004, 2005 and 2006, we granted to non-employees options to purchase 86,600, 18,000 and 51,000, respectively, shares or our common stock, pursuant to the Plans. The estimated fair value of the options was determined using the Black-Scholes Model (see note 2(n)). The 51,000 options issued in 2006 only had a contractually stated life of 5 months. We recorded compensation expense relating to the options of approximately $1,232, $243 and $229, respectively, for the years ended December 31, 2004, 2005 and 2006.

The following table summarizes the activity for stock options granted to employees and non-employees for the year ended December 31, 2006. The intrinsic value of options exercised for the years ended December 31, 2005 and 2006 was $24,462 and $4,156, respectively.

| | Number of options | Weighted average exercise price | Range of exercise | Weighted average contractual term (years) | Aggregate intrinsic value |
|---|---|---|---|---|---|
| **Balance January 1, 2006** | 5,115,969 | 9.47 | 0.60 – $ 25.36 | | |
| Granted | 1,063,200 | 7.36 | 6.46 – 11.76 | | |
| Exercised | (998,389) | 5.74 | 0.60 – 10.07 | | |
| Forfeited | (1,137,677) | 12.44 | 1.80 – 25.36 | | |
| **Balance December 31, 2006** | 4,043,103 | $  9.01 | 0.60 – $ 25.36 | 7.67 | $  14,673 |
| Ending vested & expected to vest | 3,830,535 | $  8.97 | | 7.62 | $  14,021 |
| Exercisable at December 31, 2006 | 2,164,739 | $  8.63 | | 6.95 | $  8,405 |

F-33

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

Weighted average grant date fair value per share was $12.36, $10.26 and $4.65 as of December 31, 2004, 2005 and 2006, respectively.

Information regarding options outstanding at December 31, 2006 was as follows:

| | Options Outstanding | | Options Exercisable | |
|---|---|---|---|---|
| Range of exercise price | Number of options | Weight average remaining contractual life (in years) | Number of options | Weighted average exercise price |
| $ 0.60 – $3.90 | 289,290 | 6.0 | 209,751 | $ 2.26 |
| $ 5.88 – $ 5.88 | 1,459,157 | 7.3 | 1,005,660 | 5.88 |
| $ 6.46 – $ 6.46 | 504,200 | 9.2 | 3,000 | 6.46 |
| $ 6.51 – $ 7.80 | 545,688 | 6.6 | 377,188 | 7.80 |
| $ 10.00 – $ 14.04 | 463,938 | 8.5 | 197,678 | 12.13 |
| $ 15.25 – $ 15.28 | 303,410 | 8.5 | 122,139 | 15.26 |
| $ 15.60 – $ 15.60 | 19,168 | 5.7 | 19,168 | 15.60 |
| $ 16.00 – $ 16.00 | 98,512 | 7.8 | 55,467 | 16.00 |
| $ 16.49 – $ 16.49 | 128,500 | 8.6 | 62,250 | 16.49 |
| $ 25.36 – $ 25.36 | 231,200 | 8.1 | 112,438 | 25.36 |
| | 4,043,103 | 7.7 | 2,164,739 | $ 8.63 |

As of December 31, 2005 and 2006, the weighted average remaining contractual life of the options outstanding was approximately 8.2, and 7.7 years, respectively. Options to purchase 2,146,924 and 2,164,739 shares of common stock with a weighted average exercise price of $7.74 and $8.63 were exercisable at December 31, 2005 and 2006, respectively.

*Restricted Common Stock*

During the twelve months ended December 31, 2006, we granted 2,643,048 shares of restricted common stock to certain of our key employees. The restrictions on this common stock lapse and the stock vests over periods ranging up to 4 years from the grant date. The weighted average grant date fair value for such awards was $15.70 and $9.16 for 2005 and 2006, respectively. The following table summarizes the activity for restricted stock awards granted in 2006:

| | Number of Restricted Stock Awards | Weighted-average grant date fair value |
|---|---|---|
| Non-vested at January 1, 2006 | 1,137,878 | $ 15.58 |
| Granted | 2,643,048 | 9.16 |
| Vested | (539,564) | 14.38 |
| Surrendered for taxes | (51,221) | 15.19 |
| Forfeited | (225,492) | 14.02 |
| Non-vested at December 31, 2006 | 2,964,649 | $ 10.20 |

At December 31, 2005 and 2006 shares that have vested were included as outstanding shares in the calculations of basic and diluted weighted average shares.

F-34

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

*Stock Purchase Warrants*

Warrants to purchase shares of common stock were granted with exercise prices ranging between $0.01 and $15.60, and terms ranging between 5 and 9 years. The estimated fair value of the warrants granted was determined using the Black-Scholes Model. Weighted average grant date fair value per share of warrants granted in 2004 and 2006 were $11.44 and $8.36, respectively. There were no warrants granted in 2005.

The following table summarizes the activity for warrants to purchase common stock, including warrants granted in connection with long-term debt (see Note 6) in 2006:

| | Number of warrants | Weighted average exercise price | | Range of exercise |
|---|---|---|---|---|
| **Balance January 1, 2006** | | | | 0.03 - |
| | 787,863 | 8.44 | $ | 24.00 |
| Granted | | | | 0.01 - |
| | 1,816,324 | 2.30 | | 7.35 |
| Exercised | | | | 0.03 - |
| | (33,597) | 0.29 | | 2.49 |
| Surrendered for cashless exercise | | | | 0.03 - |
| | (1,291) | 2.30 | | 2.49 |
| Forfeited | (3,334) | 24.00 | | 24.00 |
| **Balance December 31, 2006** | | | | 0.01 - |
| | 2,565,965 | $ 4.48 | $ | 15.60 |

In April 2006, we issued an additional warrant to purchase 188,775 shares of our common stock to a vendor that is exercisable upon certain minimum performance conditions. The exercise price of the warrant will be based on the trading price of our common stock at the time the performance conditions are met by the vendor. Once it is probable that the vendor will achieve the performance conditions set forth under the terms of the warrant, the fair value of the warrant will be amortized to sales and marketing expense over the remaining contractual term of the vendor commitment. This warrant is excluded from the table above.

Pursuant to SFAS No. 128, warrants to purchase 1,250,000 shares of our common stock at $0.01 issued in connection with our term loan in November 2006 were included in the calculation of our basic weighted average shares outstanding for the purposes of calculating earnings per share as these warrants were exercisable for little cash consideration.

F-35

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

**(8) Income Taxes**

     SFAS No. 109 establishes financial accounting and reporting standards for the effects of income taxes. During the years ended December 31, 2004, 2005 and 2006, we did not have any income tax expense or benefit because a full valuation allowance was provided against our net deferred tax assets. As of December 31, 2005 and 2006, the components of the net deferred tax asset were as follows:

|  | 2005 | 2006 |
|---|---|---|
| Deferred tax assets: | | |
|    Accrued compensation | $ 2,482 | $ 7,953 |
|    Capitalized costs & other items | 2,931 | 2,666 |
|    Net operating loss carryforwards | 50,353 | 75,019 |
|       Total deferred tax assets | 55,766 | 85,638 |
| Deferred tax liabilities: | | |
|    Depreciation | (2,003) | (5,379) |
|    Acquired intangibles | (340) | (631) |
|    Other | (1,916) | (645) |
|       Total deferred tax liabilities | (4,259) | (6,655) |
| Net deferred tax assets | 51,507 | 78,982 |
| Less: Valuation allowance | (51,507) | (78,982) |
| | $ — | $ — |

     SFAS No. 109 requires us to evaluate the recoverability of our deferred tax assets on an ongoing basis. The assessment is required to consider all available positive and negative evidence to determine whether, based on such evidence, it is more likely than not that some portion or all of our net deferred assets will be realized in future periods. The ultimate recoverability of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible. Management considers the scheduled reversal of deferred tax liabilities, projected future taxable income, and tax planning strategies in making this assessment. Based upon such factors as the lack of a significant history of material profits, possible increases in expense levels to support growth, the fact that the market in which we compete is intensely competitive and characterized by rapidly changing technology, the lack of carryback capacity to realize the deferred tax assets, and the uncertainty regarding the market acceptance of new product offerings, management does not at this time believe it is more likely than not that we will realize the benefits of these net deferred tax assets. Therefore, a full valuation allowance against the net deferred tax assets has been provided as of December 31, 2005 and 2006.

     The net changes in the total valuation allowance, for the years ended December 31, 2005 and 2006 were an increase of $12,962 and $27,475, respectively. Approximately $5,465 of the valuation allowance relates to acquired deferred tax assets, and pursuant to the requirements of FAS 109 any subsequent recognition of these deferred tax assets will be applied to reduce goodwill and other intangibles.

     As of December 31, 2006, we had approximately $196,128 of available net operating loss (NOL) carryforwards. Due to ownership changes, certain of these NOL carryforwards are subject to limitations under Section 382 of the Internal Revenue Code. Generally, these limitations restrict the availability of NOL carryforwards on an annual basis. The net operating loss carryforwards will begin to expire in 2019.

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

We did not have any income tax expense or benefit nor make any cash payments for income taxes for the years ended December 31, 2004, 2005 and 2006. The difference between the expected income tax benefit for the years ended December 31, 2004, 2005 and 2006, computed by applying the U.S. federal income tax rate of 35%, and actual income tax benefit, was as follows:

|  | 2004 | 2005 | 2006 |
|---|---|---|---|
| Expected Federal income tax benefit | $(3,584) | $(13,368) | $(22,305) |
| Permanent differences | 45 | 76 | (25) |
| State income taxes, net of Federal benefit | (505) | (1,234) | (2,073) |
| Change in valuation allowance | 4,044 | 12,962 | 27,475 |
| Change in provisional rate/other | — | 1,564 | (3,072) |
| Income tax expense | $   — | $   — | $   — |

## (9) Segment Information

As a result of the sale of our MVNO operations on December 31, 2005, we believe we no longer have reportable segments as MVNE and Data Service Segments are immaterial to the consolidated entity.

## (10) Commitments and Contingencies

### Operating Leases

We lease office and warehouse space under various operating leases through 2009. Rent expense was approximately $1,088, $1,760, and $1,923 for the years ended December 31, 2004, 2005 and 2006, respectively. Minimum future lease payments under these operating leases as of December 31, 2006 approximate the following: $1,806 for 2007; $1,272 for 2008; and $1,001 for 2009.

### Legal Matters

On May 7 and 18, 2007, two putative federal securities law class actions were filed in the United States District Court for the District of Columbia on behalf of persons who purchased our common stock between August 2, 2006, and May 3, 2007. These substantially similar lawsuits assert claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, against us, our chief executive officer and our chief financial officer. These claims are related to our April 3, 2007, and May 4, 2007 announcements concerning our restatement of certain previously issued financial statements. Potential plaintiffs have until July 6, 2007, to move the court for appointment as lead plaintiff. We have not yet responded to the complaints. We are unable to estimate the amount of any potential claim arising from these matters at this time. We believe that the allegations contained within these class action lawsuits are without merit and intend to vigorously defend the litigation.

On August 5, 2004, Avesair, Inc., one of the companies the assets of which we acquired, filed suit against us demanding, among other matters, that we issue to Avesair shares of our common stock valued at approximately $4.0 million as of June 30, 2004. The stock demanded by Avesair represents the maximum value of shares that they could have earned for achieving certain performance-based targets under the asset purchase agreement. We believe the performance-based targets were not achieved and intend to vigorously contest this matter. However, any adverse resolution of this matter could have a material adverse impact on our financial results if we are required to issue additional shares and would result in dilution to our stockholders.

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

On May 3, 2007, the Federal Communications Commission (FCC) issued an Order of Forfeiture and Further Notice of Apparent Liability in which it imposed a forfeiture of $819,905 against us for being late in complying with certain regulatory obligations that arose in 2004 and 2005 from a business that we sold in December 2005. Those obligations included: registering with the FCC, filing certain reports, and paying certain Universal Service Fund fees. The FCC's order also proposed imposing an additional fine of $100,000 for not having maintained in 2006 and 2007 a license necessary to conduct the business that was discontinued by us in 2005. As we did not operate the business in 2006 and 2007 we will request that the proposed fine be dismissed. With regard to the forfeiture itself, we are evaluating our legal options, which include appealing the ruling in federal court and/or negotiating a different and possibly lesser forfeiture. This forfeiture issue was initially raised by the FCC in July 2005. We advised the FCC then, and believe now, that no fine is appropriate under the circumstances.

Fifteen related putative federal court class actions have been filed against us arising out of InPhonic-sponsored rebate offers for online purchases of wireless telephones. Several of these lawsuits also name either our current or former third-party rebate processor as a defendant. On October 25, 2006 we received a decision by the Judicial Panel on Multidistrict Litigation ("JPML") granting our motion to consolidate the federal court actions in the United States District Court for the District of Columbia before the Honorable Ellen Segal Huvelle. The consolidated amended class action complaint alleges, among other things, that we and our current or former third-party rebate processor (depending on the particular claim) violated the consumer protection laws of various States, various D.C. state laws and the federal RICO (anti-racketeering) statute in connection with our disclosure and implementation of the terms and conditions of rebate offers. The class action plaintiffs seek compensatory damages and/or restitution, statutory penalties and treble damages under D.C. consumer protection laws and RICO, attorneys' fees and punitive damages, as well as injunctions concerning the content of our websites. The federal lawsuit is in an early stage. We intend to vigorously defend that action but cannot predict its outcome.

On April 27, 2007 we and the Federal Trade Commission (FTC) announced that we had entered into a consent agreement with the FTC in which InPhonic agreed to clearly and prominently disclose certain information regarding its rebate offers, such as when consumers can expect to receive their rebates, any time period that consumers must wait before submitting a rebate request, and certain information that would disqualify a consumer from receiving a rebate. We also agreed to provide rebates within time frames and under terms and conditions reasonably specified by us in our communications with our customers. We also agreed to provide rebates to certain customers whom had previously been denied them. As required by its rules, the FTC has requested comment on the consent agreement and we expect that it will become effective shortly. We have accrued an estimate of our liability associated with this consent agreement in the accompanying financial statements.

On February 15, 2007, we reached a final settlement with the District of Columbia Attorney General's Office concerning our use of mail-in rebates. We have accrued for the settlement and estimated costs of compliance in the accompanying financial statements at December 31, 2006.

From time to time we are party to other disputes or legal proceedings. We do not believe that any of the pending proceedings are likely to have a material adverse effect on our business.

**(11) Related-Party Transactions**

Goldman Sachs Credit Partners, L.P., Citicorp North America Inc. and AP InPhonic Holdings, LLC hold shares of our common stock and are the lending agents with regards to our term loan. See Note 6.

F-38

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

Mr. Laurence E. Harris, a member of our board of directors since March 2006, is " *of counsel* " in the law firm of Patton Boggs LLP ("Patton Boggs"). The total cost of various legal services provided to us by Patton Boggs in 2006 was approximately $2,219. Mr. Harris does not share in any profits of Patton Boggs or any of the fees paid by us to Patton Boggs.

**(12) InPhonic, Inc., 401(k) Plan**

Our 401(k) Plan provides retirement and incidental benefits for its employees. As allowed under Section 401(k) of the Internal Revenue Code, the 401(k) plan provides tax-deferred salary deductions of up to 15% of compensation for eligible employees. Employees are eligible to participate beginning the first day of the quarter subsequent to their start of employment. We may make discretionary matching contributions to the 401(k) plan. We did not make any discretionary matching contributions during 2004, 2005 and 2006.

**(13) Quarterly Results (unaudited)**

The following sets forth unaudited selected financial data on a quarterly basis for the years ended December 31, 2005 and 2006.

| | Quarters Ended 2005 | | | |
| --- | --- | --- | --- | --- |
| | March 31 | June 30 | September 30 | December 31 |
| Revenue | $ 68,151 | $ 75,226 | $ 91,960 | $ 85,202 |
| Cost of revenue | 40,123 | 42,004 | 53,753 | 55,850 |
| Loss from continuing operations | (7,418) | (1,162) | (4,366) | (24,820) |
| Income (loss) from discontinued operations | 424 | (490) | (587) | (1,131) |
| Net loss | (6,994) | (1,652) | (4,953) | (24,596) |
| Basic and diluted loss per share: | | | | |
| Net loss from continuing operations | $ (0.22) | $ (0.04) | $ (0.12) | $ (0.70) |
| Net gain (loss) from discontinued operations | 0.01 | (0.01) | (0.02) | 0.01 |
| Basic and diluted net loss per share | $ (0.21) | $ (0.05) | $ (0.14) | $ (0.69) |
| Basic and diluted weighted average shares | 32,901,398 | 33,847,007 | 35,515,210 | 35,463,559 |

F-39

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

| | Quarters Ended 2006 | | | |
| | March 31 | June 30 | September 30 | December 31 |
|---|---|---|---|---|
| Revenue | $ 86,978 | $ 92,128 | $ 95,103 | $ 95,365 |
| Cost of revenue | 48,181 | 51,575 | 53,521 | 64,577 |
| Loss from continuing operations | (4,348) | (9,370) | (15,591) | (34,225) |
| Income (loss) from discontinued operations | 35 | (206) | 72 | (94) |
| Net loss | (4,313) | (9,576) | (15,519) | (34,319) |
| Basic and diluted loss per share: | | | | |
|    Net loss from continuing operations | $ (0.12) | $ (0.26) | $ (0.43) | $ (0.91) |
|    Net gain (loss) from discontinued operations | 0.00 | (0.01) | 0.00 | 0.00 |
|    Basic and diluted net loss per share | $ (0.12) | $ (0.27) | $ (0.43) | $ (0.91) |
| Basic and diluted weighted average shares | 35,348,335 | 35,856,253 | 36,304,160 | 37,688,951 |

*Restatement*

The unaudited selected financial data for the quarters ended March 31, June 30, and September 30, 2006 have been adjusted to reflect corrections of accounting errors that occurred in the respective periods from amounts originally reported in our Forms 10-Q for those periods as filed with the SEC. The following provides a summary of the corrections within each quarterly reporting period. We have amended our quarterly reports on Forms 10-Q for these periods to reflect these corrections:

*Quarter ended March 31, 2006* — During the three months ended March 31, 2006, we had recorded revenue for certain of our features activations and services commissions in which it was subsequently determined that collectibility was not reasonably assured pursuant to SAB 104. As a result we reduced our revenue and accounts receivable by approximately $393 for this adjustment. The impact on the unaudited selected financial data for the quarter ended March 31, 2006 was as follows:

| | Quarter Ended March 31, 2006 | | |
| | Reported | Adjustment | Restated |
|---|---|---|---|
| Revenue | $87,371 | $ (393) | $86,978 |
| Loss from continued operations | (3,955) | (393) | (4,348) |
| Net loss | (3,920) | (393) | (4,313) |
| Net loss from continuing operations per basic and diluted share | (0.11) | (0.01) | (0.12) |
| Net loss per basic and diluted share | (0.11) | (0.01) | (0.12) |

*Quarter ended June 30, 2006* — During the three months ended June 30, 2006, we had recorded activations and services revenue net of related reserves as a change in estimate of certain carrier commissions in dispute which we had previously deemed as collectible. Upon further evaluation, we believe that it was inappropriate to have recorded revenue associated with this matter until such commissions are collected from the carrier. In addition, we identified other errors related to the recording of activations and services revenue of approximately $923 as it was subsequently determined

F-40

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

that collectibility of these amounts was not reasonably assured based on our collection experience. Accordingly, we reduced our revenue and accounts receivable by approximately $3,674 for this matter.

In addition, we identified errors that occurred in the recordation of cost of revenue and accounts receivable in the amount of $627 that have been corrected in the accompanying financial statements. The impact on the unaudited selected financial data for the quarter ended June 30, 2006 was as follows:

|  | Quarter Ended June 30, 2006 | | |
|  | Reported | Adjustment | Restated |
|---|---|---|---|
| Revenue | $95,802 | $ (3,674) | $92,128 |
| Loss from continued operations | (5,069) | (4,301) | (9,370) |
| Net loss | (5,275) | (4,301) | (9,576) |
| Net loss from continuing operations per basic and diluted share | (0.14) | (0.12) | (0.26) |
| Net loss per basic and diluted share | (0.15) | (0.12) | (0.27) |

*Quarter ended September 30, 2006* — During the three months ended September 30, 2006, we identified errors in accounting for our activations and services revenue, equipment revenue and rebates and amounts paid to consumers as "customer accommodation credits" prior to our settlement with the Attorney General of the District of Columbia.

*Activations and services revenue* — We had recorded revenue for certain types of residual and churn bonuses due from wireless carriers for activations which occurred during the quarter. Upon further evaluation, we subsequently determined revenue recognition was in error as collectibility of such amounts was not reasonably assured pursuant to SAB 104 based on the nature of the amounts due and our lack of collection experience of similar items. Accordingly, we reduced revenue and accounts receivable by $2,916 and will not record revenue on such amounts until collections are received.

In addition, upon further evaluation of carrier commission receivable balances, we identified several receivable balances that the respective carriers were disputing. Based on correspondence and other information received from the carrier during the three months ended September 30, 2006, although we may continue our collection pursuits, we now believe that based on the nature of the carrier response we should have written off these balances during our third quarter. Accordingly we have reduced activation and services revenue and accounts receivable by $1,551 and will not record revenue on such items until collections are received.

*Equipment revenue* — We identified a deficiency in our process for recording certain fees due from consumers when they cancel their wireless service contract within specified time periods or the wireless device is not returned to us as is required under the contract with the customer. Specifically, in the third quarter we accrued revenue using estimated collection rates which were higher than our prior historical experience, in part because we were implementing new collection processes. As a result of this deficiency we reduced equipment revenue and accounts receivable $1,961 during the quarter.

*Consumer product rebates and rebates paid to consumers as "customer accommodation credits"* — We identified an error in accounting for accrued expenses and reserves for consumer product rebates ("accrued consumer liabilities") totaling $3,950 for the quarter. Of this amount, we determined that our reserve for such liabilities was understated $3,297 from payments made to consumers during the three month period which were outside our customary rebate validation process ("customer accommodation credits") which erroneously reduced accrued consumer liabilities when

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

paid rather than expensing such amounts. Accordingly, we increased general and administrative expenses and accrued consumer liabilities by $3,297 as of September 30, 2006. In addition, we identified that we underestimated our accrued consumer liability reserve requirements $653 as a result of misestimating the number of periods that continued to be subject to consumer rebate eligibility. Accordingly, we decreased equipment revenue and increased our reserve for accrued consumer liabilities for this amount.

*Other* — We identified of errors that occurred in the recordation of selling and marketing and general and administrative expenses cost of revenue and accounts receivable in the amount of $325 that also have been corrected in the accompanying financial statements. The impact on the unaudited selected financial data for the quarter ended September 30, 2006 was as follows:

|  | Quarter Ended September 30, 2006 | | |
|  | Reported | Adjustment | Restated |
|---|---|---|---|
| Revenue | $102,184 | $ (7,081) | $ 95,103 |
| Loss from continued operations | (4,888) | (10,703) | (15,591) |
| Net loss | (4,816) | (10,703) | (15,519) |
| Net loss from continuing operations per basic and diluted share | (0.13) | (0.29) | (0.43) |
| Net loss per basic and diluted share | (0.13) | (0.29) | (0.43) |

F-42

See report of Grant Thornton LLP, Independent Registered Public Accounting Firm on page F-2.

S-1

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Stockholders
InPhonic, Inc. and subsidiaries:

Under date of March 8, 2005, except as to note 1(c) and note 4, which are as of March 16, 2006, we reported on the consolidated statements of operations, stockholders' equity (deficit), and cash flows for the year ended December 31, 2004, as contained in the 2006 annual report on Form 10-K. In connection with our audit of the aforementioned consolidated financial statements, we also audited the related consolidated financial statement schedule. This financial statement schedule is the responsibility of the Company's management. Our responsibility is to express an opinion on this financial statement schedule based on our audit.

In our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

/s/ KPMG LLP

McLean, Virginia
March 8, 2005, except
as to note 1(c) and note 4,
which are as of March 16, 2006

S-2

**INPHONIC, INC. & SUBSIDIARIES**

**SCHEDULE II—VALUATION AND QUALIFYING ACCOUNTS**

| Description | Balance at beginning of period | Additions | | Deductions | Balance at end of period |
| | | Charged to costs and expenses | Charged to other accounts (in thousands) | | |
|---|---|---|---|---|---|
| **Year ended December 31, 2004** | | | | | |
| Deferred tax asset valuation allowance | $33,626 | $ 4,919 | $ — | $ — | $38,545 |
| Reserve for doubtful accounts | 246 | 706 | — | — | 952 |
| **Year ended December 31, 2005** | | | | | |
| Deferred tax asset valuation allowance | 38,545 | 12,962 | — | — | 51,507 |
| Reserve for doubtful accounts | 952 | 1,702 | (612)(a) | — | 2,042 |
| **Year ended December 31, 2006** | | | | | |
| Deferred tax asset valuation allowance | 51,507 | 27,475 | — | — | 78,982 |
| Reserve for doubtful accounts | 2,042 | 7,707 | — | — | 9,749 |

(a)    Represents amount included in discontinued operations due to the sale of Liberty Wireless in December 2005.

S-3

Consent of Independent Registered Public Accounting Firm

The Board of Directors
InPhonic, Inc. and Subsidiaries:

We consent to the incorporation by reference in the registration statements (No. 333-123601 and No. 333-133859) on Forms S-8 of InPhonic, Inc. and Subsidiaries (the "Company") of our reports dated March 8, 2005, except as to note 1(c) and note 4, which are as of March 16, 2006, with respect to the consolidated statement of operations, stockholders' equity (deficit), and cash flows for the year ended December 31, 2004, and the related financial statement schedule, which reports appear in the December 31, 2006, annual report on Form 10-K of the Company.

/s/ KPMG LLP

McLean, Virginia
June 4, 2007

**CERTIFICATION PURSUANT TO**
**SECTION 302 OF**
**THE SARBANES-OXLEY ACT OF 2002**

I, David A. Steinberg, certify that:

1. I have reviewed the Annual Report on Form 10-K, as amended, for the period ended December 31, 2006 of InPhonic, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: June 4, 2007

/s/ DAVID A. STEINBERG
**David A. Steinberg**
**Chairman of the Board and Chief Executive Officer**
**(Principal Executive Officer)**

## CERTIFICATION PURSUANT TO
## SECTION 302 OF
## THE SARBANES-OXLEY ACT OF 2002

I, George Z. Moratis, certify that:

1. I have reviewed the Annual Report on Form 10-K, as amended, for the period ended December 31, 2006 of InPhonic, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: June 4, 2007

/s/ George Z. Moratis
**George Z. Moratis**
**Executive Vice President**
**and Chief Accounting Officer**
**(Principal Financial and Accounting Officer)**

**Certification of Principal Executive Officer**
**Pursuant to 18 U.S.C. 1350**
**(Section 906 of the Sarbanes-Oxley Act of 2002)**

I, David A. Steinberg, Chairman and Chief Executive Officer (principal executive officer) of InPhonic, Inc. (the "Registrant"), certify that to the best of my knowledge, based upon a review of the Annual Report on Form 10-K, as amended, for the period ended December 31, 2006 of the Registrant (the "Report"):

(1) The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934, as amended; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant.

/s/ DAVID A. STEINBERG
**Name: David A. Steinberg**
**Date:  June 4, 2007**

**Certification of Principal Financial Officer**
**Pursuant to 18 U.S.C. 1350**
**(Section 906 of the Sarbanes-Oxley Act of 2002)**

I, George Z. Moratis, Executive Vice President and Chief Accounting Officer (principal financial and accounting officer) of InPhonic, Inc. (the "Registrant"), certify that to the best of my knowledge, based upon a review of the Annual Report on Form 10-K, as amended, for the period ended December 31, 2006 of the Registrant (the "Report"):

(1) The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934, as amended; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant.

/s/ GEORGE Z. MORATIS
**Name: George Z. Moratis**
**Date:  June 4, 2007**

# EXHIBIT Q

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

# FORM 8-K

---

### CURRENT REPORT

### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): February 22, 2007

---

# INPHONIC, INC.
(Exact name of registrant as specified in its charter)

---

| | | |
|---|---|---|
| **Delaware** | **000-51023** | **52-2199384** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| | |
|---|---|
| **1010 Wisconsin Avenue, Suite 600, Washington, DC** | **20007** |
| (Address of principal executive offices) | (ZIP Code) |

Registrant's telephone number, including area code: **(202) 333-0001**

---

(Former name or former address, if changed since last report.)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐    communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
Written

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Section 2 – Financial Information**

Item 2.02. Results of Operations and Financial Condition.

On February 22, 2007, InPhonic, Inc. issued a press release announcing its financial results for the three months and year ended December 31, 2006. A copy of the release is furnished as Exhibit 99.1 to this Report on Form 8-K.

The information in this section of this Report on Form 8-K and Exhibit 99.1 attached hereto shall not be deemed "filed" for the purposes of Section 18 of the Securities Exchange Act of 1934, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, except as shall be expressly set forth by specific reference in such filing.

**Section 9 – Financial Statements and Exhibits**

Item 9.01. Financial Statements and Exhibits.

(c)    Exhibits.

99.1        Press Release dated February 22, 2007.

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

INPHONIC, INC.

By:    /s/ Lawrence S. Winkler
Name:    Lawrence S. Winkler
Title:    Chief Financial Officer, Executive Vice
President and Treasurer

Date: February 22, 2007

**INDEX TO EXHIBITS**

**Exhibit No.**          **Description**

Exhibit 99.1        Press Release dated February 22, 2007.

# InPhonic

**FOR IMMEDIATE RELEASE**

### InPhonic Announces Financial Results for Fourth Quarter and Full Year 2006

*Reports Record Fourth Quarter and Full Year 2006 Results*
*Signs Fifth Major Wireless Carrier to Residual Compensation Agreement*
*Reaches Final Settlement with Attorney General's Office*

**WASHINGTON, February 22, 2007 (BUSINESS WIRE) — InPhonic, Inc. (NASDAQ:INPC)** , a leading online seller of wireless services and products, today reported financial results for the fourth quarter and full year ended December 31, 2006.

"We are very pleased with our fourth quarter and full year results. In 2006, InPhonic made substantial progress in transitioning our business by putting in place residual-based compensation agreements with most of the major wireless carriers, improving our customer service experience, expanding our industry leading online distribution channel with high-quality partners such as Best Buy, Staples and Amazon," said InPhonic's Chairman and CEO David A. Steinberg. "For 2007, we are focused on continuing the strong operational momentum of this past year while maintaining strong revenue growth, further improving operating and contribution margins and generating sustainable positive operating cash flow."

Revenue was $120.3 million for the fourth quarter 2006, compared to $85.2 million for the fourth quarter 2005. Loss from continuing operations for the fourth quarter 2006 was ($3.4) million or ($0.09) per basic and diluted share compared to a loss from continuing operations of ($24.8) million for the fourth quarter of 2005 or ($0.70) per basic and diluted share. Excluding the impact of rebate settlement and related expenses and restructuring costs of $4.5 million, income from continuing operations for the fourth quarter 2006 would have been $1.1 million or $0.03 per basic and diluted share.

Non-GAAP Adjusted EBITDA for the fourth quarter 2006 was $11.4 million, compared to non-GAAP Adjusted EBITDA of ($12.4) million for the fourth quarter 2005. Non-GAAP Adjusted EBT for the fourth quarter 2006 was $10.6 million, or $0.28 per basic share, compared to non-GAAP Adjusted EBT of ($14.6) million, or ($0.41) per basic share for the fourth quarter 2005.

Revenue was $405.7 million for the year ended December 31, 2006, compared to $320.5 million for the year ended December 31, 2005. Loss from continuing operations for the year ended December 31, 2006 was ($17.3) million or ($0.48) per basic and diluted share compared to a loss from continuing operations of ($37.8) million for the year ended December 31, 2005 or ($1.10) per basic and diluted share. Excluding the impact of rebate settlement and related expenses, settlement and earnout expenses and restructuring costs of $11.1 million, loss from continuing operations for the full year of 2006 would have been ($6.2) million or ($0.17) per basic and diluted share.

Non-GAAP Adjusted EBITDA for the year ended December 31, 2006 was $24.5 million, compared to non-GAAP Adjusted EBITDA of $7.2 million for the year ended December 31, 2005. Non-GAAP Adjusted EBT for the year ended December 31, 2006 was $21.5 million, or $0.59 per basic share, compared to non-GAAP Adjusted EBT of $0.4 million, or $0.01 per basic share for the year ended December 31, 2005.

Adjusted EBITDA is defined as net income (loss) from continuing operations before interest expense, taxes, depreciation and amortization, restructuring costs, other non-recurring costs and stock-based compensation. Adjusted EBT is defined as Adjusted EBITDA after deducting depreciation and amortization and adding back the effect of amortization related to acquired software and intangibles and internal software development. Adjusted

EBT per basic share is defined as the per share value of Adjusted EBT based on the outstanding common stock. Adjusted EBT per diluted share is defined as the per share value of Adjusted EBT on a fully-diluted basis.

During the fourth quarter of 2006, InPhonic generated positive cash flow of approximately $6.5 million from its operations. The company also had changes in working capital reflecting purchases of inventory for the holiday selling season which utilized prompt pay discounts from its suppliers. We also experienced heavy activation volumes in the latter half of the fourth quarter, due to the holiday selling season, which increased accounts receivable that have subsequently converted to cash in the first quarter of 2007.

## Fifth Major Wireless Carrier Signs Up For Residual Compensation

InPhonic recently signed an agreement with another major wireless carrier that provides for monthly residual commission payments. This represents the fifth major wireless carrier to enter into a residual compensation agreement with InPhonic. In addition, InPhonic has residual compensation agreements with two MVNO partners, Virgin Wireless and Amp'd Mobile. "We continue to be successful in negotiating residual based compensation over the life of a subscriber in exchange for a reasonable concession in near-term activation revenue," commented InPhonic CFO Larry Winkler. "We are very pleased with the economics of these residual compensation agreements and believe they are providing increased visibility and value to the business."

InPhonic ended 2006 with approximately 660,000 residual revenue subscribers.

## Final Settlement with District of Columbia Attorney General's Office

InPhonic has reached a Final settlement with the District of Columbia Attorney General's Office concerning the outstanding consumer protection lawsuit related to the use of mail-in rebates. The Company believes that it has adequately reserved for such settlement and does not expect any additional financial statement changes related to the settlement in the future.

## New Affinity and Distribution Partners

- Launched full suite wireless devices and wireless services on Amazon's wireless store. InPhonic now offers through its popular consumer brand Wirefly a wide range of activated cell phones, smartphones, PDAs and aircards with service plans from all the nation's leading wireless carriers. InPhonic also offers prepaid cell phones and cell phone accessories, and is the only third party merchant within the Amazon.com wireless store.
- Launched US Airways Dividend Miles Wireless and Air Tran A+ Rewards Wireless online stores that reward customers for their purchases of wireless products and services. US Airways and Air Tran join Delta and United as the third and fourth InPhonic operated travel related benefits wireless programs.

## Debt Financing Completed

During the quarter, InPhonic entered into a $100 million debt financing agreement with Goldman Sachs and Citigroup. The financing will be used for any or all of the following: (a) to repay all indebtedness under the Company's existing revolving operating line of credit, (b) to fund share repurchases by the Company and (c) for working capital needs and general corporate purposes. To date, $75 million has been drawn down. It is expected the balance will be drawn down in the first quarter of 2007. Following the completion of the debt financing, InPhonic announced a $30 million stock buyback program.

## Business Outlook

The following business outlook is based on current information and expectations as of February 22, 2007. The business outlook for first quarter and full year 2007 includes the near-term impact to revenue and Adjusted EBITDA of the addition of a fifth residual compensation carrier. It is currently expected that the outlook will not be updated until the release of InPhonic's next quarterly earnings announcement, notwithstanding subsequent developments; however, InPhonic may update the outlook or any portion thereof at any time.

| | FY 2007 | Q1 2007 |
|---|---|---|
| Revenue (in millions) | $500 - $510 | $108 - $110 |
| Adjusted EBITDA (in millions) | $33 - $35 | $4.5 - $5.5 |
| Adjusted EPS per basic and diluted share | $0.24 - $0.27 | $0.00 - $0.02 |

Adjusted EPS per basic and diluted share is defined as earnings per share as calculated on the face of the income statement adjusted for stock-based compensation expense and depreciation of intangibles.

## Non-GAAP Financial Measures

A reconciliation between GAAP and Non-GAAP results is shown immediately following the Unaudited Condensed Consolidated Statements of Cash Flows.

The Company believes that the presentation of the above Non-GAAP measures provides useful information to investors regarding certain additional financial and business trends relating to its financial condition and results of operations. The Company believes when U.S. GAAP results are viewed in conjunction with these Non-GAAP measures, investors are provided with a more meaningful understanding of the Company's ongoing operating performance. In addition, the Company's management uses these measures for reviewing the Company's financial results.

These measures should be considered in addition to results prepared in accordance with U.S. GAAP, but should not be considered a substitute for, or superior to, GAAP results. The Company has reconciled Non-GAAP financial measures included in this press release to the nearest GAAP measure. Investors are encouraged to review the related GAAP financial measures and the reconciliation of these Non-GAAP financial measures to their most directly comparable GAAP financial measure.

## Conference Call

Company management will be holding a conference call today, Thursday, February 22, 2007 at 5:00 PM Eastern Time to discuss its fourth quarter and year end 2006 financial results and provide a Company update.

The conference call can be accessed by calling the following phone numbers:

- 800-811-8845 (Domestic) or 913-981-4905 (International); passcode 9097544.
- The replay will be available through March 3, 2007 by dialing 888-203-1112 (Domestic) or 719-457-0820 (International); passcode 9097544.
- A link to an audio Webcast of the call will be available at http://investor.inphonic.com/ . An audio Webcast archive following the call will also be available at http://investor.inphonic.com/

## About InPhonic

Headquartered in Washington, D.C., InPhonic, Inc. (NASDAQ: INPC — News ) is a leading online seller of wireless services and products. InPhonic sells these services and products, and provides world-class customer service through websites that it creates and manages for online businesses, national retailers, member-based organizations and associations under their own brands. InPhonic also operates Wirefly ( www.wirefly.com ), a leading one-stop comparison mobile phones and wireless plans shopping site that has been awarded "Best of the Web" by Forbes magazine and "Best in Overall Customer Experience" by Keynote Performance Systems. InPhonic also delivers a full range of MVNO and mobility solutions to enterprise clients through its Mobile Virtual Network Enablement (MVNE) platform. Among many awards in its history, InPhonic holds the distinction as #1 Company of the Year on the INC. 500 for 2004. For more information on the company, its products and services, visit the InPhonic Corporate Web site at www.inphonic.com .

Click here to join our email alert list: http://www.b2i.us/irpass.asp?BzID=1461&to=ea&s=0

Forward-Looking Statements—This press release contains forward-looking statements under the Private Securities Litigation Reform Act of 1995, including, without limitation, all statements related to future financial performance, plans to grow our business and build our brand. Words such as "expect," "anticipate," "believe" and similar expressions are intended to identify forward-looking statements. These forward-looking statements are based upon our current expectations. Forward-looking statements involve risks and uncertainties. Our actual results and the timing of events could differ materially from those anticipated in such forward-looking statements as a result of these risks and uncertainties, which include, without limitation, risks related to our fluctuating operating results, seasonality in our business, our ability to acquire products on reasonable terms, our online business model, demand for our products, the strength of our brand, competition, our ability to fulfill orders and other risks detailed in our filings with the Securities and Exchange Commission, including our Annual Report on Form 10-K for the Year ended December 31, 2005 and our Quarterly Reports on Forms 10-Q. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this press release. All forward-looking statements are qualified in their entirety by this cautionary statement, and InPhonic undertakes no obligation to revise or update any forward-looking statements to reflect events or circumstances after the date hereof.

Contacts:

Investors:
InPhonic, Inc.
Gary Tiedemann
VP, Investor Relations VP, Public Relations
(202) 333-0001
gtiedemann@inphonic.com

Press:
InPhonic, Inc.
Tripp Donnelly
VP, Public Relations
(202) 333-0001
tdonnelly@inphonic.com

## INPHONIC, INC.
### Unaudited Condensed Consolidated Statements of Operations
### (in thousands, except share and per share amounts)

| | Three Months Ended December 31, | | Twelve Months Ended December 31, | |
|---|---|---|---|---|
| | 2005 | 2006 | 2005 | 2006 |
| **Revenue:** | | | | |
| Activations and services | $ 63,122 | $ 99,854 | $ 233,730 | $ 330,050 |
| Equipment | 22,080 | 20,478 | 86,809 | 75,639 |
|    Total revenue | 85,202 | 120,332 | 320,539 | 405,689 |
| **Cost of revenue, exclusive of depreciation and amortization:** | | | | |
| Activations and services | 326 | 777 | 1,221 | 2,653 |
| Equipment | 55,524 | 59,658 | 190,509 | 210,232 |
|    Total cost of revenue | 55,850 | 60,435 | 191,730 | 212,885 |
| **Operating expenses:** | | | | |
| Sales and marketing, exclusive of depreciation and amortization | 32,127 | 34,108 | 93,726 | 117,718 |
| General and administrative, exclusive of depreciation and amortization | 18,804 | 18,553 | 63,131 | 63,841 |
| Depreciation and amortization | 3,461 | 5,188 | 9,840 | 17,174 |
| Rebate settlement and related expenses | — | 4,019 | — | 7,859 |
| Settlement and earnout | — | — | — | 696 |
| Restructuring costs | — | 436 | 847 | 2,551 |
| Investment write-off | — | — | 228 | — |
|    Total operating expenses | 54,392 | 62,304 | 167,772 | 209,839 |
| **Operating loss** | (25,040) | (2,407) | (38,963) | (17,035) |
| **Other income (expense):** | | | | |
| Interest income | 591 | 713 | 2,167 | 2,329 |
| Interest expense | (371) | (1,738) | (970) | (2,638) |
|    Total other income | 220 | (1,025) | 1,197 | (309) |
|    Loss from continuing operations | (24,820) | (3,432) | (37,766) | (17,344) |
| **Discontinued operations:** | | | | |
| Income (loss) from discontinued operations | (1,131) | (94) | (1,784) | (193) |
| Gain on sale | 1,355 | — | 1,355 | — |
|    Total income (loss) from discontinued operations | 224 | (94) | (429) | (193) |
|    Net loss | $ (24,596) | $ (3,526) | $ (38,195) | $ (17,537) |
| **Basic and diluted net loss per share:** | | | | |
| Net loss from continuing operations | $ (0.70) | $ (0.09) | $ (1.10) | $ (0.48) |
| Net income (loss) from discontinued operations | 0.01 | — | (0.01) | — |
| Basic and diluted net loss per share | $ (0.69) | $ (0.09) | $ (1.11) | $ (0.48) |
| Basic and diluted weighted average shares outstanding | 35,463,559 | 37,688,951 | 34,417,954 | 36,312,970 |

| **Unaudited Stock-Based Compensation:** | Three Months Ended December 31, | | Twelve Months Ended December 31, | |
|---|---|---|---|---|
| (In thousands) | 2005 | 2006 | 2005 | 2006 |
| Sales and marketing | $ 440 | $ 687 | $ 2,201 | $ 2,891 |
| General and administrative | 3,883 | 3,287 | 15,585 | 9,860 |
| Restructuring costs | — | 201 | — | 1,513 |
| Income (loss) from discontinued operations | 574 | 114 | 832 | 112 |
| | $ 4,897 | $ 4,289 | $ 18,618 | $ 14,376 |

# INPHONIC INC.
## Condensed Consolidated Balance Sheets
### (in thousands, except share and per share amounts)

|  | December 31, 2005 | December 31, 2006 |
|---|---|---|
|  |  | (unaudited) |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 70,783 | $ 89,972 |
| Accounts receivable, net | 34,606 | 88,398 |
| Inventory, net | 19,680 | 23,164 |
| Prepaid expenses | 2,405 | 6,507 |
| Deferred costs and other current assets | 6,823 | 3,122 |
| Current assets of discontinued operations | 2,430 | 391 |
| Total current assets | 136,727 | 211,554 |
| Restricted cash and cash equivalents | 400 | 38 |
| Property and equipment, net | 12,121 | 22,639 |
| Goodwill | 31,140 | 37,327 |
| Intangible assets, net | 12,651 | 8,092 |
| Deposits and other assets | 3,058 | 9,212 |
| Total assets | $ 196,097 | $ 288,862 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 31,543 | $ 81,747 |
| Accrued expenses and other liabilities | 31,588 | 14,432 |
| Current portion of deferred revenue | 13,851 | 7,188 |
| Current maturities of long-term debt and capital leases | 377 | 301 |
| Current liabilities of discontinued operations | 3,130 | 1,103 |
| Total current liabilities | 80,489 | 104,771 |
| Long-term debt and capital lease obligations, net of current maturities | 15,474 | 63,826 |
| Deferred revenue, net of current portion | 284 | 478 |
| Total liabilities | 96,247 | 169,075 |
| Stockholders' equity: | | |
| Common stock, $0.01 par value | | |
| Authorized 200,000,000 shares at December 31, 2005 and December 31, 2006; issued and outstanding 35,232,869 and 37,138,480 shares at December 31, 2005 and December 31, 2006, respectively | 353 | 371 |
| Additional paid-in capital | 264,155 | 301,611 |
| Accumulated deficit | (164,658) | (182,195) |
| Total stockholders' equity | 99,850 | 119,787 |
| Total liabilities and stockholders' equity | $ 196,097 | $ 288,862 |

**INPHONIC, INC.**
**Unaudited Condensed Consolidated Statements of Cash Flows**
**(in thousands)**

| | Three Months Ended December 31, | | Twelve Months Ended December 31, | |
|---|---|---|---|---|
| | 2005 | 2006 | 2005 | 2006 |
| **Cash flows from operating activities:** | | | | |
| Net loss | $(24,596) | $ (3,526) | $ (38,195) | $(17,537) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | | | |
| Depreciation and amortization | 3,461 | 5,188 | 9,840 | 17,174 |
| Non-cash sales and marketing expense and other | — | 160 | — | 456 |
| Non-cash interest expense, net | 108 | 498 | 594 | 498 |
| Stock-based compensation | 4,897 | 4,176 | 18,618 | 14,264 |
| Gain from sale of Liberty Wireless | (1,355) | — | (1,355) | — |
| Non-cash write-off of investment | — | — | 228 | — |
| Cash generated by operations | (17,485) | 6,496 | (10,270) | 14,855 |
| Changes in operating assets and liabilities, net of assets and liabilities received from business acquisitions: | | | | |
| Accounts receivable | 7,705 | (31,852) | (15,916) | (53,446) |
| Inventory | 15,661 | (5,010) | (7,540) | (1,167) |
| Prepaid expenses | (454) | 146 | (1,721) | (5,577) |
| Deferred costs and other assets | (3,092) | (902) | (4,152) | 3,705 |
| Deposits and other assets | (1,238) | (652) | (2,595) | (2,805) |
| Accounts payable | (8,188) | 23,675 | 8,956 | 49,273 |
| Accrued expenses and other liabilities | 3,435 | (4,899) | 8,973 | (14,755) |
| Deferred revenue | (840) | (3,056) | 4,188 | (6,469) |
| Net cash used in operating activities | (4,496) | (16,054) | (20,077) | (16,386) |
| **Cash flows from investing activities:** | | | | |
| Capitalized expenditures, including internal capitalized labor | (3,091) | (6,647) | (11,836) | (22,172) |
| Cash paid for acquisitions | (111) | (673) | (8,781) | (4,662) |
| Cash paid for intangible assets | (193) | — | (2,725) | (193) |
| Purchase of short-term investments | — | — | — | (5,000) |
| Proceeds from the maturity of short-term investments | 5,005 | — | — | 5,000 |
| Proceeds from the sale of assets | 101 | — | 101 | 1,111 |
| Decrease (increase) in restricted cash and cash equivalents | 100 | (38) | 100 | 362 |
| Net cash provided by (used in) investing activities | 1,811 | (7,358) | (23,141) | (25,554) |
| **Cash flows from financing activities:** | | | | |
| Principal repayments on long-term debt | (69) | (20,033) | (284) | (21,784) |
| Borrowings on line-of-credit | — | — | 15,000 | 6,355 |
| Borrowings on term loan | — | 75,000 | — | 75,000 |
| Cash paid for repurchase of common stock | (9,998) | (3,235) | (13,088) | (3,738) |
| Proceeds from exercise of warrants and options | 2,010 | 4,115 | 11,679 | 5,296 |
| Net costs of initial public offering | (1) | — | (292) | — |
| Net cash provided by (used in) financing activities | (8,058) | 55,847 | 13,015 | 61,129 |
| Net increase (decrease) in cash and cash equivalents | (10,743) | 32,435 | (30,203) | 19,189 |
| Cash and cash equivalents, beginning of the period | 81,526 | 57,537 | 100,986 | 70,783 |
| Cash and cash equivalents, end of the period | $ 70,783 | $ 89,972 | $ 70,783 | $ 89,972 |
| **Supplemental disclosure of cash flows information:** | | | | |
| Cash paid during the period for: | | | | |
| Interest | $ 146 | $ 143 | $ 253 | $ 917 |
| **Supplemental disclosure of non-cash activities:** | | | | |
| Issuance of detachable warrants with term loan | — | 11,945 | — | 11,945 |
| Release of funds in escrow related to acquisitions | — | — | 10,700 | — |
| Issuance of common stock in business acquisitions | — | 21 | 8,209 | 5,202 |
| Issuance of warrant to purchase common stock to vendor | — | — | — | 3,228 |
| Purchase consideration in accrued liabilities | — | — | 3,000 | 224 |
| Inventory exchanged for advertising credits | — | — | — | 2,323 |
| Issuance of common stock in intangible asset purchase | — | — | 1,549 | — |
| Stock-based compensation capitalized as internal labor | — | 173 | — | 616 |
| Equipment purchased on capital lease | 229 | — | 595 | 152 |

**INPHONIC INC.**
**Reconciliation of non-GAAP measure to nearest comparable GAAP measures**
**(unaudited, in millions, except share and per share amounts)**

| | Three Months Ended December 31, | | Twelve Months Ended December 31, | |
| --- | --- | --- | --- | --- |
| | 2005 | 2006 | 2005 | 2006 |
| **Adjusted EBITDA and EBT:** | | | | |
| **Net loss from continuing operations** | $ (24.8) | $ (3.4) | $ (37.8) | $ (17.3) |
| Add back: | | | | |
|     Interest expense/(income) | 0.1 | 1.0 | (0.8) | 0.3 |
|     Depreciation and amortization | 3.5 | 5.2 | 9.8 | 17.2 |
|     Non-cash amortization of sales and marketing expense | — | 0.2 | — | 0.5 |
|     Restructuring costs | —- | 0.4 | 0.9 | 2.6 |
|     One-time and Non-recurring items | 0.4 | — | 8.9 | 0.7 |
|     Rebate settlement and related expenses | — | 4.0 | 0.0 | 7.9 |
|     Loss on investments | — | — | 0.2 | — |
|     Impact of Discontinued Operations | 4.1 | — | 8.0 | — |
|     Stock-based compensation | 4.3 | 4.0 | 18.0 | 12.8 |
| **Adjusted EBITDA** | **(12.4)** | **11.4** | **7.2** | **24.5** |
| | | | | |
| Depreciation and amortization adjustments: | | | | |
|     Depreciation and amortization | (3.5) | (5.2) | (9.8) | (17.2) |
|     Amortization related to acquired software and intangibles and internal software development | 1.2 | 4.4 | 3.1 | 14.2 |
| **Adjusted EBT** | $ (14.6) | $ 10.6 | $ 0.4 | $ 21.5 |
| | | | | |
| **Adjusted EBT per share** | | | | |
|     Basic | $ (0.41) | $ 0.28 | $ 0.01 | $ 0.59 |
|     Diluted | $ (0.41) | $ 0.27 | $ 0.01 | $ 0.58 |
| | | | | |
|     Basic weighted average shares | 35,463,559 | 37,688,951 | 34,417,954 | 36,312,970 |
| | | | | |
|     Diluted weighted average shares | 37,374,506 | 39,218,650 | 37,754,914 | 37,236,261 |

# EXHIBIT R

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# Form 10-K

**(Mark One)**

☒  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
  For the fiscal year ended December 31, 2006

**OR**

☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
  For the transition period from          to

**Commission File Number: 000-51023**

# INPHONIC, INC.
**(Exact name of Registrant as specified in its Charter)**

| | |
|---|---|
| **Delaware** | **52-2199384** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. employer identification number) |
| **1010 Wisconsin Avenue, Suite 600** | |
| **Washington, D.C.** | **20007** |
| (Address of principal executive offices) | (Zip Code) |

**(202) 333-0001**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| **Common Stock, par value $0.01 per share** | **NASDAQ Stock Market LLC** |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐  No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐  No ☒

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):
Large accelerated filer ☐    Accelerated filer ☒    Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐  No ☒

As of June 30, 2006, the aggregate market value of the common stock held by non-affiliates of the registrant was approximately $117,332,977.

As of May 21, 2007, 36,964,003 shares of the registrant's common stock were outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

None.

Table of Contents

**INPHONIC, INC.**

**INDEX**

**FORM 10-K**

|  |  |  | **Page** |
|---|---|---|---|
| **PART I** | | | |
| Item 1. | Business | | 3 |
| Item 1A | Risk Factors | | 12 |
| Item 1B | Unresolved Staff Comments | | 25 |
| Item 2. | Properties | | 25 |
| Item 3. | Legal Proceedings | | 25 |
| Item 4. | Submission of Matters to a Vote of Security Holders | | 26 |
| **PART II** | | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | | 27 |
| Item 6. | Selected Financial Data | | 30 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 32 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | | 47 |
| Item 8. | Financial Statements and Supplementary Data | | 48 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | | 48 |
| Item 9A. | Controls and Procedures | | 48 |
| Item 9B. | Other Information | | 51 |
| **PART III** | | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | | 52 |
| Item 11. | Executive Compensation | | 59 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | | 71 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | | 73 |
| Item 14. | Principal Accounting Fees and Services | | 74 |
| **PART IV** | | | |
| Item 15. | Exhibits, Financial Statement Schedules | | 77 |

2

Table of Contents

# PART I

**ITEM     1. BUSINESS**

*This annual report on Form 10-K contains forward-looking statements, within the meaning of the Securities Exchange Act of 1934 and the Securities Act of 1933, that involve risks and uncertainties. In some cases, forward-looking statements are identified by words such as "believe," "anticipate," "expect," "intend," "plan," "will," "may" and similar expressions. You should not place undue reliance on these forward-looking statements, which speak only as of the date of this report. All of these forward-looking statements are based on information available to us at this time, and we assume no obligation to update any of these statements. Actual results could differ from those projected in these forward-looking statements as a result of many factors, including those identified in the section titled "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and elsewhere. We urge you to review and consider the various disclosures made by us in this report, and those detailed from time to time in our filings with the Securities and Exchange Commission, that attempt to advise you of the risks and factors that may affect our future results.*

## Overview

We are a leading online seller of wireless services in the United States, based upon the number of activations. For 2006, we reported revenue from continuing operations of $369.6 million and a loss from continuing operations of $63.5 million. Since we began operations in 1999, we have grown our business, expanded our services and broadened our customer base through internal growth and acquisitions. We operate our business through three business units: Wireless Activation and Services ("WAS"); Mobile Virtual Network Enabler ("MVNE") Services; and Data Services.

*WAS.* We sell wireless service plans, devices and accessories and satellite television service plans through our own branded websites, which include Wirefly.com and VMCSatellite.com. We also sell services and devices to consumers through websites that we create and manage for third parties under their own brands. These third parties include online businesses, member-based organizations and associations and national retailers, whom we refer to collectively as marketers. We use our proprietary e-commerce information technology platform to activate, configure and ship wireless services and devices to customers. The WAS business unit accounted for $355.7 million or approximately 96% of our total revenue in 2006.

*MVNE Services and Data Services.* We offer marketers the ability to sell mobile virtual network operator ("MVNO") services to their customers under their own brands using our e-commerce platform and operational infrastructure. Under MVNE agreements, we give marketers the ability to sell wireless voice and data services and devices. This service utilizes the same e-commerce platform, operational infrastructure and marketing relationships we have developed for our WAS segment to sell wireless services and devices, resulting in what we believe is a cost-effective means of acquiring customers. Our unified communications services, or "data services," allow wireless carriers and us to provide customers with the ability to organize personal communications by providing access to e-mail, voicemail, faxes, contacts, scheduling, calendar and conference calling functionality through a website or telephone. The MVNE Services and Data Services business unit accounted for $13.9 million or 4% of our total revenue in 2006.

We believe our online business model connects wireless carriers, marketers and consumers of wireless services and devices more effectively and efficiently than traditional retail channels. Wireless carriers benefit from broader access to consumers who purchase wireless services and devices on the Internet, through our own branded websites, as well as through our marketing relationships with high-traffic websites. Marketers benefit by generating additional revenue from the marketing fees that we pay them for selling wireless services and devices through websites that we create and manage for them, using their brands. Marketers also benefit from our broad carrier relationships and selection of service plans and devices. Consumers benefit from competitive pricing, broad selection and the convenience of using the websites we create and manage, for purchasing wireless

3

Table of Contents

services and devices. Through agreements we have with the five largest wireless carriers in the United States, Cingular, Sprint Nextel, T-Mobile, Verizon and Alltel, as well as with several regional wireless carriers and MVNOs, we offer consumers a selection of at least four carriers in each of the top 100 U.S. metropolitan markets. Collectively, these carriers' networks cover 99.9% of the U.S. population.

Our proprietary e-commerce information technology platform integrates merchandising, provisioning, procurement, customer care and billing operations into a single system for the online sales of wireless services and devices. This platform, which includes a combination of internally developed and licensed technologies, has been designed to serve as a foundation for us to build upon, allowing us to offer additional products and services to maximize performance, scalability, reliability and security. For example, this platform supports both our own branded websites as well as the websites that we create and manage for third-party marketers. This allows us to manage the sale of wireless services and devices offered from wireless carriers as well as MVNO services offered by marketers under their own brands.

## Industry Overview

### The Internet and Online Commerce

Online shopping has grown substantially over recent years, providing businesses with a lower cost sales channel. This growth is primarily a result of the convenience, broader selection and breadth of product information available on the Internet. In addition, continued improvements in payment security and growing access to high-speed Internet connections have made online shopping increasingly efficient and attractive to consumers. According to Forrester Research, Inc., an independent research company, online retail sales will grow from $172 billion in 2005 to $329 billion in 2010, a compound annual growth rate of 14%.

Online businesses have a number of competitive advantages over traditional "bricks and mortar" businesses, including broader consumer reach, lower infrastructure costs and personalized, low-cost customer interaction. In addition, online businesses may quickly and efficiently adjust to changing consumer tastes and preferences by adjusting content, shopping interfaces, the product and service offerings and the prices of the offerings they feature on their websites. Furthermore, online businesses can more easily compile consumer data to increase opportunities for direct marketing and personalized services.

### The Wireless Services Industry

Consumers increasingly understand that wireless communications provide enhanced convenience, mobility and personal safety. As a result of these factors, wireless services have achieved widespread adoption, aided in part by the increasing availability and affordability of mobile communications products. According to Ovum Limited ("Ovum"), an independent research company, the estimated number of wireless subscribers in the United States has more than doubled over the past five years, from 97.0 million subscribers in 2000 to 216.8 million in 2006, representing 77% of the U.S. population. Ovum expects that by 2010, there will be 256.0 million wireless subscribers in the U.S, representing additional growth opportunities going forward.

This future growth in wireless subscribers is expected to come from a mix of services, including traditional post-paid and pre-paid service plans and wireless subscribers who purchase handset upgrades from the same wireless carrier. Ovum expects the handset service upgrade market, which represents current wireless subscribers who commit to a new contract with their current wireless carrier instead of switching to a new carrier, to grow from 71.7 million units in 2006 to 98.8 million in 2010. According to Compete, Inc, an independent research company, these upgrade subscribers spend 27% more on their wireless devices than first-time purchasers. According to Ovum, total annual gross subscriber additions will decrease from 72.8 million in 2006 to 71.9 million in 2010. Combined, these opportunities represented 144.6 million transactions in 2006, and Ovum expects this to grow to 170.7 million transactions in 2010, a 4.3% compound annual growth rate.

4

Table of Contents

### The Opportunity

Increased competition has resulted in consolidation among wireless carriers. As a result, carriers are under pressure to reduce their costs while remaining competitive. To combat these challenges, the wireless carriers continue to turn to the Internet as a cost-effective channel for the acquisition of customers, allowing them to boost profitability and increase their return on investment. Additionally, in order to increase network utilization, carriers continue to seek out new subscribers through new product offerings, such as family shared plans and mobile content and through mobile virtual network operators.

Because of these trends, consumers are faced with an increasingly complex and constantly changing selection of wireless service plans and devices. As the number of service plans offered by wireless carriers has increased, traditional retail channels have been unable to adequately satisfy customers' needs for real-time information regarding wireless services and devices. Retail stores typically feature wireless services and devices from only one or a limited number of wireless carriers, resulting in fewer options at any given store for consumers. As a result, consumers must either visit multiple stores or select from a limited choice of wireless offerings. In addition, traditional wireless retail stores typically offer higher wireless device prices to customers due to the costs of maintaining, managing and staffing a physical storefront. In contrast to the physical retail environment, the Internet offers consumers a number of advantages for purchasing wireless services and devices, including lower prices, broader service and device selection, convenience of comparison shopping and the ability to research available plans and devices. According to Compete, Inc., an independent research company, 80% of future wireless buyers indicated they will use the Internet to support their next wireless purchase. Almost 5 million of the prospective shoppers visiting the major carriers' wireless retail stores every month conduct detailed research on wireless handsets or service plans.

## Our Value Proposition

### Value to Consumers

We offer consumers a superior shopping experience, competitive prices, broad selection and the convenience of comparing and purchasing wireless services and devices on the Internet. Key advantages for consumers include:

- *Superior Shopping Experience* . Our websites provide consumers with access to an extensive amount of information on wireless services and devices. These websites contain user-friendly search functions and navigation tools to help consumers quickly and conveniently identify the wireless services and devices that match their selection criteria, such as monthly service cost, network coverage quality and device features. We also simplify the buying experience for consumers by allowing them to complete the transaction with an easy-to-use, one-page order form. We ship products directly to customers generally within 24 hours of order and credit approval and provide customers with updates throughout the provisioning and shipping processes. We also offer consumers the opportunity to order and test-drive their wireless phone, PDA/Smartphone or wireless PC card for 30 days, and, if they are not completely satisfied they can return the phone for another model or receive a refund.

- *Competitive Pricing* . We are able to offer consumers competitive pricing on wireless devices when they purchase a service plan due to the lower cost structure of our online business model. In addition, consumers also benefit from the ability to research and comparison shop for the best prices offered by the five largest wireless carriers in the U.S. and several regional carriers.

- *Broad Selection* . We are able to offer wireless service plans and equipment to consumers across the U.S. We have agreements with the five largest wireless carriers that provide service coverage to 99.9% of the U.S. population. In each of the top 100 U.S. metropolitan markets we offer service plans from at least four wireless carriers. Our websites also feature a broad selection of the latest wireless devices and accessories from the leading device manufacturers.

5

Table of Contents

- *Knowledgeable Customer Support* . Customers can request assistance at any point in the purchase process from our customer service representatives. Our customer service representatives have access to information about the service plans offered through our carrier relationships. As a result, our customer service representatives are better able to suggest service plans that meet the customers' requirements.

### Value to Marketers

We provide our marketers with websites, branded to their specifications, which allow them to sell wireless services and devices to consumers. Key advantages for marketers include:

- *Expanded Services* . Our e-commerce platform enables marketers to focus on marketing and branding, while relieving them of the operational burden associated with merchandising, provisioning, procurement, customer care and billing of wireless services.
- *Ability to Monetize Customers* . Our online business model creates new opportunities for marketers to monetize their customers by generating revenue from the sale of wireless services and devices. Our broad selection of products and services also allows marketers to address multiple demographic segments within their customer base, thus increasing their revenue opportunities.

### Value to Wireless Carriers

We provide wireless carriers, as well as one of the leading providers of satellite television services, with new subscribers to their networks. Key advantages for these carriers include:

- *Growing Customer Acquisition Channel* . The Internet is one of the fastest growing channels for selling wireless services and devices. We provide the wireless carriers and a satellite television provider with broader access to this channel through our own branded websites and through the private-labeled websites we create and manage for marketers. These providers also benefit from our ability to offer multiple service plan and device combinations on our websites and effectively implement marketing campaigns or special offers.
- *Lower Customer Acquisition Cost* . We believe that our online business model enables wireless carriers to acquire customers at a lower cost than they would incur using traditional retail channels.

## Our Strategy

Our objective is to become the leading online seller of wireless services and other communication services in the U.S. Key elements of our strategy to achieve this objective include:

*Focus on the Customer Shopping Experience* . We continue to refine our operations to provide a superior customer experience. We have enhanced navigation tools to help consumers quickly and conveniently identify the wireless services and devices that match their selection criteria, and have developed an online resource that gives consumers updates throughout the provisioning and shipping processes. The customer shopping experience is an important element in retaining customers and expanding the relationships we have developed with marketers who use their brands to market our products and services on their websites.

*Transition to Residual Compensation Model* . We continue to modify our agreements with the wireless carriers to enable us to be compensated based on the time period that a wireless subscriber remains a customer of the wireless carrier, which we refer to as residual compensation. Residual compensation agreements with the wireless carriers enable us to receive long-term recurring revenue associated with our wireless subscribers. Under these agreements with the wireless carriers, we generally receive a residual payment for each subscriber we activate for every month they pay their wireless bill. These residual payments continue for either the entire term of the subscriber's agreement with the wireless carrier or some other pre-determined time period. As of December 31, 2006, we had residual compensation agreements with three of the five largest wireless carriers in the U.S. In early 2007, we added a fourth major wireless carrier. In addition, we have residual compensation agreements with two MVNOs and a satellite provider.

Table of Contents

*Increase Our Customer Base* . We plan to target additional marketers in order to expand our sources of customers. We also plan to build consumer and market awareness by expanding the direct marketing of our wireless services and devices. Our plans include expanding our use of the "Powered by InPhonic" brand on the websites that we create and manage for marketers, purchasing online advertising to support our existing brands, such as Wirefly.com, VMCSatellite.com and mFly.com, and creating additional brands.

*Enhance Our Wireless Carrier Relationships* . As the wireless industry continues to consolidate, we continue to improve the automated interface between our e-commerce platform and the wireless carriers' systems as well as cooperate further with wireless carriers on marketing efforts.

*Sell Device Upgrades.* As wireless subscribers increasingly choose to upgrade their existing devices with their current wireless service providers, we will market device upgrade services. Currently, we have agreements with two major wireless carriers to enable us to provide device upgrade services.

*Cross-Sell Our Full Range of Products and Services to Existing Customers* . Most of our customers initially purchase a single product or service. We increase our revenue opportunities by offering additional products and services, such as satellite television service through VMCSatellite.com, mobile content through mFly.com, wireless accessories, enhanced wireless content, device protection plans and other communications services, to these customers at the point of sale or through follow-up communications such as opt-in emails, outbound calls and direct mail.

*Develop New Products and Services* . We believe that much of the future subscriber growth within the wireless services industry will be driven by consumer demands that are not served by the products and services currently offered by the wireless carriers. We have begun to market new products and services, including mobile content, device protection, accessories and other add-on services to address additional consumer demand. In 2007, we plan to explore opportunities to develop and launch new products, services and marketing opportunities.

## Our Services

### Wireless Activation and Services

We offer customers the ability to purchase wireless services, including satellite television, and devices directly from websites that we operate under our own brands, such as Wirefly.com and VMCSatellite.com. We use our proprietary e-commerce platform to activate, configure and ship wireless services and devices to customers.

We also sell wireless service plans and devices through websites that we create and manage for marketers. These private-labeled websites allow marketers to leverage their brands to sell wireless products and services to their customers. For each marketer for which we create and manage a website, we use that marketer's brand on the website and throughout the sales and customer support process. To acquire customers through marketer-branded websites, we leverage the same e-commerce platform, operational infrastructure and wireless carrier relationships that we use for our own branded websites.

### MVNE Services and Data Services

We utilize our e-commerce platform and operational infrastructure to extend our MVNE capabilities to marketers who want to offer branded wireless services to their customers through an MVNO without having to own or operate a wireless network or operational infrastructure. The MVNE services we offer include:

- merchandising, which includes creating, pricing and branding the voice and data service plans to be marketed to potential subscribers and the systems to support sales via e-commerce sites, call centers and retail stores;

7

Table of Contents

- provisioning, which includes determining subscriber credit-worthiness and service activation for both data and voice services;

- procurement, which includes the purchasing, order processing, programming, packaging and delivery of wireless devices to subscribers and managing returns;

- customer care, which includes pre-sale and post-sale customer service using Internet and Interactive Voice Response (IVR) self-service technologies;

- billing for voice and data services, which may also include collections; and

- mobile data applications including Wireless Application Protocol (WAP) services, Short Message Service (SMS) and Multi-media Messaging Service (MMS) messaging, and Over the Air (OTA) data service activation and content delivery such as ring tones and graphics.

Our unified communications service allows customers to organize and access email, voicemail, faxes, contacts, scheduling, calendar and conference calling functionality through both a website and a telephone.

### Relationships with Wireless Carriers

We sell our customers wireless service plans of the five largest and several regional carriers in the U.S. Collectively, these carriers' networks cover 99.9% of the U.S. population. Through our agreements with these carriers, we offer consumers a selection of wireless subscription plans from at least four carriers in each of the top 100 U.S. metropolitan markets. We also purchase wireless devices directly from these carriers and their designated distributors for sale to customers. We sell devices in conjunction with wireless service plans from the leading wireless device manufacturers including Audiovox, Kyocera, LG Electronics, Motorola, Nokia, palmOne, Research in Motion (RIM), Samsung, Sanyo and Sony Ericsson.

We provide wireless carriers with a cost-effective online channel to acquire subscribers for their service plans. The wireless carriers pay us commissions and bonuses for activating wireless subscribers onto their networks. We also receive additional financial benefits from the wireless carriers through market development funds and residual compensation generally paid on a monthly basis during the time period a subscriber remains a customer of the wireless carrier, wireless device discounts and other marketing incentives. For 2006, revenue from Cingular, T-Mobile and Sprint Nextel represented 36%, 17% and 15% of our total revenue, respectively. For 2004 and 2005, revenue from our top three wireless carriers represented 76% and 67% of our total revenue, respectively.

### Marketing

We have developed a marketing strategy designed to use our own branded websites as well as to use our marketers' brands to generate sales through their private-labeled websites that we create and manage. Our marketing and advertising efforts include online and offline initiatives, which primarily consist of the following:

- *Brand Development* . We continue to invest in the brands we own, such as Wirefly.com, VMCSatellite.com and mFly.com, in order to build brand awareness and attract new and repeat customers.

- *Online Search and Advertising.* We utilize online search engine advertising and targeted online advertising on highly-trafficked websites to acquire customers. We also utilize online marketing partners to generate customer leads to our own branded websites and we pay these marketers fees for successful customer leads.

- *Private-Labeled Websites* . We create and manage websites for online businesses, member-based organizations and associations and national retailers to sell wireless products and services on their websites using their own brands. We either share a portion of revenue with marketers or pay these marketers fees for wireless service plans and devices sold on their websites.

8

Table of Contents

- *Direct Marketing.* We utilize direct marketing programs to reach additional consumer segments for our products and services. These marketing programs include permission-based email and call transfer programs.

- *Affiliate Program.* We also acquire customers through an affiliate program that extends the reach of our advertising, drawing customers from a variety of websites. By joining our affiliate program, operators of other websites earn a fee for each wireless device and service plan sold through their website. We utilize a third-party vendor to manage the affiliate program.

## Operations and Technology

Our operations leverage a common, proprietary e-commerce information technology platform, which we have built using a combination of internally developed and licensed technologies. Our e-commerce platform integrates our merchandising, provisioning, procurement, customer care and billing operations into a single system for the online sale of wireless services and devices. Our e-commerce platform has been designed to serve as a foundation for us to build and offer additional products and services and to maximize performance, scalability, reliability and security.

### Merchandising

We sell wireless services and devices through our own branded websites as well as through private-labeled websites that we create and manage for marketers. Since we manage all these websites using the same e-commerce platform, we can update device and service plan pricing information across all the websites in real time. Additionally, we can tailor the wireless service and device offerings presented on any particular website in order to better target each marketer's customer base. The websites we create and manage contain user-friendly search functions and navigation tools to help customers quickly and conveniently identify the wireless service plans and devices that match their selection criteria.

### Provisioning

We process orders using a combination of our own proprietary software and commercially available software that we license from third parties. We believe that one of our key competitive advantages is our automated order processing system. Orders from customers are delivered in a common data format that permits us to exchange data with wireless carriers through our automated credit risk assessment and activation interfaces. We have customized these interfaces to integrate with each of our wireless carriers' networks for a fast, seamless exchange of data. Once the customer's risk profile has been determined, the order status management process system either activates the customer on the wireless carrier of their choice or automatically suggests an alternative service plan from another wireless carrier for which the customer is eligible.

We have designed systems we believe to be secure to protect our corporate data and the information we collect from consumers. Our websites operate on hardware and software co-located at a Tier-1 hosting facility offering redundant and reliable network connections, power, security and other essential services. To minimize downtime, we manage and monitor our websites 24 hours a day. Our operations center located in our Largo, Maryland facility has back-up power, including batteries and diesel-fueled generators. We have a disaster recovery plan that documents the necessary steps to recover critical systems if a disaster were to occur.

### Procurement

All customer orders are fulfilled at our operations center located in Largo, Maryland. When an order is approved for service by the wireless carrier, our automated order processing system assigns a wireless device to the order, activates the selected service plan and configures the device to the customer's specifications. We ship orders generally within 24 hours of approval by the wireless carrier.

9

Table of Contents

We track orders in real-time throughout the procurement process to enable us to maintain the appropriate levels of inventory. We use rigorous quality control processes and dedicated quality assurance personnel to minimize errors.

*Customer Care and Billing*

We are focused on providing a high quality customer shopping experience. As part of these efforts, we monitor and track interactions with each customer through our proprietary customer relationship management system. We deliver customer care through self-service websites, call center representatives, email correspondence and our interactive voice response system.

Our easy-to-navigate, self-service websites enable our customers to check order, rebate, return and exchange status in addition to reviewing service plan information. We operate call center facilities in Largo, Maryland and Reston, Virginia offering customer service, direct sales support and technical assistance by telephone or email. We have also entered into outsourcing agreements with vendors in India to provide additional support services. Using our call management system, our call center representatives can respond to inbound calls using scripts tailored to each marketer's specifications. To further improve efficiency, we employ an integrated voice response system to provide self-service capabilities to consumers for pre-sale and post-sale activities.

*Real-Time Measurement and Reporting Systems*

We have developed software applications to monitor the effectiveness of our marketing campaigns on a real-time basis. These applications produce reports that we share with marketers. These reports provide us with the number of unique visitors to our marketers' websites, numbers of orders taken, number of orders approved or pending approval and orders shipped. These reports allow us to measure the effectiveness of our marketing efforts and respond quickly to changes in market demand.

## Competition

The wireless services industry continues to evolve rapidly and, despite consolidation among carriers, remains highly fragmented and competitive. We believe we compete on the basis of selection of wireless carriers; devices and service plans; convenience; price; customer service and experience; network coverage; and website features and functionality. We believe we compete favorably on all of these terms.

Companies that compete with our wireless activation and services business include:

- wireless carriers, including those from which we procure services and devices, which sell their wireless services and devices to consumers through their own websites, traditional retail operations and direct sales forces;

- online distributors that sell wireless services and devices for a limited number of wireless carriers to consumers through their own websites, such as Amazon.com, Inc.; and

- mass market retailers that sell wireless services and devices to consumers from their retail store locations, such as Radio Shack, Best Buy, Circuit City and Wal-Mart.

We believe we compete favorably against others in the wireless activation and services business because we have agreements with the major wireless carriers and device manufacturers. These agreements enable us to provide consumers with a comprehensive selection of wireless services and devices that our competitors do not provide.

Companies that currently or potentially compete with our private-labeled MVNE business include:

- companies that provide billing and customer care for MVNO services that may potentially compete with us, if we begin to provide support for branded billing and customer call solutions for companies that sell private-labeled wireless services to their customer base, such as Amdocs, Comverse, Convergys, VeriSign and Visage; and

- back-office systems providers such as Accenture and IBM.

10

Table of Contents

We believe our ability to provide a single vendor solution for MVNE services that includes wireless carrier network integration, mobile data application billing, customer care and distribution services compares favorably to our competitors.

In our data services business, we compete against a variety of companies, including CallWave and j2 Global Communications and Parus Holdings. Our unified communications service bundles voicemail, email and fax services with additional services, including our wireless activation services. Our competitors provide voicemail, email and fax services, but we believe our ability to bundle these data services with additional services enables us to compete favorably because we can present an expanded service offering to potential customers.

Many of our existing and potential competitors have substantially greater financial, technical and marketing resources than we do. Additionally, many of these companies have greater name recognition and more established relationships in many of our market segments. These competitors may be able to adopt more aggressive pricing policies and offer customers more attractive terms than we can. We may face increasing price pressure from the wireless carriers. In addition, current and potential competitors have established or may establish cooperative relationships among themselves or with third parties to compete more effectively.

## Intellectual Property Rights

Our ability to compete and continue to provide technological innovation is substantially dependent upon our technology. We rely on general intellectual property law and contractual restrictions and to a limited extent, copyrights and patents to protect our proprietary rights and technology. These contractual restrictions include confidentiality agreements, invention assignment agreements and nondisclosure agreements with employees, contractors, suppliers and marketers. In addition, we pursue the registration of our trademarks and service marks in the United States and certain other countries. In the United States, we have registered "InPhonic," "Powered by InPhonic," "Wirefly," "Welcome to our Wireless World" and other service marks. We also have unregistered copyrights with respect to images and information set forth on our website and the computer code incorporated into our website. To date, we have obtained registration of four U.S. patents.

We cannot assure you that any of our service marks, patents or copyrights will not be challenged or invalidated. Despite the protection of general intellectual property law and our contractual restrictions, steps we have taken to protect our intellectual property may not prove sufficient to prevent misappropriation of our technology or to deter third-parties from copying or otherwise obtaining and using our intellectual property without our authorization.

## Government Regulation

We are not currently subject to direct Federal, state or local government regulation, other than regulations that apply to businesses generally. The wireless network carriers we contract with are subject to regulation by the Federal Communications Commission, or FCC. Changes in FCC regulations could affect the availability of wireless coverage these wireless network carriers are willing or able to sell. Also, changes in these regulations could create uncertainty in the marketplace that could reduce demand for our services or increase the cost of doing business as a result of costs of litigation or increased service delivery cost or could in some other manner have a material adverse effect on our business, financial condition or results of operations.

Any new legislation or regulation, or the application of laws or regulations from jurisdictions whose laws do not currently apply to our business, could have an adverse effect on our business.

## Employees

As of April 30, 2007, we had a total of 551 employees. None of our employees is covered by a collective bargaining agreement. We believe our relations with our employees are good.

11

Table of Contents

## ITEM 1A. RISK FACTORS

There are a number of important factors that could cause our actual results to differ materially from those that are indicated by forward-looking statements. These factors include, without limitation, those listed below and elsewhere in this Annual Report on Form 10-K.

### Risks Related to Our Business

***We have historically incurred significant losses and may not be profitable in the future.***

We have experienced significant net losses each year since our inception in 1999. For the year ended December 31, 2006 we had net losses of $63.7 million. As of December 31, 2006, we had an accumulated deficit of $228.4 million. We may continue to incur net losses, and we cannot assure you that we will be profitable in future periods. We may not be able to adequately control costs and expenses or achieve or maintain adequate operating margins. Our financial results may also be impacted by stock-based compensation charges and possible limitations on the amount of net operating loss carryforwards that we can utilize annually in the future to offset any taxable income. Our ability to achieve and sustain profitability will depend on our ability to generate and sustain substantially higher revenue while maintaining reasonable cost and expense levels. If we fail to generate sufficient revenue or achieve profitability, we will continue to incur significant losses. We may then be forced to reduce operating expenses by taking actions not contemplated in our business plan, such as discontinuing sales of certain of our wireless services and devices, curtailing our marketing efforts or reducing the size of our workforce.

Many of our expenses, such as compensation for employees and lease payments for facilities and equipment, are relatively fixed. We base these expense levels, in part, on our expectations of future revenue. A softening in demand for our product and service offerings, whether caused by changes in consumer spending, consumer preferences, weakness in the U.S. or global economies or other factors, may result in decreased revenue, significant changes in our operating results from period to period and may cause our net losses to increase.

***We expect our financial results to fluctuate, which may lead to volatility in our stock price.***

Our revenue and operating results may vary significantly from period to period due to a number of factors, including:

- the timing of introduction of popular devices by mobile phone manufacturers and our ability to accurately forecast and procure an adequate supply of such devices;

- timing of bonuses paid to us by wireless carriers;

- collectibility of our accounts receivable;

- seasonal fluctuations in both Internet usage and purchases of wireless services and devices;

- our ability to attract visitors to our websites and our ability to convert those visitors into customers;

- economic conditions specific to online commerce and the wireless communications industry;

- our ability to retain existing customers;

- delays in market acceptance or adoption by consumers of our services, including our MVNE services;

- delays in our development and offering of new wireless services and devices;

- changes in our use of sales and distribution channels;

- our ability to obtain wireless devices at competitive prices;

12

Table of Contents

- our ability to manage our activation, delivery and procurement operations and their related costs;

- the amount of our marketing and other advertising costs;

- our or our competitors' pricing and marketing strategies;

- our competitors' introduction of new or enhanced products and services;

- the extent to which overall Internet use is affected by spyware, viruses, and "phishing," spoofing and other spam emails directed at Internet users, viruses and "denial of service" attacks directed at Internet companies and service providers, and other events; and

- the amount and timing of operating costs relating to expansion of our operations.

***If we are unable to maintain strong relationships with wireless carriers, our business would be adversely affected.***

We depend upon a small number of wireless carriers for a substantial portion of our revenue and the loss of any one of these relationships could cause our revenue to decline substantially. In addition, the increasing consolidation in the wireless industry, as evidenced by Cingular's acquisition of AT&T Wireless and Sprint's merger with Nextel, has caused the number of wireless carriers to decline and could result in further revenue and pricing pressure. For fiscal years 2006 and 2005, revenue from Cingular, T-Mobile and Sprint Nextel each represented greater than 10% of our total revenue and an aggregate of 68% and 67%, respectively. Our wireless carriers could terminate their agreements with us without penalty and with little notice. Our agreements with these carriers are non-exclusive, and they have entered into similar agreements with our competitors, which may be on more favorable terms. Our revenue may decline if:

- one or more of the wireless carriers terminates its agreement with us or we are unable to negotiate extensions of these agreements on acceptable terms; or

- there is a downturn in the business of any of these wireless carriers; or

- there is continued significant consolidation in the wireless services industry.

In addition, if the wireless carriers were to discontinue allowing us to sell and activate wireless service plans on their networks and instead were to provide these activation services exclusively themselves, this would have a significant adverse effect on our revenue.

At December 31, 2006 and 2005, the three wireless carriers accounted for approximately 69% and 74% of our total accounts receivable, net of deactivation reserves. If we are unable to collect amounts due from these and the other wireless carriers, our business could be adversely affected. Collection of our accounts receivable is critical as such cash is a key source of our liquidity.

***The restatements of our consolidated financial statements may subject us to actions or additional litigation which could have an adverse effect on our business, results of operations, financial condition and liquidity.***

We have recently restated our unaudited financial statements for the quarterly periods ended March 31, 2006, June 30, 2006 and September 30, 2006 each as filed on Form 10-Q as well as the unaudited financial results for the quarter and year-ended December 31, 2006 included in the Company's earnings release issued on February 22, 2007. These restatements may result in civil litigation or other actions which could require us to pay fines or other penalties or damages and could have an adverse effect on our business, results of operations, financial condition and liquidity. The restatements may also result in negative publicity and we may lose or fail to attract and retain key customers, employees and management personnel as a result of these matters.

Table of Contents

***Certain consequences of our late filing of our Annual Report on Form 10-K for the 2006 fiscal year and our Quarterly Report in Form 10-Q for the fiscal quarter-ended March 31, 2007 under the federal securities laws may adversely affect our financial condition and results of operations, including our ability to raise capital.***

Our failure to file timely our Annual Report on Form 10-K for the 2006 fiscal year and our Quarterly Report on Form 10-Q for the fiscal quarter-ended March 31, 2007 may adversely affect our ability to access the capital markets. We are ineligible to use a "short-form" registration that allows us to incorporate by reference future reports on Form 10-K, Form 10-Q and other SEC reports into our registration statements, or shelf registration until we have filed all of our periodic reports in a timely manner for a period of twelve months. As a result, any attempt to access the capital markets could be more expensive or be subject to delays compared to if we were able to use a short-from registration.

***Because of the delayed filing of our periodic reports, we face delisting from NASDAQ which would adversely affect the trading price of our common stock.***

As a result of the restatement and the delayed filing of our periodic reports with the SEC, on May 14, 2007, we received a NASDAQ staff determination letter indicating that we had failed to comply with the filing requirement for continued listing set forth in NASDAQ Marketplace Rule 4310(c)(14) due to our failure to timely file our Form 10-Q for the period ended March 31, 2007, and that our securities are, therefore, subject to delisting from the Nasdaq Global Market. We previously received and announced a NASDAQ staff determination letter with respect to our failure to timely file this Form 10-K for the fiscal year ended December 31, 2006. We requested and subsequently attended a hearing before the NASDAQ Listing Qualifications Panel on May 24, 2007 to appeal both staff determinations and presented a plan to cure both filing deficiencies and regain compliance. The filing of this Annual Report on Form 10-K is part of that plan of compliance. Both Nasdaq delisting actions have been automatically stayed pending the Nasdaq Panel's decision, and our stock will continue to be listed on the Nasdaq Global Market until the Panel issues its decision and during any extension that is allowed by the Panel.

If the Nasdaq Panel does not grant our request for an extension and continued listing, the extension is not for the duration we requested, or we are unable to fulfill the plan to regain compliance or otherwise meet or maintain compliance with all of the NASDAQ listing requirements, our securities will be delisted from the NASDAQ Global Market. If we are delisted, we may apply for listing on another exchange, however, there is no assurance that we will meet the requirements for initial listing or maintain compliance with the continued listing requirements of such an exchange. Delisting from the Nasdaq Global Market would adversely affect the trading price of our common stock, significantly limit the liquidity of our common stock and impair our ability to raise additional funds.

***Our internal control and procedures for financial reporting may not ensure that our public filings include timely and reliable financial information.***

As discussed in Item 9A, Controls and Procedures, we identified and reported to our Audit Committee and independent registered public accounting firm six material weaknesses in our internal control over financial reporting, as of December 31, 2006.

These material weaknesses included the following:

- We did not maintain sufficient staffing of operational and financial resources;

- We did not always effectively communicate information to our finance department;

- We did not maintain effective controls over the recordation, accuracy and completeness of activations and services revenue and related accounts receivable;

- We did not maintain effective controls over the determination and accuracy of equipment revenue and related accounts receivable;

14

Table of Contents

- We did not maintain effective controls over the accuracy and completeness of consumer product rebate liabilities; and

- We did not maintain effective controls over the accuracy and completeness of costs of goods sold and amounts due from vendors.

As a result of these material weaknesses, we determined that our internal control over financial reporting was not effective as of December 31, 2006. These material weaknesses resulted in adjustments to our revenue, accounts receivable, inventories and cost of sales that cause us to restate our unaudited financial statements for the quarterly periods ended March 31, 2006, June 30, 2006 and September 30, 2006 each as filed on Form 10-Q as well as the unaudited financial results for the quarter and year-ended December 31, 2006 included in the Company's earnings release issued on February 22, 2007.

The effectiveness of our controls and procedures could be limited by a variety of factors, and the remedial measures that we adopted in response to the weaknesses identified may not be successful to prevent similar events from recurring. These factors could include the following:

- Faulty human judgment and simple error, omission or mistake;

- Fraudulent action of an individual or collusion of two or more people;

- Inappropriate override of procedures; and

- The possibility that our enhanced controls and procedures may still not be adequate to assure the timely and accurate preparation of information and the timely filing of our periodic reports with the SEC.

A failure to successfully implement and maintain effective internal control over financial reporting, including any ineffectiveness of the remedial measures we have implemented to address the material weaknesses in internal control over financial reporting, could result in a material misstatement of our financial statements that would not be prevented or detected or otherwise cause us to fail to meet our financial reporting obligations. This, in turn, could result in a loss of investor confidence in the accuracy and completeness of our financial reports, which could have an adverse effect on our stock price.

### *Ongoing consolidation among wireless carriers could result in revenue and pricing pressure and adversely impact our results of operations.*

In recent years, there has been a trend in the wireless industry toward consolidation of wireless carriers. Ongoing consolidation among the wireless carriers would reduce the number of companies whose wireless services we offer, which could adversely affect our results of operations. We rely on the leading wireless carriers for a substantial portion of our revenue, and we expect this to continue for the foreseeable future. We may be subject to pricing pressures that may result from a further consolidation among wireless carriers, which could have an adverse effect on our operations. If consolidation continues, the commissions and bonuses paid to us by wireless carriers could decrease or the prices charged to us for the supply of wireless devices could increase, resulting in a decrease in our gross margin.

### *A failure to continue to improve our customer experience could adversely affect our operating results.*

We operate in a very competitive environment and we believe that maintaining high overall customer satisfaction is a critical part of our ongoing efforts to promote the use of our own branded websites, as well as the private-labeled websites that we create and manage for our marketers, and to improve our operating results. We have had certain problems with our customer support operations and in fulfillment of orders and experienced some customer satisfaction issues related to rebates. To date, these problems have resulted in several lawsuits and federal and state investigations. If the efforts we have undertaken to improve our customer experience are unsuccessful, we could be subject to additional customer complaints, litigation, and investigations by state and

15

Table of Contents

federal regulatory authorities, which could be costly, could divert the attention of our management from our core business and could damage our reputation. If these issues are not resolved, our revenues and results of operations could be adversely affected.

### *In the event we do not meet our financial or affirmative covenants under our term loan, we cannot ensure the receipt of a waiver of or extension of time to comply with our covenants*

We have recently had to request waivers and or extensions of time to comply with the financial and affirmative covenants under our term loan. In the event that we do not meet the covenants under our term loan, we cannot ensure that our lending group will provide additional waivers or extensions in the future.

### *A decrease in the growth rate of our wireless service activations could adversely affect our operating results.*

A substantial portion of our revenue consists of commissions we earn from the wireless carriers for the activation of new customer accounts. We may also receive bonuses for meeting volume and other performance based targets. If the growth rate in the number of new activations declines or the customer churn rates increase, we may not earn these additional bonuses and our revenue could decline in the future.

### *We may require additional cash to upgrade and expand our operations, which may not be available on terms acceptable to us, or at all.*

Since our inception, our operating and investing activities have used more cash than they have generated. We expect our uses of cash over the next 12 months to include funding our operations, expanding our customer base, maintaining and enhancing our e-commerce platform and focusing on customer service. As of December 31, 2006, we had cash and cash equivalents of $90.0 million, including borrowings under our term loan of $75.0 million. While we believe that our current cash and cash equivalents, short-term investments, and amounts available under our term loan and trade credit available from wireless carriers and handset manufacturers will be sufficient to fund our working capital and capital expenditures through the foreseeable future, our revenue may not meet our expectations, we may be unable to control costs or we may incur additional expenses, including capital expenditures. In addition, for the 2006 fiscal year we entered into multiple amendments of our credit facility to extend the required date of delivery of audited financial statements for the year-ended December 31, 2006 to May 31, 2007. These amendments when applicable, also extended the required date for the delivery of financial statements for the quarter-ended March 31, 2007 to June 15, 2007. Although we have been able to obtain an extension of the period for compliance with this covenant, there is no assurance that we will be in compliance with our covenants in the future, and if we are not in compliance, that our lenders will agree to amend them. To remain competitive, we must continue to use cash to enhance and improve the functionality and features of our e-commerce platform and the websites we create and manage. If competitors introduce new services embodying new technologies, or if new industry standards and practices emerge, we may have to spend resources on the purchase or development of new functionalities or technologies. If we incur additional expenses or experience a revenue shortfall, our current resources may not be sufficient. We may then find it necessary to obtain additional financing. In the event that additional financing is required, we may not be able to raise it on terms acceptable to us, if at all.

### *The market for our services is becoming increasingly competitive with the emergence of additional retail and online distributors of wireless services and devices, which could adversely affect our business.*

We face substantial competition in the wireless services industry. We expect competition to intensify as a result of the entrance of new competitors and the development of new technologies, products and services. We compete with wireless carriers' retail stores and online websites, as well as other retail stores and online businesses that provide similar products and services in competition with us. All of our agreements with wireless carriers and wireless device suppliers are non-exclusive, and these parties may provide the same or similar services and devices to our competitors on terms more favorable than ours. Due to the low barriers to entry in

16

Table of Contents

this industry, with sufficient time and capital, it would be possible for additional competitors to replicate our services.

Many of our existing and potential competitors have substantially greater financial, technical and marketing resources than we do. Additionally, many of these companies have greater name recognition and more established relationships in many of our market segments. These competitors may be able to adopt more aggressive pricing policies and offer customers more attractive terms than we can. We may face increasing price pressure from the wireless carriers. In addition, current and potential competitors have established, or may establish, cooperative relationships among themselves or with third parties to compete more effectively.

***Increasing costs of online advertising and or misjudgments in making advance commitments to purchase online advertising could have an adverse affect on our financial results.***

Online advertising, the cost of which continues to increase, composes a significant portion of our marketing expenses. If the effectiveness of our online advertising does not keep pace with the increased costs, our financial results could be adversely affected. In addition, in order to secure more favorable terms or advertising placement, we sometimes make significant advanced financial commitments for advertising purchases based upon our anticipated needs. If our actual needs do not match such financial commitments, our results could be adversely affected.

***We depend on Internet search engines to attract a substantial portion of the customers who use our websites, and losing these customers would adversely affect our revenue and financial results.***

Many consumers access our services by clicking through on search results displayed by Internet search engines. Internet search engines typically provide two types of search results, algorithmic listings and purchased listings. Algorithmic listings cannot be purchased, and instead are determined and displayed solely by a set of formulas designed by the search engine. Purchased listings can be purchased by advertisers in order to attract users to their websites. We rely on both algorithmic and purchased listings to attract and direct consumers to our websites. Search engines revise their algorithms from time to time in an attempt to optimize their search results. If one or more search engines which we rely on for algorithmic listings modifies its algorithms, resulting in fewer consumers clicking through to our websites, we would need to increase our marketing expenditures or we would experience a reduction in our revenue, which would adversely affect our financial results. If one or more of the search engines which we rely on for purchased listings modifies or terminates its relationship with us, our expenses could rise and our financial results may suffer.

***Any unanticipated increase in our rate of deactivation of active accounts could result in a decrease in our revenue.***

Under our agreements with wireless carriers, commissions are not earned if the customer's service is deactivated with the carrier before a pre-determined period of time, usually between 90 and 180 calendar days. We maintain a reserve to cover the commissions expected to be lost through deactivations based upon our historical experience. We monitor a number of factors in determining this reserve. For example, our experience has been that customers who participate in a promotion that allows them to obtain a phone and activate an account with no up-front payment have a higher deactivation rate than customers who pay amounts in advance. If the rate of our deactivations increases in excess of our historical experience, we would have to increase our deactivation reserve, which, in turn, would cause our revenue to decline. Further, if our estimates vary materially for a future period or periods in relation to revenue and/or net income so that we conclude that our method of determining estimates is not sufficiently accurate, we may be required to change our method of accounting for these estimates. While a change in accounting for deactivations would have no impact on our cash flow, any such change may negatively impact our net income for particular periods and cause a decline in stock price. An increase in our deactivation rate could also cause carriers to modify the commission terms with us or even terminate our agreements.

17

Table of Contents

***If we do not continue to attract customers through our existing online marketing programs, our revenue may be affected adversely and our marketing expenses may increase.***

We obtain a large portion of our customers through incentive-based online marketing programs. We engage third parties to acquire customers through different marketing initiatives, including the use of websites that we create and manage under our marketers' brands. We also use online advertising and other forms of direct marketing. Our marketers may not continue to participate in our marketing programs if the programs do not provide sufficient value, our competitors offer better terms, the third parties elect to provide these products and services directly or the market for incentive-based advertising decreases. If our marketers do not market our services to their customers, our revenues will not grow as anticipated and our marketing expenses may increase.

***We face inventory risk.***

We are exposed to inventory risks as a result of seasonality, new product launches by equipment manufacturers, rapid changes in product cycles and changes in consumer tastes with respect to wireless devices. In order to be successful, we must accurately predict these trends and avoid overstocking or under-stocking wireless devices. Demand for wireless devices, however, can change significantly between the time we order the wireless devices and the date we sell these to customers. As a result, we may have too many or too few of certain inventory items, which may affect our revenues and ability to meet customer demands.

The acquisition of certain types of inventory, or inventory from certain sources, may require significant lead-time and prepayment, and such inventory may not be returnable. We carry a broad selection of wireless devices and maintain significant inventory levels of certain popular devices and we may be unable to sell products in sufficient quantities or during the relevant selling seasons.

Any one of the inventory risk factors set forth above may adversely affect our operating results.

***Announcements and delays relating to the release of new wireless devices could adversely affect our revenue.***

From time to time, the wireless industry is significantly affected by the introduction of new wireless devices that quickly capture a large share of the market. Announcements of new devices can result in customers deferring purchase decisions until such devices are available. Likewise, our ability to have access to a sufficient supply of such devices when available is important in order for us to meet customer demand. If customers delay purchases due to the announcement of new products or if we do not have access to a sufficient supply of new products to meet demand, it could have an adverse effect on our revenues and results of operations.

***An interruption in the supply of wireless devices could hinder our ability to fulfill customer orders and cause a decline in our revenue.***

We rely on wireless carriers and wireless device suppliers in fulfilling customer orders for wireless devices. These suppliers may experience difficulty in providing us sufficient wireless devices to meet our needs or they may terminate or fail to renew contracts for supplying us these devices on terms we find acceptable. Our agreements with these suppliers are non-exclusive, and these suppliers have entered into similar agreements with our competitors, which may be on more favorable terms. From time to time, we may experience delays in receiving shipments of wireless devices from one or more of the wireless device suppliers, thereby preventing us from offering a wireless device until the shipment is received. Any significant interruption in the supply of any of these devices could hinder our ability to fulfill customer orders and result in the loss of customers, causing a decline in our revenues.

***If our distribution operations are interrupted for any significant period of time, our business and results of operations would be substantially harmed.***

Our success depends on our ability to successfully receive and fulfill orders and to promptly deliver our products to our customers. Our packaging, labeling and product return processes are performed both internally

18

Table of Contents

through our own distribution operations and to a lesser extent, by a third party. Our distribution operations are located in a single facility that is susceptible to damage or interruption from human error, fire, flood, power loss, telecommunications failure, theft, terrorist attacks and similar events. In 2003, we experienced a one-day interruption in our distribution operations due to Hurricane Isabel. Any future interruptions in our distribution center operations for a significant period of time could damage our reputation and substantially harm our business and results of operations.

*Interruptions or delays in service from third parties could impair our service offerings.*

We rely on third parties for both our primary network operations hosting center and our back-up facility. Any disruption of our access to Internet service could result in delays in our ability to receive information or transact business. We also rely on third-party software, suppliers and wireless carriers to process applications for credit approval and to bill our customers. If we are unable to process credit applications in a timely manner or if our billing software fails and we are unable to bill customers on a timely basis, our business will be affected adversely. While we do have backup systems for certain aspects of our operations, our systems are not fully redundant and our disaster recovery planning may not be sufficient for all eventualities. From time to time we have experienced interruptions in these or other third-party services and if such disruptions were to occur in the future or their performances were to deteriorate, it could impair the quality of our services. If our arrangement with any of these third parties was terminated or if a third party ceased operations, discontinued business or altered the terms on which it does business with us, we might not be able to find an alternative provider on a timely basis or on reasonable terms, which would adversely affect our operating results.

*We have grown rapidly, and we must manage additional growth and the demands on our resources and personnel in order to be successful.*

We began operations in October 1999 and have grown rapidly since that time. Our growth has resulted, and any future growth will result, in increased responsibility for our management and increased demands on our resources. Our business strategy is based on the assumption that we will continue to retain qualified personnel who can expand our customer base and continue to develop and deliver innovative customer-driven solutions. We must continue to enhance and expand our business processes, information systems and operations to accommodate this growth. To manage future growth, we will need to:

- implement additional and improved management information systems;

- retain qualified personnel to manage our operating, administrative, financial and accounting systems;

- maintain and expand our wireless service and device activation capacity;

- continue to train, motivate, manage and retain our existing employees and attract and integrate new employees;

- expand our sales force to sell our new and existing offerings; and

- maintain close coordination among our executive, information technology, accounting and finance, sales and operations organizations.

If we are unable to manage future expansion, our ability to provide a high quality customer experience could be harmed, which would damage our reputation and substantially harm our business and results of operations.

*If we do not adequately protect our intellectual property, others could copy aspects of our services and operational technology, which could force us to become involved in expensive and time-consuming litigation.*

Our ability to compete and continue to provide technological innovation is substantially dependent upon our technology. We rely on a combination of intellectual property laws and confidentiality agreements to protect our technology. We generally enter into confidentiality and nondisclosure agreements with our employees, consultants and prospective and existing marketers. In addition, we seek to control access to our proprietary

19

information. Despite our efforts to protect our intellectual property, unauthorized parties may attempt to copy or otherwise obtain and use our services or technology. Although we are not aware of any unauthorized use of our intellectual property to date, effectively policing against the unauthorized use of our technology is time consuming and costly, and we cannot assure you that the steps taken by us will prevent misappropriation of our technology. Our failure to adequately protect our intellectual property rights could harm our business by making it easier for others to duplicate our services.

*If we are unable to maintain the integration of our services with the wireless carriers' existing credit and activation systems, we will be unable to process orders in a timely manner and our business may suffer.*

To activate wireless services for customers, we rely on access to the wireless carriers' proprietary credit and activation systems through direct data, online and telephone interfaces. If, as a result of technology enhancements or upgrades of these systems by the wireless carriers, we are unable to integrate our services with these systems, we could be required to redesign or upgrade our information systems or software which could be costly and negatively affect our operating results. If we are unable to gain access to these systems, we would be unable to process orders, the wireless carriers could terminate their underlying agreements with us, and our business may suffer.

*Our failure to protect our customers' confidential information and our network against security breaches could damage our reputation and substantially harm our business and results of operations.*

A significant barrier to online commerce is concern regarding the secure transmission of confidential information over public networks. Currently, a majority of our wireless service activations and device sales are billed to our customers' credit card accounts directly. We rely on encryption and authentication technology licensed from third parties to securely transmit confidential information, including credit card numbers. Advances in computing capabilities, new discoveries in the field of cryptography or other developments may result in a compromise or breach of the technology used by us to protect customer transaction data. Although we are not aware of any security breaches, any compromise of our security could damage our reputation and expose us to a risk of loss or litigation and possible liability which would substantially harm our business and results of operations. Although we carry general liability insurance, our insurance may not cover potential claims of this type or may not be adequate to cover all costs incurred in defense of potential claims or to indemnify us for all liability that may be imposed. In addition, anyone who is able to circumvent our security measures could misappropriate proprietary information or cause interruptions in our operations. We may need to expend significant resources to protect against security breaches or to address problems caused by breaches.

*If the technology we use infringes upon the proprietary rights of others, we may be forced to seek expensive licenses, reengineer our services, engage in expensive and time-consuming litigation or stop selling our services.*

If we were to discover that our services violated or potentially violated the proprietary rights of others, we might not be able to obtain licenses to continue offering those services without substantial reengineering. Any reengineering effort may not be successful, nor can we be certain that any licenses would be available on commercially reasonable terms. Although we have not been named a party in any litigation concerning the infringement of another party's rights, a claim of infringement against us, with or without merit, could be time consuming and expensive to litigate or settle, and could divert management's attention from executing our business plan. An adverse determination against us could prevent us from offering our services. From time to time, we receive notices from others claiming we have infringed upon their intellectual property rights. The number of these claims may increase. Responding to these claims may require us to seek expensive licenses, reengineer our services, engage in expensive and time-consuming litigation or stop selling our services.

*If we are unable to attract and retain management and key personnel, we may not be able to implement our business plan.*

We believe that the successful implementation of our business plan will depend on our management team, particularly the chairman of our board of directors and our chief executive officer, David A. Steinberg. Losing

20

Table of Contents

the services of one or more members of our management team could adversely affect our business and our expansion efforts, and possibly prevent us from further improving our information management, financial and operational systems and controls. As we continue to grow, we may need to hire and retain qualified sales, marketing, administrative, operating and technical personnel with knowledge of the wireless services industry and online marketing, and to train and manage new personnel. We may not be able to identify and hire qualified personnel due to competition for such personnel. The failure to hire and retain these personnel would have an adverse effect on our business.

***Our failure to identify and integrate successfully any businesses or technologies that we acquire may increase our costs and reduce our revenue.***

As part of our business strategy, we continue to seek to expand our service offerings through investments in, or acquisitions of, other businesses or technologies that we believe are complementary to our business. Although we regularly engage in discussions relating to potential acquisitions, we may not be able to identify, negotiate or finance any future acquisitions. If we do identify acquisitions, it may be necessary for us to raise additional funds to finance those acquisitions. Additional funds may not be available on terms that are favorable to us, or at all. If we issue our stock as consideration, our stockholders would experience dilution of their percentage ownership in our stock. Upon completion of any acquisitions, we may be unsuccessful in integrating and operating such acquired businesses profitably or otherwise implementing our strategy successfully. If we are unable to integrate any newly-acquired entities or technologies effectively, our business and results of operations could suffer. The time and expense associated with finding suitable and compatible businesses, technologies or services could also disrupt our ongoing business and divert our management's attention. In addition, we may be required to reduce the carrying amount on our balance sheet of any acquired intangible assets; this reduction would adversely affect our financial results in the period in which it occurs.

***Vendors in India support our operating activities. Any difficulties experienced with these services could result in additional expense or loss of customers and revenue.***

We have outsourcing agreements with vendors in India to provide additional activation and call center support. As a result, we rely on these vendors to provide customer service and interface with our customers. If these vendors are unable to perform satisfactory customer service, we could lose customers and would have to pursue alternative strategies to provide these services, which could result in delays, interruptions, additional expense and loss of customers. A variety of proposed federal and state legislation, if enacted, could restrict or discourage U.S. companies from outsourcing their services to companies outside the U.S. This legislation, if enacted, may impact our ability to use internationally outsourced services to support our call center activities.

## Risks Related to Our Industry

***If the online market for wireless services and devices does not gain widespread acceptance, our business would suffer.***

Our success will depend in part on our ability to attract consumers who have historically purchased wireless services and devices through traditional retail stores. Furthermore, we may have to incur significantly higher and more sustained advertising and promotional expenditures or price our products more competitively than we currently anticipate in order to attract additional online consumers and sell wireless services and devices to more customers. Specific factors that could deter consumers from purchasing wireless services and devices from us include:

- concerns about buying wireless devices without a face-to-face interaction with sales personnel and the ability to physically handle and examine the devices;

- pricing that does not meet their expectations;

- concerns about the security of online transactions and the privacy of personal information;

21

Table of Contents

- delivery time associated with Internet orders;

- delayed shipments or shipments of incorrect or damaged products;

- inconvenience associated with returning or exchanging purchased items;

- inability to maintain good standing with business rating services;

- failure to provide a positive customer experience for consumers; and

- possible disruptions, computer viruses or other damage to the Internet servers or to the consumers' computers.

***We may be exposed to risks associated with credit card fraud and identity theft that could cause us to incur unexpected expenditures and loss of revenue.***

Under current credit card practices, a merchant is liable for fraudulent credit card transactions when, as is the case with the transactions we process, that merchant does not obtain a cardholder's signature. Any failure to prevent fraudulent credit card transactions would adversely affect our business and our revenue. We do not currently carry insurance to protect us against this risk. We do not receive any revenue from fraudulently placed orders. We bear the risk of future losses as a result of orders placed with fraudulent credit card data or fraudulent identity information, even though the associated financial institution approved payment of the orders. In the event our credit card chargebacks from the processors exceed levels set by VISA, Mastercard or other credit card companies, we may lose our ability to process transactions which would have an adverse effect on our business.

***Our net sales may be negatively affected if we are required to charge taxes on purchases.***

We are not required to collect or are not subject to sales or other taxes related to the products we sell, except for certain corporate level taxes and sales taxes with respect to purchases by customers located in a limited number of states. However, one or more states or foreign countries may seek to impose sales or other tax collection obligations on us in the future. A successful assertion by one or more states or foreign countries that we should be collecting sales or other taxes on the sale of our products could result in substantial tax liabilities for past sales, discourage customers from purchasing products from us, decrease our ability to compete with traditional retailers or otherwise substantially harm our business and results of operations. Currently, decisions of the U.S. Supreme Court restrict the imposition of obligations to collect state and local sales and use taxes with respect to sales made over the Internet. However, a number of states, as well as the U.S. Congress, have been considering various initiatives that could limit or supersede the Supreme Court's position regarding sales and use taxes on Internet sales. If any of these initiatives addressed the Supreme Court's constitutional concerns and resulted in a reversal of its current position, we could be required to collect sales and use taxes in additional states. The imposition by state and local governments of various taxes upon Internet commerce could create administrative burdens for us, put us at a competitive disadvantage if they do not impose similar obligations on all of our online competitors and decrease our future sales.

***Government regulation of the Internet and e-commerce is evolving and unfavorable changes could substantially harm our business and results of operations.***

We are subject to general business regulations and laws as well as regulations and laws specifically governing the Internet and e-commerce. Existing and future laws and regulations may impede the growth of the Internet or other online services. These regulations and laws may cover taxation, restrictions on imports and exports, customs, tariffs, user privacy, data protection, pricing, content, copyrights, distribution, electronic contracts and other communications, consumer protection, the provision of online payment services, broadband residential Internet access and the characteristics and quality of products and services. It is not clear how existing laws governing issues such as property ownership, sales and other taxes, libel and personal privacy apply to the Internet and e-commerce. Laws or regulations may be enacted that prohibit use of mass emails or similar

22

Table of Contents

marketing activities. We may not be able to support the marketing of our products and services by mass email or other online means if such activities are adverse to our business. Even if no relevant law or regulation is enacted, we may discontinue use or support of these activities if we become concerned that customers deem them intrusive or they otherwise adversely affect our goodwill. Unfavorable resolution of these issues may substantially harm our business and results of operations.

***The wireless services industry may experience a decline in new subscriber growth rate.***

The wireless services industry has faced an increasing number of challenges, including a slowdown in new subscriber growth. According to Ovum, total annual gross subscriber additions will decrease slightly, for example showing a decrease in gross additions from 72.8 million in 2006 to 71.9 million in 2010. If the wireless services industry experiences a decline in subscribers, our business may suffer.

***We may be unable to effectively market our wireless services if wireless carriers do not deliver acceptable wireless networks and service plans, which would cause our revenue to decline.***

The success of our business depends on the capacity, affordability and reliability of wireless voice and data access provided by wireless carriers. Growth in demand for wireless voice and data services may be limited if wireless carriers fail to maintain sufficient capacity to meet demand for these services, delay the expansion of their wireless networks and services, fail to offer and maintain reliable wireless network services or fail to market their services effectively. We also depend on wireless carriers to provide credit verification and approval to activate wireless service for customers. If wireless carriers are unable to verify credit information in a timely manner, we may lose marketers and customers.

***Use of wireless devices may pose health risks or cause injuries, which could increase our exposure to litigation and result in increased operating expenses.***

Radio frequency emissions from wireless devices may be linked to various health concerns, including cancer, and may interfere with various electronic medical devices, including hearing aids and pacemakers. In addition, there have been reports that people have been injured by explosions of refurbished batteries in wireless devices. The actual or perceived risk of radio frequency emissions from wireless devices or the potential for battery explosions or other injuries could adversely affect our business through a decline in sales of wireless services and increased exposure to potential litigation.

## Other Risks

***The market price of our common stock has been and will likely continue to be subject to fluctuation.***

We have a rapidly evolving and unpredictable business model. The trading price of our common stock fluctuates significantly. Trading prices of our common stock may fluctuate in response to a number of events and factors, such as:

- quarterly and seasonal variations in operating results;

- changes in financial estimates and ratings by securities analysts;

- announcements by us or our competitors of new product and service offerings, significant contracts, acquisitions or strategic relationships;

- publicity about our company, our products and services, our competitors or e-commerce in general;

- additions or departures of key personnel;

- any future sales of our common stock or other securities; and

- stock market price and fluctuations in trading volume of publicly-traded companies in general and Internet-related companies and specialty retailers in particular.

Table of Contents

The trading prices of Internet-related companies and e-commerce companies have been especially volatile. In the past, securities class action litigation has often been brought against a company following periods of volatility in the market price of its securities. We may be the target of similar litigation in the future. Securities litigation could result in significant costs and divert management's attention and resources, which could substantially harm our business and results of operations.

*If securities or industry analysts do not continue to publish research or reports about our business, our stock price and trading volume could decline.*

The trading market for our common stock will depend in part on the research and reports that securities or industry analysts publish about us or our business. If one or more of the analysts who covers us downgrades our stock, our stock price would likely decline. If one or more of these analysts ceases coverage of our company or fails to regularly publish reports on us, interest in the purchase of our stock could decrease, which could cause our stock price or trading volume to decline.

*Anti-takeover provisions and other restrictions in our certificate of incorporation, bylaws and applicable law might discourage, delay or prevent a change of control of our company or changes in our management that our stockholders might find desirable.*

Our certificate of incorporation and bylaws provide for, among other things:

- a classified board of directors;
- restrictions on the ability of our stockholders to call special meetings of stockholders;
- restrictions on the ability of our stockholders to act by written consent;
- restrictions on the ability of our stockholders to remove any director or the entire board of directors without cause;
- restrictions on the ability of our stockholders to fill a vacancy on the board of directors; and
- advance notice requirements for stockholder proposals.

These provisions may have the effect of delaying or preventing an acquisition of us or changes in our management, even if stockholders of our company deem such changes to be advantageous. In addition, our board of directors is permitted to authorize the issuance of undesignated capital stock without any vote or further action by the stockholders. Because we are incorporated in Delaware, we are governed by the provisions of Section 203 of the Delaware General Corporation Law, which prohibits us from engaging in a business combination with an interested stockholder for a period of three years after the date of the transaction in which the person became an interested stockholder, unless the business combination is approved in a prescribed manner. These provisions and other provisions of the Delaware General Corporation Law applicable to us may restrain large stockholders, in particular those owning 15% or more of our outstanding voting stock, from consummating a merger or business combination with us without the approval of the board of directors, even if doing so would benefit our stockholders.

*Our ability to utilize net operating loss carryforwards to offset future taxable income may be limited.*

As of December 31, 2006, we had approximately $196.1 million of federal and state net operating loss carryforwards. Under the provisions of the Internal Revenue Code, substantial changes in our ownership may limit the amount of net operating loss carryforwards that can be utilized annually in the future to offset taxable income. If such a change in our ownership occurs, our ability to use our net operating loss carryforwards in any fiscal year may be significantly limited under these provisions.

24

Table of Contents

## ITEM 1B. UNRESOLVED STAFF COMMENTS

As part of a review by the Division of Corporation Finance of the Securities and Exchange Commission ("SEC") of a Current Report on Form 8-K filed by the Company on April 3, 2007 and subsequently amended on May 4, 2007 (the "Form 8-K"), the Company received a number of comments regarding the Form 8-K and certain annual and quarterly reports filed in 2006. These comments include questions related to the Company's accounting policy for revenue recognized related to equipment discount provision termination fees earned in 2006 that could impact disclosures included in certain of its Forms 10-Q filed in 2006. The Company is working to address the questions raised by the SEC. The SEC has also requested additional information from the Company related to the Form 8-K that, upon further review by the SEC, may result in additional comments from the SEC. Specifically, the SEC has requested information related to: (i) the error in recording accrued expenses and reserves for consumer product rebates; (ii) additional expenses for rebates paid to consumers as "goodwill" or "customer accommodations"; (iii) additional details related to accounting adjustments of approximately $3.0 million; and (iv) information regarding an error in marketing expenses of approximately $1.2 million that pertained to the fiscal year ended December 31, 2005.

## ITEM 2. PROPERTIES

Our principal offices are located in Washington, D.C., where we lease 15,780 square feet of office space under a lease that expires in November 2008. Our technology and operations centers are located in Largo, Maryland, where we lease approximately 51,667 square feet under a lease that expires in September 2009. We have operations in Reston, Virginia, where we lease approximately 32,552 square feet under multiple operating leases that expire between June 2007 and January 2008; and in Great Falls, Virginia, where we lease approximately 4,150 square feet under a lease that expires in August 2007.

## ITEM 3. LEGAL PROCEEDINGS

### Legal Matters

On May 7 and 18, 2007, two putative federal securities law class actions were filed in the United States District Court for the District of Columbia on behalf of persons who purchased our common stock between August 2, 2006, and May 3, 2007. These substantially similar lawsuits assert claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, against us, our chief executive officer and our chief financial officer. These claims are related to our April 3, 2007, and May 4, 2007 announcements concerning our restatement of certain previously issued financial statements. Potential plaintiffs have until July 6, 2007, to move the court for appointment as lead plaintiff. We have not yet responded to the complaints. We believe that the allegations contained within these class action lawsuits are without merit and intend to vigorously defend the litigation.

On August 5, 2004, Avesair, Inc., one of the companies the assets of which we acquired, filed suit against us demanding, among other matters, that we issue to Avesair shares of our common stock valued at approximately $4.0 million as of June 30, 2004. The stock demanded by Avesair represents the maximum value of shares that they could have earned for achieving certain performance-based targets under the asset purchase agreement. We believe the performance-based targets were not achieved and intend to vigorously contest this matter. However, any adverse resolution of this matter could have a material adverse impact on our financial results if we are required to issue additional shares and would result in dilution to our stockholders.

On May 3, 2007, the Federal Communications Commission (FCC) issued an Order of Forfeiture and Further Notice of Apparent Liability in which it imposed a forfeiture of $819,905 against us for being late in complying with certain regulatory obligations that arose in 2004 and 2005 from a business that we sold in December 2005. Those obligations included: registering with the FCC, filing certain reports, and paying certain Universal Service Fund fees. The FCC's order also proposed imposing an additional fine of $100,000 for not having maintained in 2006 and 2007 a license necessary to conduct the business that was discontinued by us in 2005. As we did not

Table of Contents

operate the business in 2006 and 2007 we will request that the proposed fine be dismissed. With regard to the forfeiture itself, we are evaluating our legal options, which include appealing the ruling in federal court and/or negotiating a different and possibly lesser forfeiture. This forfeiture issue was initially raised by the FCC in July 2005. We advised the FCC then, and believe now, that no fine is appropriate under the circumstances.

Fifteen related putative federal court class actions have been filed against us arising out of InPhonic-sponsored rebate offers for online purchases of wireless telephones. Several of these lawsuits also name either our current or former third-party rebate processor as a defendant. On October 25, 2006 we received a decision by the Judicial Panel on Multidistrict Litigation ("JPML") granting our motion to consolidate the federal court actions in the United States District Court for the District of Columbia before the Honorable Ellen Segal Huvelle. The consolidated amended class action complaint alleges, among other things, that we and our current or former third-party rebate processor (depending on the particular claim) violated the consumer protection laws of various states, various D.C. state laws and the federal RICO (anti-racketeering) statute in connection with our disclosure and implementation of the terms and conditions of rebate offers. The class action plaintiffs seek compensatory damages and/or restitution, statutory penalties and treble damages under D.C. consumer protection laws and RICO, attorneys' fees and punitive damages, as well as injunctions concerning the content of our websites. The federal lawsuit is in an early stage. We intend to vigorously defend that action but cannot predict its outcome.

On April 27, 2007 we and the Federal Trade Commission (FTC) announced that we had entered into a consent agreement with the FTC in which InPhonic agreed to clearly and prominently disclose certain information regarding its rebate offers, such as when consumers can expect to receive their rebates, any time period that consumers must wait before submitting a rebate request, and certain information that would disqualify a consumer from receiving a rebate. We also agreed to provide rebates within time frames and under terms and conditions reasonably specified by us in our communications with our customers. We also agreed to provide rebates to certain customers whom had previously been denied them. As required by its rules, the FTC has requested comment on the consent agreement and we expect that it will become effective shortly.

On February 15, 2007, we reached a final settlement with the District of Columbia Attorney General's Office concerning our use of mail-in rebates.

From time to time we are party to other disputes or legal proceedings. We do not believe that any of the pending proceedings are likely to have a material adverse effect on our business.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

No matters were submitted to a vote of our security holders during the fourth quarter of 2006.

26

Table of Contents

PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

Our common stock has been traded on The NASDAQ Global Market under the symbol "INPC" since November 16, 2004. Prior to that time, there was no public market for our common stock. The following table sets forth the high and low intraday sales prices for our common stock for the periods indicated as reported by the NASDAQ Global Market.

Because of the delayed filing of our periodic reports, we face delisting from NASDAQ which would adversely affect the trading price of our common stock. We requested and subsequently attended a hearing before the NASDAQ Listing Qualifications Panel on May 24, 2007 to appeal both staff determinations and presented a plan to cure both filing deficiencies and regain compliance. Both NASDAQ delisting actions have been automatically stayed pending the NASDAQ Panel's decision, and our stock will continue to be listed on the NASDAQ Global Market until the Panel issues its decision and during any extension that is allowed by the Panel. If the Nasdaq Panel does not grant our request for an extension and continued listing, the extension is not for the duration we requested, or we are unable to fulfill the plan to regain compliance or otherwise meet or maintain compliance with all of the NASDAQ listing requirements, our securities will be delisted from the NASDAQ Global Market.

|  | Stock Price | |
| --- | --- | --- |
|  | High | Low |
| **Year ended December 31, 2005** | | |
| First Quarter | $28.29 | $19.13 |
| Second Quarter | 23.98 | 12.21 |
| Third Quarter | 18.20 | 12.43 |
| Fourth Quarter | 15.84 | 8.45 |
| **Year ended December 31, 2006** | | |
| First Quarter | 9.53 | 5.02 |
| Second Quarter | 9.28 | 5.88 |
| Third Quarter | 8.50 | 5.66 |
| Fourth Quarter | 12.45 | 7.34 |

As of May 21, 2007, there were approximately 147 holders of record of our common stock. This figure does not represent the actual number of beneficial owners of our common shares because shares are frequently held in "street name" by securities dealers and others for the benefit of beneficial owners who may vote the shares.

We have never declared or paid cash dividends on our common stock. We currently intend to retain future earnings, if any, for use in the operation and expansion of our business and do not anticipate paying cash dividends in the foreseeable future. The declaration and payment of any dividends in the future will be determined by our board of directors, in its discretion, and will depend on a number of factors, including our earnings, capital requirements and overall financial condition. In addition, our ability to declare and pay dividends is substantially restricted under our secured credit facility.

During the quarter ended December 31, 2006, we issued the following shares of our equity securities that were not registered under the Securities Act of 1933:

(1) Warrants to purchase an aggregate of 1,250,000 shares of our common stock at an exercise price of $0.01 per share to our secured lenders;

(2) 2,247 shares of our common stock pursuant to the net exercise of warrants at an exercise price of $2.49 per share that were issued prior to our initial public offering; and

(3) 14,080 shares of our common stock pursuant to the net exercise of warrants at an exercise price of $0.03 per share that were issued prior to our initial public offering.

27

Table of Contents

The above-described issuances were exempt from registration (1) pursuant to Section 4(2) of the Securities Act, or Regulation D or Rule 144A promulgated thereunder, as transactions not involving a public offering, (2) pursuant to Rule 701 promulgated under the Securities Act or (3) as transactions not involving a sale of securities. With respect to each transaction listed above, no general solicitation was made by either us or any person acting on our behalf, the securities sold are subject to transfer restrictions and the certificates for the equity securities contained an appropriate legend stating such securities have not been registered under the Securities Act and may not be offered or sold absent registration or pursuant to an exemption therefrom. No underwriters were involved in connection with the sales of securities referred to above.

The following table provides information about purchases we made during the fourth quarter of 2006 of our equity securities that are registered by us pursuant to Section 12 of the Exchange Act. We purchased our common stock pursuant to the stock repurchase plan we announced in November 2006 authorizing the purchase of up to $30.0 million of shares of our common stock.

| Period | Total Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plan | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plan |
|---|---|---|---|---|
| November 1, 2006 to November 30, 2006 | 90,000 | $ 11.37 | 90,000 | $ 28,976,273 |
| December 1, 2006 to December 31, 2006 | 197,500 | 11.20 | 197,500 | 26,764,448 |
| Fourth quarter 2006 totals | 287,500 | $ 11.25 | 287,500 | $ 26,764,448 |

Repurchases may take place in the open market or in privately negotiated transactions, including derivative transactions, and may be made under a Rule 10b5-1 plan. Outside of the stock repurchase program, we acquired 13,453 shares of our common stock during the fourth quarter of 2006 from certain of our employees in satisfaction of their payroll tax withholding obligations related to restricted stock awards that had lapsed during the period. The average market price per share acquired was $11.39.

Table of Contents

## STOCK PERFORMANCE GRAPH

This performance graph shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act") or otherwise subject to the liabilities under that Section and shall not be deemed to be incorporated by reference into any filing of InPhonic under the Securities Act of 1933, as amended or the Exchange Act.

The following graph shows the cumulative total return resulting from a hypothetical $100 investment in the Company's common stock on November 16, 2004, the date of its initial public offering, through December 31, 2006. Stock price performance over this period is compared to the same amount invested in the Nasdaq Composite Index and the Goldman Sachs Internet Index over the same period (in each case, assuming reinvestment of dividends). This graph is presented as required by SEC rules. Past performance might not be indicative of future results. While total stockholder return can be an important indicator of corporate performance, we believe it is not necessarily indicative of its degree of success in executing its business plan, particularly over short periods.



| | Measurement Point | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 11/16/04 | 12/04 | 3/05 | 6/05 | 9/05 | 12/05 | 3/06 | 6/06 | 9/06 | 12/06 |
| INPHONIC, INC. | $ 100.00 | $114.50 | $94.65 | $63.54 | $ 57.29 | $ 36.21 | $ 29.13 | $ 26.25 | $ 33.00 | $ 46.21 |
| NASDAQ COMPOSITE | 100.00 | 104.66 | 96.18 | 98.96 | 103.52 | 106.10 | 112.56 | 104.50 | 108.65 | 116.20 |
| GOLDMAN SACHS INTERNET | 100.00 | 110.23 | 96.40 | 99.69 | 110.34 | 126.85 | 120.44 | 108.34 | 108.15 | 123.49 |

29

Table of Contents

## ITEM 6. SELECTED FINANCIAL DATA

The following tables set forth certain of our historical consolidated financial data for the five years ended December 31, 2006. The Selected Financial Data should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Business," and our consolidated financial statements, related notes thereto and other financial information included in the consolidated financial statements.

In December 2005, we sold the operating assets of our MVNO business. As a result and in accordance with Statement of Financial Accounting Standards No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets* ("SFAS No. 144"), we classified these operations as discontinued operations and, accordingly, have segregated the revenue and expenses of the discontinued operation in the selected consolidated statement of operations for all periods presented. Please refer to Note 4 of the notes to the consolidated financial statements included elsewhere in this annual report on Form 10-K. (In thousands except share and per share amounts).

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006** |
| Revenue: | | | | | |
| Activations and services | $ 46,701 | $ 86,825 | $ 123,265 | $ 233,730 | $ 298,090 |
| Equipment | 10,604 | 13,251 | 31,603 | 86,809 | 71,484 |
| Total revenue | 57,305 | 100,076 | 154,868 | 320,539 | 369,574 |
| Cost of revenue, exclusive of depreciation and amortization: | | | | | |
| Activations and services | 5,609 | 3,866 | 1,752 | 1,221 | 2,653 |
| Equipment | 30,269 | 45,426 | 83,075 | 190,509 | 215,201 |
| Total cost of revenue | 35,878 | 49,292 | 84,827 | 191,730 | 217,854 |
| Operating expenses: | | | | | |
| Sales and marketing, exclusive of depreciation and amortization | 17,559 | 26,398 | 42,867 | 93,726 | 118,756 |
| General and administrative, exclusive of depreciation and amortization | 27,363 | 31,422 | 34,942 | 63,131 | 76,571 |
| Depreciation and amortization | 2,600 | 5,434 | 6,444 | 9,840 | 17,067 |
| Restructuring costs | — | — | — | 847 | 2,551 |
| Loss on investment | — | — | 150 | 228 | — |
| Impairment of goodwill and intangibles | 3,315 | 2,431 | — | — | — |
| Total operating expenses | 50,837 | 65,685 | 84,403 | 167,772 | 214,945 |
| Operating loss | (29,410) | (14,901) | (14,362) | (38,963) | (63,225) |
| Other income (expense): | | | | | |
| Interest income | 289 | 287 | 757 | 2,167 | 2,329 |
| Interest expense | (737) | (1,252) | (980) | (970) | (2,638) |
| Total other income (expense) | (448) | (965) | (223) | 1,197 | (309) |
| Loss from continuing operations | (29,858) | (15,866) | (14,585) | (37,766) | (63,534) |
| Discontinued operations: | | | | | |
| Income (loss) from discontinued operations | 849 | (4,356) | 4,346 | (1,784) | (193) |
| Gain on sale | — | — | — | 1,355 | — |
| Total income (loss) from discontinued operations | 849 | (4,356) | 4,346 | (429) | (193) |
| Net loss | (29,009) | (20,222) | (10,239) | (38,195) | (63,727) |
| Preferred stock dividends and accretion | (8,048) | (7,309) | (22,049) | — | — |
| Net loss attributable to common stockholders | $ (37,057) | $ (27,531) | $ (32,288) | $ (38,195) | $ (63,727) |
| Basic and diluted net loss per share: | | | | | |
| Net loss from continuing operations | $ (3.64) | $ (2.07) | $ (2.60) | $ (1.10) | $ (1.75) |
| Net gain (loss) from discontinued operations | 0.08 | (0.39) | 0.31 | (0.01) | — |
| Basic and diluted net loss per share | $ (3.56) | $ (2.46) | $ (2.29) | $ (1.11) | $ (1.75) |
| Basic and diluted weighted average shares outstanding | 10,406,584 | 11,204,791 | 14,074,505 | 34,417,954 | 36,312,970 |

**Table of Contents**

| | As of December 31, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006** |
| **Consolidated Balance Sheet Data** | | | | | |
| Cash and cash equivalents | $ 12,626 | $ 29,048 | $100,986 | $ 70,783 | $ 89,972 |
| Working capital (deficit) (1) | (14,751) | (2,425) | 93,284 | 56,238 | 60,472 |
| Total assets | 40,320 | 63,540 | 163,789 | 196,097 | 264,405 |
| Long-term obligations, less current portion | 6,276 | 2,804 | 261 | 15,474 | 63,826 |
| Redeemable preferred stock | 36,297 | 67,794 | — | — | — |
| Non-redeemable preferred stock | 3,325 | 5,209 | — | — | — |
| Total stockholders' (deficit) equity | (40,006) | (55,431) | 112,102 | 99,850 | 73,597 |

(1)   Working capital (deficit) consists of total currents assets, including cash and equivalents, less current liabilities.

31

Table of Contents

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion and analysis should be read in conjunction with the consolidated financial statements and related notes and the discussions under "Application of Critical Accounting Policies," which describes key estimates and assumptions we make in the preparation of its financial statements, Item 1A "Risk Factors", which describes key risks associated with our operations and industry, as well as our other filings with the Securities and Exchange Commission*

### Overview

We are a leading online seller of wireless services and devices based on the number of activations of wireless services sold online in the U.S. Through our wireless activation and services ("WAS") business unit, we sell service plans, devices and accessories, including satellite television services through our own branded websites; including Wirefly.com and VMCsatellite.com. We offer marketers the ability to sell wireless voice and data services and devices, under mobile virtual network enabler ("MVNE") agreements. This service utilizes the same e-commerce platform, operational infrastructure and marketing relationships that we use in our operations. We provide customers the ability to organize personal communications by providing real-time wireless access to e-mail, voicemail, faxes, contacts, scheduling, calendar and conference calling functionality through a website or telephone.

We measure our performance based on our financial results and various non-financial measures. Key financial factors that we focus on in evaluating our performance include revenue growth within a period, contribution margin (defined as revenue less cost of revenue and sales and marketing expenses), and operating income (defined as contribution margin less other operating expenses including general and administrative and depreciation and amortization expenses). Our financial results can, and do, vary significantly from quarter-to-quarter as a result of a number of factors which include economic conditions specific to online commerce and wireless communications industries, the timing of introduction of popular devices by mobile phone manufacturers, our ability to attract visitors to our websites, changes in wireless carrier commission and bonus structures, the timing of recognition of bonuses paid to us by wireless carriers and our competitors' pricing and marketing strategies.

Key non-financial measures of our success are customer feedback and customer satisfaction ratings compiled by third parties. We believe that maintaining high overall customer satisfaction is critical to our ongoing efforts to promote the use of the private-labeled websites that we create and manage for our marketers, as well as our own branded websites, and to improve our operating results. We actively solicit customer feedback on our website functionality as well as the entire purchase experience. To maintain a high level of performance by our customer service representatives, we also undertake an ongoing customer feedback process. If we are unable to meet customer expectations with respect to price or do not successfully expand our product lines or otherwise fail to maintain high overall customer satisfaction, our business and results of operations would be harmed.

Our revenue includes commissions, bonuses and other payments we receive from wireless carriers, including a satellite television provider, in connection with the activation of customers on their networks, as well as payments from customers for wireless services and devices. Our revenue continues to increase as a result of internal growth and acquisitions. As further described below, total revenue and net loss from continuing operations for the year ended December 31, 2006 were $369.6 million and $63.5 million, respectively, compared to total revenue and net loss from continuing operations of $320.5 million and $37.8 million, respectively, for the year ended December 31, 2005. Revenue from our top three wireless carriers represented 68% and 67% of our total consolidated revenue for the year ended December 31, 2006 and 2005, respectively.

In 2007, we expect the commissions we earn from four of the five largest wireless carriers will include an increasing amount of residual-based compensation. In exchange for a recurring monthly residual commission,

32

Table of Contents

these carriers will pay a lower up-front commission. Depending on the carrier, the monthly residual commission will be based on a percentage of the monthly recurring charges for authorized rate plans, authorized features and additional local airtime charges the carrier bills to the customer or a flat fixed fee per subscriber. Under these arrangements, we receive a monthly residual payment for as long as the activated subscriber remains a customer of that carrier under the original services contract, or a specified period of time, depending on the carrier. Accordingly, we expect that the amount of activations revenue recognized when a subscriber activates service will decrease, but expect that the decrease will be partially offset by the recurring monthly residual commission. In addition, based on a residual commission structure, the amount of total revenue we recognize on a subscriber activation over the life of the residual relationship may exceed the amount of revenue that would otherwise have been realized based on the full up-front commission.

In addition, future revenue and cash collections may be impacted by our ability to successfully resolve differences with wireless carriers between our sales information and subscriber activation data and similar information maintained in the respective carriers' systems which they use to determine our commission and other amounts due us. Although in most instances our records match, differences do exist which may create delays in our collections of such differences. Although we believe we have adequate reserves in place for such differences and potential collection shortfalls based on our collection experience, as our business volume increases and commission and feature plans become more numerous or complex with each carrier, our automated systems may not be updated as quickly as required or our workforce trained as promptly as needed to investigate such differences. In the event that we are slow to research such amounts, our cash collections may be affected. In the last half of 2006, we experienced an increase in such matters requiring specific attention and increasing reserves of accounts receivable which caused our net loss to increase.

A major determinant of our revenue is the extent and success of our marketing efforts and expenditures. Our marketing efforts are conducted mainly through Internet search engines which display links to our websites based on search results and through third-party, incentive-based online marketing initiatives, including the use of websites that we create and manage under our marketers' brands. We also use online advertising, search engines and third-party marketing partners based on orders and activations including Google, Yahoo, MSN and AOL. We incurred total advertising and other marketing costs of approximately $104.8 million and $80.3 million in 2006 and 2005, respectively. Online marketing initiatives are an important aspect of our business strategy because the underlying promotions attract consumers to our websites or our partners' websites.

The nature of our sales promotions and extent of our marketing initiatives also have a correlation to the quality of customer we attract or activation we place with the carrier. For instance, subsidizing the equipment sale that may lead to higher deactivation experience than activations we provision through our own websites or more traditional marketing partners.

Since we began operations in 1999, we have incurred significant losses and had negative cash flow from operations. As of December 31, 2006, we had an accumulated deficit of $228.4 million and a total stockholders' equity of $73.6 million. In order to achieve profitability in the future, we are depending upon our ability to continue to increase our revenue at levels that exceed the costs of that revenue plus operating expenses. There can be no assurances that we will operate profitably in the future.

In 2005, we acquired certain assets and assumed certain liabilities of A1 Wireless USA, Inc. ("A1 Wireless"); VMC Satellite, Inc. ("VMC"); and FONcentral.com, Inc. ("FC"). We accounted for these transactions using the purchase method of accounting in accordance with Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations.* Accordingly our results of operations include the operating results of A1 Wireless effective January 1, 2005, VMC as of April 26, 2005 and FC as of May 26, 2005, their respective acquisition dates.

In 2005, we also sold the assets of our MVNO operations, which are reflected as discontinued operations in the accompanying financial statements. As a result of this sale, we operate primarily in one segment and we no

33

Table of Contents

longer believe that segment information in accordance with SFAS No. 131, *Disclosures About Segments of an Enterprise and Related Information* , is applicable as our WAS business unit represented approximately 96% and 99% of our total revenue and cost of revenue for 2005. Our management's discussion and analysis of results of operations will continue to provide a comparison of our revenue and cost of revenue of our wireless activation and services and other components of revenue and cost of revenue to the extent MVNE and data services fluctuations appear significant in explaining and describing such results of operations.

In 2006, we grew our wireless activations business, expanded our services and broadened our customer base primarily through internal growth. Five key goals for us in 2007 include (i) increased efforts to improve collections with the wireless carriers to generate cash; (ii) reduce operating and employee expense as well as capitalized expenditures in the near-term to improve cash flow; (iii) to continue to improve the customer experience platform that we utilize for order processing, customer service and rebate handling to refine existing automation and increase efficiency and effectiveness of our back-office systems, internal workforce and outsourced call center; (iv) to further balance spending on marketing initiatives with customer activation and revenue generation characteristics; and (v) to utilize our existing customer database, website traffic and online marketing capabilities to sell new products and services. We expect to continue our growth in 2007 through internal means. In addition, we may continue to be opportunistic in our acquisition of strategic assets as we seek to build our business. In evaluating potential acquisitions, we assess our expectations regarding the impact of a transaction on our cash flows, revenue and net income, among other factors. We cannot assure you that any acquisitions that we may complete in the future will have a positive impact on our revenue, net cash provided by operating activities, the valuation of our common stock or our efforts to attain and maintain profitability.

**Restatement**

As described in our Quarterly Reports on Forms 10-Q/A for the first, second and third quarters of 2006 and in this Annual Report on Form 10-K, we restated our financial statements for each of the quarters ended March 31, June 30, and September 30, 2006. The financial statements for the year ended December 31, 2006 included in this Form 10-K reflect the adjustments associated with this restatement. (See Note 13 to the Consolidated Financial Statements.)

**Comparison of the Results of Operations for the years ended December 31, 2006 and 2005**

| | Year Ended December 31, | | | | Change Between 2005 and 2006 | |
| | 2005 | | 2006 | | | |
| (amounts in thousands) | Amount | % of Revenue | Amount | % of Revenue | Amount | % |
|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | |
| Activation and services | $233,730 | 73% | $298,090 | 81% | $ 64,360 | 28% |
| Equipment | 86,809 | 27% | 71,484 | 19% | (15,325) | -18% |
| Total revenue | $320,539 | 100% | $369,574 | 100% | $ 49,035 | 15% |
| **Cost of revenue:** | | | | | | |
| Activation and services | $ 1,221 | 1% | $ 2,653 | 1% | $ 1,432 | 117% |
| Equipment | 190,509 | 59% | 215,201 | 57% | 24,692 | 13% |
| Total cost of revenue | $191,730 | 60% | $217,854 | 58% | $ 26,124 | 14% |
| **Selected operating expenses:** | | | | | | |
| Sales and marketing | $ 93,726 | 29% | $118,756 | 32% | $ 25,030 | 27% |
| General and administrative | 63,131 | 20% | 76,571 | 21% | 13,440 | 21% |
| Depreciation and amortization | 9,840 | 3% | 17,067 | 5% | 7,227 | 73% |
| Restructuring | 847 | 0% | 2,551 | 1% | 1,704 | 201% |

Table of Contents

# REVENUE

*Revenue*

Revenue consists of activations and services revenue, and equipment revenue. Activations and services revenue consists of (i) revenue from commissions, bonuses and other payments for the activation of services of wireless carriers and a satellite television carrier through private-labeled websites that we create and manage for marketers as well as through our own branded websites; (ii) revenue from the provisioning of MVNE services which provide marketers the ability to sell MVNO services to their customers under their own brands using our e-commerce platform and operational infrastructure; and, (iii) revenue from data services under which we provide subscribers with real-time wireless access to work and personal information, including email, calendar, corporate directories, personal contacts and documents in addition to wireless entertainment and content. Equipment revenue consists mainly of revenue from the sale of wireless devices to our customers that subscribe to wireless services through our private-labeled websites or those websites that we manage for other marketers. The following further details the components of our revenue and a comparative discussion of performance:

| | Year Ended December 31, | | | | Change Between 2005 and 2006 | |
| | 2005 | | 2006 | | | |
| (amounts in thousands) | Amount | % of Revenue | Amount | % of Revenue | Amount | % |
|---|---|---|---|---|---|---|
| *Activations and services:* | | | | | | |
| Wireless activation | $222,047 | 69% | $284,208 | 77% | $ 62,161 | 28% |
| MVNE and data services | 11,683 | 4% | 13,882 | 4% | 2,199 | 19% |
| | 233,730 | 73% | 298,090 | 81% | 64,360 | 28% |
| *Equipment:* | | | | | | |
| Wireless activation | $ 86,809 | 27% | $ 71,484 | 19% | $(15,325) | -18% |
| *Total Revenue:* | | | | | | |
| Wireless activation | $308,856 | 96% | $355,692 | 96% | $ 46,836 | 15% |
| MVNE and data services | 11,683 | 4% | 13,882 | 4% | 2,199 | 19% |
| | $320,539 | 100% | $369,574 | 100% | $ 49,035 | 15% |

*Activations and Services*

Activations and services revenue increased 28% to $298.1 million for the year ended December 31, 2006 from $233.7 million for the year ended December 31, 2005. The increase in activations and services revenue of $64.4 million was attributable to an increase in the number of wireless activations that we generated through marketing partners and increased advertising efforts compared to the prior period. Gross carrier commissions for activations subject to chargeback increased 22% to $331.0 million for the year ended December 31, 2006 from $270.6 million for the year ended December 31, 2005. Activations and services revenue of MVNE and data services increased $2.2 million to $13.9 million for the year ended December 31, 2006, primarily as a result of increased MVNE revenue resulting from additional recurring revenue transactions for back-office support and the completion of certain development work in 2006. Recurring revenue transactions increased due to increased subscribers and a strategic business partnership beginning in April 2006.

*Equipment*

Revenue from sales of equipment for the year ended December 31, 2006 decreased 18% to $71.5 million from $86.8 million for the year ended December 31, 2005. The decrease in equipment revenue of $15.3 million was attributable to lower average sales prices due to an increase in point-of-sale discounts and other incentives provided to customers as compared to the year ended December 31, 2005.

35

Table of Contents

*Total revenue*

Total revenue increased 15% to $369.6 million for the year ended December 31, 2006 from $320.5 million for the year ended December 31, 2005. Revenue generated from the sale and activation of wireless devices and services accounted for approximately 96% of consolidated revenue for the years ended December 31, 2006 and 2005. Revenue from our top three wireless carriers represented 68% of consolidated revenue for the year ended December 31, 2006 compared to 67% for the comparable period of 2005. Wireless activations and services revenue and equipment sales revenue may vary from period to period based on our promotional efforts, which include subsidizing the costs of devices purchased by our customers. In 2006, total revenue was impacted by dollar increases in deactivation experience and carrier disputed amounts. We expect that such reserves will be significant in the future as our business grows. We expect that revenue from the sale and activation of wireless devices and services will continue to increase during 2007 compared to 2006 performance.

## COST OF REVENUE

Cost of revenue consists mainly of the cost of wireless devices (equipment) sold to our wireless activations and services customers. Our cost of revenue related to wireless equipment sales increased to $215.2 million for the year ended December 31, 2006 as a result of a higher volume of devices sold during the period at a lower average cost compared to sales of such devices in the year ended December 31, 2005. Total cost of revenue increased 14% to $217.9 million for the year ended December 31, 2006 compared to $191.7 million for the year ended December 31, 2005. Cost of revenue from the sale of wireless devices accounted for approximately 99% of consolidated cost of revenue for the years ended December 31, 2006 and 2005. As a percentage of total revenue, cost of equipment revenue decreased to 57% of total revenue for the year ended December 31, 2006 compared to 59% for the year ended December 31, 2005.

## OPERATING EXPENSES

*Sales and Marketing*

Sales and marketing expenses increased 27% to $118.8 million for the year ended December 31, 2006 from $93.7 million for the corresponding period of 2005. The increase of $25.0 million included a $25.3 million increase from the growth of existing marketing relationships and the addition of new marketing partner relationships since December 31, 2005. Our marketing expenses largely comprise payments to on-line advertisers, search engines and third-party marketing partners based on orders or activations. We incurred approximately $104.8 million of third-party marketing expenses in the year ended December 31, 2006. Such expenses were higher in the year ended December 31, 2006 than corresponding periods of 2005 due to increased wireless activation competition, and increased rates and volume of advertising, which caused our customer acquisition costs to increase. In addition, advertising placement and search costs also increased. We expect that marketing expenses will continue to represent a significant percentage of our revenue in future periods.

*General and Administrative*

General and administrative expenses increased 21% to $76.6 million for the year ended December 31, 2006 from $63.1 million for the corresponding period of 2005. General and administrative expenses increased $13.4 million for year ended December 31, 2006 mainly as a result of $11.2 million of costs incurred to evaluate, research and settle rebate matters associated with the District of Columbia attorney general's action including $ 8.0 million paid to certain customers without regard to their eligibility to receive a rebate; a $4.3 million increase in employee related costs due to a larger workforce; a $3.7 million increase in costs incurred for other professional services; $1.7 million increase in stock-based compensation; and a $0.7 million increase for earn-out and settlement costs related to the A1 Wireless acquisition. These increases were partially offset by an $8.2 million decrease in severance costs.

36

Table of Contents

*Depreciation and Amortization*

Depreciation and amortization expenses, which are amortized over periods ranging from 18 months to 7 years, increased 73% to $17.1 million for the year ended December 31, 2006 from $9.8 million for the year ended December 31, 2005. The increase was primarily due to the costs associated with developing new functionality related to our websites, product offerings, and normal fixed asset depreciation on an increased amount of capital expenditures as compared to the corresponding period of 2005. In addition, 2005 expenses were reduced by a $0.9 million adjustment to correct a computational error in the fixed asset system that caused depreciation expense to be overstated.

*Restructuring*

In 2005, we implemented a restructuring plan following the acquisition of A1 Wireless, to take advantage of synergies gained through the acquisition and to restructure our operations for efficiency purposes. For the year ended December 31, 2005, we recognized $0.8 million in restructuring costs which related to workforce reduction and excess facilities. All costs related to this plan were paid out in 2005. For the year ended December 31, 2006, we incurred $2.6 million of restructuring costs primarily due to severance costs and stock-based compensation for certain employees related to a plan completed in 2006.

*Loss from Continuing Operations*

Loss from continuing operations increased to $63.5 million for the year ended December 31, 2006 from $37.8 million for the year ended December 31, 2005 as a result of increasing revenue and decreasing cost of revenue and general operating expenses as a percentage of revenue.

*Net Loss*

Net loss increased to $63.7 million for the year ended December 31, 2006 from $38.2 million for the year ended December 31, 2005.

## Comparison of the Results of Operations for the years ended December 31, 2005 and 2004

| (amounts in thousands) | Year Ended December 31, 2004 | | 2005 | | Change Between 2004 and 2005 | |
| --- | --- | --- | --- | --- | --- | --- |
| | Amount | % of Revenue | Amount | % of Revenue | Amount | % |
| **Revenue:** | | | | | | |
| Activation and services | $123,265 | 80% | $233,730 | 73% | $110,465 | 90% |
| Equipment | 31,603 | 20% | 86,809 | 27% | 55,206 | 175% |
| Total revenue | $154,868 | 100% | $320,539 | 100% | $165,671 | 107% |
| **Cost of revenue:** | | | | | | |
| Activation and services | $ 1,752 | 1% | $ 1,221 | 0% | $ (531) | -30% |
| Equipment | 83,075 | 54% | 190,509 | 59% | 107,434 | 129% |
| Total cost of revenue | $ 84,827 | 55% | $191,730 | 59% | $106,903 | 126% |
| **Selected operating expenses:** | | | | | | |
| Sales and marketing | $ 42,867 | 28% | $ 93,726 | 29% | $ 50,859 | 119% |
| General and administrative | 34,942 | 23% | 63,131 | 20% | 28,189 | 81% |
| Depreciation and amortization | 6,444 | 4% | 9,840 | 3% | 3,396 | 53% |
| Restructuring | — | 0% | 847 | 0% | 847 | 100% |

Table of Contents

## REVENUE

| (amounts in thousands) | Year Ended December 31, | | | | Change Between 2004 and 2005 | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2004 | | 2005 | | | |
| | Amount | % of Revenue | Amount | % of Revenue | Amount | % |
| *Activations and services:* | | | | | | |
|   Wireless activation | $115,924 | 75% | $222,047 | 69% | $106,123 | 92% |
|   MVNE and data services | 7,341 | 5% | 11,683 | 4% | 4,342 | 59% |
| | 123,265 | 80% | 233,730 | 73% | 110,465 | 90% |
| *Equipment:* | | | | | | |
|   Wireless activation | $ 31,603 | 20% | $ 86,809 | 27% | $ 55,206 | 175% |
| *Total Revenue:* | | | | | | |
|   Wireless activation | $147,527 | 95% | $308,856 | 96% | $161,329 | 109% |
|   MVNE and data services | 7,341 | 5% | 11,683 | 4% | 4,342 | 59% |
| | $154,868 | 100% | $320,539 | 100% | $165,671 | 107% |

### Activations and Services

Our activations and services revenue increased 90% to $233.7 million for 2005 from $123.3 million for 2004. The increase in activations and services revenue of $110.5 million was attributable to a $109.7 million increase in revenue from our WAS business unit, which was primarily grown through existing marketing partners and increased advertising efforts; $3.4 million of revenue from the provisioning of MVNE Services offset by a $2.7 million decrease in revenue from our Data Services business unit.

### Equipment

Our revenue from sales of equipment increased 175% to $86.8 million for 2005 from $31.6 million for 2004. The increase in equipment revenue of $55.2 million was primarily attributable to an increase in revenue from equipment sales in connection with our WAS business unit due to an increase in the volume of activations.

### Revenue

Total revenue increased 107% to $320.5 million for 2005 from $154.9 million for 2004. Approximately $165.0 million of the increase was attributable to increases in business volume, as a result of increased activations in our WAS segment which was primarily grown through existing marketing partners and increased advertising efforts. The remaining net increase was the result of revenue reductions from our Data Services business unit of $2.7 million offset by revenue generated from our MVNE Services business unit of $3.4 million.

## COST OF REVENUE

Total cost of revenue increased 126% to $191.7 million for 2005 from $84.8 million for 2004. The increase in cost of revenue was attributable to a $107.4 million increase in cost of revenue in our WAS business unit due to increase in the number of devices sold and the average device cost, partially offset by a $0.5 million decrease in cost of activations and services revenue.

## OPERATING EXPENSES

### Sales and Marketing

Our sales and marketing expenses increased 119% to $93.7 million for 2005 from $42.9 million for 2004. This increase was comprised mainly of the following: $42.6 million from growth of existing marketing

38

Table of Contents

relationships and adding new marketing partner relationships during 2005; $4.6 million from increased payroll related costs and benefits associated with a greater number of sales related positions in 2005 to support the WAS and MVNE Services business units. Sales and marketing expenses also included stock-based compensation expense of $2.2 million for 2005.

Our marketing expenses largely comprise payments to on-line advertisers, search engines and third-party marketing partners based on orders or activations. We incurred approximately $16.7 million of the increase in these third-party marketing expenses in the fourth quarter of 2005. Such expenses were higher in our fourth quarter as wireless activation competition with the wireless carriers, retail outlets and other e-commerce providers intensified, which caused our subscriber acquisition costs to increase from prior quarters in 2005. In addition, advertising placement and search costs also increased from comparable prior periods during the fourth quarter.

*General and Administrative*

Our general and administrative expenses increased 81% to $63.1 million for 2005 from $34.9 million for 2004. The expense increase of $28.2 million mainly comprised of the following: $10.5 million related to stock-based compensation expense primarily related to the modification of stock-based awards to certain employees; $4.2 million was the result of professional fees incurred related to our initial compliance efforts with Section 404 of the Sarbanes-Oxley Act of 2002; $3.9 million related to increased payroll related expenses from a larger workforce; $3.3 million from increased credit card processing fees and other costs associated with a higher volume of shipments and orders in 2005; $1.8 million related to increased facilities costs and telecommunication related expenses and $4.5 million related to other expenses. Stock-based compensation expense included in general and administrative expenses for 2005 was $15.6 million. Of the expense approximately $7.8 million related to stock-based compensation expense associated with the accelerated vesting of options and stock awards for certain employees that were terminated during 2005.

*Depreciation and Amortization*

Our depreciation and amortization expenses increased 53% to $9.8 million for 2005 from $6.4 million for 2004, which are amortized over a period ranging from 18 months to 7 years. The increase was due to the costs associated with developing new functionality related to our websites and product offerings, increased amortization related to intangible assets acquired during 2005 and partially offset by a $0.9 million adjustment to revise cumulative depreciation on various assets acquired over the past three years.

*Restructuring Costs*

In 2005, and subsequent to the acquisition of A1 Wireless, we entered into a restructuring plan to take advantage of synergies gained through the acquisition of A1 Wireless and to restructure other operating segments for efficiency purposes. We recognized $0.8 million in restructuring costs for 2005, which primarily related to workforce reduction. All such costs were incurred in 2005.

*Loss from Continuing Operations*

Loss from continuing operations increased to $37.8 million for 2005 from $14.6 million for 2004. The increase in the loss was the result of increases in our cost of revenue and operating expenses as a percentage of revenue. Although we experienced a significant growth in revenue for 2005, cost of revenue and operating expenses both increased as described above in order to support the revenue growth we experienced.

*Net Loss*

Net loss increased to $38.2 million for 2005 from $10.2 million for 2004.

Table of Contents

**Liquidity and Capital Resources**

*Overview*

Since inception, we have funded our operations principally through the sale of equity securities and to a lesser extent, subordinated debt, credit facilities, capital leases and term loans. The significant components of our working capital are inventory and liquid assets such as cash and trade accounts receivable, reduced by accounts payable, accrued expenses and deferred revenue.

Our future capital and operating requirements will depend on many factors, including the level of our revenue, the expansion of our sales and marketing activities, the cost of our fulfillment operations, potential investments in businesses or technologies and continued market acceptance of our products. Additionally, poor financial results, unanticipated expenses, acquisitions of technologies or businesses or strategic investments could give rise to additional financing requirements sooner than we expect. In the event that cash on hand and borrowings on our term loan are not sufficient to fund working capital requirements that are not satisfied through net cash provided by operating activities or future cash requirements, we could be required, or could elect, to seek additional funding through a public or private equity or debt financing in the future. There can be no assurance that we would be able to secure additional funding in the future.

We analyze our working capital requirements very closely as nearly $43.8 million or 69% of our December 31, 2006 accounts receivable was generated from revenue earned from three wireless carriers. Generally, we collect our monthly commissionable and residual revenue from these carriers within 30 to 60 days of the month-end following a subscriber's activation net of commission chargebacks that occurred during the period. The timing of our collections from the wireless carriers is also influenced by our ability to reconcile our billing records with that of the respective carrier. Our matching and resolution process is an iterative process and although the substantial majority of our sales information readily matches, some records may require additional research which may delay collection beyond a 30-60 day period of time. The timing of collection of our accounts receivable influences the timing of payment to our vendors.

Our major uses of cash consist of payments made for inventory, marketing and payroll expenses and capital expenditures. Costs incurred for marketing and advertising is generally paid on the date the advertising occurs or shortly thereafter. We have payment terms with most other vendors we deal with that generally extend up to 45-60-days from service provisioning. Payroll expenses are generally funded semi-monthly. As of December 31, 2006, we owed the three wireless carriers referred to above approximately $39.2 million for wireless devices and accessories we procured from them or their affiliates in the fourth quarter.

Given the timing and significance of payments for advertising costs incurred in promoting our websites compared to the timing of collection of our accounts receivable, we monitor cash balances very closely and may slow payment to certain vendors while awaiting collection of accounts receivable from carrier customers. In addition, to the extent we have difficulties collecting accounts receivable, we may have to defer advertising promotions, inventory purchases or other costs which could impact our ability to generate revenue.

Cash balances at December 31, 2006 were $90.0 million an increase of $19.2 million from December 31, 2005. Cash balances at March 31, 2007 were approximately $53.4 million. We have an additional $25 million of liquidity remaining to be borrowed under our term loan. The funds may be drawn prior to July 31, 2007.

40

Table of Contents

### Consolidated Cash Flows

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2004 | 2005 (amounts in thousands) | 2006 |
| Net cash used in operating activities | $ (6,590) | $(20,077) | $(15,008) |
| Net cash used in investing activities | (15,466) | (23,141) | (25,554) |
| Net cash provided by financing activities | 93,994 | 13,015 | 59,751 |
| Change in cash and cash equivalents | $ 71,938 | $(30,203) | $ 19,189 |

Net cash used in operating activities was $15.0 million, $20.1 million and $6.6 million in 2006, 2005 and 2004, respectively. For the year ended December 31, 2006, net loss after adjustments for items to reconcile net loss to net cash provided by operating activities was $23.7 million. Such items include depreciation and amortization, increase in our allowance for doubtful accounts, non-cash interest expense and other expenses and stock-based compensation.

Changes in operating assets and liabilities from December 31, 2005 decreased net cash used in operating activities by approximately $8.7 million. Changes in working capital balances included an increase of current assets of approximately $39.0 million, excluding cash and cash equivalents, short-term investments and cash collected from notes receivable related to discontinued operations. The increase in these current assets was primarily the result of increased accounts receivable balances from December 31, 2005. The accounts receivable increase at December 31, 2006 was primarily the result of higher commission balances owed to us by the carriers as a result of increased revenue and the timing of collections at the end of the month of December.

Current liabilities, excluding debt and capital lease balances and acquisition earn-out obligations accrued during the period increased $48.9 million from December 31, 2005. The increase was mainly the result of an increase in accounts payable offset by decreases in accrued liabilities and deferred revenue. A significant portion of the company's accounts payable represent payables for inventory with the wireless carriers, original equipment manufacturers and third party distributors. The increase in accounts payable reflects the growth in business expenses and increased inventory balances on hand at December 31, 2006 as a result of higher year-end accounts receivable balances and the timing of payments made on accounts payable.

Net cash used in investing activities was $25.6 million, $23.1 million and $15.5 million in 2006, 2005 and 2004, respectively. Net cash used in investing activities in 2006 consisted mainly of $22.2 million of capital expenditures and $4.7 million paid for contingent consideration as a result of minimum EBITDA benchmarks for prior year acquisitions. Capital expenditures for 2006 consisted of $16.4 million of capitalized software labor and web development costs incurred primarily associated with enhancing our e-commerce infrastructure; $4.9 million of computer and other equipment and software, and $0.9 million of other furniture, equipment and leasehold improvements. Cash paid in 2006 for asset acquisitions included $4.0 million and $0.7 million related to the purchases of VMC and A1 Wireless, respectively. In 2007, planned capital expenditures are expected to approximate 2006 levels.

Net cash provided by financing activities was $59.8 million, $13.0 million and $94.0 million in 2006, 2005 and 2004, respectively. Cash provided by financing activities in 2006 consisted mainly of borrowings under our term loan of $73.6 million net of fees paid and less a $19.9 million re-payment of our credit facilities; proceeds from the exercise of warrants and options of $5.3 million partially offset by cash payments used to repurchase shares of our common stock for $3.7 million.

*Borrowings Under our Term Loan* . As of December 31, 2006, we maintained a term loan with Goldman Sachs Credit Partners L.P., Citicorp North America, Inc. and AP InPhonic Holdings, LLC which allowed for aggregate borrowing of up to $100.0 million. During 2006, we borrowed an aggregate principal amount of $75.0 million under the agreement. As of December 31, 2006, we have the ability to borrow an additional $25.0 million. This facility is secured by a first priority lien on substantially all of our assets. Interest on borrowings

Table of Contents

under the term loan is payable quarterly at a fixed rate of 9.0%. Interest expense during 2006 also included $0.5 million of amortization of the discount on the term loan resulting from the allocation of a portion of the $75.0 million proceeds to detachable warrants.

Under the provisions of the term loan and the executed amendments, we are required to maintain certain minimum levels of EBITDA on a quarterly basis beginning December 31, 2006, and maintain a minimum cash balance by July 31, 2007, of $25.0 million at an institution designated by the lenders. The Company may draw the remaining $25.0 million of funds under the credit agreement before July 31, 2007. We also received an extension of the financial statement delivery requirements for the full year 2006 audited financials and associated compliance certificates to May 31, 2007, and the first quarter 2007 financials to June 15, 2007.

*Common Stock Repurchase Program* . From time to time during 2006, we repurchased 350,261 shares of our common stock for approximately $3.7 million under two separate share repurchase programs authorized by our Board of Directors. As of December 31, 2006, we were authorized by the Board of Directors to repurchase up to an additional $26.8 million of our common stock through November 3, 2007. From January 1 through May 29, 2007, we repurchased an additional 1,021,074 shares for approximately $10.7 million. There can be no assurance that we will repurchase up to the full amount that we have been authorized by our Board of Directors over this time period.

In February 2007, outstanding warrants of 627,390 were exercised resulting in the issuance of 150,735 shares of our common stock.

## Contractual Obligations

The following table summarizes our contractual obligations, including interest on operating leases, and the expected effect on liquidity and cash flows as of December 31, 2006.

| | Total | Less than 1 year | 1 -3 years (amounts in thousands) | 4 - 5 years | Over 5 years |
|---|---|---|---|---|---|
| Term loan including fixed interest costs (a) | $ 95,512 | $ 7,856 | $87,656 | $ — | $ — |
| Capital leases | 574 | 301 | 248 | 25 | — |
| Operating leases | 4,079 | 1,806 | 2,273 | — | — |
| Obligation to purchase certain advertising (b) | 4,531 | 4,531 | — | — | — |
| Obligations under VMC APA (c) | 1,300 | 1,300 | — | — | — |
| | $105,996 | $15,794 | $90,177 | $ 25 | $ — |

(a) Under the term loan agreement, we may repay or the lender may require the repayment of the debt on the third anniversary of the agreement. For the purpose of this presentation, we have included the contractual obligation due on the third anniversary. If not prepaid, the debt matures in November 2011. The term loan incurs interest at 9.00% per annum.

(b) We have a commitment to purchase a minimum level of advertising and media services from a vendor by March 31, 2007. Such commitment period may be extended at the option of the vendor.

(c) Under the VMC Asset Purchase Agreement, as amended, we have agreed to pay shareholders of VMC an additional $1.3 million in cash to settle any remaining contingent consideration. Of the $1.3 million, $0.2 million represents legal fees incurred during the settlement.

## Inflation

We do not believe that inflation has materially affected our operations.

42

Table of Contents

**Recent Accounting Pronouncements**

In June, 2006, the FASB issued FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109* ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with SFAS No. 109, *Accounting for Income Taxes* . FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosure, and transition. FIN 48 will apply to fiscal years beginning after December 15, 2006, with earlier adoption permitted. We will adopt FIN 48 effective January 1, 2007. As prescribed in the interpretation, the cumulative effect of applying the provisions of FIN No. 48 should be reflected as an adjustment to the opening balance of Stockholders' Equity. We do not believe the adoption of this pronouncement will have any material effects on our consolidated financial position, results of operations, or cash flows from operations.

In September 2006, the FASB issued SFAS No. 157, *Fair Value Measurements* ("SFAS No. 157"). SFAS 157 defines fair value, establishes a framework for measuring fair value under generally accepted accounting principles, and expands disclosures about fair value measurements. SFAS 157 emphasizes that fair value is a market-based measurement, not an entity-specific measurement, and states that a fair value measurement should be determined based on the assumptions that market participants would use in pricing the asset or liability. SFAS 157 will become effective for our fiscal year beginning January 1, 2008. We do not believe the adoption of this pronouncement will have any material effects on our consolidated financial position, results of operations, or cash flows.

In February 2007, the Financial Accounting Standards Board issued SFAS 159, *The Fair Value Option for Financial Assets and Financial Liabilities—including an amendment of FASB Statement No. 115* ( "SFAS No. 159") , which allows measurement at fair value of eligible financial assets and liabilities that are not otherwise measured at fair value. If the fair value option for an eligible item is elected, unrealized gains and losses for that item will be reported in current earnings at each subsequent reporting date. SFAS 159 also establishes presentation and disclosure requirements designed to draw comparison between the different measurement attributes the company elects for similar types of assets and liabilities. SFAS No. 159 is effective for fiscal years beginning after November 15, 2007. Early adoption is permitted. We do not believe the adoption of this pronouncement will have any material effects on our consolidated financial position, results of operations, or cash flows.

In June 2006, the FASB ratified the EITF Issue No. 06-3, *How Taxes Collected from Customers and Remitted to Governmental Authorities Should Be Presented in the Income Statement"* ("EITF 06-3"). EITF No. 06-3 requires an entity to disclose transactional tax amounts assessed by government authorities that are considered significant. EITF No. 06-3 is effective for interim and annual reporting periods beginning after December 15, 2006. We have determined that the adoption of this pronouncement will have no material impact to our consolidated financial position, results of operations, or cash flows.

**Application of Critical Accounting Policies and Estimates**

Our discussion and analysis of our financial condition and results of operations are based upon our consolidated financial statements, which have been prepared in accordance with generally accepted accounting principles in the U.S. The preparation of these statements requires us to make estimates and judgments that affect the reported amount of assets, liabilities, revenues and expenses, and related disclosure of contingent assets and liabilities. We base our estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making the judgments about our revenues, cost of revenues and the carrying values of assets and liabilities that are not readily apparent from other sources. Because this can vary in each situation, actual results may differ from the estimates under different assumptions and conditions. The following is a summary of these critical estimates.

43

Table of Contents

*Revenue Recognition*

*Activation and Services* —We generate revenue primarily from wireless carriers, as well as a satellite television carrier, who pay commissions and volume and performance-based bonuses, for activating wireless services and features on their networks. We recognize commissions from wireless carriers upon shipment of activated devices to the customer. In addition to activation commissions, under certain conditions, certain carriers pay us a monthly residual fee for as long as a customer we activate for the carrier continues to be its subscriber, or for a fixed period of time depending on the carrier. Revenue from satellite television customers includes commissions earned at the time of the satellite service activation, net of an estimate for deactivations, as we are acting as an agent in the transaction.

Our revenue is reduced for estimated deactivations of the wireless services by customers prior to the expiration of a time period that ranges 90 to 180 days from the date of activation, depending on the wireless carrier. We estimate deactivations based on historical experience, which we have developed based on our experience with carriers, customer behavior and sources of customers, among other factors, allowing us to accrue estimates with what we believe is a high degree of certainty. Our estimated deactivation rates for the year ended December 31, 2006 and 2005 were 23.5% and 22.2% of gross carrier commission revenue for the respective periods. Any increase or decrease in the deactivation amount will cause a corresponding dollar-for-dollar increase or decrease in revenue. As an example, the impact of a 1% change in the deactivation rate applied to the year ended December 31, 2006 would have an increase or decrease in revenue and the corresponding reserve of $3.3 million. Any decrease in revenue resulting from an increase in deactivations would also be offset, in part, by returns of wireless devices. Our reserve for deactivations is reflected as a component of deferred revenue on our balance sheet. If we determine that we cannot accurately predict future deactivation experience, we may be required to defer 100% of our carrier commission revenue until the expiration of the appropriate chargeback period. New channels for which we have insufficient historical data to adequately estimate deactivation experience will be deferred through the expiration period for a period of 24 months, until such time that we can accurately estimate the deactivation experience for the new channel.

In addition to receiving commissions for each wireless subscriber activated, we earn performance bonuses from the wireless carriers based on negotiated performance targets. The most significant bonuses we earn are the quarterly volume bonus, which we collect from our wireless carriers on a monthly basis, based on current month activations. We record these bonuses as deferred revenue at the time of billing until we achieve the quarterly targets. We earn other quarterly bonuses from certain carriers for maintaining low customer churn and signing up wireless customers for certain additional monthly "features" such as data service or text messaging. Wireless carriers also periodically offer bonuses for achieving monthly volume and other performance targets and also formerly provided some bonus compensation under annual volume based plans. We recognize these monthly bonuses as earned in accordance with the provisions of SAB No. 104, *Revenue Recognition in Financial Statements* ("SAB No. 104"). Revenue is recognized only when all of the following criteria are met: (1) persuasive evidence of an arrangement exists, (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed or determinable, and (4) collectibility is reasonably assured. Amounts collected in cash prior to meeting the above criteria are recorded as deferred revenue. Through 2005, commission revenue earned from the activation of carrier features had been deferred until the contractual chargeback period had lapsed and we did not have adequate historical collection data to reasonably estimate an allowance for uncollectible amounts. Beginning in 2006, we began to estimate commission revenue earned from feature activations based on historical experience which we have developed based on our experience with carriers and customer behavior over a period of time in excess of 24 months. As of December 31, 2005, $1.4 million of feature activations revenue was deferred, which would have been accrued for less an estimated reserve for deactivations, in the event that we had the appropriate experience with carriers and customer behavior at December 31, 2005. As of December 31, 2006, our estimated reserve for deactivations of feature activations was $0.6 million.

In the ordinary course of recording and collecting commissions from our wireless carrier partners, we engage in an active matching and reconciling process (the "matching process") between source information for

44

Table of Contents

customer wireless carrier activations generated and maintained in our back-office sales information systems and each carrier's billing system. Although the substantial majority of our sales information matches to that of the carriers, matching differences do arise. Examples of such differences include (i) instances in which an activation per our records does not correlate to a commission fee payment schedule submitted by the carrier; (ii) commission fee payment collected from the carrier that is different than the expected payment per our sales records; and (iii) a deactivation identified on a carrier statement that does not match the carrier's original commission fee payment for such activation.

Data files supported by our billing records related to differences are submitted monthly to each carrier for resolution. Resolution of these differences is usually an iterative process and it can take up to 12 months or longer for final resolution of any difference. Information is exchanged between us and the carrier throughout this process. We recognize revenue based on the underlying data maintained in our back-office sales information systems unless the carrier provides us details that supersede our information. Given the nature of these differences and based on our experience in resolving such items with the carriers, we are also able to determine an appropriate reserve against revenue to reflect the likely success or failure of resolving these differences. In certain instances when a wireless carrier denies a claim we may file in resolving differences of this nature, we will write-off the related accounts receivable while pursuing further collection efforts and will record into income at a future date if collected. To the extent that we collect commission or other fee payments in excess of what we have recorded, we will record revenue in the period of receipt net of estimated chargeback requirements.

*Equipment revenue* —Revenue from the sale of wireless devices and accessories in a multiple-element arrangement with services is recognized at the time of sale in accordance with EITF No. 00-21, *Revenue Arrangements with Multiple Deliverables,* when fair value of the services element exists. Customers have the right to return devices within a specific period of time or usage, whichever occurs first. We provide an allowance for estimated returns of devices based on historical experience. Return rights of indirect retailers for wireless devices are limited to warranty claims, which are generally covered by the device manufacturers' original warranties. In accordance with the provisions of SAB No. 104, we determined we have sufficient operating history to estimate equipment returns. In connection with wireless activations, we sell the wireless device to the customer at a significant discount ("equipment discount provisions" or "EDP").

In the event a customer terminates their wireless service with the carrier within six months of activation and opts not to return the wireless device to us within the time frames permitted within our return policy, in many instances our sales contracts with the customer permit us to charge the customer an EDP termination fee. During 2004 and 2005 and prior to the three months ended June 30, 2006, revenue recognition of such fee was deferred until such fee was collected from the customer pursuant to SAB 104 as we did not have adequate historical collection data to reasonably estimate the ultimate collectibility of the receivable. Beginning April 1, 2006, we began to estimate EDP termination fee revenue based on historical experience of customer collection behavior which we have developed over a time period of 24 months which provides the basis on which to accrue revenue with an appropriate assurance of collectibility pursuant to SAB 104. As of March 31, 2006, $0.3 million of such revenue was deferred, which would have been accrued for in the event that we had adequate customer collection history, less an estimated reserve for uncollectible amounts. As of December 31, 2006, we had accrued as accounts receivable approximately $1.7 million in such EDP fees.

During the most recent quarter ended December 31, 2006, our handset return rate was 15.1% of handset revenue. We have recorded handset return rates of 11.7% and 10.4% for the years ended December 31, 2006 and 2005, respectively. Any increase or decrease in the actual handset return experience will cause a corresponding dollar-for-dollar decrease or increase in revenue. The impact of a 1% change in the handset returns rate applied to the year ended December 31, 2006 would have resulted in an increase or decrease in revenue of approximately $0.5 million with a corresponding increase or decrease in our cost of revenue.

45

Table of Contents

Under certain conditions, consumers purchasing wireless devices from us may be eligible for a product rebate depending on the wireless device purchased, service contract activated and the consumer maintaining their service with the wireless carrier for a period of up to six months. We estimate and record an accrued consumer liability and cost of revenue for such rebate at the time of sale based on the terms of the rebate and our rebate redemption experience over the most recent 18 months for which the contractual rebate redemption period has lapsed. Our rebate redemptions are processed by a third party vendor that validates the consumer's rebate redemption materials to ensure that the redemption request satisfies all terms and conditions of the rebate program to be eligible for payment. Only consumers that satisfy the redemption requirements of the rebate program earn the rebate amount under our normal terms and conditions.

During the last six months of 2006, we incurred and paid $8.0 million of payments made to consumers outside our customary rebate redemption process to parties that we believed generally had not satisfied all the terms and conditions of the respective rebate redemption program. Such amounts were paid to satisfy customer complaints and are viewed by us as "customer accommodation credits" and reflected in general and administrative expenses.

*Inventory Valuation*

Our inventory consists of wireless devices and accessories. The carrying value of inventory is stated at the lower of its cost or market value. Cost is determined using a method which approximates the first-in-first-out accounting method. We write down inventory for estimated obsolescence or unmarketable inventory equal to the difference between the cost of inventory and the estimated market value or replacement cost based upon assumptions about future demand and market conditions. If actual market conditions are less favorable than those projected, additional inventory write-downs may be required. Historically, we have not experienced significant write-offs, with the exception of returned, unmarketable inventory. During the year ended December 31, 2006, we have written off or fully reserved for credits due for wireless devices returned to our equipment providers totaling $4.0 million for which credit has yet to be received.

*Stock-based Compensation*

We adopted SFAS No. 123(R) on January 1, 2006 using the modified prospective application ("MPA") method. SFAS No. 123(R) established standards for the accounting for transactions in which an entity exchanges its equity instruments for goods or services. SFAS No. 123 (R) requires us to measure the cost of employee services received in exchange for an award of equity instruments usually stock options or unvested (restricted) stock awards based on the grant date fair value of the award. That cost is recognized over the period during which an employee is required to provide service in exchange for the award—the requisite service period (usually the vesting period). The amount of compensation expense recognized using the fair value method requires us to exercise judgment and make assumptions relating to the factors that determine the fair value of our stock option grants.

Prior to the adoption of SFAS No. 123(R), we applied the intrinsic value method of accounting for employee stock-based compensation as prescribed by Accounting Principles Board ("APB") Opinion No. 25, *Accounting for Stock Issued to Employees* , and related interpretations including FASB Interpretation ("FIN") No. 44, *Accounting for Certain Transactions involving Stock Compensation an Interpretation of APB Opinion No. 25* , issued in March 2000, to account for the equity grants to employees. Under this method, compensation expense was recorded on the date of grant only if the current market price of the underlying stock exceeded the exercise price. SFAS No. 123, *Accounting for Stock-Based Compensation* ("SFAS No. 123"), established accounting and disclosure requirements using a fair value-based method of accounting for stock-based employee compensation plans. As permitted by SFAS No. 123, we elected to continue to apply the intrinsic value-based method of accounting described above, and adopted the disclosure requirements of SFAS No. 123. All equity-based awards granted to non-employees were accounted for at fair value in accordance with SFAS No. 123. We incurred stock-based compensation expenses from grants of stock options, warrants and restricted stock awards.

46

Table of Contents

In 2004, we recorded approximately $2.0 million in compensation expense related to the cashless exercise of approximately 1,250,000 stock options by certain employees in connection with the sale of Series E preferred stock. At our discretion, the cashless exercise was permitted in this unique circumstance resulting in the application of variable accounting to the transaction in accordance with Financial Accounting Standards Board Interpretation No. 44 for the options being exercised.

### Goodwill and Intangible Assets

Goodwill and other intangible assets with indefinite useful lives are not amortized and are evaluated for impairment at least annually, or when events or circumstances suggest a potential impairment may have occurred. In accordance with SFAS No. 142, *Goodwill and Other Intangible Assets* ("SFAS No. 142"), we have selected the fourth quarter to perform the annual impairment test. SFAS No. 142 requires us to compare the fair value of the reporting unit to its carrying amount on an annual basis to determine if there is a potential impairment. If the fair value of the reporting unit is less than its carrying value, an impairment loss is recorded to the extent that the fair value of the goodwill within the reporting unit is less than the carrying value. The fair value for goodwill and other intangible assets not subject to amortization is determined based on discounted cash flows, market multiples or other measures, as appropriate. Based on our assessment for the year ended December 31, 2006, no impairments of goodwill or other intangible assets were noted.

For the year ended December 31, 2005, we determined that a supplier relationship valued at $3.7 million had an indefinite useful life as of the April 26, 2005 acquisition date of VMC Satellite, Inc. During 2006, we determined that as of the acquisition date, the supplier relationship had a useful life of ten years in accordance with SFAS No. 142. During the fourth quarter of 2006, we recognized $0.3 million of amortization expense for the period from April 26, 2005 to December 31, 2005. We do not believe the impact of this adjustment in 2006 to be material to the fiscal year 2006 or 2005 as a result of this change.

### Provision for Income Taxes

SFAS No. 109, *Accounting for Income Taxes,* establishes financial accounting and reporting standards for the effect of income taxes. During the years ended December 31, 2004, 2005 and 2006, we did not have any income tax expense or benefit because a full valuation allowance was provided against net deferred tax assets. Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized as a component of net income in the period that includes the enactment date.

As of December 31, 2006, we had approximately $196.1 million of net operating loss carryforwards, which may be available to offset any future taxable income, subject to ownership change limitations. Net operating loss carryforwards may be used to offset up to 90% of our alternative minimum taxable income. Alternative minimum taxes are allowed as credit carryovers against regular tax in the future in the event that the regular tax exceeds alternative minimum tax expense. The net operating loss carryforwards will begin to expire in 2019. Certain of these net operating losses obtained through our acquisitions are not included in the components of the deferred tax assets, as the use of these losses will be significantly limited under Section 382 of the Internal Revenue Code.

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We currently do not hedge interest rate exposures and have not used derivative financial instruments for speculation or trading purposes. At December 31, 2006, our debt financing consisted primarily of principal amounts outstanding under our fixed rate term loan. Our borrowings under the term loan are secured by substantially all of our assets.

47

Table of Contents

## ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

The information required by this item is set forth on pages F-1 to F-31.

## ITEM 9. CHANGES AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

On September 12, 2005, our Audit Committee of the Board of Directors (the "Audit Committee") dismissed KPMG LLP ("KPMG") as our independent registered public accounting firm.

The audit reports of KPMG on our consolidated financial statements as of and for the year ended December 31, 2004, did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles, except that the audit reports as of and for the year ended December 31, 2004, contained separate paragraphs stating that we adopted EITF 00-21, *Revenue Arrangements with Multiple Deliverables,* effective July 1, 2003.

During the two most recently completed fiscal years prior to their dismissal and through September 12, 2005, there were no disagreements with KPMG on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of KPMG, would have caused KPMG to make reference to the subject matter of the disagreement in connection with its reports on our financial statements for the past two fiscal years. In addition, there were no "reportable events" (as defined in Item 304(a)(1)(v) of Regulation S-K) during the two most recently completed fiscal years prior to their dismissal and through September 12, 2005.

We requested KPMG to furnish us with a letter addressed to the Securities and Exchange Commission stating whether or not it agreed with the above statements. A copy of that letter, dated September 20, 2005, was included with our current report on Form 8-K filed with the Securities and Exchange Commission on September 20, 2005.

On September 19, 2005, our Audit Committee engaged Grant Thornton LLP ("Grant Thornton") as our independent registered public accounting firm to audit the financial statements and internal control over financial reporting for the year ended December 31, 2005.

## ITEM 9A. CONTROLS AND PROCEDURES

Our management, including our principal executive and principal financial officer, has evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2006. Our disclosure controls and procedures are designed to provide reasonable assurance that the information required to be disclosed in this annual report on Form 10-K has been appropriately recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to our management, including our principal executive and principal financial officers, to allow timely decisions regarding required disclosure. Based on that evaluation, our principal executive and principal financial officer have concluded that our disclosure controls and procedures are effective at the reasonable assurance level.

### Management's Annual Report on Internal Control over Financial Reporting

Our Management, including our principal executive and principal financial officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")), as of December 31, 2006. Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer

48

and Chief Financial Officer, to allow timely decisions regarding required disclosures. Based on the evaluation and the identification of the material weaknesses in internal control over financial reporting described below, as well as our inability to file this Annual Report on Form 10-K for the year ended December 31, 2006 (the "Form 10-K") within the statutory time period, management concluded that our disclosure controls and procedures were not effective as of December 31, 2006.

The Company is in the process of implementing several improvements to remediate and remove the material weaknesses identified below. The Company will continue to strengthen its accounting resources, including the hiring of additional accounting personnel, the adoption of an internal audit department charter and improving general computer processes, procedures and controls.

Management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rule 13a-15(f) or 15d-15(f) promulgated under the Securities Exchange Act of 1934, as amended, as a process designed by, or under the supervision of, our principal executive and principal financial officers and effected by our board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

Management assessed the effectiveness of the internal control over financial reporting as of December 31, 2006 using the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. Management identified material weaknesses in our internal controls including the following:

- *We did not maintain sufficient staffing of operational and financial resources.* We did not maintain staffing in operational and financial resources sufficient to provide the level of controls and analysis required on a timely basis in light of the increasing complexity and growth of our business. This resulted in certain accounting processes and controls not being performed on a timely basis and the inability to maintain an adequate control environment, resulting in numerous material adjusting entries being made after year end. This material weakness contributed to errors such as those relating to revenue recognition and accounts receivable, accrual of rebates and other liabilities and adjustments made to properly account for certain amounts due from our vendors described below.

- *We did not always effectively communicate information to our finance department* . Specifically, we failed to maintain effective communication channels to adequately identify and record certain transactions during 2006. The failure to provide this communication contributed to errors relating to accounting and reporting of expenses and liabilities. This material weakness caused or contributed to, adjustments necessary to appropriately record amounts due to marketing partners, accounts receivable allowances and reserves for deactivations .

- *We did not maintain effective controls over the recordation, accuracy and completeness of activations and services revenue and related accounts receivable.*

  We did not take steps to adequately identify and appropriately record certain commission and bonus revenue received during the year from various wireless carriers in a timely and accurate manner. Recording amounts received from carriers in the appropriate accounts in a timely and accurate manner is an important business process control that is essential to the correct reporting of amounts in the financial statements. This material weakness contributed to errors relating to accounting and reporting for revenue and accounts receivable.

Table of Contents

We did not utilize an appropriate methodology during the year in recording receivables from wireless carriers associated with disputed deactivations, churn bonuses and other carrier related fees. We overstated accounts receivable by using a methodology that anticipated future improvements in collections beyond that supported by past experience, and which did not consider certain current factors and other information. As a result of this material weakness, an adjustment was necessary to properly record revenue and related receivables from these fees.

We recorded additional allowances for doubtful accounts receivable during our restatement process. The proper accounting for the allowance for doubtful accounts requires that estimates must be made on the future collectibility of receivables. Specifically after analysis we concluded that reserves were required for doubtful collections on disputed accounts receivable, an additional reserve was necessary to provide for disputed accounts receivable arising from the most recent month of carrier commissions arising from December activations. In addition, our estimating process failed to take into account all information from ongoing collections processes in order to properly state our reserves. An addition to our reserves was necessary as a result of this material weakness.

- *We did not maintain effective controls over the determination and accuracy of equipment revenue and related accounts receivable.* We did not utilize an appropriate methodology during the year in recording certain fees due from consumers when contracts are cancelled within specified time periods or the wireless device is not returned to us. Specifically, related accounts receivable were overstated to the extent that we used collection percentages which anticipated improvements in excess of past experience. As a result of this material weakness, an adjustment was necessary to properly record revenue and related receivables from these fees.

- *We did not maintain effective controls over the accuracy and completeness of consumer product rebate liabilities.* Specifically we did not utilize an appropriate methodology during the year in recording rebates payable to eligible consumers. We understated the consumer product rebate liability by not considering the appropriate amount of open periods eligible for rebates and the backlog of possible eligible rebates that had been delivered to outsourced payment service providers. As a result of this material weakness, an adjustment was necessary to properly record product rebate expenses and related payables.

- *We did not maintain effective controls over the accuracy and completeness of costs of goods sold and amounts due from vendors.* Specifically, we did not maintain adequate documentation to support the proper accounting for inventory movements related to support phone shipments for refitting and refurbishment. We overstated inventory or receivables in-kind by not maintaining adequate documentation of these phones provided to outside services providers. As a result of this material weakness, an adjustment was necessary to properly record costs of goods sold and amounts due from vendors.

These material weaknesses resulted in adjustments to our revenue and accounts receivable and certain other financial statement line items as referred to above and resulted in the restatement of previously issued consolidated financial statements for the three, six and nine-month periods ended March 31, 2006, June 30, 2006 and September 30, 2006, respectively.

Based on the COSO criteria in *Internal Control-Integrated Framework* and because of these material weaknesses, we have concluded that as of December 31, 2006, internal control over financial reporting was not effective. As a result of this conclusion, management performed significant additional substantive review of those areas described above where it identified material weaknesses to gain assurance that the financial statements as included herein are fairly stated in all material respects.

Management's assessment of the effectiveness of our internal control over financial reporting as of December 31, 2006 has been audited by Grant Thornton LLP, an independent registered public accounting firm, as stated in their Report which is included in Item 8 of this Annual Report on Form 10-K.

**Table of Contents**

### Remediation Efforts to Address Material Weaknesses

While we have taken and are in the process of taking appropriate actions with respect to our internal control over financial reporting, such deficiencies will not be considered remediated until the new internal controls operate for a period of time and are tested by both management and our independent registered public accounting firm such that we both can conclude these controls are operating effectively. In addition, we will continue to monitor the effectiveness and sustainability of new controls on an ongoing basis and seek to identify improvements to existing controls. Accordingly, we are in the process of implementing the following actions to remediate the material weaknesses identified in our "Management's Annual Report on Internal Control over Financial Reporting":

- Replacement of our chief financial officer;

- Appointment of a chief accounting officer and refinement of the accounting function to improve execution and monitoring of accounting processes, review procedures, GAAP application and identified controls;

- Hiring of a greater number of industry skilled and technically experienced employees in the accounting and finance organization to supplement existing employee base;

- Development of a comprehensive training program to ensure all accounting employees receive periodic training and continuing education in requisite areas and generally accepted accounting principles;

- Refinement of communications programs and contract review policies and procedures to ensure accounting department is timely and routinely informed of operating matters;

- Continued enhancement of our general computer processes, procedures and controls;

- Continued emphasis of the importance of establishing the appropriate environment in relation to accounting, financial reporting and internal control over financial reporting, and the importance of identifying areas of improvement;

- Complementing resources of our internal audit department and taking steps to enhance the independence of internal audit by strengthening its reporting relationship to the Audit Committee; and

- As approved by the Audit Committee, adoption of a charter setting forth the purpose, authority and responsibility of the internal audit activity. The charter defines the role of internal audit as providing independent, objective assurance and consulting services designed to add value and improve operations. The internal audit department ("Internal Audit") will perform specific audits to assess whether objectives are being achieved in the areas of operations, financial reporting and compliance with applicable laws, regulations and policies. Internal Audit will report functionally to the Audit Committee and administratively to the chief executive officer. Internal Audit will have unrestricted access to our records, property and personnel and have full and free access to the Audit Committee.

Our testing and evaluation of the operating effectiveness and sustainability of these changes to our internal control over financial reporting have not yet been completed as the above-referenced remediation actions are still in the implementation process. In addition, our efforts to remediate deficiencies surrounding the levels of our staffing and related levels of expertise may take some time to remediate over the next several quarters.

### ITEM 9B. OTHER INFORMATION

None.

51

Table of Contents

# PART III

## ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

The Company's executive officers, key employees and directors are as follows:

| Name | Age | Position with the Company |
|---|---|---|
| *Executive Officers:* | | |
| David A. Steinberg (4) | 37 | Chairman of the Board and Chief Executive Officer |
| Andrew B. Zeinfeld | 46 | President, E-Commerce |
| Brian J. Curran | 43 | Chief Operating Officer |
| George Z. Moratis | 41 | Executive Vice President and Chief Accounting Officer |
| *Non-Management Directors:* | | |
| John Sculley (1)(2)(4) | 68 | Vice Chairman of the Board |
| Blake Bath (2)(3) | 41 | Director |
| Ira Brind (1)(2)(3) | 66 | Director |
| Laurence E. Harris (3) | 71 | Director |
| Jack F. Kemp (1) | 71 | Director |
| *Key Employees:* | | |
| Frank C. Bennett III | 48 | President, MVNE Services |
| Gregory S. Cole | 37 | Senior Vice President and Corporate Treasurer |
| Walter W. Leach III | 44 | General Counsel and Corporate Secretary |
| Gary J. Smith | 40 | Chief Information Officer |
| Michael E. Walden | 37 | President, 1010 Interactive LLC |
| Brian T. Westrick | 38 | President, Wireless Activation and Services |

(1)    Member of the Compensation Committee.
(2)    Member of the Nominating and Governance Committee.
(3)    Member of the Audit Committee.
(4)    Member of the Mergers and Acquisitions Committee.

Set forth below is certain information regarding the positions and business experience of each executive officer, director and key employee of the Company.

## Executive Officers

*David A. Steinberg,* our founder, has served as our chairman of the board of directors and chief executive officer since our inception and served as president from August 2002 until March 2004. Prior to founding InPhonic, Mr. Steinberg was chairman, president and chief executive officer of Sterling Cellular, Inc., a distributor of wireless products that he founded in November 1993. In April 2004, Mr. Steinberg was appointed to the board of the United States Chamber of Commerce. In June 2002, Mr. Steinberg was named the Greater Washington Ernst & Young Entrepreneur of the Year in the communications category. Mr. Steinberg holds a B.A. from Washington & Jefferson College.

*Andrew B. Zeinfeld* has served as our President of E-Commerce since April 2006. Prior to joining us in April 2006, Mr. Zeinfeld served in a variety of management positions at RadioShack Corporation during a 28-year term that began in 1978, and served most recently as senior vice president and chief retail services officer of radioShack corporation.

*Brian J. Curran* has served as our chief operating officer since May 2006. From August 2000 to May 2006, Mr. Curran was the vice president of customer centricity of Best Buy Co., Inc. While at Best Buy, Mr. Curran was responsible for the fulfillment and customer service operations of the 100 million customer service phone

52

Table of Contents

calls that Best Buy receives annually. Mr. Curran was also uniquely instrumental in managing the launch of BestBuy.com. Prior to joining Best Buy, Mr. Curran was employed by Comp USA Management Co. from December 1992 until August 2000 where he served in increasingly senior roles culminating in vice president of direct sales. Mr. Curran was employed by Checkered Flag, Inc. as the sales and finance manager from 1986 to 1992. Mr. Curran began his career with the United States Navy where he remained until 1986.

*George Z. Moratis* , has served as our senior vice president of financial reporting and analysis since October 2005 and chief accounting officer since May 2007. From November 2004 to June 2005, Mr. Moratis served as senior vice president and treasurer of USA Mobility, a provider of wireless communications solutions to the healthcare, government, large enterprise and emergency response sectors. From December 1998 to November 2004, Mr. Moratis served in several management positions and most recently was chief financial officer, treasurer and principal accounting officer of Metrocall Holdings, Inc., a provider of traditional paging and advanced wireless data and messaging services, until its acquisition by USA Mobility in November 2004. Prior to joining Metrocall, Mr. Moratis spent several years with MCI Communications Corporation, the U.S. Securities and Exchange Commission, and Deloitte & Touche in several different roles. Mr. Moratis holds a B.A. degree from the University of Pittsburgh and is a certified public accountant.

## Non-Management Directors

*John Sculley* is vice chairman of our board of directors and has served on our board of directors since February 2000. Since June 1994 until 2004, Mr. Sculley served as a partner of Sculley Brothers LLC, a private investment and advisory services company. Since 2004, he has been Venture Partner at Rho Capital Partners. Prior to forming Sculley Brothers, Mr. Sculley was chief executive officer of Apple Computer, Inc. from 1983 until 1993. From 1967 to 1983, Mr. Sculley held marketing and management positions at the Pepsi-Cola Company, including serving as its president and chief executive officer from 1978 to 1983. Mr. Sculley serves on the board of directors of MetroPCS, Inc., Transforma Acquisition Group Inc. and several private companies. Mr. Sculley holds a B.A. from Brown University and an M.B.A. from The Wharton School of the University of Pennsylvania.

*Blake Bath* has served on our board since October 2006. Mr. Bath most recently served as managing director and senior equity research analyst for Lehman Brothers, a financial services firm, where he has covered wireline and wireless telecommunications services since January 1996. From September 1992 to September 2006, Mr. Bath held several equity research positions, including as the senior analyst for telecommunications at Lehman Brothers. Prior to joining Lehman Brothers as a senior analyst in January 1996, Mr. Bath was the primary telecommunications analyst at Sanford C. Bernstein & Co., LLC, an investment research firm, from 1992 to 1996. From 1989 to 1992, Mr. Bath served as an analyst in the strategic planning and corporate finance organizations at MCI Communications Corporation, a telecommunications carrier. Mr. Bath holds an M.B.A. from Columbia University and a B.S. degree from the University of Michigan.

*Ira Brind* has served on our board of directors since December 2000. Since May 1989, Mr. Brind has served as president and chief executive officer of Brind Investments, Inc. Mr. Brind was the president and co-founder of Brind-Lindsay & Co., Inc., a private equity and venture capital firm, from 1987 to December 2004. From 1967 until 1983, Mr. Brind was the chief executive officer of Brind Leasing Corporation, a full service truck leasing company, which he sold to McDonnell Douglas. He was chief executive officer and president of McDonnell Douglas Truck Services, a truck leasing company, from 1983 until 1987. Mr. Brind is currently the chairman emeritus of the board of trustees of Thomas Jefferson University Hospital, vice chairman of the Board of Trustees of University of the Arts, member of the Board of Trustees of the Wistar Institute, the Connelly Foundation, Thomas Jefferson University and the Jefferson Health System. Mr. Brind serves on the board of directors of several private companies. Mr. Brind holds a B.A. and a J.D. from the University of Pennsylvania.

*Laurence E. Harris* has served as a director since March 2006. He is " *of counsel* " at the law firm Patton Boggs LLP and was a partner with the firm from May 2001 until December 2004. From December 1996 to April 2001, Mr. Harris was senior vice president and general counsel of Teligent, Inc., an international

53

**Table of Contents**

telecommunications company. Teligent, Inc. filed a voluntary petition for bankruptcy in May 2001. From 1992 to 1996, Mr. Harris served as senior vice president of law and public policy for MCI Communications Corporation. From 1982 to 1992, Mr. Harris was president and chief operating officer of Metromedia Telecommunications, Inc. and CRICO Communications, a privately-held paging company. Prior to Metromedia, Mr. Harris served as chief of the Federal Communication Commission's Mass Media Bureau. From 1972 to 1982, Mr. Harris served as a vice president of law and public policy for MCI, managing corporate relations for the Federal Communications Commission (FCC) and the office of telecommunications policy at the White House. Mr. Harris was a lieutenant in the U.S. Navy, serving in the destroyer fleet. Mr. Harris serves on the board of directors of MCI, where he is a member of the risk and corporate governance committees. Mr. Harris also serves on the board of directors and is chairman of the audit committee for Sports Brands International, Inc. Mr. Harris holds a B.A. degree from Columbia College and J.D. from Georgetown University.

*Jack F. Kemp* has served on our board of directors since June 2002. Mr. Kemp is founder and chairman of Kemp Partners, a strategic consulting firm which seeks to provide clients with strategic counsel, relationship development, and marketing advice in helping them accomplish business and policy objectives. From January 1993 until July 2004, Mr. Kemp was co-director of Empower America, Inc., a Washington, D.C.-based public policy and advocacy organization he co-founded with William Bennett and Ambassador Jeane Kirkpatrick. In 1996, Mr. Kemp was the Republican Party candidate for Vice President. Prior to founding Empower America, Mr. Kemp served as U.S. Secretary of Housing and Urban Development from 1989 to 1992, and in the U.S. House of Representatives from 1971 to 1989. Mr. Kemp also serves as a director of Hawk Corporation, Oracle Corporation, Six Flags, Inc. and WorldSpace, Inc. Mr. Kemp holds a B.A. from Occidental College.

## Key Employees

*Frank C. Bennett III* has served as our president of MVNE services since March 2004, and prior to that he served as our chief operating officer from April 2002. From August 2000 to August 2001, Mr. Bennett was the senior vice president and group operations officer for the retail group of Verizon. From October 1999 to August 2000, Mr. Bennett served as vice president, e-commerce and technology of Bell Atlantic Corporation (now part of Verizon). From February 1998 to October 1999, he was vice president, customer billing of Bell Atlantic. In addition, from July 1996 to December 1998, Mr. Bennett served as a founder and vice president, call center development of Bell Atlantic Plus, a provider of bundled wireline and wireless services. Mr. Bennett holds a B.A. from the University of Virginia and an M.B.A. from The Wharton School of the University of Pennsylvania.

*Gregory S. Cole* , our senior vice president and corporate treasurer joined us in May 2006. Prior to joining us, from September 1998 to August 2005, Mr. Cole served as vice president, treasurer for XM Satellite Radio Holdings Inc., a provider of satellite radio services. From September 1994 to September 1998, Mr. Cole was a member of the finance department and privatization team at USEC, Inc., an energy company. Mr. Cole began his career as a certified public accountant in 1991, working for both local and national accounting firms including Coopers and Lybrand LLC. Mr. Cole holds an M.B.A. from the University of Maryland and BBA from James Madison University in Virginia.

*Walter W. Leach, III* has served as our general counsel since January 2001. Mr. Leach served as corporate counsel of Snyder Communications, a marketing and communications solution provider from June 1997 to January 2001. From October 1992 to June 1997, Mr. Leach served as deputy corporate counsel for Inductotherm Industries, Inc., a privately held manufacturer. Mr. Leach holds a B.A. from Syracuse University and a J.D. from Vermont Law School.

*Gary J. Smith* has served as our chief information officer since July 2000. From July 1999 to July 2000, Mr. Smith served as chief information officer and vice president of technology of Varsity Group Inc., formerly known as VarsityBooks.com, LLC, an online retailer of textbooks. From September 1987 to July 1999,

Table of Contents

Mr. Smith served in various technology management positions at Discovery Communications Inc., an international media company, including most recently vice president of technology. Mr. Smith holds a B.S. from the University of Maryland.

*Michael E. Walden* has served in various executive-level positions at our company since joining us in October 2000 and is currently the President of our subsidiary 1010 Interactive LLC. Mr. Walden previously served as our vice president and executive vice president of Corporate Development from October 2000 until January 2007. December 1999 to October 2000, Mr. Walden served as vice president of new media and entertainment at Etensity, Inc., an e-business consulting firm. From October 1998 to December 1999, Mr. Walden served as vice president of operations for Professional Resource Services, a technology consulting and recruiting firm, a spin-out of NDC Group, a technology consulting firm. From November 1995 to October 1998, Mr. Walden served as director of telecommunications services for NDC Group. From 1991 to 1994, Mr. Walden served on the Washington D.C. legislative staff of U.S. Senator Arlen Specter. Mr. Walden holds a B.S. in Business Administration from the University of Richmond.

*Brian T. Westrick* has served as president of our wireless activation and services division since July 2002 and has held various executive-level positions since joining us in June 2000. From December 1994 to June 2000, Mr. Westrick was vice president of sales and marketing for Universal Jet Trading. From July 1991 to December 1994, Mr. Westrick was marketing director for Lease Audit and Analysis Services, a real estate consulting company. From June 1990 to July 1991, Mr. Westrick was a marketing representative with Xerox Corporation. Mr. Westrick holds a B.S. from the Wallace E. Carroll School of Management at Boston College.

### Information Regarding the Board of Directors and Certain Committees

Our board of directors currently consists of six members. Our board of directors is divided into three classes of directors who serve in staggered three-year terms, as follows:

- The Class I directors are Messrs. Steinberg and Harris, and their terms will expire at the annual meeting of stockholders to be held in 2008.

- The Class II directors are Messrs. Brind and Bath, and their terms will expire at the annual meeting of stockholders to be held in 2009.

- The Class III directors are Messrs. Kemp and Sculley, and their terms will expire at the annual meeting of stockholders to be held in 2007.

The Board of Directors held 13 meetings during 2006. No director attended fewer than 75% of the total number of meetings of the Board of Directors and of the committees of which he was a member during 2006. It is our policy to have each director attend all meetings of stockholders. In 2006, two of our seven directors attended the annual meeting of stockholders. The Board of Directors has determined that each member of the Board of Directors, other than Mr. Steinberg, is independent in accordance with applicable rules of The Nasdaq Global Market and the rules and regulations of the Securities and Exchange Commission. The Board of Directors has an Audit Committee, a Compensation Committee, a Nominating and Governance Committee and a Mergers and Acquisitions Committee. The Board of Directors has adopted a charter for the Audit Committee, Compensation Committee and the Nominating and Governance Committee, copies of which are available on our website at http://investor.inphonic.com/corpgov/corpgov.cfm.

The Audit Committee consists of Messrs. Harris, Bath and Brind. The Board of Directors has determined that each of the members of the Audit Committee is independent in accordance with applicable rules of The NASDAQ Global Market and the rules and regulations of the Securities and Exchange Commission. The Board of Directors has determined that each of the members of the Audit Committee is an "audit committee financial expert" as that term is defined in Item 407 of Regulation S-K under the Securities Exchange Act of 1934. The

Table of Contents

Audit Committee held 17 meetings during 2006. The Audit Committee oversees our corporate accounting and financial reporting process and the audits of our financial statements. Among other matters, the Audit Committee:

- is responsible for the appointment, compensation and retention of our Independent Registered Public Accounting Firm and reviews and evaluates the auditors' qualifications, independence and performance;

- oversees the Independent Registered Public Accounting Firm's audit work and reviews and pre-approves all audit and non-audit services that may be performed by them;

- reviews and approves the planned scope of our annual audit;
- monitors the rotation of partners of the Independent Registered Public Accounting Firm on our engagement team as required by law;

- reviews our consolidated financial statements and discusses with management and the Independent Registered Public Accounting Firm the results of the annual audit and the review of our unaudited quarterly financial statements;

- reviews our critical accounting policies and estimates;

- oversees the adequacy of our accounting and financial controls;

- annually reviews the Audit Committee charter and the committee's performance;

- reviews and approves all related-party transactions; and

- establishes and oversees procedures for the receipt, retention and treatment of complaints regarding accounting, internal controls or auditing matters and oversees enforcement, compliance and remedial measures under our code of conduct.

The Compensation Committee consists of Messrs. Brind, Kemp and Sculley. The Board of Directors has determined that each of the members of the Compensation Committee is independent in accordance with applicable rules of The NASDAQ Global Market. The Compensation Committee held three meetings during 2006. The Compensation Committee approves, administers and interprets our compensation and benefit policies, and administers our stock option and benefit plans. The Compensation Committee:

- reviews and approves corporate goals and objectives relevant to compensation of the chief executive officer and the other executive officers;

- evaluates the performance of the chief executive officer and the other executive officers in light of those goals and objectives;

- sets compensation of the chief executive officer and the other executive officers;

- approves all executive officer employment, severance, or change-in-control agreements, including all special or supplemental benefits, and all agreements to indemnify executive officers or directors;

- administers the issuance of stock options and other awards to executive officers and directors under our stock plans; and

- reviews and evaluates, annually, the performance of the Compensation Committee and its members.

The Nominating and Governance Committee consists of Messrs. Brind, Bath and Sculley. The Board of Directors has determined that each of the members of the Nominating and Governance Committee is independent in accordance with applicable rules of The NASDAQ Global Market. The Nominating and Governance Committee was formed in May 2004 and held one meeting during 2006. The Nominating and Governance Committee:

- identifies individuals qualified to become directors;

56

Table of Contents

- recommends to the Board of Directors director nominees for each election of directors;

- develops and recommends to the Board of Directors criteria for selecting qualified director candidates;

- considers committee member qualifications, appointment and removal;

- recommends corporate governance guidelines applicable to the Company; and

- provides oversight in the evaluation of the Board of Directors and each committee.

The Mergers and Acquisitions Committee consists of Messrs. Sculley and Steinberg. The Mergers and Acquisitions Committee held one meeting during 2006. The Mergers and Acquisitions Committee reviews, monitors and advises the Board of Directors in connection with potential mergers and acquisitions.

## Director Nominations

Consistent with its charter, the Nominating and Governance Committee will evaluate and recommend to the Board of Directors director nominees for each election of directors.

In fulfilling its responsibilities, the Nominating and Governance Committee considers the following factors in reviewing possible candidates for nomination as director:

- the appropriate size of our Board of Directors and its committees;

- the perceived needs of the Board of the Directors for particular skills, background and business experience;

- the skills, background, reputation, and business experience of nominees compared to the skills, background, reputation, and business experience already possessed by other members of the Board of Directors;

- nominees' independence from management;

- applicable regulatory and listing requirements, including independence requirements and legal considerations, such as antitrust compliance;

- the benefits of a constructive working relationship among directors; and

- the desire to balance the considerable benefit of continuity with the periodic injection of the fresh perspective provided by new members.

The Nominating and Governance Committee's goal is to assemble a Board of Directors that brings to the Company a variety of perspectives and skills derived from high quality business and professional experience. Directors should possess the highest personal and professional ethics, integrity and values, and be committed to representing the best interests of our stockholders. They must also have an inquisitive and objective perspective and mature judgment. Director candidates, in the judgment of the Nominating and Governance Committee, must have sufficient time available to perform all Board of Directors and committee responsibilities. Members of the Board of Directors are expected to prepare for, attend and participate in all meetings of the Board of Directors and applicable committee meetings.

Other than the foregoing, there are no stated minimum criteria for director nominees, although the Nominating and Governance Committee may also consider such other factors as it may deem, from time to time, to be in the best interests of the Company and its stockholders.

## Identifying and Evaluating Candidates for Nomination as Director

The Nominating and Governance Committee annually evaluates the current members of the Board of Directors whose terms are expiring and who are willing to continue in service against the criteria set forth above

57

Table of Contents

in determining whether to recommend these directors for election. The Nominating and Governance Committee regularly assesses the optimum size of the Board of Directors and its committees and the needs of the Board of Directors for various skills, background and business experience in determining whether it is advisable to consider additional candidates for nomination.

Candidates for nomination as director may come to the attention of the Nominating and Governance Committee from time to time through incumbent directors, management, stockholders or third parties. These candidates may be considered at meetings of the Nominating and Governance Committee at any point during the year. Such candidates are evaluated against the criteria set forth above. If the Nominating and Governance Committee believes at any time that it is desirable that the Board of Directors consider additional candidates for nomination, the committee may poll directors and management for suggestions or conduct research to identify possible candidates and may, if the Nominating and Governance Committee believes it is appropriate, engage a third party search firm to assist in identifying qualified candidates. In March 2006, the Nominating and Governance Committee nominated, and the Board of Directors appointed, Mr. Harris as a director and in October 2006, the Nominating and Governance Committee nominated, and the Board of Directors appointed, Mr. Bath as a director. Messrs. Harris and Bath were recommended as nominees by the Nominating and Governance Committee.

The Nominating and Governance Committee will evaluate any recommendation for director nominee proposed by a stockholder. In order to be evaluated in connection with the Nominating and Governance Committee's established procedures for evaluating potential director nominees, any recommendation for director nominee submitted by a stockholder must be sent in writing to: InPhonic, Inc., Attention: Walter W. Leach III, Corporate Secretary, 1010 Wisconsin Avenue, Suite 600, Washington, DC 20007, at least 120 days prior to the anniversary of the date definitive proxy materials were mailed to stockholders in connection with the prior year's annual meeting of stockholders and must contain the following information:

- the candidate's name, age, contact information and present principal occupation or employment; and

- a description of the candidate's qualifications, skills, background, and business experience during, at a minimum, the last five years, including his/her principal occupation and employment and the name and principal business of any corporation or other organization in which the candidate was employed or served as a director.

In addition, our by-laws permit stockholders to nominate directors for consideration at an annual meeting provided they notify us at least 120 days prior to the anniversary of the date when definitive proxy materials were mailed to stockholders in connection with the prior year's annual meeting of stockholders.

All directors and director nominees must submit a completed form of directors' and officers' questionnaire as part of the nomination process. The evaluation process may also include interviews and additional background and reference checks for non-incumbent nominees, at the discretion of the Nominating and Governance Committee.

## Stockholder Communications with the Board of Directors

Stockholders may communicate with directors of the Company by transmitting correspondence by mail or facsimile, addressed to the director or the full Board of Directors as follows:

Board of Directors
c/o Walter W. Leach III, General Counsel
InPhonic, Inc.
1010 Wisconsin Avenue
Suite 600
Washington, DC 20007
Fax: 202-333-8280

Table of Contents

The Corporate Secretary will maintain a log of such communications and transmit as soon as practicable such communications to the identified director(s), except where security concerns militate against further transmission of the communication or the communication relates to commercial matters not related to the sender's interest as a stockholder, as determined by the General Counsel, Walter W. Leach III. The Board of Directors or individual directors so addressed will be advised of any communication withheld for such reasons.

**Code of Conduct**

We have adopted a code of business conduct and ethics, and a policy providing for the reporting of potential violations of the code, for directors, officers (including our principal executive officer, principal financial officer and controller) and employees, known as the Code of Conduct and Policy Regarding Reporting of Possible Violations (the "Code of Conduct"). The Code of Conduct is available on our website at http://investor.inphonic.com/profiles/investor Governance.

Additionally, stockholders may request a free copy of the Code of Conduct from:

InPhonic, Inc.
Attention: Investor Relations
1010 Wisconsin Avenue
Suite 600
Washington, DC 20007
(202) 333-0001

**Compliance with Section 16(a) of the Exchange Act**

Section 16(a) of the Exchange Act requires that the Company's executive officers and directors, and persons who own more than ten percent of a registered class of the Company's equity securities, file reports of ownership and changes in ownership with the SEC and provide the Company with copies of such reports. The Company has reviewed such reports received by it and written representations from its directors and executive officers. Based solely on such review, the Company believes that the following person did not make the following timely filings pursuant to Section 16(a) of the Exchange Act: Goldman Sachs Group Inc. filed a Form 4 November 20, 2006 with respect to multiple purchases of the Company's common stock November 6, 2006.

## ITEM 11. EXECUTIVE COMPENSATION

### Compensation Committee Interlocks and Insider Participation

None of the members of our Compensation Committee has at any time been one of our officers or employees. None of our executive officers serves or in the past has served as a member of the board of directors or compensation committee of any entity that has one or more of its executive officers serving on our Board of Directors or our compensation committee. See "Certain Relationships and Related Transactions."

## COMPENSATION DISCUSSION AND ANALYSIS

### Philosophy & Objectives

The primary goals of the compensation committee of our board of directors with respect to executive compensation are to attract and retain the most talented and dedicated executives possible, to tie annual and long-term cash and stock incentives to achievement of specified performance objectives, and to align executives' incentives with stockholder value creation. To achieve these goals, the compensation committee has implemented a compensation plan that ties a significant portion of executives' overall compensation to key strategic targets such as the number of new activations of wireless devices and services, a positive customer experience, establishing and maintaining key strategic relationships and our financial and operational

59

performance, as measured by metrics such as our revenue growth cash flow, pursuit of profitability, and operational and financial measures specific to our business divisions. The compensation committee evaluates individual executive performance with a goal of setting compensation at levels the committee believes are comparable with executives in other companies of similar size and stage of development operating in the communications industry, while taking into account our relative performance and our own strategic goals.

We have retained a compensation consultant to provide us a compensation survey for our use in creating our policies and procedures with respect to executive compensation. We conduct an annual benchmark review of the aggregate level of our executive compensation, as well as the mix of elements used to compensate our executive officers. This review is based on a summary of published survey data compiled by Watson Wyatt & Company for technology companies with annual revenues of approximately $300 million, as well as reports published by the Mercer Group International. Utilizing this information, we created salary and stock option grant ranges for certain executive-level positions, which were approved by the Compensation Committee and are updated annually. The mix of cash and equity incentive compensation for our chief executive officer and chief financial officer are based on separate analysis of the compensation surveys by the Compensation Committee.

## Elements of Compensation

Executive compensation consists of following elements:

*Base Salary.* Base salaries for our executives are established based on the scope of their responsibilities, taking into account competitive market compensation paid by other companies for similar positions. Generally, we believe that executive base salaries should be targeted near the median of the range of salaries for executives in similar positions with similar responsibilities at comparable companies. Base salaries are reviewed annually, and adjusted from time to time to realign salaries with market levels after taking into account individual responsibilities, performance and experience. For 2007, this review has not yet occurred.

*Discretionary Annual Bonus.* The compensation committee has the authority to award discretionary, annual cash bonuses to our executive officers. These awards are intended to compensate officers for achieving financial and operational goals and for achieving individual annual performance objectives. These objectives vary depending on the individual executive, but relate generally to strategic factors such as the number of new activations of wireless devices and services, a positive customer experience, establishing and maintaining key strategic relationships and our financial and operational performance, as measured by metrics such as our revenue growth, pursuit of profitability, and operational and financial measures specific to our business divisions. Each fiscal year the compensation committee selects, in its discretion, our executive officers who are eligible to receive a discretionary bonus. The compensation committee will establish the terms and conditions applicable to any award granted under the plan and a participant will be eligible to receive an award under the plan in accordance with such terms and conditions. Awards will be paid in whole or in part in cash or restricted stock. Similar to bonuses paid in the past, the actual amount of discretionary bonus will be determined following a review of each executive's individual performance and contribution to our strategic goals. The actual amount of discretionary bonus is determined following a review of each executive's individual performance and contribution to our strategic goals conducted during the first quarter of each fiscal year. The compensation committee has not fixed a maximum payout for any officer's annual discretionary bonus.

Based on the compensation committee's review of individual and company performance in 2006, the compensation committee awarded two named executive officers, Michael Walden and Brian Westrick, cash bonuses in the amounts indicated in the table entitled "Summary Compensation Table."

*2004 Equity Incentive Plan .* We believe that stock-based awards encourage our named executive officers to provide superior performance. We established our 2004 Equity Incentive Plan to provide certain of our employees, including our executive officers, with incentives to help align those employees' interests with the interests of stockholders. The compensation committee believes that the use of stock-based awards offers the best

Table of Contents

approach to achieving our compensation goals. Other than Mr. Steinberg's stock that he acquired as founder of our company, our 2004 Equity Incentive Plan provides the principal method for our named executive officers to acquire equity or equity-linked interests in our company. We believe that the annual aggregate value of these awards should be set near competitive median levels for comparable companies. However, due to the relatively early stage of our business, we expect to provide a greater portion of total compensation to our executives through our stock compensation plans than through cash-based compensation. Periodic awards are made at the discretion of the compensation committee to eligible employees and, in appropriate circumstances, the compensation committee considers the recommendations of members of management.

*Stock Options.* Our 2004 Equity Incentive Plan authorizes us to grant options to purchase shares of common stock to our employees, directors and consultants. Our compensation committee is the administrator of the 2004 Equity Incentive Plan. Beginning January 1, 2006 due to our adoption of SFAS No. 123(R), which changed the accounting for stock option grants, we generally award executive-level employees restricted stock, rather than grant them stock options. We made this change in philosophy because under SFAS No. 123(R) both types of awards receive the same accounting treatment and thus we are able to give an amount of equity value while awarding fewer shares relative to a stock option grant that would require the executive to tender an exercise price. We continue to grant stock options to non-executive employees. Prior to January 1, 2006, stock options were granted to executive officers at the commencement of employment and, in connection with annual salary increases and bonuses. Stock options typically vest over a four-year period with 25% vesting on the first anniversary of the date of grant and the remainder in equal installments every 90 days thereafter over the remainder of the period, and generally expire ten years after the date of grant. Incentive stock options also include certain other terms necessary to assure compliance with the Internal Revenue Code of 1986, as amended.

*Restricted Stock Award s.* Our compensation committee has and may in the future make grants of restricted stock to our named executive officers. The compensation committee reviewed and approved restricted stock awards to executive officers based upon a review of competitive compensation data, its assessment of individual performance, a review of each executive's existing long-term incentives, and retention considerations. Restricted stock awards typically vest over a four-year period with 25% vesting on the first anniversary of the date of grant and the remainder in equal installments every 90 days thereafter over the remainder of the period.

*2006 Awards .* In 2006, certain named executive officers were awarded restricted stock in the amounts indicated in the section entitled "Grants of Plan Based Awards". In connection with the negotiation and closing of the $100 million term loan with Goldman Sachs Credit Partners, L.P. and Citicorp North America, Inc. and to provide further incentive to attain the company's strategic, financial and operational goals, the compensation committee made restricted stock awards to Messrs. Steinberg, Walden, Westrick, Winkler and Zeinfeld in the amounts indicated in the section entitled "Grants of Plan Based Awards". These restricted stock awards vest over a four-year period with 25% vesting on the first anniversary of the date of grant and the remainder in equal installments every 90 days thereafter over the remainder of the period.

***1999 Stock Incentive Plan.*** Our 1999 Stock Incentive Plan was terminated upon our adoption of our 2004 Equity Incentive Plan in connection with the closing of our initial public offering November 2004. The only equity incentive we issued under the 1999 Stock Incentive plan was stock options. The option exercise price and the term of each option were determined by the compensation committee. The compensation committee also determined at what time or times each option may be exercised and, the period of time, if any, after retirement, death, disability or termination of employment during which options may be exercised. Stock options granted under the 1999 Stock Incentive Plan typically vest over a four-year period with 25% vesting on the first anniversary of the date of grant and the remainder in equal installments every 90 days thereafter over the remainder of the period, and generally expire ten years after the date of grant. As of May 21, 2007, we had outstanding options to purchase 1,909,911 shares of our common stock under the 1999 Stock Incentive Plan.

***Benefits.*** We provide additional benefits to our executive officers in order to remain competitive with compensation packages available in our industry generally and foster an attractive working environment. In

61

Table of Contents

many cases, these benefits are identical or substantially identical to those provided to all employees at the same location. For named executive officers, we generally provide benefits such as life insurance, medical insurance, auto allowances, use of Company courier and driver services, use of executive assistants for personal errands, and payment of club membership and professional organization fees. In connection with the hiring of a new executive officer, we may also provide for reimbursement of relocation expenses. The payment of personal benefits to our named executive officers varies based on the executive level.

## Tax and Accounting Implications

*Compensation Deduction Limit.* As part of its role, the Compensation Committee considers the deductibility of executive compensation under Section 162(m) of the Internal Revenue Code, which provides that we may not deduct compensation of more than $1,000,000 that is paid to certain individuals. The Compensation Committee has considered the $1 million limit for federal income tax purposes on deductible executive compensation that is not performance-based, and believes that the executive compensation paid in 2006 and prior years satisfied the requirements of federal tax law and thus the compensation should be fully deductible.

## COMPENSATION COMMITTEE REPORT

The Compensation Committee has reviewed and discussed the Compensation Discussion and Analysis required by Item 402(b) of Regulation S-K with management and, based on such review and discussions, the Compensation Committee recommended to the Board that the Compensation Discussion and Analysis be included in this Annual Report.

Compensation Committee

Ira Brind, Chairman
Jack F. Kemp
John Sculley

Table of Contents

## SUMMARY COMPENSATION TABLE

The following table sets forth information concerning the compensation earned during the fiscal year ended December 31, 2006 by our Chief Executive Officer, former Chief Financial Officer, and our three other most highly-compensated executive officers:

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($)(2) | Option Awards ($)(3) | Non-Equity Incentive Plan Compensation ($)(7) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| David A. Steinberg (1) Chairman of the Board and Chief Executive Officer | 2006 | 346,250 | — | 457,636 | 1,130,269 | — | — | 46,405 | 1,980,560 |
| Lawrence S. Winkler (4) Former Chief Financial Officer, Executive Vice President and Treasurer | 2006 | 300,000 | — | 1,122,097 | 298,960 | — | — | 13,278 | 1,734,335 |
| Brian Westrick (5) President, Wireless Activation & Services | 2006 | 237,000 | 20,000 | 170,165 | 288,908 | — | — | 6,709 | 722,782 |
| Michael Walden Executive VP Corporate Development | 2006 | 225,000 | 20,175 | 170,165 | 203,936 | 20,000 | — | — | 639,276 |
| Andrew Zeinfeld (6) President | 2006 | 205,769 | — | 381,932 | — | — | — | 40,000 | 627,701 |

(1) Other Compensation includes the following: $18,851 for life insurance; $12,000 for courier and driver services; $8,000 for the use of an executive assistant for personal errands; $7,554 for the payment of club membership dues and professional membership fees.

(2) Reflects the dollar amount recognized for financial reporting purposes in accordance with FAS 123(R) and thus may include amounts from awards granted in and prior to 2006. Assumptions used in the calculation of these amounts are included in Note (o) to our audited financial statements included in our Annual Report on Form 10-K.

(3) Reflects the dollar amount recognized for financial reporting purposes in accordance with FAS 123(R) and thus includes amounts from awards granted in and prior to 2006. Assumptions used in the calculation of these amounts are included in Note (o) to our audited financial statements included in our Annual Report on Form 10-K.

(4) Other Compensation includes $13,278 for medical insurance. Effective May 31, 2007, Mr. Winkler's employment with us has terminated.

(5) Other Compensation includes $6,709 auto allowance.

(6) Other Compensation includes $40,000 relocation and legal expense reimbursement.

(7) Commissions paid in 2006.

Table of Contents

# GRANTS OF PLAN BASED AWARDS

The following table sets forth certain information with respect to option awards and other plan-based awards granted during the fiscal year ended December 31, 2006 to our named executive officers:

| Name | Grant Date ($) | All Other Stock Awards: Number of Shares of Stock or Units (#) | Exercise or Base Price of Option Awards ($) | Grant Date Fair Value of Stock Awards ($) |
|---|---|---|---|---|
| David A. Steinberg (1) | 12/28/2006 | 500,000 | — | $ 11.11 |
| Lawrence S. Winkler (2) | 06/13/2006 | 25,000 | — | $ 6.51 |
| | 12/28/2006 | 100,000 | — | $ 11.11 |
| Brian T. Westrick (3) | 03/22/2006 | 28,000 | — | $ 6.46 |
| | 12/28/2006 | 50,000 | — | $ 11.11 |
| Michael Walden (4) | 03/22/2006 | 28,000 | — | $ 6.46 |
| | 12/28/2006 | 50,000 | — | $ 11.11 |
| Andrew Zeinfeld (5) | 06/13/2006 | 350,000 | — | $ 6.51 |
| | 12/28/2006 | 50,000 | — | $ 11.11 |

(1) Grant date fair value of 12/28/06 restricted stock grant as prescribed by FAS123(R) is $5,555,000. No option awards were granted.
(2) Grant date fair value of 6/13/06 and 12/28/06 restricted stock grants as prescribed by FAS123(R) are $162,750 and $1,111,000, respectively. No option awards were granted. Effective May 31, 2007 Mr. Winkler's employment with us has terminated.
(3) Grant date fair value of 3/22/06 and 12/28/06 restricted stock grants as prescribed by FAS123(R) are $180,880 and $555,500, respectively. No option awards were granted.
(4) Grant date fair value of 3/22/06 and 12/28/06 restricted stock grants as prescribed by FAS123(R) are $180,880 and $555,500, respectively. No option awards were granted.
(5) Grant date fair value of 6/13/06 and 12/28/06 restricted stock grants as prescribed by FAS123(R) are $2,278,500 and $555,500, respectively. No option awards were granted.

## Employment Agreements

We have entered into employment agreements with our named executive officers. The following discussion provides an overview of these agreements; it is not a complete description of all terms of the agreements. For the location of the agreements discussed below in our public SEC filings, please refer to the exhibit index in our Form 10-K for the year ended December 31, 2006.

In February 2000, we entered into an employment agreement with Mr. Steinberg, which was subsequently amended in March and May 2004. The agreement provides that we will employ Mr. Steinberg as our chief executive officer until May 31, 2008. The terms can be extended if we and Mr. Steinberg agree to do so 30 days prior to the end of the current term. Under this agreement, Mr. Steinberg receives an annual base salary to be established from time to time by the board of directors, which shall not be less than $290,000 per year, and he is eligible for an annual bonus equal to 65% of his then current annual salary based on the attainment of reasonable performance objectives established by the Compensation Committee of the Board of Directors. Mr. Steinberg's annual base salary is currently $320,000. Pursuant to the May 2004 amendment, Mr. Steinberg was granted options to purchase 666,667 shares of our Common Stock, at an exercise price of $5.88 per share, 25% of which vested on the first anniversary of the date of grant and the remainder vest in equal quarterly installments over the following three years.

Table of Contents

Effective May 31, 2007, Mr. Winkler's employment with us was terminated.

We entered into an employment agreement with Mr. Walden effective as of May 1, 2004. This employment agreement provided that we will employ Mr. Walden as Senior Vice President of Corporate Development. Under this agreement, Mr. Walden received an annual base salary of $150,000 to be reviewed annually, and is eligible for a bonus to be determined by the good faith discretion of the CEO based on Mr. Walden's overall performance. Mr. Walden shall be eligible to participate in such profit-sharing, stock option, bonus, incentive and performance based award programs as are made available to any other executive employees of the Company. In 2006, Mr. Walden's base salary was $225,000. Mr. Walden is currently President of InPhonic's Subsidiary, 1010 Interactive LLC.

If Mr. Walden's employment is terminated without cause, he would be entitled to three (3) month's salary at the rate in effect at the time of termination either in one lump sum or three equal payments commencing as of the effective date of the termination.

During the term of his employment and for 12 months thereafter, Mr. Walden has agreed not to (i) render any service ( as an employee, officer, director, consultant or otherwise) to any unit or division of any entity involved directly in the Business (as defined in the Employment Agreement); (ii) make or hold any investment in any entity in the Business other than the ownership of not more than 5% of the listed stock of any publicly traded entity; or (iii) contact any customer or employee to request, induce or attempt to induce any such customer or employee to terminate its business relationship, agreement, or employment with the Company."

We entered into an employment agreement with Mr. Zeinfeld on December 20, 2006. This agreement provides that we will employ Mr. Zeinfeld as President of E-Commerce. Under the agreement, Mr. Zeinfeld will receive an initial base salary of $300,000 per annum. In addition, Mr. Zeinfeld will have the opportunity to earn an annual bonus of $100,000 for on-target performance, as such terms shall be defined by the CEO and Mr. Zeinfeld. We also agreed to reimburse Mr. Zeinfeld for up to $15,000 of third party moving expenses incurred by Mr. Zeinfeld in connection with his relocation to the Washington, D.C. area and up to $20,000 for any interim housing expenses. In addition, we agreed to reimburse Mr. Zeinfeld for up to $5,000 in legal expenses incurred in negotiating the employment agreement. On June 13, 2006, pursuant to his employment, Mr. Zeinfeld received 350,000 shares of our restricted common stock. The shares will vest over a four-year period, such that 25% of the shares will vest on the first anniversary of May 1, 2006 (the vesting commencement date) and the remainder will vest ratably every 90 days over the remainder of the four-year period.

During the term of his employment and for 12 months thereafter, Mr. Zeinfeld has agreed not to (i) render any service (as an employee, officer, director, consultant or otherwise) to any unit or division of any entity involved directly in the Business (as defined in the employment agreement)); (ii) make or hold any investment in any entity in the Business other than the ownership of not more than 5% of the listed stock of any publicly traded entity; or (iii) contact any customer or employee of the Company to request, induce or attempt to induce such customer or employee to terminate any business relationship, agreement or employment with the Company, provided however, if Mr. Zeinfeld is terminated for Good Reason or without Cause, the 12 month period shall be reduced to six months.

We enter into agreements with substantially all of our employees containing confidentiality provisions. We enter into non-competition agreements with our executive officers and key employees. The non-competition agreements prohibit these employees from competing with us or disclosing confidential information about us for a period up to 12 months after their employment with our company ends.

Table of Contents

## OUTSTANDING EQUITY AWARDS AT FISCAL YEAR-END

The following table summarizes the outstanding option awards and other plan-based awards held by our named executive officers.

| | Option Awards | | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) (1) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested |
| David A. Steinberg | 458,332 | 208,335 | — | $ 5.88 | 5/13/2014 | 500,000 | $5,545,000 | — | — |
| | | | | | | 56,241 | $  623,713 | — | — |
| Lawrence S. Winkler(2) | 133,334 | — | — | $ 5.88 | 1/29/2014 | 112,482 | $1,247,425 | — | — |
| | 95,833 | 4,167 | — | $ 5.88 | 5/13/2014 | 34,369 | $  381,152 | — | — |
| | | | | | | 25,000 | $  277,250 | — | — |
| | | | | | | 100,000 | $1,109,000 | — | — |
| Brian T. Westrick | 2,709 | — | — | $ 7.80 | 3/07/2012 | 28,000 | $  310,520 | — | — |
| | 2,606 | 10,417 | — | $ 5.88 | 1/29/2014 | 16,874 | $  187,133 | — | — |
| | 5,031 | 25,152 | — | $ 5.88 | 5/13/2014 | 50,000 | $  554,500 | — | — |
| | 10,938 | 15,315 | — | $10.00 | 10/26/2014 | | | | |
| | 8,750 | 11,250 | — | $16.49 | 7/25/2015 | | | | |
| Michael Walden | 2,605 | 10,419 | — | $ 5.88 | 1/29/2014 | 16,874 | $  187,133 | — | — |
| | 1,835 | 10,774 | — | $ 5.88 | 5/13/2014 | 28,000 | $  310,520 | — | — |
| | — | 17,500 | — | $10.00 | 10/26/2014 | 50,000 | $  554,500 | — | — |
| | 8,750 | 11,250 | — | $16.49 | 7/25/2015 | | | | |
| Andrew Zeinfeld | — | — | — | — | — | 350,000 | $3,881,500 | — | — |
| | | | | | | 50,000 | $  554,500 | — | — |

(1)   Each restricted stock award vests over a 4 year period with 25% vesting at year one and the remainder vesting quarterly over the next 3 years.

(2)   Effective May 31, 2007, Mr. Winkler's employment with us has terminated.

Table of Contents

## OPTION EXERCISES AND STOCK VESTED

The following table sets forth certain information concerning option exercises by our named executive officers and vesting of our Common Stock held by them during the fiscal year ended December 31, 2006:

| | Option Awards | | Stock Awards | |
| | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($)(1) | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($)(2) |
| Name | | | | |
|---|---|---|---|---|
| David A. Steinberg | — | — | 6,248 | $ 71,977 |
| | | | 6,248 | 38,488 |
| | | | 6,248 | 51,858 |
| | | | 25,015 | 144,837 |
| | | | 43,759 | $ 307,160 |
| Lawrence S. Winkler (3) | 100,000 | $ 496,500 | 50,000 | $ 289,674 |
| | | | 12,496 | 103,717 |
| | | | 12,496 | 76,975 |
| | | | 12,507 | 141,204 |
| | | | 12,496 | 143,954 |
| | | | 100,025 | $ 755,524 |
| Brian T. Westrick | 975 | $ 5,762 | 7,504 | $ 43,448 |
| | 2,604 | 15,429 | 1,874 | 15,554 |
| | 7,812 | 45,432 | 1,874 | 11,544 |
| | 19,145 | 107,960 | 1,874 | 21,588 |
| | 30,536 | $ 174,583 | 13,126 | $ 92,135 |
| Michael Walden | 5,114 | $ 11,064 | 7,504 | $ 58,531 |
| | 1,250 | 3,763 | 1,874 | 15,554 |
| | 2,196 | 10,852 | 1,874 | 11,544 |
| | 3,780 | 18,680 | 1,874 | 21,588 |
| | 8,750 | 7,192 | 13,126 | $ 107,218 |
| | 2,526 | 12,455 | | |
| | 5,615 | 27,686 | | |
| | 29,231 | $ 91,693 | | |
| Andrew Zeinfeld | — | — | — | — |

(1)  Based on the difference between the market price of our Common Stock on the date of exercise and the exercise price.
(2)  Based on the market price of our Common Stock on the vesting date.
(3)  Effective May 31, 2007, Mr. Winkler's employment with us has terminated.

Table of Contents

## POTENTIAL PAYMENTS UPON TERMINATION OR CHANGE OF CONTROL

If we terminate Mr. Steinberg's employment without cause or Mr. Steinberg terminates his employment for good reason, Mr. Steinberg is entitled to continue to receive his base salary for one year. If Mr. Steinberg's employment is terminated without cause within 180 days of a change of control, he is entitled to continue to receive his base salary for one year and 50% of his unvested options will immediately become vested and exercisable.

If Mr. Walden's employment is terminated without cause, he would be entitled to three (3) month's salary at the rate in effect at the time of termination provided that Mr. Walden does not obtain employment or a consulting engagement during such three (3) month period and any rights or benefits available under applicable employee benefit programs then in effect in which Mr. Walden participates.

If Mr. Zeinfeld's employment is terminated coincident with or within 180 days of a Change in Control (as defined in the employment agreement), fifty percent (50%) of the unvested shares of Restricted Stock will vest immediately following the Change in Control.

The initial term of the employment agreement is four years, and shall renew upon mutual agreement of Mr. Zeinfeld and the Company within 30 days prior to expiration of the term. If we terminate Mr. Zeinfeld's employment (i) without Cause, or (ii) if Mr. Zeinfeld resigns for Good Reason, Mr. Zeinfeld is entitled to receive (i) an amount equal to his base salary for a one-year period; (ii) the pro rata portion of any bonus in effect at the time of termination; (iii) any rights or benefits available under employee benefit plans then in effect, in which Mr. Zeinfeld participated; (iv) reimbursement of expenses in accordance with section 5.2 of the employment agreement; and (v) any vested stock options or restricted stock.

*Termination Upon a Change in Control*

| Name | Cash Payment | Equity Acceleration | Benefits and Perquisites |
|------|-------------|---------------------|--------------------------|
| David A. Steinberg | $320,000 | $3,627,069 | $ 15,000 |
| Michael Walden | $ 56,250 | — | 15,000 |
| Andrew Zeinfeld | $300,000 | $2,218,000 | — |

68

Table of Contents

## DIRECTOR COMPENSATION

The following table sets forth information concerning the compensation earned during the last fiscal year by each individual who served as a director at any time during the fiscal year:

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| John Sculley | $ 89,583 | $115,366 | $ 9,167 | — | — | — | $214,117 |
| Blake Bath (1) | $ 15,000 | $  8,796 | — | — | — | — | $ 23,796 |
| Ira Brind | $109,000 | $115,366 | $ 9,167 | — | — | — | $233,534 |
| Robert A. Fox (2) | $ 15,000 | $ 60,900 | $ 9,167 | — | — | — | $ 85,067 |
| Laurence E. Harris (3) | $ 94,000 | $ 54,466 | — | — | — | — | $148,466 |
| Jay C. Hoag (4) | $102,500 | $115,366 | $ 9,167 | — | — | — | $227,034 |
| Jack F. Kemp | $ 76,833 | $115,366 | $23,260 | — | — | — | $215,459 |
| Thomas E. Wheeler (5) | $ 20,000 | $153,063 | $29,230 | — | — | — | $202,293 |
| Mark Levine | $  8,750 | — | — | — | — | — | $  8,750 |

(1)  Mr. Bath was appointed our Board of Directors on October 13, 2006 and was granted 10,000 shares of restricted stock with 70% vesting at year 1 and 30% vesting at year 2.

(2)  Mr. Fox retired from the Board of Directors on March 22, 2006.

(3)  Mr. Harris was appointed our Board of Directors on March 22, 2006 and was granted 15,480 shares of restricted stock with 70% vesting at year 1 and 30% vesting at year 2.

(4)  Mr. Hoag retired from the Board of Directors on October 13, 2006.

(5)  Mr. Wheeler retired from the Board of Directors on June 22, 2006.

In 2006, members of our Board of Directors received $10,000 in annual cash compensation for their service on the Board of Directors. In addition, members of the Board of Directors serving on the Compensation Committee, Nominating and Governance Committee or Mergers and Acquisitions Committee received annual cash compensation of $5,000 per committee. Members of the Audit Committee received $7,500 in annual cash compensation and the chairman of the Audit Committee received $10,000 in annual cash compensation. The employee member of our Board of our Directors received no additional compensation for his service on the Board. The members of our Board of Directors were reimbursed for travel, lodging and other reasonable expenses incurred in attending Board of Directors and committee meetings. Under our 2004 Equity Incentive Plan, non-employee directors received grants of options to purchase up to 30,000 shares of our Common Stock upon joining our Board of Directors, and awards of 7,000 shares of restricted stock and grants of options to purchase 3,000 shares of our Common Stock annually.

In March 2006, the Compensation Committee approved a new outside director compensation program for non-employee directors for the 2006 fiscal year. Pursuant to this program, directors who are not employees receive an annual cash retainer fee of $50,000 and a fee of $1,000 for participation in each meeting of the Board of Directors or meeting of a committee of the Board of Directors. For service on the Audit Committee, each regular member shall receive annual cash compensation of $10,000, while the chairman of the Audit Committee will receive $50,000 annual cash compensation, in recognition of the additional time commitment required of the chairman in reviewing the Company's continuing compliance with Section 404 of the Sarbanes-Oxley Act of 2002. Non-employee directors will also receive annual restricted stock awards valued at approximately $100,000 on the date of approval of the award, which will be issued under the 2004 Equity Incentive Plan and will vest over a two-year period. For the 2006 fiscal year, members of the Board of Directors received an award of an aggregate of 15,480 shares of restricted stock, with 10,836 shares vesting on March 22, 2007 and the remainder vesting on March 22, 2008. Directors will also be reimbursed for travel, lodging and other reasonable expenses related to attendance at Board of Directors and committee meetings.

**Table of Contents**

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The following table sets forth information regarding the beneficial ownership of our Common Stock as of May 21, 2007, unless otherwise indicated, by (1) all stockholders known by us to beneficially own more than five percent of the outstanding Common Stock, (2) each of the directors, (3) each of our executive officers named in the Summary Compensation Table and (4) all of our directors and executive officers as a group. We have relied upon information provided to us by our directors and executive officers and copies of documents sent to us that have been filed with the Securities and Exchange Commission by others for purposes of determining the number of shares each person beneficially owns. Beneficial ownership is determined in accordance with the rules and regulations of the Securities and Exchange Commission and generally includes those persons who have voting or investment power with respect to the securities. Except as otherwise indicated, and subject to applicable community property laws, the persons named in the table have sole voting and investment power with respect to all shares of the Company's Common Stock beneficially owned by them. Shares of our Common Stock subject to options or warrants that are exercisable within 60 days of May 21, 2007 are also deemed outstanding for purposes of calculating the percentage ownership of that person, and if applicable, the percentage ownership of executive officers and directors as a group, but are not treated as outstanding for the purpose of calculating the percentage ownership of any other person. Percentages of shares beneficially owned are based on 36,964,003 shares of our Common Stock outstanding as of May 21, 2007.

| Name and Address of Beneficial Owner (1) | Number of Shares Owned | Percent Owned |
|---|---|---|
| ***Directors, Nominees and Executive Officers*** | | |
| David A. Steinberg (2) | 4,973,575 | 13.3% |
| Brian T. Westrick (3) | 137,867 | * |
| Brian J. Curran (4) | 257,797 | * |
| Lawrence S. Winkler (5) | 475,778 | 1.3% |
| Andrew B. Zeinfeld (6) | 401,500 | 1.1% |
| Michael Walden (7) | 106,841 | * |
| Blake Bath (8) | 20,000 | * |
| Ira Brind (9) | 139,288 | * |
| Laurence E. Harris (10) | 15,480 | * |
| Jack F. Kemp (11) | 69,731 | * |
| John Sculley (12) | 443,664 | 1.2% |
| Thomas Wheeler (13) | 24,898 | * |
| All directors and executive officers as a group (12 persons) (14) | 7,066,419 | 18.6% |
| ***Five Percent Stockholders (15):*** | | |
| The Goldman Sachs Group, Inc. (16) | 5,095,806 | 13.8% |
| FMR Corporation (17) | 3,924,800 | 10.6% |
| Trafelet & Company, LLC (18) | 2,561,100 | 6.9% |
| S.A.C. Capital Advisors. LLC (19) | 1,904,346 | 5.2% |
| MSD Capital, LP (20) | 1,864,700 | 5.0% |
| Vardon Capital, LLC (21) | 1,852,225 | 5.0% |

* less than 1%
(1) Unless otherwise indicated, the address of each stockholder is c/o InPhonic, Inc., 1010 Wisconsin Avenue, Suite 600, Washington, DC 20007.
(2) Includes (1) 296,817 shares beneficially owned by a trust created for the benefit of Mr. Steinberg's children, (2) 50,000 shares held by a family-owned limited liability company created for estate planning purposes, (3) 541,665 shares issuable upon exercise of vested stock options and (4) 549,993 shares of restricted stock that are subject to vesting. Mr. Steinberg shares dispositive and voting control over these shares. Mr. Steinberg disclaims beneficial ownership of these shares except to the extent of his pecuniary interest.

(3)  Includes (a) 44,867 shares issuable upon exercise of vested stock options and (b) 93,000 shares of restricted stock that are subject to vesting.

(4)  Includes 250,000 shares of restricted stock that are subject to vesting.

(5)  Includes (a) 133,334 shares issuable upon exercise of vested stock options and (b) 259,355 shares of restricted stock that are subject to vesting. Effective May 31, 2007, Mr. Winkler's employment with us has terminated.

(6)  Includes 400,000 shares of restricted stock that are subject to vesting.

(7)  Includes (a) 22,716 shares issuable upon exercise of vested stock options and (b) 84,125 shares of restricted stock that are subject to vesting.

(8)  Includes 10,000 shares of restricted stock that are subject to vesting.

(9)  Includes (a) 7,667 shares issuable upon exercise of vested options, (b) 17,480 shares of restricted stock that are subject to vesting, (c) 23,490 shares beneficially owned by Brind Investment Partners II, of which Mr. Brind is a partner, and as to which shares Mr. Brind shares dispositive and voting control. Mr. Brind disclaims beneficial ownership of these shares except to the extent of his pecuniary interest. The address of Mr. Brind is c/o Brind Investment Partners II, 1926 Arch Street, Philadelphia, PA 19103.

(10)  Includes 15,480 shares of restricted stock that are subject to vesting.

(11)  Includes (a) 11,455 shares of common stock beneficially owned by the Jack Kemp Family Trust, of which Mr. Kemp disclaims beneficial ownership of these shares except to the extent of his pecuniary interest, (b) 52,251 shares issuable upon exercise of vested options, and (c) 17,480 shares of restricted stock that are subject to vesting .

(12)  Includes (a) 130,002 shares issuable upon exercise of vested options and (b) 17,480 shares of restricted stock subject to vesting. Also includes (c) 2,292 shares owned by John Sculley Irrevocable Trust Udt 12/30/97 FBO Oliver Allnatt, and (d) 2,292 shares owned by John Sculley Irrevocable Trust Udt 12/30/97 FBO Madeline Allnatt of which Mr. Sculley disclaims beneficial ownership of these shares except to the extent of his pecuniary interest. The address of Mr. Sculley is 152 West 57th Street, 23rd floor, New York, New York 10019.

(13)  Includes (a) 9,750 shares issuable upon exercise of vested options and (b) 15,148 shares of restricted stock that are subject to vesting.

(14)  Includes (a) 943,252 shares issuable upon exercise of vested options and (b) 1,729,541 shares of restricted stock that are subject to vesting.

(15)  Mr. Steinberg is also a holder of greater than 5% of our Common Stock.

(16)  As reported on Form 4 filed on April 5, 2007 by The Goldman Sachs Group, Inc. ("GS Group") and Goldman, Sachs & Co. ("Goldman Sachs" and together with GS Group, the "Reporting Persons"). Goldman Sachs is a wholly-owned subsidiary of GS Group. The shares reported herein may be deemed to be beneficially owned indirectly by GS Group by reason of the direct ownership of such securities by Goldman Sachs or another wholly-owned subsidiary of GS Group (collectively, "Goldman"). The "Reporting Persons" have shared voting and dispositive power. The address is 85 Broad Street, New York, New York 10004.

(17)  As reported on a Schedule 13G filed on March 12, 2007 by FMR Corp. ("FMR") and Edward C. Johnson 3d, Chairman and principal shareholder of FMR ("Mr. Johnson"), the shares are beneficially owned by Fidelity Management & Research Company ("Fidelity Research") as an investment adviser to various investment companies (the "Funds"), with Mr. Johnson, FMR and the Funds each having the sole power to dispose of such shares and the Funds' Boards of Trustees having the sole power to vote or direct the vote of such shares. The address is 82 Devonshire Street, Boston, Massachusetts 02109.

(18)  As reported on a Schedule 13G filed on February 14, 007 by Trafelet & Company, LLC, and Remy W. Trafelet, its managing member. Represents shares as to which Trafelet has shared voting and dispositive power. The address is 900 Third Avenue, 5 th Floor, New York, NY 10022.

(19)  As reported on a Schedule 13G filed on March 7, 2007 by: (i) S.A.C. Capital Advisors, LLC, ("SAC Capital Advisors") with respect to shares of Common Stock, beneficially owned by S.A.C. Capital Associates, LLC ("SAC Capital Associates") and S.A.C. MultiQuant Fund, LLC ("SAC MultiQuant"); (ii) S.A.C. Capital Management, LLC, ("SAC Capital Management") with respect to shares beneficially owned by SAC Capital Associates and SAC MultiQuant; (iii) CR Intrinsic Investors, LLC ("CR Intrinsic Investors") with respect to shares beneficially owned by CR Intrinsic Investments, LLC ("CR Intrinsic Investments"); and

Table of Contents

(iv) Steven A. Cohen with respect to shares beneficially owned by SAC Capital Advisors, SAC Capital Management, SAC Capital Associates, SAC MultiQuant, CR Intrinsic Investors and CR Intrinsic Investments. The address of the principal business office of (i) SAC Capital Advisors, CR Intrinsic Investors and Mr. Cohen is 72 Cummings Point Road, Stamford, Connecticut 06902 and (ii) SAC Capital Management is 540 Madison Avenue, New York, New York 10022.

(20) As reported on a Schedule 13G filed on May 7, 2007 by MSD Capital, LP and PT Investments I, LP. Represents shares as to which MSD Capital, LP and PT Investments I, LP have shared voting and dispositive power. The address of both is 645 Fifth Avenue, 21st Floor, New York, NY 10022.

(21) As reported on a Schedule 13G filed on February 14, 2007 by (i) Vardon Partners, L.P., a Delaware limited partnership; (ii) Vardon Partners II, L.P., a Delaware limited partnership; (iii) Vardon Focus Fund, L.P., a Delaware limited partnership; (iv) Vardon Focus Fund II, L.P., a Delaware limited partnership; (v) Vardon Continuum Fund, L.P. (formerly known as Vardon Hybrid Fund, L.P.), a Delaware limited partnership (together the "Domestic Funds"); (vi) Vardon International, Ltd., a Cayman Islands exempted company; (vii) Vardon International BP, Ltd., a Cayman Islands exempted company; (viii) Vardon Focus Fund International, Ltd., a Cayman Islands exempted company; (ix) Vardon Focus International BP, Ltd., a Cayman Islands exempted company (together the "Offshore Funds"); (x) Vardon Capital, L.L.C., a Delaware limited liability company ("VC"), with respect to shares of Common Stock held in the Domestic Funds; (xi) Vardon Capital Management, L.L.C., a Delaware limited liability company an SEC registered Investment Adviser ("VCM"), with respect to shares of Common Stock held in the accounts of the Domestic Funds, Offshore Funds and certain other separate account clients managed by VCM (the "Managed Accounts", and together with the Domestic Funds and Offshore Funds, the "Advisory Clients") for which VCM serves as the investment manager and (xii) Richard W. Shea, Jr. ("Mr. Shea"), the sole managing member of VC and VCM, with respect to shares of Common Stock deemed to be beneficially owned by VC and VCM. The address of the Domestic Funds, is 120 West 45th Street, 17th Floor, New York, NY 10036, and the address of the Offshore Funds, is Admiral Financial Center, P.O. Box 32021 SMB, 90 Fort Street, Grand Cayman, Cayman Islands, B.W.I.

## EQUITY COMPENSATION PLAN INFORMATION

The following table provides information with respect to the equity securities that are authorized for issuance under our equity compensation plans as of December 31, 2006:

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in first column) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 7,007,752 | $ 5.20 | 434,272 |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | 7,007,752 | $ 5.20 | 434,272 |

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

### Policy Statement

We have a policy whereby all transactions between us and our officers, directors and affiliates will be on terms no less favorable to us than could be obtained from unrelated third parties. These transactions must be approved by the Audit Committee of our Board of Directors. The transactions set forth below were conducted

Table of Contents

under application of this policy and we believe were no less favorable to us than we would have obtained in an arms length transaction with an unaffiliated third party.

### Issuance of Options and Restricted Stock

In March 2006, we awarded each of Messrs. Brind, Hoag, Kemp, Sculley, Wheeler and Harris 15,480 shares of restricted stock.

In November 2006, we awarded Mr. Wheeler, a former director, 8,504 shares of restricted stock for serving as chair of our advisory committee and Mr. Bath was awarded 10,000 shares of restricted stock.

### Law Firm "Of Counsel" Serving on Board of Directors

Mr. Laurence E. Harris, a director of the Company since March 2006, is *"of counsel"* in the law firm of Patton Boggs LLP ("Patton Boggs"). The total cost of various legal services provided by Patton Boggs in 2006 was $2,219,315. Mr. Harris does not share in any of the fees received by Patton Boggs from the Company.

### Investments by Executive Officers

Mr. Steinberg is a trustee of the KKS DAS DES TRUST, which is a limited partner of TCV V, L.P. and TCV VI, L.P. Mr. Hoag, one of our former directors, is a member of Technology Crossover Management V, L.L.C., ("TCM"). TCM is the general partner of TCV V, L.P. and TCV VI, L.P. The KKS DAS DES TRUST's investment comprises less than 0.1% of the capital under management of TCV V, L.P. and TCV VI, L.P., respectively. Neither TCV V, L.P. nor TCV VI, L.P. owns shares of our common stock.

### Sale of Stock by Executive Officers to our Lending Group

Concurrent with our entering into our term loan in November 2006, affiliates of Mr. Steinberg established for trusts and estates purposes and Mr. Winkler sold an aggregate of 450,000 and 100,000 shares of common stock to our lending group, respectively.

### Director Independence

The Board of Directors has determined that each member of the Board of Directors, other than Mr. Steinberg, is independent in accordance with applicable rules of The NASDAQ Global Market and the rules and regulations of the Securities and Exchange Commission and have made such determination based on the fact that none of such persons have had, or currently have, any relationship with the Company or its affiliates or any executive officer of the Company or his or her affiliates, that would currently impair their independence, including, without limitation, any commercial, industrial, banking, consulting, legal, accounting, charitable or familial relationship. The Board of Directors has an Audit Committee, a Compensation Committee, a Nominating and Governance Committee and a Mergers and Acquisitions Committee. Each member of the Audit Committee, Compensation Committee and the Nominating and Governance Committee is independent as defined under current NASDAQ listing standards.

## ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES

### Independent Registered Public Accounting Firm

The Audit Committee has selected the firm of Grant Thornton LLP ("Grant Thornton") to serve as the Independent Registered Public Accounting Firm for the fiscal year ending December 31, 2007, subject to the ratification by our stockholders. Grant Thornton currently serves as the Company's Independent Registered Public Accounting Firm.

Table of Contents

On September 12, 2005, the Audit Committee of the Board of Directors dismissed KPMG LLP ("KPMG") as our Independent Registered Public Accounting Firm, effective immediately.

The audit reports of KPMG on our consolidated financial statements as of and for the years ended December 31, 2004 and 2003, did not contain an adverse opinion or disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles, except that the audit reports as of and for the years ended December 31, 2004 and 2003, contained separate paragraphs stating that we adopted EITF 00-21, *Revenue Arrangements with Multiple Deliverables,* effective July 1, 2003.

During the two most recently completed fiscal years prior to KPMG's dismissal and through September 12, 2005, there were no disagreements with KPMG on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of KPMG, would have caused KPMG to make reference to the subject matter of the disagreement in connection with its reports on our financial statements for the fiscal years ended December 31, 2004 and 2003. In addition, there were no "reportable events" (as defined in Item 304(a)(1)(v) of Regulation S-K) during the two most recently completed fiscal years prior to KPMG's dismissal and through September 12, 2005.

We provided KPMG with a copy of the disclosures above and requested that KPMG furnish us with a letter addressed to the SEC stating whether or not it agreed with the above statements. A copy of that letter, dated September 20, 2005, was filed as Exhibit 16.1 to our report on Form 8-K filed with the SEC on September 20, 2005.

On September 19, 2005, our Audit Committee engaged Grant Thornton as our Independent Registered Public Accounting Firm to audit our financial statements and internal controls over financial reporting for the year ending December 31, 2005.

Prior to engaging Grant Thornton, we did not consult with Grant Thornton during the two most recently completed fiscal years prior to KPMG's dismissal and through September 19, 2005 regarding (i) either the application of accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on our financial statements, and neither was a written report nor oral advice provided to us that Grant Thornton concluded was an important factor considered by us in reaching a decision as to the accounting, auditing or financial reporting; or (ii) any matter which was the subject of either a "disagreement" or a "reportable event" (as each is defined in Items 304(a)(1)(iv) and (v) of Regulation S-K, respectively).

## Fees and Services

The following table summarizes fees billed to the Company by Grant Thornton for the fiscal year 2006 and the fees billed to the Company by Grant Thornton and KPMG for audit and other work performed in fiscal year 2005 ($'s in thousands):

| Services | 2006 | | 2005 | |
| --- | --- | --- | --- | --- |
| | Grant Thornton | KPMG | Grant Thornton | KPMG |
| Audit Fees (a) | $ 2,136 | $ — | $ 1,437 | $1,381 |
| Audit-Related Fees (b) | — | — | 62 | — |
| Tax Fees (c) | — | — | — | 101 |
| All Other Fees (d) | — | — | — | — |
| Total Fees | $ 2,136 | $ | $ 1,499 | $1,482 |

(a)   The audit fees for the years ended December 31, 2006 and 2005 were for professional services rendered during the audits of the Company's consolidated financial statements and its controls over financial

74

Table of Contents

reporting, for reviews of the Company's consolidated financial statements included in the Company's quarterly reports on Form 10-Q and for reviews of other filings made by the Company with the Securities and Exchange Commission ("SEC").

(b)   Audit-related fees consist of fees for assurance and related services that are reasonably related to the performance of the audit and the review of our financial statements and which are not reported under "Audit Fees." These services relate to due diligence and accounting advice related to mergers and acquisitions and other accounting-related matters.

(c)   Tax fees consist of fees for tax compliance, tax advice and tax planning services.

(d)   All other fees consist of fees for products and services other than the services reported above.

**Pre-Approval of Non-Audit Services**

Our Audit Committee has established a policy governing our use of Grant Thornton for non-audit services. Under the policy, management may use Grant Thornton for non-audit services that are permitted under SEC rules and regulations, provided that management obtains the Audit Committee's approval before such services are rendered. In fiscal years 2006 and 2005, all audit, audit related, and tax fees were pre-approved by the Audit Committee. Under SEC rules, subject to certain permitted de minimis criteria, pre-approval is required for all professional services rendered by our principal accountant for all services rendered on or after May 6, 2003. We are in compliance with these SEC rules.

Table of Contents

PART IV

**ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

The following documents are filed as part of this Annual Report:

(1)    Index to Financial Statements

|  | Page Number |
|---|---|
| Report of Grant Thornton LLP, Independent Registered Public Accounting Firm | F-2 |
| Report of KPMG, LLP, Independent Registered Public Accounting Firm | F-4 |
| Consolidated Balance Sheets as of December 31, 2005 and 2006 | F-5 |
| Consolidated Statements of Operations for the years ended December 31, 2004, 2005 and 2006 | F-6 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 2004, 2005 and 2006 | F-7 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2004, 2005 and 2006 | F-8 |
| Notes to Consolidated Financial Statements | F-9 |

(2)    Financial Statement Schedules

The following consolidated financial statement schedule of InPhonic, Inc. and subsidiaries is filed herewith:

|  | Page Number |
|---|---|
| Report of Grant Thornton LLP, Independent Registered Public Accounting Firm | S-1 |
| Report of KPMG LLP, Independent Registered Public Accounting Firm | S-2 |
| Schedule II—Valuation and Qualifying Accounts | S-3 |

All other schedules have been omitted because the information required to be shown in the schedules is not applicable or is included elsewhere in our financial statements or the notes thereto.

(3)    Exhibits

| Exhibit No. | Description |
|---|---|
| 2.1(c)(d) | Asset Purchase Agreement dated as of December 17, 2004, between A1 Wireless USA, Inc. and CAIS Acquisition LLC |
| 2.2(d) | First Amendment to the Asset Purchase Agreement dated as of December 17, 2004, between A1 Wireless USA, Inc., CAIS Acquisition LLC and InPhonic, Inc. |
| 2.3(c)(e) | Asset Purchase Agreement dated as of April 26, 2005, between VMC Satellite, Inc., InPhonic, Inc. and CAIS Acquisition II, LLC |
| 2.4(f)(g) | First Amendment to the Asset Purchase Agreement dated as of September 1, 2005, by and among CAIS Acquisition II, LLC, InPhonic, Inc., RR Holding, Inc. (formerly known as VMC Satellite, Inc.) and Rick Rahim |
| 3.1(a) | Eleventh Amended and Restated Certificate of Incorporation of InPhonic, Inc. |
| 3.2(a) | Third Amended and Restated Bylaws of InPhonic, Inc. |

76

Table of Contents

| Exhibit No. | Description |
| --- | --- |
| 4.1(a) | Specimen stock certificate for shares of common stock of InPhonic, Inc. |
| 10.1(a) | Seventh Amended and Restated Investor Rights Agreement dated as of June 12, 2003 by and among InPhonic, Inc. and the Purchasers listed therein |
| 10.2 | Credit Agreement dated as of November 7, 2006 among InPhonic, Inc., The lenders from time to time, Goldman Sachs Credit Partners L.P., and Citicorp North America Inc, as Administrative Agent. |
| 10.3 | Amendment No. 1 dated February 6, 2007 to Credit Agreement dated as of November 7, 2006 among InPhonic, Inc., the lenders from time to time, Goldman Sachs Credit Partners, L.P. and Citicorp North America Inc., as Administrative Agent. |
| 10.4(c) | Amendment No. 2 to Credit Agreement dated as of March 30, 2007, to the Credit Agreement dated as of November 7, 2006 among InPhonic, Inc. the lenders from time to the and Citicorp North America, Inc. as Administrative Agent. |
| 10.5 | Amendment No. 3 to Credit Agreement dated as of April 9, 2007, to the Credit Agreement dated as of November 7, 2006, as amended, among InPhonic, Inc. the lenders from time to the and Citicorp North America, Inc. as Administrative Agent. |
| 10.6 | Amendment No. 4 to Credit Agreement dated as of April 23, 2007, to the Credit Agreement dated as of November 7, 2006, as amended, among InPhonic, Inc. the lenders from time to the and Citicorp North America, Inc. as Administrative Agent. |
| 10.7 | Amendment No. 5 to Credit Agreement dated as of May 1, 2007, to the Credit Agreement dated as of November 7, 2006, as amended, among InPhonic, Inc. the lenders from time to the and Citicorp North America, Inc. as Administrative Agent. |
| 10.8 | Warrant Agreement dated as of November 7, 2006 by and between InPhonic, Inc., Goldman, Sachs & Co., Citicorp North America, Inc. and AP InPhonic Holdings, LLC |
| 10.9(a) | Form of Assignment of Invention, Nondisclosure and Noncompetition Agreement |
| 10.10(a) | Employment Agreement dated as of February 4, 2000 by and between InPhonic, Inc. and David A. Steinberg, as amended by Amendment No. 1 dated March 1, 2004 and Amendment No. 2 dated May 14, 2004 |
| 10.11(k) | Employment Agreement between InPhonic, Inc. and Lawrence S. Winkler, entered into on July 25, 2005 and effective as of January 19, 2004 |
| 10.12(n) | Employment Agreement between InPhonic, Inc. and Andrew B. Zeinfeld, entered into on December 20, 2006 |
| 10.13(n) | Employment Agreement between InPhonic, Inc. and Brian J. Curran, entered into on December 20, 2006 |
| 10.14(a) | Employment Agreement effective April 2, 2002, by and between InPhonic, Inc. and Frank C. Bennett, III |
| 10.15(a) | Lease dated as of February 26, 2001 by and between Rouse Commercial Properties, LLC, Rouse Office Management, LLC and InPhonic, Inc., as amended by First Amendment to Lease, dated May 29, 2002 |
| 10.16(l) | Second Amendment to Lease dated September 23, 2004 by and between Inglewood Business Park III, LLC and Inglewood Business Park IV, LLC (assignees of Rouse Commercial Properties, LLC), by MTM Builder/Developer, Inc. and InPhonic, Inc., as amended by Third Amendment to Lease made and entered into as of July 19, 2005 |
| 10.17(a) | Lease Agreement dated April 29, 2003 by and between Waterfront Center Limited Partnership and InPhonic, Inc., as amended by Addendum No. 1, dated September 9, 2003 and Addendum No. 2, dated May 14, 2004 |

| Exhibit No. | Description |
| --- | --- |
| 10.18(l) | Deed of Lease by and between Parkridge Phase Two Associates Limited Partnership and InPhonic, Inc. dated July 27, 2005 |
| 10.19(m) | First Amendment to Lease by and between Parkridge Phase Two Associates Limited Partnership and InPhonic, Inc. dated November 8, 2005 |
| 10.20(h) | Sublease dated November 17, 2004, by and between CareerBuilder, LLC and InPhonic, Inc. |
| 10.21(a) (b) | Premier I-Dealer Agreement dated March 1, 2001 by and between T-Mobile USA, Inc., and its subsidiaries and affiliates and InPhonic, Inc. and its affiliates and related entities, as amended |
| 10.22(o) (r) | Cingular Wireless Non-Exclusive Dealer Agreement and Cingular Wireless Internet Dealer and Master Dealer Addendum ("the Agreements") with Cingular Wireless II, LLC ("Cingular"), effective October 1, 2006 |
| 10.23(c) (j) | Asset Purchase Agreement dated as of May 26, 2005, between FONcentral.com, Inc. and FON Acquisition, LLC |
| 10.24(a) | 1999 Amended and Restated Stock Incentive Plan |
| 10.25(h) | 2004 Equity Incentive Plan |
| 10.26(k) | Form of Stock Option Agreement for options granted under the 2004 Equity Incentive Plan |
| 10.27(k) | Form of Restricted Stock Agreement for awards granted under the 2004 Equity Incentive Plan |
| 10.28(q) | Outside Director Compensation Summary |
| 10.29(p) | First Amendment to Employment Agreement effective March 16, 2006 by and between InPhonic, Inc. and Lawrence S. Winkler |
| 10.30 | Employment Agreement effective May 1, 2004 by and between InPhonic, Inc. and Michael Walden. |
| 16.1(n) | Letter from KPMG LLP to the Securities and Exchange Commission dated September 20, 2005 |
| 21.1 | Subsidiaries of InPhonic, Inc. |
| 23.1 | Consent of Grant Thornton LLP, Independent Registered Public Accounting Firm |
| 23.2 (s) | Consent of KPMG LLP, Independent Registered Public Accounting Firm |
| 31.1 | Rule 13a-14(a) Certification of Principal Executive Officer. |
| 31.2 | Rule 13a-14(a) Certification of Principal Financial Officer. |
| 32.1 | Section 1350 Certification of Principal Executive Officer. |
| 32.2 | Section 1350 Certification of Principal Financial and Accounting Officer. |

(a)   Incorporated by reference to our Registration Statement on Form S-1 (File No. 333-116420).

(b)   Confidential treatment granted for certain portions of this Exhibit pursuant to Rule 406 under the Securities Act of 1933, as amended which portions are omitted and filed separately with the Securities and Exchange Commission.

(c)   Confidential treatment granted for certain portions of this Exhibit pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended, which portions are omitted and filed separately with the Securities and Exchange Commission.

(d)   Incorporated by reference to our Current Report on Form 8-K filed on January 10, 2005.

(e)   Incorporated by reference to our Current Report on Form 8-K/A filed on December 22, 2006.

(f)   Appendix 1 to this First Amendment to Asset Purchase Agreement has been omitted in reliance upon the rules of the Securities and Exchange Commission. A copy will be delivered to the Securities and Exchange Commission upon request.

Table of Contents

(g)     Incorporated by reference to our Current Report on Form 8-K/A filed on December 22, 2006.

(h)     Incorporated by reference to our Annual Report on Form 10-K for the year ended December 31, 2004.

(i)      Incorporated by reference to our Quarterly Report on Form 10-Q for the three months ended March 31, 2005.

(j)      Incorporated by reference to our Current Report on Form 8-K filed on June 3, 2005.

(k)     Incorporated by reference to our Current Report on Form 8-K filed on July 29, 2005.

(l)      Incorporated by reference to our Quarterly Report on Form 10-Q for the three months ended June 30, 2005.

(m)    Incorporated by reference to our Quarterly Report on Form 10-Q for the three months ended September 30, 2005.

(n)     Incorporated by reference to our Current Report on Form 8-K filed on December 22, 2006

(o)     Incorporated by reference to our Quarterly Report on Form 10-Q for the three months ended September 30, 2006

(p)     Incorporated by reference to our Annual Report on Form 10-K for the year ended December 31, 2005.

(q)     Incorporated by reference to our Current Report on Form 8-K filed on March 24, 2006.

(r)      Confidential treatment requested for certain portions of this Exhibit pursuant to Rule 24b-2 under the Securities Exchange Act of 1939, as amended which portions are omitted and filed separately with the Securities and Exchange Commission.

(s)     To be filed by amendment.

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

INPHONIC, INC.

By:         / S / D AVID A. S TEINBERG

**David A. Steinberg**
**Chairman of the Board and**
**Chief Executive Officer**

Dated: May 31, 2007

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and the dates indicated:

| Signature | Title | Date |
|---|---|---|
| / S / D AVID A. S TEINBERG<br>**David A. Steinberg** | Chairman of the Board and Chief Executive Officer (Principal Executive Officer) | May 31, 2007 |
| / S / G EORGE Z. M ORATIS<br>**George Z. Moratis** | Principal Financial and Accounting Officer | May 31, 2007 |
| / S / J OHN S CULLEY<br>**John Sculley** | Vice Chairman of the Board | May 31, 2007 |
| / S / B LAKE B ATH<br>**Blake Bath** | Director | May 31, 2007 |
| / S / I RA B RIND<br>**Ira Brind** | Director | May 31, 2007 |
| / S / L AURENCE E. H ARRIS<br>**Laurence E. Harris** | Director | May 31, 2007 |
| / S / J ACK F. K EMP<br>**Jack F. Kemp** | Director | May 31, 2007 |

80

Table of Contents

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

|  | Page Number |
|---|---|
| Reports of Grant Thornton LLP, Independent Registered Public Accounting Firm | F-2 |
| Report of KPMG LLP, Independent Registered Public Accounting Firm | F-6 |
| Consolidated Balance Sheets at December 31, 2005 and 2006 | F-7 |
| Consolidated Statements of Operations for the years ended December 31, 2004, 2005 and 2006 | F-8 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 2004, 2005 and 2006 | F-9 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2004, 2005 and 2006 | F-10 |
| Notes to Consolidated Financial Statements | F-11 |

F-1

**Table of Contents**

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Board of Directors and shareholders
Inphonic, Inc.

We have audited the accompanying consolidated balance sheets of Inphonic, Inc. and subsidiaries (the Company) as of December 31, 2006 and 2005, and the related consolidated statements of operations, common stockholders' equity, and cash flows for each of the two years in the period ended December 31, 2006. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2006 and 2005, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2006 in conformity with accounting principles generally accepted in the United States of America.

Our audits were conducted for the purpose of forming an opinion on the basic consolidated financial statements taken as a whole. Schedule II is presented for the purpose of additional analysis and is not a required part of the basic consolidated financial statements. This schedule has been subjected to the auditing procedures applied in the audit of the basic consolidated financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic consolidated financial statements taken as a whole.

As discussed in Note 2 to the Notes to Consolidated Financial Statements, the Company adopted SFAS No. 123R, " *Share-Based Payment* ," effective January 1, 2006.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of the Company's internal control over financial reporting as of December 31, 2006, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) and our report dated May 31, 2007 expressed an unqualified opinion on management's assessment of the effectiveness of the Company's internal control over financial reporting and an adverse opinion on the effectiveness of the Company's internal control over financial reporting.

/s/ Grant Thornton LLP

McLean, Virginia
May 31, 2007

F-2

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Board of Directors and Shareholders
Inphonic, Inc.

We have audited management's assessment, included in the accompanying Management's Report on Internal Control Over Financial Reporting, that Inphonic, Inc. (a Delaware Corporation) and subsidiaries did not maintain effective internal control over financial reporting as of December 31, 2006, because of the effect of material weaknesses in the lack of the appropriate level of financial and operational support or adequate internal communications to process internal controls, the revenue recognition of carrier commissions, bonuses and related allowances, revenue recognition of consumer cancellation fees and accounting for certain inventories based on criteria established in *Internal Control— Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)*. Inphonic's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. The following material weaknesses have been identified and included in management's assessment:

- The Company did not maintain an appropriate level of staffing in operational and financial resources to provide the level of controls and analysis required on a timely basis. The failure to provide an adequate level of staffing resulted in certain accounting processes not being performed on a timely basis and the inability to maintain an adequate control environment. Maintaining appropriate levels of staffing is an important entity level control that is essential to maintaining the operating effectiveness of the underlying process level controls. This material weakness contributed to errors such as those relating to proper revenue recognition.

F-3

**Table of Contents**

- The Company failed to establish effective communication channels between operations and finance to adequately identify and record certain transactions during 2006. The failure to provide this communication manifested itself in situations such as 1) a 2005 liability not being recorded on a timely basis, and 2) accounts receivable reserves not being appropriately stated based on the status of collection efforts involving operational personnel and 3) the deactivation reserve being understated due to the fact that certain consumer focused marketing programs impacting the customer deactivation behavior not being properly reflected in the underlying data and the deactivation reserve model. Establishing effective communication between the Finance Department and operational departments will allow the company to reflect any necessary commitments in the financial statements. This material weakness contributed to errors relating to accounting and reporting of revenue, expenses and liabilities.

- The Company did not utilize an appropriate methodology during the year in recording receivables from carriers associated with disputed deactivations, churn bonuses and other carrier related fees. Similar to other newly disputed amounts with carriers, revenue should not be recorded until the carrier agrees to pay the amount or collection is probable. The Company overstated accounts receivable by using a methodology that could not be supported by past experience and failed to include current results and other information received from the carriers.

In addition, the Company did not take steps to adequately identify and appropriately record certain commission and bonus revenues received during the year from various carriers in a timely and accurate manner. Recording amounts received from carriers in the appropriate accounts in a timely and accurate manner is an important business process control that is essential to the correct reporting of amounts in the financial statements. This material weakness contributed to errors relating to accounting and reporting for revenue and accounts receivable. This material weakness contributed to errors relating to accounting and reporting of revenues.

- The Company did not utilize an appropriate methodology during the year in recording certain Equipment Discount Provision fees due from consumers when contracts are cancelled within specified time periods and the wireless device is not returned to the Company. Specifically, the Company overstated revenue and account receivable by using collection percentages in excess of that which could be supported by past collection experience. As a result of this material weakness, an adjustment was necessary to properly record revenue and related receivables from these fees.

- The Company did not utilize an appropriate methodology during the year in recording rebates payable to eligible consumers. The Company understated the product rebate liability by not considering the appropriate amount of open periods eligible for rebates and the backlog of possible eligible rebates that had been delivered to outsourced payment service providers. Additionally, the Company failed to reflect actual rebate payments made to customers in its calculation of accrued product rebate liability. As a result of this material weakness, an adjustment was necessary to properly record product rebate expense and the related liability.

- The Company did not maintain adequate documentation to support the proper accounting for inventory movements related to phone shipments for refitting and refurbishment. Consequently, the Company overstated inventory or receivables by not maintaining adequate documentation of track phones provided to outside services providers. As a result of this material weakness, an adjustment was necessary to properly record costs of goods sold and amounts due from vendors.

- The Company did not consider all of the factors in determining its estimate of allowance for doubtful accounts. The proper accounting for the allowance for doubtful accounts requires that estimates must be made on the future collectibility of receivables. In the course of concluding on its analysis of reserves necessary related to accounts receivable, the Company concluded that an additional reserve was necessary for current receivables which based on historical experience will not be paid in the initial carrier payment. Receivables not paid in initial carrier payments are reclassified to disputed receivables and the related collection efforts are addressed through a specific process. We recommend that in future periods, management consider in its reserve an estimate of current

F-4

**Table of Contents**

receivables expected to be reclassified as disputed receivables and the related collection experience. As a result of this material weakness, an adjustment was necessary to properly record the allowance for doubtful accounts and bad debt expense.

These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2006 financial statements, and this report does not affect our report dated May 31, 2007, which expressed an unqualified opinion on those financial statements.

In our opinion, management's assessment that Inphonic, Inc. and Subsidiaries did not maintain effective internal control over financial reporting as of December 31, 2006, is fairly stated, in all material respects, based on *Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).* Also in our opinion, because of the effect of the material weaknesses described above on the achievement of the objectives of the control criteria, Inphonic, Inc. and Subsidiaries has not maintained effective internal control over financial reporting as of December 31, 2006, based on *Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).*

/s/   Grant Thornton LLP

McLean, Virginia
May 31, 2007

F-5

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Report of Independent Registered Public Accounting Firm

The Board of Directors and Stockholders
InPhonic, Inc. and subsidiaries:

We have audited the accompanying consolidated statement of operations, stockholders' equity (deficit), and cash flows of InPhonic, Inc. and subsidiaries for the year ended December 31, 2004. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the results of operations and the cash flows of InPhonic, Inc. and subsidiaries for the year ended December 31, 2004, in conformity with U.S. generally accepted accounting principles.

KPMG LLP

McLean, Virginia
March 8, 2005, except
as to note 1(c) and note 4,
which are as of March 16, 2006

F-6

Table of Contents

**INPHONIC, INC. & SUBSIDIARIES**
**Consolidated Balance Sheets**
**As of December 31, 2005 and 2006**
**(in thousands, except per share and share amounts)**

| | 2005 | 2006 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 70,783 | $ 89,972 |
| Accounts receivable (net of allowance of $2,042 and $9,749, respectively) | 34,606 | 63,820 |
| Inventory, net | 19,680 | 23,164 |
| Prepaid expenses | 2,405 | 6,507 |
| Deferred costs and other current assets | 6,823 | 3,122 |
| Current assets of discontinued operations | 2,430 | 391 |
| Total current assets | 136,727 | 186,976 |
| Restricted cash and cash equivalents | 400 | 38 |
| Property and equipment, net | 12,121 | 22,746 |
| Goodwill | 31,140 | 38,223 |
| Intangible assets, net | 12,651 | 8,092 |
| Deposits and other assets | 3,058 | 8,330 |
| Total assets | $ 196,097 | $ 264,405 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 31,543 | $ 85,975 |
| Accrued expenses and other current liabilities | 31,588 | 22,521 |
| Current portion of deferred revenue | 13,851 | 16,604 |
| Current maturities of capital leases | 377 | 301 |
| Current liabilities of discontinued operations | 3,130 | 1,103 |
| Total current liabilities | 80,489 | 126,504 |
| Long-term debt and capital lease obligations, net of current maturities | 15,474 | 63,826 |
| Deferred revenue, net of current portion | 284 | 478 |
| Total liabilities | 96,247 | 190,808 |
| Commitments and Contingencies | — | — |
| Stockholders' equity: | | |
| Common stock, $0.01 par value | | |
| Authorized 200,000,000 shares at December 31, 2005 and 2006; issued and outstanding 35,232,869 and 37,138,480 shares at December 31, 2005 and 2006, respectively | 353 | 371 |
| Additional paid-in capital | 264,155 | 301,611 |
| Accumulated deficit | (164,658) | (228,385) |
| Total stockholders' equity | 99,850 | 73,597 |
| Total liabilities and stockholders' equity | $ 196,097 | $ 264,405 |

See accompanying notes to consolidated financial statements

F-7

Table of Contents

**INPHONIC, INC. & SUBSIDIARIES**
**Consolidated Statements of Operations**
**Years Ended December 31, 2004, 2005 and 2006**
**(in thousands, except per share and share amounts)**

|  | 2004 | 2005 | 2006 |
|---|---|---|---|
| Revenue: | | | |
| Activations and services | $ 123,265 | $ 233,730 | $ 298,090 |
| Equipment | 31,603 | 86,809 | 71,484 |
| Total revenue | 154,868 | 320,539 | 369,574 |
| Cost of revenue, exclusive of depreciation and amortization: | | | |
| Activations and services | 1,752 | 1,221 | 2,653 |
| Equipment | 83,075 | 190,509 | 215,201 |
| Total cost of revenue | 84,827 | 191,730 | 217,854 |
| Operating expenses: | | | |
| Sales and marketing, exclusive of depreciation and amortization | 42,867 | 93,726 | 118,756 |
| General and administrative, exclusive of depreciation and amortization | 34,942 | 63,131 | 76,571 |
| Depreciation and amortization | 6,444 | 9,840 | 17,067 |
| Restructuring costs | — | 847 | 2,551 |
| Loss on investment | 150 | 228 | — |
| Total operating expenses | 84,403 | 167,772 | 214,945 |
| Operating loss | (14,362) | (38,963) | (63,225) |
| Other income (expense): | | | |
| Interest income | 757 | 2,167 | 2,329 |
| Interest expense | (980) | (970) | (2,638) |
| Total other income (expense) | (223) | 1,197 | (309) |
| Loss from continuing operations | (14,585) | (37,766) | (63,534) |
| Discontinued operations: | | | |
| Income (loss) from discontinued operations | 4,346 | (1,784) | (193) |
| Gain on sale | — | 1,355 | — |
| Total income (loss) from discontinued operations | 4,346 | (429) | (193) |
| Net loss | (10,239) | (38,195) | (63,727) |
| Preferred stock dividends and accretion | (22,049) | — | — |
| Net loss attributable to common stockholders | $ (32,288) | $ (38,195) | $ (63,727) |
| Basic and diluted net loss per share: | | | |
| Net loss from continuing operations | $ (2.60) | $ (1.10) | $ (1.75) |
| Net income (loss) from discontinued operations | 0.31 | (0.01) | — |
| Basic and diluted net loss per share | $ (2.29) | $ (1.11) | $ (1.75) |
| Basic and diluted weighted average shares outstanding | 14,074,505 | 34,417,954 | 36,312,970 |

See accompanying notes to consolidated financial statements

F-8

Table of Contents

**INPHONIC, INC. & SUBSIDIARIES**
**Consolidated Statements of Stockholders' Equity**
**Years Ended December 31, 2004, 2005 and 2006**
**(in thousands, except share amounts)**

| | Series D-5 convertible preferred stock | | Series D-3 convertible preferred stock | | Series D-2 convertible preferred stock | | Series A convertible preferred stock | | Common stock | | Additional paid-in capital | Note receivable from stockholder | Accumulated deficit | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | | | | |
| **Balance, January 1, 2004** | 672,389 | $ 1,884 | 792,775 | $ 2,137 | 416,667 | $ 688 | 668,782 | $ 500 | 11,547,514 | $ 115 | $ 34,540 | $ (1,120) | $ (94,175) | $ (55,431) |
| Issuance of common stock | — | — | — | — | — | — | — | — | 8,504 | 1 | 49 | — | — | 50 |
| Warrants issued in connection with long-term debt | — | — | — | — | — | — | — | — | — | — | 817 | — | — | 817 |
| Stock-based compensation expense | — | — | — | — | — | — | — | — | — | — | 7,381 | — | — | 7,381 |
| Proceeds of initial public offering, net of costs | — | — | — | — | — | — | — | — | 6,500,000 | 65 | 110,773 | — | — | 110,838 |
| Conversion of preferred stock upon initial public offering | (672,389) | (1,884) | (792,775) | (2,137) | (416,667) | (688) | (668,782) | (500) | 13,619,536 | 136 | 92,172 | — | — | 87,099 |
| Conversion of preferred stock to common stock warrants | — | — | — | — | — | — | — | — | — | — | 2,744 | — | — | 2,744 |
| Note receivable from stockholder | — | — | — | — | — | — | — | — | — | — | — | 1,120 | — | 1,120 |
| Dividends and accretion on redeemable preferred stock | — | — | — | — | — | — | — | — | — | — | — | — | (22,049) | (22,049) |
| Preferred stock dividends declared | — | — | — | — | — | — | — | — | — | — | (10,306) | — | — | (10,306) |
| Exercise of common stock warrants and options | — | — | — | — | — | — | — | — | 577,019 | 7 | 71 | — | — | 78 |
| Net loss | — | — | — | — | — | — | — | — | — | — | — | — | (10,239) | (10,239) |
| **Balance, December 31, 2004** | — | — | — | — | — | — | — | — | 32,252,573 | 324 | 238,241 | — | (126,463) | 112,102 |
| Issuance of common stock in connection with the acquisition of: | | | | | | | | | | | | | | |
| A1 Wireless, Inc. | — | — | — | — | — | — | — | — | 236,526 | 2 | 4,907 | — | — | 4,909 |
| VMC Satellite, Inc. | — | — | — | — | — | — | — | — | 257,215 | 3 | 3,297 | — | — | 3,300 |
| FONcentral.com, Inc. | — | — | — | — | — | — | — | — | 131,876 | 1 | 1,548 | — | — | 1,549 |
| Costs related to initial public offering | — | — | — | — | — | — | — | — | — | — | (292) | — | — | (292) |
| Stock-based compensation expense | — | — | — | — | — | — | — | — | — | — | 17,886 | — | — | 17,886 |
| Repurchase and retirement of common stock | — | — | — | — | — | — | — | — | (1,081,487) | (11) | (13,077) | — | — | (13,088) |
| Exercise of common stock warrants, options, restricted stock awards and other | — | — | — | — | — | — | — | — | 3,436,166 | 34 | 11,645 | — | — | 11,679 |
| Net loss | — | — | — | — | — | — | — | — | — | — | — | — | (38,195) | (38,195) |
| **Balance, December 31, 2005** | — | — | — | — | — | — | — | — | 35,232,869 | 353 | 264,155 | — | (164,658) | 99,850 |
| Issuance of common stock in connection with the acquisition of: | | | | | | | | | | | | | | |
| A1 Wireless, Inc. | — | — | — | — | — | — | — | — | 15,408 | — | 235 | — | — | 235 |
| VMC Satellite, Inc. | — | — | — | — | — | — | — | — | 697,045 | 7 | 4,960 | — | — | 4,967 |
| Issuance of common stock warrant | — | — | — | — | — | — | — | — | — | — | 15,173 | — | — | 15,173 |
| Stock-based compensation expense | — | — | — | — | — | — | — | — | — | — | 15,551 | — | — | 15,551 |
| Repurchase and retirement of common stock | — | — | — | — | — | — | — | — | (350,261) | (4) | (3,734) | — | — | (3,738) |
| Exercise of common stock warrants, options, restricted stock awards and other | — | — | — | — | — | — | — | — | 1,543,419 | 15 | 5,271 | — | — | 5,286 |
| Net loss | — | — | — | — | — | — | — | — | — | — | — | — | (63,727) | (63,727) |
| **Balance, December 31, 2006** | — | $ — | — | $ — | — | $ — | — | $ — | 37,138,480 | 371 | $ 301,611 | $ — | $ (228,385) | $ 73,597 |

See accompanying notes to consolidated financial statements

F-9

Table of Contents

INPHONIC, INC. & SUBSIDIARIES
Consolidated Statements of Cash Flows
Years Ended December 31, 2004, 2005 and 2006
(in thousands)

| | 2004 | 2005 | 2006 |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Net loss | $ (10,239) | $ (38,195) | $(63,727) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization | 6,444 | 9,840 | 17,067 |
| Non-cash interest expense, sales and marketing expense and other | 306 | 594 | 954 |
| Stock-based compensation | 7,381 | 18,618 | 14,274 |
| Increase in allowance for doubtful accounts | — | — | 7.707 |
| Gain from the sale of Liberty Wireless | — | (1,355) | — |
| Write off of investment | 150 | 228 | — |
| Changes in operating assets and liabilities, net of assets and liabilities received from business acquisition: | | | |
| Accounts receivable | (8,428) | (15,916) | (36,575) |
| Inventory | (7,255) | (7,540) | (1,167) |
| Prepaid expenses | (321) | (1,721) | (5,577) |
| Deferred costs and other current assets | (120) | (4,152) | 4,276 |
| Deposits and other assets | 167 | (2,595) | (1,167) |
| Accounts payable | 3,217 | 8,956 | 53,236 |
| Accrued expenses and other liabilities | 4,143 | 8,973 | (7,297) |
| Deferred revenue | (2,035) | 4,188 | 2,947 |
| Net cash used in operating activities | (6,590) | (20,077) | (15,008) |
| Cash flows from investing activities: | | | |
| Capitalized expenditures, including internal capitalized labor | (5,544) | (11,836) | (22,172) |
| Cash paid for acquisitions | (11,142) | (8,781) | (4,662) |
| Cash paid for purchase of intangible assets | — | (2,725) | (193) |
| Purchase of short-term investments | — | — | (5,000) |
| Proceeds from the maturity of short-term investments | — | — | 5,000 |
| Proceeds from the sale of assets | — | 101 | 1,111 |
| Note receivable from stockholder | 1,120 | — | — |
| Reduction in restricted cash and cash equivalent | 100 | 100 | 362 |
| Net cash used in investing activities | (15,466) | (23,141) | (25,554) |
| Cash flows from financing activities: | | | |
| Principal repayments on long-term debt and capital leases | (11,046) | (284) | (21,784) |
| Borrowings on line of credit | — | 15,000 | 6,355 |
| Proceeds from term loan and other debt, net of fees | 3,976 | — | 73,632 |
| Cash paid for repurchase of common stock | — | (13,088) | (3,738) |
| Proceeds from exercise of warrants and options | 91 | 11,679 | 5,286 |
| Net proceeds (costs) of initial public offering, net of costs | 110,838 | (292) | — |
| Preferred stock dividend payments | (9,865) | — | — |
| Net cash provided by financing activities | 93,994 | 13,015 | 59,751 |
| Net increase (decrease) in cash and cash equivalents | 71,938 | (30,203) | 19,189 |
| Cash and cash equivalents, beginning of year | 29,048 | 100,986 | 70,783 |
| Cash and cash equivalents, end of year | $100,986 | $ 70,783 | $ 89,972 |
| Supplemental disclosure of cash flows information: | | | |
| Cash paid during the period for: | | | |
| Interest | $ 849 | $ 253 | $ 917 |
| Income taxes | — | — | — |
| Supplemental disclosure of non-cash activities: | | | |
| Issuance of warrants to purchase common stock with debt | $ 817 | $ — | $ 11,945 |
| Issuance of warrant to purchase common stock to vendor | — | — | 3,228 |
| Inventory exchanged for advertising credits | — | — | 2,323 |
| Stock-based compensation capitalized as website and internal use software costs | — | — | 616 |
| Issuance of common stock in business acquisitions | — | 8,209 | 5,202 |
| Issuance of common stock in intangible asset purchase | — | 1,549 | — |
| Issuance of common stock to settle a liability | 50 | — | — |
| Equipment purchase on capital lease | 635 | 595 | 152 |
| Release of funds in escrow related to acquisitions | — | 10,700 | — |
| Purchase consideration included in accrued liabilities | — | 3,000 | 1,120 |
| Preferred stock dividends and accretion to redemption value | 22,049 | — | — |
| Conversion of preferred stock, total preferred shares converted into 13,619,536 shares of common stock | 92,308 | — | — |

See accompanying notes to consolidated financial statements

F-10

Table of Contents

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(in thousands, except per share and share amounts)**

**(1)  The Company**

**(a)  *Business Description***

We are a leading online seller of wireless services and devices based on the number of activations of wireless services sold online in the United States. We are headquartered in Washington D.C. and maintain our technology and operations centers in Largo, Maryland and Reston and Great Falls, Virginia. We sell wireless service plans, including satellite television services through our branded websites; including Wirefly.com, A1 Wireless.com, and VMCsatellite.com and through websites that we create and manage for third parties. We offer marketers the ability to sell wireless voice and data services and devices under mobile virtual network enabler ("MVNE") agreements. We provide customers the ability to organize personal communication by providing real time wireless access to e-mail, voicemail, faxes, contacts, scheduling, calendar and conference calling functionality through a website or telephone.

**(b)  *Risk and Uncertainties***

Our operations are subject to certain risks and uncertainties including, among others, actual and potential competition by entities with greater financial resources, rapid technological changes, the need to retain key personnel and protect intellectual property and the availability of additional capital financing on terms acceptable to us.

Since inception, we have incurred net losses attributable to common stockholders of approximately $228,385. To date, management has relied on debt and equity financings to fund our operating deficit. We had $89,972 of cash and cash equivalents on hand at December 31, 2006. We may require additional financing to fund future operations.

**(c)  *Discontinued Operations***

On December 31, 2005, we sold the operating assets of our mobile virtual network operator ("MVNO") Liberty Wireless ("Liberty") to Teleplus Wireless Corp., a subsidiary of Teleplus Enterprises, Inc. The sale of Liberty has enabled us to streamline and focus our resources on our other operations including the growth of our MVNE business. The sale of Liberty was recorded as a discontinued operation in the financial statements pursuant to Statement of Financial Accounting Standards ("SFAS") No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets* ("SFAS No. 144"). We have classified these operations as discontinued operations and, accordingly, have segregated assets and liabilities of the discontinued operations in the accompanying Consolidated Balance Sheets as of December 31, 2005 and 2006 and the revenue and expenses of the discontinued operation in the accompanying Consolidated Statements of Operations for each of the three years ended December 31, 2006. Cash flows pertaining to discontinued operations were not disclosed separately in the Consolidated Statements of Cash Flows.

**(2)  *Summary of Significant Accounting Policies***

**(a)  *Principles of Consolidation and Basis of Presentation***

The consolidated financial statements include the accounts of InPhonic, Inc. and its subsidiaries. All significant intercompany accounts and transactions are eliminated upon consolidation.

F-11

Table of Contents

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

*(b)   Use of Estimates*

The preparation of consolidated financial statements in conformity with generally accepted accounting principles in the United States requires management to make estimates and assumptions that affect the reported amounts of certain assets and liabilities, revenue and expenses, and the related disclosure of contingent assets and liabilities in the consolidated financial statements and accompanying notes. The most significant of such estimates include our reserve for future deactivations, allowance for rebates, allowance for uncollectible accounts receivable, valuation of inventory, estimated useful life of assets, impairment of long-lived assets and goodwill, valuation of deferred tax assets and reserves for contingent tax liabilities. Actual results could differ from those estimates.

In preparation of the accompanying financial statements for the year ended December 31, 2005, we recorded an adjustment to reduce depreciation and amortization expense by $891. These adjustments to depreciation were made to correct a computational error in the fixed asset subledger that caused depreciation expense to be overstated in each prior period between fiscal years 2001 and 2005. We do not believe the impact of the adjustment was material to fiscal year 2005 or any period prior.

*(c)   Cash and Cash Equivalents*

We consider all highly liquid investments with an original maturity of three months or less to be cash equivalents.

*(d)   Financial Instruments*

*Fair Value of Financial Instruments*

Our financial instruments, as defined under SFAS No. 107, *Disclosures about Fair Value of Financial Instruments* , include our cash, accounts receivable, accounts payable, borrowings under our line of credit with Comerica and our term loan. The fair value of cash, accounts receivable, and accounts payable were equal to their respective carrying values at December 31, 2005 and 2006. At December 31, 2005, the borrowings outstanding under our line of credit were equal to the respective carrying value. We retired our line of credit in November 2006. We hold cash and cash equivalents primarily in four financial institutions, which often exceed FDIC insured limits. Historically, we have not experienced any losses due to such concentration of credit risk.

As of December 31, 2006, the carrying value of the term loan was $63.6 million and the fair value of the debt approximated $72.4 million. The carrying value of the debt was recorded at a discount primarily as the result of a portion of the proceeds allocated to the fair value of detachable warrants issued with the debt. See Note 6 for further discussion.

*Concentration Risk*

Financial instruments that potentially subject us to a concentration risk consist principally of accounts receivable and accounts payable. We extend credit to wireless network carriers ("carriers") on an unsecured basis in the normal course of business. Three carriers accounted for approximately 74% and 69% of accounts receivable, net of the deactivation reserve, as of December 31, 2005 and 2006, respectively.

F-12

Table of Contents

## INPHONIC, INC. & SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
**(in thousands, except per share and share amounts)**

For each of the years ended December 31, 2004, 2005 and 2006, revenue from three carriers exceeded 10% of the total revenue. Revenue as a percentage of total revenues for these carriers was as follows:

|  | 2004 | 2005 | 2006 |
|---|---|---|---|
| Carrier A | 22% | 30% | 36% |
| Carrier B | 28% | 16% | 17% |
| Carrier C | 26% | 21% | 15% |
| Total | 76% | 67% | 68% |

We are extended credit from wireless carriers at up to 60 day trade payable terms in the normal course of business to purchase certain handset equipment. The three carriers described above accounted for approximately 31% and 46% of accounts payable as of December 31, 2005 and 2006, respectively.

We depend primarily on our carriers to supply cellular phones and accessories in a timely manner in adequate quantities and consistent quality. If we are unable to obtain cellular phones in adequate quantities, we may incur delays in shipment or be unable to meet demand for our products. At December 31, 2005 and 2006, one carrier accounted for approximately 32% and 25% of our total purchases of cellular phones.

*(e)*  *Allowance for Doubtful Accounts*

We maintain allowances for doubtful accounts for estimated losses resulting from the inability of customers to pay. The amount of the allowance is based on a combination of factors including the status of collection efforts with the respective wireless carriers on balances in which additional source information or other transaction details continue to be exchanged between us and the carrier. Our allowance for receivables due from carriers is estimated based on previous experience with collection efforts of similar nature. If the financial condition of any of the larger carrier customers we do business with were to deteriorate, resulting in an impairment of their ability to make payments, additional allowances may be required.

*(f)*  *Inventory*

Inventory consists primarily of wireless devices. The carrying value of inventory is stated at the lower of its cost or market value. Cost is determined using a consistent method which approximates the first-in-first-out method. We write down inventory for estimated obsolescence or unmarketable inventory equal to the difference between the cost of inventory and the estimated market value or replacement cost based upon assumptions about future demand and market conditions. If actual market conditions are less favorable than those projected, additional inventory write-downs may be required. During the years ended December 31, 2004, 2005, and 2006, we wrote down inventory approximately $423, $506, and $179, respectively, in order to record certain inventory to a fair market value, which was lower than our cost. In addition during the year ended December 31, 2006, we have written-off or fully reserved for amounts due from equipment vendors for wireless devices returned to them totaling $3,990 for which credit has yet to be received.

Effective January 1, 2006, we adopted SFAS No. 151, *Inventory Costs that is an amendment to ARB No. 43, Chapter 4* ("SFAS No. 151"), amends chapter 4 "Inventory Pricing" of ARB No. 43 and paragraph A3 of SFAS No. 144. Previously, ARB 43 did not define the term "so abnormal" which could lead to unnecessary incomparable financial reporting. SFAS No. 151 clarifies that abnormal costs related to idle facility expense, freight, handling costs, and wasted materials (spoilage) should be recognized as period costs. There was no material effect on our consolidated financial position, result of operations or cash flows as a result of this adoption.

F-13

**Table of Contents**

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

**(g)**    *Long-Lived Assets*

*Property and Equipment*

Property and equipment is recorded at cost or at fair value if it is acquired in a business acquisition. Replacements and improvements that extend the useful life of property and equipment are capitalized. Property and equipment is depreciated over the following useful lives. Leasehold improvements are depreciated over the stated useful life or the contractually stated period of the underlying lease.

|  | Estimated useful life (in years) |
| --- | --- |
| Computer and equipment | 3 |
| Software | 3 |
| Furniture and fixtures | 7 |
| Leasehold improvements | 3 |
| Website development | 1.5 |
| Internal software development | 2 |

We account for the costs relating to the development of our e-commerce platform for internal use based on AICPA Statement of Position ("SOP") No. 98-1, *Accounting for the Costs of Computer Software Developed or Obtained for Internal Use* , and the Emerging Issues Task Force ("EITF") No. 00-02, *Accounting for Web Site Development Costs* . Website development costs consist of internal and external costs incurred to purchase and implement the web software and enhancements to the functionality of the web software, used in our business.

In accordance with SFAS No. 144, we are required to evaluate the carrying value of long-lived assets and certain intangible assets. SFAS No. 144 first requires an assessment of whether circumstances currently exist which suggest the carrying value of long-lived assets may not be recoverable. At December 31, 2005 and 2006, we did not believe any such conditions existed. Had these conditions existed, we would have assessed the recoverability of the carrying value of our long-lived assets and amortizable intangible assets based on estimated undiscounted cash flows to be generated from such assets. In assessing the recoverability of these assets, we would have projected estimated cash flows based on various operating assumptions such as average revenue per activation, deactivation rates, and sales and workforce productivity ratios. If the projection of undiscounted cash flows did not exceed the carrying value of the long-lived assets, we would have been required to record an impairment charge to the extent the carrying value exceeded the fair value of such assets.

*Goodwill and Intangible Assets*

Goodwill and intangible assets with indefinite useful lives are not amortized and are evaluated for impairment at least annually, or when events or circumstances suggest a potential impairment may have occurred. In accordance with SFAS No. 142, *Goodwill and Other Intangible Assets* ("SFAS No. 142"), we have selected the fourth quarter to perform the annual impairment test. SFAS No. 142 requires us to compare the fair value of the reporting unit to its carrying amount on an annual basis to determine if there is a potential impairment. If the fair value of the reporting unit is less than its carrying value, an impairment loss is recorded to the extent that the fair value of the goodwill within the reporting unit is less than the carrying value. The fair value for goodwill and other intangible assets not subject to amortization is determined based on discounted cash flows, market multiples or other measures, as appropriate. Based on our assessment for the year ended December 31, 2006, no impairments of goodwill or other intangible assets were noted.

F-14

Table of Contents

## INPHONIC, INC. & SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
### (in thousands, except per share and share amounts)

For the year ended December 31, 2005, we originally determined that a supplier relationship valued at $3,730 had an indefinite useful life as of the April 26, 2005 acquisition date of VMC Satellite, Inc. During 2006, we determined that as of the acquisition date, the supplier relationship had a useful life of ten years in accordance with SFAS No. 142. During the fourth quarter of 2006, we recognized $255 of amortization expense for the period from April 26, 2005 to December 31, 2005. We do not believe the impact of this adjustment in 2006 to be material to the fiscal year 2006 or 2005 as a result of this change.

Intangible assets with determinable useful lives, which primarily consist of software and technology, customer contracts, affiliate relationships, a supplier relationship and a non-compete agreement, were recorded at fair value at the date of acquisition and amortized over the following economic lives:

|  | Estimated economic life (in years) |
|---|---|
| Software and technology | 1.5 to 5 |
| Customer contracts | 1.5 to 3 |
| Affiliate relationships | 5 |
| Non-compete agreement | 2 to 5 |
| Supplier relationship | 10 |
| Other | 1.5 to 5 |

Intangible assets not subject to amortization include trade names.

*(h)*    ***Revenue Recognition***

*Activations and Services Revenue*

We recognize revenue from the sale of wireless services and the provisioning of MVNE and data services.

*Wireless Services:* We generate revenue from wireless carriers, including a satellite television carrier, who pay commissions and volume and performance-based bonuses, for activating wireless services and features on their networks. We recognize commissions from wireless carriers upon shipment of activated devices to the customer. In addition to activation commissions, certain carriers pay us a monthly residual fee either for as long as a customer who we activate for that carrier continues to be its subscriber, or for a fixed period of time depending on the carrier. Within our Satellite Television business unit, we receive satellite activation certificates evidencing activation rights in advance of their resale to customers. Revenue from satellite television customers includes commissions earned at the time of the satellite service activation, net of an estimate for deactivations, as we are acting as an agent in the transaction. Revenue is reduced for estimated deactivations of its wireless services by customers prior to the expiration of a time period that ranges 90 to 180 days from the date of activation, depending on the wireless carrier. We estimate deactivations based on historical experience, which we developed based on our experience with carriers, customer behavior and sources of customers, among other factors, allowing us to accrue estimates with what we believe is a high degree of certainty. If we determine that we cannot accurately predict future deactivation experience, we may be required to defer 100% of our carrier commissions revenue until the expiration of the appropriate chargeback period. Our reserves for deactivations are included in accounts receivable and deferred revenue on the accompanying balance sheets. Accounts receivable at December 31, 2005 and 2006 included reserve for deactivations of $7,540 and $7,639, respectively. Deferred revenue at December 31, 2005 and 2006 included reserve for deactivations of $10,796 and $14,546, respectively.

F-15

Table of Contents

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

In addition to receiving commissions for each wireless subscriber activated, we earn performance bonuses from the wireless carriers based on negotiated performance targets. The most significant bonuses we earn are the quarterly volume bonuses, which we collect from wireless carriers on a monthly basis, based on current month activations. We record these bonuses as deferred revenue at the time of billing until we achieve the quarterly targets. We also earn other quarterly bonuses from certain carriers for maintaining low customer churn and signing up wireless customers for certain additional monthly "features" such as data service or text messaging. Wireless carriers also periodically offer bonuses for achieving monthly volume and other performance targets. We recognize these monthly bonuses as earned in accordance with the provisions of the Securities and Exchange Commission's ("SEC") Staff Accounting Bulletin ("SAB") No. 104, *Revenue Recognition in Financial Statements* ("SAB No. 104"). Revenue is recognized only when all of the following criteria are met: (1) persuasive evidence of an arrangement exists, (2) delivery has occurred or services have been rendered, (3) the seller's price to the buyer is fixed or determinable, and (4) collectibility is reasonably assured. Amounts collected in cash prior to meeting the above criteria are recorded as deferred revenue. Through 2005, commission revenue earned from the activation of carrier features had been deferred until the contractual chargeback period had lapsed as we did not have adequate historical information to estimate a reserve. Beginning in 2006, we began to estimate commission revenue earned from feature activations based on historical experience which we have developed based on our experience with carriers and customer behavior over a period of time in excess of 24 months. As of December 31, 2005, $1,383 of feature activations revenue was deferred, which would have been accrued for less an estimated reserve for deactivations, in the event that we had the appropriate experience with carriers and customer behavior at December 31, 2005. As of December 31, 2006, our estimated reserve for deactivations of feature activations was $629.

In the ordinary course of recording and collecting commissions from our wireless carrier partners, we engage in a matching and reconciling process (the "matching process") between source information for customer wireless carrier activations generated and maintained in our back-office sales information systems and each carrier's billing system. Although the substantial majority of our sales information matches to that of the carriers, matching differences do arise. Examples of such differences include (i) instances in which an activation per our records does not correlate to a commission fee payment schedule submitted by the carrier; (ii) commission fee payment collected from the carrier that is less than the expected payment per our sales records; (iii) a deactivation identified on a carrier statement that does not match the carrier's original commission fee payment for such activation and (iv) commission or other fee payment we collect that is in excess of expected payment per our sales records.

Data files supported by our billing records related to differences are submitted monthly to each carrier for resolution. Resolution of these differences is usually an iterative process and it can take up to 12 months or longer for final resolution of any difference. Information is exchanged between us and the carrier throughout this process. We recognize revenue based on the underlying data maintained in our back-office sales information systems unless the carrier provides us details that supersedes our information. Given the nature of these differences and based on our experience in resolving such items with the carriers, we are also able to determine an appropriate reserve against revenue to reflect the likely success or failure of resolving these differences. In certain instances when a wireless carrier denies a claim we may file in resolving differences of this nature, we will write-off the related accounts receivable while pursuing further collection efforts and will record into income at a future date if collected. To the extent that we collect commission or other fee payments in excess of expectations, we will record revenue in the period of receipt net of estimated chargeback requirements.

F-16

Table of Contents

INPHONIC, INC. & SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
(in thousands, except per share and share amounts)

*MVNE Services:*

We offer marketers the ability to sell wireless services to their customers under their own brands using our e-commerce platform and operational infrastructure through MVNE contracts. We receive fees for development of the network platform, as well as for operational support services. We defer the fees attributable to the production of the network platform and recognize these fees and costs over the expected life of the agreement (typically 12 to 48 months). Fees received for custom functional enhancements to the network platform and for operational services are deferred until all revenue criteria have been satisfied. Deferred revenue from MVNE contracts as of December 31, 2005 and 2006 included $1,852 and $1,195, respectively.

*Other Revenue:*

We sell data services, including a service that allows customers to access email, voicemail, facsimiles, contacts and personal calendar information through a website or a telephone. We bill customers monthly and revenue is recognized monthly, as the services are performed.

*Equipment Revenue:*

Revenue from the sale of wireless devices and accessories in a multiple-element arrangement with services is recognized at the time of sale in accordance with EITF No. 00-21, *Revenue Arrangements with Multiple Deliverables,* when fair value of the services element exists. Customers have the right to return devices within a specific period of time or usage, whichever occurs first. We provide an allowance for estimated returns of devices based on historical experience. Return rights of indirect retailers for wireless devices are limited to warranty claims, which are generally covered by the device manufacturers' original warranties. In accordance with the provisions of SAB No. 104, we determined we have sufficient operating history to estimate equipment returns. In connection with wireless activations, we sell the wireless device to the customer at a significant discount, which is generally in the form of a rebate ("equipment discount provisions" or "EDP"). Rebates are recorded as a reduction of revenue. We recognize equipment revenue net of rebate costs based on historical experience of rebates claimed. Future experience could vary based upon rates of consumers redeeming rebates.

In the event a customer terminates their wireless service with the carrier within six months of activation and opts not to return the wireless device to us within the time frames permitted within our return policy, in many instances our sales contracts with the customer permit us to charge the customer an EDP termination fee for each unreturned device. Prior to the three months ended June 30, 2006, revenue recognition of such fee was deferred until such fee was collected from the customer pursuant to SAB 104 as we did not have adequate historical collection data to reasonably estimate the ultimate collectibility of the receivable. Beginning April 1, 2006, we began to estimate EDP termination fee revenue based on historical experience of customer collection behavior which we have developed over a time period of 24 months which provides the basis on which to accrue revenue with an appropriate assurance of collectibility pursuant to SAB 104. As of March 31, 2006, $293 of such revenue was deferred, which would have been accrued for in the event that we had adequate customer collection history, less an estimated reserve for uncollectible amounts. As of December 31, 2006, we had accrued as accounts receivable approximately $1,686 in such EDP fees.

**(i)    Cost of Revenue**

The major components of cost of revenue, exclusive of depreciation and amortization, are:

*Activations and services.* Cost of activations and services revenue includes costs incurred from providers of telecommunications and data center services.

F-17

Table of Contents

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

*Equipment.* We purchase wireless devices and accessories from wireless carriers, device manufacturers and third-party vendors to sell to customers and indirect retailers in the WAS business unit. We sell these wireless devices and accessories at a price below cost to encourage the sale and use of the services. We do not manufacture any of this equipment. Costs from the sale of wireless devices and accessories sold directly to customers are recognized at the time of sale. From time to time, we receive price protection credits on equipment purchased from certain vendors. We recognize price protection credits received for equipment that has been sold and shipped as a reduction of cost of revenue. Cost of revenue included shipping expenses of $4,677, $8,575 and $11,385 for the years ended December 31, 2004, 2005 and 2006, respectively.

**(j)    Advertising Costs**

We expense advertising and other marketing costs as incurred and principally include amounts paid to marketing partners based on the delivery of customers to our websites for wireless activation and services. Advertising and other marketing costs for the years ended December 31, 2004, 2005 and 2006 were $36,185, $79,078 and $104,351, respectively.

Beginning in 2007, we expect to begin capitalizing and amortizing a portion of our advertising costs (as direct response advertising) associated with activity pursuant to an agreement with a vendor.

**(k)    Accrued Consumer Liabilities**

Under certain conditions, consumers' purchasing wireless devices from us may be eligible for a product rebate depending on the wireless device purchased, service contract activated and the consumer maintaining their service with the wireless carrier for a period of up to six months. We estimate and record an accrued consumer liability and cost of revenue for such rebate at the time of sale based on the terms of the rebate and our rebate redemption experience over the most recent 18 months following the lapse of the contractual rebate redemption period. Our rebate redemptions are generally processed by a third party vendor that validates the consumer's rebate redemption materials to ensure that the redemption request satisfies all terms and conditions of the rebate program to be eligible for payment. Only consumers that satisfy the redemption requirements of the rebate program receive the rebate amount.

During the last six months of 2006, we incurred and paid $7,950 of payments made to consumers outside our customary rebate redemption process to parties that we believed generally had not satisfied all the terms and conditions of the respective rebate redemption program. Such amounts were paid to satisfy customer complaints and are viewed by us as "customer credits" and reflected in general and administrative expenses.

**(l)    Accounts payable**

Accounts payable at December 31, 2005 and 2006 consisted of:

|  | 2005 | 2006 |
|---|---|---|
| Trade payables for inventory | $14,353 | $50,989 |
| Other accounts payable | 17,190 | 34,986 |
|  | $31,543 | $85,975 |

F-18

Table of Contents

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

**(m)  Accrued Expenses and Other Current Liabilities**

Accrued expenses and other liabilities at December 31, 2005 and 2006 consisted of:

|  | 2005 | 2006 |
|---|---|---|
| Accrued consumer liabilities, including accrued rebates | $18,289 | $ 8,203 |
| Accrued payroll and related expenses | 1,452 | 1,685 |
| Accrued acquisition costs and severance costs | 5,063 | 1,674 |
| Accrued sales taxes payable | 593 | 443 |
| Accrued interest | 83 | 995 |
| Accrued product costs | 697 | 2,245 |
| Other | 5,411 | 7,276 |
|  | $31,588 | $22,521 |

**(n)  Restructuring Costs**

In the first quarter of 2005, we implemented a restructuring plan to take advantage of synergies gained through the acquisition of A1 Wireless and to restructure other operating segments. During the year ended December 31, 2005, we recognized $847 in restructuring costs, $811 of which related to workforce reduction and $36 related to exited facilities and contracts. We paid all restructuring costs related to this plan by December 31, 2005.

During 2006, we implemented a restructuring plan related to changes in our management and operations structure. We recognized $2,551 related to the termination of our former president and chief operating officer and thirty-four other senior executives and employees. Of this amount, $1,017 related to severance benefits that will be paid out in cash to the recipients on a monthly or semi-monthly basis over the terms of their respective severance agreements, $1,513 related to expenses incurred as a result of the modification of stock-based compensation awards under which vesting of 50% of unvested restricted share and option awards was accelerated for three of the former employees, and $21 related to other costs. As of December 31, 2006, we have $303 included in accrued expenses and other current liabilities for these expenses which have not yet been paid. We expect all remaining costs will be paid by June 30, 2007.

**(o)  Income Taxes**

SFAS No. 109, *Accounting for Income Taxes* ("SFAS No. 109"), establishes financial accounting and reporting standards for the effect of income taxes. During the years ended December 31, 2004, 2005 and 2006, we did not have any income tax expense or benefit because a full valuation allowance was provided against our net deferred tax assets. Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized as a component of net income in the period that includes the enactment date.

**(p)  Stock-Based Compensation**

We adopted SFAS No. 123 (revised 2004), *Share Based Payment* ("SFAS No. 123(R)") on January 1, 2006 using the modified prospective application method ("MPA"). SFAS No. 123(R)

F-19

Table of Contents

## INPHONIC, INC. & SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
### (in thousands, except per share and share amounts)

established standards for the accounting for transactions in which an entity exchanges its equity instruments for goods or services. SFAS No. 123(R) requires us to measure the cost of employee services received in exchange for an award of equity instruments (usually stock options or unvested (restricted) stock awards based on the grant-date fair value of the award. That cost is recognized over the period during which an employee is required to provide service in exchange for the award—the requisite service period (usually the vesting period). In March 2005, the SEC issued SAB No. 107, *Valuation of Share-Based Payment Arrangements for Public Companies* ("SAB 107") relating to the interaction of the adoption of SFAS No. 123(R) and the SEC rules and regulations. We have applied the provisions of SAB 107 in our adoption of SFAS 123(R).

Prior to our adoption of SFAS No. 123(R), we applied the intrinsic value method of accounting for employee stock-based compensation as prescribed by Accounting Principles Board ("APB") Opinion No. 25, *Accounting for Stock Issued to Employees,* and related interpretations including FASB Interpretation ("FIN") No. 44, *Accounting for Certain Transactions involving Stock Compensation an Interpretation of APB Opinion No. 25* , to account for our stock option grants to employees. Under this method, compensation expense was recorded on the date of the grant only if the current market price of the underlying stock exceeded the exercise price. SFAS No. 123, *Accounting for Stock-Based Compensation* ("SFAS No. 123"), established accounting and disclosure requirements using a fair value-based method of accounting for stock-based employee compensation plans. As permitted by SFAS No. 123, we have elected to continue to apply the intrinsic value-based method of accounting described above, and had adopted the disclosure requirements of SFAS No. 123. All shares of restricted stock awarded to employees were accounted for at fair value in accordance with SFAS No. 123.

Under the MPA method, compensation cost for all share-based payments granted prior to, but not vested as of December 31, 2005, is based on the grant date fair value estimated in accordance with the pro forma provisions of SFAS No. 123, and compensation cost for all share based payments granted or modified subsequent to December 31, 2005, will be based on the grant date fair value estimated in accordance with the provisions of SFAS No. 123(R). Results for prior periods have not been restated. We use the ratable method of attributing the value of stock-based compensation to expense. SFAS No. 123(R) requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. In our pro forma information required under SFAS No. 123 for the periods prior to January 1, 2006, we accounted for forfeitures as they occurred. The fair value of each option granted is estimated on the grant date using the Black-Scholes option pricing model which takes into account as of the grant date the exercise price and expected life of the option, the current price of the underlying stock and its expected volatility, expected dividends on the stock and the risk-free interest rate for the term of the option.

For the year ended December 31, 2006 as a result of our adoption of SFAS No. 123(R), we recognized stock-based compensation expense related to employee options granted prior to January 1, 2006 of $6,260, of which $405 was capitalized in accordance with our compensation policies and SFAS No. 123(R).

F-20

Table of Contents

## INPHONIC, INC. & SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
### (in thousands, except per share and share amounts)

In addition, we granted options to certain of our employees to purchase 1,012,200 shares of our common stock during the year ended December 31, 2006. The options granted were granted at a weighted average exercise price of $7.14. The grant date fair value of employee share options was estimated using the Black-Scholes option-pricing model with the following assumptions:

|  | 2004 | 2005 | 2006 |
|---|---|---|---|
| Expected volatility | 70.00% | 70.00% | 72.00% |
| Risk free interest rate | 3.12% | 3.82% | 4.72% |
| Expected dividend rate | 0.00% | 0.00% | 0.00% |
| Expected life (in years) | 4.0 | 4.0 | 5.6 |

The weighted average fair value per share of options granted using these assumptions was $4.65. Compensation cost of the grant was reduced by an estimated forfeiture amount based on an annual experience rate of 9.93%. As of the date of grants, total compensation cost related to the grants including estimated forfeitures was approximately $4,705 for the stock options granted during the year ended December 31, 2006. Stock-based compensation expense for these grants for the year ended December 31, 2006 was $670.

The impact of adopting SFAS No. 123(R) increased stock-based compensation expense included in our operating expenses and increased net loss from continuing operations by approximately $2,464 for the year ended December 31, 2006 or $0.07 per basic and diluted share. There was no impact from the adoption on cash flow from operations or cash flows from financing activities.

Our pro forma net loss applicable to common shareholders, and pro forma net loss per common share, basic and diluted, for periods prior to our adoption of SFAS No. 123(R) was as follows.

|  | For the year ended | |
|---|---|---|
|  | 2004 | 2005 |
| Net loss attributable to common stockholders, as reported | $(32,288) | $(38,195) |
| Add: Stock-based compensation expense included in net loss attributable to common stockholders, as reported | 5,289 | 17,482 |
| Less: Total stock-based compensation expense determined under fair value based methods for all stock awards, net of related tax effects | (6,472) | (15,599) |
| Pro forma net loss attributable to common stockholders | $(33,471) | $(36,312) |
| Net loss per common share, basic and diluted, as reported | $ (2.29) | $ (1.11) |
| Net loss per common share, basic and diluted, pro forma | $ (2.38) | $ (1.06) |

We account for equity grants issued to non-employees at fair value, in accordance with the provisions of SFAS No. 123 and EITF No. 96-16, *Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services* . We use a Black-Scholes model to estimate the fair value of such awards and compensation expense relating to such equity issuances is recognized over the applicable vesting period of the options, warrants, or stock, in accordance with the method prescribed by FIN No. 28, *Accounting for Stock Appreciation Rights and Other Variable Stock Option of Award Plans* .

F-21

Table of Contents

## INPHONIC, INC. & SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
#### (in thousands, except per share and share amounts)

Stock-based compensation, which includes compensation recognized on stock option grants and restricted stock awards for employees and non-employees was included in the following line items on the accompanying financial statements. We have capitalized $616 of stock-based compensation as internally developed software for the year ended December 31, 2006. No such costs were capitalized in 2005. There were no tax benefits recognized in the statements of operations for stock based awards in any periods:

*Balance Sheets:*

*Statements of operations:*

|  | For the year ended December 31, | | |
|  | 2004 | 2005 | 2006 |
|---|---|---|---|
| Sales and marketing | $2,111 | $ 2,201 | $ 2,891 |
| General and administrative | 5,096 | 15,585 | 9,860 |
| Restructuring costs | — | — | 1,513 |
| Income (loss) from discontinued operations | 174 | 832 | 112 |
|  | $7,381 | $18,618 | $14,376 |

Stock-based compensation from continuing operations in 2005 included $7,851 related to the modification of the terms of original restricted stock awards or option grants related to six employees that were terminated in 2005. Stock based compensation from continuing operations in 2006 included $1,370 related to the modification of stock-based awards for five employees. Such modifications accelerated the vesting of 81,035 shares of restricted stock and options underlying 122,258 shares of our common stock. Unrecognized compensation cost for all unvested options and restricted stock awards was $36,459 as of December 31, 2006 which will be recognized over a weighted average period of 1.5 years.

*(q)*   **Net Loss Per Common Share**

We calculate net loss per common share in accordance with SFAS No. 128, *Earnings Per Share* ("SFAS No. 128"). Basic net loss per common share excludes any dilutive effects of options, warrants, restricted stock awards and convertible securities and is calculated by dividing net loss attributable to common stockholders by the weighted average number of common shares outstanding for the period. Diluted net loss per common share equals basic net loss per common share as the effects of options, warrants, restricted stock awards and convertible securities would have been anti-dilutive.

F-22

Table of Contents

## INPHONIC, INC. & SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
**(in thousands, except per share and share amounts)**

The following table reconciles net loss attributable to common stockholders and basic and diluted weighted average common shares outstanding to the historical or pro forma net loss attributable to common stockholders and the historical or pro forma basic and diluted weighted average common shares outstanding for the years ended December 31, 2004, 2005 and 2006. Information presented for 2004 has been prepared on a pro forma basis assuming outstanding preferred stock was converted into common stock at the beginning of the period in connection with our initial public offering. Weighted average shares outstanding presented for 2006 includes the effect 1,250,000 shares representing detachable warrants issued with the term loan on November 7, 2006, as described in Note 6. These warrants are exercisable at $0.01 per share.

|  | 2004 | 2005 | 2006 |
|---|---|---|---|
| Numerator: | | | |
| Net loss from continuing operations | $  (14,585) | $  (37,766) | $  (63,534) |
| Preferred stock dividends and accretion | (22,049) | — | — |
| Net loss from continuing operations attributable to common stockholders | (36,634) | (37,766) | (63,534) |
| Income (loss) from discontinued operations | 4,346 | (429) | (193) |
| Net loss attributed to common stockholders | $  (32,288) | $  (38,195) | $  (63,727) |
| Denominator: | | | |
| Weighted average shares outstanding | 14,074,505 | 34,417,954 | 36,312,970 |
| Basic and diluted net gain (loss) per share: | | | |
| Net loss from continuing operations attributable to common stockholders | $  (2.60) | $  (1.10) | $  (1.75) |
| Net income (loss) from discontinued operations | 0.31 | (0.01) | — |
| Basic and diluted earnings per share: | $  (2.29) | $  (1.11) | $  (1.75) |

For the years ended December 31, 2004, 2005 and 2006, we incurred a net loss. If our outstanding common stock equivalents were exercised or converted into common stock, the result would have been anti-dilutive and, accordingly, basic and diluted net loss attributable to common stockholders per share are identical for all periods presented in the accompanying condensed consolidated statements of operations. The following summarizes our potential outstanding common stock equivalents as of the end of each period.

|  | December 31, | | |
|---|---|---|---|
|  | 2004 | 2005 | 2006 |
| Options to purchase common stock | 6,629,469 | 5,115,969 | 4,043,103 |
| Restricted stock awards | — | 1,137,878 | 2,964,649 |
| Warrants to purchase common stock | 1,780,923 | 787,863 | 2,754,740 |
| Total common stock equivalents convertible into common stock | 8,410,392 | 7,041,710 | 9,762,492 |

F-23

Table of Contents

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(in thousands, except per share and share amounts)**

**(r)    Adoption of SAB 108**

In September 2006, the SEC released Staff Accounting Bulletin No. 108, *Considering the Effects of Prior Year Misstatements When Quantifying Misstatements in Current Year Financial Statements* ("SAB 108"). SAB 108 provides guidance on how the effects of the carryover or reversal of prior year financial statement misstatements should be considered in quantifying a current year misstatement. Prior practice allowed the evaluation of materiality on the basis of (1) the error quantified as the amount by which the current year income statement was misstated (rollover method) or (2) the cumulative error quantified as the cumulative amount by which the current year balance sheet was misstated (iron curtain method). SAB 108 is effective for fiscal years ending after November 15, 2006. SAB 108 requires a dual approach that consists of both the rollover and iron curtain methods. We adopted SAB 108 effective in the fourth quarter ended December 31, 2006. There was no material effect on our financial position, results of operations or cash flows as a result of this adoption.

**(s)    Recent Accounting Pronouncements**

In May 2005, the Financial Accounting Standards Board ("FASB") FASB issued SFAS No. 154, *Accounting Changes and Error Corrections* ("SFAS No. 154"), a replacement of APB Opinion No. 20, *Accounting Changes* , and SFAS No. 3, *Reporting Accounting Changes in Interim Financial Statements* . SFAS No. 154 changes the requirements for the accounting for, and reporting of, a change in accounting principle. Previously, voluntary changes in accounting principles were generally required to be recognized by way of a cumulative effect adjustment within net income during the period of the change. SFAS No. 154 requires retrospective application to prior periods' financial statements of changes in accounting principles, unless it is impracticable to determine either the period-specific effects or the cumulative effect of the change. SFAS No. 154 is effective for accounting changes made in fiscal years beginning after December 15, 2005; however, the statement does not change the transition provisions of any existing accounting pronouncements. We adopted the pronouncement effective January 1, 2006. There was no material effect on our financial position, results of operations or cash flows as a result of this adoption.

In June 2006, the FASB ratified the EITF Issue No. 06-3, *How Taxes Collected from Customers and Remitted to Governmental Authorities Should Be Presented in the Income Statement"* ("EITF 06-3"). EITF No. 06-3 requires an entity to disclose transactional tax amounts assess by government authorities that are considered significant. EITF No. 06-3 is effective for interim and annual reporting periods beginning after December 15, 2006. We have determined that the adoption of this pronouncement will have no material impact to our consolidated financial position, results of operations, or cash flows.

In June, 2006, the FASB issued FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109* ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with SFAS No. 109. FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosure, and transition. FIN 48 will apply to fiscal years beginning after December 15, 2006, with earlier adoption permitted. We will adopt FIN 48 effective January 1, 2007. As prescribed in the interpretation, the cumulative effect of applying the provisions of FIN No. 48 should be reflected as an adjustment to the opening balance of Stockholders' Equity. We do not believe the adoption of this pronouncement will have any material effects on our consolidated financial position, results of operations, or cash flows.

Table of Contents

## INPHONIC, INC. & SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
#### (in thousands, except per share and share amounts)

In September 2006, the FASB issued SFAS No. 157, *Fair Value Measurements* ("SFAS No. 157"). SFAS 157 defines fair value, establishes a framework for measuring fair value under generally accepted accounting principles, and expands disclosures about fair value measurements. SFAS 157 emphasizes that fair value is a market-based measurement, not an entity-specific measurement, and states that a fair value measurement should be determined based on the assumptions that market participants would use in pricing the asset or liability. SFAS 157 will become effective for our fiscal year beginning January 1, 2008. We do not believe the adoption of this pronouncement will have any material effects on our consolidated financial position, results of operations, or cash flows.

In February 2007, the Financial Accounting Standards Board issued SFAS 159, *The Fair Value Option for Financial Assets and Financial Liabilities—including an amendment of FASB Statement No. 115* ( "SFAS No. 159") , which allows measurement at fair value of eligible financial assets and liabilities that are not otherwise measured at fair value. If the fair value option for an eligible item is elected, unrealized gains and losses for that item will be reported in current earnings at each subsequent reporting date. SFAS 159 also establishes presentation and disclosure requirements designed to draw comparison between the different measurement attributes the company elects for similar types of assets and liabilities. SFAS No. 159 is effective for fiscal years beginning after November 15, 2007. Early adoption is permitted. We do not believe the adoption of this pronouncement will have any material effects on our consolidated financial position, results of operations, or cash flows.

**(3) Business Acquisitions**

*(a) Acquisition of A1 Wireless*

On January 4, 2005, we acquired certain assets and assumed certain obligations of A1 Wireless, Inc. in a transaction accounted for using the purchase method of accounting in accordance with SFAS No. 141, *Business Combinations* ("SFAS No. 141"). A1 Wireless activated and sold wireless services and devices to consumers through their own branded websites, branded partner websites, that it created and managed, and through sophisticated online search advertising campaigns. This acquisition enhanced our existing distribution channels in the WAS business unit. The results of A1 Wireless' operations were included in our financial statements beginning January 1, 2005, and are reported in the WAS business unit.

Purchase consideration consisted of cash and shares of common stock for an aggregate purchase price of $24,582, including acquisition costs of $2,148 and contingent consideration of $5,173. At the closing, we paid approximately $10,700 in cash, which was held by an escrow agent as of December 31, 2004 and issued 160,226 shares of common stock with a fair value of $3,736. The contingent consideration included cash of $4,000 and 76,300 shares of our common stock with a fair value of $1,173.

*(b) Acquisition of VMC Satellite, Inc.*

On April 26, 2005, we completed the acquisition of certain assets and liabilities of VMC Satellite, Inc., ("VMC") in a transaction accounted for using the purchase method of accounting in accordance with SFAS No. 141. VMC is a marketer of digital broadcast satellite services. This acquisition has enabled us to expand our service offerings, creating additional revenue opportunities from consumers that visit its portfolio of websites and marketing partners each month. The results of VMC's operations were included in our financial statements beginning April 26, 2005, and are reported in the WAS business unit.

Table of Contents

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

The aggregate consideration for the net assets acquired was approximately $10,979 which consisted of $4,679 in cash paid and includes acquisition costs of approximately $725 and shares of our common stock, with a fair value of $6,300, issuable in two tranches. The first tranche of stock consideration was distributed in July and September 2005 and included a total of 257,215 shares of our common stock with a fair value of approximately $3,300. Pursuant to the asset purchase agreement, as amended, the second tranche of stock consideration was to be distributed by us no later than April 26, 2006, and required us to issue common stock or cash with a fair value of $3,000 on the distribution date. We recorded the second tranche of stock consideration in accrued liabilities as of December 31, 2005 and reclassified the amount to additional paid in capital when the distribution was made in April 2006.

In addition, we agreed to pay up to an aggregate of $5,050 in cash plus 334,288 shares of our common stock upon the acquired operations attaining certain EBITDA (earnings before interest, tax, depreciation and amortization) benchmarks between April 26, 2005 and April 30, 2007. For the year ended December 31, 2006, certain EBITDA benchmarks were met and $5,116 of cash (of which $1,120 was accrued as of December 31, 2006) and shares of common stock with a fair value of $1,967 were issued as a result of VMC attaining certain EBITDA targets. This contingent consideration increased the carrying value of goodwill by $7,083. The goodwill recorded in connection with the transaction is deductible for tax purposes.

**(4)    Discontinued Operations**

On December 31, 2005, we completed the sale of substantially all of the operating assets of our Liberty Wireless business for approximately $2,318 including consideration payable in cash of up to $1,491 and notes receivable of approximately $755, net of $35 discount. Of the consideration payable at closing in cash, approximately $784 was received in January 2006 and $707 was offset against service liabilities assumed by the buyer in the transaction. We recorded a net gain on the sale of $1,355. In connection with this gain recognition on the sale, we considered the guidance of SAB Topic 5:E, *Accounting for a Divesture Of A Subsidiary or Other Business Operation* .

Under the terms of the notes receivable, we received proceeds due in installments through 2006. Although the notes do not bear interest, we have recorded the notes at a discount and accreted interest income over their outstanding terms. Between January 1, 2006 and December 31, 2006, we received scheduled principal repayments of $1,111 on the notes receivable, and have offset certain payables in amounts of $130 regarding collection of the notes receivable. As of December, 31, 2006, $250 of receivables have not yet been collected. However, we believe these amounts are fully collectible.

Summary operating results for the discontinued operating segment were as follows:

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | **2004** | **2005** | **2006** |
| Revenue | $ 49,332 | $ 23,221 | $ — |
| Costs and expenses | 44,986 | 23,650 | 193 |
| Income (loss) from discontinued operations | $  4,346 | $   (429) | $(193) |

F-26

Table of Contents

INPHONIC, INC. & SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
(in thousands, except per share and share amounts)

Balance sheet data included:

|  | As of December 31, | |
|  | 2005 | 2006 |
|---|---|---|
| Accounts and notes receivable, net | $1,848 | $ 391 |
| Other current assets | 4 | — |
| Other non-current assets | 578 | — |
| Assets of discontinued operations | $2,430 | $ 391 |
| Accounts payable | $ 931 | $ — |
| Other accrued expenses | 2,199 | 1,103 |
| Liabilities of discontinued operations | $3,130 | $1,103 |

**(5)  Long-lived Assets**

*Property and Equipment*

Property and equipment, stated net of accumulated depreciation and amortization, consisted of the following as of December 31, 2005 and 2006:

|  | 2005 | 2006 |
|---|---|---|
| Computer and equipment | $ 7,117 | $ 10,187 |
| Software | 5,117 | 6,367 |
| Furniture and fixtures | 834 | 785 |
| Leasehold improvements | 1,675 | 2,039 |
| Other equipment | — | 554 |
| Capitalized leases | 1,243 | 1,397 |
| Less: Accumulated depreciation and amortization | (9,504) | (13,101) |
|  | 6,482 | 8,228 |
| Website and internal software development costs | 14,162 | 31,169 |
| Less: Accumulated depreciation and amortization | (8,523) | (16,651) |
| Website and internal software development costs, net | 5,639 | 14,518 |
| Total property and equipment, net | $12,121 | $ 22,746 |

Depreciation expense for the years ended December 31, 2004, 2005 and 2006 was $5,373, $6,702 and $12,315, respectively. The cost of property and equipment under capital leases was $1,243 and $1,397 at December 31, 2005 and 2006, respectively. Accumulated depreciation for assets under capital leases was $278 and $751 at December 31, 2005 and 2006, respectively.

*Website and internal software development costs*

We capitalized a total of approximately $253, $647 and $1,385 during 2004, 2005 and 2006, respectively, relating to the development of the e-commerce platform. In addition, we capitalized costs incurred to develop certain internal use software of approximately $3,008, $6,729 and $15,622 in 2004, 2005 and 2006, respectively. We are amortizing the web development costs over a period of 18 months and internal use software costs over a period of 24 months. These costs are included in depreciation and amortization in the accompanying consolidated statements of operations. Amortization expense on

F-27

Table of Contents

## INPHONIC, INC. & SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
#### (in thousands, except per share and share amounts)

the e-commerce platform and other internal use software development costs was approximately $2,784, $3,749, and $8,127 during 2004, 2005 and 2006, respectively.

*Goodwill and intangible assets*

Amortizable intangible assets were comprised of the following:

|  | December 31, 2005 | | |
|---|---|---|---|
|  | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Software and technology | $ 1,123 | $ 1,045 | $ 78 |
| Customer contracts | 885 | 885 | — |
| Affiliate and carrier relationships | 3,960 | 676 | 3,284 |
| Non-compete agreement (a) | 5,049 | 1,431 | 3,618 |
| Other | 1,935 | 1,104 | 831 |
| Total | $ 12,952 | $ 5,141 | $ 7,811 |

(a) On May 27, 2005, we completed the purchase of certain intangible assets of FONcentral.com, Inc. The aggregate consideration for the assets acquired was approximately $4,139 which consisted of $2,590 in cash, which included acquisition costs and accrued expenses of $151, plus 131,876 shares of common stock with a fair value equal to approximately $1,549.

|  | December 31, 2006 | | |
|---|---|---|---|
|  | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Software and technology | $ 90 | $ 31 | $ 59 |
| Affiliate and carrier relationships | 3,960 | 1,496 | 2,464 |
| Non-compete agreement | 5,049 | 3,788 | 1,261 |
| Supplier relationships | 3,730 | 628 | 3,102 |
| Other | 2,128 | 2,032 | 96 |
| Total | $ 14,957 | $ 7,975 | $ 6,982 |

Aggregate amortization expense for intangible assets subject to amortization was approximately $3,138 in 2005 and $4,752 in 2006. Estimated amortization expense based on current intangible balances is $2,301, $1,303, $1,303, $465, and $373 for the years ended December 31, 2007, 2008, 2009, 2010 and 2011, respectively.

The carrying value of intangible assets with indefinite lives was $4,840 and $1,110 for December 31, 2005 and 2006, respectively. Intangible assets with indefinite lives consisted of trade names. For the year ended December 31, 2005, we originally determined that a supplier relationship valued at $3,730 had an indefinite life as of the acquisition date. During 2006, we determined that as of the acquisition date, the supplier relationship had a useful life of ten years in accordance with SFAS No. 142. During the fourth quarter of 2006, we recognized $255 of amortization expense for the period from April 26, 2005 to December 31, 2005. We do not believe the impact of this adjustment in 2006 to be material to fiscal year 2006 or 2005 as a result of this change.

F-28

Table of Contents

## INPHONIC, INC. & SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
(in thousands, except per share and share amounts)

The following table reflects the changes to goodwill for the years ended December 31, 2005 and 2006:

| | WAS Segment | Data Services Segment | Total |
|---|---|---|---|
| Balance as of January 1, 2005 | $ 9,258 | $ 221 | $ 9,479 |
| Goodwill arising from the A1 Wireless acquisition | 17,988 | — | 17,988 |
| Goodwill arising from the VMC acquisition | 3,894 | — | 3,894 |
| Sale of Data Services software assets | — | (221) | (221) |
| Balance as of December 31, 2005 | 31,140 | — | 31,140 |
| Goodwill arising from the VMC acquisition | 7,083 | — | 7,083 |
| Balance as of December 31, 2006 | $ 38,223 | $ — | $38,223 |

**(6) Debt**

Debt consisted of the following:

| | December 31, | |
|---|---|---|
| | 2005 | 2006 |
| Borrowings under credit facility | $15,000 | $ — |
| Borrowings under term loan | — | 75,000 |
| Capital leases | 851 | 574 |
| | 15,851 | 75,574 |
| Less discount from warrant issuance | — | (11,447) |
| Less current maturities | (377) | (301) |
| Long-term debt | $15,474 | $ 63,826 |

*(a) $100 million term loan*

On November 7, 2006, we executed a $100,000 aggregate principal amount senior secured term loan with Goldman Sachs Credit Partners, L.P., Citicorp North America, Inc. and AP Inphonic Holdings Inc. bearing a fixed rate of interest of nine percent per annum and secured by substantially all our assets. As of November 7, 2006, the Goldman Sachs Group, Inc., an affiliate of Goldman Sachs Credit Partners, L.P., beneficially-owned approximately 15.5% of our common stock. This term loan matures in November 2011. Beginning in November 2009, we have the ability to repay principal on the loan without penalty and conversely, the lenders have the right to call the remaining outstanding principal of the debt without penalty. As additional consideration, we also granted the lenders warrants to purchase 1,250,000 shares of our common stock at an exercise price of $0.01 per share. We received proceeds of $75,000 aggregate principal amount of the term loan proceeds on November 7, 2006, and have the option to draw-down the remaining amount at a later date. Proceeds from the term loan will be used to repay all indebtedness under the existing credit facility, fund share repurchases of our common stock, and for general corporate and working capital needs. In conjunction with the loan transaction above, we terminated our credit facility with Comerica Bank and used proceeds from the term loan to repay the outstanding principal obligation of $19,924 plus accrued interest. For the period November 7, 2006 to December 31, 2006, we accrued $994 of interest on the term loan, which was included as accrued expenses and other current liabilities on the accompanying balance sheet at December 31, 2006.

F-29

Table of Contents

INPHONIC, INC. & SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
(in thousands, except per share and share amounts)

Under the terms of the term loan, we are required to maintain certain minimum levels of EBITDA on a quarterly basis beginning December 31, 2006, maintain a minimum $25,000 cash balance at a certain financial institution beginning July 31, 2007, maintain a maximum level of capitalized expenditures and maintain certain other financial and non-financial covenants, including our delivery of our audited financial statements with the opinion of our independent registered public accounting firm within 90 days of our year-end in accordance with the financial statement delivery requirements under the term loan agreement. On May 1, 2007, we amended the term loan agreement to extend the draw date for an additional $25 million of borrowings to July 31, 2007. Additionally, we received an extension of time to satisfy the delivery requirements of our annual 2006 and first quarter 2007 financial statements and related certificates under the term loan agreement to May 31, 2007 and June 15, 2007, respectively. We were in compliance with the covenants under the term loan agreement.

The warrants to purchase 1,250,000 shares of common stock at $0.01 per share were valued at $13,715 using a Black-Scholes model. Assumptions used in the model included a five year term based on the contractual life, 72% volatility and a risk free rate of 4.6%. We estimated the fair value of our long-term fixed rate term loan using a discounted cash flow analysis based on a current borrowing rate of companies with a similar debt rating. We assumed a life of the debt equal to the earliest period in which we can repay or refinance the debt. The estimated fair value of the term loan with a fixed interest rate at 9.00% was $72,400. In accordance with APB No. 14, *Accounting for Convertible Debt and Debt Issued with Stock Purchase Warrants,* we allocated the $75,000 proceeds to the term loan and detachable warrants based on the relative fair value of each on a standalone basis. As such, $63,055 and $11,945 of the $75,000 proceeds were allocated to the term loan and the detachable warrants, respectively. The amount of proceeds allocated to the fair value of the detachable warrants has resulted in a discount of $11,945 on the term loan as of November 7, 2006. For the year ended December 31, 2006, $498 of this discount has been amortized using the effective interest method and reflected in interest expense. As of December 31, 2006, the remaining unamortized discount on the debt was $11,447.

As a result of the completion of the financing transaction, we incurred $1,368 of financing costs. For the period of November 7, 2006 to December 31, 2006, we have amortized $76 of these costs, which was reflected as interest expense. As of December 31, 2006, $495 and $797 of these costs are deferred and included in deferred costs and other current assets and deposits and other assets, respectively, on the accompanying balance sheet. Additionally, we are required to pay a $75 management fee on an annual basis. This fee is amortized over the annual period and included in interest expense on the accompanying consolidated statements of operations.

*(b)     $25 million Credit Facility*

As of December 31, 2005, we maintained a revolving operating line of credit with Comerica Bank, ("Comerica"), which allowed for aggregate borrowing of up to $25,000 subject to certain limits based on accounts receivable and inventory levels and secured by substantially all our assets. At December 31, 2005, we had $15,000 outstanding the revolving line of credit and we had an additional $1,700 of availability under the line of credit based on the limits described above. Borrowings outstanding under the revolving line of credit accrued interest at the bank's LIBOR rate plus a margin of 2%. Interest payments were made on the last business day of each month. We were assessed a line of credit commitment fee quarterly by Comerica, based on the availability under the line of credit. We paid commitment fees of $25 during 2005. The revolving line of credit was repaid on November 7, 2006. At that time, the agreement with Comerica was terminated.

F-30

Table of Contents

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

*(c)*  *Standby Letters of Credit*

At December 31, 2005 and 2006, we had approximately $400 and $38, respectively, of standby letters of credit in connection with vendor obligations.

*(c)*  *Capital Leases*

In 2004, 2005 and 2006, we entered into capital leases for the purchase of $635, $595 and $152 of leased computer equipment, respectively. Capital lease obligations totaled $851 as of December 31, 2005 and $574 as of December 31, 2006.

*(d)*  *Maturities of Long-Term Debt*

The aggregate maturities of long-term debt which included amounts outstanding under the term loan and capital lease obligations, at December 31, 2006, approximate the following: $301 in 2007; $216 in 2008; $75,031 in 2009 and $25 in 2010. Under the term loan agreement, we may repay or the lender may require the repayment of the debt on the third anniversary of the agreement. For the purpose of this presentation, we have included the contractual obligation due on the third anniversary. If not prepaid, the debt matures in November 2011.

**(7)  Capital Stock**

As of December 31, 2006, we had 200,000,000 and 10,000,000 authorized shares of common and preferred stock, respectively. At December 31, 2005 and 2006, there were 35,232,869 and 37,138,480 shares of common stock issued and outstanding, respectively. There were no shares of preferred stock outstanding as of December 31, 2005 and 2006.

During the year ended December 31, 2006, we issued 712,453 shares of our common stock related to contingent consideration related to business acquisitions in prior years as described in Notes 3 and 5; repurchased 350,261 shares under a stock repurchase program; issued 998,389 and 539,564 shares in connection with stock option exercises and lapses of restrictions on common stock, respectively; and 33,597 shares were issued in exercise of warrants and other events.

During the year ended December 31, 2005, we issued 625,617 shares of our common stock related to business and intangible asset acquisitions during 2005 as described in Notes 3 and 5; repurchased 1,081,487 shares under a stock repurchase program; issued 2,450,495 and 75,226 shares in connection with stock option exercises and lapses of restrictions on common stock, respectively; and 910,418 shares were issued in exercise of warrants and other events.

On November 19, 2004, we issued 6,500,000 additional shares of our common stock in an initial public offering, at a price of $19.00 per share for proceeds of $110,838 net of issuance costs of $4,017. In connection with this offering, we also issued 13,619,536 shares of common stock in exchange for all outstanding preferred stock.

*(a)*  *Preferred Stock*

In November 2004, upon the closing of the initial public offering, all issued and outstanding shares of our redeemable convertible preferred stock were automatically converted into approximately 13.6 million shares of common stock. Each share of Series A and B preferred stock outstanding was converted into common stock at an exchange ratio of 0.83 shares of common stock for 1 share of preferred stock. Each share of Series C, D, and D-1 preferred stock outstanding was converted into

F-31

Table of Contents

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

common stock at an exchange ratio of 0.42 shares of common stock for 1 share of preferred stock. All other shares of preferred stock outstanding were converted into common stock at an exchange ratio of 0.33 shares of common stock for 1 share of preferred stock, as follows:

|  | Shares of common stock issued |
|---|---|
| Series A | 557,320 |
| Series B | 1,902,239 |
| Series C | 2,808,696 |
| Series D and D-1 | 4,412,779 |
| Series D-2 | 138,892 |
| Series D-3 | 264,261 |
| Series D-4 | — |
| Series D-5 | 224,132 |
| Series E | 3,311,217 |
| Shares of common stock issued for preferred stock | 13,619,536 |

**(b)    Common Stock**

Holders of shares of common stock are entitled to one vote per common share held on all matters voted on by the stockholders. Dividends may be declared and paid on common stock shares at the discretion of our board of directors and are subject to any preferential dividend rights of any outstanding preferred stockholders. No dividends on shares of common stock have been declared or paid through December 31, 2006.

**(c)    Repurchase of Common Stock**

In 2005 and 2006, our board had authorized us to repurchase shares of our common stock. For the period August 17, 2005 to December 31, 2005, we repurchased 1,018,487 shares of our common stock at an average price of $12.10 per share for approximately $13,088. In 2006, through August 6, 2006, we purchased an additional 62,761 shares of common stock at an average price of $8.01 per share for approximately $502.

On November 3, 2006, our board of directors authorized the repurchase of up to an additional $30,000 of our common stock through November 2007. The shares may be repurchased from time to time at prevailing market prices. The timing and amount of any shares repurchased will be based on market conditions and other factors. Repurchases may also occur under a Rule 10b5-1 plan, which permit shares to be repurchased when we may otherwise be precluded from doing so by laws prohibiting insider trading or by self imposed trading black out periods. There is no guarantee as to the exact number of shares that will be repurchased under the stock repurchase program, and we may discontinue purchases at any time. We intend to fund the share repurchases with cash on hand, proceeds from the term loan and cash generated from future operations. Between November 3, 2006 and December 31, 2006, we repurchased 287,500 shares of common stock at an average price of $11.25 per share for approximately $3,236.

**(d)    Stock-Based Benefit Plans**

*1999 Stock Incentive Plan*

Our 1999 Stock Incentive Plan (the "1999 Plan"), which was adopted by the board of directors in December 1999, provided for grants of stock-based awards from time to time to our employees,

F-32

Table of Contents

INPHONIC, INC. & SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
(in thousands, except per share and share amounts)

officers, directors and consultants at exercise prices determined by the board of directors. Options granted under the 1999 Plan generally vest over a four-year period and expire ten years from the grant date. As of November 19, 2004, no additional options were available for grant under the 1999 Plan due to the adoption of the 2004 Equity Incentive Plan (the "2004 Plan").

*2004 Equity Incentive Plan*

The 2004 Plan, which was adopted by the board of directors and approved by the stockholders in September 2004, allows for grants of stock-based awards from time to time to our employees, officers, directors and consultants at exercise prices determined by the board of directors. Options to purchase a total of 3,000,000 shares of common stock were originally authorized for issuance under the 2004 Plan, which number was increased by up to an additional 3,987,853 as of December 31, 2006 from the following sources: (1) shares subject to options or other awards outstanding under the 1999 Plan as of the date of its termination which expire or otherwise terminate for any reason, without having been exercised or settled in full and (2) shares acquired under the 1999 Plan forfeited to us on or after the date of its termination.

For incentive stock options, the exercise price must be at least equal to fair market value at the date of grant. For nonqualified stock options, the option may be granted with an exercise price less than fair market value. Options granted under the 2004 Plan generally vest over a period to be determined by the administrator and expire ten years from the grant date. As of December 31, 2006, 434,272 options were available for future grant under the 2004 Plan.

During 2004, 2005 and 2006, we granted to non-employees options to purchase 86,600, 18,000 and 51,000, respectively, shares or our common stock, pursuant to the Plans. The estimated fair value of the options was determined using the Black-Scholes Model (see note 2(n)). The 51,000 options issued in 2006 only had a contractually stated life of 5 months. We recorded compensation expense relating to the options of approximately $1,232, $243 and $229, respectively, for the years ended December 31, 2004, 2005 and 2006.

The following table summarizes the activity for stock options granted to employees and non-employees for the year ended December 31, 2006. The intrinsic value of options exercised for the years ended December 31, 2005 and 2006 was $24,462 and $4,156, respectively.

| | Number of options | Weighted average exercise price | Range of exercise | Weighted average contractual term (years) | Aggregate intrinsic value |
|---|---|---|---|---|---|
| **Balance January 1, 2006** | 5,115,969 | 9.47 | 0.60 – $ 25.36 | | |
| Granted | 1,063,200 | 7.36 | 6.46 – 11.76 | | |
| Exercised | (998,389) | 5.74 | 0.60 – 10.07 | | |
| Forfeited | (1,137,677) | 12.44 | 1.80 – 25.36 | | |
| **Balance December 31, 2006** | 4,043,103 | $ 9.01 | 0.60 – $ 25.36 | 7.67 | $ 14,673 |
| Ending vested & expected to vest | 3,830,535 | $ 8.97 | | 7.62 | $ 14,021 |
| Exercisable at December 31, 2006 | 2,164,739 | $ 8.63 | | 6.95 | $ 8,405 |

F-33

Table of Contents

INPHONIC, INC. & SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
(in thousands, except per share and share amounts)

Weighted average grant date fair value per share was $12.36, $10.26 and $4.65 as of December 31, 2004, 2005 and 2006, respectively.

Information regarding options outstanding at December 31, 2006 was as follows:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of exercise price | Number of options | Weight average remaining contractual life (in years) | | Number of options | Weighted average exercise price |
| $   0.60 – $3.90 | 289,290 | 6.0 | | 209,751 | $   2.26 |
| $   5.88 – $ 5.88 | 1,459,157 | 7.3 | | 1,005,660 | 5.88 |
| $   6.46 – $ 6.46 | 504,200 | 9.2 | | 3,000 | 6.46 |
| $   6.51 – $ 7.80 | 545,688 | 6.6 | | 377,188 | 7.80 |
| $ 10.00 – $ 14.04 | 463,938 | 8.5 | | 197,678 | 12.13 |
| $ 15.25 – $ 15.28 | 303,410 | 8.5 | | 122,139 | 15.26 |
| $ 15.60 – $ 15.60 | 19,168 | 5.7 | | 19,168 | 15.60 |
| $ 16.00 – $ 16.00 | 98,512 | 7.8 | | 55,467 | 16.00 |
| $ 16.49 – $ 16.49 | 128,500 | 8.6 | | 62,250 | 16.49 |
| $ 25.36 – $ 25.36 | 231,200 | 8.1 | | 112,438 | 25.36 |
| | 4,043,103 | 7.7 | | 2,164,739 | $   8.63 |

As of December 31, 2005 and 2006, the weighted average remaining contractual life of the options outstanding was approximately 8.2, and 7.7 years, respectively. Options to purchase 2,146,924 and 2,164,739 shares of common stock with a weighted average exercise price of $7.74 and $8.63 were exercisable at December 31, 2005 and 2006, respectively.

*Restricted Common Stock*

During the twelve months ended December 31, 2006, we granted 2,643,048 shares of restricted common stock to certain of our key employees. The restrictions on this common stock lapse and the stock vests over periods ranging up to 4 years from the grant date. The weighted average grant date fair value for such awards was $15.70 and $9.16 for 2005 and 2006, respectively. The following table summarizes the activity for restricted stock awards granted in 2006:

| | Number of Restricted Stock Awards | Weighted-average grant date fair value |
|---|---|---|
| Non-vested at January 1, 2006 | 1,137,878 | $          15.58 |
| Granted | 2,643,048 | 9.16 |
| Vested | (539,564) | 14.38 |
| Surrendered for taxes | (51,221) | 15.19 |
| Forfeited | (225,492) | 14.02 |
| Non-vested at December 31, 2006 | 2,964,649 | $          10.20 |

At December 31, 2005 and 2006 shares that have vested were included as outstanding shares in the calculations of basic and diluted weighted average shares.

F-34

Table of Contents

# INPHONIC, INC. & SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
### (in thousands, except per share and share amounts)

*Stock Purchase Warrants*

Warrants to purchase shares of common stock were granted with exercise prices ranging between $0.01 and $15.60, and terms ranging between 5 and 9 years. The estimated fair value of the warrants granted was determined using the Black-Scholes Model. Weighted average grant date fair value per share of warrants granted in 2004 and 2006 were $11.44 and $8.36, respectively. There were no warrants granted in 2005.

The following table summarizes the activity for warrants to purchase common stock, including warrants granted in connection with long-term debt (see Note 6) in 2006:

| | Number of warrants | Weighted average exercise price | | Range of exercise |
|---|---|---|---|---|
| **Balance January 1, 2006** | | | | 0.03 - |
| | 787,863 | 8.44 | $ | 24.00 |
| Granted | | | | 0.01 - |
| | 1,816,324 | 2.30 | | 7.35 |
| Exercised | | | | 0.03 - |
| | (33,597) | 0.29 | | 2.49 |
| Surrendered for cashless exercise | | | | 0.03 - |
| | (1,291) | 2.30 | | 2.49 |
| Forfeited | (3,334) | 24.00 | | 24.00 |
| **Balance December 31, 2006** | | | | 0.01 - |
| | 2,565,965 | $ 4.48 | $ | 15.60 |

In April 2006, we issued an additional warrant to purchase 188,775 shares of our common stock to a vendor that is exercisable upon certain minimum performance conditions. The exercise price of the warrant will be based on the trading price of our common stock at the time the performance conditions are met by the vendor. Once it is probable that the vendor will achieve the performance conditions set forth under the terms of the warrant, the fair value of the warrant will be amortized to sales and marketing expense over the remaining contractual term of the vendor commitment. This warrant is excluded from the table above.

Pursuant to SFAS No. 128, warrants to purchase 1,250,000 shares of our common stock at $0.01 issued in connection with our term loan in November 2006 were included in the calculation of our basic weighted average shares outstanding for the purposes of calculating earnings per share as these warrants were exercisable for little cash consideration.

F-35

Table of Contents

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

**(8) Income Taxes**

SFAS No. 109 establishes financial accounting and reporting standards for the effects of income taxes. During the years ended December 31, 2004, 2005 and 2006, we did not have any income tax expense or benefit because a full valuation allowance was provided against our net deferred tax assets. As of December 31, 2005 and 2006, the components of the net deferred tax asset were as follows:

|  | 2005 | 2006 |
|---|---|---|
| Deferred tax assets: | | |
| Accrued compensation | $ 2,482 | $ 7,953 |
| Capitalized costs & other items | 2,931 | 2,666 |
| Net operating loss carryforwards | 50,353 | 75,019 |
| Total deferred tax assets | 55,766 | 85,638 |
| Deferred tax liabilities: | | |
| Depreciation | (2,003) | (5,379) |
| Acquired intangibles | (340) | (631) |
| Other | (1,916) | (645) |
| Total deferred tax liabilities | (4,259) | (6,655) |
| Net deferred tax assets | 51,507 | 78,982 |
| Less: Valuation allowance | (51,507) | (78,982) |
| | $ — | $ — |

SFAS No. 109 requires us to evaluate the recoverability of our deferred tax assets on an ongoing basis. The assessment is required to consider all available positive and negative evidence to determine whether, based on such evidence, it is more likely than not that some portion or all of our net deferred assets will be realized in future periods. The ultimate recoverability of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible. Management considers the scheduled reversal of deferred tax liabilities, projected future taxable income, and tax planning strategies in making this assessment. Based upon such factors as the lack of a significant history of material profits, possible increases in expense levels to support growth, the fact that the market in which we compete is intensely competitive and characterized by rapidly changing technology, the lack of carryback capacity to realize the deferred tax assets, and the uncertainty regarding the market acceptance of new product offerings, management does not at this time believe it is more likely than not that we will realize the benefits of these net deferred tax assets. Therefore, a full valuation allowance against the net deferred tax assets has been provided as of December 31, 2005 and 2006.

The net changes in the total valuation allowance, for the years ended December 31, 2005 and 2006 were an increase of $12,962 and $27,475, respectively. Approximately $5,465 of the valuation allowance relates to acquired deferred tax assets, and pursuant to the requirements of FAS 109 any subsequent recognition of these deferred tax assets will be applied to reduce goodwill and other intangibles.

As of December 31, 2006, we had approximately $196,128 of available net operating loss (NOL) carryforwards. Due to ownership changes, certain of these NOL carryforwards are subject to limitations under Section 382 of the Internal Revenue Code. Generally, these limitations restrict the availability of NOL carryforwards on an annual basis. The net operating loss carryforwards will begin to expire in 2019.

F-36

Table of Contents

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

We did not have any income tax expense or benefit nor make any cash payments for income taxes for the years ended December 31, 2004, 2005 and 2006. The difference between the expected income tax benefit for the years ended December 31, 2004, 2005 and 2006, computed by applying the U.S. federal income tax rate of 35%, and actual income tax benefit, was as follows:

|  | 2004 | 2005 | 2006 |
|---|---|---|---|
| Expected Federal income tax benefit | $(3,584) | $(13,368) | $(22,305) |
| Permanent differences | 45 | 76 | (25) |
| State income taxes, net of Federal benefit | (505) | (1,234) | (2,073) |
| Change in valuation allowance | 4,044 | 12,962 | 27,475 |
| Change in provisional rate/other | — | 1,564 | (3,072) |
| Income tax expense | $ — | $ — | $ — |

**(9) Segment Information**

As a result of the sale of our MVNO operations on December 31, 2005, we believe we no longer have reportable segments as MVNE and Data Service Segments are immaterial to the consolidated entity.

**(10) Commitments and Contingencies**

*Operating Leases*

We lease office and warehouse space under various operating leases through 2009. Rent expense was approximately $1,088, $1,760, and $1,923 for the years ended December 31, 2004, 2005 and 2006, respectively. Minimum future lease payments under these operating leases as of December 31, 2006 approximate the following: $1,806 for 2007; $1,272 for 2008; and $1,001 for 2009.

*Legal Matters*

On May 7 and 18, 2007, two putative federal securities law class actions were filed in the United States District Court for the District of Columbia on behalf of persons who purchased our common stock between August 2, 2006, and May 3, 2007. These substantially similar lawsuits assert claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, against us, our chief executive officer and our chief financial officer. These claims are related to our April 3, 2007, and May 4, 2007 announcements concerning our restatement of certain previously issued financial statements. Potential plaintiffs have until July 6, 2007, to move the court for appointment as lead plaintiff. We have not yet responded to the complaints. We are unable to estimate the amount of any potential claim arising from these matters at this time. We believe that the allegations contained within these class action lawsuits are without merit and intend to vigorously defend the litigation.

On August 5, 2004, Avesair, Inc., one of the companies the assets of which we acquired, filed suit against us demanding, among other matters, that we issue to Avesair shares of our common stock valued at approximately $4.0 million as of June 30, 2004. The stock demanded by Avesair represents the maximum value of shares that they could have earned for achieving certain performance-based targets under the asset purchase agreement. We believe the performance-based targets were not achieved and intend to vigorously contest this matter. However, any adverse resolution of this matter could have a material adverse impact on our financial results if we are required to issue additional shares and would result in dilution to our stockholders.

F-37

Table of Contents

## INPHONIC, INC. & SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
### (in thousands, except per share and share amounts)

On May 3, 2007, the Federal Communications Commission (FCC) issued an Order of Forfeiture and Further Notice of Apparent Liability in which it imposed a forfeiture of $819,905 against us for being late in complying with certain regulatory obligations that arose in 2004 and 2005 from a business that we sold in December 2005. Those obligations included: registering with the FCC, filing certain reports, and paying certain Universal Service Fund fees. The FCC's order also proposed imposing an additional fine of $100,000 for not having maintained in 2006 and 2007 a license necessary to conduct the business that was discontinued by us in 2005. As we did not operate the business in 2006 and 2007 we will request that the proposed fine be dismissed. With regard to the forfeiture itself, we are evaluating our legal options, which include appealing the ruling in federal court and/or negotiating a different and possibly lesser forfeiture. This forfeiture issue was initially raised by the FCC in July 2005. We advised the FCC then, and believe now, that no fine is appropriate under the circumstances.

Fifteen related putative federal court class actions have been filed against us arising out of InPhonic-sponsored rebate offers for online purchases of wireless telephones. Several of these lawsuits also name either our current or former third-party rebate processor as a defendant. On October 25, 2006 we received a decision by the Judicial Panel on Multidistrict Litigation ("JPML") granting our motion to consolidate the federal court actions in the United States District Court for the District of Columbia before the Honorable Ellen Segal Huvelle. The consolidated amended class action complaint alleges, among other things, that we and our current or former third-party rebate processor (depending on the particular claim) violated the consumer protection laws of various States, various D.C. state laws and the federal RICO (anti-racketeering) statute in connection with our disclosure and implementation of the terms and conditions of rebate offers. The class action plaintiffs seek compensatory damages and/or restitution, statutory penalties and treble damages under D.C. consumer protection laws and RICO, attorneys' fees and punitive damages, as well as injunctions concerning the content of our websites. The federal lawsuit is in an early stage. We intend to vigorously defend that action but cannot predict its outcome.

On April 27, 2007 we and the Federal Trade Commission (FTC) announced that we had entered into a consent agreement with the FTC in which InPhonic agreed to clearly and prominently disclose certain information regarding its rebate offers, such as when consumers can expect to receive their rebates, any time period that consumers must wait before submitting a rebate request, and certain information that would disqualify a consumer from receiving a rebate. We also agreed to provide rebates within time frames and under terms and conditions reasonably specified by us in our communications with our customers. We also agreed to provide rebates to certain customers whom had previously been denied them. As required by its rules, the FTC has requested comment on the consent agreement and we expect that it will become effective shortly. We have accrued an estimate of our liability associated with this consent agreement in the accompanying financial statements.

On February 15, 2007, we reached a final settlement with the District of Columbia Attorney General's Office concerning our use of mail-in rebates. We have accrued for the settlement and estimated costs of compliance in the accompanying financial statements at December 31, 2006.

From time to time we are party to other disputes or legal proceedings. We do not believe that any of the pending proceedings are likely to have a material adverse effect on our business.

## (11) Related-Party Transactions

Goldman Sachs Credit Partners, L.P., Citicorp North America Inc. and AP InPhonic Holdings, LLC hold shares of our common stock and are the lending agents with regards to our term loan. See Note 6.

F-38

**Table of Contents**

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

Mr. Laurence E. Harris, a member of our board of directors since March 2006, is " *of counsel* " in the law firm of Patton Boggs LLP ("Patton Boggs"). The total cost of various legal services provided to us by Patton Boggs in 2006 was approximately $2,219. Mr. Harris does not share in any profits of Patton Boggs or any of the fees paid by us to Patton Boggs.

**(12) InPhonic, Inc., 401(k) Plan**

Our 401(k) Plan provides retirement and incidental benefits for its employees. As allowed under Section 401(k) of the Internal Revenue Code, the 401(k) plan provides tax-deferred salary deductions of up to 15% of compensation for eligible employees. Employees are eligible to participate beginning the first day of the quarter subsequent to their start of employment. We may make discretionary matching contributions to the 401(k) plan. We did not make any discretionary matching contributions during 2004, 2005 and 2006.

**(13) Quarterly Results (unaudited)**

The following sets forth unaudited selected financial data on a quarterly basis for the years ended December 31, 2005 and 2006.

| | Quarters Ended 2005 | | | |
| --- | --- | --- | --- | --- |
| | March 31 | June 30 | September 30 | December 31 |
| Revenue | $ 68,151 | $ 75,226 | $ 91,960 | $ 85,202 |
| Cost of revenue | 40,123 | 42,004 | 53,753 | 55,850 |
| Loss from continuing operations | (7,418) | (1,162) | (4,366) | (24,820) |
| Income (loss) from discontinued operations | 424 | (490) | (587) | (1,131) |
| Net loss | (6,994) | (1,652) | (4,953) | (24,596) |
| Basic and diluted loss per share: | | | | |
| Net loss from continuing operations | $ (0.22) | $ (0.04) | $ (0.12) | $ (0.70) |
| Net gain (loss) from discontinued operations | 0.01 | (0.01) | (0.02) | 0.01 |
| Basic and diluted net loss per share | $ (0.21) | $ (0.05) | $ (0.14) | $ (0.69) |
| Basic and diluted weighted average shares | 32,901,398 | 33,847,007 | 35,515,210 | 35,463,559 |

F-39

**Table of Contents**

## INPHONIC, INC. & SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
**(in thousands, except per share and share amounts)**

|  | Quarters Ended 2006 | | | |
|  | March 31 | June 30 | September 30 | December 31 |
|---|---|---|---|---|
| Revenue | $ 86,978 | $ 92,128 | $ 95,103 | $ 95,365 |
| Cost of revenue | 48,181 | 51,575 | 53,521 | 64,577 |
| Loss from continuing operations | (4,348) | (9,370) | (15,591) | (34,225) |
| Income (loss) from discontinued operations | 35 | (206) | 72 | (94) |
| Net loss | (4,313) | (9,576) | (15,519) | (34,319) |
| Basic and diluted loss per share: | | | | |
| Net loss from continuing operations | $ (0.12) | $ (0.26) | $ (0.43) | $ (0.91) |
| Net gain (loss) from discontinued operations | 0.00 | (0.01) | 0.00 | 0.00 |
| Basic and diluted net loss per share | $ (0.12) | $ (0.27) | $ (0.43) | $ (0.91) |
| Basic and diluted weighted average shares | 35,348,335 | 35,856,253 | 36,304,160 | 37,688,951 |

*Restatement*

The unaudited selected financial data for the quarters ended March 31, June 30, and September 30, 2006 have been adjusted to reflect corrections of accounting errors that occurred in the respective periods from amounts originally reported in our Forms 10-Q for those periods as filed with the SEC. The following provides a summary of the corrections within each quarterly reporting period. We have amended our quarterly reports on Forms 10-Q for these periods to reflect these corrections:

*Quarter ended March 31, 2006* — During the three months ended March 31, 2006, we had recorded revenue for certain of our features activations and services commissions in which it was subsequently determined that collectibility was not reasonably assured pursuant to SAB 104. As a result we reduced our revenue and accounts receivable by approximately $393 for this adjustment. The impact on the unaudited selected financial data for the quarter ended March 31, 2006 was as follows:

|  | Quarter Ended March 31, 2006 | | |
|  | Reported | Adjustment | Restated |
|---|---|---|---|
| Revenue | $87,371 | $ (393) | $86,978 |
| Loss from continued operations | (3,955) | (393) | (4,348) |
| Net loss | (3,920) | (393) | (4,313) |
| Net loss from continuing operations per basic and diluted share | (0.11) | (0.01) | (0.12) |
| Net loss per basic and diluted share | (0.11) | (0.01) | (0.12) |

*Quarter ended June 30, 2006* — During the three months ended June 30, 2006, we had recorded activations and services revenue net of related reserves as a change in estimate of certain carrier commissions in dispute which we had previously deemed as collectible. Upon further evaluation, we believe that it was inappropriate to have recorded revenue associated with this matter until such commissions are collected from the carrier. In addition, we identified other errors related to the recording of activations and services revenue of approximately $923 as it was subsequently determined

Table of Contents

## INPHONIC, INC. & SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
### (in thousands, except per share and share amounts)

that collectibility of these amounts was not reasonably assured based on our collection experience. Accordingly, we reduced our revenue and accounts receivable by approximately $3,674 for this matter.

In addition, we identified errors that occurred in the recordation of cost of revenue and accounts receivable in the amount of $627 that have been corrected in the accompanying financial statements. The impact on the unaudited selected financial data for the quarter ended June 30, 2006 was as follows:

|  | Quarter Ended June 30, 2006 | | |
|  | Reported | Adjustment | Restated |
| --- | --- | --- | --- |
| Revenue | $95,802 | $ (3,674) | $92,128 |
| Loss from continued operations | (5,069) | (4,301) | (9,370) |
| Net loss | (5,275) | (4,301) | (9,576) |
| Net loss from continuing operations per basic and diluted share | (0.14) | (0.12) | (0.26) |
| Net loss per basic and diluted share | (0.15) | (0.12) | (0.27) |

*Quarter ended September 30, 2006* — During the three months ended September 30, 2006, we identified errors in accounting for our activations and services revenue, equipment revenue and rebates and amounts paid to consumers as "customer accommodation credits" prior to our settlement with the Attorney General of the District of Columbia.

*Activations and services revenue* — We had recorded revenue for certain types of residual and churn bonuses due from wireless carriers for activations which occurred during the quarter. Upon further evaluation, we subsequently determined revenue recognition was in error as collectibility of such amounts was not reasonably assured pursuant to SAB 104 based on the nature of the amounts due and our lack of collection experience of similar items. Accordingly, we reduced revenue and accounts receivable by $2,916 and will not record revenue on such amounts until collections are received.

In addition, upon further evaluation of carrier commission receivable balances, we identified several receivable balances that the respective carriers were disputing. Based on correspondence and other information received from the carrier during the three months ended September 30, 2006, although we may continue our collection pursuits, we now believe that based on the nature of the carrier response we should have written off these balances during our third quarter. Accordingly we have reduced activation and services revenue and accounts receivable by $1,551 and will not record revenue on such items until collections are received.

*Equipment revenue* — We identified a deficiency in our process for recording certain fees due from consumers when they cancel their wireless service contract within specified time periods or the wireless device is not returned to us as is required under the contract with the customer. Specifically, in the third quarter we accrued revenue using estimated collection rates which were higher than our prior historical experience, in part because we were implementing new collection processes. As a result of this deficiency we reduced equipment revenue and accounts receivable $1,961 during the quarter.

*Consumer product rebates and rebates paid to consumers as "customer accommodation credits"* — We identified an error in accounting for accrued expenses and reserves for consumer product rebates ("accrued consumer liabilities") totaling $3,950 for the quarter. Of this amount, we determined that our reserve for such liabilities was understated $3,297 from payments made to consumers during the three month period which were outside our customary rebate validation process ("customer accommodation credits") which erroneously reduced accrued consumer liabilities when

F-41

**Table of Contents**

**INPHONIC, INC. & SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(in thousands, except per share and share amounts)**

paid rather than expensing such amounts. Accordingly, we increased general and administrative expenses and accrued consumer liabilities by $3,297 as of September 30, 2006. In addition, we identified that we underestimated our accrued consumer liability reserve requirements $653 as a result of misestimating the number of periods that continued to be subject to consumer rebate eligibility. Accordingly, we decreased equipment revenue and increased our reserve for accrued consumer liabilities for this amount.

*Other* — We identified of errors that occurred in the recordation of selling and marketing and general and administrative expenses cost of revenue and accounts receivable in the amount of $325 that also have been corrected in the accompanying financial statements. The impact on the unaudited selected financial data for the quarter ended September 30, 2006 was as follows:

| | Quarter Ended September 30, 2006 | | |
|---|---|---|---|
| | Reported | Adjustment | Restated |
| Revenue | $102,184 | $  (7,081) | $ 95,103 |
| Loss from continued operations | (4,888) | (10,703) | (15,591) |
| Net loss | (4,816) | (10,703) | (15,519) |
| Net loss from continuing operations per basic and diluted share | (0.13) | (0.29) | (0.43) |
| Net loss per basic and diluted share | (0.13) | (0.29) | (0.43) |

F-42

# Exhibit S

# SEC EDGAR Filing Information

## Form 8-K -- Current report

Period of Report: **2007-08-09**
Filing Date Changed: **2007-08-09**
Documents: **3**

SEC Accession No.
**0001193125-07-177618**
Filing date: **2007-08-09**
Accepted: **2007-08-09 17:04:00**

**Item 2.02:** Results of Operations and Financial Condition
**Item 9.01:** Financial Statements and Exhibits

## Table of submitted documents:

| Seq | Type | Document | Size | Description |
|-----|------|----------|------|-------------|
| 1 | 8-K | d8k.htm | 13467 | FORM 8-K |
| 2 | EX-99.1 | dex991.htm | 165588 | EXHIBIT 99.1 |
| 3 | GRAPHIC | g73082inphonic.jpg | 7813 | GRAPHIC |
| | | 0001193125-07-177618.txt | 191477 | **Complete submission text file** |

## Filer Information:

**INPHONIC INC** (Filer) **(0001133324)**
IRS No.: **522199384** | State of Incorp.: | Fiscal Year End: **1231**
Type: **8-K** | Act: **34** | File No.: **000-51023** | Film No.: **071041524**
SIC: **4899** Communications Services, NEC

Assistant Director 11

**Business Address**
1010 WISCONSIN AVE
SUITE 600
WASHINGTON DC 20007
2023330001

**Mailing Address**
1010 WISCONSIN AVE
SUITE 600
WASHINGTON DC 20007

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 8-K

---

## CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported): August 9, 2007**

---

# INPHONIC, INC.
#### (Exact name of registrant as specified in its charter)

---

| **Delaware** | **000-51023** | **52-2199384** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**1010 Wisconsin Avenue, Suite 600, Washington, DC**      **20007**
(Address of principal executive offices)     (ZIP Code)

### Registrant's telephone number, including area code: (202) 333-0001

#### (Former name or former address, if changed since last report.)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Section 2 – Financial Information**

Item 2.02.    Results of Operations and Financial Condition.

On August 9, 2007, InPhonic, Inc. issued a press release announcing its financial results for the three months and six months ended June 30, 2007. A copy of the release is furnished as Exhibit 99.1 to this Report on Form 8-K.

The information in this section of this Report on Form 8-K and Exhibit 99.1 attached hereto shall not be deemed "filed" for the purposes of Section 18 of the Securities Exchange Act of 1934, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, except as shall be expressly set forth by specific reference in such filing.

**Section 9 – Financial Statements and Exhibits**

Item 9.01.    Financial Statements and Exhibits.

(c)    Exhibits.

99.1        Press Release dated August 9, 2007.

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

INPHONIC, INC.

By:    /s/ Kenneth D. Schwarz
Name:  Kenneth D. Schwarz
Title:   Chief Financial Officer, Executive Vice President

Date: August 9, 2007

**INDEX TO EXHIBITS**

| Exhibit No. | Description |
| --- | --- |
| Exhibit 99.1 | Press Release dated August 9, 2007. |



**FOR IMMEDIATE RELEASE**

**InPhonic Announces Second Quarter 2007 Financial Results**

*Announced Strategic Alliance with Brightstar*
*Added Liquidity by Accessing $15 Million from Existing Credit Facility*
*Hired Telecom and Technology Veteran as New CFO*

**WASHINGTON, August 9, 2007 (BUSINESS WIRE) — InPhonic, Inc. (NASDAQ:INPC)** , a leading online seller of wireless services and products, today reported financial results for the second quarter ended June 30, 2007.

"In the second quarter of 2007, we began addressing many of the operational challenges that were identified on our last conference call in an effort to better position the Company in the later half of 2007 for improved operating cash flow. Although we are still early in the process, we are encouraged by some initial positive indicators and believe these improvements to the business will yield their full impact in the second half of the year." said InPhonic's Chairman and CEO David A. Steinberg.

Revenue was $79.4 million for the second quarter of 2007, compared to $92.1 million for the second quarter of 2006. Loss from continuing operations for the second quarter 2007 was ($40.6) million or ($1.06) per basic and diluted share compared to a loss from continuing operations of ($9.4) million or ($0.26) per basic and diluted share for the second quarter of 2006.

Non-GAAP Adjusted EBITDA for the second quarter 2007 was a loss of ($15.5) million. Non-GAAP Adjusted EPS for the second quarter 2007 was a loss of ($0.59) per share.

Adjusted EBITDA is defined as net income (loss) from continuing operations before interest expense, taxes, depreciation and amortization, restructuring costs, other non-recurring costs, stock-based compensation and certain other adjustments. Adjusted EPS per basic and diluted share is defined as earnings per share as calculated on the face of the income statement adjusted for stock-based compensation expense and depreciation of intangibles, non-recurring costs and other adjustments. The footnotes to the Non-GAAP measures describe these adjustments in more detail.

**Signed Letter of Intent with Brightstar**

The Company announced today a letter of intent for a new strategic alliance with Brightstar and expects to sign a definitive agreement by September 30, 2007. As part of the strategic alliance Brightstar would acquire the distribution, inventory and fulfillment assets of InPhonic and become InPhonic's exclusive provider of hardware (wireless handsets, SIM cards and accessories), direct-to-consumer distribution, on-hand inventory, value added customization and logistics. InPhonic would become the exclusive online activation and enablement platform for Brightstar's existing consumer businesses. Currently, Brightstar has approximately 11,000 points of sale in the United States with some of the most recognized retail store brands and approximately 160,000 points of sale internationally.

It is expected that the definitive agreement will encompass collaboration across a number of functional areas and would provide InPhonic benefits in three key areas – improved cash flows due to outsourced inventory management, enhanced margins resulting from hardware procurement and significant growth opportunities in a new marketing relationship with Brightstar and its vast domestic and international sales channels.

Brightstar strengthened its commitment to this new alliance further by making an investment of $5 million in InPhonic, purchasing approximately 925,000 newly issued restricted shares. These shares represent approximately 2.5 percent of InPhonic's outstanding share count as of June 30, 2007, and were priced at a premium to the existing market price.

**Liquidity Position**

InPhonic ended the second quarter of 2007 with $22.5 million in cash and cash equivalents. The Company was able to improve its liquidity position by working with Citicorp and Goldman Sachs to complete an agreement to draw an additional $15 million from the existing credit agreement. The total balance of the note will be $90 million.

The immediate new equity investment of $5 million from Brightstar plus the new borrowings from the Lending Group will provide an aggregate infusion of $20 million into InPhonic.

### Hired New Chief Financial Officer

In July, InPhonic hired a new Chief Financial Officer, Kenneth D. Schwarz. Mr. Schwarz joined InPhonic after many years of experience working in publicly-held telecommunications and technology companies in senior finance and operational roles. Immediately prior to joining InPhonic, Mr. Schwarz served in senior executive positions, including CFO and subsequently President of Consumer Solutions at Intersections Inc., a NASDAQ-listed public company and leading provider of identity theft protection and credit management solutions.

### Non-GAAP Financial Measures

A reconciliation between GAAP and Non-GAAP results is shown immediately following the Unaudited Condensed Consolidated Statements of Cash Flows.

The Company believes that the presentation of the above Non-GAAP measures provides useful information to investors regarding certain additional financial and business trends relating to its financial condition and results of operations. The Company believes when U.S. GAAP results are viewed in conjunction with these Non-GAAP measures, investors are provided with a more meaningful understanding of the Company's ongoing operating performance. In addition, the Company's management uses these measures for reviewing the Company's financial results.

These measures should be considered in addition to results prepared in accordance with U.S. GAAP, but should not be considered a substitute for, or superior to, GAAP results. The Company has reconciled Non-GAAP financial measures included in this press release to the nearest GAAP measure. Investors are encouraged to review the related GAAP financial measures and the reconciliation of these Non-GAAP financial measures to their most directly comparable GAAP financial measure.

### Conference Call

Company management will be holding a conference call on August 9, 2007 at 5:00 PM Eastern Time to discuss its second quarter 2007 financial results and provide a Company update.

The conference call can be accessed by calling the following phone numbers:

- (800) 946-0783 (Domestic) or (719) 4572658 (International); passcode 6904443.

- The replay will be available beginning at 7:00 p.m. on August 9, 2007 by dialing 888-203-1112 (Domestic) or 719-457-0820 (International); passcode 6904443.

- A link to an audio Webcast of the call will be available at http://investor.inphonic.com/ . An audio Webcast archive following the call will also be available at http://investor.inphonic.com/

### About InPhonic

Headquartered in Washington, D.C., InPhonic, Inc. (NASDAQ: INPC — News ) is a leading online seller of wireless services and products. InPhonic sells these services and products, and provides world-class customer service through websites that it creates and manages for online businesses, national retailers, member-based organizations and associations under their own brands. InPhonic also operates Wirefly ( www.wirefly.com ), a leading one-stop comparison mobile phones and wireless plans shopping site that has been awarded "Best of the Web" by Forbes magazine and "Best in Overall Customer Experience" by Keynote Performance Systems. InPhonic also delivers a full range of MVNO and mobility solutions to enterprise clients through its Mobile Virtual Network Enablement (MVNE) platform. Among many awards in its history, InPhonic holds the distinction as #1 Company of the Year on the INC. 500 for 2004. For more information on the company, its products and services, visit the InPhonic Corporate Web site at www.inphonic.com .

Click here to join our email alert list: http://www.b2i.us/irpass.asp?BzID=1461&to=ea&s=0

Forward-Looking Statements—This press release contains forward-looking statements under the Private Securities Litigation Reform Act of 1995, including, without limitation, all statements related to future financial performance, plans to grow our business and build our brand. Words such as "expect," "anticipate," "believe" and similar expressions are intended to identify forward-looking statements. These forward-looking statements are based upon our current expectations. Forward-looking statements involve risks and uncertainties. Our actual results and the timing of events could differ materially from those anticipated in such forward-looking statements as a result of these risks and uncertainties, which include, without limitation, risks related to our fluctuating operating results, seasonality in our business, our ability to acquire products on reasonable terms, our online business model, demand for our products, the strength of our brand, competition, our ability to fulfill orders and other risks detailed in our filings with the Securities and Exchange Commission, including our Annual Report on Form 10-K for the Year ended December 31, 2006 and our Quarterly Reports on Forms 10-Q. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this press release. All forward-looking statements are qualified in their entirety by this cautionary statement, and InPhonic undertakes no obligation to revise or update any forward-looking statements to reflect events or circumstances after the date hereof.

Contacts:

Investors:
InPhonic, Inc.
Gary Tiedemann
VP, Investor Relations
(202) 333-0001
gtiedemann@inphonic.com

Press:
InPhonic, Inc.
Tripp Donnelly
VP, Public Relations
(202) 333-0001
tdonnelly@inphonic.com

**INPHONIC, INC. & SUBSIDIARIES**
**Unaudited Condensed Consolidated Statements of Operations**
**(in thousands, except share and per share amounts)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2006 | 2007 | 2006 | 2007 |
| Revenue: | | | | |
| Activations and services | $ 74,216 | $ 66,780 | $ 140,958 | $ 151,541 |
| Equipment | 17,912 | 12,642 | 38,148 | 29,286 |
| Total revenue | 92,128 | 79,422 | 179,106 | 180,827 |
| Cost of revenue, exclusive of depreciation and amortization: | | | | |
| Activations and services | 1,065 | 621 | 1,325 | 1,384 |
| Equipment | 50,510 | 53,093 | 98,431 | 118,755 |
| Total cost of revenue | 51,575 | 53,714 | 99,756 | 120,139 |
| Operating expenses: | | | | |
| Sales and marketing, exclusive of depreciation and amortization | 27,408 | 30,514 | 54,130 | 61,959 |
| General and administrative, exclusive of depreciation and amortization | 16,908 | 26,519 | 30,139 | 50,395 |
| Depreciation and amortization | 3,960 | 5,829 | 7,443 | 11,220 |
| Restructuring | 1,906 | 340 | 1,906 | 340 |
| Total operating expenses | 50,182 | 63,202 | 93,618 | 123,914 |
| Operating loss | (9,629) | (37,494) | (14,268) | (63,226) |
| Other income (expense): | | | | |
| Interest income | 547 | 326 | 1,174 | 1,003 |
| Interest expense | (288) | (3,476) | (624) | (6,138) |
| Total other income (expense) | 259 | (3,150) | 550 | (5,135) |
| Loss from continuing operations | (9,370) | (40,644) | (13,718) | (68,361) |
| Discontinued operations: | | | | |
| Loss from discontinued operations | (206) | (4) | (171) | (102) |
| Net loss | $ (9,576) | $ (40,648) | $ (13,889) | $ (68,463) |
| Basic and diluted net loss per share: | | | | |
| Net loss from continuing operations | $ (0.26) | $ (1.06) | $ (0.38) | $ (1.77) |
| Loss from discontinued operations | (0.01) | (0.00) | (0.01) | (0.00) |
| Basic and diluted net loss per share | $ (0.27) | $ (1.06) | $ (0.39) | $ (1.77) |
| Basic and diluted weighted average shares outstanding | 35,856,253 | 38,265,453 | 35,529,454 | 38,654,575 |

| (In thousands) | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2006 | 2007 | 2006 | 2007 |
| Sales and marketing | $ 819 | $ 784 | $ 1,538 | $ 1,457 |
| General and administrative | 2,097 | 2,459 | 4,260 | 5,018 |
| Restructuring | 1,312 | — | 1,312 | — |
| | $ 4,228 | $ 3,243 | $ 7,110 | $ 6,475 |

**INPHONIC INC, & SUBSIDIARIES**
**Condensed Consolidated Balance Sheet**
**(in thousands, except share and per share amounts)**

| | December 31, 2006 | June 30, 2007 (unaudited) |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 89,972 | $ 22,543 |
| Accounts receivable, net | 63,820 | 50,393 |
| Inventory, net | 23,164 | 13,882 |
| Prepaid expenses | 6,507 | 5,455 |
| Deferred costs and other current assets | 3,122 | 3,277 |
| Current assets of discontinued operations | 391 | 115 |
| Total current assets | 186,976 | 95,665 |
| Restricted cash and cash equivalents | 38 | 38 |
| Property and equipment, net | 22,746 | 25,604 |
| Goodwill | 38,223 | 38,223 |
| Intangible assets, net | 8,092 | 6,475 |
| Deposits and other assets | 8,330 | 15,235 |
| Total assets | $ 264,405 | $ 181,240 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 85,975 | $ 76,258 |
| Accrued expenses and other liabilities | 22,521 | 18,719 |
| Current portion of deferred revenue | 16,604 | 14,798 |
| Current maturities of capital leases | 301 | 280 |
| Current liabilities of discontinued operations | 1,103 | 1,103 |
| Total current liabilities | 126,504 | 111,158 |
| Long-term debt and capital lease obligations, net of current maturities | 63,826 | 65,385 |
| Deferred revenue, net of current portion | 478 | 351 |
| Total liabilities | 190,808 | 176,894 |
| Commitments and contingencies | — | — |
| Stockholders' equity: | | |
| Common stock, $0.01 par value | | |
| Authorized 200,000,000 shares at December 31, 2006 and June 30, 2007; issued and outstanding 37,138,480 and 36,926,080 shares at December 31, 2006 and June 30, 2007, respectively | 371 | 369 |
| Additional paid-in capital | 301,611 | 300,825 |
| Accumulated deficit | (228,385) | (296,848) |
| Total stockholders' equity | 73,597 | 4,346 |
| Total liabilities and stockholders' equity | $ 264,405 | $ 181,240 |

**INPHONIC, INC. & SUBSIDIARIES**
**Unaudited Condensed Consolidated Statements of Cash Flows**
**(in thousands)**

| | Six Months Ended June 30, | |
|---|---|---|
| | 2006 | 2007 |
| Cash flows from operating activities: | | |
| Net loss | $(13,889) | $(68,463) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 7,443 | 11,220 |
| Increase (decrease) in allowance for doubtful accounts | (997) | 5,492 |
| Non-cash interest expense, sales and marketing expense and other | 135 | 2,244 |
| Stock-based compensation, including related payroll taxes | 7,110 | 6,349 |
| Changes in operating assets and liabilities | | |
| Accounts receivable | (20,928) | 8,211 |
| Inventory | (3,454) | 9,282 |
| Prepaid expenses | (2,336) | (948) |
| Deferred costs and other assets | 4,295 | (155) |
| Deposits and other assets | 161 | (937) |
| Accounts payable | 21,037 | (9,717) |
| Accrued expenses and other liabilities | (2,722) | (7,221) |
| Deferred revenue | (3,678) | (1,933) |
| Net cash used in operating activities | (7,823) | (46,576) |
| Cash flows from investing activities: | | |
| Capitalized expenditures, including internal capitalized labor | (8,874) | (12,159) |
| Cash paid for acquisitions | (3,028) | (1,000) |
| Cash paid for the purchase of intangible assets | (193) | — |
| Purchase of short-term investments | (5,000) | — |
| Proceeds from the sale of assets of discontinued operations | 1,110 | — |
| Reduction in restricted cash and cash equivalents | 400 | — |
| Other | — | (50) |
| Net cash used in investing activities | (15,585) | (13,209) |
| Cash flows from financing activities: | | |
| Principal repayments on capital leases | (213) | (134) |
| Cash paid for repurchase of common stock | (503) | (10,726) |
| Proceeds from exercise of options, warrants and other | 752 | 3,216 |
| Net cash provided by (used in) financing activities | 36 | (7,644) |
| Net decrease in cash and cash equivalents | (23,372) | (67,429) |
| Cash and cash equivalents, beginning of the period | 70,783 | 89,972 |
| Cash and cash equivalents, end of the period | $ 47,411 | $ 22,543 |
| Supplemental disclosure of cash flows information: | | |
| Cash paid during the period for: | | |
| Interest | $    263 | $  2,719 |
| Supplemental disclosure of non-cash activities: | | |
| Issuance of common stock in business acquisitions | 3,856 | — |
| Issuance of warrant to purchase common stock to vendor | 3,228 | — |
| Stock-based compensation capitalized as internal labor | 325 | 302 |

**INPHONIC INC.**
**Reconciliation of non-GAAP measure to nearest comparable GAAP measures**
**(unaudited, in thousands, except share and per share amounts)**

| | Three Months Ended June 30, | |
|---|---|---|
| | 2006 | 2007 |
| **Adjusted EBITDA and EPS:** | | |
| **Net loss from continuing operations** | $ (9,370) | $ (40,644) |
| Non-cash items: | | |
| Depreciation and amortization | 3,960 | 5,829 |
| Stock -based compensation | 2,916 | 3,243 |
| Non-cash amortization of sales and marketing expense | 135 | 162 |
| Interest income and expense | (259) | 3,150 |
| Non-recurring items (1): | | |
| Restructuring costs | 1,906 | 340 |
| Discontinued marketing programs | — | 4,459 |
| Rebate settlement and related expenses | — | 1,906 |
| AR reserves for bad debts and other adjustments | — | 2,563 |
| Legal and accounting expenses related to restatement | — | 3,030 |
| Settlement, relocation and other exit costs | — | 503 |
| **Adjusted EBITDA** | $ (712) | $ (15,459) |
| **Net Loss** | $ (9,576) | $ (40,648) |
| Stock-based compensation | 2,916 | 3,243 |
| Non-cash amortization of sales and marketing expenses | 135 | 162 |
| Non-cash interest | — | 974 |
| Amortization of intangible assets | 1,078 | 703 |
| Impact of non-recurring items: | 1,906 | 12,801 |
| **Adjusted Net Loss** | $ (3,541) | $ (22,765) |
| **Adjusted EPS per share** | | |
| Basic | $ (0.10) | $ (0.59) |
| Diluted | $ (0.10) | $ (0.59) |
| Basic weighted average shares | 35,856,253 | 38,265,453 |
| Diluted weighted average shares | 35,856,253 | 38,265,453 |

**Footnotes:**

(1)    These items were incurred during the quarter and are not expected to recur beyond the second quarter of 2007. This category includes legal and accounting fees associated with the completion of the restatement of the 2006 financials; consumer credits or settlements provided to consumers during the rebate process outside of our normal procedures; write-offs of accounts receivable with certain troubled wireless partners; additional reserves on certain carrier receivables and facility relocation and other exit/settlement costs incurred during the quarter.

# EXHIBIT T

# SEC EDGAR Filing Information

## Form 8-K/A -- Current report [amend]

Period of Report: **2007-04-02**
Filing Date Changed: **2007-08-10**
Documents: **1**

SEC Accession No.
**0001193125-07-179164**
Filing date: **2007-08-10**
Accepted: **2007-08-10 17:06:39**

**Item 4.02:** Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review

## Table of submitted documents:

| Seq | Type | Document | Size | Description |
|-----|------|----------|------|-------------|
| 1 | 8-K/A | d8ka.htm | 43336 | AMENDMENT NO. 2 TO FORM 8-K |
| | | 0001193125-07-179164.txt | 44855 | **Complete submission text file** |

## Filer Information:

**INPHONIC INC** (Filer) **(0001133324)**
IRS No.: **522199384** | State of Incorp.: | Fiscal Year End: **1231**
Type: **8-K/A** | Act: **34** | File No.: **000-51023** | Film No.: **071046128**
SIC: **4899** Communications Services, NEC

Assistant Director 11

**Business Address**
1010 WISCONSIN AVE
SUITE 600
WASHINGTON DC 20007
2023330001

**Mailing Address**
1010 WISCONSIN AVE
SUITE 600
WASHINGTON DC 20007

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K/A
**(Amendment No. 2)**

---

## CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): April 2, 2007**

---

# INPHONIC, INC.
**(Exact name of registrant as specified in its charter)**

---

| **Delaware** | **000-51023** | **52-2199384** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **1010 Wisconsin Avenue, Suite 600, Washington, DC** | **20007** |
|---|---|
| (Address of principal executive offices) | (ZIP Code) |

Registrant's telephone number, including area code: **(202) 333-0001**

---

**(Former name or former address, if changed since last report.)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Explanatory Paragraph**

The following amends the Company's Form 8-K filed April 2, 2007 as amended on Form 8-K/A filed May 4, 2007. The purpose of this amendment is to clarify information reported in the aforementioned documents. Readers should also reference the Company's Forms 10-Q, as amended, for its quarterly periods of 2006 and the Company's Form 10-K for the year ended December 31, 2006, as amended, which were filed following the events referenced herein.

This amendment on Form 8-K/A only amends the following item: Item 4.02 – Non-Reliance on Previously Issued Financial Statements Or A Related Audit Report Or Completed Interim Review.

**Item 4.02.      Non-Reliance On Previously Issued Financial Statements Or A Related Audit Report Or Completed Interim Review.**

The following includes an update to clarify or provide additional details of information first disclosed in the Company's Form 8-K dated April 2, 2007 as amended by Form 8-K/A filed on May 4, 2007.

As reported on April 2, 2007, the Company's Audit Committee had conducted additional review using the services of independent counsel and other experts with respect to the matters identified below. The Audit Committee concluded that these matters resulted from misapplication of GAAP; improperly recognized revenue and improperly deferred expenses; inadequate controls; and insufficient processes, procedures and expertise. In response, the Company is currently developing and implementing a remediation plan which will include a reorganization of the finance and accounting functions within the Company.

**Fiscal Year 2006**

On April 2, 2007, the Company's management and Audit Committee concluded that the Company's unaudited financial statements for the quarterly periods ended June 30, 2006 and September 30, 2006 each as filed on Form 10-Q (the "2nd and 3rd Quarter Financials") as well as the unaudited financial results for the quarter and year-ended December 31, 2006 included in the Company's earnings release issued on February 22, 2007 (the "Year End Results") should no longer be relied upon as a result of certain errors discovered subsequent to the issuance of the Year End Results. As of May 4, 2007, the Company's management and Audit Committee also concluded that the Company's unaudited financial statements for the quarterly period ending March 31, 2006 filed on Form 10-Q (the "1st Quarter Financials") should no longer be relied upon as a result of certain errors discovered subsequent to the issuance of the year end results. The Company has identified the matters set forth below which will require changes to the 1st Quarter Financials and the 2nd and 3rd Quarter Financials and unaudited Year End Results. The matters for which changes will be required are:

- In 2006, the Company recorded net activation and services revenue of approximately $30.7 million and net equipment revenue of $0.1 million related to certain carrier commissions and bonuses which it had deemed collectible. The Company now believes that it was inappropriate to have recorded revenue associated with these matters until such collections are received. The Company will continue its efforts to collect amounts outstanding and will record related receipts as revenue at the time of collection.

- In 2006, the Company recorded net activation and services revenue of $1.3 million related to cash received from a satellite services provider but for which the satellite services provider later determined that it had paid amounts for which it believed it was not contractually obligated to pay. The Company now believes that this amount will be used to offset future amounts due from the satellite services provider.

- The Company has identified a deficiency in its process for recording certain fees due from consumers when contracts are canceled within specified time periods or the wireless device is not returned to the Company as is required under the contract with the customer ("Equipment Discount Provisions" or "EDPs"). The Company believes that $2.5 million in revenue originally recorded as being earned and the related accounts receivable amount should be reduced to be reflective of such historical experience without regard to improvements in collections expected in the future from additional collection processes being employed. If the Company ultimately is able to collect on or sell these pools of consumer receivables at a more favorable rate, a gain may be

2

recorded at the time of such collection or sale, subject to the terms of the agreements. The Company has identified a third party marketplace for the sale of its EDP receivables and is actively marketing these assets.

- The Company has identified an error in the recording of accrued expenses and reserves for consumer product rebates totaling $4.9 million. These amounts should have been recorded as either an expense or reduction to equipment revenue in 2006. The Company believes that $3.3 million of the total adjustment is related to additional expenses for rebates paid to consumers as "goodwill" or "customer accommodation credits" prior to its settlement with the Attorney General of the District of Columbia.

  Historically, the consumer product rebate liability has been determined based on actual redemption experience as a percentage of total products rebates issued to customers. Each month, the historical redemption rate is applied to the total amount of potential rebates issued during the month to determine the estimated liability to accrue in the given month. As customers redeem the rebate and the rebate is paid by the Company, the liability is reduced. The liability remains on the Company's balance sheet until the contractual redemption period has lapsed under the terms and the conditions of the wireless device sale and the Company has distributed the rebate funds to the qualifying recipients. The Company did not change its accounting policy for consumer rebates during the fiscal year.

  In the third and fourth quarters of 2006, the Company made payments to certain customers to satisfy customer complaints related to their rebate redemptions even though they may have failed to fully satisfy the contractual terms and conditions to be otherwise eligible to receive the rebate. As these payments were outside of the expense estimation process, they should have been immediately expensed when incurred rather than applied against the rebate liability as other payments made for rebate redemptions made in the ordinary course of our business. The Company refers to payments made under these circumstances as "goodwill" or "customer accommodation credits." In the course of the restatement efforts, it was noted that approximately $3.3 million of these "goodwill" related payments was erroneously applied against the rebate reserve account rather than being expensed as incurred. This event caused the reserve to be understated as of September 30, 2006 and December 31, 2006.

  In addition to the above described event, it was also noted that in estimating the rebate liability at September 30, 2006 and December 31, 2006, the Company miscalculated the number of months that remained subject to rebate redemption in which the contractual redemption period had not expired or qualifying rebates from this period remained unpaid. As a result of this miscalculation, the Company underestimated its rebate reserve by approximately $1.6 million.

- The Company recorded certain amounts as receivable or as a reduction or accounts payable related $4.0 million of certain handset equipment that has been returned to its equipment vendors for repair and replacement. Subsequent to year-end, the Company determined that it would not collect or receive credit for certain amounts related to these returns. The Company will continue its efforts to collect amounts outstanding and will record related receipts as a reduction of equipment cost of revenue at the time of collection.

- The Company has identified other accounting adjustments of approximately $2.7 million, net, related to the correction of certain equipment expenses, sales and marketing expenses, general and administrative expenses and depreciation expense associated with the following:

| (in millions) | | |
|---|---:|---|
| Write-off of long-term assets | $ 0.9 | a |
| Co-op related cost of revenue and sales and marketing expense | 0.8 | b |
| Shared advertising accrual | 0.6 | c |
| Accrued Federal Trade Commission rebate consent agreement | 0.4 | d |
| Accrued sales and marketing for satellite business unit | 0.3 | e |
| Accrued VMC settlement | 0.2 | f |
| Accrued price protection credits | 0.1 | g |
| Accrued shipping costs | 0.1 | h |
| Accrued audit and related fees | (0.6) | i |
| Depreciation expense | (0.1) | j |
| **Total** | **$ 2.7** | |

a.    Amounts relate to an adjustment to write off certain costs capitalized for potential acquisitions that were deemed no longer valid at December 31, 2006;

b.    Amounts relate to an adjustment to reverse specific co-op equipment cost of revenue and sales and marketing expenses for items deemed non-collectible or deemed a duplication error at December 31, 2006;

c.    The Company identified an error regarding a marketing expense of approximately $1.2 million that should have been recorded in the quarter and year ended December 31, 2005. Of such amount, $0.6 million was recorded in the fourth quarter ended December 31, 2006;

d.    Subsequent to the issuance of the Year End Results, the Company entered into a consent agreement with the Federal Trade Commission. At that time, the Company was able to estimate that approximately $0.4 million of rebates would be paid to customers for which rebates had previously been denied. Prior to the consent agreement, the Company was unable to reasonably estimate the amounts to be paid;

e.    As a result of the negotiation of an amendment to an operating agreement with the provider of satellite television services which was completed and signed subsequent to the issuance of the Year End Results but including certain activity completed in 2006, the Company determined it had incurred an additional $0.3 million of sales and marketing expense under the terms and conditions of the amended agreement;

f.    Subsequent to the issuance of the Year End Results, the Company entered into an agreement to settle a dispute regarding amounts owed under the asset purchase agreement with VMC Satellite, Inc. Such dispute was pending as of December 31, 2006. As a result of the agreement, the Company accrued $0.2 million of additional general and administrative expense;

g.    Amounts relate to an adjustment for the over-accrual of price protection credits during 2006;

h.    Amounts relate to an adjustment for under-accrued shipping costs identified subsequent to the issuance of the Year End Results;

i.    Amounts relate to an adjustment to reverse over-accrued audit and related fees in fiscal year 2006 that were incurred in fiscal year 2007; and

j.    Amounts relate to an adjustment for amounts that were over-depreciated prior to December 31, 2006.

The Company has amended the previously filed Forms 10-Q containing the 1st Quarter Financials and the 2nd and 3rd Quarter Financials and the Form 10-K containing the year end results with an aggregate impact greater than anticipated at the time of the Company's original April 2, 2007 Form 8-K filing and at the time of the Company's amendment on Form 8-K/A filed on May 4, 2007. The Company increased its previously reported net loss to reflect an aggregate net loss of $63.7 million for the year. The Company has filed its restated financial statements contained in Form 10-Q/A for the quarterly periods ended March 31, 2006, June 30, 2006, and September 30, 2006, as well as its Annual Report on Form 10-K on June 1, 2007.

Additionally, the Company has identified six material weaknesses in its internal controls over financial reporting. At the entity level, management identified a material weakness in its control environment because it lacked a sufficient number of employees with appropriate levels of knowledge, expertise and training in the application of generally accepted accounting principles in certain groups. At the transactional level, due to the lack of sufficient personnel, the Company was unable to properly perform certain accounting procedures in a timely manner relating to the recording of carrier commissions. Additionally, the Company inappropriately recorded receivables from the carriers that were not supported by historical experience. Also, the Company identified a material weakness in its process for recording revenue relating to EDPs as well as a material weakness due to a failure within the Company to effectively communicate information to its finance department necessary to record certain marketing expenses on a timely basis. Finally, the Company did not utilize an appropriate methodology for recording consumer product rebates. The Company was required to provide the assessment of the effectiveness of the Company's internal control structure and procedures for financial reporting at the time it filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2006. Management has taken certain actions to remediate the material weaknesses described above based on an evaluation of the accounting staffing, systems, policies and procedures relating to revenue recognition. Our efforts to remediate deficiencies surrounding the levels of our staffing and related levels of expertise may take some time to remediate over the next several quarters.

**Fiscal Year 2005**

In addition to the issues with respect to 2006 discussed above, the Company has identified an error regarding a marketing expense of approximately $1.2 million that should have been recorded in the fourth quarter and year ended December 31, 2005. Of that amount, $0.6 million was recorded in the fourth quarter ended December 31, 2006. If it had been properly recorded, such additional expense would have increased the Company's net loss for the fourth quarter ended December 31, 2005 from approximately $24.8 million to approximately $26.0 million. As a result of this new disclosure, on May 1, 2007, the Company's management and Audit Committee concluded that the Company's audited financial statements for the fiscal year ended December 31, 2005 should no longer be relied upon. Subsequent to May 1, 2007, the Company has determined that the $1.2 million was not material both individually and in the aggregate with all other errors identified to the 2005 financial statements and the correction of these errors in the 2006 financial statements was not material to the 2006 financial statements, taken as a whole. As such, our results for fiscal year 2005 were not restated and these errors were corrected in the 2006 financial statements.

The Company's management and its Audit Committee have discussed the matters described in this Amendment No. 2 to Form 8-K/A with Grant Thornton LLP, the Company's independent registered public accounting firm.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**INPHONIC, INC.**

By:     /s/ D AVID A. S TEINBERG

Name: David A Steinberg

Title:   Chairman and Chief Executive Officer

Date: August 10, 2007

6

# EXHIBIT U

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

———————

## FORM 8-K

## CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): **September 3, 2007**

## INPHONIC, INC.
(Exact name of registrant as specified in its charter)

| **Delaware** | **000-51023** | **52-2199384** |
|:---:|:---:|:---:|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**1010 Wisconsin Avenue, Suite 600, Washington, DC 20007**
(Address of principal executive offices)          (ZIP Code)

Registrant's telephone number, including area code: **(202) 333-0001**

———————

(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Section 8—Other Events**

Item 8.01. Other Events.

On September 5, 2007, InPhonic, Inc. issued a press release announcing it entered into an agreement with Brightstar US, Inc., a subsidiary of Brightstar Corp. A copy of the release is furnished as Exhibit 99.1 to this Report on Form 8-K.

**Section 9—Financial Statements and Exhibits**

Item 9.01. Financial Statements and Exhibits.

(c) Exhibits.

99.1  Press Release dated September 5, 2007.

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

INPHONIC, INC.

/s/ David A. Steinberg
Name: David A. Steinberg
Title: Chairman and Chief Executive Officer

Date: September 5, 2007

**INDEX TO EXHIBITS**

| Exhibit No. | Description |
| --- | --- |
| Exhibit 99.1 | Press Release dated September 5, 2007. |

**Brightstar and InPhonic Sign Definitive Agreement to Form Strategic Alliance**
*— New Alliance Sets Stage for Expanded Sales Opportunities and
Better Operational Efficiencies for Both Companies —*

**Washington, D.C. and Miami – September 5, 2007** – Brightstar Corp., a global leader in customized distribution and supply chain solutions for the wireless industry, and InPhonic, Inc. (NASDAQ: INPC), a leading online seller of wireless services and products, today announced the signing of a definitive agreement to form a new strategic alliance.

Upon the closing of the agreement, there would be four principal components of the new relationship:

- Brightstar will acquire the distribution, inventory and fulfillment assets of InPhonic and will become InPhonic's exclusive provider of hardware (wireless handsets, SIM cards and accessories), direct-to-consumer distribution, on-hand inventory, value added customization and logistics.
- Brightstar will make a $5 million equity investment in InPhonic representing approximately 2.5% of InPhonic's outstanding shares.
- Brightstar will leverage InPhonic's online activation and enablement platform for its existing consumer businesses. Brightstar serves approximately 11,000 points of sale in the United States with some of the most recognized retail store brands.
- Brightstar also serves approximately 160,000 points of sale worldwide providing both companies global expansion opportunities with their new combined capabilities.

The terms of this new strategic alliance encompass collaboration across a number of functional areas with a focus on providing InPhonic benefits in four key areas – improved cash flows due to outsourced inventory management, enhanced margins resulting from hardware procurement, reduced current operational and fulfillment expenses, and significant growth opportunities in a new sales and marketing relationship with Brightstar and its domestic and international sales channels. Subject to closing conditions, the transaction is expected to close in mid to late September 2007.

"This strategic partnership with Brightstar will allow us to focus on our core competencies as an online wireless leader in customer acquisition. This new alliance would provide an initial cash infusion, and we believe a significant positive impact to InPhonic's working capital and cash flow as well. We believe the combination of InPhonic's activation and retail consumer platform along with Brightstar's operational excellence in fulfillment and logistics present significant growth potential for both companies," said David A. Steinberg, InPhonic's Chairman and CEO. "By combining our efforts, the companies can bring a powerful and unique value proposition to Brightstar's existing customers, as well as expanded capabilities and improved fulfillment services for our distribution channels."

"The relationship with InPhonic represents a mutually beneficial situation for both of our organizations. It allows InPhonic to concentrate on its core business, while Brightstar does what it does best—provide supply chain management that is customized to meet customer needs," said Marcelo Claure, Brightstar's founder, president and CEO. "InPhonic is a leader in the online wireless industry. We are very excited to be working with them to explore and cultivate expanded sales opportunities and deepen our existing relationship in optimizing their supply chain and distribution needs."

**About Brightstar**

Brightstar Corp. is a global leader in customized distribution and supply chain solutions for the wireless industry. Headquartered in Miami, FL, Brightstar operates sales, distribution and manufacturing facilities in 49 countries on six continents. The company provides solutions to more than 30,000 network operators, MVNOs, retailers, resellers and independent agents around the world, and also represents the world's leading wireless manufacturers. In 2006, Brightstar generated $3.6 billion in revenue. For more information, visit www.brightstarcorp.com .

**About InPhonic**

Headquartered in Washington, D.C., InPhonic, Inc. (NASDAQ:INPC) is a leading online seller of wireless services and products. InPhonic sells these services and devices, and provides world-class customer service through websites that it creates and manages for online businesses, national retailers, member-based organizations and associations under their own brands. InPhonic also operates Wirefly ( www.wirefly.com ), a leading one-stop comparison mobile phones and wireless plans shopping site that has been awarded "Best of the Web" by Forbes magazine and "Best in Overall Customer Experience" by Keynote Performance Systems. InPhonic also delivers a full range of MVNO and mobility solutions to enterprise clients through its Mobile Virtual Network Enablement (MVNE) platform. Among many awards in its history, InPhonic holds the distinction as #1 Company of the Year on the INC. 500 for 2004. For more information on the company, its products and services, visit the InPhonic Corporate Web site at www.inphonic.com .

Click here to join InPhonic's investor email list, http://www.b2i.us/irpass.asp?BzID=1461&to=ea&s=0

*"Safe Harbor" Statement —Under the Private Securities Litigation Reform Act of 1995, this press release may contain forward-looking statements that involve risks and uncertainties. Important factors, which could cause actual operating results to differ materially from those in the forward-looking statements, are detailed in filings with the Securities and Exchange Commission made from time to time by the Company. This press release and statements are current as of the date of the individual announcements and the Company undertakes no obligation to publicly release any revisions to any forward-looking statement to reflect events or circumstances after the date thereof or to reflect the occurrence of unanticipated events. The closing of the agreement with Brightstar is subject to the satisfaction of closing conditions, including Brightstar board approval, potential government and other third-party approvals, the execution of a mutually acceptable service agreement, sublease agreement and sale agreement. Furthermore, we can provide no assurance that the conditions set forth in the agreement with Brightstar will be satisfied or that the closing will occur.*

**Contacts:**

**InPhonic, Inc.**
Tripp Donnelly
Vice President
Corporate Communications
(202) 333-0001
tdonnelly@inphonic.com

**Brightstar**
Sally Lange
Vice President, Global Market & Public Relations
(305) 921-1264
sally.lange@brightstarcorp.com

# EXHIBIT V



# FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden
hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **Steinberg David** | **INPHONIC INC [ INPC ]** | |
| (Last)　(First)　(Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | _ X _ Director　　　_ X _ 10% Owner |
| **1010 WISCONSIN AVENUE, NW, SUITE 600** | **11/7/2006** | _ X _ Officer (give title below)　_____ Other (specify below) |
| (Street) | | **Chairman of the Board and CEO** |
| **WASHINGTON, DC 20007** | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| (City)　(State)　(Zip) | | _ X _ Form filed by One Reporting Person<br>_____ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| **Common Stock** | 11/7/2006 | | S | | 400000 | D | $10.45 | 50000 | I | See Note 1 (1) |
| **Common Stock** | 11/7/2006 | | S | | 50000 | D | $10.45 | 296817 | I | See Note 2 (2) |

### Table II - Derivative Securities Beneficially Owned ( *e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

( **1** )  Shares held by a family-owned limited liability company created for estate planning purposes. Mr. Steinberg has voting and dispositive power with respect to these shares.

( **2** )  Shares held by the BB&LB Trust dated June 24, 2002. Mr. Steinberg disclaims beneficial ownership of these shares.

**Remarks:**
The total for all Common Stock directly and indirectly owned by Mr. Steinberg and all Common Stock subject to options held by Mr. Steinberg is 4,726,693 shares. (This excludes 296,817 shares held by the BB&LB Trust dated June 24, 2002. Mr. Steinberg disclaims beneficial ownership of these shares.)

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |

| | | | |
|---|---|---|---|
| **Steinberg David**<br>**1010 WISCONSIN AVENUE, NW**<br><br>**SUITE 600**<br>**WASHINGTON, DC 20007** | **X** | **X** | **Chairman of the Board and CEO** |

**Signatures**

| | |
|---|---|
| /s/ Walter Leach, III, Attorney-in-Fact | 11/7/2006 |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*       If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

# EXHIBIT W

**FORM 4**

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * <br><br> **WINKLER LAWRENCE** <br><br> (Last)  (First)  (Middle) <br><br> **1010 WISCONSIN AVENUE, NW, SUITE 600** <br> (Street) <br><br> **WASHINGTON, DC 20007** <br> (City)  (State)  (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol <br><br> **INPHONIC INC [ INPC ]** <br><br> 3. Date of Earliest Transaction (MM/DD/YYYY) <br><br> **11/7/2006** <br><br> 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) <br><br> ____ Director  _____ 10% Owner <br> **X** __ Officer (give title below)  _____ Other (specify below) <br> **CFO, EVP and Treasurer** <br><br> 6. Individual or Joint/Group Filing (Check Applicable Line) <br> _ **X** _ Form filed by One Reporting Person <br> ____ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| **Common Stock** | 11/7/2006 | | M (1) | | 100000 | A | $5.88 | 355117 | D | |
| **Common Stock** | 11/7/2006 | | S (1) | | 100000 | D | $10.45 | 255117 | D | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| **Employe Stock Option (Right to Buy)** | $5.88 | 11/7/2006 | | M (1) | | | 100000 | | 5/25/2005 | 1/29/2014 | Common Stock | 100000 | $0 | 105555 | D | |

### Explanation of Responses:

( **1** )  Option vests and becomes exercisable over a period of three years, with 50,000 shares vested on May 25, 2005, 33% vested on the first anniversary of Mr. Winkler's employment and the remainder in equal installments per three-month period over the next two years.

### Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| **WINKLER LAWRENCE** <br> **1010 WISCONSIN AVENUE, NW** <br><br> **SUITE 600** <br> **WASHINGTON, DC 20007** | | | **CFO, EVP and Treasurer** | |

**Signatures**

| | |
|---|---|
| /s/ Walter Leach, III, Attorney-in-Fact | 11/7/2006 |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*         If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*        Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

# EXHIBIT X



## FORM 4

[ ] Check this box if no
longer subject to Section 16.
Form 4 or Form 5
obligations may continue.
*See* Instruction 1(b).

### UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

OMB APPROVAL

OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden
hours per response... 0.5

| 1. Name and Address of Reporting Person *<br><br>**WINKLER LAWRENCE**<br><br>(Last)    (First)    (Middle)<br><br>**1010 WISCONSIN AVENUE, NW, SUITE 600**<br>(Street)<br><br>**WASHINGTON, DC 20007**<br>(City)    (State)    (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol<br><br>**INPHONIC INC [ INPC ]**<br><br>3. Date of Earliest Transaction (MM/DD/YYYY)<br><br>**1/3/2007**<br><br>4. If Amendment, Date Original Filed (MM/DD/YYYY) | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable)<br><br>___ Director    _____ 10% Owner<br>__ X __ Officer (give title below)    _____ Other (specify below)<br>**CFO, EVP and Treasurer**<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br>_ X _ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 1/3/2007 | | M (1) | | 100000 | A | $5.88 | 447316 | D | |
| Common Stock | 1/3/2007 | | S (1) | | 100000 | D | $10.74 | 347316 | D | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (Right to Buy) | $5.88 | 1/3/2007 | | M | | | 100000 | 1/29/2004 (2) | 1/29/2014 | Common Stock | 100000 | $5.88 | 33334 (3) | D | |

### Explanation of Responses:

( **1** )   Shares sold pursuant to a previously established 10b5-1 trading plan.

( **2** )   Option vests and becomes exercisable over a period of 3 years, with 16,667 shares vested on May 25, 2004, 33% vested on the first anniversary of Mr. Winkler's employment and the remainder in equal installments quarterly over the next two years.

( **3** )   This amount is adjusted for an inadvertent miscalculation of derivative securities beneficially owned by the reporting person following the transactions reported on a Form 4 filed on November 9, 2006.

### Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| **WINKLER LAWRENCE**<br>**1010 WISCONSIN AVENUE, NW** | | | | |

**SUITE 600**
**WASHINGTON, DC 20007**

**CFO, EVP and Treasurer**

**Signatures**

| | |
|---|---|
| **Walter W. Leach, III, Attorney-in-Fact** | **1/5/2007** |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

# EXHIBIT Y

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

———————————

# FORM 8-K

### CURRENT REPORT
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): **November 7, 2006**

# INPHONIC, INC.
(Exact name of registrant as specified in its charter)

| **Delaware** | **000-51023** | **52-2199384** |
|:---:|:---:|:---:|
| **(State or other jurisdiction of incorporation)** | **(Commission File Number)** | **(IRS Employer Identification No.)** |

**1010 Wisconsin Avenue, Suite 600, Washington, DC 20007**
(Address of principal executive offices)        (ZIP Code)

Registrant's telephone number, including area code: **(202) 333-0001**

_____

(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 8.01. Other Events.**

**InPhonic Announces the Sale of Secondary Shares in Conjunction with Debt Financing**

**InPhonic, Inc. (NASDAQ:INPC),** a leading online seller of wireless services and products, today announced that in conjunction with the recently announced $100 million debt financing a group of InPhonic shareholders sold secondary shares to multiple participants in the debt financing in a private transaction at a price discounted to market. David Steinberg, CEO, and Lawrence Winkler, CFO participated in this group. Mr. Steinberg, through vehicles set up for trusts and estate purposes, sold 450,000 InPhonic shares and Mr. Winkler sold 100,000 InPhonic shares. These sales were one-time private transactions and neither Mr. Steinberg nor Mr. Winkler has any plan to sell additional InPhonic shares in the foreseeable future. Mr. Steinberg continues to own approximately 5 million InPhonic shares, total options, and restricted units in the company.

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

INPHONIC, INC.

/s/ David A. Steinberg
Name: David A. Steinberg
Title:   Chairman and Chief Executive Officer

Date: November 9, 2006

# EXHIBIT Z



**FORM 4**

[ ] Check this box if no
longer subject to Section 16.
Form 4 or Form 5
obligations may continue.
*See* Instruction 1(b).

UNITED STATES SECURITIES AND EXCHANGE
COMMISSION
Washington, D.C. 20549

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden
hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP
## OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **WINKLER LAWRENCE** | **INPHONIC INC [ INPC ]** | ____ Director                    _____ 10% Owner |
| (Last)      (First)      (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | __ **X** __ Officer (give title below)     _____ Other (specify below) |
| **1010 WISCONSIN AVENUE, NW, SUITE 600** | **7/1/2005** | **CFO, EVP and Treasurer** |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| **WASHINGTON, DC 20007** | | _ **X** _ Form filed by One Reporting Person |
| (City)      (State)      (Zip) | | ___ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| **Common Stock** | 7/1/2005 | | M | | 25000 (1) | A | $5.88 | 25000 | D | |
| **Common Stock** | 7/1/2005 | | S | | 25000 (1) | D | $15.4080 | 0 | D | |
| **Common Stock** | 7/5/2005 | | M | | 25000 (1) | A | $5.88 | 25000 | D | |
| **Common Stock** | 7/5/2005 | | S | | 25000 (1) | D | $15.4303 | 0 | D | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| **Employee Stock Option (Right to Buy)** | $5.88 | 7/1/2005 | | M | | | 25000 | 1/29/2005 (2) | 1/29/2014 | **Common Stock** | 25000 | $5.88 | 258334 | D | |
| **Employee Stock Option (Right to Buy)** | $5.88 | 7/5/2005 | | M | | | 25000 | 1/29/2005 (2) | 1/29/2014 | **Common Stock** | 25000 | $5.88 | 233334 | D | |

**Explanation of Responses:**

( **1** )   Shares sold pursuant to a previously established 10b5-1 Trading Plan.

( **2** )   Option vests and becomes exercisable over a period of 3 years, with 16,667 shares vested on May 25, 2004, 33% vested on the first anniversary of Mr. Winkler's employment and the remainder in equal installments quarterly over the next two years.

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| **WINKLER LAWRENCE**<br>**1010 WISCONSIN AVENUE, NW**<br><br>**SUITE 600**<br>**WASHINGTON, DC 20007** | | | **CFO, EVP and Treasurer** | |

**Signatures**

| | |
|---|---|
| **Walter W. Leach, III, Attorney in Fact** | **7/6/2005** |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*        If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*        Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

# EXHIBIT AA

# FORM 4

[ ] Check this box if no
longer subject to Section 16.
Form 4 or Form 5
obligations may continue.
*See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE**
**COMMISSION**
**Washington, D.C. 20549**

OMB APPROVAL

OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden
hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP
## OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * <br><br> **WINKLER LAWRENCE** <br><br> (Last)   (First)   (Middle) <br><br> **1010 WISCONSIN AVENUE, NW, SUITE 600** <br><br> (Street) <br><br> **WASHINGTON, DC 20007** <br><br> (City)   (State)   (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol <br><br> **INPHONIC INC [ INPC ]** <br><br> 3. Date of Earliest Transaction (MM/DD/YYYY) <br><br> **6/10/2005** <br><br> 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) <br><br> ____ Director    _____ 10% Owner <br> _ **X** _ Officer (give title below)   _____ Other (specify below) <br> **CFO, EVP and Treasurer** <br><br> 6. Individual or Joint/Group Filing (Check Applicable Line) <br> _ **X** _ Form filed by One Reporting Person <br> ___ Form filed by More than One Reporting Person |

## Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| **Common Stock** | 6/10/2005 | | M | | 25000 (1) | A | $5.88 | 25000 | D | |
| **Common Stock** | 6/10/2005 | | S | | 25000 (1) | D | $16.0320 | 0 | D | |
| **Common Stock** | 6/13/2005 | | M | | 25000 (1) | A | $5.88 | 25000 | D | |
| **Common Stock** | 6/13/2005 | | S | | 25000 (1) | D | $15.91 | 0 | D | |

## Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A)    (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| **Employee Stock Option (Right to Buy)** | $5.88 | 6/10/2005 | | M | | 25000 | 1/29/2005 (2) | 1/29/2014 | Common Stock | 25000 | $5.88 | 308334 | D | |
| **Employee Stock Option (Right to Buy)** | $5.88 | 6/13/2005 | | M | | 25000 | 1/29/2005 (2) | 1/29/2014 | Common Stock | 25000 | $5.88 | 283334 | D | |

**Explanation of Responses:**

( **1** )  Shares sold pursuant to a previously established 10b5-1 Trading Plan.

**( 2 )**   Option vests and becomes exercisable over a period of 3 years, with 16,667 shares vested on May 25, 2004, 33% vested on the first anniversary of Mr. Winkler's employment and the remainder in equal installments quarterly over the next two years.

| Reporting Owners | | | | |
|---|---|---|---|---|
| | Relationships | | | |
| Reporting Owner Name / Address | Director | 10% Owner | Officer | Other |
| **WINKLER LAWRENCE**<br>**1010 WISCONSIN AVENUE,**<br>**NW**<br>**SUITE 600**<br>**WASHINGTON, DC 20007** | | | **CFO, EVP and Treasurer** | |

**Signatures**

**Walter W. Leach, III, Attorney in Fact**

**6/14/2005**

—————————————————

** Signature of Reporting Person

—————————————————

Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*       If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

Powered By 

**© 2005 | EDGAR Online, Inc.**

# EXHIBIT BB

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# Form 10-Q/A
**(Amendment No. 2)**

---

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES AND EXCHANGE ACT OF 1934**

    **For the quarter ended March 31, 2006**

        **OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

    **For the transition period from _____ to _____.**

**Commission File Number 000-51023**

---

# INPHONIC, INC.
**(Exact name of Registrant as specified in its Charter)**

---

| | |
|---|---|
| **Delaware** | **52-2199384** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer identification no.)** |
| | |
| **1010 Wisconsin Avenue, Suite 600, Washington, DC** | **20007** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code: (202) 333-0001**

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒ .  No ☐ .

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

    Large accelerated filer ☐    Accelerated filer ☒    Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act.).   Yes ☐ .   No ☒ .

The registrant had 35,835,157 shares of common stock outstanding as of April 28, 2006.

Table of Contents

## EXPLANATORY NOTE

We filed our Quarterly Report on Form 10-Q for the three months ended March 31, 2006 with the Securities and Exchange Commission (the "SEC") on May 10, 2006. We filed Amendment No. 1 on Form 10-Q/A on June 1, 2007 to amend and restate our unaudited financial statements for the three months ended March 31, 2006 and related footnote disclosures to correct errors in our accounting for activations and services revenue identified during the year-end audit. We are filing this Amendment No. 2 on Form 10-Q/A to clarify those disclosures in Note 1(c) to our unaudited condensed consolidated financial statements regarding the restatement of the unaudited financial statements for the three months ended March 31, 2006 and to clarify our disclosure of changes in internal control in accordance with Item 308(c) of Regulation S-K.

This Amendment No. 2 to our Quarterly Report on Form 10-Q for the three months ended March 31, 2006 amends only the following items:

      Part I, Item 1  -  Financial Statements
      Part I, Item 4  -  Controls and Procedures
      Part II, Item 6  -  Exhibits

**INPHONIC, INC.**

**INDEX**

**FORM 10-Q/A**

**PART I. – FINANCIAL INFORMATION**

|  |  | Page |
|---|---|---|
| Item 1. | Financial Statements | 3 |
|  | Unaudited Condensed Consolidated Balance Sheets at December 31, 2005 and March 31, 2006 | 3 |
|  | Unaudited Condensed Consolidated Statements of Operations for the Three Months Ended March 31, 2005 and March 31, 2006 | 4 |
|  | Unaudited Condensed Consolidated Statements of Stockholders' Equity for the Three Months Ended March 31, 2006 | 5 |
|  | Unaudited Condensed Consolidated Statements of Cash Flows for the Three Months Ended March 31, 2005 and March 31, 2006 | 6 |
|  | Notes to Unaudited Condensed Consolidated Financial Statements |  |
| Item 4. | Controls and Procedures | 16 |

**PART II. – OTHER INFORMATION**

| Item 6. | Exhibits | 17 |
|---|---|---|
| **SIGNATURES** |  | 18 |

2

Table of Contents

PART I

ITEM 1.    FINANCIAL STATEMENTS

### INPHONIC, INC. & SUBSIDIARIES
#### Condensed Consolidated Balance Sheets
#### (in thousands, except per share and share amounts)

| | December 31, 2005 | March 31, 2006 (restated) (unaudited) |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $    70,783 | $   63,854 |
| Short-term investments | — | 5,000 |
| Accounts receivable, net of allowance of $2,042 and $1,695, respectively | 34,606 | 34,823 |
| Inventory, net | 17,693 | 23,079 |
| Prepaid expenses | 2,405 | 3,417 |
| Other current assets | 6,823 | 2,821 |
| Current assets of discontinued operations | 2,430 | 1,527 |
| Total current assets | 134,740 | 134,521 |
| Restricted cash and cash equivalents | 400 | — |
| Property and equipment, net | 12,121 | 14,032 |
| Goodwill | 31,140 | 34,125 |
| Intangible assets, net | 12,651 | 11,606 |
| Deposits and other assets | 3,058 | 3,745 |
| Total assets | $  194,110 | $ 198,029 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Current maturities of long-term debt and capital leases | $       377 | $   15,385 |
| Accounts payable | 29,556 | 38,721 |
| Accrued expenses and other liabilities | 31,588 | 29,457 |
| Deferred revenue | 14,135 | 13,929 |
| Current liabilities of discontinued operations | 3,130 | 1,681 |
| Total current liabilities | 78,786 | 99,173 |
| Long term debt and capital lease obligations, net of current maturities | 15,474 | 385 |
| Total liabilities | 94,260 | 99,558 |
| Stockholders' equity: | | |
| Common stock, $0.01 par value | | |
| Authorized 200,000,000 shares at December 31, 2005 and March 31, 2006; issued and outstanding 35,232,869 and 35,356,326 shares at December 31, 2005 and March 31, 2006, respectively | 353 | 354 |
| Additional paid-in capital | 264,155 | 267,088 |
| Accumulated deficit | (164,658) | (168,971) |
| Total stockholders' equity | 99,850 | 98,471 |
| Total liabilities and stockholders' equity | $  194,110 | $ 198,029 |

See accompanying notes to unaudited condensed consolidated financial statements

3

**Table of Contents**

**INPHONIC, INC. & SUBSIDIARIES**
**Unaudited Condensed Consolidated Statements of Operations**
**(in thousands, except per share and share amounts)**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2005 | 2006 |
| | | (restated) |
| Revenue: | | |
|     Activations and services | $ 49,751 | $ 66,742 |
|     Equipment | 18,400 | 20,236 |
|         Total revenue | 68,151 | 86,978 |
| Cost of revenue, exclusive of depreciation and amortization: | | |
|     Activations and services | 1,173 | 260 |
|     Equipment | 38,950 | 47,921 |
|         Total cost of revenue | 40,123 | 48,181 |
| Operating expenses: | | |
|     Sales and marketing, exclusive of depreciation and amortization | 17,498 | 26,722 |
|     General and administrative, exclusive of depreciation and amortization | 16,278 | 13,231 |
|     Depreciation and amortization | 1,777 | 3,483 |
|     Restructuring costs | 149 | — |
|         Total operating expenses | 35,702 | 43,436 |
| Operating loss | (7,674) | (4,639) |
| Other income (expense): | | |
|     Interest income | 482 | 627 |
|     Interest expense | (226) | (336) |
|         Total other income | 256 | 291 |
|         Loss from continuing operations | (7,418) | (4,348) |
| Discontinued operations: | | |
|     Income from discontinued operations | 424 | 35 |
|     Net loss | $ (6,994) | $ (4,313) |
| Basic and diluted net loss per share: | | |
|     Net loss from continuing operations | $ (0.22) | $ (0.12) |
|     Net income from discontinued operations | 0.01 | 0.00 |
|     Basic and diluted net loss per share | $ (0.21) | $ (0.12) |
|     Basic and diluted weighted average shares outstanding | 32,901,398 | 35,348,335 |

See accompanying notes to unaudited condensed consolidated financial statements

4

**Table of Contents**

**INPHONIC, INC. & SUBSIDIARIES**
**Unaudited Condensed Consolidated Statements of Stockholders' Equity**
**(in thousands, except share amounts)**

| | Common stock | | Additional paid-in capital | Accumulated deficit (restated) | Total |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| **Balance, December 31, 2005** | 35,232,869 | $ 353 | $264,155 | $ (164,658) | $99,850 |
| Stock-based compensation expense | — | — | 3,002 | — | 3,002 |
| Repurchase and retirement of common stock | (62,761) | (1) | (502) | — | (503) |
| Exercise of common stock options, restricted stock awards, and other | 186,218 | 2 | 433 | — | 435 |
| Net loss | — | — | — | (4,313) | (4,313) |
| **Balance, March 31, 2006 (restated)** | 35,356,326 | $ 354 | $267,088 | $ (168,971) | $98,471 |

See accompanying notes to unaudited condensed consolidated financial statements

5

**Table of Contents**

**INPHONIC, INC. & SUBSIDIARIES**
**Unaudited Condensed Consolidated Statements of Cash Flows**
**(in thousands)**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2005 | 2006 |
| | | (restated) |
| Cash flows from operating activities: | | |
| Net loss | $ (6,994) | $ (4,313) |
| Adjustments to reconcile net loss to net cash provided (used) by operating activities: | | |
| Depreciation and amortization | 1,777 | 3,483 |
| Non-cash interest expense, net | 162 | 16 |
| Stock-based compensation | 7,004 | 2,882 |
| Changes in operating assets and liabilities, net of assets and liabilities received from business acquisition: | | |
| Accounts receivable | (9,975) | (690) |
| Inventory | (5,129) | (5,386) |
| Prepaid expenses | (1,316) | (1,012) |
| Other current assets | (197) | 4,006 |
| Deposits and other assets | (312) | (109) |
| Accounts payable | 3,387 | 8,432 |
| Accrued expenses and other liabilities | (1,594) | (5,878) |
| Deferred revenue | 3,703 | (206) |
| Net cash provided (used) in operating activities | (9,484) | 1,225 |
| Cash flows from investing activities: | | |
| Capitalized expenditures, including internal capitalized labor | (2,078) | (4,199) |
| Cash paid for acquisitions | (45) | — |
| Purchase of short-term investments | (4,967) | (5,000) |
| Proceeds from the sale of assets of discontinued operations | — | 794 |
| Reduction in restricted cash and cash equivalents | — | 400 |
| Net cash used in investing activities | (7,090) | (8,005) |
| Cash flows from financing activities: | | |
| Principal repayments on debt | (80) | (81) |
| Cash paid for repurchase of common stock | — | (502) |
| Proceeds from exercise of warrants and options | 647 | 434 |
| Net costs of initial public offering | (203) | — |
| Net cash provided (used) by financing activities | 364 | (149) |
| Net decrease in cash and cash equivalents | (16,210) | (6,929) |
| Cash and cash equivalents, beginning of the period | 100,986 | 70,783 |
| Cash and cash equivalents, end of the period | $ 84,776 | $63,854 |
| Supplemental disclosure of cash flows information: | | |
| Cash paid during the period for: | | |
| Interest | $ 62 | $ 260 |
| Income taxes | — | — |
| Supplemental disclosure of non-cash activities: | | |
| Issuance of common stock in business acquisition | $ 3,736 | $ — |
| Release of funds in escrow related to A1 Wireless acquisition | 10,700 | — |
| VMC earn-out consideration included in accrued liabilities | — | 2,985 |

See accompanying notes to unaudited condensed consolidated financial statements

6

**Table of Contents**

**(1)    The Company and Basis of Presentation**

    *(a)    Preparation of Interim Financial Statements*

        We have prepared the accompanying condensed consolidated financial statements pursuant to the rules and regulations of the U.S Securities and Exchange Commission (the "SEC") for interim financial reporting. The financial information included herein, other than the consolidated balance sheet as of December 31, 2005, has been prepared without audit. The consolidated balance sheet at December 31, 2005 has been derived from, but does not include all the disclosures contained in the audited financial statements for the year ended December 31, 2005. The preparation of consolidated financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of certain assets and liabilities, the disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reported period. In the opinion of management, these unaudited statements include all the adjustments and accruals necessary for a fair presentation of the results of the periods presented herein. These condensed consolidated financial statements should be read in conjunction with the consolidated financial statements and accompanying notes included in our Annual Report on Form 10-K for the year ended December 31, 2005. The results of operations for the interim periods presented are not necessarily indicative of the results that may be expected for a full year. Certain prior year amounts have been reclassified to conform to the current period presentation.

    *(b)    Business*

        We are a leading online seller of wireless services and devices based on the number of activations of wireless services sold online in the United States. We sell wireless service plans and devices, including satellite television services through our own branded websites; including Wirefly.com, A1 Wireless.com, and VMCsatellite.com and through websites that we create and manage for third parties. We offer marketers the ability to sell wireless voice and data services and devices under mobile virtual network enabler ("MVNE") agreements. This service utilizes the same e-commerce platform, operational infrastructure and marketing relationships that we use in our operations. We provide customers the ability to organize personal communication by providing real time wireless access to e-mail, voicemail, faxes, contacts, scheduling, calendar and conference calling functionality through a website or telephone.

    *(c)    Restatement*

        We have restated our consolidated financial statements to reflect the correction of an error in the application of revenue recognition of certain receivables. During the three months ended March 31, 2006, we had recorded $549 of revenue for certain commissions from features activations in which it was subsequently determined that collectibility was not reasonably assured. Additionally, prior to the restatement, we recognized $156 related to certain feature activation commissions in the three months ended September 30, 2006, which as a result of the restatement, we have concluded that we had met all revenue recognition criteria as of March 31, 2006. As a result, we reduced our revenue and accounts receivable by $393 for these adjustments. The impact of the restatement on the three months ended March 31, 2006 is shown in the table below:

| | March 31, 2006 (reported) | March 31, 2006 (adjustments) | March 31, 2006 (restated) |
|---|---|---|---|
| Accounts receivable | $  35,216 | $      (393) | $  34,823 |
| Total current assets | 134,914 | (393) | 134,521 |
| Total assets | 198,422 | (393) | 198,029 |
| Accumulated deficit | (168,578) | (393) | (168,971) |
| Total stockholders' equity | 98,864 | (393) | 98,471 |
| Total liabilities and stockholders' equity | 198,422 | (393) | 198,029 |

**Table of Contents**

| | For the three months ended | | |
|---|---|---|---|
| | 31-Mar<br>(reported) | 31-Mar<br>(adjustments) | 31-Mar<br>(restated) |
| **Revenue:** | | | |
| Activations and services | $67,135 | $ (393) | $66,742 |
| Total revenue | 87,371 | (393) | 86,978 |
| Operating loss | (4,246) | (393) | (4,639) |
| Loss from continuing operations | (3,955) | (393) | (4,348) |
| Net loss | (3,920) | (393) | (4,313) |
| **Net loss per share:** | | | |
| Net loss from continuing operations | (0.11) | (0.01) | (0.12) |
| Basic and diluted net loss per share | (0.11) | (0.01) | (0.12) |

| | For the three months ended | | |
|---|---|---|---|
| | 31-Mar<br>(reported) | 31-Mar<br>(adjustments) | 31-Mar<br>(restated) |
| **Cash flows from operating activities:** | | | |
| Net loss | $ (3,920) | $ (393) | $(4,313) |
| Accounts receivable | (1,083) | 393 | $ (690) |

*(d)* ***Risks and Uncertainties***

Our operations are subject to certain risks and uncertainties including, among others, actual and potential competition by entities with greater financial resources, rapid technological changes, the need to retain key personnel and protect intellectual property and the availability of additional capital financing on terms acceptable to us.

Since inception we have incurred net losses attributable to common stockholders of approximately $168,971. To date, management has relied on debt and equity financings to fund our operating deficit. While we currently have $68,854 of cash and cash equivalents and short-term investments on hand as of March 31, 2006, we may require additional financing to fund future operations.

*(e)* ***Acquisitions and Discontinued Operations***

We acquired certain assets and assumed certain liabilities of A1 Wireless USA, Inc. ("A1 Wireless") on January 4, 2005 and VMC Satellite, Inc. ("VMC") on April 26, 2005. We accounted for these transactions using the purchase method of accounting in accordance with Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations.* Accordingly our results of operations include the operating results of A1 Wireless effective January 1, 2005 and VMC as of the April 26, 2005 acquisition date.

On December 31, 2005, we completed the sale of substantially all of the operating assets of our mobile virtual network operator ("MVNO") Liberty Wireless ("Liberty") to Teleplus Wireless Corp, a subsidiary of Teleplus Enterprises, Inc. The Liberty sale has enabled us to streamline and focus our resources on our other operations including the growth of our MVNE . The sale of Liberty was recorded as a discontinued operation in the financial statements pursuant to SFAS No. 144, *Accounting for Impairment or Disposal of Long Lived Assets.*

8

Table of Contents

(2)   **Summary of Significant Accounting Policies**

(a)   *Revenue Recognition*

*Activations and Services Revenue*

We recognize revenue from the sale of wireless services and the provisioning of MVNE and data services.

*Wireless Services:* We generate revenue from wireless carriers, including a satellite television carrier, who pay commissions and volume and performance-based bonuses, for activating wireless subscribers. We recognize commissions from wireless carriers upon shipment of activated devices to the customer. In addition to activation commissions certain carriers pay us a monthly residual fee either for as long as a customer who we activate for that carrier continues to be its subscriber, or for a fixed period of time depending on the carrier. We purchase satellite activation certificates evidencing activation rights in advance of their resale to customers. Revenue from satellite television customers includes sales of these satellite activation certificates, net of the certificate cost, as we are acting as an agent in the transaction. Our wireless revenue is reduced for estimated deactivations of customers prior to the expiration of a time period that ranges 120 to 210 days from the date of activation, depending on the wireless carrier. We estimate deactivations based on historical experience, which we developed based on our experience with carriers, customer behavior and sources of customers, among other factors, allowing us to accrue estimates with what we believe is a high degree of certainty. If we determine that we cannot accurately predict future deactivation experience, we may be required to defer 100% of our carrier commissions revenue until the expiration of the appropriate chargeback period. Our reserves for deactivations are included in accounts receivables and deferred revenue on the accompanying balance sheets.

In addition to receiving commissions for each wireless subscriber activated, we earn performance bonuses from the wireless carriers based on negotiated performance targets. The most significant bonus we earn is the quarterly volume bonus, which we bill wireless carriers for on a monthly basis, based on current month activations. We record these bonuses as deferred revenue at the time of billing until we achieve the quarterly targets. We also earn other quarterly bonuses from certain carriers for maintaining low customer churn and signing up customers for certain additional monthly "features" such as text messaging or data service. Wireless carriers also periodically offer bonuses for achieving monthly volume and other performance targets. We recognize these monthly bonuses as earned in accordance with the provisions of Staff Accounting Bulletin ("SAB") No. 104, *Revenue Recognition in Financial Statements* . Revenue is recognized only when all of the following criteria are met: (1) persuasive evidence of an arrangement exists, (2) delivery has occurred or services have been rendered, (3) the seller's price to the buyer is fixed or determinable, and (4) collectibility is reasonably assured. Amounts collected in cash prior to meeting the above criteria are recorded as deferred revenue. Through 2005, commission revenue earned from the activation of carrier features had been deferred until the contractual chargeback period had lapsed. Beginning in 2006, we began to estimate commission revenue earned from feature activations based on historical experience which we have developed based on our experience with carriers and customer behavior over a period of time in excess of 24-months. This allows us to accrue estimates with what we believe is a high degree of certainty in accordance with SAB 104. Activation and service revenue included $669 as a result of this change.

*MVNE Services:* We offer marketers the ability to sell wireless services to their customers under their own brands using our e-commerce platform and operational infrastructure through MVNE contracts. We receive fees for the development of the network platform, as well as for operational support services. We defer the fees attributable to the production of the network platform and recognize these fees and costs over the expected life of the agreement (typically 12 to 48 months). Prepaid fees are deferred until all revenue criteria have been satisfied. Deferred revenue as of December 31, 2005 and March 31, 2006 included $1,852 and $1,918, respectively, from MVNE contracts.

*Data Services:* We sell data services, including a service that allows customers to access email, voicemail, facsimiles, contacts and personal calendar information through a website or a telephone; wireless email; and mobile marketing services. We bill customers and recognize revenue monthly, as the services are performed.

*Equipment Revenue*

Revenue from the sale of wireless devices and accessories in a multiple-element arrangement with services are recognized at the time of sale in accordance with *Emerging Issues Task Force* EITF No. 00-21, *Revenue Arrangements with Multiple Deliverables,* when fair value of the services element exists. Customers have the right to return devices within a specific period of time or usage, whichever occurs first. We provide an allowance for estimated returns of devices based on historical experience. In accordance with the provisions of SAB

9

Table of Contents

No. 104, we determined we have sufficient operating history to estimate equipment returns. In connection with wireless activations, we sell customers wireless devices at a significant discount, which is generally in the form of a rebate. Rebates are recorded as a reduction of revenue. We recognize equipment revenue, less a reserve for customer rebates (accrued consumer liabilities), which is based on historical experience of rebates claimed. Future experience could vary based upon rates of consumers redeeming rebates.

**(b)  Concentrations of Credit Risk**

Financial instruments that potentially subject us to a concentration of credit risk consist principally of accounts receivable. We extend credit to wireless network carriers ("carriers") on an unsecured basis in the normal course of business. Three carriers accounted for 67% and 70% of accounts receivable, net of the deactivation reserve, as of December 31, 2005 and March 31, 2006, respectively.

For the three months ended March 31, 2005 and 2006, revenue from three carriers exceeded 10% of our total revenue. Revenue as a percentage of total revenue for these carriers was as follows:

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2005 | 2006 |
| Customer A | 24% | 35% |
| Customer B | 24% | 16% |
| Customer C | 22% | 15% |
| Total | 70% | 66% |

**(c)  Accrued Expenses and Other Liabilities**

Accrued expenses and other liabilities at December 31, 2005 and March 31, 2006 consisted of:

|  | As of | |
| --- | --- | --- |
|  | December 31, 2005 | March 31, 2006 |
| Accrued consumer liabilities | $ 18,289 | $15,478 |
| Accrued payroll and related expenses | 1,452 | 1,073 |
| Accrued acquisition costs and severance costs | 5,063 | 7,769 |
| Accrued taxes payable | 593 | 389 |
| Other | 6,191 | 4,748 |
|  | $ 31,588 | $29,457 |

**(d)  Restructuring Costs**

We implemented a restructuring plan in the first quarter of 2005 following the acquisition of A1 Wireless, to take advantage of synergies gained through the acquisition and to restructure our operations for efficiency purposes. For the three months ended March 31, 2005, we recognized $149 in restructuring costs, all of which related to workforce reduction. All costs related to this plan were paid out in 2005.

**(e)  Stock-Based Compensation**

We adopted Statement of Financial Accounting Standards "SFAS" No. 123 (revised 2004), *Share Based Payment* (SFAS No. 123(R)) on January 1, 2006 using the modified prospective application method ("MPA"). SFAS No. 123(R) established standards for the accounting for transactions in which an entity exchanges its equity instruments for goods or services. SFAS No. 123(R) requires us to measure the cost of employee services received in exchange for an award of equity instruments (usually stock options or unvested (restricted) stock awards) based on the grant-date fair value of the award. That cost is recognized over the period during which an employee is required to provide service in exchange for the award – the requisite service period (usually the vesting period).

Prior to our adoption of SFAS No. 123(R), we applied the intrinsic value method of accounting for employee stock-based compensation as prescribed by Accounting Principles Board ("APB") Opinion No. 25, *Accounting for Stock Issued to Employees,* and related interpretations including FASB Interpretation ("FIN") No. 44, *Accounting for Certain Transactions involving Stock Compensation an Interpretation of APB Opinion No. 25* , to account for our stock option grants to employees. Under this method, compensation expense was

Table of Contents

recorded on the date of the grant only if the current market price of the underlying stock exceeded the exercise price. SFAS No. 123, *Accounting for Stock-Based Compensation* ("SFAS No. 123"), established accounting and disclosure requirements using a fair value-based method of accounting for stock-based employee compensation plans. As permitted by SFAS No. 123, we had elected to continue to apply the intrinsic value-based method of accounting described above, and had adopted the disclosure requirements of SFAS No. 123. All shares of restricted stock awarded to employees were accounted for at fair value in accordance with SFAS No. 123.

Under the MPA method, compensation cost for all share-based payments granted prior to, but not vested as of December 31, 2005, is based on the grant date fair value estimated in accordance with the pro forma provisions of SFAS No. 123, and compensation cost for all share based payments granted subsequent to December 31, 2005, will be based on the grant date fair value estimated in accordance with the provisions of SFAS No.123(R). Results for prior periods have not been restated. We use the ratable method of attributing the value of stock-based compensation to expense. SFAS No. 123(R) requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. In our pro forma information required under SFAS No. 123 for the periods prior to January 1, 2006, we accounted for forfeitures as they occurred. The fair value of each option granted is estimated on the grant date using the Black-Scholes option pricing model which takes into account as of the grant date the exercise price and expected life of the option, the current price of the underlying stock and its expected volatility, expected dividends on the stock and the risk-free interest rate for the term of the option.

*Stock Options* – We have two stock plans under which we have issued or may issue options to purchase shares of our common stock. The 1999 Stock Incentive Plan (the "1999 Plan"), provided for grants of stock-based awards from time to time to employees, officers, directors and consultants of the Company at exercise prices determined by the board of directors. Options granted under the 1999 Plan generally vest over a four-year period and expire ten years from the grant date. As of November 19, 2004, no additional options were available for grant under the 1999 Plan due to the adoption of the 2004 Equity Incentive Plan (the "2004 Plan").

The 2004 Plan allows for grants of stock-based awards from time to time to employees, officers, directors and consultants at exercise prices determined by the board of directors. For incentive stock options, the exercise price must be at least equal to fair market value at the date of grant. For nonqualified stock options, the option may be granted with an exercise price less than fair market value. Options granted under the 2004 Plan vest over a period to be determined by the administrator, generally four years, and expire ten years from the grant date.

For the three months ended March 31, 2006 as a result of our adoption of SFAS No. 123 (R), we recognized stock-based compensation expense related to employee options granted prior to January 1, 2006 of $1,899 of which $148 was capitalized in accordance with our compensation policies and SFAS No. 123(R).

In addition on March 22, 2006, we granted options to certain of our employees to purchase 679,900 shares of our common stock at an exercise price of $6.46 per share. The grant date fair value of employee share options was estimated using the Black Scholes option-pricing model with the following assumptions: an expected life averaging 5.77 years; an average volatility of 72%; no dividend yield; and a risk-free interest rate averaging 4.69%. The weighted average fair value per share of options granted was $4.28. Compensation cost of the grant was reduced by an estimated forfeiture amount based on an annual experience rate of 9.93%. As of the date of grant, total compensation cost related to the grant including estimated forfeitures was approximately $2,324. Stock-based compensation expense for this grant for the three months ended March 31, 2006 was $29.

The impact of adopting SFAS No. 123(R) increased stock-based compensation expense included in our operating expenses and reduced net income from continuing operations by approximately $850 for the three months ended March 31, 2006 or $0.02 per basic and diluted share. There was no impact from the adoption on cash flow from operations or cash flows from financing activities.

11

Table of Contents

The following table summarizes the activity for stock options granted to employees and non-employees for the three months ended March 31, 2006.

| | Number of options | Weighted average exercise price | Weighted average contractual term | Aggregate intrinsic value |
|---|---|---|---|---|
| Balance January 1, 2006 | 5,115,969 | $ 9.47 | | |
| Granted | 679,900 | 6.46 | | |
| Exercised | (93,409) | 5.07 | | |
| Forfeited | (151,929) | 13.06 | | |
| Balance March 31, 2006 | 5,550,531 | $ 9.06 | 8.17 | $ 4,870 |
| Ending vested & expected to vest | 5,119,324 | $ 9.02 | 8.09 | $ 4,603 |
| Exercisable at March 31, 2006 | 2,406,746 | $ 8.13 | 7.28 | $ 2,590 |

The weighted-average grant date fair value of options granted during the three months ended March 31, 2006 was $4.28. The total intrinsic value of options exercised during the three months ended March 31, 2006 was $139.

*Restricted Common Stock* – During the three months ended March 31, 2006, we granted 462,709 shares of restricted common stock to certain of our key employees. The restrictions on this common stock lapse and the stock vests over periods ranging up to 4 years from the grant date. The following table summarizes the activity for restricted stock for the three months ended March 31, 2006.

| | Number of restricted stock awards | Weighted-average grant-date fair value |
|---|---|---|
| Nonvested at January 1, 2006 | 1,137,878 | $ 16.48 |
| Granted | 462,709 | 6.46 |
| Vested | (92,809) | 16.83 |
| Surrendered for taxes | (4,710) | 13.31 |
| Forfeited | (63,067) | 20.04 |
| Nonvested at March 31, 2006 | 1,440,001 | $ 13.23 |

As of March 31, 2006, there was approximately $12,200 of total unrecognized compensation cost related to restricted share-based compensation arrangements. That cost is expected to be recognized over a weighted-average period of 1.65 years. The total fair value of shares vested during the three months ended March 31, 2006 was approximately $1,600.

*Warrants* – During the three month period ended March 31, 2006, we did not grant any warrants to purchase shares of our common stock. Warrants outstanding at March 31, 2006, were exercisable for 787,863 shares of our common stock.

Our pro forma net loss per common share, basic and diluted, for the three months ended March 31, 2005 was as follows:

| | Three Months Ended March 31, 2005 |
|---|---|
| Net loss as reported | $ (6,994) |
| Add: Stock-based employee compensation expense included in net loss as reported | 6,643 |
| Less: Total stock-based employee compensation determined under fair value based methods for all stock awards, net of related tax effects | (2,518) |
| Pro forma net loss | $ (2,869) |
| Net loss per common share, basic and diluted, as reported | $ (0.21) |
| Net loss per common share, basic and diluted, pro forma | $ (0.09) |
| Basic and dilutive weighted average common shares outstanding | 32,901,398 |

12

Stock-based compensation which includes compensation recognized on stock option grants and restricted stock awards has been included in the following line items in the accompanying condensed consolidated financial statements. There was no tax benefit recognized in the statements of operations for stock-based awards in either period:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2005 | 2006 |
| Balance Sheets: | | |
| Property and equipment, net | $ — | $ 148 |
| Statements of operations: | | |
| Sales and marketing | 596 | 719 |
| General and administrative | 6,345 | 2,163 |
| Income from discontinued operations | 63 | — |
| | $ 7,004 | $ 2,882 |

*(f)* *Net Loss per Share*

We calculate net loss per share in accordance with SFAS No. 128, *Earnings Per Share* . Basic net loss per common share excludes any dilutive effects of options, warrants, restricted stock and convertible securities and is calculated by dividing net loss attributable to common stockholders by the weighted average number of common shares issuable and outstanding for the period. Diluted net loss per common share equals basic net loss per common share, as the effects of options, warrants, restricted stock and convertible securities will be anti-dilutive.

The following table reconciles net loss and basic and diluted weighted average common shares outstanding to the historical or pro forma net loss and the pro forma basic and diluted weighted average common shares outstanding for the three months ended March 31, 2005 and 2006.

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2005 | restated 2006 |
| Net loss from continuing operations | $ (7,418) | $ (4,348) |
| Net income from discontinued operations | 424 | 35 |
| Net loss | $ (6,994) | $ (4,313) |
| Weighted average shares outstanding | 32,901,398 | 35,348,335 |
| Basic and diluted earnings per share: | | |
| Net loss from continuing operations | $ (0.22) | $ (0.12) |
| Net income from discontinued operations | 0.01 | 0.00 |
| Basic and diluted earnings per share | $ (0.21) | $ (0.12) |
| Anti dilutive weighted average shares excluded from diluted loss per share | 8,149,335 | 1,348,878 |

**(3)    Discontinued Operations**

On December 31, 2005, we completed the sale of substantially all of the operating assets of our Liberty Wireless business. During the three months ended March 31, 2006 we collected $794 of notes receivable recorded at December 31, 2005 related to the divestiture.

Summary of operating results for the discontinued operations are as follows:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2005 | 2006 |
| Revenue | $ 8,456 | $ — |
| Costs and expenses | (8,032) | 35 |
| Income from discontinued operations | $ 424 | $ 35 |

Table of Contents

Balance sheet data included:

|  | As of | |
| --- | --- | --- |
|  | December 31, 2005 | March 31, 2006 |
| Accounts and notes receivable, net | $ 1,848 | $ 1,527 |
| Other current assets | 582 | — |
| Assets of discontinued operations | $ 2,430 | $ 1,527 |
| Accounts payable | $ 931 | $ 199 |
| Other accrued expenses | 2,199 | 1,482 |
| Liabilities of discontinued operations | $ 3,130 | $ 1,681 |

**(4)  Intangible Assets and Goodwill**

*(a)  Acquired Intangible Assets*

We amortize intangible assets on a straight-line basis over periods ranging from one to ten years. Supplier relationships and trade name have indefinite lives. Amortized intangible assets comprised the following:

|  | December 31, 2005 | | |
| --- | --- | --- | --- |
|  | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Software and technology | $ 1,123 | $ 1,045 | $ 78 |
| Customer contracts | 885 | 885 | — |
| Affiliate and carrier relationships | 3,960 | 676 | 3,284 |
| Non-compete agreement | 5,049 | 1,431 | 3,618 |
| Supplier relationships | 3,730 | — | 3,730 |
| Trade name | 1,110 | — | 1,110 |
| Other | 1,935 | 1,104 | 831 |
| Total | $ 17,792 | $ 5,141 | $12,651 |

|  | March 31, 2006 | | |
| --- | --- | --- | --- |
|  | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Software and technology | $ 90 | $ 16 | $ 74 |
| Affiliate and carrier relationships | 3,960 | 874 | 3,086 |
| Non-compete agreement | 5,049 | 1,993 | 3,056 |
| Supplier relationships | 3,730 | — | 3,730 |
| Trade name | 1,110 | — | 1,110 |
| Other | 1,935 | 1,385 | 550 |
| Total | $15,874 | $ 4,268 | $11,606 |

The following table reflects the changes to goodwill for the three months ended March 31, 2006.

| | |
| --- | --- |
| Balance as of December 31, 2005 | $31,140 |
| Goodwill arising from VMC earn-out [1] | 2,985 |
| Balance as of March 31, 2006 | $34,125 |

(1)  We achieved the earn-out performance target stipulated in the VMC Asset Purchase Agreement on February 28, 2006 and accordingly recorded additional goodwill of $2,985. The earn-out consideration consisted of amounts that will be payable in cash of $2,363 and 119,389 shares of our common stock with a fair value of $622. Such consideration was reflected in accrued expenses and other liabilities in the accompanying balance sheet at March 31, 2006. We distributed the cash consideration and shares of common stock in April 2006.

14

Table of Contents

**(5)   Debt**

We maintain a revolving operating line of credit which allows for aggregate borrowings of up to $25,000 subject to certain limits based on accounts receivable and inventory levels. At March 31, 2006 and December 31, 2005, there was $15,000 outstanding under this line of credit. As of March 31, 2006, we have an additional $176 of availability under the line of credit based on the limits described above. The line of credit expires effective January 1, 2007 and accordingly the outstanding balance has been classified as a current liability as of March 31, 2006. Borrowings outstanding under the line of credit are secured by substantially all of the company's assets. Under the terms of our line of credit facility we are required to maintain a current ratio, as defined, of no less than 1.1 to 1. We are also required to maintain an unrestricted cash balance of no less than $10,000 held at the bank and to meet certain minimum levels of EBITDA, as defined. As of March 31, 2006, we were in compliance with the EBITDA covenant under the credit facility.

**(6)   Repurchase of Common Stock**

On August 17, 2005, our Board of Directors authorized the repurchase of up to $30,000 of our common stock through August 2006. The shares may be repurchased by us from time to time at prevailing market prices. The timing and amount of any shares repurchased are based on market conditions and other factors. Repurchases may also be made under a Rule 10b5-1 plan, which permits shares to be repurchased when we might otherwise be precluded from doing so by laws prohibiting insider trading or by self imposed trading black out periods. There is no guarantee as to the exact number of shares that will be repurchased under the stock repurchase program, and we may discontinue purchases at any time. We intend to fund our share repurchases with cash on hand and cash generated from future operations. During the three months ended March 31, 2006, we repurchased 62,761 shares of our common stock at an average price of $8.01 per share for approximately $502. All shares repurchased were returned to the status of authorized but unissued shares of common stock as of March 31, 2006. Since the inception of this program, we have repurchased 1,144,248 shares for an aggregate consideration of $13,591.

**(7)   Commitments and Contingencies**

*Legal Matters*

We are subject to litigation, claims and assessments in the normal course of business including those arising from asset acquisitions or business combinations. We do not believe that any existing or anticipated litigation, claims or assessments will have a material effect on our consolidated financials statements.

On August 5, 2004, Avesair, Inc., a company whose assets we acquired, filed suit against us demanding, among other matters, that we issue to Avesair shares of our common stock valued at approximately $4,000 as of June 30, 2004. The stock demanded by Avesair represents the maximum value of shares that they could have earned for achieving certain performance-based targets under the asset purchase agreement. We believe the performance-based targets were not achieved and intend to vigorously contest this matter.

On July 25, 2005, the Federal Communications Commission ("FCC") issued a Notice of Apparent Liability, asserting that we registered with the FCC and reported and contributed to the Universal Service Fund ("USF") and the Telecommunications Relay Service Fund later than required by FCC rules. The FCC has preliminarily proposed to fine us approximately $820 for late payment of such fees. In a letter dated August 24, 2005 we responded to the FCC's preliminary finding and asserted that no fine is appropriate under the circumstances. However, any adverse resolution of this matter could have a material adverse impact on our financial results.

15

Table of Contents

## ITEM 4.    CONTROLS AND PROCEDURES

### Disclosure Controls and Procedures

Management had previously concluded that our disclosure controls and procedures were effective as of March 31, 2006. However, in connection with the restatement of our March 31, 2006, June 30, 2006 and September 30, 2006 interim financial statements as fully described in Note 1 of this Form 10-Q/A, management determined that the material weaknesses described below existed as of March 31, 2006. Accordingly, our Chief Executive Officer and Chief Accounting Officer have now concluded that disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) were not effective as of March 31, 2006 to ensure information required to be disclosed by us in the reports we file or submit under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified within the SEC's rules and forms and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Accounting Officer, as appropriate, to allow timely decisions regarding required disclosure.

Not withstanding the material weaknesses described below, management believes the condensed consolidated financial statements included in this Quarterly Report on Form 10-Q/A fairly present in all material respects our financial condition, results of operations and cash flows for all periods presented.

A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood, that a material misstatement of the annual or interim quarterly financial statements will not be prevented or detected. Management identified material weaknesses in our internal controls including the following:

- *We did not maintain sufficient staffing of operational and financial resources.* We did not maintain staffing in operational and financial resources sufficient to provide the level of controls and analysis required on a timely basis in light of the increasing complexity and growth of our business. This resulted in certain accounting processes and controls not being performed on a timely basis and the inability to maintain an adequate control environment, resulting in numerous material adjusting entries being made after year end. This material weakness contributed to errors such as those relating to proper revenue recognition and accounts receivable described below.

- *We did not always effectively communicate information to our finance department* . Specifically, we failed to maintain effective communication channels to adequately identify and record certain transactions during 2006. The failure to provide this communication contributed to errors relating to accounting and reporting of expenses and liabilities. This material weakness caused or contributed to, adjustments necessary to appropriately record accounts receivable allowances and reserves for deactivations described below .

- *We did not maintain effective controls over the recordation, accuracy and completeness of activations and services revenue and related accounts receivable.*

  We did not take steps to adequately identify and appropriately record certain commission and bonus revenue received during the year from various wireless carriers in a timely and accurate manner. Recording amounts received from carriers in the appropriate accounts in a timely and accurate manner is an important business process control that is essential to the correct reporting of amounts in the financial statements. This material weakness contributed to errors relating to accounting and reporting for revenue and accounts receivable.

  We did not utilize an appropriate methodology during the year in recording receivables from wireless carriers associated with disputed deactivations, churn bonuses and other carrier related fees. We overstated accounts receivable by using a methodology that anticipated future improvements in collections beyond that supported by past experience, and which did not consider certain current factors and other information. As a result of this material weakness, an adjustment was necessary to properly record revenue and related receivables from these fees.

These material weaknesses resulted in adjustments to our revenue and accounts receivable and certain other financial statement line items as referred to above and resulted in the restatement of previously issued consolidated financial statements for the three month period ended March 31, 2006.

### Internal Controls over Financial Reporting

With the exception of the items described above, there have been no changes in our internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting for this current period.

16

**Table of Contents**

**PART II**

**ITEM 6.    EXHIBITS**

| Exhibit No. | Description |
| --- | --- |
| 31.1 | Rule 13a-14(a) Certification of Principal Executive Officer. |
| 31.2 | Rule 13a-14(a) Certification of Principal Financial Officer. |
| 32.1 | Section 1350 Certification of Chief Executive Officer. |
| 32.2 | Section 1350 Certification of Chief Financial Officer. |

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

INPHONIC, INC.

By: _____/S/ D AVID A. S TEINBERG_____

**David A. Steinberg**
**Chairman of the Board and**
**Chief Executive Officer**

By: _____/S/ K ENNETH D. S CHWARZ_____

**Kenneth D. Schwarz**
**Executive Vice President and**
**Chief Financial Officer**

Date: August 10, 2007

18

**CERTIFICATION PURSUANT TO
SECTION 302 OF
THE SARBANES-OXLEY ACT OF 2002**

I, David A. Steinberg, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q, as amended for the period ended March 31, 2006 of InPhonic, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: August 10, 2007

/s/ David A. Steinberg
David A. Steinberg
Chairman of the Board and Chief Executive Officer

**CERTIFICATION PURSUANT TO**
**SECTION 302 OF**
**THE SARBANES-OXLEY ACT OF 2002**

I, Kenneth D. Schwarz, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q, as amended for the period ended March 31, 2006 of InPhonic, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: August 10, 2007

/s/ Kenneth D. Schwarz
Kenneth D. Schwarz
Executive Vice President and Chief Financial Officer

**Certification of Principal Executive Officer**
**Pursuant to 18 U.S.C. 1350**
**(Section 906 of the Sarbanes-Oxley Act of 2002)**

I, David A. Steinberg, Chairman and Chief Executive Officer (principal executive officer) of InPhonic, Inc. (the "Registrant"), certify that to the best of my knowledge, based upon a review of the Quarterly Report on Form 10-Q, as amended for the period ended March 31, 2006 of the Registrant (the "Report"):

(1)    The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934, as amended; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant.

/s/ David A. Steinberg
Name: David A. Steinberg
Date:   August 10, 2007

**Certification of Principal Financial Officer**
**Pursuant to 18 U.S.C. 1350**
**(Section 906 of the Sarbanes-Oxley Act of 2002)**

I, Kenneth D. Schwarz, Executive Vice President and Chief Financial Officer (principal financial officer) of InPhonic, Inc. (the "Registrant"), certify that to the best of my knowledge, based upon a review of the Quarterly Report on Form 10-Q, as amended for the period ended March 31, 2006 of the Registrant (the "Report"):

(1)    The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934, as amended; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant.

/s/ Kenneth D. Schwarz
Name:  Kenneth D. Schwarz
Date:    August 10, 2007

# EXHIBIT CC

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

## Form 10-Q/A
### (Amendment No. 2)

---

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES AND EXCHANGE ACT OF 1934**

**For the quarter ended June 30, 2006**

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____.**

### Commission File Number 000-51023

---

# INPHONIC, INC.
### (Exact name of Registrant as specified in its Charter)

---

| | |
|---|---|
| **Delaware** | **52-2199384** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer identification no.) |
| **1010 Wisconsin Avenue, Suite 600, Washington, DC** | **20007** |
| (Address of principal executive offices) | (Zip Code) |

### Registrant's telephone number, including area code: (202) 333-0001

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒ .   No ☐ .

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐     Accelerated filer ☒     Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act.).   Yes ☐ .   No ☒ .

The registrant had 36,157,751 shares of common stock outstanding as of August 1, 2006.

Table of Contents

## EXPLANATORY NOTE

We filed our Quarterly Report on Form 10-Q for the three and six months ended June 30, 2006 with the Securities and Exchange Commission (the "SEC") on August 9, 2006. We filed Amendment No. 1 on Form 10-Q/A on June 1, 2007 to amend and restate our unaudited financial statements for the three and six months ended June 30, 2006 and related footnote disclosures to correct errors in our accounting for activations and services revenue identified during the year-end audit. We are filing this Amendment No. 2 on Form 10-Q/A to further clarify those disclosures in Note 1(c) to our unaudited condensed consolidated financial statements regarding the restatement of the unaudited financial statements for the three and six months ended June 30, 2006 and to clarify our disclosure of changes in internal control in accordance with Item 308(c) of Regulation S-K.

This Amendment No. 2 to our Quarterly Report on Form 10-Q for the three and six months ended June 30, 2006 amends only the following items:

Part I, Item 1 – Financial Statements

Part I, Item 4 – Controls and Procedures

Part II, Item 6 – Exhibits

## INPHONIC, INC.

## INDEX

## FORM 10-Q/A

## PART I. – FINANCIAL INFORMATION

| | | Page |
|---|---|---|
| Item 1. | Financial Statements | 3 |
| | Unaudited Condensed Consolidated Balance Sheets at December 31, 2005 and June 30, 2006 | 3 |
| | Unaudited Condensed Consolidated Statements of Operations for the Three and Six Months Ended June 30, 2005 and June 30, 2006 | 4 |
| | Unaudited Condensed Consolidated Statements of Stockholders' Equity for the Six Months Ended June 30, 2006 | 5 |
| | Unaudited Condensed Consolidated Statements of Cash Flows for the Six Months Ended June 30, 2005 and June 30, 2006 | 6 |
| | Notes to Unaudited Condensed Consolidated Financial Statements | 7 |
| Item 4. | Controls and Procedures | 19 |

## PART II. – OTHER INFORMATION

| | | |
|---|---|---|
| Item 6. | Exhibits | 20 |
| **SIGNATURES** | | 21 |

2

## PART I

ITEM 1.    FINANCIAL STATEMENTS

### INPHONIC, INC.
#### Condensed Consolidated Balance Sheets
#### (in thousands, except per share and share amounts)

| | December 31, 2005 | June 30, 2006 (restated) (unaudited) |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 70,783 | $ 47,411 |
| Short-term investments | — | 5,000 |
| Accounts receivable, net of allowance of $2,042 and $1,045, respectively | 34,606 | 56,672 |
| Inventory, net | 17,693 | 21,147 |
| Prepaid expenses | 2,405 | 4,741 |
| Deferred costs and other current assets | 6,823 | 2,532 |
| Current assets of discontinued operations | 2,430 | 597 |
| Total current assets | 134,740 | 138,100 |
| Restricted cash and cash equivalents | 400 | — |
| Property and equipment, net | 12,121 | 16,154 |
| Goodwill | 31,140 | 34,124 |
| Intangible assets, net | 12,651 | 10,721 |
| Deposits and other assets | 3,058 | 6,568 |
| Total assets | $ 194,110 | $ 205,667 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Current maturities of long-term debt and capital leases | $ 377 | $ 15,384 |
| Accounts payable | 29,556 | 51,524 |
| Accrued expenses and other liabilities | 31,588 | 25,489 |
| Current portion of deferred revenue | 13,851 | 9,858 |
| Current liabilities of discontinued operations | 3,130 | 1,601 |
| Total current liabilities | 78,502 | 103,856 |
| Long-term debt and capital lease obligations, net of current maturities | 15,474 | 406 |
| Deferred revenue, net of current portion | 284 | 599 |
| Total liabilities | 94,260 | 104,861 |
| Stockholders' equity: | | |
| Common stock, $0.01 par value | | |
| Authorized 200,000,000 shares at December 31, 2005 and June 30, 2006; issued and outstanding 35,232,869 and 36,106,153 shares at December 31, 2005 and June 30, 2006, respectively | 353 | 360 |
| Additional paid-in capital | 264,155 | 278,993 |
| Accumulated deficit | (164,658) | (178,547) |
| Total stockholders' equity | 99,850 | 100,806 |
| Total liabilities and stockholders' equity | $ 194,110 | $ 205,667 |

See accompanying notes to unaudited condensed consolidated financial statements

3

Table of Contents

**INPHO NIC, INC.**
**Unaudited Condensed Consolidated Statements of Operations**
**(in thousands, except per share and share amounts)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2005 | 2006 (restated) | 2005 | 2006 (restated) |
| Revenue: | | | | |
| Activations and services | $ 55,452 | $ 74,216 | $ 105,203 | $ 140,958 |
| Equipment | 19,774 | 17,912 | 38,174 | 38,148 |
| Total revenue | 75,226 | 91,128 | 143,377 | 179,106 |
| Cost of revenue, exclusive of depreciation and amortization: | | | | |
| Activations and services | 286 | 1,065 | 1,459 | 1,325 |
| Equipment | 41,718 | 50,510 | 80,668 | 98,431 |
| Total cost of revenue | 42,004 | 51,575 | 82,127 | 99,756 |
| Operating expenses: | | | | |
| Sales and marketing, exclusive of depreciation and amortization | 19,827 | 27,408 | 37,325 | 54,130 |
| General and administrative, exclusive of depreciation and amortization | 12,299 | 16,908 | 28,577 | 30,139 |
| Depreciation and amortization | 2,142 | 3,960 | 3,919 | 7,443 |
| Restructuring costs | 245 | 1,906 | 394 | 1,906 |
| Investment write-off | 228 | — | 228 | — |
| Total operating expenses | 34,741 | 50,182 | 70,443 | 93,618 |
| Operating loss | (1,519) | (9,629) | (9,193) | (14,268) |
| Other income (expense): | | | | |
| Interest income | 545 | 547 | 1,027 | 1,174 |
| Interest expense | (188) | (288) | (414) | (624) |
| Total other income | 357 | 259 | 613 | 550 |
| Loss from continuing operations | (1,162) | (9,370) | (8,580) | (13,718) |
| Discontinued operations: | | | | |
| Loss from discontinued operations | (490) | (206) | (66) | (171) |
| Net loss | $ (1,652) | $ (9,576) | $ (8,646) | $ (13,889) |
| Basic and diluted net loss per share: | | | | |
| Net loss from continuing operations | $ (0.04) | $ (0.26) | $ (0.26) | $ (0.38) |
| Net loss from discontinued operations | (0.01) | (0.01) | (0.00) | (0.01) |
| Basic and diluted net loss per share | $ (0.05) | $ (0.27) | $ (0.26) | $ (0.39) |
| Basic and diluted weighted average shares outstanding | 33,847,007 | 35,856,253 | 33,380,156 | 35,529,454 |

See accompanying notes to unaudited condensed consolidated financial statements

4

Table of Contents

## INPHONIC, INC.
### Unaudited Condensed Consolidated Statements of Stockholders' Equity
### (in thousands, except share amounts)

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total |
| --- | --- | --- | --- | --- | --- |
| | Shares | Amount | | (restated) | |
| **Balance, December 31, 2005** | 35,232,869 | $ 353 | $264,155 | $ (164,658) | $ 99,850 |
| Stock-based compensation expense | — | — | 7,511 | — | 7,511 |
| Issuance of common stock in connection with the acquisition and earnouts of: | | | | | |
| A1 Wireless, Inc. | 15,408 | — | 235 | — | 235 |
| VMC Satellite, Inc. | 482,146 | 5 | 3,617 | — | 3,622 |
| Issuance of common stock warrant | — | — | 3,228 | — | 3,228 |
| Repurchase and retirement of common stock | (62,761) | (1) | (502) | — | (503) |
| Exercise of common stock options, restricted stock awards and other | 438,491 | 3 | 749 | — | 752 |
| Net loss | — | — | — | (13,889) | (13,889) |
| **Balance, June 30, 2006 (restated)** | 36,106,153 | $ 360 | $278,993 | $ (178,547) | $100,806 |

See accompanying notes to unaudited condensed consolidated financial statements

5

Table of Contents

## INPHONIC, INC.
### Unaudited Condensed Consolidated Statements of Cash Flows
### (in thousands)

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2005 | 2006 (restated) |
| **Cash flows from operating activities:** | | |
| Net loss | $ (8,646) | $(13,889) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 3,919 | 7,443 |
| Non-cash sales and marketing expense related to common stock warrant | — | 135 |
| Non-cash interest expense, net | 324 | — |
| Stock-based compensation | 9,796 | 7,110 |
| Non-cash write-off of investment | 228 | — |
| Changes in operating assets and liabilities, net of assets and liabilities received from business acquisition: | | |
| Accounts receivable | (20,542) | (21,925) |
| Inventory | (6,931) | (3,454) |
| Prepaid expenses | (741) | (2,336) |
| Deferred costs and other assets | 164 | 4,295 |
| Deposits and other assets | (439) | 161 |
| Accounts payable | 7,376 | 21,037 |
| Accrued expenses and other liabilities | 4,117 | (2,722) |
| Deferred revenue | 2,137 | (3,678) |
| Net cash used in operating activities | (9,238) | (7,823) |
| **Cash flows from investing activities:** | | |
| Capitalized expenditures, including internal capitalized labor | (6,026) | (8,874) |
| Cash paid for acquisitions | (6,269) | (3,028) |
| Cash paid for intangible assets | (2,439) | (193) |
| Purchase of short-term investments | (17,860) | (5,000) |
| Proceeds from the sale of assets of discontinued operations | — | 1,110 |
| Reduction in restricted cash and cash equivalents | — | 400 |
| Net cash used in investing activities | (32,594) | (15,585) |
| **Cash flows from financing activities:** | | |
| Principal repayments on debt | (146) | (213) |
| Cash paid for repurchase of common stock | — | (503) |
| Proceeds from exercise of warrants and options | 6,543 | 752 |
| Net costs of initial public offering | (291) | — |
| Net cash provided by financing activities | 6,106 | 36 |
| Net decrease in cash and cash equivalents | (35,726) | (23,372) |
| Cash and cash equivalents, beginning of the period | 100,986 | 70,783 |
| Cash and cash equivalents, end of the period | $ 65,260 | $ 47,411 |
| Supplemental disclosure of cash flows information: | | |
| Cash paid during the period for: | | |
| Interest | $       90 | $     263 |
| Income taxes | — | — |
| Supplemental disclosure of non-cash activities: | | |
| Issuance of common stock in business acquisitions | 8,209 | 3,856 |
| Issuance of common stock in intangible asset purchase | 1,549 | — |
| Release of funds in escrow related to A1 Wireless acquisition | 10,700 | — |
| Issuance of warrant to purchase common stock to vendor | — | 3,228 |
| Purchase consideration in accrued liabilities | 3,000 | — |

See accompanying notes to unaudited condensed consolidated financial statements

6

Table of Contents

INPHONIC, INC.

**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(in thousands, except per share and share amounts)**

**(1)    The Company and Basis of Presentation**

*(a)    Preparation of Interim Financial Statements*

We have prepared the accompanying condensed consolidated financial statements pursuant to the rules and regulations of the U.S. Securities and Exchange Commission (the "SEC") for interim financial reporting. The financial information included herein, other than the consolidated balance sheet as of December 31, 2005, has been prepared without audit. The consolidated balance sheet at December 31, 2005 has been derived from, but does not include all the disclosures contained in the audited financial statements for the year ended December 31, 2005. The preparation of consolidated financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of certain assets and liabilities, the disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reported period. In the opinion of management, these unaudited statements include all the adjustments and accruals necessary for a fair presentation of the results of the periods presented herein. These condensed consolidated financial statements should be read in conjunction with the consolidated financial statements and accompanying notes included in our Annual Report on Form 10-K for the year ended December 31, 2005. The results of operations for the interim periods presented are not necessarily indicative of the results that may be expected for a full year. Certain prior year amounts have been reclassified to conform to the current period presentation.

*(b)    Business*

We are a leading online seller of wireless services and devices based on the number of activations of wireless services sold online in the United States. We sell wireless service plans and devices, including satellite television services through our own branded websites; including Wirefly.com, A1 Wireless.com, and VMCsatellite.com and through websites that we create and manage for third parties. We offer marketers the ability to sell wireless voice and data services and devices under mobile virtual network enabler ("MVNE") agreements. This service utilizes the same e-commerce platform, operational infrastructure and marketing relationships that we use in our operations. We provide customers the ability to organize personal communication by providing real time wireless access to e-mail, voicemail, faxes, contacts, scheduling, calendar and conference calling functionality through a website or telephone.

*(c)    Restatement*

We have restated our consolidated financial statements as of and for the three and six month periods ended June 30, 2006 to reflect the correction of the following errors related to the application of our revenue recognition and cost of revenue accounting policies which had been identified in the audit of our financial statements for the year ended December 31, 2006:

During the three months ended March 31, 2006, we had recorded $549 of revenue for commissions from features activations in which it was subsequently determined that collectibility was not reasonably assured. Additionally, prior to the restatement, we recognized $156 related to certain feature activation commissions in the three months ended September 30, 2006, which as a result of the restatement, we have concluded that we had met all revenue recognition criteria as of March 31, 2006. As a result, we reduced our revenue and accounts receivable by $393 for these adjustments.

During the three months ended June 30, 2006, we had recorded activations and services revenue net of related reserves as a change in estimate of certain carrier commissions in dispute which we had previously deemed as collectible. Upon further evaluation, we believe that it was inappropriate to have recorded revenue associated with this matter until such commissions are collected from the carrier. In addition, we identified other errors related to the recording of activations and services revenue of approximately $923. Other errors included our recordation of certain commissions from features activations for which it was subsequently determined that collectibility was not reasonably assured and we recognized $389 related to certain feature activation commissions in the three months ended September 30, 2006, which as a result of the restatement, we have concluded that we had met all revenue recognition criteria as of June 30, 2006. Accordingly, we reduced our revenue and accounts receivable by approximately $3,674 for these adjustments.

In addition during the three months ended June 30, 2006, we identified errors that occurred in the recordation of cost of revenue and accounts receivable in the amount of $627 that have been corrected in the accompanying financial statements. These errors included amounts that were overbilled to certain carriers for rebates on purchased handset equipment and rebates recorded for the purchase of certain handset equipment which were subsequently not collected. The impact on our financial statements for these items for the three and six months ended June 30, 2006 is shown in the table below:

|  | June 30, 2006 (reported) | June 30, 2006 (adjustments) | June 30, 2006 (restated) |
|---|---|---|---|
| Accounts receivable | $ 61,366 | $ (4,694) | $ 56,672 |
| Total current assets | 142,794 | (4,694) | 138,100 |
| Total assets | 210,361 | (4,694) | 205,667 |

| Accumulated deficit | (1,859) | (4,688) | (6,547) |
| Total stockholders' equity | 105,500 | (4,694) | 100,806 |
| Total liabilities and stockholders' equity | 210,361 | (4,694) | 205,667 |

7

Table of Contents

| | Three Months Ended June 30, 2006 | | | For the six months ended | | |
|---|---|---|---|---|---|---|
| | 30-Jun (reported) | 30-Jun (adjustments) | 30-Jun (restated) | 30-Jun (reported) | 30-Jun (adjustments) | 30-Jun (restated) |
| Revenue: | | | | | | |
| Activations and services | $77,890 | $ (3,674) | $74,216 | $145,025 | $ (4,067) | $140,958 |
| Total revenue | 95,802 | (3,674) | 92,128 | 183,173 | (4,067) | 179,106 |
| Cost of revenue, exclusive of depreciation and amortization Equipment | $49,883 | $ 627 | $50,510 | $ 97,804 | $ 627 | $ 98,431 |
| Total cost of revenue | 50,948 | 627 | 51,575 | 99,129 | 627 | 99,756 |
| Operating loss | (5,328) | (4,301) | (9,629) | (9,574) | (4,694) | (14,268) |
| Loss from continuing operations | (5,069) | (4,301) | (9,370) | (9,024) | (4,694) | (13,718) |
| Net loss | (5,275) | (4,301) | (9,576) | (9,195) | (4,694) | (13,889) |
| Net loss per share: | | | | | | |
| Net loss from continuing operations | (0.14) | (0.12) | (0.26) | (0.25) | (0.13) | (0.38) |
| Basic and diluted net loss per share | (0.15) | (0.12) | (0.27) | (0.26) | (0.13) | (0.39) |

| | For the six months ended | | |
|---|---|---|---|
| | 30-Jun (reported) | 30-Jun (adjustments) | 30-Jun (restated) |
| Cash flows from operating activities: | | | |
| Net loss | $ (9,195) | $ (4,694) | $(13,889) |
| Accounts receivable | (26,619) | 4,694 | $(21,925) |

*(d)*   *Risks and Uncertainties*

Our operations are subject to certain risks and uncertainties including, among others, actual and potential competition by entities with greater financial resources, rapid technological changes, the need to retain key personnel and protect intellectual property and the availability of additional capital financing on terms acceptable to us.

Since inception we have incurred net losses attributable to common stockholders of approximately $178,547. To date, management has relied on debt and equity financings to fund our operating deficit. While we currently have $52,411 of cash and cash equivalents and short-term investments on hand as of June 30, 2006, we may require additional financing to fund future operations.

*(e)*   *Acquisitions and Discontinued Operations*

We acquired certain assets and assumed certain liabilities of A1 Wireless USA, Inc. ("A1 Wireless") on January 4, 2005; VMC Satellite, Inc. ("VMC") on April 26, 2005; and FONcentral.com, Inc. ("FC") on May 26, 2005. We accounted for these transactions using the purchase method of accounting in accordance with Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations*. Accordingly our results of operations include the operating results of A1 Wireless effective January 1, 2005, VMC as of April 26, 2005 and FC as of May 26, 2005.

On December 31, 2005, we completed the sale of substantially all of the operating assets of our mobile virtual network operator ("MVNO") Liberty Wireless ("Liberty") to Teleplus Wireless Corp, a subsidiary of Teleplus Enterprises, Inc. The sale of Liberty has enabled us to streamline and focus our resources on our other operations including the growth of our MVNE business. The sale of Liberty was recorded as a discontinued operation in the financial statements pursuant to SFAS No. 144, *Accounting for Impairment or Disposal of Long Lived Assets*. Cash flows pertaining to discontinued operations are not disclosed separately in the Unaudited Condensed Consolidated Statements of Cash Flows.

**(2)   Summary of Significant Accounting Policies**

*(a)*   *Revenue Recognition*

*Activations and Services Revenue*

We recognize revenue from the sale of wireless services and the provisioning of MVNE and data services.

*Wireless Services:* We generate revenue from wireless carriers, including a satellite television carrier, who pay commissions and volume and performance-based bonuses, for activating wireless subscribers. We recognize commissions from wireless carriers upon shipment of activated devices to the customer. In addition to activation

commissions certain carriers pay us a monthly residual fee either for as long as a customer who we activate for that carrier continues to be its subscriber, or for a fixed period of time depending on the carrier. We purchase satellite activation certificates evidencing activation rights in advance of their resale to customers. Revenue from satellite television customers includes sales of these satellite activation certificates, net of the certificate cost, as we are acting as an agent in the transaction. Our wireless revenue is reduced for estimated deactivations of customers prior to the expiration of a time period that ranges 120 to 180 days from the date of activation, depending on the wireless carrier. We estimate deactivations based on historical experience, which we developed based on our experience with carriers, customer behavior and sources of customers, among other factors, allowing us to accrue estimates with what we believe is a high degree of certainty. If we determine that we cannot accurately predict future deactivation experience, we may be required to defer 100% of our carrier commissions revenue until the expiration of the appropriate chargeback period. Our reserves for deactivations are included in accounts receivable and deferred revenue on the accompanying balance sheets.

In addition to receiving commissions for each wireless subscriber activated, we earn performance bonuses from the wireless carriers based on negotiated performance targets. The most significant bonus we earn is the quarterly volume bonus, which we bill wireless carriers for on a monthly basis, based on current month activations. We record these bonuses as deferred revenue at the time of billing until we achieve the quarterly targets. We also earn other quarterly bonuses from certain carriers for maintaining low customer churn and signing up customers for certain additional monthly "features" such as text messaging or data service. Wireless carriers also periodically offer bonuses for achieving monthly volume and other performance targets. We recognize these monthly bonuses as earned in accordance with the provisions of Staff Accounting Bulletin ("SAB") No. 104, *Revenue Recognition in Financial Statements* . Revenue is recognized only when all of the following criteria are met: (1) persuasive evidence of an arrangement exists, (2) delivery has occurred or services have been rendered, (3) the seller's price to the buyer is fixed or determinable, and (4) collectibility is reasonably assured. Amounts collected in cash prior to meeting the above criteria are recorded as deferred revenue. Through 2005, commission revenue earned from the activation of carrier features had been deferred until the contractual chargeback period had lapsed. Beginning in 2006, we began to estimate commission revenue earned from feature activations based on historical experience which we have developed based on our experience with carriers and customer behavior over a period of time in excess of 24 months.

*MVNE Services:* We offer marketers the ability to sell wireless services to their customers under their own brands using our e-commerce platform and operational infrastructure through MVNE contracts. We receive fees for the development of the network platform, for custom functional enhancements to the network platform, and for operational support services. We defer the fees attributable to the production of the network platform and recognize these fees and costs over the expected life of the agreement (typically 12 to 48 months). Fees received for custom functional enhancements to the network platform and for operational services are deferred until all revenue criteria have been satisfied. Deferred revenue from MVNE contracts as of December 31, 2005 and June 30, 2006 was $1,852 and $1,776, respectively.

*Data Services:* We sell data services, including a service that allows customers to access email, voicemail, facsimiles, contacts and personal calendar information through a website or a telephone; wireless email; and mobile marketing services. We bill customers and recognize revenue monthly, as the services are performed.

9

Table of Contents

*Equipment Revenue*

Revenue from the sale of wireless devices and accessories in a multiple-element arrangement with services are recognized at the time of sale in accordance with *Emerging Issues Task Force EITF No. 00-21, Revenue Arrangements with Multiple Deliverables,* when fair value of the services element exists. Customers have the right to return devices within a specific period of time or usage, whichever occurs first. We provide an allowance for estimated returns of devices based on historical experience. In accordance with the provisions of SAB No. 104, we determined we have sufficient operating history to estimate equipment returns. In connection with wireless activations, we sell customers wireless devices at a significant discount (equipment discount provision or "EDP"), which is generally in the form of a rebate. Rebates are recorded as a reduction of revenue. We recognize equipment revenue, less a reserve for customer rebates (accrued consumer liabilities), which is based on historical experience of rebates claimed. Future experience could vary based upon rates of consumers redeeming rebates.

In the event a customer terminates their wireless service with the carrier within six months of activation and opts not to return the wireless device to us within the time frames permitted within our return policy, in many instances our sales contracts with the customer permit us to charge the customer an EDP termination fee for each unreturned device. Prior to the three months ended June 30, 2006, revenue recognition of such fee was deferred until such fee was collected from the customer pursuant to SAB 104 as we did not have adequate historical collection data to reasonably estimate the ultimate collectibility of the receivable. Beginning April 1, 2006, we began to estimate EDP termination fee revenue based on historical experience of customer collection behavior which we have developed over a time period of 24 months which provides the basis on which to accrue revenue with an appropriate assurance of collectibility pursuant to SAB 104. As of March 31, 2006, $293 of such revenue was deferred, which would have been accrued for in the event that we had adequate customer collection history, less an estimated reserve for uncollectible amounts. As of June 30, 2006, we had accrued as accounts receivable approximately $786 in such EDP fees. This change in estimate was not significant enough to change our reported net loss per share.

**(b)    Concentrations of Credit Risk**

Financial instruments that potentially subject us to a concentration of credit risk consist principally of accounts receivable. We extend credit to wireless network carriers ("carriers") on an unsecured basis in the normal course of business. Three carriers accounted for 67% and 76% of accounts receivable, net of the deactivation reserve, as of December 31, 2005 and June 30, 2006, respectively.

For the three and six months ended June 30, 2005 and 2006, revenue from three carriers exceeded 10% of our total revenue. Revenue as a percentage of total revenue for these carriers was as follows:

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
|  | 2005 | 2006 | 2005 | 2006 |
| Customer A | 27% | 35% | 25% | 35% |
| Customer B | 13% | 16% | 16% | 15% |
| Customer C | 14% | 16% | 13% | 16% |
| Total | 54% | 67% | 54% | 66% |

**(c)    Accrued Expenses and Other Liabilities**

Accrued expenses and other liabilities at December 31, 2005 and June 30, 2006 consisted of:

|  | As of | |
| --- | --- | --- |
|  | December 31, 2005 | June 30, 2006 |
| Accrued consumer liabilities | $  18,289 | $14,377 |
| Commitment to provide inventory to vendor | — | 4,000 |
| Accrued payroll and related expenses | 1,452 | 1,301 |
| Accrued acquisition costs and severance costs | 5,063 | 896 |
| Accrued taxes payable | 593 | 321 |
| Other | 6,191 | 4,594 |
|  | $   31,588 | $25,489 |

**(d)    Restructuring Costs**

We implemented a restructuring plan following the acquisition of A1 Wireless, to take advantage of synergies gained through the acquisition and to restructure our operations for efficiency purposes. For the three months ended June 30, 2005, we recognized $245 in restructuring costs, $219 of which related to workforce

**Table of Contents**

reduction and the remaining $26 to excess facilities. During the six months ended June 30, 2005, we recognized $394 in restructuring costs, of which $358 related to workforce reduction and the remaining $36 to excess facilities. All costs related to this plan were paid out in 2005.

Table of Contents

During the three months ended June 30, 2006, we implemented a restructuring plan related to changes in our management and operational structure. For the three and six months ended June 30, 2006, we recognized $1,906 related to the termination of our former president and chief operating officer and thirteen other senior executives and employees. Of this amount, $594 related to severance benefits that will be paid out in cash to the recipients on a monthly or bi-monthly basis over the terms of their respective severance agreements and $1,312 related to severance expenses incurred as a result of the modification of stock-based compensation awards under which vesting of 50% of unvested restricted share and option awards was accelerated for three of the former employees.

At June 30, 2006, we had an accrued liability recorded of $553 of which approximately $473 will be paid out in cash by December 31, 2006. In addition, accrued liabilities included $368 related to the acceleration of the stock-based compensation awards described above under which the underlying shares of common stock were not distributed to two of the recipients by June 30, 2006. We expect to distribute these shares in the third quarter of 2006.

### (e)  *Loss on investment*

During the six months ended June 30, 2005, we sold all data service software acquired from Avesair Inc. in May 2003, to a third party vendor and wrote off related capitalized labor, intangible assets, goodwill and other costs related to this asset. As a result of this transaction, we recognized a loss of $228 during the three months ended June 30, 2005.

### (f)  *Stock-Based Compensation*

We adopted Statement of Financial Accounting Standards "SFAS" No. 123 (revised 2004), *Share Based Payment* (SFAS No. 123(R)) on January 1, 2006 using the modified prospective application method ("MPA"). SFAS No. 123(R) established standards for the accounting for transactions in which an entity exchanges its equity instruments for goods or services. SFAS No. 123(R) requires us to measure the cost of employee services received in exchange for an award of equity instruments (usually stock options or unvested (restricted) stock awards) based on the grant-date fair value of the award. That cost is recognized over the period during which an employee is required to provide service in exchange for the award – the requisite service period (usually the vesting period).

Prior to our adoption of SFAS No. 123(R), we applied the intrinsic value method of accounting for employee stock-based compensation as prescribed by Accounting Principles Board ("APB") Opinion No. 25, *Accounting for Stock Issued to Employees,* and related interpretations including FASB Interpretation ("FIN") No. 44, *Accounting for Certain Transactions involving Stock Compensation an Interpretation of APB Opinion No. 25* , to account for our stock option grants to employees. Under this method, compensation expense was recorded on the date of the grant only if the current market price of the underlying stock exceeded the exercise price. SFAS No. 123, *Accounting for Stock-Based Compensation* ("SFAS No. 123"), established accounting and disclosure requirements using a fair value-based method of accounting for stock-based employee compensation plans. As permitted by SFAS No. 123, we had elected to continue to apply the intrinsic value-based method of accounting described above, and had adopted the disclosure requirements of SFAS No. 123. All shares of restricted stock awarded to employees were accounted for at fair value in accordance with SFAS No. 123.

Under the MPA method, compensation cost for all share-based payments granted prior to, but not vested as of December 31, 2005, is based on the grant date fair value estimated in accordance with the pro forma provisions of SFAS No. 123, and compensation cost for all share based payments granted subsequent to December 31, 2005, will be based on the grant date fair value estimated in accordance with the provisions of SFAS No.123(R). Results for prior periods have not been restated. We use the ratable method of attributing the value of stock-based compensation to expense. SFAS No. 123(R) requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. In our pro forma information required under SFAS No. 123 for the periods prior to January 1, 2006, we accounted for forfeitures as they occurred. The fair value of each option granted is estimated on the grant date using the Black-Scholes option pricing model which takes into account as of the grant date the exercise price and expected life of the option, the current price of the underlying stock and its expected volatility, expected dividends on the stock and the risk-free interest rate for the term of the option.

12

*Stock Options* – We have two stock plans under which we have issued or may issue options to purchase shares of our common stock. The 1999 Stock Incentive Plan (the "1999 Plan"), provided for grants of stock-based awards from time to time to employees, officers, directors and consultants of the Company at exercise prices determined by the board of directors. Options granted under the 1999 Plan generally vest over a four-year period and expire ten years from the grant date. As of November 19, 2004, no additional options were available for grant under the 1999 Plan due to the adoption of the 2004 Equity Incentive Plan (the "2004 Plan").

The 2004 Plan allows for grants of stock-based awards from time to time to employees, officers, directors and consultants at exercise prices determined by the board of directors. For incentive stock options, the exercise price must be at least equal to fair market value at the date of grant. For nonqualified stock options, the option may be granted with an exercise price less than fair market value. Options granted under the 2004 Plan vest over a period to be determined by the administrator, generally four years, and expire ten years from the grant date.

For the three and six months ended June 30, 2006 as a result of our adoption of SFAS No. 123 (R), we recognized stock-based compensation expense related to employee options granted prior to January 1, 2006 of $2,299 and $3,858, of which $88 and $235, respectively, was capitalized in accordance with our compensation policies and SFAS No. 123(R).

In addition on March 22 and June 13 of 2006, we granted options to certain of our employees to purchase 679,900 and 207,000 shares of our common stock, respectively. The options granted on March 22, 2006 and June 13, 2006 were granted at an exercise price of $6.46 and $6.51 per share, respectively. The grant date fair value of employee share options was estimated using the Black Scholes option-pricing model with the following assumptions: an expected life averaging 5.77 years; an average volatility of 72%; no dividend yield; and a risk-free interest rate averaging 4.75%. The weighted average fair value per share of options granted was $4.29. Compensation cost of the grant was reduced by an estimated forfeiture amount based on an annual experience rate of 9.93%. As of the date of grants, total compensation cost related to the grants including estimated forfeitures was approximately $2,324 and $715 for the March 22, 2006 and June 13, 2006 grants, respectively. Stock-based compensation expense for these grants for the three and six months ended June 30, 2006 was $97 and $126 respectively.

The impact of adopting SFAS No. 123(R) increased stock-based compensation expense included in our operating expenses and reduced net income from continuing operations by approximately $1,244 and $1,748 for the three and six months ended June 30, 2006 respectively or $0.03 and $0.05 per basic and diluted share. There was no impact from the adoption on cash flow from operations or cash flows from financing activities.

The following table summarizes the activity for stock options granted to employees and non-employees for the six months ended June 30, 2006.

| | Number of options | Weighted average exercise price | Weighted average contractual term | Aggregate intrinsic value |
|---|---|---|---|---|
| Balance January 1, 2006 | 5,115,969 | $ 9.47 | | |
| Granted | 886,900 | 6.35 | | |
| Exercised | (152,847) | 4.93 | | |
| Forfeited | (550,717) | 11.37 | | |
| Balance June 30, 2006 | 5,299,305 | $ 8.89 | 7.96 | $2,537,656 |
| Ending vested & expected to vest | 4,962,939 | $ 8.85 | 7.88 | $2,465,793 |
| Exercisable at June 30, 2006 | 2,754,733 | $ 8.29 | 7.18 | $1,743,915 |

The weighted-average grant date fair value of options granted during the six months ended June 30, 2006 was $4.29. The total intrinsic value of options exercised during the six months ended June 30, 2006 was $324.

13

Table of Contents

*Restricted Common Stock* – During the six months ended June 30, 2006, we granted 1,205,127 shares of restricted common stock to certain of our key employees. The restrictions on this common stock lapse and the stock vests over periods ranging up to four years from the grant date. The following table summarizes the activity for restricted stock for the six months ended June 30, 2006.

| | Number of Restricted Stock Awards | Weighted-average grant date fair value | |
|---|---|---|---|
| Nonvested at January 1, 2006 | 1,137,878 | $ | 16.48 |
| Granted | 1,205,127 | | 6.21 |
| Vested | (304,938) | | 16.06 |
| Surrendered for taxes | (31,921) | | 15.72 |
| Forfeited | (112,230) | | 17.52 |
| Nonvested at June 30, 2006 | 1,893,916 | $ | 10.00 |

As of June 30, 2006, there was approximately $14,014 of total unrecognized compensation cost related to restricted share-based compensation arrangements. That cost is expected to be recognized over a weighted-average period of 1.71 years. The total fair value of shares vested during the six months ended June 30, 2006 was approximately $4,899.

*Stock Purchase Warrants* – In April 2006, we issued a warrant to purchase 566,324 shares of our common stock at an exercise price of $7.35 per share. The estimated fair value of the warrant granted was determined using the Black Scholes Model. The weighted average grant date fair value per share of this warrant was $5.70. The following table summarizes warrant activity for the six months ended June 30, 2006:

| | Number of warrants | Weighted average exercise price | | Range of exercise |
|---|---|---|---|---|
| Balance January 1, 2006 | 787,863 | $ | 8.44 | $ 0.03 -15.60 |
| Granted | 566,324 | | 7.35 | 7.35 |
| Exercised | (17,270) | | 0.28 | 0.03 - 14.04 |
| Surrendered for cashless exercise | (627) | | 2.25 | 0.03 - 2.49 |
| Balance June 30, 2006 | 1,336,290 | $ | 8.08 | $ 0.03 -15.60 |

In April 2006, we issued an additional warrant to purchase 188,775 shares of our common stock to a vendor that is exercisable upon certain performance conditions. The exercise price of the warrant will be based on the trading price of our common stock at the time the performance conditions are met by the vendor. Once it is probable that the vendor will achieve the performance conditions set forth under the terms of the warrant, the fair value of the warrant will be amortized to sales and marketing expense over the remaining contractual term of the vendor commitment.

Warrants outstanding at June 30, 2006 were exercisable for 1,336,290 shares of our common stock, excluding this contingent warrant.

14

Our pro forma net loss per common share, basic and diluted, for the three and six months ended June 30, 2005 was as follows:

|  | Three Months Ended June 30, 2005 | Six Months Ended June 30, 2005 |
|---|---|---|
| Net loss as reported | $ (1,652) | $ (8,646) |
| Add: Stock-based employee compensation expense included in net loss as reported, net of related tax effects | 2,529 | 9,172 |
| Less: Total stock-based employee compensation determined under fair value based methods for all stock award, net of related tax effects | (2,653) | (5,171) |
| Pro forma net loss | $ (1,776) | $ (4,645) |
| Net loss per common share, basic and diluted, as reported | $ (0.05) | $ (0.26) |
| Net loss per common share, basic and diluted, pro forma | $ (0.05) | $ (0.14) |
| Basic and diluted weighted average common shares outstanding | 33,847,007 | 33,380,156 |

Stock-based compensation which includes compensation recognized on stock option grants and restricted stock awards has been included in the following line items in the accompanying condensed consolidated financial statements. There was no tax benefit recognized in the statements of operations for stock-based awards in either period:

|  | As of | |
|---|---|---|
|  | December 31, 2005 | June 30, 2006 |
| Balance Sheet: | | |
| Property and equipment, net | $ — | $ 286 |

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 2005 | 2006 | 2005 | 2006 |
| Statement of operations: | | | | |
| Sales and marketing | $ 456 | $ 819 | $1,052 | $1,538 |
| General and administrative | 2,210 | 2,097 | 8,555 | 4,260 |
| Restructuring | — | 1,312 | — | 1,312 |
| Income from discontinued operations | 126 | — | 189 | — |
|  | $ 2,792 | $4,228 | $9,796 | $7,110 |

During the three and six months ended June 30, 2006, we modified the stock-based awards of 5 employees which accelerated the vesting of 81,035 shares of restricted stock and options underlying 122,258 shares of our common stock. As a result of the expedited vesting, we accelerated expense recognition of the compensation cost associated with the newly vested shares. Accordingly, stock-based compensation expense includes $1,312 from these actions. Incremental compensation cost arising from the modifications to the vesting terms of the awards was not significant.

*(g) Net Loss per Share*

We calculate net loss per share in accordance with SFAS No. 128, *Earnings Per Share* . Basic net loss per common share excludes any dilutive effects of options, warrants, restricted stock and convertible securities and is calculated by dividing net loss attributable to common stockholders by the weighted average number of common shares issuable and outstanding for the period. Diluted net loss per common share equals basic net loss per common share, as the effects of options, warrants, restricted stock and convertible securities will be anti-dilutive.

15

Table of Contents

The following table reconciles net loss and basic and diluted weighted average common shares outstanding to the historical or pro forma net loss and the pro forma basic and diluted weighted average common shares outstanding for the three and six months ended June 30, 2005 and 2006.

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2005 | 2006 | 2005 | 2006 |
| | | (restated) | | (restated) |
| Net loss from continuing operations | $ (1,162) | $ (9,370) | $ (8,580) | $ (13,718) |
| Net loss from discontinued operations | (490) | (206) | (66) | (171) |
| Net loss | $ (1,652) | $ (9,576) | $ (8,646) | $ (13,889) |
| Weighted average shares outstanding | | | | |
| Basic and diluted earnings per share: | 33,847,007 | 35,856,253 | 33,380,156 | 35,529,454 |
| Net loss from continuing operations | $ (0.04) | $ (0.26) | $ (0.26) | $ (0.38) |
| Net loss from discontinued operations | (0.01) | (0.01) | (0.00) | (0.01) |
| Basic and diluted earnings per share | $ (0.05) | $ (0.27) | $ (0.26) | $ (0.39) |

During the three and six months ended June 30, 2006 and 2005, we incurred a net loss. If our outstanding common stock equivalents were exercised or converted into common stock, the result would have been anti-dilutive and, accordingly, basic and diluted net loss attributable to common stockholders per share are identical for all periods presented in the accompanying condensed consolidated statements of operations. The following summarizes our potential outstanding common stock as of the end of each period:

| | June 30, | |
| --- | --- | --- |
| | 2005 | 2006 |
| Options to purchase common stock | 5,881,423 | 5,299,305 |
| Restricted stock awards | 269,266 | 1,893,916 |
| Warrants to purchase common stock | 942,380 | 1,525,065 |
| Options awarded in connection with the VMC acquisition | 210,379 | — |
| Total options, warrants and restricted stock awards convertible into common stock | 7,303,448 | 8,718,286 |

**(3)  Discontinued Operations**

On December 31, 2005, we completed the sale of substantially all of the operating assets of our Liberty Wireless business. During the six months ended June 30, 2006 we collected $1,110 of notes receivable recorded at December 31, 2005 related to the divestiture.

Summary of operating results for the discontinued operations is as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2005 | 2006 | 2005 | 2006 |
| Revenue | $ 6,392 | $ — | $ 14,848 | $ — |
| Costs and expenses | (6,882) | (206) | (14,914) | (171) |
| Loss from discontinued operations | $ (490) | $ (206) | $ (66) | $ (171) |

16

**Table of Contents**

Balance sheet data included:

| | As of | |
|---|---|---|
| | December 31, 2005 | June 30, 2006 |
| Accounts and notes receivable, net | $ 1,848 | $ 597 |
| Other current assets | 582 | |
| Assets of discontinued operations | $ 2,430 | $ 597 |
| Accounts payable | $ 931 | $ — |
| Other accrued expenses | 2,199 | 1,601 |
| Liabilities of discontinued operations | $ 3,130 | $1,601 |

## (4) Goodwill

The following table reflects the changes to goodwill for the six months ended June 30, 2006:

| | |
|---|---|
| Balance as of December 31, 2005 | $ 31,140 |
| Goodwill arising from VMC Satellite, Inc. earn-out [1] | 2,984 |
| Balance as of June 30, 2006 | $ 34,124 |

---

(1) We achieved the earn-out performance target stipulated in the VMC Asset Purchase Agreement on February 28, 2006 and accordingly recorded additional goodwill of $2,984. The earn-out consideration consisted of amounts that were paid in cash of $2,362 and 119,389 shares of our common stock with a fair value of $622. Such consideration was in April 2006.

## (5) Debt

We maintain a revolving operating line of credit which allows for aggregate borrowings of up to $25,000 subject to certain limits based on accounts receivable and inventory levels. At June 30, 2006 and December 31, 2005, there was $15,000 outstanding under this line of credit. As of June 30, 2006, we had no additional borrowing availability under the facility based on the limits described above. The line of credit expires effective January 1, 2007 and accordingly the outstanding balance has been classified as a current liability as of June 30, 2006. Borrowings outstanding under the line of credit are secured by substantially all of our assets. Under the terms of the facility, we are required to maintain a current ratio, as defined, of no less than 1.1 to 1. We are also required to maintain an unrestricted cash balance of no less than $10,000 held at the bank and to meet certain minimum levels of EBITDA, as defined. As of June 30, 2006, we were in compliance with the financial covenants under the credit facility.

## (6) Repurchase of Common Stock

On August 17, 2005, our Board of Directors authorized the repurchase of up to $30,000 of our common stock through August 17, 2006. The shares may be repurchased by us from time to time at prevailing market prices. The timing and amount of any shares repurchased are based on market conditions and other factors. Repurchases may also be made under a Rule 10b5-1 plan, which permits shares to be repurchased when we might otherwise be precluded from doing so by laws prohibiting insider trading or by self imposed trading black out periods. There is no guarantee as to the exact number of shares that will be repurchased under the stock repurchase program, and we may discontinue purchases at any time. We intend to fund our share repurchases with cash on hand and cash generated from future operations. During the six months ended June 30, 2006, we repurchased 62,761 shares of our common stock at an average price of $8.01 per share for approximately $503. All shares repurchased were returned to the status of authorized but unissued shares of common stock as of June 30, 2006. Since the inception of this program, we have repurchased 1,144,248 shares for an aggregate consideration of $13,591.

## (7) Commitments and Contingencies

*Legal Matters*

On August 5, 2004, Avesair, Inc., one of the companies the assets of which we acquired, filed suit against us demanding, among other matters, that we issue to Avesair shares of our common stock valued at approximately $4,000 as of June 30, 2004. The stock demanded by Avesair represents the maximum value of

Table of Contents

shares that they could have earned for achieving certain performance-based targets under the asset purchase agreement. We believe the performance-based targets were not achieved and intend to vigorously contest this matter. However, any adverse resolution of this matter could have a material adverse impact on our financial results if we are required to issue additional shares and would result in dilution to our stockholders.

On July 25, 2005, the Federal Communications Commission (FCC) issued a Notice of Apparent Liability, asserting that we registered with the FCC and reported and contributed to the Universal Service Fund (USF) and the Telecommunications Relay Service Fund later than required by FCC rules. The FCC has preliminarily proposed to fine us approximately $820 for late payment of such fees. In a letter dated August 24, 2005 we responded to the FCC's preliminary finding and asserted that no fine is appropriate under the circumstances. However, any adverse resolution of this matter could have a material adverse impact on our financial results.

Eight related putative nationwide class actions have been filed against us arising out of InPhonic-sponsored rebate offers for online purchases of wireless telephones. Five of the eight putative class actions also name a third-party rebate processor as a defendant. The rebate processor began to process claims for InPhonic-sponsored rebate offers in or about July 2005, and our agreement with this rebate processor expired in or about July 2006.

We have filed a motion with the Judicial Panel on Multidistrict Litigation ("JPML") to consolidate the eight actions in the United States District Court for the District of Columbia. The rebate processor and a majority of the putative class representative plaintiffs have joined our request for consolidation of these cases in the District of Columbia. Other plaintiffs seek consolidation of these cases in the District of Arizona. Our JPML motion is fully briefed and likely to be heard by the JPML in the latter part of September 2006. We expect a decision from the JPML by the fourth quarter of 2006.

Three of the actions were originally filed in the United States District Court for the District of Columbia. Three actions were originally filed in the United States District Court for the District of Arizona. One action was originally filed in New Jersey state court, but was subsequently removed to, and remains pending in, the United States District Court for the District of New Jersey. The remaining action was originally filed in the United States District Court for the Northern District of Illinois.

The putative class action complaints allege, among other things, violations of the consumer protection laws of various states and (in certain lawsuits) the federal RICO (anti-racketeering) statute in connection with our disclosure and implementation of the terms and conditions of rebate offers. The class action plaintiffs seek statutory penalties, treble damages, attorneys' fees, and punitive damages under the consumer protection statutes, and treble damages and attorneys' fees under the RICO statute, as well as injunctions concerning the content of our websites.

The federal lawsuits are in an early stage. We have made motions in each of the courts where these cases are pending to defer pre-trial deadlines until the JPML makes its decision on transfer and consolidation. To date, the federal court in the District of Columbia has stayed all proceedings in two of the lawsuits pending the JPML's ruling, and the federal court in the Northern District of Illinois has entered a substantially similar order. Similar motions remain pending in the New Jersey action and in one of the Arizona actions. We intend to vigorously defend these actions but cannot predict their outcomes.

On June 8, 2006, the Attorney General of the District of Columbia brought a lawsuit in the Superior Court of the District of Columbia (the "DCAG Action"), alleging violations of the D.C. consumer protection statute based on factual allegations that are substantively the same as those in the private putative nationwide class actions. The DCAG Action seeks injunctive relief, restitution for consumers, statutory penalties, and attorneys' fees. The DCAG Action cannot be removed to federal court or consolidated with the eight federal putative class actions. However, we have asked the JPML to transfer the private actions to the federal court in the District of Columbia so that they can be informally coordinated with the DCAG Action. We answered the complaint on July 28, 2006. We intend to vigorously defend this action, but cannot predict its outcome.

From time to time we are party to other disputes or legal proceedings. We do not believe that any of the pending proceedings are likely to have a material adverse effect on our business.

18

Table of Contents

## ITEM 4.    CONTROLS AND PROCEDURES

### Disclosure Controls and Procedures

Management had previously concluded that our disclosure controls and procedures were effective as of June 30, 2006. However, in connection with the restatement of our March 31, 2006, June 30, 2006 and September 30, 2006 interim financial statements as fully described in Note 1 of this Form 10-Q/A, management determined that the material weaknesses described below existed as of June 30, 2006. Accordingly, our Chief Executive Officer and Chief Accounting Officer have now concluded that disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) were not effective as of June 30, 2006 to ensure information required to be disclosed by us in the reports we file or submit under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified within the SEC's rules and forms and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Accounting Officer, as appropriate, to allow timely decisions regarding required disclosure.

Not withstanding the material weaknesses described below, management believes the condensed consolidated financial statements included in this Quarterly Report on Form 10-Q/A fairly present in all material respects our financial condition, results of operations and cash flows for all periods presented.

A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood, that a material misstatement of the annual or interim quarterly financial statements will not be prevented or detected. Management identified material weaknesses in our internal controls including the following:

- *We did not maintain sufficient staffing of operational and financial resources.* We did not maintain staffing in operational and financial resources sufficient to provide the level of controls and analysis required on a timely basis in light of the increasing complexity and growth of our business. This resulted in certain accounting processes and controls not being performed on a timely basis and the inability to maintain an adequate control environment, resulting in numerous material adjusting entries being made after year end. This material weakness contributed to errors such as those relating to proper revenue recognition and accounts receivable described below.

- *We did not always effectively communicate information to our finance department* . Specifically, we failed to maintain effective communication channels to adequately identify and record certain transactions during 2006. The failure to provide this communication contributed to errors relating to accounting and reporting of expenses and liabilities. This material weakness caused or contributed to, adjustments necessary to appropriately record accounts receivable allowances and reserves for deactivations described below .

- *We did not maintain effective controls over the recordation, accuracy and completeness of activations and services revenue and related accounts receivable.*

  We did not take steps to adequately identify and appropriately record certain commission and bonus revenue received during the year from various wireless carriers in a timely and accurate manner. Recording amounts received from carriers in the appropriate accounts in a timely and accurate manner is an important business process control that is essential to the correct reporting of amounts in the financial statements. This material weakness contributed to errors relating to accounting and reporting for revenue and accounts receivable.

  We did not utilize an appropriate methodology during the year in recording receivables from wireless carriers associated with disputed deactivations, churn bonuses and other carrier related fees. We overstated accounts receivable by using a methodology that anticipated future improvements in collections beyond that supported by past experience, and which did not consider certain current factors and other information. As a result of this material weakness, an adjustment was necessary to properly record revenue and related receivables from these fees.

- *We did not maintain effective controls over the determination and accuracy of equipment revenue and related accounts receivable.* We did not utilize an appropriate methodology during the year in recording certain fees due from consumers when contracts are cancelled within specified time periods and the wireless device is not returned to us. Specifically, related accounts receivable were overstated to the extent that we used collection percentages which anticipated improvements in excess of past experience. As a result of this material weakness, an adjustment was necessary to properly record revenue and related receivables from these fees.

These material weaknesses resulted in adjustments to our revenue and accounts receivable and certain other financial statement line items as referred to above and resulted in the restatement of previously issued consolidated financial statements for the three and six-month periods ended June 30, 2006.

### Changes in Internal Control over Financial Reporting

With the exception of the items described above, there have been no changes in our internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting for this current period.

**Table of Contents**

**PART II**

**ITEM 6.**     **EXHIBITS**

| Exhibit No. | Description |
|---|---|
| 31.1 | Rule 13a-14(a) Certification of Principal Executive Officer. |
| 31.2 | Rule 13a-14(a) Certification of Principal Financial Officer. |
| 32.1 | Section 1350 Certification of Chief Executive Officer. |
| 32.2 | Section 1350 Certification of Chief Financial Officer. |

20

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

INPHONIC, INC.

By:      / s / DAVID A. STEINBERG

**David A. Steinberg**
**Chairman of the Board and**
**Chief Executive Officer**

By:      / s / KENNETH D. SCHWARZ

**Kenneth D. Schwarz**
**Executive**
**Vice President and Chief Financial Officer**

Date: August 10, 2007

21

## CERTIFICATION PURSUANT TO
## SECTION 302 OF
## THE SARBANES-OXLEY ACT OF 2002

I, David A. Steinberg, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q, as amended for the period ended June 30, 2006 of InPhonic, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: August 10, 2007

/s/ David A. Steinberg
David A. Steinberg
Chairman of the Board and Chief Executive Officer

**CERTIFICATION PURSUANT TO**
**SECTION 302 OF**
**THE SARBANES-OXLEY ACT OF 2002**

I, Kenneth D. Schwarz, certify that:

1.   I have reviewed this Quarterly Report on Form 10-Q, as amended for the period ended June 30, 2006 of InPhonic, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)   All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: August 10, 2007

/s/ Kenneth D. Schwarz
Kenneth D. Schwarz
Executive Vice President and
Chief Financial Officer

**Certification of Principal Executive Officer**
**Pursuant to 18 U.S.C. 1350**
**(Section 906 of the Sarbanes-Oxley Act of 2002)**

I, David A. Steinberg, Chairman and Chief Executive Officer (principal executive officer) of InPhonic, Inc. (the "Registrant"), certify that to the best of my knowledge, based upon a review of the Quarterly Report on Form 10-Q, as amended for the period ended June 30, 2006 of the Registrant (the "Report"):

(1)    The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934, as amended; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant.

/s/ David A. Steinberg
Name: David A. Steinberg
Date:   August 10, 2007

**Certification of Principal Financial Officer**
**Pursuant to 18 U.S.C. 1350**
**(Section 906 of the Sarbanes-Oxley Act of 2002)**

I, Kenneth D. Schwarz, Executive Vice President and Chief Financial Officer (principal financial officer) of InPhonic, Inc. (the "Registrant"), certify that to the best of my knowledge, based upon a review of the Quarterly Report on Form 10-Q, as amended for the period ended June 30, 2006 of the Registrant (the "Report"):

(1)    The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934, as amended; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant.

/s/ Kenneth D. Schwarz
Name: Kenneth D. Schwarz
Date:   August 10, 2007

# EXHIBIT DD

Copyright 2007 Voxant, Inc.
All Rights Reserved.
Copyright 2007 CCBN, Inc.
All Rights Reserved.
FD (Fair Disclosure) Wire

August 9, 2007 Thursday

**TRANSCRIPT:** 080907av.765

**LENGTH:** 8798 words

**HEADLINE:** Q2 2007 InPhonic, Inc. Earnings Conference Call - Final

**BODY:**

OPERATOR: Good day everyone, and welcome to today's InPhonic's second quarter 2007 earnings release conference call. Today's call is being recorded. At this time all participants have been placed in a listen only mode. The floor will be open for your questions following the presentation. It is now my pleasure to turn the call over to InPhonic's Senior Vice President and Corporate Treasurer, Greg Cole, please go ahead.

GREG COLE, SVP/TREASURER, INPHONIC: Thank you and good evening everyone. This is Greg Cole, Senior Vice President and Corporate Treasurer. On the call with me today are InPhonic executives David Steinberg; Andy Zeinfeld; and our newest addition, Ken Schwarz.

Before we begin I would like to remind you that matters discussed in this call may contain forward-looking statements that involve risks and uncertainties concerning InPhonic's expected performance, as well as InPhonic's strategic and operational plans. Actual results may differ materially from projected results, and reported historical results should not be considered as an indication of future performance.

Potential risks and uncertainties include, among others, fluctuation of our financial results that could lead to volatility in our stock price; decreases in customer growth rates, acceptance of new products and services, and risks related to the integration of recent acquisitions. All information discussed on this call is as of today, August 9, 2007, and InPhonic undertakes no duty to update this information.

Other factors that could affect the company's business and financial results are discussed in the risk factors section of the company's annual report on Form 10K for the year ended December 31, 2006, which is on file with the SEC. On this call we will also discuss some non-GAAP financial measures, including gross profit; earnings before interest, taxes, depreciation and amortization; stock based compensation; and pro forma earnings per share, including any amortization related to acquisitions. In addition we will be discussing sales and marketing expenses and general and administrative expenses, which may exclude stock based compensation.

The call will consist of prepared remarks by David, Ken and Andy, followed by a question and answer session. An audio replay of the call will be available on the investor relations section of InPhonic's website. I will now turn the call over to David Steinberg.

DAVID STEINBERG, CEO, INPHONIC: Thank you Greg. I'd like to welcome everyone to our second quarter 2007 earnings conference call. I would like to begin by briefly discussing a few of the important recent events that have occurred outside of the second quarter here at InPhonic, then provide a quick summary of the second quarter financial results.

Q2 2007 InPhonic, Inc. Earnings Conference Call - Final FD (Fair Disclosure)
Wire August 9, 2007 Thursday

First, we signed a letter of intent to enter into a strategic alliance with Brightstar Corporation, one of the leading distribution and logistics management companies in the wireless industry. We expect to sign a definitive agreement by September 30, 2007. On completion of the definitive agreement, Brightstar will acquire all the on hand inventory and certain fulfillment assets of InPhonic and in the process, become our exclusive provider of wireless hardware and direct to consumer distribution, value added customization and logistics. All expense savings generated from this outsource role with be shared with Brightstar 50/50. This constitutes what we believe to be the nuts and bolts of a solid outsourcing relationship.

In Brightstar we believe we have found a strategic partner that will help us grow our business and formed an alliance that will include a unique twist on the traditional outsourcing model arrangement. We expect to work together to combine the direct to consumer businesses of Brightstar onto the InPhonic activation and enablement platform. Their existing clients include companies such as Wal-Mart, Kmart, and Tech Data, as well as their significant dealer network. Both companies will have an incentive to make this happen through a contribution of profit sharing arrangement.

Brightstar has decided to strengthen their commitment to the new alliance further, by making a strategic investment of $5 million into InPhonic, purchasing approximately 925,000 newly issues shares, representing approximately 2.5% of our outstanding shares as of June 30. This is priced at a premium to our existing share price. We see this investment as further validation of our business plan to transition the company into profitability.

The relationship with Brightstar will also add significant working capital to our business by better matching our commission revenue with the carrier's payments for our wireless handset activation. This impact could represent approximately $10 million to $30 million in additional cash flow benefits over the next few months. Andy and Ken will provide additional details of the Brightstar relationship in a moment.

Next, I'm pleased to announce that we have worked closely with our lending group, which is administered by Citicorp, and includes Goldman Sachs, on our plan for transitioning the business to profitability and cash flow. To that end, I am pleased to announce the lending group has agreed to an additional $15 million draw down from our credit agreement to assist in the management of our working capital as we transition our business to begin the new Brightstar relationship.

The new equity investment of $5 million, plus the borrowings from the lending group, will provide an immediate infusion of $20 million to InPhonic. In addition to that, the estimated $10 million to $30 million of working capital benefit that we expect to realize over the new few quarters, and initial cash infusion on top of that, will provide a total benefit to the company of between $30 million and $50 million in fresh cash.

Third, I'm happy to have Ken Schwarz on the call today. Ken joined InPhonic in July as our new Chief Financial Officer. Ken comes to us with many years of experience working at telecommunications and technology and companies in senior finance and operating roles at public companies, most recently as the President of Intersections Incorporated. We're excited to have Ken aboard, and are looking forward to his contribution toward making InPhonic a profitable cash flow business.

Now with respect to our financial results; our financial results for the second quarter do not include the impact of significant adjustments we have made to the cost structure of the business. As we discussed on the last call, we expect to see approximately $9 million in expense reductions per quarter in the sales and marketing and general and administrative and expense areas. We expect improvements in our deactivation rate over the next two quarters, and we are experiencing increased revenue from better provisioning and collecting of the features that we are activating for our customers.

Q2 2007 InPhonic, Inc. Earnings Conference Call - Final FD (Fair Disclosure)
Wire August 9, 2007 Thursday

Although we have implemented a number of important changes to the businesses, those changes were not fully implemented until very late in the second quarter and will not have their impact until the second half of the year. This has been a challenging time for everyone here at InPhonic, our partners and our stake-holders. However, despite the difficulties of the last several months, we remain fully committed to improving cash flow and look forward to demonstrating our success in this area this quarter.

Total revenue for the quarter was $79.4 million compared to $92.1 million for the second quarter of 2006. This is indicative of our change in strategy to fo-cus on the most productive distribution channels. We had total customer transac-tions for the quarter of 319,000. Again transaction volume is reflective of our overall change in customer acquisition strategy. These customer transactions in-clude wireless, satellite television and MVNE activations as well as device pro-tection plans and other services that we sell.

We ended the second quarter with 920,000 residual subscribers and did pass through the 1 million residual subscribers in early August. Average churn on our base of residual subscribers continues to be less than 2%, and RPU continues to trend slightly lower overall due to continuing industry trend of selling more family plan subscriptions with a possible positive offset due to the sale of high end data and friendly smart phones.

The deactivation rate for the second quarter was 22.6%, that's an improvement over the 24.3% reported for the first quarter of 2007, but still above the 21% for the second quarter of 2006. We believe that as we believe that as we con-tinue to provision phones with additional features correctly, the deactivation rate will continue to improve. I will now hand the call over to our Chief Finan-cial Officer, Kenneth Schwarz.

KEN SCHWARZ, CFO, INPHONIC: Thank you David and good afternoon everyone. As a reminder, when we discuss our quarterly financial results, we will be referring to continuing operations, both with respect to the current quarter and any com-parative quarters.

My focus at InPhonic will be working with the senior management team on an end to end look at all key parts of our business. I plan at looking at how we price handsets and acquire customers with Andy, how we convert and serve custom-ers with Brian, and how we bill and collect revenue with my finance team. I will also be working with Greg in treasury to insure that we generate adequate li-quidity to operate our business. I am pleased with the strength of my finance team, and hope to provide leadership both for them, and overall, to make this company profitable.

Now I'd like to provide an update of our liquidity position and then provide an overview of the quarterly financial results. Our cash position at June 30, 2007 was $23 million. As David mentioned earlier, we have drawn down $15 million from our existing debt financing with Citicorp and Goldman Sachs, and expect an equity investment of $5 million from Brightstar. Goldman Sachs and Citigroup re-main committed partners to InPhonic, and have been instrumental in assisting the company in reviewing the turn around plan and providing the flexibility we needed to begin the transformation of our business.

Upon completion of the Brightstar agreement, we anticipate additional working capital benefit from better matching commission revenue and equipment expenses, as well as removing the inventory from our balance sheet. We estimate this at between $10 million and $30 million of benefit to our cash flow that we will be-gin to realize in the fourth quarter of 2007.

In the quarter we used approximately $20.2 million of cash in our operations, including the impact of working capital. Total revenue for the quarter was $79.4 million; wireless activations generated $76.6 million in revenue, with MVNE and data services contributing $2.8 million in revenue. This compares to a total revenue of $92.1 million for the second quarter of 2006, with $87.1 million com-ing from [WAS] and $5.5 million coming from MVNE and data services.

Q2 2007 InPhonic, Inc. Earnings Conference Call - Final FD (Fair Disclosure)
Wire August 9, 2007 Thursday

Sales and marketing costs for the second quarter, excluding stock based compensation, were $29.7 million or 37% of revenue. This compares to sales and marketing costs for the second quarter 2006 of $26.6 million or 29% of revenue. General and administrative costs for the second quarter, excluding stock based compensation, were $24.1 million or 30% of revenue. In addition, there were, in this number, nonrecurring items in G&A of approximately $5.8 million related to items such as legal and accounting expenses associated with the completed audit process and accounting restatement, goodwill rebate payments, and expenses related to relocation of one of our offices. This compares to general and administrative costs for the second quarter of 2006 of $14.8 million or 16% of revenue. Adjusted EBITDA was a loss of $15.5 million as compared to a loss of $712,000 for the second quarter of 2006.

Now, let me address guidance. Revenue in the third and fourth quarters will increase sequentially by 5% to 10% over the second quarter of 2007. We expect to see a positive contribution to cash flow. We also expect positive adjusted EBITDA in the third quarter. Once we have executed the definitive agreement with Brightstar, we will no longer own and build up inventory in our balance sheet, which creates a use of working capital. At that point, our EBITDA should more closely reflect our operating cash flow on an ongoing basis.

The job today, and going forward over the next year, is to manage the business with a few key objectives in mind; improving operating cash flow, we have already announced and implemented improvements to the business, including significant reductions in quarterly cash spend from operating expenses and capital expenditures. Remember, these adjustments were not fully implemented until the beginning of the third quarter 2007, so you will not see these in our second quarter financial results.

Provisioning features correctly will create more revenue with no cost, and lower our customer returns by shipping correctly. Improving our carrier revenue collection efforts, including future revenue from the sale of data plans, will also improve, reducing the deactivation rate by pushing better business through our activation channels, better provisioning of our featured services, and providing an incentive for our customers to remain active. Andy is actively working to implement these changes, and will talk to these.

Improving our working capital, cash spend, upon agreement and implementation of a strategic relationship with Brightstar; the entire company is completely dedicated these objectives. In this effort we hope to build a better business and begin the road back to having a great company.

Finally, we have completed and satisfied all of our NASDAQ listing requirements, and are in full compliance. I will now turn the call over to Andy.

ANDY ZEINFELD, PRESIDENT, INPHONIC: Thank you Ken. I'd like to begin by providing some additional details on the Brightstar deal. We believe this is a critical step for InPhonic, and will contribute significant immediate and ongoing benefits to our operating cash flow. This deal is part of a larger effort to examine our business and determine what we do well, and what we can improve upon, by partnering with other companies.

Fundamentally we are an online consumer acquisition engine, and technology integration company, so we believe this deal allows us to continue focusing on our core competency while adding a world class distribution partner that will deliver substantial value to InPhonic, our customers, and our wireless partners. We expect to be ready for the transition of services beginning with implementation of the agreement on or before September 30, 2007.

Here is an outline of the near term and long term goals; in the near term, beginning with the implementation of a signed definitive agreement, again which we expect to be by September 30, 2007, we will make best efforts to migrate Brightstar's direct-to-consumer business to the InPhonic activation and implement platform. And conversely, InPhonic will migrate to the Brightstar logistics, procurement and inventory management platform.

Q2 2007 InPhonic, Inc. Earnings Conference Call - Final FD (Fair Disclosure)
Wire August 9, 2007 Thursday

We will jointly fund, with Brightstar, the implementation of the agreement. This includes creating interfaces of our systems and working through logistics and fulfillment handoff points. We will collaborate with Brightstar on forecasting, demand planning and inventory management, as well as reverse logistics. It is expected that, under the final agreement, Brightstar will procure all wireless handsets for InPhonic. It is also intended for Brightstar to assume management and some financial responsibility for InPhonic's distribution center.

In the longer term, this new relationship could offer significant growth opportunities for InPhonic, both domestically and internationally. The combination of InPhonic's activation and direct-to-consumer platform with Brightstar's operational capabilities in wholesale fulfillment and logistics has the potential to achieve superior shareholder value. Our efforts in the United States could bring a powerful and unique value proposition to new potential customers, as well as expanding our existing relationships with companies such as Best Buy, Radio Shack and many others.

Internationally, Brightstar is one of the largest providers of supply chain solutions and distribution services to the wireless industry. There could be an opportunity for InPhonic to leverage its scaleable activation platform to replicate an eventual joint domestic business model for Brightstar's large and diverse international customer base of over 160,000 points of distribution, getting more mobile devices and plans in the hands of consumers, the world over in the most efficient way possible.

We believe there could be significant operating expense and cash benefits to the proposed deal, including the following: working capital. These have already been already been detailed by David and Ken.

Inventory operations; Brightstar will take over the management of the distribution center operations, which could result in significant savings to our general and administrative expenses.

Handset procurement and fulfillment; improved procurement and management of the inventory fulfillment operations could result in substantial savings in gross margin expansion related to lower purchase price and shipping cost of handsets.

Reverse logistics could produce substantial savings on repair cost per phone, and new consumer businesses. The contemplated migration of Brightstar's consumer activation and the enablement business to the InPhonic platform could provide a significant revenue contribution, as well as new opportunities for residual consumer growth.

Now, I'd like to discuss some of the core changes taking place here at InPhonic, and then address a few of the initiatives I discussed on the last call.

As I discussed on the last call, all sales are not treated equal. In the past, we have focused on top line revenue growth and activation volume. We are now entirely focused on positive cash flow and return on investment. Over the last 60 days, we've engaged in a complete analysis of all our marketing partners and sales channels and have aggressively been shutting down additional partners or channels that do not have a positive contribution to the business. I cannot overstate how significant of a change this is to the culture at InPhonic. And I'm very proud of the team and our success to this point, although we clearly have a long road ahead and much work to do over the coming months.

We continue to evaluate and make adjustments to our partner and challenge relationships and hope to show significant and material improvements in the efficiency and effectiveness of our sales and marketing efforts in the third and fourth quarters. I also believe these long-term changes to our culture will have a meaningful positive impact on our deactivation rates in the back half of the year.

A point of focus for the new sales and marketing organization is to effectively capitalize on incremental high-margin revenue opportunities that help us to increase profitability and improve the customer experience. On the last call,

Q2 2007 InPhonic, Inc. Earnings Conference Call - Final FD (Fair Disclosure)
Wire August 9, 2007 Thursday

I detailed two of these opportunities; accessories and the up-selling of wireless features.

Earlier in the year, we launched a new wireless accessory store within Wirefly and the majority of our [Wide] label partners. I'm pleased to say that although it's still early, our efforts in this area have been successful and we've seen our sales volume and [attach rates] improve materially.

In the second quarter of 2007, the number of wireless accessories we sold improved 42%, when compared to the second quarter of 2006. And our gross profit on these accessories improved 55% over that same time. This means that we're not only seeing volumes increase, but we are also seeing improvement in the gross margin on these sales.

Although we are pleased with the progress, we also believe there is still significant opportunity to improve the contribution of accessory sales to our bottom line. Currently, approximately one out of every five handsets we sell has an accessory attached as part of the sale. This can be improved and we're on our way.

The up-selling of wireless features, as well as improved provisioning and collection, our feature revenue is a primary focus. By up selling features, we're attempting to create greater value in certain subscribers by making available to them, in a convenient, compelling way, such things as data plans, instant messaging, ringtones and other mobile entertainment and information options. This sales activity creates incremental revenue that carries very attractive margins.

These high-quality subscribers not only deliver increased value on day one of the transaction, they also carry compelling turn and RPU characteristics, which make them very valuable from a residual perspective.

Although it's still early, we've seen a substantial improvement in the feature attachment rate, year-over-year. In the second quarter of 2007, at least one feature was attached to approximately 41% of our handset sales. This compares to a 27% attach rate in the second quarter of 2006.

It's also important to note, customers who are able to complete their wireless purchasing experience online and have them provisioned correctly, by taking advantage of our accessory and wireless features, offers a generally more satisfied - they're generally more satisfied with the overall shopping experience and are likely to return and transact again and ultimately, deactivate at a much lower rate.

I'd also like to tell you that InPhonic is now working with five of the nation's leading network marketing companies to significantly improve our sales reach across thousands of sales agents who are actively educating the marketplace on our wireless offerings. We are very pleased with the early results.

The changes we've made over the last couple months have been dramatic in impact to the business. We are seeing the positive changes every day and believe those changes will be more clearly reflected in the third and fourth quarter financial results.

David, back to you.

DAVID STEINBERG: Thank you, Andy. Well the first half of this year has been challenging. We are completely dedicated to improving the operations of the business and delivering improved cash flow and profitability and we do feel that the worst is now behind us.

With that, let's move to questions operator.

OPERATOR: (OPERATOR INSTRUCTIONS)

And we'll take our first question from Jeetil Patel with Deutsche Bank.

JEETIL PATEL, ANALYST, DEUTSCHE BANK: Hi guys. We actually got dropped for part of the commentary about the Brightstar deal but, I guess, can you just talk about how much capital will you get for the inventory outsourcing of the distri-

Q2 2007 InPhonic, Inc. Earnings Conference Call - Final FD (Fair Disclosure)
Wire August 9, 2007 Thursday

bution assets? You said you have $13 million on the balance sheet currently. Can you talk about, I guess, what do you end up getting for the sales of those assets to Brightstar if that's how we should think about it?

Second, can you talk about what the timing is behind the outsourcing event deal? Do you need have a final agreement before that can happen, or does the LOI carry you into getting the process rolling? And then, I have a quick follow up.

DAVID STEINBERG: The asset purchase initially, and we did outline all this, if the conference call company dropped some, we should move quickly to get the script up on line. The reality is that it appears as if the up front payment is going to be anywhere from $15 million to $20 million, including the assets in the facility and the inventory, with an incremental cash flow benefit over the next couple of quarters of anywhere from $10 million to $30 million on top of that.

The timing is, we have said that we will sign a definitive agreement by the end of the third quarter. I would tell you that it's going to happen much, much sooner than that; you know, we're talking days, not weeks or months. And we expect the cut over to be some time in the next couple of weeks, which will include the payment.

JEETIL PATEL: Okay and so your commentary about the $30 million to $50 million of cash coming in, with the credit line as well, does that incorporate the sale of the assets and facility, the working capital and the credit line all together?

DAVID STEINBERG: It does.

JEETIL PATEL: Okay.

DAVID STEINBERG: So, if you look at $15 million on the credit line plus $15 million to $20 million there gets you to $30 million to $35 million plus another $10 million to $30 million on the cash flow. So, I mean, it could be as high as $50 million or $60 million. We're trying to be conservative in the way we look at it by saying anywhere from $30 million to $50 million.

JEETIL PATEL: Okay and can you talk about in the - what do you think your year-end cash balance looks like in terms of, you know, after all is said and done and your comments around positive cash flow, I guess, can you talk about, you know, outside of the working capital change, do you think that - on this one-time kind of shift going on, how much - what's your cash flow dynamic look like in the back half and what's your year-end cash balance look like? Thanks.

KEN SCHWARZ: This is Ken Schwarz. At this stage of the game, we're having the inflows that David just outlined to you; we are - as I'd indicated in the call is we are looking at an operating cash flow positive for the balance of the year. Other than that, I'm not ready to specifically state what it's going to be at the end of the year.

DAVID STEINBERG: I think that's a good way of putting it and let me further point out, we expect to be operating cash flow positive in the third quarter and then in the fourth quarter on.

So, we feel like we've put the company in the right position to make the blocking and tackling decisions and we believe that our cash position will be greater than the inflows in what we now currently have.

Do you have a follow up, Jeetil?

OPERATOR: Anything further, Mr. Patel?

JEETIL PATEL: No [everything] was said. Thanks.

OPERATOR: Thank you and we'll move next to Imran Khan with JP Morgan.

IMRAN KHAN, ANALYST, JP MORGAN: Yes, hi; thank you for taking my question. Two questions; first, if I look at your second quarter result in contribution profit dollars, the way I define gross profit myself, the marketing was nega-

Q2 2007 InPhonic, Inc. Earnings Conference Call - Final FD (Fair Disclosure)
Wire August 9, 2007 Thursday

tive. And sales and marketing actually, I think, 35% revenue, up from 26% a year ago and gross profit margins declined 12 points, what...?

DAVID STEINBERG: 29% a year ago and 37% this year.

IMRAN KHAN: Right; so, what gives you the confidence that you can run the business on a breakeven contribution profit margin, a profitable contribution margin? What will change that the gross profit margins will improve, or the sales and marketing went down without --(inaudible).

DAVID STEINBERG: Well, a significant portion is what we previously had discussed, which is that, there are a variety of marketing programs that we have discontinued, in the third quarter. And it's going to be much more focused. This is probably what Andy's been talking about and we outlined.

So, you will see the results of that occur in the third quarter and beyond. That should significantly change, you know, the marketing as a percentage of our revenue, prospectively.

ANDY ZEINFELD: And, from a gross margin perspective, let's be very clear. In the second quarter our gross margin was dramatically affected by two things; one, carrier write-offs. So, we took a number of carrier write-offs that were from prior periods in the quarter that affected revenue with no cost associated with them.

And two, we had a major challenge related to activating our data features. So, if you look at it, about 33% to 40% of the customers who were buying product from us are now activating data features. It was 41% last quarter.

What's happened is, we were, because of a number of systemic issues in our business, not provisioning them properly. And we were building our pricing scheme, Imran, on the theory that we would be collecting those feature revenues.

So, for example, in the past, we would say, okay, we'll give you a free 'phone, call it a free Razr. In very round numbers, you get $300.00 revenue, net of deactivations or returns; you give away a $150.00 and you made a $150.00 gross profit.

What happened is we switched our pricing scheme to say, "Hey we can get up to $125 to activate a basic data feature for one of these PDAs." So we would say, "Okay we'll give you a free $200 Pearl, Blackberry Pearl, if you activate the data feature," which would have driven our revenue to $400. Then you give away a $200 device and hypothetically we would have made $200 in margin. What we found was we were only collecting 15% of the data revenue. So you were collecting $315 yet giving away a $200 phone. What we're doing now is, we put an action team in place that is activating 100% of features properly by using a manual team in India. We've repositioned some our employees over there who do provisioning to make sure that we're activating every single one right.

This is many, many millions of dollars a month in gross margin and revenue that we have just not been provisioning properly. So between those two things, the carrier write offs and the feature revenue, I think just correcting those two things gets our gross margin and our contribution margin right back into positive territory. Andy? I agree, and as we said earlier, not all sales were created equal. So we were able to analyze the data and find out where we had channels that had high deactivation rates, and cut those out; and look at each one of the marketing partners, and look at the ROI on the invested advertising dollars and do away with those dollars that were being spent on advertising that wasn't generating the acceptable profit.

KEN SCHWARZ: And I think what you will see is the deactivation rate go down significantly this next quarter as a result of those efforts.

IMRAN KHAN: Thank you, that helps.

KEN SCHWARZ: And that's historical, I mean the way we provision it is it's historical, so it takes a while for us to actually reflect those prospectively.

Q2 2007 InPhonic, Inc. Earnings Conference Call - Final FD (Fair Disclosure)
Wire August 9, 2007 Thursday

DAVID STEINBERG: And we'll see that benefit in the third quarter Imran. So we feel very comfortable, and quite frankly looking at our July results, which look substantially better than our second quarter results, we're very encouraged by the new plan and feel that the new action plan is working moving forward. We actually were able to terminate millions of dollars in marketing that month, yet not see a dramatic drop in business. We still expect to grow the business over the second quarter by at least 5% to 10% sequentially.

IMRAN KHAN: Thank you, that's helpful.

OPERATOR: Next we have Steve Mather with SMH Capital.

STEVE MATHER, ANALYST, SANDERS MORRIS HARRIS: Thank you. Good afternoon David.

DAVID STEINBERG: Hi Steve, how you doing?

STEVE MATHER: Oh, pretty good. Just a couple of things; you mentioned the Brightstar benefit of $10 million to $30 million. Could you sort of parse that out into what would be recurring versus nonrecurring in the quarter?

DAVID STEINBERG: So that doesn't include the nonrecurring, so the recurring really is -- the nonrecurring is they are purchasing our assets initially. They're buying the inventory we have on hand plus the assets in our fulfillment facility. In addition to that, what you're going to see is, today we have to buy a phone, it sits in our warehouse for sometimes 90 days before we ship it and get it activated, and then we have to wait another 30 to 45 days to get paid from our carriers. On a going forward basis we'll effectively buy the phone as it's shipped to the consumer, and we'll get paid by our carrier partners in the normal period of time in which they would pay us. So it's supposed to, the way it's supposed to line up, better match our shipments to our activation revenue, and by eliminating that use of working capital to build inventory it will allow us, on a going forward basis, to actually have our EBITDA very closely reflect our operating cash flow.

And if I can I'd like to add although I believe we do a decent job in running a distribution center, that's Brightstar's core competency. And we know just by the diligence that's been completed that they will run this distribution center more efficiently than we do. And the unique twist to this partnership is the sharing of profits. So for every dollar they're able to reduce our expenses, we're able to share in those profits. So there's an incentive for Brightstar to reduce our overall expenses. It's a win/win proposition for everybody.

KEN SCHWARZ: And that also includes, we expect, because of the purchasing power that the handset prices and shipping will be reduced as well.

DAVID STEINBERG: So not included in that 10 to 30 Steve, is we think we can drop our costs of goods sold dramatically by partnering with Brightstar. They buy billions of dollars worth of cell phones a year versus the couple of hundred million we buy a year. We are now going to share in 100% of the savings and then split up 50/50 whatever is saved. So this is a driver, in my opinion, in really three ways. You've got the cash flow component, you've got -- you're going to get a nice step in gross margin.

You've got an investment into the company, and then you've got new consumer business on top if it where we're going to be able to have access, for the first time, to their -- I think it's 115,000 retail distribution points, where we want to take our direct to you in store virtual strategy that we rolled out with Radio Shack, we've rolled out with the Sprint kiosks and with Sam's Club, and we now want to roll it out to all of their distribution. That's not factored into our growth rate.

STEVE MATHER: Okay. Could you comment on the revenue guidance? Is it up 5% to 10% sequentially for the next two quarters, which will put you somewhere just above $400 million?

DAVID STEINBERG: Yes. We're not giving annual guidance, but you can do the math. It's 5% to 10% sequentially per quarter through the end of this year.

Q2 2007 InPhonic, Inc. Earnings Conference Call - Final FD (Fair Disclosure)
Wire August 9, 2007 Thursday

STEVE MATHER: Okay. And then just one other thing, when I calculate free cash flow I just do cash flow from ops minus Cap Ex. It looks like negative 33 and then negative 26 this quarter. You made it easy for us, there's a list of initiatives, improving deactivation, and you mentioned $9 million a quarter in marketing and G&A, etc. How do you see free cash flow?

DAVID STEINBERG: Well you've got to understand, the biggest component to this, in my opinion, is the feature revenue and eliminating marketing and driving down deaction returns. So the numbers, if you added them all up, are dramatically higher in opportunity than the negative cash last quarter. And remember, we also had millions of dollars in the last quarter paid to accounting firms and law firms as we completed our restatement and such. Ken, do you want to touch on this as well?

KEN SCHWARZ: I'll let Greg go ahead and jump in on this.

GREG COLE: Steve I think really where we're at today is, I think we are going to be in a position where we're working toward the positive free cash flow metric that you're describing. I wish we could say that we feel we can cover the Cap Ex next quarter, but I think we're more comfortable talking about sort of an interim step on that, and saying that we'll work on the operating line first, and then as we go into the back half of the year we hope to be able to cover the Cap Ex as well. But we're just not at a point where we're ready to give you guidance on that yet.

DAVID STEINBERG: So we believe we'll be operating cash flow positive in the third quarter and free cash flow positive in the fourth.

STEVE MATHER: Okay, thanks.

OPERATOR: And next we'll move to George Grose with American Capital.

GEORGE GROSE, ANALYST, AMERICAN CAPITAL PARTNERS: Good afternoon. It seems like this new action plan is like your second attempt at dealing with the working capital issues. The first was back in Q4 you had $100 million financing with Goldman Sachs and that was supposed to cure this issue. I guess now, I mean, can you tell us maybe what are some of the checks that you have internally, checks and balances that maybe give you confidence that this time you can execute on the action plan?

DAVID STEINBERG: The biggest one is that was a financing event; this is a shift in business strategy. So by matching our phone shipments to our activation revenue from the carriers, that's monumental in strategic shift for our company. It used to be you would go negative cash flow on every single phone you shipped for at least a month or two, until you paid by the carriers. Now it's going to match up very well. Plus, and I think, George, we spent a lot of time on all the programs, cutting $9 million plus in marketing. You've got millions and millions of dollars tied up in features. Ken?

KEN SCHWARZ: Deactivations, and the things we expect as well from the fulfillment work we're going to do with Brightstar. So I mean we've outlined a number of initiatives, so you're right, there's working capital and funding initiatives, which we've outlined, but in addition what we've been outlining is the operating initiatives that we've undertaken over the past six months.

ANDY ZEINFELD: And I believe the strategy of the corporation last year versus this year is substantially different. Last year we were looking at growth. We were looking at top line growth, and this year we are solely focused on the bottom line profitability and free cash flow. It really is a different strategy.

GEORGE GROSE: Okay. And I guess you -- when I look at the reconciliation of your EBITDA it looks like you had like another $2 million related to the rebate settlements. It seems like every call we hear that it's going to be the end of them. Are you done with them now?

DAVID STEINBERG: We now believe we're done. This relates to some legal settlements which we're very excited about. So this should be done, George. We did say though, I will give us credit, last quarter we did say there would be some

Q2 2007 InPhonic, Inc. Earnings Conference Call - Final FD (Fair Disclosure)
Wire August 9, 2007 Thursday

in the second quarter on this. But the reality is that we -- the real goal was let's get the back half behind us and move forward. And I think there were a number of items that were written off in the second quarter that we're not calling out as extraordinary, that happens to be one of them, as far as carrier write offs and some other things, that will not actually happen into the third quarter.

We were trying not to kind of put together a picture on EBITDA, we were just trying to put together where we think the business is going forward. And we're really excited about the Brightstar agreement, not just because of the cash. I mean the cash is good, and the cash flow is good. I'm more excited about the gross margin increment that should come out of it in addition to the cash flow and better working on the consumer side with some of our clients, which are some of the biggest corporations in the world.

GEORGE GROSE: Okay, and then last, the $4.4 million related to the discontinued marketing programs?

ANDY ZEINFELD: As I spoke about earlier, we've analyzed all of our different marketing and sales channels and that is an expense related to those marketing ventures that we're no longer doing. They didn't have the return on investment that was required and we made the difficult decision to stop them and do away with the growth that was coming from those channels. But it was top line growth; not bottom line profitability.

GEORGE GROSE: Okay, thanks.

OPERATOR: And next, we have Bob Lee with Sidoti and Company.

BOB LEE, ANALYST, SIDOTI & CO: Just a follow up from the last question about the discontinued marketing; I guess, in the third quarter David, you had mentioned that you'd wanted to focalize on the marketing. You want a more profitable activation. Does that mean that that's going to continue throughout the third quarter and fourth quarter, that you're going to have discontinuing marketing programs?

DAVID STEINBERG: Well, we are evaluating a number of marketing programs but I don't think we believe, Bob, we're going to take another charge associated with it in the third quarter.

ANDY ZEINFELD: And if I can say, we will always be examining our marketing partners and channels and making decisions, daily, on what's working and what is not working.

DAVID STEINBERG: And, once again, I was very encouraged, Bob, by what we saw in July. We were able to take out some really expensive marketing programs and still feel very confident that we can deliver 5% to 10% sequential growth with operating cash flow positive in this quarter and free cash flow in the 4th.

BOB LEE: Okay. Andy, I got cut off during the part of the conference call but last - in June, you'd mentioned that there were going to be some significant campaigns to improve deactivations. Can you kind of highlight that?

ANDY ZEINFELD: Yes sir. We have spent a lot of time here on this whole feature issue and making sure that we're activating what the consumer is actually ordering and asking for. And if you think about the experience when the consumer gets the device and it's not provisioned correctly, they expected it - I'm making this up; they're expecting it to have e-mail capabilities and, when they get the device, it doesn't work. It's very frustrating and that's what leads to the deactivations, the returns; the consumer going to either a retailer or directly to the carrier to make changes and that affecting what commissions that we receive.

Not only that, we've done some things with follow up communications to our consumers and how we're communicating during the purchase, immediately after the purchase and follow up. It's all about improving the customer experience, from the beginning to the end.

DAVID STEINBERG: And the deeper we've gotten into this, Bob, the deeper we have found that, if you activate and ship the 'phone correctly and quickly, they deactivate at substantially lower rates. And we have really focused on fixing this feature issue, which has a double compounding effect.

One, it has dramatically driven up our cost of goods sold as a percentage of revenue, because we expected to collect these millions of dollars a month that we did not collect. And on top of it, you've got a much higher deactivation and return rate because, when people get a product that's shipped to them incorrectly, they return it.

So, once again, we feel that we've got a handle on the feature rate going into July that quite frankly was a part of the reason the deactivation rate began to drop last quarter because of what we saw in June, where we started to get a handle on this. It's normalizing very, very well in July and that's a trend we expect to continue.

BOB LEE: I guess, are you using any kind of other incentive programs, like going back to some rebates or accessory giveaways? Is that --.

ANDY ZEINFELD: Well, I hope you can appreciate there are some things that we're doing. We really don't want to discuss those for competitive purposes.

DAVID STEINBERG: The rebates are not one of them. We continue to use rebates as a small component of our business but it's certainly something we want to leave in our past.

BOB LEE: Okay, fair enough. And then, lastly, not lastly, but in terms of the system that you'd mentioned about capturing the right features that are being activated by your customers and getting paid for that, you had mentioned that there is now a group that's auditing that. Now, is the system, that automatic process that you have, is that in place already?

DAVID STEINBERG: We have put the automated system in place with two of the five biggest carriers in the United States. The other three carriers, right now, they are literally, every day, activating those manually. They're already baked into our G&A structure. We don't think it's going to drive additional expense there. It's a few people, in India, doing this that we have actually reallocated from other jobs they were doing it. And, we're talking about so many millions of dollars a month in opportunity, that the cost associated with activating those manually pales in comparison.

Andy, what're we putting the next, the two big guys, the next two big guys on?

ANDY ZEINFELD: One at the end of this month and one is mid-next month.

DAVID STEINBERG: Right, so by the end of September, we should have everybody automated.

ANDY ZEINFELD: And although everybody will be automated, I just want to specify again that is not slowing us down from doing it manually.

DAVID STEINBERG: And we will continue to audit, once we have the automated (inaudible) to insure that they're provisioned correctly and follow up on it.

ANDY ZEINFELD: Yes; this was a major issue inside our business that we didn't recognize fast enough on many levels. And, we're glad we've now caught it. And, you know, back to Imran's original question, understanding this problem really gives us a lot of comfort that we can swing from what happened in the second quarter to what we believe is going to happen in the third quarter.

BOB LEE: Okay and then, I guess my last question is, considering the about $30 million to $35 million restatement last year, I guess, are you getting any kind of pushback from your carriers concerning remitting those payments back to you?

DAVID STEINBERG: Well, let's not comment on - because the carriers are obviously our partners, it's very important we are working very closely with them and actually making a lot of headway there.

Q2 2007 InPhonic, Inc. Earnings Conference Call - Final FD (Fair Disclosure)
Wire August 9, 2007 Thursday

ANDY ZEINFELD: I'd like to say that our carriers have really worked with us well on this. And, you know, when I talk to them, there's not a conversation that goes by where they say if there's monies that are owed to us, we're going to be paid for them. We just have to document it and be able to show the information correctly.

DAVID STEINBERG: And one of the things I think is important, we've really instructed the finance team, which is still building itself, Ken is brand new, to focus on making sure we collect every dollar that we billed now, while working on some of the older stuff.

BOB LEE: Okay, fair enough. Thank you very much.

OPERATOR: And we'll take our final question from Sameet Sinha, with Kaufman Brothers.

SAMEET SINHA, ANALYST, KAUFMAN BROTHERS: Yes, good evening. I have a couple of questions; if I look at your numbers sequentially, I mean, your revenues came down significantly; your sales and marketing kind of stayed fairly stable. So, when you talk about cutting marketing channels, what happened in the second quarter that you - maybe you were distracted by the restatement? Can you comment on that and then I have a bunch of other questions.

DAVID STEINBERG: The answer is we were incredibly distracted by the investigation and the restatement. And, quite frankly, we didn't make those cuts in the second quarter. We made those cuts going into the third quarter.

I do want to point out that revenue is really affected by two things. One was carrier write offs and two was this feature revenue that, once again, is millions of dollars a months that we expected to get that we found out, late in the quarter, we were not properly provisioning, therefore, we're not collecting.

SAMEET SINHA: Okay. Now, in terms of the Brightstar deal, you spoke about expense savings. I mean, how much - can you quantify for us how much G&A could come down? And also, in terms of the inventory, you have about $15 million right now. By the time the deal closes, you- let's say, for example, you have $5 million. So, essentially, you have an asset sale of $5 million--.

DAVID STEINBERG: No, no, no; that's nowhere near right. I quoted, I think, for, I think, Jeetil, that we believe this is an upfront approximately $20 million asset sale, upfront.

ANDY ZEINFELD: Consisting of the current inventory, at that point in time, and certain equipment and other assets--.

DAVID STEINBERG: That we've got invested in the facility, because they're effectively buying that business from us.

SAMEET SINHA: Okay, okay. Now, in terms of your operating cash flow, then you spoke about being positive, I'm just guessing that this does not include the $15 million to $20 million from Brightstar?

DAVID STEINBERG: We believe that you'll have a positive impact on that one-time and some negative impacts from some past-due payables that we got that will offset each other and you're probably correct on that.

SAMEET SINHA: Okay. Now, this $4.4 million in marketing charges that you talked about, what is marketing guarantees that you had made and now you had to cancel this contract and pay for them? Or -- I'm trying to understand how or why you would have to incur a charge if you're cutting out some marketing channels.

ANDY ZEINFELD: Essentially you're tight. These were commitments or insert orders that had already been committed to and placed but we're not doing on a going forward basis.

SAMEET SINHA: Okay and, in terms of the payables, is there any way you can stem the flow? I mean, if - understanding you have to keep paying your handset partners but, slow the flow of that so that you can maintain higher cash balances? Is there something? Or, is it just nave on my part?

Q2 2007 InPhonic, Inc. Earnings Conference Call - Final FD (Fair Disclosure)
Wire August 9, 2007 Thursday

DAVID STEINBERG: No. That's what the whole Brightstar agreement is about. And it's not slowing; it's consolidated. And Greg?

GREG COLE: Yes. I mean, I think we have tried, in the past, to be very care- ful about managing the carrier payments with the payments on our payables and other expenses out the door. I think one of the advantages of getting this transaction with Brightstar completed will be, as David said, it gives us more ability to better match. Because, I won't be fronting the expense for that in- ventory upfront, prior to getting the box shipped out the door.

And I think that's an important piece for us, that will help us tremendously in trying to manage our flows, because we'll be able to take this (inaudible) off of our balance sheet and shift that to someone else.

KEN SCHWARZ: An additional benefit is that we have, on occasion, gone through out-of-stock conditions, where we've not been able to fulfill and lost that revenue. And with the Brightstar agreement, we hope to be able to recoup some revenue that we have not been able to realize in the past.

GREG COLE: Yes, and we really, I think the out-of-stock issue was one that will fix itself and we'll dramatically grow the business again, once you have everything in stock.

SAMEET SINHA: Okay. Thank you very much.

DAVID STEINBERG: Thank you.

OPERATOR: That does conclude our question and answer session. At this time, I'll turn the call back over to our speakers for any additional or closing re- marks.

DAVID STEINBERG: Once again, thank you, everybody, for coming. You know, we feel this Brightstar agreement is a mission-critical, going forward agreement for us that puts our company back on the trajectory we want to be, which is cash flow positive and EBITDA positive. I'm excited to have Ken here and Andy and Brian really running the day-to-day. And thank you very much for attending the call. Take care.

OPERATOR: That does conclude our conference call for today and we do thank you for your participation.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assump- tions underlying the forward-looking statements are reasonable, any of the as- sumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURA- CIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFOR- MATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

**LOAD-DATE:** August 24, 2007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN RE INPHONIC, INC.
SECURITIES LITIGATION

Case No.:  1:07-cv-00930-RBW

**[PROPOSED] ORDER**

This cause comes before the Court with respect to Defendants David A. Steinberg and

Lawrence S. Winkler's Motion To Dismiss The First Amended Class Action Complaint.

The Court being fully advised in the premises, IT IS HEREBY ORDERED that

Defendants' Motion is GRANTED.  It is FURTHER ORDERED that the First Amended Class

Action Complaint be, and is hereby, DISMISSED WITH PREJUDICE.

ENTERED:

By the Court:

Date: _____

_____
Honorable Reggie B. Walton
United Stated District Judge

The Clerk shall send a copy of this Order to:

Laurie Smilan
laurie.smilan@lw.com

J. Christian Word
christian.word @lw.com

David Becker
david.becker@lw.com

Steven J. Toll
stoll@cmht.com

Andrew N. Friedman
afriedman@cmht.com

Elizabeth S. Finberg
efinberg@cmht.com