## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                  )

THOMAS STEVENS, et al.,          )
                                  )

          Plaintiffs,         )
                                  )

          v.                  )       Civil Action No. 07-0930 (RBW)
                                  )

INPHONIC, INC., et al.,          )
                                  )

          Defendants.     )
                                  )
_____)

## <u>MEMORANDUM OPINION</u>

On May 5, 2008, the plaintiffs, purchasers of common stock from InPhonic, Inc.

("InPhonic"), filed their First Amended Class Action Complaint ("Am. Compl.") alleging

that between May 8, 2006, and October 11, 2007 (the "Class Period"), Am. Compl. ¶ 1,

the defendants, David A. Steinberg ("Steinberg"), InPhonic's Chief Executive Officer

("CEO") and Chairman of the Board of Directors, and Lawrence S. Winkler ("Winkler"),

InPhonic's Chief Financial Officer ("CFO") and Treasurer, violated §§ 10(b) and 20(a) of

the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b), 78t(a) (2006)) and Rule 10b-5

of the Code of Federal Regulations, 17 C.F.R. § 240.10b-5 (2009), Am. Compl. ¶¶ 26-27.

Specifically, the plaintiffs contend that the defendants committed these violations by

"knowingly and recklessly" artificially inflating InPhonic's stock price by overstating of

the company's revenues and understating its expenses related to wireless activations, as

well as equipment and consumer rebates for fiscal year 2006. Id. ¶ 4. Currently before

the Court is the defendants' Motion to Dismiss the First Amended Class Action

Complaint ("Defs.' Mot.") under Federal Rule of Civil Procedure 12(b)(6) for "failure to

state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), which the lead

plaintiff opposes.[1]  For the reasons that follow, the Court must deny in part and grant it in

part the defendants' motion to dismiss.

## I.  FACTUAL BACKGROUND

The facts when considered in the light most favorable to the plaintiffs are as

follows.  InPhonic is a Delaware corporation with its principal place of business in

Washington, D.C.  Am. Compl. ¶ 29.  InPhonic began operations in 1999, providing a

variety of wireless-related services.  Id. ¶ 30.  Chief among these services was the online

sale of wireless service plans and equipment, which comprised 96% of the company's

business.  Id.  InPhonic eventually became the leading seller of cell phones and wireless

plans purchased on the Internet.  Id.  In fiscal year 2006, InPhonic's quarterly filings with

the United States Securities and Exchange Commission ("SEC") reported a steady growth

in revenue.  Id. ¶¶ 52, 71, 102, 132.  As required by the Sarbanes-Oxley Act of 2002

("Act"), 15 U.S.C. § 7241 (2006), defendants Steinberg and Winkler certified the

---

[1]      The Court considered the following documents in resolving the defendants' motion: the
defendants' Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss the First
Amended Class Action Complaint ("Defs.' Mem.") and the Declaration of David A. Becker in Support of
Defendants' Motion to Dismiss the First Amended Class Action Complaint ("Becker Decl."), which was
submitted with the defendants' memorandum; the Lead Plaintiff's Memorandum of Law in Opposition to
Defendants' Motion to Dismiss the First Amended Class Action Complaint ("Pls.' Opp'n"); and the
Defendants' Reply Memorandum in Support of Their Motion to Dismiss the First Amended Class Action
Complaint ("Defs.' Reply").

On a motion to dismiss, this Court may consider "documents incorporated into the complaint by
reference, and matters of which a court may take judicial notice."  Tellabs, Inc. v. Makor Issues & Rights,
Ltd., 551 U.S. 308, 322 (2007); see also In re XM Satellite Radio Holdings Sec. Litig., 479 F. Supp. 2d
165, 174 n.8 (D.D.C. 2007) (citing Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 360-61 (6th Cir.
2001)) (holding that "a court may consider the full text of the SEC filings, prospectus, analysts' reports and
statements 'integral to the complaint,' even if not attached [to the complaint], without converting the
motion into one for summary judgment under [Rule 56 of the Federal Rules of Civil Procedure]." (internal
quotation marks omitted)).  Thus, this Court also reviewed the SEC filings referenced in the Amended
Complaint, Defs.' Mem., Becker Decl., Exs. C, E, H, S, U, Y, and the transcript of InPhonic's investor
conference call held on August 9, 2007, id., Ex. DD.

accuracy these filings, including the reported financial results and efficacy of the company's internal controls, as required by the Act.  Id. ¶ 84.

On November 7, 2006, while InPhonic's stock price was artificially inflated due to accounting irregularities that were later identified, Steinberg sold 450,000 shares of his InPhonic stock, which amounted to less than 10% of his total holdings, for a total profit to him of $4,702,500.  Id. ¶¶ 223-24.  On that same date, Winkler sold 100,000 shares of his InPhonic stock, which amounted to about 28% of his total holdings, for a total profit to him of $1,044,999.  Id. ¶¶ 240-41.  The shares were sold at "a price discounted to market" and 27% below the class-period high.  Defs.' Mem., Becker Decl., Ex. Y (Nov. 7, 2006 Form 8-K); see also id. at 15.  These sales were made as part of an agreement with Goldman Sachs and other lenders, in exchange for a $100 million line of credit provided to InPhonic.  Am. Compl. ¶¶ 225-26.

On April 3, 2007, InPhonic issued a public statement and a SEC Form 8-K filing which revealed that accounting irregularities had resulted in improper revenue recognition for fiscal year 2006.  Id. ¶¶ 5, 144.  The April 3 filing warned investors that as a result of the accounting errors, the financial statements for the second, third, and fourth quarters of 2006 could no longer be relied upon and also identified three material weaknesses in the company's internal controls.  Id. ¶ 144.  InPhonic further disclosed the extent of these errors on May 4, 2007, in a Form 8-K/A filed with the SEC.  Id. ¶ 147.  The May 4 filing clarified that no financial results from 2006 should be relied upon due to numerous misapplications of Generally Accepted Accounting Principles (hereinafter simply "accounting"), including "improperly recognized revenue and improperly deferred expenses; inadequate [internal] controls[,] and insufficient processes, procedures and

expertise." Id.  Following the April 3 and May 4 filings, InPhonic's stocks fell a total of 19.2 %, id. ¶¶ 200, 203, and on May 31, 2007, defendant Winkler resigned from his position with InPhonic, id. ¶ 27; Defs.' Mem., Becker Decl., Ex. C (May 30, 2007 Form 8-K).

The revenue recognition inconsistency arose because during fiscal year 2006, InPhonic reported that it recognized revenue from carrier commissions[2] when the devices were activated and shipped to customers, and then reduced its revenue by subtracting expenses from projected deactivations within a certain period of time, "such as 180 days." Am. Compl. ¶ 34.  In a restatement of earnings filed on June 1, 2007 ("June 2007 Restatement"), InPhonic revealed that it had overstated its revenue for 2006 by $34.8 million due to what turned out to be an underestimation of its deactivation projections. Id. ¶ 35.  InPhonic also admitted that it "overstated accounts receivable by using a methodology that anticipated future improvements in collections beyond that supported by past experience, and which did not consider certain current factors and other information." Id. ¶¶ 36, 143.  In sum, the June 2007 Restatement indicate that the total revenues for fiscal year 2006 were $369.6 million, down from InPhonic's original $405.7 million in stated earnings, and also that the net losses for 2006 were $63.7 million, $46.4 million more than originally reported.  Id. ¶¶ 151-52.  noted

In the June 2007 Restatement, InPhonic also stated that the company overstated its equipment revenues by an additional $2.6 million due to the improper recording of uncollected fees and penalties as a result of early termination of wireless plans and

---

[2]      According to the allegations set forth in the complaint, "carrier commissions" refers to InPhonic's revenue from "finder's fee[s]" paid to it by wireless service providers each time InPhonic signed up a new customer for that wireless service provider.  Am. Compl. ¶ 32.

wireless devices not returned by customers as required by their sales contracts.  Id. ¶¶ 37-
38.  InPhonic explained that it had presumed in its previous filings that collection
percentages of these fees and penalties would increase over past collection rates, but that
this increase had failed to occur.  Id. ¶ 38.  Additionally, InPhonic also stated that it had
improperly recorded $2.8 million in revenues as a result of its inaccurate projections of
collections on disputed carrier commissions and overstated $4.9 million in equipment
revenue due to the improper denial of consumer rebates.[3]  Id. ¶¶ 39-42.

        The June 2007 Restatement also disclosed the existence of internal control
deficiencies, or "material weaknesses," including failures to: "maintain sufficient staffing
of operational and financial resources;" "effectively communicate information to
[InPhonic's] finance department;" "maintain effective controls over the recordation,
accuracy and completeness of activations and services revenue and related accounts
receivable;" "maintain effective controls over the determination and accuracy of
equipment revenue and related accounts receivable;" "maintain effective controls over the
accuracy and completeness of consumer product rebate liabilities;" and "maintain
effective controls over the accuracy and completeness of costs of goods sold and amounts
due from vendors."  Id. ¶ 143.

        Also on June 1, 2007, following the issuance of the June 2007 Restatement,
Steinberg participated in a telephone conference with InPhonic's stakeholders, during
which he personally apologized for the need to make financial restatements, and

---

[3]        These rebates were denied through the employment of a system that required customers to
simultaneously submit paid phone bills that were at least 120 days old to show that the service had been
maintained, along with postmarked rebate submissions within 120 days of the activation of service, thereby
"render[ing] the rebate requirements impossible to [satisfy]."  Am. Compl. ¶ 40.

attributed the accounting irregularities to "back office processes [that] have not appropriately scaled with the rapid transaction growth" of InPhonic's business. Id. ¶¶ 152-53, 155.  Steinberg also stated during the telephone call that he expected revenues to be between $460 million and $480 million for fiscal year 2007. Id. ¶¶ 157-58.  After the call, InPhonic's share price rose 9% at the close of the day's trading on June 1, 2007. Id. ¶¶ 159, 204.

On August 9, 2007, the defendants filed another Form 8-K and a press release announcing that InPhonic had formed a letter of intent with Brightstar, Inc. ("Brightstar"), a "global leader in customized distribution and supply chain solutions for the wireless industry."  Id. ¶¶ 165, 171.  InPhonic "emphasized the importance of a definitive agreement with Brightstar[,] noting that [the] agreement would . . . provide [it] benefits in three key areas – improved cash flows due to outsourced inventory management, enhanced margins resulting from hardware procurement and significant growth opportunities in a new marketing relationship with Brightstar."  Id. ¶ 166.  The August 9 press release went on to report that Brightstar "strengthened its commitment to this new alliance further by making an investment of approximately $5 million in InPhonic through the purchase of approximately 925,000 newly issued restricted shares."[4]  Id. ¶ 167.  At the close of trading on August 9, 2007, InPhonic's share price increased by 22%.  Id. ¶ 205.  The following day, August 10, 2007, InPhonic filed a Form 8-K/A that further disclosed details of the improper accounting practices which led to the

---

[4]      The parties dispute the date upon which Brightstar's payment would be forthcoming.  The plaintiffs contend that the Form 8-K led investors to believe the $5 million investment was to be made "immediately."  Am. Compl. ¶ 167.  The defendants, however, claim that this interpretation was dispelled later that same day during the telephone conference in which InPhonic's Senior Vice President and Treasurer, Greg Cole, and InPhonic's new CFO, Ken Schwarz, clarified that Brightstar was "expected" to make its $5 million investment as part of the anticipated agreement between the parties.  Defs.' Mem., Becker Decl., Ex. DD (August 9, 2007 Transcript of InPhonic, Inc. Earnings Conference Call) at 2-3.

issuance of the June 2007 Restatement for the fiscal year 2006.  Id. ¶ 169.  That day, the closing price of InPhonic's shares decreased by nearly 28%.  Id. ¶ 206.

On September 5, 2007, InPhonic issued a press release entitled "Brightstar and InPhonic Sign Definitive Agreement to Form Strategic Alliance."  Id. ¶ 171.  That document outlined "four principle components" of the relationship between InPhonic and Brightstar, including Brightstar's $5 million investment to be paid to InPhonic "subject only to unspecified closing conditions."  Id.  InPhonic later issued a press release and a Form 8-K on October 11 and October 12, 2007, respectively, announcing that the "proposed" partnership with Brightstar had been "terminated."  Id. ¶¶ 175-76.  Upon this announcement, InPhonic's stock price dropped from $1.94 to $0.77, a 60% decrease.  Id. ¶ 178.  Defendant Steinberg subsequently tendered his resignation on November 7, 2007, and on November 8, 2007, InPhonic filed a petition for bankruptcy.  Id. ¶ 179.

The plaintiffs have filed this action seeking compensatory damages for losses sustained as a result of the defendants' alleged wrongdoing.  Id. ¶ 20.  Specifically, the plaintiffs allege that the defendants made fraudulent misstatements in InPhonic's 2006 financial reports, its June 2007 Restatement, its alliance agreement with Brightstar, and the $5 million investment Brightstar was supposed to make in InPhonic.  Id. ¶¶ 5, 11, 16.

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The complaint must therefore provide a defendant with notice of "the 'who, what, when, where, and how' with respect to the circumstances of the fraud" in order to meet this enhanced pleading standard.  Anderson v. USAA Cas. Ins. Co., 221 F.R.D. 250, 253

(D.D.C. 2004) (quoting <u>DiLeo v. Ernst & Young</u>, 901 F.2d 624, 627 (7th Cir. 1990)); <u>see</u>

<u>also</u> <u>In re U.S. Office Prods. Sec. Litig.</u>, 326 F. Supp. 2d 68, 73 (D.D.C. 2004) ("[T]he

circumstances that the claimant must plead with particularity include matters such as the

time, place, and content of the false misrepresentations, the misrepresented fact, and what

the opponent retained or the claimant lost as a consequence of the alleged fraud." (citing

<u>United States ex rel. Totten v. Bombardier Corp.</u>, 286 F.3d 542, 551-52 (D.C. Cir.

2002)); <u>see</u> <u>Shekoyan v. Sibley Int'l Corp.</u>, 217 F. Supp. 2d 59, 73 (D.D.C. 2002)

("Conclusory allegations that a defendant's actions were fraudulent or deceptive are not

sufficient to satisfy Rule 9(b)." (citation omitted)).

Additionally, complaints brought based on Section 10(b) of the Securities

Exchange Act of 1934 and Rule 10b-5, as amended by the Private Securities Litigation

Reform Act of 1995 ("PSLRA"), must meet a higher pleading standard in order to

survive a motion to dismiss than the standard that applies to a typical motion to dismiss

brought under the Federal Rules.  <u>See</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551

U.S. 308, 319-20 (2007).  Specifically, the PSLRA requires plaintiffs who allege claims

of material false statements to: (1) "specify each statement alleged to have been

misleading [and] the reason or reasons why the statement is misleading;" and (2) "state

with particularity facts giving rise to a strong inference that the defendant acted with the

required state of mind." 15 U.S.C. § 78u-4(b)(1)-(2) (2006).

In evaluating the sufficiency of a plaintiff's scienter allegations in Section 10(b)

and Rule 10b-5 actions, the Court must consider "competing inferences rationally drawn

from the facts alleged," in addition to the inferences urged by the plaintiff.  <u>Tellabs</u>, 551

U.S. at 314.  For the Court to determine that a complaint has pled facts that give rise to a

"strong inference" of the defendant's requisite state of mind, the inference of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. Further, the plaintiff's allegations must not be "scrutinized in isolation" but rather considered collectively. Id. at 323. In short, the question the Court must consider in evaluating the defendants' motion to dismiss is: accepting as true the plaintiffs' allegations as a whole, "would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" Id. at 326.

Moreover, when evaluating a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), see Defs.' Mot.; Defs.' Mem. at 12, the Court must construe the allegations and facts in the complaint in the light most favorable to the plaintiffs and must grant the plaintiffs the benefit of all inferences that can be derived from the facts alleged, Tellabs, 551 U.S. at 319; Barr v. Clinton, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (citing Kowal v. MCI Commc'n Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)). Moreover, in deciding whether to dismiss a claim under Rule 12(b)(6), the Court can only consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." E.E.O.C. v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997) (citation omitted). In addition, a complaint need not plead "detailed factual allegations," but the factual allegations included "must be enough to raise a right to relief above the speculative level" and to "nudge[] . . . claims across the line from conceivable to plausible." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545, 570 (2007). However, the Court need not accept asserted inferences or conclusory allegations that are unsupported by the facts set forth in the complaint. Kowal, 16 F.3d at 1276.

9

### III.    LEGAL ANALYSIS

In order to state a claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, a complaint must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  Stoneridge Inv. Partners, LLC v. Scientific Atlanta, Inc., 552 U.S. 148, __, 128 S. Ct. 761, 768 (2008).  As to the scienter requirement, scienter has been "sufficiently pled if the plaintiffs '(a) allege facts to show that defendants had both motive and opportunity to commit fraud or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" Burman v. Phoenix Worldwide Indus., Inc., 384 F. Supp. 2d. 316, 331 (D.D.C. 2005) (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)); see also Liberty Prop. Trust v. Republic Props. Corp., 577 F.3d 335, 342 (D.C. Cir. Aug. 14, 2009) ("Either intentional wrongdoing or 'extreme recklessness' satisfies the standard" mandated by 15 U.S.C. § 78u-4(b)(2).).  To be sure, an allegation of scienter only satisfied the enhanced pleading requirement of 15 U.S.C. § 78u-4(b)(2) in this Circuit if the conduct alleged amounts to "intentional wrongdoing or 'extreme recklessness.'" Liberty Prop. Trust, 2009 WL 2568102 at *6; see In re Fed. Nat'l Mortgage Ass'n Sec., Derivative, & "ERISA" Litig., 503 F. Supp. 2d 25, 37 (D.D.C. 2007) ("Fannie Mae I") (defining "extreme recklessness,' . . . [as] 'extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" (quoting SEC v. Steadman, 967 F.2d 636, 641-42 (D.C. Cir. 1992)).  Given that there has

been no direct evidence of intentional wrongdoing alleged, the plaintiffs cannot "rest on a

bare inference that [the] defendant[s] 'must have had knowledge of the facts'" to satisfy

the extreme-recklessness standard.  <u>Burman</u>, 384 F. Supp. 2d at 332 (quoting <u>In re</u>

<u>Advanta Corp. Sec. Litig.</u>, 180 F.3d 525, 539 (3d Cir. 1999)).  Rather, the plaintiffs must

allege an "'extreme departure from the standards of ordinary care, . . . which presents a

danger of misleading buyers or sellers that is either known to the defendant or is so

obvious that the actor must have been aware of it.'"[5]  <u>Steadman</u>, 967 F.2d at 641-42

(quoting <u>Sundstrand Corp. v. Sun Chem. Corp.</u>, 553 F.2d 1033, 1045 (7th Cir. 1977)

(finding that the defendants' failure to record their company's shares as required by state

law because of improper legal advice provided by their attorney was not evidence of

extreme recklessness, even though the defendants had extensive experience in the

securities industry)).

  The defendants contend that the plaintiffs' amended complaint fails to state a

claim upon which relief can be granted based on the plaintiffs' failure to adequately plead

scienter in their Section 10(b) and Rule 10b-5 claim.[6]  Defs.' Mem. at 11-31.  Namely,

---

[5]  The plaintiffs argue that the appropriate standard is mere "recklessness" and cites to this and
another member of this Court's decisions in <u>Burman</u> and <u>In re The Baan Company Securities Litigation</u>,
("<u>Baan</u>"), 103 F. Supp. 2d 1, 20-23 (D.D.C. 2000), for support.  Pls.' Opp'n at 15, n.4.  However, in
explaining the "recklessness" standard, both of these cases cited the identical language used by this Circuit
in applying the "extreme recklessness" standard and thus this Court finds the distinction immaterial.
<u>Compare</u> <u>Burman</u>, 384 F. Supp. 2d at 332, <u>and</u> <u>Baan</u>, 103 F. Supp. 2d. at 20, <u>with</u> <u>Steadman</u>, 967 F.2d at
642-43 (quoting <u>Sundstrand</u>, 553 F.2d at 1045), <u>and</u> <u>Dolphin & Bradbury, Inc. v. SEC</u>, 512 F.3d 634, 639
(D.C. Cir. 2008) (holding that "'extreme recklessness' can satisfy [the] scienter requirement" of Section
10b-5 claims and quoting same language from <u>Steadman</u> and <u>Sundstrand</u>).

[6]  To the extent that the defendants' motion can be read as raising an overall challenge to the
adequacy of the specificity of the complaint as a whole, <u>see</u> Defs.' Mem. at 11-13, that challenge can be
easily resolved.  A complaint alleging securities fraud complies with Rule 9(b) by setting forth:

> (1) precisely what statements were made in what documents or oral
> representations or what omissions were made and (2) the time and
> place of each such statement and the person responsible for making . . .
> (3) the content of such statements and the manner in which they misled

(continued . . . )

the defendants challenge the plaintiffs' alleged failure: (1) to plead facts that support a

strong inference that the defendants acted with scienter regarding InPhonic's 2006

financial misstatements, id. at 13-14; (2) to demonstrate loss causation, falsity, and

scienter with regard to the June 2007 Restatement, id. at 25-26; (3) to plead scienter and

falsity regarding defendant Steinberg's September 5, 2007 press release announcing the

signing of a definitive agreement between InPhonic and Brightstar, id. at 28-29; (4) to

plead scienter and falsity regarding defendant Steinberg's August 9, 2007 press release

pertaining to Brightstar's $5 million investment in InPhonic, id. at 27-28; and (5) to plead

a requisite 10(b) and Rule 10b-5 violation that would support a controlling person

liability claim under Section 20(a), id. at 30-31.  The defendants also contend that the

plaintiffs have failed to properly limit their class to investors who purchased InPhonic

stock prior to April 3, 2007, when InPhonic disclosed its accounting irregularities.  Id. at

20-21, 30.

---

( . . . continued)
> the plaintiff, and (4) what the defendants obtained as a consequence of
> the fraud.

Burman, 384 F. Supp. 2d at 328 (quoting Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1371 (11th Cir. 1997) (citations omitted); see also Institutional Investors Group v. Avaya, Inc., 564 F.3d 242, 253 (3d Cir. 2009) (finding that Rule 9b's particularity requirement "is comparable to and effectively subsumed by the requirements of [15 U.S.C. §78u-4(b)(1) of] the PSLRA." (quoting Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp., 523 F.3d 75, 85 n.5 (1st Cir. 2008)).  By specifically identifying InPhonic's four quarterly Form 10-Q forms, which list the company's 2006 revenues, the June 2007 Restatement, and the press releases of August 9 and September 5, 2007, the plaintiffs have adequately identified the statements that were allegedly misleading, when they were made, and that it was the defendants who made them.  Compl. ¶¶ 52-64, 71-84, 96-113, 131-38, 144.  With the support of the defendants' own admissions in the June 2007 Restatement, as well as InPhonic's 2006 SEC filings, the plaintiffs have also explained why these statements were allegedly materially false and misleading, how they invoked the plaintiffs' reliance, and the financial gains the defendants are alleged to have acquired.  Id. ¶¶ 65-70, 85-95, 114-30, 141-44.  Therefore, the plaintiffs' amended complaint alleges sufficient details to meet the "who, what, when, where and how" requirements of Rule 9(b).  See, e.g., Republic Prop. Trust, 540 F. Supp. 2d at 154, Anderson, 221 F.R.D. at 253, U.S. Office, 326 F. Supp. 2d at 73.

The plaintiffs argue in response that their amended complaint properly states a claim under Section 10(b) and Rule 10b-5 by: (1) specifying each of the defendants' false statements, including when they were made and why they were false; (2) alleging facts, such as InPhonic's accounting violations, the June 2007 Restatement of the company's financial reports, and the defendants' insider trading and Sarbanes-Oxley certifications, that create a strong inference of scienter regarding InPhonic's 2006 financial misstatements; (3) alleging that the defendants' April 3 announcement was only a partial disclosure of InPhonic's 2006 financial misrepresentations and therefore purchasers of InPhonic stock after that date are properly included within the Class Period; (4) sufficiently alleging causation, falsity, and scienter regarding the June 2007 Restatement through InPhonic's August 10, 2007 final disclosure of the 2006 financial misstatements and the resulting market decline of the company's stock; (5) sufficiently alleging scienter and falsity of the "definitive agreement" announcement between Brightstar and InPhonic through InPhonic's press release on October 11, 2007; and (6) sufficiently alleging falsity and scienter regarding the Brightstar investment announcement through InPhonic's August 9, 2007 press release, which stated that Brightstar had already made the $5 million investment when in fact it did not.  Pls.' Opp'n at 4-5.  The plaintiffs also allege that since they have sufficiently stated a claim for a Section 10(b) violation, their Section 20(a) claim is also adequately alleged.  Id. at 33.

For the reasons set forth below, the Court finds that the plaintiffs have adequately pled a Section 10(b) and Rule 10b-5 violation as to defendant Steinberg with regard to his alleged misstatement on August 9, 2007, regarding Brightstar's anticipated $5 million investment, and therefore the defendants' motion to dismiss the plaintiffs' complaint

based on that theory of liability must be denied.  However, because the plaintiffs have

failed to otherwise sufficiently state a claim for a relief as to all remaining aspects of the

claim, the defendants' motion must be granted in all other respects.

> **A.    The Plaintiffs' Claims Regarding the Defendants' Alleged 2006
> Financial Misstatements Do Not Allege a Strong Inference of Scienter
> as Required by the PSLRA.**

The defendants argue that the plaintiffs' failure to adequately plead a strong

inference of scienter warrants the dismissal of the component of their Section 10(b) and

Rule 10b-5 claim related to the 2006 financial misstatements.  Defs.' Mot. at 13-20.

Specifically, the defendants contend that the plaintiffs' allegations are merely conclusory

because they fail to "identify <u>any</u> internal corporate documents or witnesses or any

corporate admission showing that the accounting errors 'related to the misapplication of

[their] accounting policies and determination of certain estimates' were the result of

fraud, rather than innocent mistakes."  <u>Id.</u> at 13.  This deficiency, the defendants argue,

"tips the scales against a strong inference of scienter."  <u>Id.</u>  The plaintiffs respond that

both circumstantial evidence of the defendants' state of mind and their motive and

opportunity to commit fraud "support the conclusion that [the] [d]efendants' issuance of

fraudulent financial statements was made with the requested scienter."  Pls.' Opp'n at 15-

16.  For the following reasons, the Court finds that the defendants have the stronger

position.

> **1.    Evidence of Reckless or Conscious Behavior**

The plaintiffs allege that InPhonic's 2006 SEC quarterly statements were

misleading because they grossly overstated the company's revenues and understated its

expenses.  Am. Compl. ¶ 4.  While the defendants' June 2007 Restatement evidences that

these earlier statements were ultimately found to be false, the amended complaint makes

no reference to any documents that would support a strong inference that the defendants'

had any knowledge as to the inadequacy of InPhonic's internal controls or the flaws in its

revenue calculations that led to the inflation of the price of the company's stock.  See

U.S. Office Prods., 326 F. Supp. 2d at 80 (finding the fraud allegation based on the

defendant's restatement of earlier financial information too conclusory to survive a

dismissal motion because it demonstrated nothing about the defendant's scienter).

Instead, the plaintiffs rely on the specific type of InPhonic's accounting errors, the

defendants' Sarbanes-Oxley certifications, and the fact that the individual defendants'

executive positions within InPhonic "made them privy to confidential proprietary

information concerning [the company]," Am. Compl. ¶¶ 210-13, which as demonstrated

below are insufficient to support the scienter element of a Section 10(b) and Rule 10b-5

claim.

        i.        <u>InPhonic's Improper and Premature Recording of Revenue</u>

      The plaintiffs contend that the magnitude of InPhonic's specific accounting

violations, namely the improper and premature recording of revenue, suggests that the

defendants made a "conscious choice" to recognize revenue improperly and that this

alone gives rise to an inference of scienter.  Pls.' Opp'n at 18.  This position is not only

contrary to established case law, but also goes against the very mandates of the PSLRA.[7]

See Fidel v. Farley, 392 F.3d 220, 231 (6th Cir. 2004) ("Allowing an inference of scienter

based on the magnitude of fraud 'would eviscerate the principle that accounting errors

_____

[7]      The plaintiffs seek support solely from the <u>Baan</u> decision where one member of this Court found that the accounting violations concerning improper revenue recognition similar to that alleged by the plaintiffs here was probative of scienter.  103 F. Supp. 2d at 21.  However, this Court finds the reasoning of the Second, Fourth, and Sixth Circuit Courts more persuasive based on the circumstances of this case.

alone cannot justify a finding of scienter.'"); see also Ottoman v. Hanger Orthopedic Group, Inc., 353 F.3d 338, 351 (4th Cir. 2003) (finding that the plaintiff's failure to allege facts showing how defendants should have been on notice of their revenue recognition errors prohibited any inference of scienter); Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) (holding that only where allegations of accepted accounting violations are coupled with evidence of "corresponding fraudulent intent" will they be sufficient to show scienter) (quoting Chill v. Gen. Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996)).

The purpose of the PSLRA's heightened pleading requirements is to impose special burdens on plaintiffs in order to deter "nuisance filings, [the] targeting of deep-pocket defendants, [and] vexatious discovery requests." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 81 (2006).  To adopt the plaintiffs' argument would "invite[] a court to speculate as to the existence of specific (but unpled and unidentified) warning signs that show the [defendant] acted with scienter," and relieve the plaintiffs of their burden simply through the occurrence of improper revenue recognition.  Farley, 392 F.3d at 231 (quoting Reiger v. Price Waterhouse Coopers LLP, 117 F. Supp. 2d 1003, 1013 (S.D. Cal. 2000)), overruled on other grounds, Tellabs, 551 U.S. 308.  Thus, if the plaintiffs' position was correct, every time a publicly traded company made this specific type of accounting error, the company would be at risk of being hauled into court to atone for its actions, even if no facts are alleged to suggest it was caused by anything other than innocent mistakes.  This surely does not comport with the PSLRA's heightened pleading requirement, and the Court must decline to adopt such a position.  Accordingly, the Court finds that the occurrence of improper revenue recognition by InPhonic in fiscal year 2006, without more, is not enough to assert a strong inference of scienter.

ii.    The Defendants' Sarbanes-Oxley Certifications

The Court must apply this same reasoning to the plaintiffs' allegation that that
there is a strong inference of scienter under circumstances where the defendants'
Sarbanes-Oxley certifications verifying InPhonic's financial accounting practices and
internal controls were later found to be false.  See Am. Comp. ¶ 13.  Specifically, the
plaintiffs allege that since the defendants later admitted in its June 2007 Restatement that
InPhonic's internal controls were inadequate, the defendants' 2006 Sarbanes-Oxley
certifications that had previously validated the adequacy of these controls are enough to
support a strong inference of scienter.  Pls.' Opp'n at 18-19.  The plaintiffs rely chiefly on
In re ProQuest Sec. Litig., 527 F. Supp. 2d 728 (E.D. Mich. 2007), where the district
court found that the defendant's false Sarbanes-Oxley certifications regarding the quality
of the company's internal controls provided evidence that the defendant knew that the
controls were inadequate.  Pls.' Opp'n at 18.

This Court is not persuaded that ProQuest supports the plaintiffs' position because
accepting it would be buying in on the proposition that scienter is adequately pled when it
is alleged that an accounting error or mistake made by a publicly traded company was
later uncovered.  Presumably, the plaintiffs are relying on ProQuest for the proposition
that the filing of the incorrect Sarbanes-Oxley certification is alone sufficient to satisfy
their scienter pleading requirement.  The Court expresses ambivalence concerning the
plaintiffs' position because on the one hand they cite ProQuest after stating that "[p]oor
internal controls have been found to be highly indicative of scienter," id. (quoting
ProQuest, 527 F. Supp. 2d at 745), which apparently is not arguing that asserting the
filing of the faulty certification is alone sufficient.  However, on the other hand, the

17

plaintiffs seemingly argue that asserting the filing of the certification is alone sufficient, in that they recite the ProQuest court's finding that the filing was "[t]he most significant evidence of scienter," and then immediately state that "[t]his is consistent with the concept that scienter is sufficiently alleged when a complaint alleges that [the] [d]efendants 'failed to check information they had a duty to monitor,'" id. at 18-19 (quoting In re Interbank Funding Corp. Sec. Litig., 329 F. Supp. 2d 84, 92 (D.D.C. 2004). If the Court's assumption is correct, this later position must be rejected because the ProQuest court found that scienter had been adequately pled by "taking all of the allegations together, [including the assertion regarding the filing of the faulty certifications,] not singularly or in isolation as [the] defendants urge[d], [and from that perspective concluding that] there [was] a compelling inference of fraud." ProQuest, 527 F. Supp. 2d at 745 (emphasis in original).  Moreover, the Interbank Funding court, which is also cited by the plaintiffs, took the same position in language that follows the quotation reiterated by the plaintiffs in their opposition.  See 329 F. Supp. 2d at 91-92 ("It is true that a strong inference of scienter may be established 'where the complaint sufficiently alleges that the defendants . . . failed to check information they had a duty to monitor.'" (citing Novak, 216 F.3d at 311)), vacated on other grounds, Belizan v. Hershon, 434 F.3d 579  (D.C. Cir. 2006).  However, as the Court appreciated in ProQuest, the court in Interbank Funding went on to note that "[i]t is well established . . . that a pleading of scienter may not rest on a bare inference that a defendant 'must have had knowledge of the facts.'"  Id. (citations omitted).  Thus, not only does ProQuest not support the position that the filing of a misleading Sarbanes-Oxley certification is alone sufficient to adequately plead scienter, but adopting such a position would effectively

"eviscerate" the heightened pleading requirement evolved by the PSLRA.  Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006) (refusing to interpret the Sarbanes-Oxley Act to mean that certification inaccuracies were enough to establish scienter because it directly conflicted with the plain language of the PSLRA, and nothing in the Sarbanes-Oxley Act evidenced any congressional intent for a different result).

    As with the accounting violations, without any factual allegations that the defendants had reason to know that the financial statements they certified were false or misleading when released, the fact that the Sarbanes-Oxley certifications regarding the adequacy of InPhonic's internal controls turned out to be false, is not alone enough to support a strong inference of scienter.  See Ley v. Visteon Corp., 543 F.3d 801, 812 (6th Cir. 2008) (ruling that the defendants' Sarbanes-Oxley certifications did not raise an inference of scienter when the plaintiffs failed to allege facts suggesting that the defendants "had reason to know or should have suspected accounting irregularities or other 'red flags' at the time they signed the certifications") (citing Garfield 466 F.3d at 1266); Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc., 497 F.3d 546, 555 (5th Cir. 2007).

            iii.    The Defendants' Corporate Officer Positions

    The plaintiffs' allegation that the defendants' executive positions with the company is alone sufficient to infer scienter is also incorrect.  See Am. Compl. ¶¶ 28, 210.  Another member of this Court, as well as several Circuits have found that alleging that a defendant, as a corporate officer in a company, "should have known" of misleading or fraudulently-made statements based on that person's position with the company is not

enough, by itself, to infer scienter.[8]  Fannie Mae I, 503 F. Supp. 2d at 40 (finding that

"allegations that a securities fraud defendant 'should have known' of deficient internal

controls [based on his position and employment responsibilities] are insufficient, alone,

to demonstrate a strong inference of scienter"); see also In re Ceridian Corp. Sec. Litig.,

542 F.3d 240, 247 (8th Cir. 2008) (finding that strong inference of scienter could not be

adequately pled based on the defendants' executive and financial job titles alone, but

rather the plaintiff must allege specific details regarding the defendants' actual executive

decisions that lead to the fraud); Rosenbloom v. Adams, Scott & Conway, Inc., 552 F.2d

1336, 1339 (9th Cir. 1977) ("A director, officer, or even the president of a corporation

often has superior knowledge and information, but neither the knowledge nor the

information necessarily attaches to those positions."); cf. Southland Sec. Corp. v. INSpire

Ins. Solutions, Inc., 365 F.3d 353, 365, 380 (5th Cir. 2004) (finding that "corporate

officers may not be held responsible for unattributed corporate statements solely on the

basis of their titles, even if their general level of day-to-day involvement in the

corporation's affairs is pleaded," but scienter could be inferred where additional "facts

and circumstances alleged" also supported an inference of scienter).  Thus, the plaintiffs'

generalized assertion that the defendants' corporate positions exposed them to

"confidential" information about InPhonic is insufficient to warrant an inference of

scienter in the absence of details regarding what this information entailed, when the

---

[8]      The plaintiffs also argue the applicability of the "core business operations" doctrine, which
provides that the Court can infer the defendants' scienter in the absence of particularized allegations when
the fraud involves facts so "critical to a business's core operations or an important transaction" that their
knowledge may be attributed to the company and its key officers.  Pls.' Opp'n at 23-25.  The plaintiffs
contend that because InPhonic's improper accounting practices were used in calculating 96% of the
company's revenue, "'it would be absurd to suggest' that [the defendants] were unaware of the truth."  Id. at
24-25.  However, this "exceedingly rare[ly]" used doctrine has not been recognized by this Circuit and the
Court declines to recognize it here.  South Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 785 (9th Cir. 2008).

defendants received it, or how it related to the alleged fraud.  Am. Compl. ¶ 210; see

Ceridian Corp., 542 F.3d at 247; Advanta Corp., 180 F.3d at 539.

### 2.   Motive and Opportunity

Alternatively, the plaintiffs allege that the defendants' motive and opportunity to

commit fraud, as well as their alleged insider trading during the class period,

demonstrates a strong inference of scienter.  Pls.' Opp'n at 20.  Specifically, the plaintiffs

contend that because the defendants Steinberg and Winkler received the bulk of their

compensation based on InPhonic's financial performance, they had motive to create a

"false impression of profitability" and artificially inflate the company's stock price.  Am.

Compl. ¶¶ 216, 221. The plaintiffs further allege that the defendants' stock sale on

November 7, 2006, was "suspiciously timed and calculated to maximize personal benefit

from undisclosed inside information during the [c]lass [p]eriod," because both the

defendants were aware of or were reckless in not knowing of InPhonic's improper

accounting methodologies and the resulting inflation of the company's stock price.[9]  Id.

¶¶ 225, 238.

The defendants do not dispute the facts alleged in the amended complaint that

their November 7 stock sale generated a greater return than any of their previous sales.

Defs.' Mot. at 14-20.  Instead, they contend that the selling of these shares was part of an

agreement to secure a line of credit from Goldman Sachs for the benefit of InPhonic and

its shareholders.  Id. at 15.  While the defendants did reap a significant benefit from the

---

[9]     The plaintiffs maintain that that the sales are "suspicious" because of their timing, amount, and
scope.  Pls.' Opp'n at 21-22.  Specifically, they note defendant Steinberg's sale of 450,000 shares was three
times larger than any of his previous sales and garnered for him a profit of 4.7 million dollars, Am. Compl.
¶¶ 224, 227, while defendant Winkler's sale of 100,000 shares was four times larger than any of his
previous sales and constituted 28% of his total stock holdings, id. ¶¶ 240-41.

agreement with Goldman Sachs, Am. Compl. ¶ 226, the sale of the stocks occurred after

a public disclosure at a price 27% below the class-period high, Defs.' Mem., Becker

Decl., Exs. H (Historical Prices of InPhonic Stock During Putative Class Period) & Y

(Nov. 9, 2006 Form 8-K).  Moreover, the defendants also note that the amount of stocks

sold, less than 10% of defendant Steinberg's total stock holdings and 28% of defendant

Winkler's, is not large enough to raise an inference of scienter.  Defs.' Mot. at 15.

It is well established that "'motive-and-opportunity allegations of scienter

anchored merely in a defendant's profit motive' are simply insufficient to survive a

dismissal motion."  Burman, 384 F. Supp. 2d at 332 (quoting Interbank Funding, 329 F.

Supp. 2d at 90) (ruling that the plaintiffs' allegation that the defendant was motivated to

mislead the plaintiffs out of a desire to maximize personal profit was not enough to

sufficiently plead scienter).  See, e.g., U.S. Office Prods., 326 F. Supp. 2d at 76 n.1

(rejecting the plaintiffs' contention that the defendants' motive to earn profit from their

investment was enough to plead scienter based on motive and opportunity); Baan, 103 F.

Supp. 2d at 20 (finding that the plaintiffs' allegation that the defendant was motivated to

inflate stock prices so that company would maintain its competitive position in market

failed to adequately plead scienter because such "allegations of motive would apply to

virtually all . . . executives and companies"); see also Kalnit v. Elchler, 264 F.3d 131, 140

(2d Cir. 2001) ("[A]n allegation that defendants were motivated by a desire to maintain or

increase executive compensation is insufficient [to support scienter] because such a

desire can be imputed to all corporate officers.") (citing Acito v. IMCERA Group, Inc.,

47 F.3d 47, 54 (2d Cir. 1995)).

Furthermore, allegations of insider trading can be strongly indicative of scienter only if the timing and amount of the sales are suspicious.  Baan, 103 F. Supp. 2d at 19. Courts look to whether these sales were calculated to maximize profit or were inconsistent with prior trading practices in making this assessment.  Id., accord Cent. Laborers' Pension Fund, 497 F.3d at 553 (finding that the defendant's retention of the vast majority of his shares was an important factor in negating a strong inference of scienter); Teachers' Ret. Sys. v. Hunter, 477 F.3d 162, 184 (4th Cir. 2007) (holding that the defendants' insider trading did not give rise to the requisite inference of scienter because the complaint did not allege that the sales were timed to profit from any particular disclosures, nor did the sales occur at prices particularly high for the class period).  However, in evaluating whether the corporate officers' trading is suspicious enough to raise a strong inference of scienter, the Court "must [also] consider plausible nonculpable explanations" for the trading engaged in by the defendants, as well as the explanations the plaintiffs seek to have the Court to infer.  Tellabs, 551 U.S. at 324.  A strong showing of scienter has not been pled where a reasonable person would find the nonfraudulent inference equally or more inferable than the plaintiffs' allegations of fraud. Id.

Applying these principles to the facts at hand, the plaintiffs' allegations regarding the defendants' profit motive and sale of stocks during the class period are not enough to cause a reasonable person to find them as compelling as defendants' nonfraudulent explanations and thus do not support a strong inference of scienter.  See id. at 325.  First, the fact that the defendants received bonuses based on InPhonic's profitability is simply not enough to infer scienter since this practice is typical in the corporate world and would

thus create an inference of scienter against any corporate officer whose company's profits were later found to be inaccurate.  See, e.g., Kalnit, 264 F.3d at 140; Burman, 384 F. Supp. 2d at 332; Baan, 103 F. Supp. 2d at 20.  Second, as in Teachers' Retirement System, where the court found no "strong inference" of scienter because the defendants' stock sales occurred at prices significantly lower than the class-period high and were not alleged to have been timed with any particular disclosure, 477 F.3d at 184, the defendants' stock sales here were made after a public disclosure at a price 27% below the class period high, see Defs.' Mem., Becker Decl., Ex. Y (Nov. 7, 2006 Form 8-K); see also id. at 15.  This Court fails to see how the defendants were taking advantage of "insider information" through their sales when the news of the Goldman Sachs agreement had already been disclosed publically at the time of the sales and thus, in theory, any InPhonic stock holder could have chosen to take advantage of the company's elevated stock price as well by selling some of all of their own shares.[10]  Moreover, like the situation in Central Laborers' Pension Fund, where the defendant's continued possession of a vast majority of his shares was enough to defeat a strong inference of scienter, here, the defendants retained the bulk of their shares after the November 2006 sale, which were ultimately rendered worthless when InPhonic declared bankruptcy on November 8, 2007. 497 F.3d at 553.  Viewing the defendants' stock sales through the lens of the standard established by the Supreme Court in Tellabs, the Court finds that a reasonable person could not conclude that the plaintiffs' position that the sales were "calculated to

---

[10]     The plaintiffs also make allegations of collective insider trading and contend that these company insiders, including InPhonic employees John Sculley and Jay Hoag, sold 2.6 million shares and realized profits of nearly $28 million during the Class Period. Am. Compl. ¶¶ 243-46.  The Court finds that these allegations fail to support a strong inference of scienter by InPhonic's employees for the same reasons the plaintiffs' allegations of insider trading by defendants Steinberg and Winkler fail to support a strong inference of scienter against them.  See Teachers' Ret. Sys., 477 F.3d at 184; Tellabs, 551 U.S. at 324.

maximize personal benefit," Am. Compl. ¶ 225, is equal to or more compelling than the defendants' nonfraudulent explanations for why the sales were made.  Thus, the plaintiffs have failed to adequately allege that the circumstances surrounding the defendants' November 2006 stock sales raise a strong inference of scienter.

In sum, the plaintiffs' allegations regarding the accounting violations, the filing of the Sarbanes-Oxley certifications, the defendants' executive positions with the company, and their purported motives and opportunity, standing alone, are not sufficient to raise a strong inference of scienter.  Moreover, even when taken together, these allegations, at most, only marginally support an inference of scienter and certainly not one as compelling or more so than the opposing inferences of nonfraudulent intent "one could draw from the facts alleged."[11]  Tellabs, 551 U.S. at 324.  The Court must therefore dismiss those components of the plaintiffs' two claims based on the 2006 financial misstatements due to their failure to plead a strong inference of scienter.[12]

---

[11]    While other courts have also found a combination of these factors insufficient to raise a strong inference of scienter, see, e.g., Ley, 543 F.3d at 814 (finding that accounting violations, the defendants' motive and opportunity, and inaccurate Sarbanes-Oxley certifications did not raise a strong inference of scienter when viewed collectively), this Court acknowledges that such a determination must be made on a case-by-case basis, see Institutional Investors Group, 564 F. 3d at 269 ("[A]s with all totality-of-the circumstances tests, our analysis will be case specific. It will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the [c]omplaint, it is at least as likely as not that defendants acted with scienter.").

[12]    Given that the components of the plaintiffs' claims regarding the defendants' 2006 financial misstatements must be dismissed for failure to allege the requisite scienter, this Court need not reach the issue of whether reasonable reliance has been sufficiently alleged regarding class members who purchased InPhonic stock after InPhonic's April 3, 2007 press release.  See Defs.' Mot. at 20.

### B.     The Amended Complaint Does Not Adequately Plead Scienter or Falsity with Respect to the Amended Restatement Allegations.[13]

The defendants also argue for dismissal of those components of the plaintiffs'

claims related to the June 2007 Restatement based on the plaintiffs' failures to show how

the August 10, 2007 amendments rendered the June 2007 Restatement false and

misleading, or allege facts from which a strong inference of scienter can be inferred

regarding defendant Steinberg from these two documents.  Defs.' Mot. at 22.[14]  The

plaintiffs argue, however, that the August 10 amendments contained additional material

information which demonstrate that InPhonic's accounting irregularities were far worse

---

[13]     The components of the plaintiffs' claims relating to the June 2007 Restatement only has the possibility of being maintained by members of the class who purchased InPhonic stock between June 1 and August 10, 2007, given that the alleged false statement was made on June 1, 2007, and it was allegedly corrected on August 10, 2007.  Defs.' Mot. at 22; see Winer Family Trust v. Queen, 503 F.3d 319, 325 (3d Cir. 2007) (holding that investors only had standing to assert 10b-5 claims based on activity that occurred prior to the date of their stock purchases).

[14]     The defendants argue that all allegations against defendant Winkler for events occurring after May 31, 2007, must be dismissed because he resigned from InPhonic on that date and was thus not associated with the company when the August 10, 2007 amendments of the June 2007 Restatement were issued, nor when the Brightstar announcements were made.  Defs.' Mot. at 22, 26. The plaintiffs, however, claim that defendant Winkler can be held liable for the June 2007 Restatement despite his resignation because it would "be absurd to suggest that he was unaware of the issues involved in the massive Restatement issued only one day after his departure." Pls.' Opp'n at 29 n.11. The plaintiffs did not respond, however, to the defendants' argument for dismissal of the Brightstar allegations against defendant Winkler.  Id. at 31-33. This Court finds that the June 2007 Restatement and Brightstar allegations must be dismissed as to defendant Winkler because the facts giving rise to the allegations occurred after his resignation, but even more significantly, "[u]pon close inspection . . . [the] [p]laintiffs' allegations are far too general to give rise to an inference of scienter under either [the] theory" that "adequate 'motive and opportunity' allegations, or, alternatively, through sufficient averments constituting strong circumstantial evidence of conscious misbehavior or recklessness."  See In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 269 (S.D.N.Y. 2008) (holding that statements made after the defendant's resignation could not properly be attributed to that defendant in the absence of other evidence demonstrating attribution).  Here, even if defendant Winkler acquired a financial benefit in the short term from the sale of a portion of his stock, the majority of his stock, which he retained, actually lost value, and against this backdrop the plaintiffs' allegations concerning Winkler do not give rise to the requisite scienter given these overall circumstances. Id. at 270 ("The desire to improve a company's year-end financial numbers is essentially identical to the 'motive to maintain the appearance of corporate profitability,' which does not give rise to inference of scienter.").  Thus, the "circumstantial allegations [are not] correspondingly greater" so as to raise a strong inference that defendant Winkler had either actual knowledge of the misrepresentations or showed extreme recklessness in not knowing about the situation. Id.; see also Liberty Prop. Trust, 577 F.3d at 341.

than what the defendants originally disclosed in the June 2007 Restatement.  Am. Compl.

¶ 172.

   The Court finds it unnecessary to venture into the issues of loss causation or

falsity as set forth by the Supreme Court in Stoneridge Investment Partners, 552 U.S. at

__, 128 S. Ct. at 768, because, as with the 2006 financial misstatements components of

the plaintiffs' claims, they again have alleged no facts from which a strong inference of

scienter may be inferred with respect to their June 2007 Restatement claims.  The

plaintiffs offer only a vague allegation that defendant Steinberg knew that the June 2007

Restatement was misleading due to his "access to material non-public information,"

making him privy to it as an executive officer in the company.  Am. Compl. ¶ 28.  Such

generalized assertions have consistently been held insufficient to satisfy the scienter

requirement imposed by PSLRA and this Court can rule no differently.  See, e.g.,

Ceridian Corp., 542 F.3d at 247; In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 142 (3d

Cir. 2004) (finding the allegation that the defendants were "privy to confidential

proprietary information concerning the [c]ompany" does not alone give rise to strong

inference of scienter under the PSLRA); Advanta Corp., 180 F.3d at 539 (ruling that

"[g]eneralized imputations of [the defendants'] knowledge" do not satisfy scienter

requirement for securities fraud claims).  Without alleging specific facts lending support

to their allegation that defendant Steinberg was in possession of the August 10

information at the time the June 2007 Restatement was issued, this Court cannot find that

the inference of scienter from the plaintiffs' perspective is "at least as compelling as any

opposing inference of nonfraudulent intent."  Tellabs, 551 U.S. at 314.  In fact, given that

the brunt of the adverse information regarding InPhonic's 2006 financial misstatements

was already disclosed in the June 2007 Restatement, it is more probable that the

additional details offered by defendant Steinberg in the August 10 amendment were the

result of further accounting recalculations rather than a knowing admission of

wrongdoing.  Thus, the plaintiffs' claims as to the June 2007 Restatement must be

dismissed for failure to sufficiently plead the requisite strong showing of scienter.

   C.   **The Amended Complaint Does Not Adequately Plead Falsity Nor a Strong Inference of Scienter Regarding InPhonic's September 5, 2007 Announcement of Entering into a Definitive Agreement with Brightstar.**

   The defendants next argue that the plaintiffs have failed to allege that the

September 5, 2007 press release announcing the signing of a definitive agreement

between InPhonic and Brightstar was a misstatement or that it was issued with the level

of scienter necessary to support this component of the claims asserted by the plaintiff.

Defs.' Mot. at 29-30.  The plaintiffs, however, contend that the announcement was false

and misleading because defendant Steinberg admitted in InPhonic's Form 8-K filing of

October 12, 2007, that the company defaulted on their credit agreement with Goldman

Sachs due to a "'failure to enter into a definitive agreement . . . .'" Am. Compl. ¶ 174.

This Court finds the defendants' argument persuasive.

   InPhonic's October 12 filing stated, in relevant part:

>    On October 5, 2007, the [c]ompany received . . . a notice of
>    default and reservation of rights from its secured lenders
>    under [the] Credit Agreement, dated November 7, 2006, as
>    amended (the 'Credit Agreement').  The events of default
>    include (i) failure to pay interest on the loans on October 1,
>    2007; (ii) failure to conclude the Inventory Transaction (as
>    defined in the Credit Agreement); and (iii) <u>failure to enter
>    into a definitive agreement to provide for the outsourcing
>    of the [c]ompany's inventory management, logistics and
>    fulfillment obligations by October 5, 2007</u>.

Defs.' Mem., Becker Decl., Ex. E (Oct. 12, 2007 Form 8-K) (emphasis added).  The filing

went on to state that an agreement had been established between InPhonic and Brightstar

on September 3, 2007, but that the agreement had been terminated on October 5, 2007.

Id.

        By comparison, Burman, a case where the requisite scienter was alleged, this

Court denied the defendants' motion to dismiss the plaintiffs' Section 10(b) and Rule

10b-5 claim in light of allegations that the defendants issued public statements regarding

company projects when they knew facts or had access to information suggesting that

these statements were inaccurate.  384 F. Supp. 2d at 333.  Specifically, the plaintiffs

identified a published statement made by the defendants that informed investors that the

defendant company had actually executed contracts with the Immigration and

Naturalization Service and the Egyptian government.  Id.  The plaintiffs then pointed to

specific corporate documents, including "an investor update letter," which showed that

these contracts were still in the negotiation stage at the time of the defendants' earlier

statements.  Id.  This Court found that these alleged facts were enough to support the

plaintiffs' contention that the defendants, at a minimum, acted recklessly regarding their

misrepresentation and thus a strong inference of scienter had sufficiently been pled.  Id. at

333-34.

        Here, in contrast to the allegations pled in Burman, where the plaintiff clearly

outlined two contradictory statements made by the defendants, id., here, the plaintiffs

have only identified statements which declared that an agreement between InPhonic and

Brightstar had been signed and that this agreement had subsequently been terminated.

The revelation that the agreement was later terminated does not establish that there was

never any agreement at all, much less that the defendants knowingly or with extreme

recklessness misrepresented the existence of an agreement when in fact none existed.

See Am. Compl. ¶ 174.  The plaintiffs allege no facts refuting the defendants'

nonfraudulent explanation that the agreement with Brightstar had been signed at the time

of the September 5, 2007 joint-press release but that it had been terminated later on

October 5, 2007.  Defs.' Mot. at 29.  Without more, the plaintiffs' allegations amount to

nothing more than conclusory speculation and therefore fail to satisfy the scienter

pleading requirement of that component of their two claims.

> **D.    The Amended Complaint Adequately Alleges Falsity and a Strong Inference of Scienter Regarding Defendant Steinberg's August 9, 2007 Announcement of Brightstar's Investment of $5 Million.**

While the plaintiffs' other attempts to plead the defendants' potential liability

under the PSLRA have been deemed unsuccessful, their amended complaint does

adequately assert potential liability as to those class members who purchased stock

between August 9 and September 5, 2007, based on InPhonic's press release and

defendant Steinberg's representations on August 9, 2007 regarding Brightstar's purported

$5 million investment in InPhonic.  The defendants argue that the use of the future tense

in the press release to describe the Brightstar investment undermines the plaintiffs'

allegations that the events of August 9 communicated the impression that the Brightstar

investment had already occurred.  Defs.' Mot. at 27-28; see also Defs.' Mem., Becker

Decl., Ex. S (Aug. 9, 2007 Ex. 99.1 Press Release) at 2 ("The immediate new equity

investment of $5 million from Brightstar plus the new borrowings from the Lending

Group will provide an aggregate infusion of $20 million into InPhonic." (emphasis

added)).  The defendants further contend that even if the August 9 press release created a

misunderstanding, any resulting misunderstanding was corrected by Kenneth Schwartz, InPhonic's CFO at the time, later that day during the investor telephone conference.  Id. at 28; see also id., Becker Decl., Ex. DD (Aug. 9, 2007 InPhonic, Inc. Earnings Conference Call) at 3 ("[W]e have drawn down $15 million from our existing debt financing with Citicorp and Goldman Sachs, and expect an equity investment of $5 million from Brightstar.").  The defendants posit that "the fact that a statement is not clear and is later clarified does not mean it was known or intended to be false when made." Defs.' Reply at 16.  The plaintiffs maintain on the other hand that the language used in the August 9 press release to initially describe Brightstar's investment in InPhonic mislead investors into believing that the company had already received the $5 million.  Am. Compl. ¶ 167.

InPhonic's August 9, 2007 press release announced the signing of a "letter of intent for a new strategic alliance with Brightstar," and then went on to state that "Brightstar strengthened its commitment to this new alliance further by making an investment of $5 million in InPhonic, purchasing approximately 925,000 newly issued restricted shares."  Defs.' Mem., Becker Decl., Ex. S (Aug. 9, 2007 Ex. 99.1 Press Release) (emphasis added).  InPhonic later stated in its September 5, 2007 press release that Brightstar "will make a $5 million equity investment" upon the closing of the definitive agreement between the two companies.  Defs.' Mem., Becker Decl., Ex. U (Sept. 5, 2007 Ex. 99.1 Press Release) (emphasis added).  However, when this agreement with Brightstar was terminated on October 5, Brightstar had not made the $5 million investment.  Am. Compl. ¶ 172.

Despite the defendants' contentions to the contrary, the Court finds that use of the word "strengthened" in the August 9, 2007 press release in describing the new alliance with Brightstar clearly conveyed the impression that Brightstar had already made a $5 million investment in InPhonic.  <u>See</u> Defs.' Mem., Becker Decl., Ex. S (Aug. 9, 2007 Ex. 99.1 Press Release).  Nor did defendant Steinberg clarify this erroneously conveyed impression in the subsequent conference call on that same date.[15]  <u>Id.</u>, Becker Decl., Ex. DD (Aug. 9, 2007 InPhonic, Inc. Earnings Conference Call) at 2.  To the contrary, rather than clarifying that the investment would be made in the future upon the completion of a further agreement, Steinberg repeated the information disclosed in the press release.  <u>Id.</u> ("Brightstar <u>has decided</u> to strengthen their commitment to the alliance further by making a strategic investment of $5 million into InPhonic." (emphasis added)).  Nothing about this statement indicated that the $5 million investment was yet to be made.  If anything, it supports the plaintiffs' position that a reasonable inference was conveyed that the investment had already been made, or at best from the defendants' perceptions, conveyed the impression that the agreement to make the investment had already been made, even if the funds had not yet been transferred to InPhonic, which also proved to be untrue.  Such assertions mirror those that were at issue in <u>Burman</u>, where this Court found that the defendants' claim that several contracts had been consummated when in fact there had only been negotiations on the matters, established a strong inference of scienter.  <u>Burman</u>, 384 F. Supp. 2d at 333-34.

---

[15]     Again, the Court may take note of the transcripts of the August 9, 2007 telephone conference in resolving the defendants' motion because courts "may consider the full text of the SEC filings, prospectus, analysts' reports and statements 'integral to the complaint' even if not attached" to the complaint.  <u>Bovee</u>, 272 F.3d at 360.  Other courts have further held that taking judicial notice of conference call transcripts is appropriate in order to "provide the full context in which the information was disclosed to the market."  <u>Patel v. Parnes</u>, 253 F.R.D. 531, 547 (C.D. Cal. 2008).

InPhonic's CFO at the time, Ken Schwarz, did later state in the August 9, 2007 conference call that InPhonic "expect[s] an equity investment of $5 million," thereby recasting the status of the investment as an event expected to occur the future.  See Defs.' Mem., Becker Decl., Ex. DD (Aug. 9, 2007 InPhonic, Inc. Earnings Conference Call) at 3.  However, this comment, taken together with Steinberg's prior statements, at best downgrades InPhonic's misrepresentation from an outright false statement to a misleading one.  A single word in a conference call, the word "expect" in this case, is not generally sufficient to cure previous fraudulent statements in formal SEC filings.  See Provenz v. Miller, 102 F.3d 1478, 1493 (9th Cir. 1996) (quoting Kaplan v. Rose, 49 F.3d 1363, 1376 (9th Cir. 1994) (holding that a disclosure only cures a previous misstatement if it contains "a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression").  In any event, whether Schwarz's statement cured Steinberg's prior misstatement should not be decided at this stage of the proceeding.  See In re Health Mgmt., Inc., 184 F.R.D. 40, 44 (E.D.N.Y. 1999) (quoting Sirota v. Solitron Devices, Inc., 673 F.2d 566, 572 (2d Cir. 1982), cert denied 459 U.S. 838, and cert denied, 459 U.S. 908 (1982) (holding that whether a disclosure was curative should not be decided on a motion to dismiss where there is a "substantial question[] of fact" regarding the scope or time limit of a class)).  Unlike the defendants' clear statements on April 3, 2007, which expressly disavowed the 2006 financial statements, the use of the word "expect" uttered during the course of a conference call is not sufficiently compelling for the Court to conclude that it cured the impression conveyed by the earlier statements at the motion to dismiss stage of this litigation.  Id.

The plaintiffs' amended complaint therefore adequately pleads scienter and falsity with respect to the components of the plaintiffs' claims, which assert that defendant Steinberg misled investors who purchased InPhonic stock between August 9 and September 5, 2007, by his statements regarding Brightstar's $5 million investment and the defendants' motion to dismiss this part of the plaintiffs' claims must be denied. However, this component of the complaint must be dismissed as to defendant Winkler since he had relinquished his position with InPhonic several months before the statements concerning Brightstar were made.

> **E.     The Amended Complaint Adequately Alleges "Controlling Person" Liability Under Section 20(a) Against Defendant Steinberg With Respect to the Alleged Misstatements Regarding the Brightstar Investment.**

Finally, the defendants also challenge the plaintiffs' "controlling person" claim (Count Two) pled under Section 20(a) of the Securities Exchange Act of 1934 on the ground that the plaintiffs have failed to allege a primary violation of Section 10(b) and Rule 10b-5 against either of the defendants. Defs.' Mot. at 31. The plaintiffs argue in response that they have sufficiently alleged their Section 10(b) and Rule 10b-5 claim against both defendants Steinberg and Winkler and therefore their Section 20(a) claim should not be dismissed. Pls.' Opp'n at 33.

Section 20(a) imposes joint and several liability upon individuals who exercise control over a violator of Section 10(b), including a corporation. 15 U.S.C. § 78t(a); Institutional Investors Group, 564 F.3d at 252 (recognizing that acts of corporation may serve as a basis for Section 20(a) liability). A properly pled Section 20(a) claim must allege that a defendant controlled another person and that the "controlled person" violated Section 10(b). Alpharma Inc., 372 F.3d at 153. Here, the plaintiffs have alleged that

defendant Steinberg, in his positions as CEO and Chairman of Board of Directors of InPhonic, was a "controlling person" within the meaning of Section 20(a) over InPhonic. Am. Compl. ¶¶ 270-71.  Because this Court finds that the plaintiffs have adequately pled a violation of Section 10(b) and Rule 10b-5 against defendant Steinberg with regards to alleged misstatements about the $5 million investment by Brightstar, the plaintiffs' Section 20(a) claim on this basis is proper.  See Institutional Investors Group, 564 F.3d at 280 (finding that because the plaintiffs had adequately pleaded a violation of Section 10(b) against defendant company's CEO, the plaintiffs' Section 20(a) claim was proper). The defendants' motion to dismiss is thus denied in regards to this component of the Section 20(a) claim against defendant Steinberg.  However, because the plaintiffs have not sufficiently pled any other components of their Section 10(b) and Rule 10b-5 claim as to either defendant, the Court must grant the defendants' motion to dismiss those other components of the plaintiffs' Section 20(a) claims.  And because the plaintiffs' Section 10(b) and Rule 10b-5 claim failed to survive the defendants' motion to dismiss in its entirely as to defendant Winkler, their Section 20(a) claim as to him must also be dismissed in its entirety.  See Alpharma Inc., 372 F.3d at 153 ("because [the] plaintiffs failed to state a Rule 10b-5 claim against the company, [i.e., the controlled person,] its Section 20(a) claim against the Individual Defendants fails as well").

## IV. CONCLUSION

In summary, the Court finds: (1) the plaintiffs' allegations concerning the defendants' accounting errors, Sarbanes-Oxley certifications, executive positions within the company, as well as their alleged motive and opportunity to commit the alleged fraud fail both to either individually or collectively raise a strong inference of scienter in

regards to InPhonic's 2006 financial misstatements; (2) the plaintiffs' failure to assert facts alleging that the defendants knew or were extremely reckless in not knowing that the June 2007 Restatement was false or misleading when issued prevents them from pleading a strong inference of scienter; (3) the plaintiffs have failed to plead facts supporting their allegation that InPhonic's announcement that the company had entered into a definitive agreement with Brightstar was false at the time it was made or that it was done knowingly or with extreme recklessness; (4) the plaintiffs have sufficiently pled falsity and scienter concerning the announcement of Brightstar's $5 million investment in InPhonic; and (5) the plaintiffs have adequately alleged a Section 20(a) claim only against defendant Steinberg regarding his announcement of a $5 million investment by Brightstar in InPhonic.  Therefore, based on these findings, the Court must deny the defendants' motion to dismiss with respect to the components of the plaintiffs' two claims relating to the alleged misstatements made on August 9, 2007, concerning the representations regarding Brightstar's $5 million investment, and grant the defendants' motion to dismiss in all other respects.[16]


_____/s/_____
Reggie B. Walton
United States District Judge

---

[16]    The Court issued an Order consistent with this Memorandum Opinion on September 30, 2009. That Order is now final upon the issuance of this Memorandum Opinion.